Ex Parte

Application for Writ of Habeas Corpus

From Harris County

TEDDRICK BATISTE
(Name of Applicant)

174th Judicial District Court

## TRIAL COURT WRIT NO. 1212366-A
## CLERK'S SUMMARY SHEET

APPLICANT'S NAME: BATISTE, TEDDRICK R.
(As reflected in judgment)

RECEIVED IN
COURT OF CRIMINAL APPEALS

JAN 29 2015

Abel Acosta, Clerk

OFFENSE: CAPITAL MURDER
(As reflected in judgment)

CAUSE NO.: 1212366
(As reflected in judgment)

PLEA: ☐ GUILTY ☒ NOT GUILTY ☐ NOLO CONTENDERE

SENTENCE: DEATH
(Terms of years reflected in final judgment)

TRIAL DATE: JUNE 23, 2011
(Date sentence was imposed)

JUDGE'S NAME: RUBEN GUERRERO
(Judge presiding at trial)

APPEAL NO.: AP-76,600
(If applicable)

HEARING HELD: ☒ YES ☐ NO
(Pertaining to the Application for Writ of Habeas Corpus)

FINDINGS & CONCLUSIONS FILED: ☒ YES ☐ NO
(Pertaining to the Application for Writ of Habeas Corpus)

RECOMMENDATION: ☐ GRANT ☒ DENY ☐ NONE ☐DISMISS
(Trial court's recommendation regarding the Writ of Habeas Corpus)

JUDGE'S NAME: Ruben Guerrero
(Judge presiding over habeas corpus proceeding)

REV. 01-02-04

# P O S T   C O N V I C T I O N

FROM:                    174TH  DISTRICT COURT

OF

HARRIS COUNTY,  TEXAS

BATISTE, TEDDRICK R.

<u>APPLICANT</u>

VS.

THE STATE OF TEXAS

<u>RESPONDENT</u>

# INDEX

**PAGE**

| | |
|---|---|
| CAPTION | 1 |
| APPLICATION FOR WRIT OF HABEAS CORPUS | 2 |
| LETTER TO APPLICANT | 557 |
| DISTRICT ATTORNEY ACKNOWLEDGMENT LETTER | 558 |
| UNOPPOSED MOTION FOR NINETY-DAY EXTENSION OF TIME TO FILE INITIAL STATE HABEAS APPLICATION | 559 |
| LETTER FROM OFFICE OF CAPITAL WRITS | 584 |
| AMENDED UNOPPOSED MOTION FOR NINETY-DAY EXTENSION OF TIME TO FILE INITIAL STATE HABEAS APPLICATION | 587 |
| 11.071 WRIT OF HABEAS CORPUS OATH OF INDIGRNCE/FINDINGS OF FACT/ ORDER APPOINTING COUNSEL/ STATEMENT OF FACTS | 625 |
| RESPONDENT'S MOTION FOR EXTENSION OF TIME | 627 |
| LETTER TO APPLICANT | 632 |
| RESPONDENT'S ORIGINAL ANSWER | 633 |
| LETTER TO APPLICANT | 791 |
| STATE'S MOTION DESIGNATING ISSUE AND FOR TRIAL COUNSEL TO FILE AN AFFIDAVIT/ STATE'S PROPOSED ORDER DESIGNATING ISSUE AND FOR TRIAL COUNSEL TO FILE AN AFFIDAVIT | 792 |
| LETTER TO APPLICANT | 809 |
| AFFIDAVIT OF GARALD E. BOURQUE | 810 |
| LETTER TO APPLICANT | 814 |
| AFFIDAVIT | 815 |
| LETTER TO APPLICANT | 822 |

 REV: 01-02-04

# INDEX

| | PAGE |
|---|---|
| APPLICANT'S RESPONSE TO TRIAL COUNSEL AFFIDACITS | 823 |
| APPLICANT'S MOTION TO RECONSIDER ORDER DENYING REQUEST FOR AN EVIDENTIARY HEARING | 833 |
| APPLICANT'S PROPOSED FINDINGD OF FACT AND CONCLUSION OF LAW; PROPISED ORDER | 844 |
| REVISED SCHEDULING ORDER | 934 |
| RESPONDENT'S PROPOSED FINDINGS OF FACTS AND ORDER | 935 |
| LETTER TO APPLICANT | 1014 |
| MANDATE | 1015 |
| OPINION | 1016 |
| INDICTMENT | 1061 |
| DOCKET SHEETS | 1062 |
| JUDGMENT AND SENTENCE | 1102 |
| CERTIFICATE OF THE CLERK | 1104 |

REV: 01-02-04

CAPTION

THE STATE OF TEXAS          {IN THE 174th DISTRICT COURT

COUNTY OF HARRIS          {OF HARRIS COUNTY, TEXAS

At a regular term of the 174th District Court of Harris County, Texas, begun and holden

within and for the County of Harris and State of Texas, at Houston on the 3RD  day of

NOVEMBER, A.D. 2014 and which will adjourn on the 1ST  day of FEBRUARY, A.D.,

2015. The Honorable RUBEN GUERRERO Judge thereof presiding, the following

proceedings came on to be heard, to-wit:


EX-PARTE                         {

BATISTE, TEDDRICK R.          {H A B E A S

vs. CAUSE # 1212366-A          {C O R P U S

THE STATE OF TEXAS          {

# IN THE 174th JUDICIAL DISTRICT COURT
## HARRIS COUNTY, TEXAS

|  |  |  |
|---|---|---|
| EX PARTE | ) | Trial Cause No. 1212366 – A |
| TEDDRICK BATISTE, | ) | |
| APPLICANT | ) | |
|  | ) | |
|  | ) | |

**INITIAL APPLICATION FOR A WRIT OF HABEAS CORPUS (FILED PURSUANT TO TEX. CODE CRIM. PROC. ART. 11.071)**

BRAD D. LEVENSON (No. 24073411)
Director, Office of Capital Writs
(Email: Brad.Levenson@ocw.texas.gov)
JANET GILGER (No. 24079978)
(Email: Janet.Gilger@ocw.texas.gov)
Post-Conviction Attorney
Office of Capital Writs
1700 N. Congress Ave, Suite 460
Austin, Texas 78711
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Applicant

: 00002

# TABLE OF CONTENTS

APPLICATION FOR A WRIT OF HABEAS CORPUS ......................................... 1

PROCEDURAL HISTORY ....................................................................... 4

A.    Trial Court Proceedings ................................................................. 5

B.    State Appellate Proceedings .......................................................... 6

C.    State Habeas Proceedings ............................................................. 6

STATEMENT OF FACTS ........................................................................ 6

A.    Guilt Phase Presentation .............................................................. 6

B.    Punishment Phase Presentation ..................................................... 7

C.    Post-Conviction Investigation ........................................................ 9

    1.    Frontal Lobe Damage ........................................................... 9

    2.    Batiste's Juvenile History ..................................................... 10

    3.    Evidence of Other Mitigating Circumstances .............................. 10

STANDARD OF CARE ......................................................................... 11

A.    Ineffective Assistance of Counsel ................................................. 11

ARGUMENT ...................................................................................... 15

CLAIM ONE:   TRIAL COUNSEL WAS INEFFECTIVE FOR NOT DISCOVERING BATISTE'S FRONTAL LOBE DAMAGE AND SUBSEQUENTLY FAILING TO PRESENT EXPERT TESTIMONY REGARDING BATISTE'S BRAIN DYSFUNCTION ..................................... 15

A.    Relevant Factual Background ....................................................... 16

B.    Post-Conviction Investigation Reveals That Batiste Suffers From Previously Undiagnosed and Untreated Frontal Lobe Damage ............................... 17

C.    Trial Counsel's Failure to Discover Batiste's Frontal Lobe Damage Constituted Deficient Performance ............................................... 19

i

    1.    Standards Required For Capital Representation ................................ 19

    2.    Compelling Evidence Existed that Batiste's Trial Team Was on Notice That a Thorough Mitigation Investigation Should Have Included a Neuropsychological Evaluation.................................................................... 21

D.    Trial Counsel's Subsequent Failure to Present Expert Testimony Regarding Batiste's Brain Dysfunction to the Jury Constituted Deficient Performance ......... 24

    1.    Frontal lobe damage and risk-taking.................................................. 24

    2.    Impact of Batiste's Brain Impairment on His Everyday Functioning 25

    3.    Etiology of Frontal Lobe Damage and Potential for Treatment ........ 27

E.    Trial Counsel's Failures Constituted Deficient Performance....................... 28

F.    Conclusion ................................................................................................. 30

CLAIM TWO: TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PRESENT A GANG EXPERT TO OFFER AN OPINION TO REBUT THE PROSECUTION'S EVIDENCE OF BATISTE'S GANG INVOLVEMENT ...... 30

A.    Relevant Factual Background...................................................................... 31

    1.    Prosecution Classification Expert David Davis ................................. 31

    2.    Prosecution Gang Expert Clint Ponder ............................................. 31

    3.    Prosecution Security Threat Group Expert Irma Fernandez.............. 32

    4.    The Defense Case During the Punishment Phase .............................. 33

B.    Trial Counsel was Ineffective for Failing to Rebut the Prosecution's Evidence of Batiste's Gang Affiliation by Presenting Testimony from a Gang Expert ................................................................................................................. 34

    1.    Batiste's Early Life and First Experiences with Gangs ..................... 35

    2.    The Negative Impact of Teddrick's First Exposure to the Juvenile Justice System.................................................................................................. 37

    3.    Batiste's Return to School and his Boot Camp Experience............... 38

4. Teddrick's Exposure to Institutionalized Gang Culture..................... 41

5. Teddrick's Release from TYC Custody and His Focus on Family.... 44

6. Conclusions ........................................................................ 48

C. Batiste was Prejudiced by Trial Counsel's Failure to Present Testimony from a Gang Expert.................................................................................. 52

CLAIM THREE: TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PRESENT AN EXPERT AT THE PUNISHMENT PHASE TO EXPLAIN TO THE JURY THE RELEVANCE OF BATISTE'S LIFE HISTORY ..................... 53

A. The Role of an Expert Regarding the Client's Social History ..................... 54

B. Given the Importance of Telling Batiste's Story via a Well-Qualified Expert, Not Retaining Such an Expert Constitutes Deficient Performance........................ 54

C. An Expert Would Have Presented a Comprehensive Account of Batiste's Life History, and the Fact That Jurors Did Not Hear it Prejudiced the Outcome of the Case ........................................................................................ 56

1. Introduction: A Life Rooted in Instability........................................... 56

2. Teddrick's Birth.......................................................................... 58

3. Paternal Family History.................................................................. 59

4. Maternal Family History: Darlene and Her Children ........................ 60

5. Maternal Family History: Violence and Instability ............................ 63

6. Maternal Family History: Rowena's Childhood and Adolescence.... 66

7. Teddrick: Infancy and Early Childhood............................................ 67

8. Teddrick: Unpredictability and Residential Instability ...................... 68

9. Social Disorganization Theory......................................................... 71

10. Teddrick: Adolescence and the Juvenile Justice System ................... 73

11. Teddrick: Trying To Be an Adult....................................................... 76

12. Teddrick: The Gang Influence and Affiliation................................... 82

iii

13.   Teddrick: The Importance of a Father-Figure ................................... 85

14.   Teddrick: The Importance of Rap Music ........................................... 89

15.   Teddrick: A Family and Community That Failed Him ...................... 90

D.   That the Jurors Did Not Hear Testimony from an Expert Prejudiced the Outcome of Batiste's Case ...................................................................... 93

CLAIM FOUR:   TRIAL COUNSEL FAILED TO PROPERLY INVESTIGATE AND PREPARE LAY WITNESSES FOR THE PUNISHMENT PHASE OF BATISTE'S TRIAL ............................................................................... 94

A.   Trial Counsel Failed to Properly Develop the Lay Witnesses Who Were Called to Testify During the Punishment Phase of Batiste's Trial ......................... 95

1.   Trial Counsel's Presentation of Lay Witness Testimony at the Punishment Phase Did Not Adequately Inform the Jury of Batiste's Complicated Familial and Social History ...................................................... 97

a.   Rowena Scott ................................................................................. 97

b.   Darlene Beard ................................................................................ 99

c.   Beverly West ............................................................................... 101

2.   Trial Counsel's Presentation of Lay Witness Testimony at the Punishment Phase Did Not Adequately Inform the Jury of Batiste's Complicated Social History and the Inadequate Preparation of These Witnesses Left Them Vulnerable to Damaging Cross-Examination ......... 102

a.   Stephanie Soliz ........................................................................... 102

b.   Kevin Noel Jr. ............................................................................. 106

c.   Micaela Lara ............................................................................... 109

3.   Trial Counsel's Presentation of Lay Witness Testimony at the Punishment Phase Harmed, Rather Than Helped, Batiste's Case in Mitigation ................................................................................................. 111

a.   Gary Thiebaud ............................................................................ 111

b.   Kristopher McSherry ................................................................. 113

iv

B.     Conclusion ........................................................................... 116

CLAIM FIVE:   BATISTE'S COUNSEL FAILED TO INVESTIGATE AND
PRESENT EVIDENCE FROM ADDITIONAL WITNESSES THAT WOULD
HAVE STRENGTHENED BATISTE'S MITIGATION PRESENTATION ...... 117

A.     The Investigation and Development of Lay Witnesses for Batiste's Trial
Was Deficient.......................................................................... 117

B.     Counsel's Deficient Investigation Meant That Testimony of Several
Valuable Witnesses Was Absent From Trial, Prejudicing Batiste's Mitigation Case
........................................................................................... 119

        1.     Monica Davis............................................................ 120

        2.     Truman Jackson........................................................ 122

        3.     Malcolm Mitchell ..................................................... 123

        4.     Ricardo Lara ............................................................ 124

        5.     Kevin Noel Sr. .......................................................... 126

        6.     Necole Baldwin ........................................................ 127

        7.     Danyell Soliz ............................................................ 128

        8.     Raul Soliz ................................................................ 128

        9.     Melissa Beard-Carter................................................. 129

        10.    Dytaniel Rod Carter.................................................. 130

C.     Conclusion ........................................................................... 131

CLAIM SIX:   TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO
PRESENT EVIDENCE THAT BATISTE WOULD NOT BE A FUTURE
DANGER ................................................................................. 132

A.     Future Dangerousness is a Central Piece to Any Capital Verdict............. 133

B.     Relevant Factual Background..................................................... 133

        1.     Justin Loughridge .................................................... 133

: 00007

2. Dr. Scott Krieger ............................................................ 134

3. David Davis ..................................................................... 134

4. Irma Fernandez................................................................ 134

5. Robert Dean ..................................................................... 135

6. Aggravated Robbery......................................................... 135

7. Black Widow Homicide ................................................... 135

C. Trial Counsel Failed to Adequately Communicate With and Prepare Their Own Expert ..................................................................................... 136

D. Trial Counsel Was Ineffective For Failing to Present Expert Evidence That Batiste Would Not Be a Future Danger ................................................. 141

E. Trial Counsel's Failure to Present Any Evidence Regarding Future Danger Constituted Deficient Performance..................................................... 146

F. Trial Counsel's Deficient Performance Prejudiced Batiste's Trial ............ 148

CLAIM SEVEN:  TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PREPARE BATISTE TO TESTIFY ................................................................. 149

A. Relevant Facts................................................................................. 150

B. Trial Counsel Performed Deficiently by Failing to Prepare Batiste to Testify and that Failure Prejudiced Him ......................................................... 155

1. Batiste's Testimony Contradicted and Discredited the Defense's Mitigation Theory ...................................................................... 156

2. Trial Counsel's Failure to Prepare Batiste to Testify Led to His Portrayal as Remorseless ............................................................ 157

3. Presenting Batiste as a Witness Allowed the Prosecution to Introduce into Evidence Letters Batiste Wrote from Jail that Would Have Otherwise Been Inadmissible.................................................................... 159

C. Conclusion ...................................................................................... 160

CLAIM EIGHT: TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO CHALLENGE THE PROSECUTION'S USE OF BATISTE'S JAIL LETTERS DURING THE PUNISHMENT PHASE OF TRIAL ............................................ 161

A.     Relevant Factual Background .................................................................. 161

B.     Trial Counsel Performed Deficiently by Failing to Present Testimony from an Expert on the Meaning and Significance of the Rap Lyrics in Batiste's Letters ... .................................................................................................................... 162

       1.     Introduction ................................................................................ 163

       2.     Remorse and Being Overwhelmed with Emotion ............................. 164

       3.     Preparation for Institutionalization .................................................. 168

       4.     Hypemusic .................................................................................... 168

       5.     Teddrick's Gang Affiliation ............................................................ 169

       6.     Conclusion .................................................................................... 173

C.     Trial Counsel Performed Deficiently by Failing to Prepare Their Witnesses for the Prosecution's Use of Batiste's Letters from Jail ...................................... 174

D.     Batiste was Harmed by Trial Counsel's Deficient Performance ................. 177

CLAIM NINE: BATISTE'S CONSITUTIONAL RIGHT TO A FAIR TRIAL WAS DENIED BY THE STATE'S FAILURE TO DISCLOSE RELEVANT IMPEACHMENT EVIDENCE ........................................................................ 179

A.     Relevant Proceedings ............................................................................. 179

B.     Batiste's Constitutional Right to a Fair Trial Was Violated by the State's Failure to Disclose the Criminal History and Probation Status of Anthony Moore ... .................................................................................................................... 181

C.     Conclusion ............................................................................................. 183

CLAIM TEN: BATISTE'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL WERE VIOLATED BY JUROR MISCONDUCT ............................................. 183

A.     Relevant Facts ........................................................................................ 184

B.   The Jurors Committed Misconduct by Discussing the Case Before Deliberations .......................................................................................... 186

C.   Batiste Was Prejudiced by the Juror Misconduct ...................................... 189

D.   Appellate Counsel was Ineffective for Failing to Assert Claims of Juror Misconduct on Appeal ................................................................ 191

E.   Conclusion .................................................................................................. 191

CLAIM ELEVEN:   TRIAL COUNSEL FAILED TO SUFFICIENTLY PRESERVE ERROR BY MAKING PROPER, TIMELY OBJECTIONS TO THE STATE'S INTRODUCTION OF INADMISSIBLE EVIDENCE DURING THE PENALTY PHASE OF TRIAL ........................................................................... 191

A.   Trial Counsel was Ineffective for Failing to Preserve Error by Making Proper, Timely Objections and that Failure Prejudiced Batiste ............................ 192

  1.   Trial Counsel Failed to Object to the State's Improper Questioning of Stephanie Soliz about Collateral Matters ..................................... 193

  2.   Trial Counsel Failed to Object to the State's Improper Questioning of Terry Soliz about Other Witness' Prior Bad Acts ....................................... 194

  3.   Trial Counsel Failed to Object to the State's Improper Questioning of Kevin Noel Jr. Regarding Specific Instances of Conduct ........................... 195

  4.   Trial Counsel Failed to Object to the State's Improper Questioning Regarding Other Witness' Prior Bad Acts .................................. 196

B.   Conclusion .................................................................................................. 197

CLAIM TWELVE:   THE TRIAL COURT COMMITTED ERROR FOR GRANTING A FLAT FEE TO TRIAL COUNSEL AND TRIAL COUNSEL WAS INEFFECTIVE FOR ACCEPTING THE FLAT FEE ............................... 197

A.   Relevant Facts ............................................................................................ 198

B.   Flat Fee Payments Are Improper in a Capital Case ................................... 198

C.   Trial Court Committed Reversible Error by Granting a Flat Fee Payment to Trial Counsel .......................................................................... 201

: 00018

D.    Trial Counsel was Ineffective for Requesting and Accepting a Flat Fee as Compensation for their Work which Caused Trial Counsel to Commit Errors thereby Harming Batiste ......................................................................................... 202

CLAIM THIRTEEN:  TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO SUFFICIENTLY PRESERVE ERROR BY MAKING A PROPER, TIMELY FIRST AMENDMENT OBJECTION TO THE INTRODUCTION OF RELIGIOUS SCAPULAR EVIDENCE................................................................. 203

A.    Relevant Facts............................................................................................... 205

B.    Admission of the Religious Scapular Violated Batiste's Right to Free Exercise of Religion Under the First Amendment and Trial Counsel was Ineffective for Failing to Object on First Amendment Grounds .......................... 206

    1.    The Scapular is Religious................................................................. 207

C.    Trial Counsel was Ineffective for Failing to Cross Officer Ponder ........... 209

D.    Appellate Counsel was Ineffective for Failing to Raise Ineffective Assistance of Trial Counsel on Direct Appeal....................................................... 211

E.    Conclusion .................................................................................................... 211

CLAIM    FOURTEEN:    BATISTE'S    DEATH    SENTENCE    IS UNCONSTITUTIONAL BECAUSE IT WAS ASSIGNED BASED ON TEXAS' ARBITRARY SYSTEM OF ADMINISTERING THE DEATH PENALTY ..... 212

A.    Supreme Court Precedent Mandates That the Death Penalty Not Be Applied Arbitrarily.................................................................................................................. 212

B.    Texas' Death Penalty Scheme Is Unconstitutional....................................... 214

    1.    Geography ......................................................................................... 215

    2.    Race ................................................................................................... 219

C.    Conclusion .................................................................................................... 221

CLAIM FIFTEEN:  BATISTE'S RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE VIOLATED WHEN THE TRIAL COURT WAS PROHIBITED FROM

: 000011

INSTRUCTING THE JURY THAT A VOTE BY ONE JUROR WOULD RESULT IN A LIFE SENTENCE...................................................................... 221

A. The Supreme Court Has Invalidated Jury Instructions That Place An Added Burden on the Sentencer Before Finding Mitigating Circumstances. ................... 223

B. Texas' 10-12 Sentencing Scheme Impairs the Ability of a Majority of Jurors to Reach a Life Sentence.......................................................................... 224

C. The 10-12 Rule Constitutes an Impermissible Outside Influence on Jury Deliberations ............................................................................................... 226

D. Conclusion ............................................................................................. 228

CLAIM SIXTEEN: TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PRESERVE THE RECORD FOR APPEAL......................................................... 228

A. Given the Importance of Preserving Issues for Appeal and the Clear Mandate of the ABA Guidelines to Do So, Failure to Preserve the Trial Record Constitutes Ineffective Assistance of Counsel..................................................... 228

B. Even if Failure to Preserve the Trial Record Will Not Always Automatically Satisfy the Deficient Performance Prong of *Strickland*, the Deficient Conduct of Batiste's Counsel in This Case Warrants a Finding of Deficient Performance.... 230

C. This Inquiry Must Take Into Account the Inherent Difficulties of Establishing Prejudice When a "Substantial and Crucial Portion" of the Transcript is Missing ....................................................................................................... 232

CLAIM SEVENTEEN: BATISTE'S DEATH SENTENCE SHOULD BE VACATED BECAUSE THE PUNISHMENT PHASE JURY INSTRUCTIONS RESTRICTED THE EVIDENCE THE JURY COULD DETERMINE WAS MITIGATING.................................................................................................. 233

A. The Texas Statute and Batiste's Jury Instructions..................................... 234

B. Texas' Statute Unconstitutionally Limits the Categories of Evidence a Capital Jury May Find Mitigating and Warrant a Life Sentence.......................... 235

C. Batiste's Trial Counsel Was Ineffective For Failing to Request a Jury Instruction that Clarified the Meaning and Application of Mitigating Evidence. 238

D. Conclusion ............................................................................................. 239

: 00012

PRAYER FOR RELIEF ........................................................................ 241

CERTIFICATE OF SERVICE ............................................................. 243

: 00013

# TABLE OF AUTHORITIES

**Federal Cases**

*Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007) .............................. 235, 236, 239

*Alcorta v. Texas*, 355 U.S. 28 (1957) .................................................................... 182

*Allen v. United States*, 164 U.S. 492 (1896) ......................................................... 227

*Arizona v. Washington*, 434 U.S. 497 (1978) ....................................................... 226

*Bobby v. Van Hook*, 558 U.S. 4 (2009) .................................................................. 12

*Brady v. Maryland*, 373 U.S. 83 (1963) ...................................................... 179, 181

*Brewer v. Quarterman*, 550 U.S. 286 (2007) ...................................................... 240

*Calley v. Callaway*, 519 F.2d 184 (5th Cir.1975) ................................................ 182

*Cannon v. Mullin*, 383 F.3d 1152 (10th Cir. 2004) ..................................... 155, 156

*Cullen v. Pinholster*, __U.S.__, 131 S. Ct. 1388 (2011) .................................. 12, 19

*Downum v. United States*, 372 U.S. 734 (1963) ................................................... 226

*East. v. Scott*, 55 F.3d 996 (5th Cir. 1995) .......................................................... 182

*Evitts v. Lucey*, 469 U.S. 387 (1985) ........................................................... 191, 211

*Faulder v. Johnson*, 81 F.3d 515 (5th Cir. 1996) ................................................ 182

*Ferguson v. Georgia*, 365 U.S. 570 (1961) ......................................................... 156

*Ford v. Wainwright*, 477 U.S. 399 (1986) ........................................................... 212

*Furman v. Georgia*, 408 U.S. 238 (1972) .................................................... 213, 215

*Giglio v. United States*, 405 U.S. 150 (1972) .............................................. 179, 181

*Godfrey v. Georgia*, 446 U.S. 420 (1980) ........................................................... 214

*Green v. Johnson*, 160 F.3d 1029 (5th Cir. 1998) ............................................... 230

*Gregg v. Georgia*, 428 U.S. 153 (1976) ................................................ 213, 217, 218

*Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770 (2011) ............................... 12, 14

*Harrison v. Motley*, 478 F.3d 750 (6th Cir. 2007) .............................................. 155

*Higgins v. Renico*, 470 F.3d 624 (6th Cir. 2006) ................................................ 156

*Holloway v. Arkansas*, 435 U.S. 475 (1978) ....................................................... 202

*Irvin v. Dowd*, 366 U.S. 717 (1961) ..................................................................... 183

*Johnson v. Mississippi*, 486 U.S. 578 (1988) ...................................................... 179

*Jurek v. Texas*, 428 U.S. 262 (1976) .............................................................. passim

*Kyles v. Whitley*, 514 U.S. 419 (1995) ................................................................. 183

*Lockett v. Ohio*, 438 U.S. 586 (1978) .................................................................. 233

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803) ........................................... 219

*McCleskey v. Kemp*, 481 U.S. 279 (1987) ........................................................... 236

*McKoy v. North Carolina*, 494 U.S. 433 (1990) .................................................. 224

*Miller v. Dretke*, 420 F.3d 356 (5th Cir. 2005) .................................................... 13

*Mills v. Maryland*, 486 U.S. 367 (1988) ...................................................... 223, 224

*Mooney v. Holohan*, 294 U.S. 103 (1935) ........................................................... 182

*Napue v. Illinois*, 360 U.S. 264 (1959) ............................................................... 182

*Padilla v. Kentucky*, 559 U.S. 356 (2010) ............................................................ 12

xii

*Penry v. Johnson*, 532 U.S. 782 (2001) ........................................................ 214, 238
*Penry v. Lynaugh*, 492 U.S. 302 (1989)........................................ 215, 218, 237, 240
*Porter v. McCollum*, __ U.S. __, 130 S. Ct. 447 (2009)................................. passim
*Porter v. McCollum*, 558 U.S. 30 (2009)............................................................ 11, 14
*Rayborn v. United States*, 489 Fed. Appx. 871 (6th Cir. 2012).................... 155, 156
*Rompilla v. Beard*, 545 U.S. 374 (2005)............................................................ passim
*Sears v. Upton*, 130 S. Ct. 3259 (2010) ......................................................... 119
*Skipper v. South Carolina*, 476 U.S. 1 (1986) .............................. 147, 236, 237, 239
*Smith v. Phillips*, 455 U.S. 209 (1982)................................................................. 183
*Smith v. Robbins*, 528 U.S. 259 (1999)................................................................ 233
*Strickland v. Washington*, 466 U.S. 668 (1984) ............................................... passim
*Strickler v. Greene*, 527 U. S. 263 (1999) ............................................................ 181
*Tennard v. Dretke*, 542 U.S. 274 (2004)........................................................... passim
*Turner v. Louisiana*, 379 U.S. 466 (1965)............................................................ 187
*United States v. Auten*, 632 F.2d 478 (5th Cir.1980)............................................ 182
*United States v. Bagley*, 473 U.S. 667 (1985) ..................................................... 181
*United States v. Barham*, 595 F.2d 231 (5th Cir. 1979) ...................................... 182
*United States v. Resko*, 3 F.3d 684 (3d Cir. 1993)....................................... 187, 188
*United States v. Selva*, 559 F.2d 1303 (5th Cir. 1977) ........................................ 232
*United States v. Teague*, 953 F.2d 1525 (11th Cir. 1992) .................................... 156
*United States v. York*, 600 F.3d 347 (5th Cir. 2010).............................. 183, 187, 188
*Virgil v. Dretke*, 446 F.3d 598 (5th Cir. 2006) ...................................................... 11
*Walbey v. Quarterman*, 309 Fed. Appx. 795 (5th Cir. 2009) .............................. 132
Wardius v. Oregon, 412 U.S. 470 (1973) ............................................................ 233
*Wiggins v. Smith*, 539 U.S. 510 (2003)............................................................. passim
*Williams v. Taylor*, 529 U.S. 362 (2000) ....................................................... 14, 111
*Woodson v. North Carolina*, 428 U.S. 280 (1976) ............................................... 213
*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ........................................................... 220
*Zant v. Stephens*, 462 U.S. 862 (1983)................................................................ 179

**State Cases**
*Berry v. State*, 233 S.W.3d 847 (Tex. Crim. App. 2007)...................................... 149
*Coble v. State*, 330 S.W.3d 253 (Tex. Crim. App. 2010) ..................................... 146
*Davis v. State*, 329 S.W.3d 798 (Tex. Crim. App. 2010) ..................................... 206
*Ethington v. State*, 819 S.W.2d 854 (Tex. Crim. App. 1991)............................... 192
*Ex parte Chandler*, 182 S.W.3d 350 (Tex. Crim. App. 2005).............................. 132
*Ex parte Ellis*, 233 S.W.3d 324 (Tex. Crim. App. 2007) ..................................... 132
*Ex parte Flores*, 387 S.W.3d 626 (Tex. Crim. App. 2012) ................................... 11
*Ex parte Gonzales*, 204 S.W.3d 391 (Tex. Crim. App. 2006)................... 13, 14, 15
*Ex parte Jimenez*, 364 S.W.3d 866 (Tex. Crim. App. 2012).................................. 11
*Ex parte Martinez*, 195 S.W.3d 713 (Tex. Crim. App. 2006) ............................... 14

: 00015

*Franklin v State*, 138 S.W.3d 351 (Tex. Crim. App. 2004)................................... 183
*Howard v. State*, 239 S.W.3d 359 (Tex. App.—San Antonio 2007)..................... 229
*Martinez v. State*, 98 S.W.3d 189 (Tex. Crim. App. 2003) ........................... 192, 203
*Mason v. State*, 905 S.W.2d 570 (Tex. Crim. App. 1995)..................................... 206
*Mathews v. State*, 635 S.W.2d 532 (Tex. Crim. App. 1982) ................................. 228
*McQuarrie v. State*, 380 S.W.3d 145 (Tex. Crim. App. 2012)............................. 189
*Medina v. State*, 2004 WL 764444, *6 (Tex. App.—Texarkana 2004) ............... 229
*Moosavi v. State*, 711 S.W.2d 53 (Tex. Crim. App. 1986)................................... 228
*Ramirez v. State*, 802 S.W.2d 674, 676 (Tex. Crim. App. 1990) ......................... 195
*Tanguma v. State*, 47 S.W.3d 663 (Tex. App.—Corpus Christi 2001) ................ 228
*Thompson v. State*, 9 S.W.3d 808 (Tex. Crim. App. 1999 ...................................... 11
*Valle v. State*, 109 S.W.3d 500 (Tex. Crim. App. 2003) ...................... 228, 230, 231

**Other Authority**

ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 2003, 31 HOFSTRA L. REV. 913 (2003) ................. passim

ABA Standards for Criminal Justice (3d ed. 1993).......................................... 12, 19

ABA Standards for Criminal Justice: Providing Defense Services (3d ed. 1992) . 20

ABA Supplementary Guidelines for the Mitigation Function of Defense Team in Death Penalty Cases (2008) .................................................................................. 54

Adam Gershowitz, *Statewide Capital Punishment: The Case For Eliminating Counties' Role in the Death Penalty* (March 2009) ................................. 216, 218

Brian Rogers, *Houston Man Gets Death Sentence in 2008 Triple Killing*, HOUSTON CHRON, October 18, 2010 ............................................................................... 202

Craig Haney, *The Social Context of Capital Murder: Social Histories and the Logic of Mitigation*, 35 SANTA CLARA L. REV. 547, 559-83 (1995) ................. 20

David C. Baldus, et al., *Race and Proportionality Since* McCleskey v. Kemp *(1987): Different Actors with Mixed Strategies of Denial and Avoidance*, 39 COLUM. HUM. RTS. L. REV. 143 (2007) ........................................................... 219

Douglas S. Liebert, Ph.D. & David V. Foster, M.D., *The Mental Health Evaluation in Capital Cases: Standards of Practice*, 15 AM. J. FORENSIC PSYCHIATRY 43 (1994) .................................................................................................................. 20

*Executive Dysfunction After Brian Injury*, HEADWAY: THE BRAIN INJURY ASSOCIATION, *available at* https://www.headway.org.uk/executive-dysfunction-after-brain-injury.aspx (last visited April 18, 2013).......................................... 23

Harvey Rice, *Galveston Jury Sentences Baby-Killer Dad to Death*, HOUSTON CHRON., March 21, 2011................................................................................... 202

Isaac Unah, *Choosing Those Who Will Die: The Effect of Race, Gender, and Law in Prosecutorial Decision to Seek the Death Penalty in Durham County, North Carolina*, 15 MICHIGAN J. OF RACE & LAW 135 (2009) ................................... 219

xiv

James Luginbuhl & Julie Howe, *Discretion in Capital Sentencing Instructions: Guided or Misguided?,* 70 IND. L.J. 1161 (1995).............................................. 239

Jeffrey Kirchmeier, *Aggravating and Mitigating Factors: The Paradox of Today's Arbitrary and Mandatory Capital Punishment Scheme*, 6 WM. & MARY BILL OF RIGHTS J. 345 (1998)..................................................................................... 216

Jim Hom, *Forensic Neuropsychology: Are We There Yet?* 18 ARC. CLIN. NEUROPSYCHOL. 827 (2003) ....................................................................... 23

John E. Blume, Sherri Lynn Johnson & Scott E. Sundby, *Competent Capital Representation: The Necessity of Knowing and Heeding What Jurors Tell Us About Mitigation*, 36 HOFSTRA L. REV. 1035 (2008)....................................... 157

Jules Epstein, *Death-Worthiness and Prosecutorial Discretion in Capital Case Charging*, 19 TEMPLE POL. & CIVIL RIGHTS L. REV. 389 (2010) ............. 216, 219

Katherine Barnes, et al., *Place Matters (Most): An Empirical Study of Prosecutorial Decision-Making in Death-Eligible Cases*, 51 ARIZ. L. REV. 305 (2009) ...................................................................................................... 216, 220

Laura Sesana, *Santa Muerte: Unusual Saint Gaining popularity in Mexico and the US*, WASH. TIMES COMMUNITIES, March 6, 2013 ............................................. 208

Michael Catalano, Making and Preserving the Record – Objections, 6 Am. Jur. Trials 605 (1967)............................................................................................ 228

R. Andrew Chesnut & Sarah Borealis, *Santa Muerte*, WORLD RELIGIONS & SPIRITUALITY PROJECT, February 20, 2012 ....................................................... 209

Richard Dunham, *Todd Staples Says Drug Cartels Have Invaded U.S.: "The Sovereignty of the United States is Under Siege on Texas Soil"*, HOUST. CHRONICLE, May 17, 2011 .............................................................................. 210

Scott E. Sundby, *The Capital Jury and Absolution: The Intersection of Trial Strategy, Remorse, and the Death Penalty*, 83 CORNELL L. REV. 1557 (1998) 158

Scott Phillips, *Racial Disparities in the Capital of Capital Punishment*, 45 HOUS. L. REV. 807 (2008)........................................................................................ 219

State Bar of Texas, *Guidelines and Standards for Texas Capital Counsel* (2006) 12

Stephen P. Garvey, *The Emotional Economy of Capital Sentencing*, 75 N.Y.U. L. REV. 26 (2000). ............................................................................................. 158

Stuart Powell, *Democrats Resist Rep. Michael McCaul's Proposal to Designate Drug Cartels "Terrorist Organizations"*, HOUST. CHRONICLE, March 31, 2011 ......................................................................................................................... 210

Theodore Eisenberg & Martin T. Wells, *Deadly Confusion: Juror Instructions in Capital Cases*, 79 CORNELL L. REV. 1 (1993)................................................. 238

**Statutes**

Tex. Code Crim. Proc. art. 37.071 ....................................... 133, 221, 234

Tex. R. App. Proc. 33.1(a) ......................................................... 192, 204

: 00017

Tex. R. Evid. 608(b) .................................................................................. 193, 194
Tex. R. Evid. 609(a) ........................................................................................ 180

: 000018

## APPLICATION FOR A WRIT OF HABEAS CORPUS

### This is a Capital Case

"Stereotypes lose their power when the world is found to be more complex than the stereotype would suggest.  When we learn that individuals do not fit the group stereotype, then it begins to fall apart."

—Edward Koch

When the jury sentenced Teddrick Batiste to death for the 2009 murder of Horace Holiday, what they sat in judgment of was not Batiste himself, but a two-dimensional facsimile of him—a paper cut-out, a distorted copy.  The Batiste presented to the jurors at trial was unsympathetic and frightening—and altogether incomplete.  His complexity was reduced to simplistic sound bites.  Batiste's humanity and true character were obscured behind the misleading image of a heartless, remorseless gang member.  In truth, Batiste was a young man whose life demanded that he focus on personal survival from a young age, and who tragically lacked the necessary skills to fulfill his very real dream of having a stable family of his own.  Had the jury seen Batiste for who he truly was, the outcome of his trial would have been drastically different.

First, the jury never heard evidence that Batiste suffers from frontal lobe damage, a neurological impairment that affects his ability to properly assess risk and adequately engage in reflective self-control.  Further, the jury never heard that Batiste's neurological impairment is not forever debilitating, but controllable with proper medication and a structured environment (like the one a prison setting offers).

The jury was given a simplistic one-dimensional impression of Batiste's family life and childhood.  They were told that Batiste had a good family, that he was loved and always had food, clothes, and a roof over his head.  In actuality, from birth Batiste's young life was defined by instability.  He lacked for a father,

1

his mother was young and inexperienced, and his extended family struggled with the multigenerational effects of violence and poverty. From a very young age, Batiste had to fend for himself with little to no supervision or support. He learned early that he needed to care for and protect himself, because there was no consistent figure in his life to fill that role. Batiste was also moved around continuously from place to place, school to school, neighborhood to neighborhood, for his entire childhood. This forced Batiste to constantly redefine, realign, and reposition himself each time he was uprooted. Yet, the complexity of Batiste's family history and young life was never presented. Furthermore, because Batiste's counsel never presented testimony from an expert, Batiste's life history was never synthesized into a compelling, meaningful narrative for the jury.

The prosecution framed Batiste as a menacing gang member, a deeply entrenched member of the Crips who had power and control over others. Batiste's counsel did nothing to dispel the prosecution's conclusions. While Batiste had some affiliation with the Crips, he was not a hard-core gang member, and only ever marginally affiliated at most. Unlike many hard-core gang members, Batiste did not come from a gang family, nor did he grow up in a gang. At the young age of fourteen, Batiste was sent into the juvenile justice system for a relatively minor, non-violent offense. This seemingly inconsequential institutional response to a juvenile mistake triggered a series of increasingly stringent and harsh measures by the juvenile justice system. This experience alienated Batiste even further from his family and school friends and thrust him into an environment where he was surrounded by older, violent, and more criminalized teenagers and young adults. It was at Sheffield Boot Camp, a particularly harsh and distant institution, that Batiste aligned himself as a Crip and only then simply as a matter of survival. Affiliating with the Crips gave Batiste vital protection and at least some sense of belonging and consistency.

2

Trial counsel never countered the prosecution's evidence of Batiste's gang affiliation with an expert who could have explained to the jury the difference between someone like Batiste, who was affected by the gang culture of the environment in which he found himself, and someone who was deeply entrenched in gang culture and whose entire life was consumed by gang identity. Such an expert could have explained how Batiste's focus on providing for his family and desire to find and keep legitimate jobs was wholly inconsistent with the prosecution's labeling him as a hard-core gang member.

During trial, the prosecution used letters that Batiste wrote to his friends and family—often in the form of rap lyrics—to cast Batiste as a remorseless, heartless killer. However, this simplistic conclusion misconstrued the honest sentiments of remorse, regret, and fear that Batiste's lyrics actually express. Trial counsel did nothing to counter the prosecution's distortion of Batiste's true character. Counsel could have ensured that the complexity of Batiste's expression was not lost on the jury by providing expert testimony on the meaning and significance of his lyrics. Such testimony would have revealed Batiste as a young man struggling with the "gangster" label that had been thrust upon him. Such testimony would have revealed a young man attempting to express his intense and often conflicting emotions through rap lyrics, the only medium he had available to him.

The prosecution's portrayal of Batiste as a menacing gang member set the stage for the jury to be improperly swayed by their irrational fears and lose their ability to remain neutral fact-finders. After the jurors heard testimony about Batiste's Crip affiliation, one juror became frightened at the sight of several young men who appeared to her to match the description of Crips. She brought her fear into the jury room and by sharing her fear with other jurors, shattered the neutrality required of a jury in a capital trial.

3

The prosecution portrayed Batiste as a threat and future danger by presenting evidence of Batiste's gang affiliation, his other charged crimes, and his infractions while incarcerated. Yet the jury never had the opportunity to hear from an expert on future danger who could have told the jury that the best indicator of future dangerousness in the prison setting is past behavior in a similar setting. The jury never heard in a comprehensible way that Batiste exhibited no indications that he would pose a risk of future dangerousness if incarcerated for life in prison. To the contrary, Batiste gave every indication that he would adjust well to a prison environment, and would have strong motivations to exhibit good behavior in order to maintain a strong relationship with his children and take advantage of the privileges and opportunities available to him in prison. Because trial counsel failed to present such reasoned, fact and research-based opinion from an expert, the jury was left to make a fear-based decision regarding future dangerousness.

The distorted image of Batiste was fatally solidified after trial counsel failed to properly prepare Batiste to testify during the punishment phase of trial. Instead, Batiste's testimony allowed the prosecution to continue to manipulate the picture of who Batiste truly was.

Ultimately, trial counsel failed to offer to jurors the completed, three-dimensional picture of Batiste, as described above and as will be discussed throughout this Application. It is for that reason an evidentiary hearing should be held to examine the merits of the claims that follow, and Batiste's conviction and death sentence should be overturned.

## I.

## PROCEDURAL HISTORY

Teddrick Roshod Batiste is confined under a sentence of death pursuant to the judgment of the 174th District Court, Harris County, Texas, case number 1212366, which was rendered and entered on June 23, 2011. (7 CR at 1716-17; 25

4

RR at 84.)[1]

## A. Trial Court Proceedings

On July 14, 2009, a grand jury indictment was filed charging Batiste with the capital murder of Horace Holiday, committed during the commission of a robbery. The case was set in the 174th District Court, Judge Ruben Guerrero presiding. (1 CR at 56.) The court appointed R.P. "Skip" Cornelius to represent Batiste on April 22, 2009, and Gerald Bourque on October 29, 2009. (1 CR at 4, 62.)

Voir dire commenced on April 26, 2011, and concluded on May 4, 2011. (7 CR at 1755-67; 3 RR at 3-10 RR at 80.) Batiste was arraigned on June 6, 2011, and entered a plea of not guilty. After the reading of the indictment, trial counsel entered a plea of not guilty on Batiste's behalf. The State gave its opening statement and the defense reserved the right to make an opening statement. (7 CR at 1770-71; 13 RR at 9-19.)

The State rested its case on June 9, 2011. The defense did not present any affirmative evidence and rested its case the same day. (7 CR at 1776; 16 RR at 84.) The case was submitted to the jury for guilt/innocence determination and the jurors deliberated approximately one-half hour before being excused for the day. (7 CR at 1776; 16 RR at 149-50.) Deliberations resumed on June 10, 2011, and the jury returned a verdict of guilty shortly thereafter. (7 CR at 1777; 17 RR at 3.)

The punishment phase began on June 13, 2011 (7 CR at 1779; 18 RR at 3), and concluded on June 23, 2011, after eight days of testimony. (7 CR at 1793; 25 RR at 78.) Jury deliberations commenced on June 23, 2011, and that same day the jury returned the verdict answering "Yes" to special issue one, "Yes" to special

---

[1] All references to "CR" are to the Clerk's Record signed by Deputy L. Arriaga on August 15, 2011. All references to "RR" are to the Reporter's Record in Batiste's underlying capital trial.

5

: 00023

issue two, and "No" to special issue three. (7 CR at 1793; 25 RR at 81.) Teddrick Batiste was then sentenced to death. (7 CR at 1793; 25 RR at 83.)

### B. State Appellate Proceedings

On June 23, 2011, Batiste filed his notice of appeal and the court appointed Patrick McCann to represent Batiste for purposes of the direct appeal. (7 CR at 1720-21; 1800.) On June 25, 2012, Batiste filed his opening appellate brief, *Teddrick Batiste v. The State of Texas*, with cause number AP-76,600 in the Texas Court of Criminal Appeals ("CCA"). The State filed their response on December 18, 2012. On March 20, 2013, oral argument was held before the CCA. A decision is currently pending.

### C. State Habeas Proceedings

On June 23, 2011, the trial court appointed the Office of Capital Writs to represent Batiste in his post-conviction habeas litigation, pursuant to Code of Criminal Procedure Article 11.071. This Application follows.

## II.

## STATEMENT OF FACTS

### A. Guilt Phase Presentation

The State presented evidence that Teddrick Batiste and an unknown accomplice killed Horace Holiday at an Exxon gas station during the course of a robbery. Testimony was elicited from fourteen witnesses, including the manager of the Exxon station and two customers; as well as several law enforcement officers, including sheriff's deputies, crime scene investigators, forensic analysts, and the medical examiner. (*See* 13-16 RR at *passim*.)

In the early morning hours of April 19, 2009, Batiste and an associate were driving around north Houston in Batiste's Buick LaSabre. They saw a white Cadillac and decided to steal the car's expensive-looking rims. They pursued the Cadillac onto the highway and pulled up alongside it. Gunshots were fired from

: 000024

the LaSabre. The Cadillac and its driver were hit, and the vehicle exited the freeway and crashed into a gas pump at a nearby Exxon station. (1 CR at 116-29.) An injured and bleeding Horace Holiday exited the Cadillac from the driver's side, and attempted to crawl across the gas station floor near the pumps. The LaSabre followed the Cadillac off the freeway and drove around the pumps, passing Holiday on the ground at least twice. While still on the ground, Holiday was shot several more times at point blank range. (13 RR at 111-28, 134-54.)

Both the LaSabre and Cadillac fled the scene.[2] The Cadillac was quickly pursued by a sheriff's deputy who happened to be parked across the street from the Exxon. A high speed chase ensued and the Cadillac was disabled by tire spikes. Batiste emerged as the sole occupant of the Cadillac and was immediately detained. (13 RR at 24-41.) Shortly after his arrest, Batiste made a statement to police assuming full responsibility for the robbery and shooting death of Holiday. (14 RR at 130-49.) Batiste's recorded statement was played for the jury. (14 RR at 140.)

Defense counsel did not call any witnesses during the guilt phase.[3]

## B. Punishment Phase Presentation

The State opened its punishment case by calling Justin Loughridge, Batiste's former juvenile probation officer to detail Batiste's juvenile adjudications for possession of a controlled substance and multiple unauthorized uses of a motor

---

[2] It was not conclusively established by the evidence whether the LaSabre left the scene before or after Holiday was fatally shot.

[3] The defense argued at closing that Batiste was the driver of the LaSabre on the freeway and the ballistics made it unreasonable for the driver to have also been the shooter on the freeway. The defense argued that it was possible that Holiday fired first and the person in the LaSabre fired in self-defense. The defense further argued that no one could identify Batiste as the shooter at the Exxon station and he took responsibility in his statement to the police because he was trying to protect his associate. (*See* 16 RR at 109-27.)

: 00025

vehicle, and his subsequent time at both boot camp and the Texas Youth Commission ("TYC"). (18 RR at 4-32.) The state also called Dr. Scott Krieger, a psychologist who evaluated Batiste as a juvenile and diagnosed him with disruptive behavior disorder non-specified. (18 RR at 48.)

The State offered evidence of Batiste's behavior while incarcerated at the Harris County jail since his arrest in April 2009. This included incidents of cursing at staff members, assaulting inmates, refusing to obey orders, possessing an intoxicant, fighting, damaging county property, engaging in group demonstration, and possessing a weapon. (18 RR at 130-52.) The State also presented evidence to establish that Batiste was a member of the Crips. (18 RR at 152, 157-99.) The State further provided a description of the Texas prison system and the levels of inmate classifications. (19 RR at 30-73.) An inmate housed with Batiste testified about aggressive and intimidating behavior Batiste exhibited towards him and other inmates at the county jail. (19 RR at 105-36.)

Several witnesses, including two victims, and a sergeant with the Harris County Sheriff, testified about Batiste's participation in the aggravated robbery of the Phat Kat Tats tattoo parlor on March 23, 2009. (19 RR at 165-216; 20 RR at 3-57.) Batiste's statement taking responsibility for that robbery was played for the jury. (19 RR at 41.)

A constable with the Harris County Sheriff then testified regarding Batiste's arrest for marijuana possession on April 11, 2009. (20 RR at 58-68.)

A Houston police officer, crime lab analyst, medical examiner, Houston police detective, and three victims testified regarding Batiste's participation in a robbery/homicide at the Black Widow tattoo parlor on April 8, 2009, where the owner of the tattoo shop was shot and killed. (20 RR at 74-181; 21 RR at 3-18, 27-74, 83-116, 121-50, 22 RR at 14-31.) Batiste's statement taking responsibility for the robbery and homicide was played for the jury. (21 RR at 64.)

Finally, Horace Holiday's mother and grandmother presented victim impact testimony. (22 RR at 49-75.)

Defense counsel presented Batiste as a hard worker, a good father, and an individual who was remorseful for the pain and suffering he caused his victims and their families.

The first witness for the defense was Dr. Beth Pelz, a professor of Criminal Justice, who testified generally about the security and classification system at Texas prisons. (23 RR at 26-76.) Next, the defense presented Gary Thiebaud, Batiste's former football coach, who testified that Batiste had great athletic promise but squandered his potential; and Kristopher McCrery, Batiste's former boss, who testified that Batiste was a good employee with no major disciplinary issues at work. (23 RR at 113-23, 129-34.)

The defense then produced testimony from Batiste's girlfriend and mother of his children, as well as several friends and family members who asserted that Batiste came from a loving and supportive family and was a good father and provider to his children. (23-24 RR *passim.*)

Finally, Batiste took the stand and assumed responsibility for the death of Holiday, as well as for the aggravated robbery and robbery/homicide. Batiste apologized and expressed remorse for his actions. (24 RR at 113-42.)

## C. Post-Conviction Investigation

Post-conviction investigation has revealed a considerable amount of evidence that would have benefited Batiste at trial.

### 1. Frontal Lobe Damage

Based on numerous red flags in Batiste's personal, juvenile, and criminal history, an expert was retained to perform neuropsychological testing of Batiste. This testing revealed that Batiste suffers from frontal lobe damage to his brain, and

: 000027

his ability to perceive and conceptualize risk is significantly compromised. (*See* Ex. 1 [Aff. of Dr. James Underhill].)

## 2. Batiste's Juvenile History

Batiste was adjudicated within the juvenile justice system for a minor non-violent offense at age fourteen. Through a series of alternative schools, boot camps, and Texas Youth Commission facilities, Batiste's early entanglement in the juvenile justice system as a youth led to his early exposure to violence, organized gangs, and thus began a process of institutionalization that would tremendously impact his life trajectory. (*See* Ex. 2 [Aff. of Charles Reframe].)

## 3. Evidence of Other Mitigating Circumstances

Ten lay witnesses, including friends and family members of Batiste, could have presented testimony about the effects of Batiste's unstable family history, including violence, lack of supervision, residential instability, drug abuse, and parental alienation. (*See* Ex. 5 [Aff. of Nicole Baldwin]; Ex. 7 [Aff. of Melissa Beard-Carter]; Ex. 8 [Aff. of Daniel Rod Carter]; Ex. 9 [Aff. of Monica Davis]; Ex. 10 [Aff. of Truman Jackson]; Ex. 12 [Aff. of Ricardo Lara]; Ex. 14 [Aff. of Malcolm Mitchell]; Ex. 16 [Aff. of Brian Fayhee]; Ex. 18 [Aff. of Daniel Soliz]; Ex. 20 [Aff. of Raul Soliz].) Furthermore, the lay witnesses that did testify could have also provided additional mitigation. (*See* Ex. 6 [Aff. of Darlene Beard]; Ex. 11 [Aff. of Michaela Lara]; Ex. 15 [Aff. of Kevin Noel Jr.]; Ex. 17 [Aff. of Rowena Scott]; Ex. 20 [Aff. of Stephanie Soliz]; Ex. 21 [Aff. of Beverly West].)

Testimony from these witnesses would have provided a compelling account of Batiste as a young man striving for stability and a family of his own, but failing to attain it due to his brain dysfunction and social, economic, and sociological factors beyond his control. (*See* Ex. 3 [Aff. of Dr. Scott Bowman].)

: 00028

## III.

## STANDARD OF CARE

### A. Ineffective Assistance of Counsel

A criminal defendant is guaranteed the right to trial representation. This Sixth Amendment right to counsel "preserves the fairness, consistency, and reliability of criminal proceedings by ensuring that the process is an adversarial one." *Ex parte Flores*, 387 S.W.3d 626, 633 (Tex. Crim. App. 2012).

An ineffective assistance of counsel claim has two components: Batiste must show that counsel's performance was deficient, and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Porter v. McCollum*, 558 U.S. 30, 38, 39 (2009); *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Virgil v. Dretke*, 446 F.3d 598, 608 (5th Cir. 2006); *Ex parte Jimenez*, 364 S.W.3d 866, 883 (Tex. Crim. App. 2012); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999) ("[A]ppellant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.").

To establish deficiency, Batiste must show his counsel's representation fell below an objective standard of reasonableness. *Porter*, 558 U.S. at 38-39 (quoting *Strickland*, 466 U.S. at 688). A defendant need only prove ineffective assistance of counsel by a preponderance of the evidence. *Thompson*, 9 S.W.3d at 813. This standard governs the claim as a whole, and does not replace the more lenient "reasonable probability" standard for the prejudice prong.

The Supreme Court has reiterated that it applies a "case-by-case approach to determining whether an attorney's performance was unconstitutionally deficient under *Strickland*." *Rompilla v. Beard*, 545 U.S. 374, 393–94 (2005) (O'Connor, J., concurring) (*citing Strickland*, 466 U.S. 668).

Deficient performance is performance that is "inconsistent with the standard

11

: 00029

of professional competence in capital cases that prevailed [at the time of the trial]." *Cullen v. Pinholster*, __U.S.__, 131 S. Ct. 1388, 1407 (2011). The Supreme Court has repeatedly assessed the reasonableness of counsel's performance by looking to "[p]revailing norms of practice as reflected in [the] American Bar Association standards." *Strickland*, 466 U.S. at 688; *see also Padilla v. Kentucky*, 559 U.S. 356, 130 S. Ct. 1473, 1482 (2010) (ABA Standards "may be valuable measures of the prevailing professional norms of effective representation"); *Rompilla*, 545 U.S. at 387 ("'[W]e long have referred [to the ABA Standards for Criminal Justice] as "guides to determining what is reasonable".'") (quoting *Wiggins*, 539 U.S. at 524). Because adequacy is based upon "counsel's perspective at the time," *Strickland*, 466 U.S. at 689, courts must look to the guidelines then in effect. *See Bobby v. Van Hook*, 558 U.S. 4 (2009).

At the time of Batiste's trial, his attorneys' obligations were governed by the "prevailing professional norms," even if those norms did not align with a less rigorous defense based on "most common customs." *Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 788 (2011). The Supreme Court instructs courts to look at the "norms of practice as reflected in the American Bar Association and the like" and to consider "all the circumstances" of a case. *Strickland*, 466 U.S. at 688. These sources of norms include the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 2003, 31 HOFSTRA L. REV. 913 (2003) ("ABA Guidelines") and the ABA Standards for Criminal Justice (3d ed. 1993) ("ABA Standards"); *see also* Guidelines and Standards for Texas Capital Counsel (April 21, 2006) ("Texas Guidelines").

Defense counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 690-91. "[The] Guidelines applied the clear requirements for investigation set forth in the earlier Standards to death

12

penalty cases and imposed . . . similarly forceful directive[s]." *Rompilla*, 545 U.S. at 387 n.7. Pursuant to the Guidelines, counsel was required to conduct "thorough and independent investigations relating to the issues of both guilt and penalty." *ABA Guidelines*, Guideline 10.7, 31 HOFSTRA L. REV. at 1015. A court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. *Miller v. Dretke*, 420 F.3d 356, 361 (5th Cir. 2005); *Wiggins*, 539 U.S. at 521. When defense counsel is not aware of the relevant mitigating evidence, "the issue is not whether he was ineffective for failing to present [the] evidence . . . , but rather whether he failed to conduct a reasonable investigation to uncover mitigating evidence." *Ex parte Gonzales*, 204 S.W.3d 391, 396 (Tex. Crim. App. 2006).

Similarly, the Standards state that counsel "should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty." *ABA Standards*, Standard 4-4.1 (emphasis added); *Texas Guidelines*, Guideline 11.1. Most significantly, "[t]he duty to investigate exists regardless of the accused's admissions or statements to defense counsel of facts constituting guilt or the accused's stated desire to plead guilty." *Id.* Similarly, the duty to investigate may exist despite the accused's failure to mention potentially mitigating evidence or the accused's affirmative denial that such evidence exists. *Rompilla*, 545 U.S. at 377; *Ex parte Gonzales*, 204 S.W.3d at 396.

Once capital trial counsel completes the necessary pretrial investigation, he must then formulate a defense theory "that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies." *ABA Guidelines*, Guideline 10.10.1, 31 HOFSTRA L. REV. at 1047 (2003). The CCA holds capital counsel to an even higher standard: "It is not sufficient to inquire

13

generally and leave it up to the defendant to raise topics or respond to open-ended questions. Like a doctor, [capital] defense counsel must be armed with a comprehensive check-list of possibilities, and forcefully inquire about each topic." *Ex parte Gonzales*, 204 S.W.3d at 400–01 (Cochran, J., concurring).

To establish prejudice, Batiste "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in [the] outcome." *Porter*, 558 U.S. at 44 (quoting *Strickland*, 466 U.S. at 693-94). Batiste need not show that counsel's deficient conduct "more likely than not altered the outcome" in his case, *Strickland*, 466 U.S. at 693, but he must demonstrate that "the likelihood of a different result [is] substantial, not just conceivable." *Richter*, 131 S. Ct. at 792. State courts "must decide whether the undiscovered and unoffered evidence would have created a reasonable probability that, had the jury heard it, the jury's verdict would have been different." *Ex parte Martinez*, 195 S.W.3d 713, 731 (Tex. Crim. App. 2006).

State post-conviction courts must analyze a capital penalty phase ineffectiveness claim by "reweigh[ing] the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534. It is not necessary for the petitioner to demonstrate that the newly presented mitigation evidence would necessarily overcome the aggravating circumstances. *Williams v. Taylor*, 529 U.S. 362, 394-98 (2000). The Constitution requires that state post-conviction courts "engage with what [a defendant] actually went through . . ." as expressed in mitigating evidence. *Porter*, 558 U.S. at 44. It is not only incorrect but "[i]t is unreasonable to discount to irrelevance [mitigating] evidence . . . [or] to conclude that [certain mitigating evidence] would be reduced to inconsequential proportions simply because the jury would also have learned [of related

14

aggravating evidence.]" *Id.* The Texas Court of Criminal appeals "[has] adapted the Supreme Court's prejudice test to require that there is a reasonable probability that, absent the errors, the jury would have answered the mitigation issue differently." *Ex parte Gonzales*, 204 S.W.3d at 394.

**IV.**

**ARGUMENT**

**CLAIM ONE**

**TRIAL COUNSEL WAS INEFFECTIVE FOR NOT DISCOVERING BATISTE'S FRONTAL LOBE DAMAGE AND SUBSEQUENTLY FAILING TO PRESENT EXPERT TESTIMONY REGARDING BATISTE'S BRAIN DYSFUNCTION**

Because trial counsel did not retain an expert to perform a neuropsychological evaluation and testing of Batiste, they were unable to present to the jury evidence that Batiste suffered from significant and untreated frontal lobe damage. As a result, the jury never heard vital information, which was relevant to the determination of penalty, regarding how Batiste's culpability for the crime was impacted by this damage to his brain.

The frontal lobe of the brain is viewed as the emotional and personality control center for a person's mind and body, and is responsible for how an individual acts and reacts to information, other people, and life situations. It is well established that cognitive impairment and neuropsychological development have a significant relationship with human behavior and violence.

An expert could have explained the science of frontal lobe brain damage to jurors and how someone with Batiste's type of injury would be affected. Batiste's sentence of death was therefore unlawfully and unconstitutionally imposed in violation of his applicable state and federal Constitutional rights, state statutory law, and United States Supreme Court and state case law.

## A. Relevant Factual Background

Trial counsel did not present any witnesses during the guilt phase of Batiste's trial. (13-16 RR at *passim.*) During the punishment phase of Batiste's trial, the defense did not present any testimony, through an expert witness or otherwise, regarding Batiste's behavioral, psychological, or cognitive functioning. (18-25 RR at *passim.*) Trial counsel did not retain an expert to perform a neuropsychological evaluation and/or conduct any testing of Batiste.[4]

Alternatively, the State presented the testimony of Dr. Scott Krieger, a clinical psychologist, who evaluated a sixteen-year-old Batiste in 2004, when he was incarcerated at TYC. Dr. Krieger testified that he interviewed Batiste as a juvenile in 2004 and administered several psychological tests to him, including the Minnesota Multiphasic Inventory Adolescent Form (MMPI-A). Dr. Krieger did not administer an IQ test because Batiste had been tested less than a year prior to Dr. Krieger's evaluation and was found to have an IQ of 89, just below the normal range. (18 RR at 42-43, 46-48.)

Dr. Krieger testified that in 2004, he diagnosed Batiste with "disruptive behavior disorder non-specified," which is a broad diagnosis for disruptive or oppositional behaviors that do not meet the criteria for oppositional defiant disorder or conduct disorder. Additionally, based on Batiste's self-report of controlled substance use, Dr. Krieger also diagnosed Batiste with cannabis abuse. (18 RR at 48.) Dr. Krieger testified that when he analyzed the results of Batiste's MMPI-A score, only one of the ten basic clinical scales was elevated to a clinically significant level—scale nine, which is the measure of a person's energy level.

---

[4] Trial counsel was granted funding by the trial court to retain three experts who did not testify at trial: clinical psychologist, Dr. Jolie Brams (1 CR at 69-95); clinical psychologist, Dr. Matthew Mendel (*id.* at 132-44); and addiction specialist, Dr. Terry Rustin (*id.* 145-58).

16

: 88834

People with similar elevations are hyperactive and impulsive, distractible and restless, and prefer action over thought and reflection. (*Id.* at 59-60.)

Further, Dr. Krieger testified that Batiste's motivation for stealing cars and selling drugs appeared to be because of "greed" rather than of "need" and that Batiste did not express empathy for his victims. Dr. Krieger testified that during their 2004 interview, Batiste acknowledged that his activities were illegal and not socially acceptable and understood that he could be caught. (18 RR at 52-53.)

Dr. Krieger is not a neuropsychologist and did not perform a neuropsychological evaluation of Batiste at any time.

## B. Post-Conviction Investigation Reveals That Batiste Suffers From Previously Undiagnosed and Untreated Frontal Lobe Damage

During the post-conviction investigation, Batiste's current counsel conducted a comprehensive investigation into Batiste's medical, social, juvenile, and criminal history. Based on several risk factors present in Batiste's history that will be discussed below, Dr. James Underhill was retained to conduct a comprehensive neuropsychological evaluation of Batiste. The purpose of the neuropsychological testing was to determine whether "measureable neuropsychological dysfunction or deficits were present, and if so, what the nature, extent, and effects of the impairments were on Batiste's behavioral, psychological, and cognitive functioning." (Ex. 1 at ¶10 [Aff. of Dr. James Underhill].)

Dr. Underhill administered a comprehensive neuropsychological evaluation and testing to Batiste on January 5 and 6, 2012. Dr. Underhill's formal assessment included portions of the Halstead-Reitan neuropsychological battery, the Meyers Neuropsychological Battery, and other standardized neuropsychological measures designed to assess a patient's frontal, parietal, temporal, and occipital lobe

: 00035

functions.[5]   All neuropsychological tests administered by Dr. Underhill had appropriate and documented standardization, reliability, and validity. The tests used by Dr. Underhill are often administered and are generally accepted in the neuropsychology community. The same tests that Dr. Underhill administered to Batiste were widely available at the time of the offense and at the time of Batiste's trial. (Ex. 1 at ¶11 [Aff. of Dr. Underhill].)

Among other tests, Dr. Underhill administered portions of the Meyers Neuropsychological Battery (MNB), which is a comprehensive standardized neuropsychological testing battery. It has been used since the early 1990's to evaluate sensory, motor, attention, memory, language psycho-motor, and executive functioning and provides a picture of the individual's overall brain functioning. The MNB has demonstrated accuracy in determining the presence or absence of brain damage, with a 96.1% accuracy rate of identifying brain damaged individuals. (Ex. 1 at ¶22 [Aff. of Dr. Underhill].)

Dr. Underhill's testing revealed that Batiste suffers from "damage to his frontal lobe, specifically with regard to the part of the prefrontal cortex that controls risk taking." This damage was present in April 2009, when the offenses were committed, as well as during the pendency of Batiste's trial. (Ex. 1 at ¶¶23, 37 [Aff. of Dr. Underhill].)

---

[5] In addition to the neuropsychological testing, Dr. Underhill conducted a personal interview of Batiste regarding his family background, personal history and experiences, and Batiste's current physical, medical, and emotional state. Prior to the evaluation, Dr. Underhill also reviewed Batiste's juvenile detention and probation records; jail disciplinary records; jail medical records; school records; testimony from family members and other mitigation witnesses during the punishment phase of Batiste's trial; testimony of the State's expert Dr. Krieger; as well as several online newspaper articles regarding details of the offense. (Ex. 1 at ¶13 [Aff. of Dr. Underhill].) For the ease of the reader, Dr. Underhill's analysis in this claim is not set out in block quotations, but comes directly from his expert affidavit and is cited as such.

## C. Trial Counsel's Failure to Discover Batiste's Frontal Lobe Damage Constituted Deficient Performance

Counsel's failure to discover Batiste's frontal lobe damage "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Whether trial counsel's performance is deficient depends on whether counsel's actions are "inconsistent with the standard of professional competence in capital cases that prevailed [at the time of the trial]." *Pinholster*, 131 S. Ct. at 1407.

### 1. Standards Required For Capital Representation

The standards of professional competence at the time of Batiste's trial were set by the 2003 American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases. The Guidelines state that "[c]ounsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty." ABA Guidelines, Guideline 10.7. Moreover, the Guidelines state that "counsel at every stage of the case have a continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation." *Id.* at Guideline 10.11(A).

Because the duty to investigate all avenues of mitigation is instrumental to the defense of a capital case, the Guidelines require that the defense team consist of two qualified attorneys, an investigator, and a mitigation specialist. *Id.* at Guideline 4.1(A)(1). Counsel's own observations of the client's mental status, while necessary (*See* Guidelines 10.5 and 10.15.1(E)(2)), can hardly be expected to be sufficient to detect the array of conditions that could be of critical importance. Accordingly, at least one member of the defense team must be a person qualified by experience and training to screen for mental or psychological disorders or defects and recommend such further investigation of the subject as may seem appropriate. *See id.* at Guideline 4.1(A)(2).

19

: 00037

This type of further investigation may consist of hiring experts to "rebut or explain evidence presented by the prosecutor." *Id.* at Guideline 10.11(F)(2); *see also* ABA STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES, Standard 5-1.4 cmt. (3d ed. 1992) (National standards on defense services have consistently recognized that quality representation cannot be rendered unless assigned counsel has access to, among other things, expert witnesses).

In particular, mental health experts are essential to defending capital cases. A defendant's psychological and social history and his emotional and mental health are often of vital importance to the jury's decision at the punishment phase. Dr. Richard Dudley and Pamela Leonard, *Getting it Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment*, 36 HOFSTRA L. REV. 963, 975 (2008); Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. REV. 299, 323-24 (1983). Neurological and psychiatric impairment are common among persons convicted of violent offenses on death row. *See, e.g.*, Craig Haney, *The Social Context of Capital Murder: Social Histories and the Logic of Mitigation*, 35 SANTA CLARA L. REV. 547, 559-83 (1995). As a result, counsel must compile extensive historical data, as well as obtain, when appropriate, a thorough physical and neurological examination. Diagnostic studies, neuropsychological testing, appropriate brain scans, blood tests or genetic studies, and consultation with additional mental health specialists may also be necessary. *See* Douglas S. Liebert, Ph.D. & David V. Foster, M.D., *The Mental Health Evaluation in Capital Cases: Standards of Practice*, 15 AM. J. FORENSIC PSYCHIATRY 43, 43-64 (1994).

### 2. Compelling Evidence Existed that Batiste's Trial Team Was on Notice That a Thorough Mitigation Investigation Should Have Included a Neuropsychological Evaluation

The circumstances of a particular case will often require specialized research and expert consultation. ABA Guidelines, Guideline 10.7 (commentary). Mental health issues are so ubiquitous in capital defense representation that the provision of resources in that area should be routine, although every situation will also have its own unique needs. The demands of each case—and each stage of the same case—will differ. *Id.* at Guideline 4.1 (commentary).

Batiste's defense team consisted of two qualified attorneys, an investigator, and a mitigation specialist. The mitigation specialist interviewed family members of Batiste and obtained his medical, school, juvenile delinquency, and criminal history records. Based on even this cursory investigation, it was evident that a neuropsychological evaluation was appropriate based on neuropathology and cognitive dysfunction risk factors present in Batiste's social history; Batiste's history of meningitis as a neonate; and the risk factors present in Batiste's juvenile history. Trial counsel's failure to seek out such an appropriate evaluation, despite the presence of numerous indicators it was warranted, was ultimately deficient. *See Rompilla v. Beard*, 545 U.S. 374, 392 (2005) (school, medical, and prison records of defendant were full of "red flags" that pointed to a need to test further, and when testing revealed organic brain damage and mental disturbance, trial counsel was found ineffective for failure to investigate records and pursue testing.)

It is well established that there are certain etiological risk factors that breed neuropathology and cognitive dysfunction. Many defendants who have been charged with homicide have been exposed to various environmental factors that

21

leave them at risk of cognitive, neuropsychological, and organic brain impairment which can lead later to violent behavior.[6]

Batiste's mitigation specialist learned from Batiste's mother and grandmother that Batiste was born to a teenage mother who concealed her pregnancy and received no pre-natal care or medical supervision throughout the duration of her pregnancy. Batiste's mother also revealed that the family was poor and she struggled to provide Batiste with a stable or consistent living environment. Basic investigation into Batiste's familial, social, and developmental history revealed the presence of a multitude of risk factors for neurological and cognitive dysfunction, including: young maternal age during pregnancy; poor maternal diet and medical care during pregnancy; exposure to parental physical abuse and emotional neglect; exposure to housing instability; poor socioeconomic conditions; deficient parental and offspring education; substance abuse and dependency history (substance abusers are more likely to have pre-existing neurological conditions and deal with those conditions by the use of substances); and experience of violent victimization with possible exposure to head injury. Mark Cunningham & Mark Vigen, *Death Row Inmate Characteristics, Adjustment, and Confinement: A Critical Review of the Literature*, BEHAV. SCI. LAW 20, 191-210 (2002).

Additionally, Batiste's mother and grandmother reported that Batiste suffered from meningitis as a child. Medical records confirm that at nine months old, Batiste was rushed to the emergency room with a critically high fever and

---

[6] The fact that Batiste had an IQ in the "normal" range (89 in 2004) certainly does not absolve trial counsel's failure. Frontal lobe damage often has an insignificant effect on traditional IQ testing. Researchers believe that this may have to do with the fact that IQ tests typically assess convergent rather than divergent thinking. Frontal lobe damage can have an impact on divergent thinking, or flexibility and problem solving skills. D. Stuss et al., *Subtle Neuropsychological Deficits in Patients with Good Recovery After Closed Head Injury*, 17 NEUROSURGERY 41, 41-47.

: 000048

lethargic disposition.  Batiste spent over a week in the hospital with a diagnosis of H. influenzae meningitis.  (Def. Trial Ex. 20, 25 RR.)  Brain damage can result from this type of life-threatening bacterial meningitis, and Batiste's medical history should have alerted trial counsel to the need to further investigate the possible complications and implications of Batiste's illness.[7]

Finally, Batiste's juvenile delinquency history was indicative that he likely suffered from some sort of brain dysfunction and should have been evaluated by a neuropsychologist or other appropriate professional.  It is well established that a high frequency of frontal and temporal lobe abnormalities and/or organic brain damage is found amongst juvenile delinquents.  Arthur S. Brickman et al., *Neuropsychological Assessment of Seriously Delinquent Adolescents*, 23 JOURNAL OF THE AMERICAN ACADEMY OF CHILD PSYCHIATRY 453, 453-57 (1984).  Batiste's juvenile delinquency history, when evaluated in light of the multitude of socioeconomic risk factors and medical history of meningitis would have led any reasonable counsel to acknowledge that further mental health evaluation was appropriate.[8]

---

[7] Brain injury and illness, including meningitis, are commonly known causes of frontal lobe damage.  *See Executive Dysfunction After Brian Injury*, HEADWAY: THE BRAIN INJURY ASSOCIATION, *available at* https://www.headway.org.uk/executive-dysfunction-after-brain-injury.aspx  (last visited April 18, 2013).

[8] Neuropsychological testing of criminal, and especially capital, defendants is not a new phenomenon and the availability of information and practitioners is wide spread.  The science of neuropsychology has been around for centuries and the field of neuropsychology as it relates to forensics and human criminal behavior has grown significantly in the past twenty years alone.  Neuropsychological referrals from attorneys rank equally in frequency with referrals from neurosurgeons, psychologists, general physicians, and rehabilitation specialists; and legal entities are now accounting for almost a third of private practice referral sources.  The number of presentations and peer reviewed publications on the topic of neuropsychology in the forensic context has sky-rocketed.  Moreover, the

23

: 00041

### D. Trial Counsel's Subsequent Failure to Present Expert Testimony Regarding Batiste's Brain Dysfunction to the Jury Constituted Deficient Performance

Trial counsel's failure to discover Batiste's frontal lobe damage resulted in their subsequent failure to present an expert neuropsychologist to testify regarding the brain damage and its' far reaching implications. If an appropriate evaluation had been done, an expert witness could have presented testimony regarding the nature of frontal lobe damage, its potential causes and effects, the far reaching implications on Batiste's risk taking behavior, and the availability of treatment.

Had trial counsel retained a qualified expert like Dr. James Underhill to conduct comprehensive neuropsychological testing of Batiste, he or she would have been able to then testify as follows:

#### 1. Frontal lobe damage and risk-taking

The frontal lobe is the area of the brain located at the front of both cerebral hemispheres. It is positioned anterior to the parietal lobe and superior and anterior to the temporal lobes. The frontal lobe is involved in motor function, problem solving, spontaneity, memory, language, initiation, judgment, impulse control, and social and sexual behavior. The left frontal lobe is responsible for language related movement, and the right frontal lobe controls non-verbal abilities. (Ex. 1 at ¶24 [Aff. of Dr. Underhill].)

However, for the majority of individuals, there is cross-over of function between both sides of the frontal lobe. The frontal lobe also contains many of the dopamine-sensitive neurons in the cerebral cortex. The dopamine system is associated with reward, attention, short-term memory tasks, planning, and

---

neuropsychologist's ability to testify concerning the presence of brain dysfunction is universally accepted in courts of all jurisdictions. *See* Jim Hom, *Forensic Neuropsychology: Are We There Yet?* 18 ARC. CLIN. NEUROPSYCHOL. 827, 827-45 (2003).

: 000042

motivation. A common characteristic of frontal lobe damage is a difficulty in or an inability to interpret feedback from an external environment. Examples of this deficit may include perseverating on a response, non-compliance with rules, impaired associated learning (which uses external cues to help guide behavior), and inappropriate or heightened risk taking. (Ex. 1 at ¶25 [Aff. of Dr. Underhill].)

Impulsivity and/or risk taking are often seen in individuals following frontal lobe damage. Impulsivity is simply a response disinhibition, while risk taking is related to the reward-based aspects of decision-making. An impulsive person will make a decision quickly, without considering the consequences, leading ultimately to behavior that exhibits a lack of self-control. Contrarily, a person with an inability to evaluate risk will look at the consequences but not weigh them. Instead, they will "jump at the opportunity of a reward even if the likelihood of receiving that reward is slim." (Ex. 1 at ¶26 [Aff. of Dr. Underhill].) Batiste's frontal lobe functioning with regard to risk taking is impaired. In comparison, the majority of a representative sample of the United States population scored better than Batiste on the portions of the Iowa Gambling Test designed to calculate an individual's ability to appropriately evaluate a situation involving risk. (*Id.* at ¶27.)

## 2. Impact of Batiste's Brain Impairment on His Everyday Functioning

Individuals with damaged frontal lobes often suffer from minimal to substantial memory loss. Batiste suffers from mild impairment of memory. However, it is his inability to conceptualize risk that significantly affects his functioning. Once Batiste is engaged in risky behavior he will continue to engage in that behavior, despite having the knowledge and recognition that the behavior may ultimately have dire consequences. Batiste's brain impairment renders him unlikely to stop risky behavior once it has begun, and in fact, causes him to behave in a way that actually increases the risk associated with a given situation despite being aware of the costs. (Ex. 1 at ¶28 [Aff. of Dr. Underhill].)

Batiste's inability to perceive risk can be compared to that of a compulsive gambler. An individual affected in this manner can recognize that the chance of winning is extraordinarily slim, and the likelihood of him losing his money is great. However, once the process of gambling has begun, he experiences difficulties in stopping himself. Instead, he increases the risk by continuing to gamble, despite the fact that he can acknowledge he will almost certainly lose. This is true regardless of the extent of the risk—it does not matter if there is one dollar or 100,000 dollars on the line. His inability to stop escalating the risk is the same. (Ex. 1 at ¶29 [Aff. of Dr. Underhill].)

The impact of damage to Batiste's frontal lobe is demonstrated by his history of failures to appropriately weigh the consequence of his actions. For example, immediately prior to his arrest in this case, Batiste was employed at a steel forging company. There was a period of several weeks where he worked in excess of forty hours and earned a significant amount of money in overtime. He immediately adjusted his spending habits to reflect that expectation of income, despite the fact that there was no guarantee that the overtime hours would continue. Intellectually, Batiste could understand that the consequence of this behavior was that he would not be able to meet his financial obligations. However, he continued to spend money and increased the material expectations of his family. In order to meet this expectation when the overtime income ceased, he began to engage again in illegal activities. (Ex. 1 at ¶30 [Aff. of Dr. Underhill].)

Similarly, Batiste's admission of facts in the instant crime reflects his inability to calculate risk. Once he perceived a "reward" (i.e., the rims on the victim's tires), he was unable to adjust his behavior based on the risk involved to himself and others. He began to assume an inordinate amount of risk for a relatively small reward. His actions indicate that once he was in the situation he

26

: 000044

escalated the level of risk again and again until the incident ended with tragic results. (Ex. 1 at ¶31 [Aff. of Dr. Underhill].)

### 3. Etiology of Frontal Lobe Damage and Potential for Treatment[9]

There are several possible etiologies of the brain dysfunction that Batiste demonstrates. Because of the confluence of interrelated factors it is not possible to distinguish the effects of any one etiology from the others. The impairment could result from head trauma or illness. However, contributing factors to Batiste's impairment could have been the result of a lack of pre-natal care his mother received during her pregnancy and/or her diet while pregnant. Furthermore, the meningitis Batiste suffered from as a neonate could have contributed to or been the direct cause of his impairment. (Ex 1 at ¶¶32-33 [Aff. of Dr. Underhill].)

Despite the frontal lobe damage, there are several ways that this impairment can be treated and controlled within a prison environment. First, medication is available that normalizes the dopamine response within the brain.[10] A dopamine reuptake inhibitor is a type of drug that acts as a reuptake inhibitor for the neurotransmitter dopamine. This in turn leads to increased extracellular concentrations of dopamine and therefore an increase in dopaminergic neurotransmission. In other words, the medication normalizes the amount of dopamine that is released in the brain, which in turn quells an individual's desire to engage in risk taking behaviors. In large scale studies, this class of medication has

---

[9] Trial counsel's failure to discover Batiste's frontal lobe damage and subsequent failure to present an expert witness to provide the jury with this essential information also had a detrimental effect on the jury's evaluation of whether or not Batiste would be a future danger. A full discussion of this issue can be found at Claim Six, *post*.

[10] Methylphenidate, marketed under the brand name Ritalin, is a dopamine reuptake inhibitor that is widely available and extremely effective in normalizing behavior. As of April 1, 2013, this medication was available in the Texas Correctional Managed Care formulary. (Ex. 1 at ¶34 [Aff. of Dr. Underhill].)

: 000045

decreased criminality in adults, including those with violent criminal behavior. (Ex. 1 at ¶34 [Aff. of Dr. Underhill].)

Secondly, the prison environment itself is conducive to the management and control of Batiste's brain dysfunction. Life in a secure prison is by its very nature controlled. Without much opportunity for decision making, and with limited freedom of movement, Batiste would likely not be presented with the opportunity to engage in risk taking behavior. However, even if presented with such an opportunity, the structure of the prison provides for frequent intervention and interruption. The manifestation of Batiste's brain injury is not immediate, rather he must first be confronted with a situation involving some level of risk. Once confronted with such a situation, he fails to appropriately calculate and evaluate the amount of reward to be gained versus the risk to be undertaken. Then, he must execute his actions according to that miscalculation. If Batiste's thought process is interrupted at any point, he is unlikely to follow through with risk taking behavior. The mechanics of the prison environment provide for constant interruption, and therefore disruption, of Batiste's ability to engage in and follow through with risk taking behavior. (Ex. 1 at ¶35 [Aff. of Dr. Underhill].)

### E. Trial Counsel's Failures Constituted Deficient Performance

In the presentation of their position that Batiste's life was not worthy of saving, the State argued at the close of the punishment trial that mitigation evidence is evidence that reduces a defendant's "moral blameworthiness." The State maintained that Batiste was raised by a loving mother and grandparents, was not beaten or molested, and had it a lot better than other people in the community. But most importantly, the State argued that Batiste made the choice to get in trouble, sell drugs, steal cars, commit bad acts in juvenile hall, drop out of school, and go on to commit acts of violence, and even if the jury had sympathy for Batiste

: 000046

it did not reduce his moral blameworthiness, because *Batiste made his own choices.* (25 RR at 49-53.)

Here, the neuropsychologist's role in mitigation was not only to educate the jury on the defendant's neuropsychological functioning, but also to assist in explaining the results in light of Batiste's ability to form intent to commit the crime, plan his behavior, use knowledge to regulate behavior, inhibit unsuccessful behaviors, and appreciate the consequence and risk to his behavior. The defense could have rebutted the State's position that everything Batiste did was as a result of his reasoned and rational choice; and instead educated the jury about what neuropsychological testing and assessment actually meant in the context of Batiste's risk factors, cognitive functioning, and ultimately, what effect Batiste's frontal lobe damage had on his participation in the crime. While not an *excuse* for his actions, the jurors were entitled to an *explanation.*

An expert witness, such as Dr. Underhill, could have provided the jury with insight into Batiste's general cognitive functioning as it related to planning, judgment, abstract reasoning, and ability to use knowledge to regulate behavior. The jury would then have been equipped with the tools to understand that Batiste's inability to properly conceptualize situations involving risk and adjust his behavior accordingly was not a product of his free-will, but rather a consequence of factors completely beyond his control. The jury, while not absolving him of responsibility, would have found that Batiste's life was in fact worth saving.

Furthermore, there does not have to be a direct correlation between a capital defendant's impairment and causation of his crime, rather any cognitive or neuropsychological impairment can be mitigating, even if it cannot be determined to have direct causative etiology with the homicidal behavior. *Tennard v. Dretke*, 542 U.S. 274, 287 (2004). Even without relating Batiste's frontal lobe damage back to the circumstances surrounding his arrest, the mere existence of Batiste's

: 00047

brain dysfunction is relevant to the impact it had on every aspect of his life, from childhood to early adulthood. Given the likelihood of even just one juror finding evidence that should have been presented through a neuropsychologist mitigating, Batiste would not be now facing certain death. *Wiggins*, 539 U.S. at 536.

### F. Conclusion

The most fundamental investigation into Batiste's life and social history reveals a myriad of factors that put him at risk of brain dysfunction. Trial counsel's failure to discover the existence of Batiste's frontal lobe damage and subsequent failure to convey essential mitigating evidence to the jury, created "a probability sufficient to undermine confidence in" the outcome of Batiste's punishment trial, and as a result, his death sentence should be overturned. *Porter*, 130 S. Ct. at 455-56 (quoting *Strickland*, 466 U.S. at 693-94).

## CLAIM TWO

## TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PRESENT A GANG EXPERT TO OFFER AN OPINION TO REBUT THE PROSECUTION'S EVIDENCE OF BATISTE'S GANG INVOLVEMENT

During the punishment phase of trial, a central feature of the prosecution's case for the death penalty was the admission of evidence of Batiste's gang affiliation. The prosecution offered evidence of Batiste's gang affiliation in support of their argument that he would be a future danger and that nothing mitigated against the imposition of the death penalty. Because trial counsel failed to offer an expert opinion regarding Batiste's gang affiliation to rebut the prosecution's evidence, their conduct fell below the generally recognized standard of care. The testimony of a gang expert could have assisted jurors in understanding the limited nature of Batiste's gang involvement and the mitigating factors that led to that limited affiliation. Therefore Batiste's sentence of death was unlawfully and unconstitutionally imposed in violation of his applicable state

and federal Constitutional rights, state statutory law, and United States Supreme Court and state case law.

## A. Relevant Factual Background

In preparation for trial, the prosecution filed a Notice of Intent to Use Extraneous Offenses which included notice that the prosecution intended to use Batiste's membership in the Five Deuce Hoover Crips against him at trial either as impeachment at guilt or during punishment. (4 CR at 845-46.)

### 1. Prosecution Classification Expert David Davis

At punishment, the prosecution offered the testimony of David Davis as an expert on the Texas Department of Criminal Justice's ("TDCJ") classification system (hereafter "classification expert"). (18 RR at 98.) Davis testified that upon entry into the Harris County jail, he documented Batiste as a member of the Five Deuce Hoover Crips street gang. (*Id.* at 152.) He testified that when an inmate is identified as gang-affiliated, he makes a referral to the "disruptive groups unit." (*Id.* at 104.) He testified that gang membership can affect the classification level an inmate receives, but it does not necessarily affect housing assignments because it would be impossible to separate all gang members. (*Id.* at 116-17.) Davis also testified that while Batiste was housed in the Harris County jail, he was written up for numerous offenses ranging from major infractions like assault to minor ones like throwing orange peels out of his cell. (*Id.* at 130-49.)

### 2. Prosecution Gang Expert Clint Ponder

Next the prosecution called Houston Police Officer Clint Ponder as a gang expert. (18 RR 157.) Ponder testified that he was assigned to the Fondren Divisional Gang Unit and handled gang-related problems. (*Id.* at 158.) Ponder testified about his knowledge of the Crips street gang. (*Id.* 162-64.) He further testified that he identified Batiste as a member of the Crips based on photographs of Batiste's tattoos; his possession of a blue bandana at the time of arrest; his

31

possession of a blue Santa Muerte necklace at the time of arrest; and his inclusion in the police gang tracker database. (*Id.* at 165-77.) Ponder testified extensively about the meaning of Batiste's tattoos and explained why they were gang-related. (*Id.* at 178-97.) He testified that Crips never write the letters "c-k" because that stands for "Crip killer." Instead Crips write "c-c," so that "back" would be spelled "bacc." (*Id.* at 195-96.) Trial counsel did not cross-examine Ponder. (*Id.* at 200.)

### 3. Prosecution Security Threat Group Expert Irma Fernandez

The prosecution then called Irma Fernandez to testify. (19 RR at 30.) Fernandez testified that she worked for TDCJ and was assigned to the Ellis Unit, a maximum security prison in Huntsville, Texas. (*Id.* at 31.) She worked with security threat groups with the prison's Gang Renouncement and Disassociation Process (GRDP). (*Id.* at 32.) She testified that TDCJ recognizes twelve groups as security threat groups and the Crips are one of them. (*Id.* at 36.) She testified that security threat groups are defined as groups that threaten the safety and security of the prison and its staff. (*Id.*) She testified that individuals who were Crips on the street will continue their criminal activities in prison. (*Id.* at 37.) Crips were identified as a security threat group because of their history of violence, assaults against staff and inmates, weapon possession, extortion and other crimes. (*Id.* at 39.) She testified that Crips prey on weaker inmates, participate in riots, and engage in sexual assaults on other inmates. (*Id.* at 40-42.)

Fernandez testified that upon entry to TDCJ, Batiste was interviewed regarding his gang affiliation and his tattoos were photographed. (19 RR at 45-50.) She testified that if Batiste were to be sentenced to life without parole, he would be housed in general population at TDCJ and would thus have the opportunity to harm other inmates and staff. (*Id.* at 52-56.) She testified that inmates sentenced to life without parole have less incentive to behave well and are more assaultive toward

32

staff and other inmates because they have an attitude that nothing worse can be done to them. (*Id.* at 56-57.)

Fernandez also testified that gang members have access to contraband in prison and drugs, cell phones, and other contraband can be smuggled into prison. (19 RR at 63-64.) She testified that it is extremely dangerous when gang members get cell phones in prison because they can coordinate gang activity outside of prison and order hits against other gang members. (*Id.* at 64.) She testified that TDCJ staff is not able to prevent most gang activity and that they catch and prevent only a small portion of gang activity that occurs in TDCJ facilities. (*Id.* at 71.)

### 4. The Defense Case During the Punishment Phase

On cross-examination of defense witness Stephanie Soliz, Batiste's girlfriend and mother of his child, the prosecution elicited that she knew that Batiste's associates were Crips and that Batiste frequently invited them to their house. (23 RR at 167.)

On cross-examination of Soliz's mother, Terry Soliz, the prosecution elicited that she did not know that Batiste was in a gang. (24 RR at 22.) Batiste's mother, Rowena Scott, also testified that she did not suspect that Batiste was in a gang. (*Id.* at 109.)

Trial counsel presented testimony from Batiste's brother, Kevin Noel, Jr. On cross-examination, the prosecution elicited that Noel did not know or suspect that Batiste was a member of the Crips. (24 RR at 39.) Noel admitted to the prosecution that he himself was a member of the Line Five Piru Bloods, and that he had been photographed wearing red and showing gang signs. (*Id.* at 45.) In a letter to Noel, Batiste gave him advice about getting gang-related tattoos by saying that if Noel was going to get a tattoo, he should make sure it is the right tattoo so that he does not get into any trouble. (*Id.* at 51.)

33

Trial counsel called Batiste himself to testify. Trial counsel elicited from Batiste that he planned to distance himself from his Crip associates while in prison and that he intended to participate in the prison's program that helps individuals get out of gangs. However, the prosecution confronted Batiste with letters he had written while in jail awaiting trial with multiple references to his Crip affiliation. (24 RR at 180-81.)

## B. Trial Counsel was Ineffective for Failing to Rebut the Prosecution's Evidence of Batiste's Gang Affiliation by Presenting Testimony from a Gang Expert

Trial counsel knew the prosecution was going to use evidence of Batiste's gang affiliation. They knew that evidence about gangs had the potential to be extremely prejudicial. In fact, during the guilt phase of trial, Batiste's counsel worked diligently to keep out any mention of Batiste's gang affiliation. (*See, e.g.*, 14 RR at 127.) However, in the punishment phase, trial counsel allowed the prosecution's evidence to go unchallenged and unrebutted. Trial counsel had a duty to challenge the prosecution's inflammatory evidence of Batiste's gang affiliation. Thus, trial counsel's failure to present testimony from a gang expert constituted deficient performance and fell below the generally accepted standards for capital defense counsel. *See Strickland*, 466 U.S. at 688.

Trial counsel also recognized that testimony about Batiste's membership in the Crips would be highly inflammatory and prejudicial to the jury during the punishment phase of trial. They objected to its admission twice—once when Davis testified and once when Fernandez testified. (18 RR at 154-56; 19 RR at 37-39.) And yet they still did nothing to challenge or rebut this inflammatory testimony.

The standards of professional competence at the time of Batiste's trial were set by the American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases. The Guidelines state that

34

: 00052

"[c]ounsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty." ABA Guidelines, Guideline 10.7. Moreover, the Guidelines state that "counsel at every stage of the case have a continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation *or rebuts the prosecution's case in aggravation*." *Id.* at Guideline 10.11(A) (emphasis added). Finally, counsel should consider hiring experts to "rebut or explain evidence presented by the prosecutor." *Id.* at Guideline 10.11(F)(2). Based on these accepted minimum standards of professional competence, trial counsel performed deficiently by not presenting testimony from a gang expert.

Trial counsel was on notice that the prosecution intended to use Batiste's gang affiliation as aggravating evidence during the punishment phase of trial. Therefore trial counsel had a duty to challenge and rebut this evidence. No reasonable strategy justifies leaving aggravating evidence unchallenged. Trial counsel could have rebutted the prosecution's evidence regarding Batiste's gang affiliation by presenting testimony from a gang expert. Had trial counsel hired an individual like Charles Rotramel, an expert in Houston-area gangs and the juvenile justice system, he or she would have been able to testify as follows:[11]

### 1. Batiste's Early Life and First Experiences with Gangs

Teddrick[12] grew up without consistent and steady parenting. Several of his family members note that Teddrick never had a positive, dependable male figure in his life while growing up and that by necessity his mother spent much of her time working to provide for her two young sons. (Ex. 7 at ¶9 [Aff. of Melissa Beard-Carter]; Ex. 9 at ¶¶35-41 [Aff. of Monica Davis].) The identity and whereabouts

---

[11] For the ease of the reader, Rotramel's analysis in this Claim is not set out in block quotations, but comes directly from his expert affidavit and is cited as such.

[12] First names will be used throughout this section.

35

: 000053

of his biological father were unknown, and his mother was subsequently involved in various romantic relationships that were unstable and dysfunctional. Teddrick's mother exposed him to men who were physically and emotionally abusive and had serious drug problems. (Ex. 17 at ¶¶20-32 [Aff. of Rowena Scott]; Ex. 15 at ¶¶8-14 [Aff. of Kevin Noel Jr.]; Ex. 9 at ¶¶35-41[Aff. of Monica Davis].) This lack of authority, structure, and direction at home ultimately led Teddrick to seek these things out on the streets. (Ex. 2 at ¶23 [Aff. of Charles Rotramel].)

Teddrick's first actual exposure to the gang lifestyle occurred when he attended Campbell Middle School in the Cypress-Fairbanks Independent School District ("Cy-Fair ISD"). Around April 2002, when he was fourteen years old, Teddrick met a man named Daron in his neighborhood who claimed to be a Five Deuce Hoover Crip. Daron was about twenty-three years old, had a regular job, and a family. Daron claimed to be from Los Angeles—the birthplace of the Crips—and claimed to know a lot about the Crips. While Daron may not have actually been from Los Angeles and may not have even been a Crip (as evidenced by the fact that he had a job and a family, both uncommon for "hard-core" gang members), the actual effect that Daron had on Teddrick was profound. (Ex. 2 at ¶25 [Aff. of Rotramel].)

Teddrick looked up to Daron, and as a result of meeting him, Teddrick began wearing blue and "dropping knowledge," or sharing information about the Crips while at school. However, Teddrick did not have any actual affiliation and did not belong to any clique. Teddrick was merely presenting himself as a gang member without having any actual involvement or membership. This type of behavior is common among young teenagers in some neighborhoods, where being perceived as a gang member is seen as something cool and edgy, but nothing more. (Ex. 2 at ¶26 [Aff. of Rotramel].)

36

At the time Teddrick was in middle school at Campbell, there were very few legitimate gang members in the Cy-Fair ISD. As a result, Teddrick believed that the knowledge he learned about Crips from Daron was enough to make him a Crip, even though he did not associate with any actual gang members or participate in any organized gang activity. (Ex. 2 at ¶27 [Aff. of Rotramel].)

## 2. The Negative Impact of Teddrick's First Exposure to the Juvenile Justice System

Around this same time, Teddrick began to hang out with other students at Campbell who were breaking school rules and getting into trouble. Teddrick started selling Ritalin at school to other students. Teddrick was caught selling Ritalin at school in May of 2002. Teddrick was arrested and his entanglement in the juvenile justice system began. (Ex. 2 at ¶28 [Aff. of Rotramel].)

When Teddrick was caught selling Ritalin, the schools in the Cy-Fair ISD had a "zero tolerance policy." This policy dictated that a student that committed a crime on school grounds had to be arrested and expelled, no matter the circumstances of the "crime" or personal attributes of the student. At the time of Teddrick's arrest, Cy-Fair ISD had the strictest zero-tolerance policy and was the largest client of the Harris County Juvenile Justice Alternative Education Program ("JJAEP") even though it was not the largest school district. As a result of the zero tolerance policy, Teddrick was expelled from Campbell, adjudicated in the juvenile justice system, and released to the custody of his mother and step-father. However, because he had been expelled, he could no longer return to his home campus at Campbell Middle School. Instead, the JJAEP placed Teddrick into Excel Academy, an alternative school. Teddrick spent an entire summer and subsequent academic year at Excel Academy for the singular offense of selling Ritalin on school grounds. (Ex. 2 at ¶¶29-31 [Aff. of Rotramel].)

: 00055

Teddrick had to take a two-hour bus ride every day to reach the Excel Academy and then another two-hour bus ride home in the afternoon. As a result, Teddrick spent at least four hours a day on the bus with other teenagers mandated to Excel Academy. The bus ride was so lengthy because youth from all over Houston were sent to Excel Academy and the same bus had to pick up all of the students. The teenagers that Teddrick encountered during his four hours on the bus going to and from Excel Academy were very different than those he encountered in the Cy-Fair ISD. Many of the students were older than Teddrick, some as old as eighteen or nineteen. Many of the students in JJAEP at the time were there for serious or violent crimes. Some were in JJAEP after already having been to Texas Youth Commission ("TYC") facilities, or even adult jail. During these bus rides, Teddrick's older classmates discussed how to steal cars and how to sell and cook crack. It was from these individuals that Teddrick would ultimately learn how to steal cars. (Ex. 2 at ¶¶33-34 [Aff. of Rotramel].)

### 3. Batiste's Return to School and his Boot Camp Experience

Teddrick completed his term at Excel Academy in December 2002 and began attending Cypress Ridge ("Cy-Ridge") High School in January 2003. Teddrick had a strong desire to get involved in sports after his release from JJAEP. Coach Gary Thiebaud, the head football coach at Cy-Ridge, had seen Teddrick play football in middle school and recruited him to play football at Cy-Ridge. (Ex. 2 at ¶35 [Aff. of Rotramel].) However, Teddrick missed the fall football season because he was in JJAEP and as a result could only participate in spring training once he arrived at Cy-Ridge. Had Teddrick been able to participate in the regular football season, the course of his life potentially could have been drastically different. (Ex. 2 at ¶36 [Aff. of Rotramel].)

Competing with a team of positive peers and accomplishing a goal with others is genuinely life-changing for many at-risk youth. Especially for gang-

38

affiliated youth such as Teddrick who have only been exposed to negative peer relations and who lack true genuine friendships, the camaraderie, and sense of belonging and accomplishment a team sport can provide cannot be overstated. The connections they make with their teammates and the opportunity to highlight their skills in the arena of competition has a long-lasting effect on young people, particular those who, like Teddrick, are in need of a positive outlet. Because Teddrick missed the fall football season he did not get to participate in any actual games, rather he just attended spring training. As a result he never got to truly experience competitive sports in an active and engaged manner. (Ex. 2 at ¶37 [Aff. of Rotramel].)

Teddrick was excited about the possibility of focusing on sports but continued to associate with the teenagers he had met on the bus to Excel Academy, including the ones who were older and had more experience with criminal activity. While he had one foot in the camaraderie of the football team, he now had another foot in the life of the streets. Using what he learned from his classmates at JJAEP's Excel Academy, Teddrick started to steal cars, mainly so that he could visit his girlfriend Stephanie. Teddrick was arrested twice for unauthorized use of a vehicle during the summer following his first semester at Cy-Ridge High School. As a result of these two arrests, Teddrick was again adjudicated delinquent and placed in the custody of the Juvenile Probation Officer for Harris County. (Ex. 2 at ¶¶38, 40 [Aff. of Rotramel].)

Juvenile Probation first placed Teddrick at Burnett-Bayland Rehabilitation Center ("BBRC") and then at Delta Boot Camp. Teddrick was released from Delta Boot Camp in December 2003. Since the time that Teddrick was sent to Delta Boot Camp, the juvenile justice system in Texas generally, and Houston particularly, has determined that the boot camp model is not effective. Now the boot camp is called Harris County Leadership Academy. Nationally, studies began

: 000057

to show in the mid-2000s that juvenile boot camps have the highest rate of recidivism of any juvenile correctional facilities in the country. Juvenile justice departments around the country began to move away from the boot camp model after a Government Accountability Office (GAO) study identified 1,619 incidents of child abuse at juvenile boot camps in the year 2005.[13] (Ex. 2 at ¶¶41-42 [Aff. of Rotramel].)

Teddrick left Delta Boot Camp considering the idea of joining the military as a career goal. However, just as Teddrick was beginning to form constructive life goals, he was placed into an environment that made it difficult to nurture positive change. Just as Teddrick left boot camp, his mother moved out of the Cy-Fair ISD and into an apartment complex directly across the street from Eisenhower High School, near the Acres Homes neighborhood. These apartment complexes around Eisenhower High School are notoriously high in crime, with extensive drug dealing, prostitution, and other crimes. Eisenhower High School has a well documented history of gangs and criminal activity among students. Teddrick was thrust into a rough neighborhood where he knew no one and forced into a school with unfamiliar faces and considerable gang activity. Also as a result of his mother's move to Acres Homes, Teddrick lived even farther away from his girlfriend, Stephanie. Two months after Teddrick moved to Acres Homes, Teddrick was again arrested for unauthorized use of a motor vehicle. When Teddrick was adjudicated delinquent he was sentenced to TYC. After orientation, Teddrick was sent to the Sheffield campus, located in Pecos County, Texas. (Ex. 2 at ¶¶43-45 [Aff. of Rotramel].)

---

[13] Ken Dilanian, *GAO Study Reveals Boot Camp "Nightmare"*, USA TODAY, October 10, 2007, *available at* http://usatoday30.usatoday.com/news/nation/2007-10-10-boot-camps-main_N.htm?csp=34.

: 000000

### 4. Teddrick's Exposure to Institutionalized Gang Culture

Teddrick's experience at TYC's Sheffield Boot Camp proved transformative. Sheffield was a facility deep in West Texas, far from Teddrick's home, family, loved ones, and comfort zone. Sheffield closed in 2008 after sexual abuse scandals erupted in TYC's West Texas State School a year prior. Before its closing, Sheffield had a reputation as being an extremely harsh and isolating experience for youth. (Ex. 2 at ¶46 [Aff. of Rotramel].)

Before his time at Sheffield, Teddrick had little to no contact with hard-core gang members. Prior to Sheffield, he had only encountered other youth like himself, who postured as being affiliated with a gang, but who had no real connection or alliance to an actual gang. All of this changed when Teddrick arrived at Sheffield. In order to survive at Sheffield, youths would have to identify with a gang. There were no individual sets or cliques—there were just large gangs such as Bloods, Crips, and MS-13. When a youth arrived at Sheffield, they quickly would establish an affiliation with an established gang for protection. The gangs at Sheffield had less in common with typical street gangs and were more similar to the large prison gangs. Juvenile street gangs are based on specific territories; members come from specific neighborhoods, apartment complexes, or areas of a city. Because youths come to TYC from all over the state of Texas, there is not enough of a critical mass for any juvenile street gang to gain influence and a following. Consequently, youth in TYC custody often organize themselves into larger, prison-style gangs based on race, ethnicity, or home gang affiliation. (Ex. 2 at ¶46 [Aff. of Rotramel].)

Sheffield was understaffed at the time Teddrick was there. As a result, there was often minimal supervision, leaving the youth like Teddrick vulnerable to abuse and violence at the hands of other youth and staff members in their dorms. Sheffield had large dorms called pods. There would be a control booth in the

41

center of two pods, where a guard would be charged with monitoring both pods. Sometimes guards would enter the pods and while they were in one pod, the other pod would not be monitored. Other times, the guard would sleep in the control booth, leaving both pods unmonitored. As a result, the lack of supervision led to a lawless environment where each youth had to concentrate on his own individual survival. (Ex. 2 at ¶¶47, 50 [Aff. of Rotramel].)

Furthermore, Teddrick was extremely isolated during his time at Sheffield. Due to Sheffield's remote location, Teddrick's family only managed to visit once during the year he was there. (Ex. 17 at ¶35 [Aff. of Rowena Scott].) There were also few youth from the Houston area at Sheffield and the other west Texas facilities. The youth at Sheffield were from all over the state, but few were from the Houston area because it was so far away. There were many other TYC facilities that were much closer to Teddrick's family in Houston. It is problematic that TYC chose to send him so far from his comfort zone and support network at such a young age. As a result of the isolation, Teddrick was forced to align himself with and rely on virtual strangers for all of his needs, both physical and emotional. (Ex. 2 at ¶¶48, 50-51 [Aff. of Rotramel].)

It is also significant that Teddrick was sent to TYC for nonviolent offenses. The juvenile justice system has changed tremendously since Teddrick's time at TYC. If Teddrick were adjudicated for the same offenses now he would not be sent to an incarceratory facility for an extended period of time. As a result of the Annie B. Casey Foundation's Juvenile Detention Alternatives Initiative, Harris County has closed two juvenile correctional facilities and has reduced the length of stay in others. The county now sends 81% fewer youth to the TYC (now the Texas Juvenile Justice Department) than it did as recently as 2005. This change is part of a national trend toward reducing the number of youth incarcerated. This trend is also driven by high levels of recidivism in such facilities, as well as numerous

scandals related to systematic and repeated abuse of juveniles in such facilities. Research has shown that incarcerating youth does not reduce crime but in fact increases it, while at the same time risking the exposure of youth to dangerous and abusive conditions.[14]  (Ex. 2 at ¶52 [Aff. of Rotramel].)

Teddrick was one of the youngest individuals at Sheffield.  Most of the youth there were older, more institutionalized, and more hardened than he was.  As a sixteen year old nonviolent offender, Teddrick was housed with violent offenders from all over the state who were up to nineteen or twenty years old.  (Ex. 2 at ¶56 [Aff. of Rotramel].)

Teddrick's affiliation with the Crips at Sheffield was a matter of his own protection and survival in an unfamiliar and dangerous institution far removed from everything and everyone he knew.  As one of the youngest youth in the facility, Teddrick would have been subject to abuse and exploitation by older youth if he lacked protection.  He was able to find protection through affiliation with the Crips at Sheffield.  (Ex. 2 at ¶53 [Aff. of Rotramel].)

Teddrick's experience at Sheffield ultimately institutionalized him.  This means that Teddrick's long term incarceration at one of the harshest juvenile facilities at a very young age led to permanent psychological maladaptations that affected his ability to communicate and to succeed in the outside world. Institutionalization (often called prisonization) has been found to cause several psychological adaptations: (1) dependence on institutional structure and contingencies; (2) hypervigilance, interpersonal distrust, and suspicion; (3) emotional over-control, alienation, and psychological distancing; (4) social withdrawal and isolation; (5) incorporation of exploitative norms of prison culture;

---

[14] Richard A. Mendel, *No Place for Kids: The Case for Reducing Juvenile Incarceration*, THE ANNIE E. CASEY FOUNDATION, *available at* http://www.aecf.org/OurWork/JuvenileJustice/JuvenileJusticeReport.aspx.

: 000061

(6) diminished sense of self-worth and personal value; and (7) Post-Traumatic Stress Disorder.[15]  Teddrick's institutionalization created in him a deep distrust of other people, made him distance himself from others, made him suspicious of others, and ultimately made it difficult for him to function outside of institutional control. (Ex. 2 at ¶54 [Aff. of Rotramel].)

### 5. Teddrick's Release from TYC Custody and His Focus on Family

After spending a year at Sheffield, Teddrick was transferred to Schaeffer House—a halfway house in El Paso, which was even further from home. Teddrick's experience at Schaeffer House was just as isolating and alienating as his experience at Sheffield.  Both Sheffield and Schaeffer were in the West Texas TYC district which was the epicenter of the abuse scandal in 2007 which ultimately led to the dismantling of TYC entirely.  (Ex. 2 at ¶¶57-58 [Aff. of Rotramel].)

While in TYC custody, Teddrick earned his GED.  This meant that at seventeen years old, Teddrick could not return to high school and thus could not return to the life of a typical teenager.  He no longer had the ability to play football or be involved with any kind of organized sports.  There was no structured environment for him and no one directing him toward any kind of life path. (Ex. 2 at ¶59 [Aff. of Rotramel].)

Despite this lack of guidance, when Teddrick was released from TYC he had a strong desire to start a family with Stephanie.  Stephanie had her first son, Kash, a few weeks before Teddrick was released.  Even though Teddrick was not Kash's biological father, Teddrick made it clear that he wanted to raise Kash as his own, to be the father figure for him, and to provide for Stephanie and Kash.  Shortly thereafter, Teddrick, Stephanie, and Kash moved in with Stephanie's father Raul

---

[15] Craig Haney, *The Psychological Impact of Incarceration: Implications for Post-Prison Adjustment*, *available at* http://aspe.hhs.gov/hsp/prison2home02/haney.htm.

: 00062

Soliz. This was the first time that Teddrick had a stable family unit in his life. He ate three square meals a day together with his new "family," again, for the first time in his life. Teddrick responded positively to this change and stayed out of trouble during this time. He began working several jobs and ultimately began working with Raul, who had a lawn care business of his own. (Ex. 19 at ¶¶4-6 [Aff. of Raul Soliz]; Ex. 2 at ¶¶60-61 [Aff. of Rotramel].)

By all accounts, Teddrick had a strong work ethic and loved to work. He would work as many hours as possible. This period of Teddrick's life is also suggestive that, given an affirming support structure, Teddrick could have been a productive, law-abiding citizen. (Ex. 2 at ¶61 [Aff. of Rotramel].)

It is extremely uncommon for a hard-core gang member to take on a full time job of any kind. Individuals with a strong gang affiliation rely on the gang for income and social standing. Working a full time job, particularly for or near minimum wage, is considered "selling out" the gang. It is entirely inconceivable to believe that a serious gang member would work extra hours and multiple jobs. (Ex. 2 at ¶62 [Aff. of Rotramel].)

After this period living with Stephanie and her family, the young couple began to argue, leading to a temporary break-up. Teddrick began staying with various associates in Houston. Eventually, Teddrick started hanging out with gang-related individuals back in his old neighborhood around Eisenhower High. (Ex. 2 at ¶63 [Aff. of Rotramel].)

It was during this time that Teddrick became known by the nickname "New York," because he claimed to be from New York and loved all things New York. This is one of several different nicknames that Teddrick used. In different circles, Teddrick went by "Smoke." On another occasion, Teddrick self-reported to gang officers that his gang moniker was "Yayo" and that his affiliation with the Crips had started in California. This is a strong indication that while professing a Five

45

Deuce Hoover Crip affiliation outwardly, Teddrick actually never had a strong gang-affiliation because he lacked a "set," or a common group of gang members with whom he associated on a regular basis. Because he was always moving around and having to make new associations with people, Teddrick would make up new associations for himself. Because Teddrick spent much of his childhood moving from neighborhood to neighborhood and spent much of his adolescence in and out of the juvenile justice system, he lacked a sense of belonging or a strong community bond. (Ex. 2 at ¶64 [Aff. of Rotramel].)

Also symptomatic of his institutionalization was Teddrick's continuous changing of friends, intense mistrust of others, and failure to maintain a strong set of friends. It is common for gang-affiliated youth to have very few, if any, actual friends. Frequently, the social construct of "loyalty" will take the place of true friendship among youth who have been institutionalized. Having never experienced long lasting relationships, the institutionalized youth overemphasizes loyalty to their associates. Loyalty becomes a proxy for the unconditional positive regard which they have never experienced. Everyone the institutionalized youth has gotten close to has abandoned them, and all of their relationships are tentative and temporary. To the institutionalized youth, being loyal to another person is an essential character trait that makes them better than all the people who have abandoned them. Loyalty consequently becomes the most important thing for these youth. If a youth in an institutional setting can find someone or some group that is loyal to them, then that becomes something that the youth cannot let go. This also explains why associates in a gang will go out of their way to take credit for the crime of another, even someone they may not be particularly close to. Loyalty trumps friendship at every turn. (Ex. 2 at ¶¶65, 68 [Aff. of Rotramel].)

The only time that Teddrick had stability during his life was when he lived with Raul, Stephanie, and Kash. Almost predictably, once Teddrick lost the

: 000064

stability of life with Stephanie's family, Teddrick again found himself in trouble for unauthorized use of a vehicle. Teddrick pled guilty and was sent to state jail for the first time. (Ex. 2 at ¶¶65-66 [Aff. of Rotramel].)

As soon as Teddrick was released from state jail, he left Houston to live with his friends Rico and Micaela Lara in Denton. Stephanie also joined them in Denton, bringing with her Kash and Teddrick's newborn son Alex. The idea behind moving to Denton was to get away from the negative influences and old associations in Houston. Teddrick recognized that he needed to stay away from the bad influences that led him to his incarceration in state jail. Rico—likely the only true friend Teddrick ever had in his life—saw this and made sure that Teddrick came to live with him and his family in Denton. (Ex. 2 at ¶67 [Aff. of Rotramel; Ex. 11 at ¶¶14-18 [Aff. of Micaela Lara]; Ex. 12 at ¶¶7-9 [Aff. of Rico Lara].)

Rico helped Teddrick find work and the two young couples lived together in Denton until personal difficulties between Teddrick and Stephanie caused Stephanie to move back to Houston with the kids. Just days later, Teddrick was arrested for burglary of a vehicle and spent two months in jail in Denton. After his release, Teddrick and Stephanie reunited in Houston. (Ex. 11 at ¶¶14-22 [Aff. of Micaela Lara]; Ex. 12 at ¶¶7-10, 13 [Aff. of Rico Lara].)

After reuniting with Stephanie and the children in Houston, Teddrick was fully invested in the idea of having a family life and being the provider for his family, working more than full-time at Forge USA. Teddrick moved Stephanie and the kids into their own apartment, and Teddrick paid the rent and the bills with his earnings. However, at the same time, Teddrick began affiliating with new people in the area. He had several younger associates who he spent time with. He saw himself as trying to teach these younger youth both the ways of the street and at the same time, trying to keep them in school. Teddrick would pick them up

47

: 00065

from school to make sure they had attended that day. Again, none of Teddrick's behavior is consistent with the behavior of a hardcore gang member. While Teddrick may have seen himself as older and wiser than his younger associates, he was still working a full-time job, supporting a family, and trying to be a positive influence. (Ex. 2 at ¶70 [Aff. of Rotramel].)

Up to this point, Teddrick had never been involved in any crimes of violence. But these younger associates were "jackers," meaning they would commit armed robberies by sticking a gun in people's faces and demanding their valuables. Teddrick strongly discouraged this behavior. While Teddrick could not successfully prevent them from jacking people, they would at least not do it around him. (Ex. 2 at ¶71 [Aff. of Rotramel].)

Eventually, Teddrick's hours at Forge USA got reduced and he began to feel enormous stress about not being able to provide for his family. It was a tremendously difficult time in his life. During this time, some of his younger associates had a plan to "jack" a tattoo parlor. While Teddrick initially resisted, in a low moment, he decided to ride with them. As the "elder" of the group, he decided this time to give the younger associates "leeway" to pull off this robbery and let them call the shots. Again, the concept that loyalty is the most important thing among institutionalized and gang-affiliated youth like Teddrick likely contributed to his decision to go along with behavior of his younger associates that he would otherwise disapprove of. (Ex. 2 at ¶¶72-73 [Aff. of Rotramel].)

### 6. Conclusions

Teddrick was never a hard-core gang member. He was not born into a gang-affiliated family, nor was he ever formally inducted into gang membership. Hard-core gang members often inherit gang membership from family members. In other cases, they choose to join a specific gang because of the influence of older or tougher peers. Gang membership is the most important factor in the life of a hard-

core gang member; nothing in a gang member's life is as significant as the gang and its members. The hard-core gang member develops strong affiliations with other members of his gang, spending large amounts of time with the gang and shunning involvement in other activities or relationships. (Ex. 2 at ¶¶19-21 [Aff. of Rotramel].)

For the hard-core gang member, gang affiliation defines their identity and is a central component to their lives. Hard-core gang members do not hide their gang affiliation, nor do they compartmentalize it or separate it out from their day-to-day lives. Significantly, none of Teddrick's family members knew that he was in a gang. (Ex. 7 at ¶17 [Aff. of Melissa Beard-Carter]; Ex. 9 at ¶42 [Aff. of Monica Davis]; Ex. 17 at ¶3 [Aff. of Rowena Scott].) Even his younger brother Kevin, who himself admitted to being affiliated with the Bloods, never saw Teddrick actively participate in gang activity. (Ex. 15 at ¶¶4-5 [Aff. of Kevin Noel].) This is entirely inconsistent with being a hard-core gang member. If Teddrick had been a hard-core gang member, not only would his family have known about it, but Teddrick would have proudly professed his membership to them. The fact that Teddrick's family did not know about his affiliation does not suggest that his family did not know him well. To the contrary, it suggests that Teddrick never actively defined himself according to his gang affiliation. (Ex. 2 at ¶¶21-22 [Aff. of Rotramel].)

Instead, Teddrick's gang affiliation was in large part shaped by the outmoded juvenile justice system within which he found himself at an early age. Teddrick first entered the juvenile justice system as a youth with no gang affiliation whose only offense was selling pills and exited the system affiliated with the Crips and with the knowledge and skill set to commit more serious crimes. (Ex. 2 at ¶100 [Aff. of Rotramel].)

49

Were Teddrick to enter the juvenile justice system as it exists today in Harris County, his life would have been drastically different. The institutional responses to Teddrick's early offenses would not have been so severe. This is true because authorities in the juvenile justice system have learned that many of the techniques used even as recently as the time that Teddrick was in the juvenile justice system are not effective, do not decrease juvenile crime, and are not good for the youth themselves. (Ex. 2 at ¶¶101-02 [Aff. of Rotramel].)

After Teddrick's entanglement in the juvenile justice system at an early age, there has been a tremendous amount of research on what is referred to as the "school-to-prison pipeline." The Council of State Governments recently completed a study on this subject called "Breaking School Rules."[16] Texas Appleseed also completed a massive study of this issue throughout the State of Texas called "Breaking Rules, Breaking Budgets."[17] This research and other similar studies show that juveniles who are arrested and/or removed from their home schools for zero tolerance offenses are being unnecessarily placed in the juvenile and criminal justice systems from which they cannot later extract themselves. Not only are these policies extremely costly, they are removing youth who could be successful in school with support and guidance, and are placing them in the juvenile justice system where they are more likely to meet negative peers, drop out of school, develop substance abuse issues, and continue on a path toward prison. Efforts are now being made here in Texas and around the country to end

---

[16] Counsel of State Governments, *Breaking Schools' Rules: A Statewide Study of How School Discipline Relates to Students' Success and Juvenile Justice Involvement, available at* http://justicecenter.csg.org/resources/juveniles.

[17] Texas Appleseed, *Breaking Rules, Breaking Budgets: The Cost of Exclusionary Discipline in Dallas ISD, available at* http://www.texasappleseed.net/index.php?option=com_docman&task=doc_download&gid=692&Itemid=.

zero tolerance policies, reduce or eliminate alternative schools, keep students in their home schools, and connect them to positive activities. (Ex. 2 at ¶103 [Aff. of Rotramel].)

One example of reforms taking place in juvenile justice is Judge Steven Teske's model in Clayton County, Georgia. Judge Teske eliminated the zero tolerance policy and created a protocol that youth cannot be arrested for things that happen at school that are nonviolent. Only after a third offense can a student be arrested. In the ten years since Judge Teske implemented his reforms, there has been a 60% reduction in juvenile crimes and more positively, the graduation rate is up 20%. Standardized test scores are also up.[18] (Ex. 2 at ¶105 [Aff. of Rotramel].)

The reforms which took place in the Texas juvenile justice system would have had a direct and positive impact on Teddrick. The boot camps that Teddrick attended no longer exist. The Brown Schools that ran Excel Academy no longer exists. TYC itself and the facilities that Teddrick was sent to no longer exist. TYC was replaced in 2011 with the Texas Juvenile Justice Department. As a result of the reforms implemented since the time Teddrick was in the juvenile system, juvenile crime is down 40% in Harris County.[19] (Ex. 2 at ¶¶106-07 [Aff. of Rotramel].)

Teddrick's gang involvement was in large part shaped by the outmoded juvenile justice system within which he found himself at an early age. Were Teddrick to enter the juvenile justice system as it exists today in Harris County, his life would have been drastically different. All of the institutional responses to

---

[18] Steven C. Teske, Brian Huff, & Cody Graves, *Collaborative Role of Courts in Promoting Outcomes for Students: The Relationship Between Arrests, Graduation Rates and School Safety*, available at http://www.school-justicesummit.org/papers/paper_9.cfm.

[19] Harris County Juvenile Detention Alternatives Initiative (JDAI) Report, Vol. 4, Issue 4, August 2012.

Teddrick's early offenses would not have been so severe and it is likely that his life would have taken an entirely different trajectory.   (Ex. 2 at ¶¶108-09 [Aff. of Rotramel].)

## C. Batiste was Prejudiced by Trial Counsel's Failure to Present Testimony from a Gang Expert

While the prosecution presented no less than three experts to testify about why Batiste's gang affiliation made him a future danger and militated for the imposition of the death penalty, trial counsel failed to present any expert testimony to challenge the prosecution's assertions regarding Batiste's gang affiliation.  This failure caused tremendous harm to Batiste's case.  At the end of the punishment phase of trial, the jury was left with the false impression that Batiste was a hardened and entrenched leader of a violent, menacing gang.  The truth however, is quite different.  As a gang expert like Rotramel could have attested, Batiste was never a hard-core gang member, but was a gang-affected young man who associated himself with negative peers and adopted an outward gang identity. Batiste was a young man who was impacted by his early institutionalization and responded to the pressures and dangers of those institutions by adopting an affiliation with a group identity larger than himself.

Batiste was severely prejudiced by trial counsel's failure to present testimony from a gang expert.  The jury was in visceral fear of Batiste after the prosecution presented evidence of Batiste's affiliation with the Crips.  Immediately following the testimony of the prosecution's gang expert, Clint Ponder, one of the jurors became fearful when two young men wearing blue entered the elevator and stood too close to her.  (19 RR at 3-4.)  While there was no suggestion that these men were associated with Batiste, much less with the Crips, the juror "went into shock" and "couldn't breathe" out of fear just at the thought that they could be associated with Batiste.  (*Id.* at 4.)  The juror herself admitted that she could have

52

just been paranoid based on the testimony she heard the day before regarding Batiste's gang affiliation and tattoos. (*Id.* at 5.)[20] Given this incident, trial counsel knew how inflammatory any mention of violent gang affiliation could be and yet still did nothing to challenge the prosecution's assertions regarding Batiste's gang affiliation.

Trial counsel failed outright to rebut the prosecution's evidence of Batiste's gang affiliation. Left unchallenged, this evidence contributed considerably to the prosecution's case that Batiste was a future danger and that nothing mitigated against imposition of the death penalty. Had trial counsel rebutted this evidence by presenting testimony from a gang expert like Rotramel, there would be "a probability sufficient to undermine confidence in" the outcome of Batiste's punishment trial, and as a result, his death sentence should be overturned. *Porter*, 130 S. Ct. at 455-56 (quoting *Strickland*, 466 U.S. at 693-94).

## CLAIM THREE

## TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PRESENT AN EXPERT AT THE PUNISHMENT PHASE TO EXPLAIN TO THE JURY THE RELEVANCE OF BATISTE'S LIFE HISTORY

Batiste's trial counsel did not present the testimony of an expert who would have assisted jurors in understanding the available mitigating evidence and explained how that mitigating evidence lessened Batiste's moral culpability. As a result of this deficient performance, Batiste's sentence of death was unlawfully and unconstitutionally imposed in violation of his applicable state and federal Constitutional rights, state statutory law, and United States Supreme Court and state case law.

---

[20] *See* Claim Ten, *post,* for further discussion of this issue.

## A. The Role of an Expert Regarding the Client's Social History

At Batiste's punishment phase trial, an expert should have been presented to present opinions about Batiste's psycho-social history which would have given the jurors a way of understanding his actions and thus, a way of answering "Yes" to the Mitigation Special Issue.

Mitigation specialists also referred to as social historians, review records and meet with witnesses, gathering and weaving the bare facts of the client's life into a compelling narrative. *See* ABA Guidelines, Guideline 10.11 (commentary) (noting the importance of presenting "the client's complete social history" at punishment); *see also ABA Supplementary Guidelines for the Mitigation Function of Defense Team in Death Penalty Cases*, Guideline 10.11, 36 HOFSTRA L. REV. 677, 689-90 (2008). While every capital defense team must hire a mitigation specialist to assist in gathering the evidence necessary to create a social history, an expert must also be retained to synthesize that information into a coherent psycho-social narrative for presentation to the jury. Such an expert then uses their particularized expertise relevant to the client to present the social history developed by a mitigation specialist in a cohesive narrative.

## B. Given the Importance of Telling Batiste's Story via a Well-Qualified Expert, Not Retaining Such an Expert Constitutes Deficient Performance

At the heart of the punishment phase of a capital trial is the presentation of mitigation evidence and the concept of moral culpability. Moral culpability acknowledges an elementary psychological reality—that people do not arrive at their choices from the same path. Thus, it follows that the degree of "blameworthiness" of an individual for capital murder may vary depending on what factors and experiences shape, influence, and/or compromise those choices. A jury's understanding of the evidence impacting the moral culpability of a

: 00072

defendant is critical to a jury's consideration of the appropriate punishment for a capital offense.

Mitigating evidence is not developed to provide a defense to the crime or to challenge evidence of guilt; nor is it an excuse or explanation for a crime. Instead, it provides a context for the crime by describing an individual's life experiences that serve to inspire compassion, empathy, mercy, and/or understanding. Indeed, mitigating evidence is *any* evidence that "might serve 'as a basis for a sentence less than death.'" *Tennard v. Dretke*, 542 U.S. 274, 287 (2004) (quoting *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986)) (emphasis added).

Since *Wiggins v. Smith*, defense attorneys in capital cases have been on notice as to the necessity of performing a wide-ranging investigation into their client's life history. 539 U.S. at 535. Defense attorneys regularly retain mitigation specialists to gather this type of mitigating evidence to be presented through the testimony of others at the punishment phase. However, it is not enough that counsel present the client's life story through lay witness testimony. Like any subject matter that warrants an expert opinion, here, the client's life story must be explained to the jury in a way that illuminates why it is relevant to moral culpability. In other words, it is not sufficient to present a parade of witnesses discussing the client's history—an expert must also be hired to give that life history context. Here, trial counsel's unreasonable failure to hire such an expert constitutes deficient performance. *See Strickland*, 466 U.S. at 688.

Dr. Scott Bowman, or someone with a similar background in criminal justice studies, would have been ideally suited to act as the expert in Batiste's case given his expertise in issues facing African-American families, the juvenile justice system, youth development, and the prison and criminal justice systems. (Ex. 3 at ¶¶4-7 [Aff. of Dr. Scott Bowman].)

: 00073

**C. An Expert Would Have Presented a Comprehensive Account of Batiste's Life History, and the Fact That Jurors Did Not Hear it Prejudiced the Outcome of the Case**

After having interviewed Batiste, reviewed records, and read affidavits from multiple individuals[21] who knew Batiste as both a child, adolescent and a young adult, Dr. Bowman, or a similarly qualified expert, would have been able to testify about the most important aspects of Batiste's life and how those experiences shaped him and ultimately contributed to the behavior for which he stood trial.[22]

**1. Introduction: A Life Rooted in Instability**

Teddrick Batiste's[23] life has been an unending search for emotional, structural, and financial stability in a critically unstable environment. His family, personal, and structural life were such that he could not effectively produce the balance and stability he craved and needed. Additionally, due to a number of social, psychological, and emotional factors, some of which began before he was even born, his quest frequently led him down the wrong paths. (Ex. 3 at ¶15 [Aff. of Dr. Bowman].)

Many factors in Teddrick's environment contributed to this lack of balance, including but not limited to: multi-generational patterns of poverty and ineffectual parenting; a complete lack of prenatal care; unsupervised home birth; meningitis as

---

[21] Dr. Bowman's testimony comes not only from the evidence that was presented at trial, but also from post-conviction litigation. (*See* Claims Four and Five, *post.*) For the ease of the reader, Dr. Bowman's analysis in this Claim is not set out in block quotations, but comes directly from his expert affidavit and is cited as such.

[22] As discussed in footnote four in Claim One, *ante*, trial counsel received funding from the court to hire several experts. Batiste met with psychologist Dr. Jolie Brams in March 2010, but Dr. Brams did not testify or have any further involvement with the case. Batiste then met with clinical psychologist Dr. Matthew Mendel on April 21 and 22, 2011, a mere four days before voir dire commenced. Dr. Mendel also did not testify at trial.

[23] Batiste will be referred to as "Teddrick" for this section of the Application, and family members will be referred to by their first names for ease of identification.

: 000074

a neonate; psychological and emotional trauma associated with the lack of, and abandonment by, any appropriate father figures; frequent relocations and subsequent new schools; lack of parental supervision due to his mother's work responsibilities; influence of his external environment, such as neighborhoods and peers; early and influential interaction with the juvenile justice system; gang affiliation; use of illicit drugs, including marijuana; and finally, his overwhelming desire, but ultimately unattainable goal—to be the sole provider for his own family. All of these factors were present in Teddrick's life before he had reached eighteen years of age, and had a significant impact on Teddrick's physical, intellectual, emotional, psychological, and social development from utero to young adulthood. (Ex. 3 at ¶¶16-17 [Aff. of Dr. Bowman].)

Within the literature of criminal delinquency, there are several theories that attempt to explain why individuals commit crimes. The application of theoretical approaches to particular individual and social circumstances usually produce the most logical and applicable theories. Walter Reckless's (1961) "Containment Theory" is a well-known, well-studied theory and is considered one of the canonized theories within the field of criminal justice. The main contentions within this theory are that individuals, particularly youth, who commit delinquent acts often do so according to pushes and pulls that act as motivations towards delinquency. The way to counteract the motivation and/or likelihood of delinquent acts is through the strength of inner and outer containments; and strong pushes and pulls, combined with weak inner and outer containments are the most likely scenario to produce delinquent behavior. (Ex. 3 at ¶¶18-20 [Aff. of Dr. Bowman].)

Theoretically, the pushes and pulls towards delinquency are generally negative and are correlated to delinquent behavior. For an example relating specifically to Teddrick, his family life pushed him to seek alternative forms of acceptance but he was pulled into gang affiliation and the larger lure of

: 00075

delinquency. The pushes and pulls are presumed to take place concurrently and reinforce each other, resulting in delinquent behavior. While these are not the sole circumstances in Teddrick's life that resulted in pushes and pulls towards delinquency, these are the most transparent. (Ex. 3 at ¶21 [Aff. of Dr. Bowman].)

The inner and outer containments that are structured to counteract delinquent behavior are generally positive and are correlated to conformist behavior. Inner containments are suggested to be a strong sense of self-actualization, a strong moral compass and a fear of how other's in close relationship would view their potentially delinquent behavior. Additionally, outer containments are suggested to be implemented through strong parental and school supervision that structurally limits the ability for delinquency. (Ex. 3 at ¶22 [Aff. of Dr. Bowman].)

For an example as it relates specifically to Teddrick, while the school system and juvenile justice system attempted to create an outer containment (with clearly documented limitations), little containment came from those closest to him. Similar to the pushes and pulls, the inner and outer containments (when present) are presumed to both take place concurrently and reinforce each other towards conforming behavior. While these are not the sole circumstances in Teddrick's life that resulted in pushes and pulls towards delinquency, his fundamental upbringing and his actions based upon weak inner and outer containments are the most transparent. These competing influences are exacerbated not only by the unstable environment Teddrick was born into, but the chaos that existed within his family, well before his birth. (Ex. 3 at ¶23 [Aff. of Dr. Bowman].)

## 2. Teddrick's Birth

Teddrick Roshod Batiste was born on December 30, 1987, to a fifteen year old girl who hid the pregnancy from her family until she gave birth in the bathroom in the middle of the night. (Ex. 3 at ¶24 [Aff. of Dr. Bowman]; Ex. 22 [Birth Certificate of Teddrick Batiste].)

: 00078

Rowena LaShawn Batiste ("Rowena") knew she was pregnant because her menstrual cycle had stopped but she did not tell anyone about the pregnancy because she was afraid of how her mother Darlene Mitchell Beard ("Darlene") would react. Rowena was able to hide the physical manifestations of the pregnancy. She received no pre-natal care and did not see a doctor or other medical professional during the duration of the pregnancy. She just prayed for a healthy baby. (Ex. 17 at ¶15 [Aff. of Rowena Scott].)

No one in the family knew or suspected that Rowena, a heavy-set girl, was pregnant. (Ex. 6 at ¶20 [Aff. of Darlene Beard]; Ex. 14 at ¶11 [Aff. of Malcolm Mitchell]; Ex. 21 at ¶11 [Aff. of Beverly West]; Ex. 10 at ¶9 [Aff. of Truman Jackson]; Ex. 7 at ¶7 [Aff. of Melissa Beard-Carter]; Ex. 9 at ¶30 [Aff. of Monica Davis].) Rowena went into labor at home, just a few days after she turned fifteen years old.[24] She labored for several hours. Darlene thought she was suffering from severe gas, but Rowena finally confided in her that she was having a baby. Darlene caught Teddrick when he was born and cut the umbilical cord. (Ex. 6 at ¶20 [Aff. of Darlene Beard]; Ex. 17 at ¶16 [Aff. of Rowena Scott].)

### 3. Paternal Family History

Nothing is known about Teddrick's biological father. Rowena identified Teddrick's father as Clifton Johnson, a man with whom she had a single sexual encounter. According to Rowena, Clifton was twenty-two or twenty-three years old when she skipped school and met him at a friend's house. Clifton never knew

---

[24] There is some discrepancy as to whether Rowena had just turned fifteen or sixteen years old at the time Teddrick was born. Teddrick's birth certificate lists Rowena's age as sixteen. However, based on her birth year of 1972, she would have been just fifteen. Rowena's actual birth year may not be conclusively known as she herself was born at home and was not issued a birth certificate until she was approximately eight years old. (Ex. 9 at ¶13 [Aff. of Monica Davis].)

: 00077

Rowena was pregnant and has never met Teddrick or been involved in his life in any way. (Ex. 17 at ¶14 [Aff. of Rowena Scott].)

Rowena never told members of her family the identity of Teddrick's father. (Ex. 6 at ¶21 [Aff. of Darlene Beard]; Ex. 14 at ¶11 [Aff. of Malcolm Mitchell]; Ex. 21 at ¶11 [Aff. of Beverly West]; Ex. 10 at ¶9 [Aff. of Truman Jackson]; Ex. 9 at ¶33 [Aff. of Monica Davis].) There have been rumors over the years that Teddrick's father was actually a relative. Monica Mitchell Davis ("Monica"), Rowena's older sister, used to see an unknown man leaving money in the family's mailbox and she thought he might have been Teddrick's father. (Ex. 9 at ¶31 [Aff. of Monica Davis].)

### 4. Maternal Family History: Darlene and Her Children

Darlene, Teddrick's grandmother, was born in 1948 and grew up in Coldspring, Texas, as one of nine children. She was raised by a single mother, Susan Clark Mitchell ("Susan"). Darlene met a boy named David Alexander when she was in high school and had a son by him named Malcolm Mitchell ("Malcolm") when she was sixteen years old. David did not stick around after Malcolm was born. Shortly thereafter, Darlene got pregnant again, this time by a man named Willie Fields. At seventeen years old Darlene delivered her second child, a daughter named Monica. (Ex. 6 at ¶¶5-9 [Aff. of Darlene Beard].)

Darlene did not raise Malcolm and Monica. They were instead left in the care of Susan, who was also raising her other grandchildren Beverly, Etta, and Ray in Coldspring. (Ex. 6 at ¶9 [Aff. of Darlene Beard]; Ex. 9 at ¶5 [Aff. of Monica Davis]; Ex. 21 at ¶5 [Aff. of Beverly West].) Darlene moved to Houston in 1966 to try and make a better life for herself. She needed a job and there were no opportunities for her in Coldspring. Darlene met Truman Jackson in 1968 and they had a child together, a boy also named Truman Jackson ("Truman"). In a similar

fashion to the previous two fathers, Truman Sr. did not stay and was never a significant part of Truman's life. (Ex. 6 at ¶¶10-11 [Aff. of Darlene Beard].)

Darlene next met Clarence Batiste at a night club in Houston. He was married to another woman, but Darlene got pregnant by him and gave birth to a son named Christopher Batiste ("Christopher"). Clarence was not involved in raising or supporting Christopher. (Ex. 6 at ¶12 [Aff. of Darlene Beard].) Darlene next became involved with a man named Ulysee Bean. She lived with him briefly and he was good to her and the children. The relationship ended when Darlene moved back to Coldspring because her mother was ill. However, Darlene was pregnant again and Rowena was born soon thereafter. Ulysee is the father of Rowena, although Darlene led everyone to believe that Rowena's father was actually Clarence. Darlene gave Rowena the last name Batiste and it was not until Rowena was nine or ten years old that she was told who her actual biological father really was. (Ex. 6 at ¶13 [Aff. of Darlene Beard]; Ex. 17 at ¶5 [Aff. of Rowena Scott].) Darlene resumed her relationship with Clarence in Houston and gave birth to her sixth child, Willie Batiste ("Willie"). Clarence was still married at the time and again, took no part in raising or providing for his sons. (Ex. 6 at ¶14 [Aff. of Darlene Beard]; Ex. 9 at ¶9 [Aff. of Monica Davis].)

By 1974, Darlene was a twenty-six year old single mother with six children fathered by five different men. All of her children were born at home and were not issued birth certificates. Two of the children, Rowena and Willie, were unable to start school at the appropriate age because they did not have the proper documentation. (Ex. 9 at ¶13 [Aff. of Monica Davis].)

Darlene moved around frequently and was involved in brief relationships with many different men. She relied a great deal on family members to help care for her children. Malcolm and Monica were raised primarily by their grandmother Susan, and Truman frequently stayed with Susan as well. For reasons not known, Darlene

: 000079

concealed her pregnancies with Rowena and Willie. She was a heavy-set woman which made it physically possible for her to hide a pregnancy. (Ex. 9 at ¶11 [Aff. of Monica Davis]; Ex. 14 at ¶5 [Aff. of Malcolm Mitchell]].)

On Christmas Day of 1972, Monica was staying with Darlene. She was still living with Susan at the time, but was briefly staying at her mother's place. Darlene left to go to work and Monica heard what she thought was a doll crying. Monica believed that the doll was a Christmas gift left for her and ultimately determined that the crying was coming from inside a closet. With the help of an aunt, Monica got the "doll" down from the top shelf of the closet and discovered it was actually a newborn baby. Darlene had given birth in the house, put the baby on a pillow on the top shelf of the closet, and then left without telling anyone. That is how the family discovered that Rowena had been born. No one suspected that Darlene had been pregnant. (Ex. 9 at ¶11 [Aff. of Monica Davis].)

Similarly, Darlene did not tell anyone that she was pregnant with Willie, who was born approximately two years after Rowena. Monica and Susan were visiting their aunt, SK Davis ("SK"), who at the time lived about a block away from Darlene. Darlene was there to visit as well. Susan mentioned that she really wanted some watermelon and Darlene said they should all go to her apartment because she had a surprise for everyone. They all went to Darlene's apartment expecting to find a watermelon, but instead they discovered a newborn baby Willie on the couch, alone in the apartment. (Ex. 9 at ¶12 [Aff. of Monica Davis].) Malcolm did not realize that the baby was Darlene's and actually thought he belonged to a friend. (Ex. 14 at ¶5 [Aff. of Malcolm Mitchell].)

Life for the family changed dramatically around 1979 when grandmother Susan became critically ill. She suffered from diabetes and severe gastrointestinal issues. Her doctors wanted to amputate her leg because of the diabetes, but Susan refused. Susan's doctor was in Houston and she and the children still in her care at

the time (Malcolm, Monica, and Beverly), moved to Houston permanently in order for her to be near the doctor. Susan was hospitalized and the children were forced to move into the Houston projects with Darlene. Susan spent several months in the hospital before she died. (Ex. 9 at ¶¶14-16 [Aff. of Monica Davis].)

### 5. Maternal Family History: Violence and Instability

For several years when her children were young, Darlene was involved with a physically and verbally abusive man named Peter Paul Zenon ("Zenon"). He was, by all accounts, a monster. (Ex. 6 at ¶15 [Aff. of Darlene Beard]; Ex. 9 at ¶17 [Aff. of Monica Davis]; Ex. 17 at ¶¶8-9 [Aff. of Rowena Scott]; Ex. 14 at ¶7 [Aff. of Malcolm Mitchell]; Ex. 10 at ¶6 [Aff. of Truman Jackson]; Ex. 21 at ¶9 [Aff. of Beverly West].) Darlene and her six children, as well as her niece Beverly, moved in with Zenon shortly before Susan died and lived with him off and on for the better part of four years. During that time, Zenon beat and terrorized Darlene on a constant basis, often in front of the children. Zenon broke Darlene's arm several times, beat her with a baseball bat, and hit her in the head so severely that she suffered permanent damage. When Susan died, Zenon beat Darlene so relentlessly that she was almost unable to attend the funeral. (Ex. 6 at ¶15 [Aff. of Darlene Beard]; Ex. 9 at ¶18 [Aff. of Monica Davis].)

Rowena and the other children also bore the brunt of Zenon's wrath. Zenon chased Monica down the street with a gun, beat her with a bullwhip, and blinded her in one eye with a gun barrel. (Ex. 9 at ¶19 [Aff. of Monica Davis].) Rowena and the other children were beaten for minor infractions, like not cleaning up or eating food they were not supposed to have. Zenon "disciplined" Rowena and the other children by hitting them and making them kneel on coins. Zenon beat one of the boys until he bled for cutting up a couch, even though Zenon's own son was actually the one responsible. (Ex. 6 at ¶15 [Aff. of Darlene Beard]; Ex. 17 at ¶9

000081

[Aff. of Rowena Scott]; Ex. 14 at ¶7 [Aff. of Malcolm Mitchell]; Ex. 10 at ¶6 [Aff. of Truman Jackson].)

The first time that the children saw Zenon attack their mother, they attempted to intervene to protect her. In response, Zenon lined them all up against a wall, shot a gun over their heads, and said if any of them ever interfered again he would shoot them. The children were terrified of Zenon. (Ex. 9 at ¶17 [Aff. of Monica Davis]; Ex. 17 at ¶8 [Aff. of Rowena Scott]; Ex. 14 at ¶7 [Aff. of Malcolm Mitchell].)

Darlene frequently left Zenon and stayed with relatives. She would stay away a week or so, but then inevitably go back. It was a time of chaos and instability and the children were forced to move around a great deal. Sometimes Darlene stayed at Zenon's house with the children, sometimes she stayed at a relative's house with the children, and then sometimes she was not with the children at all. (Ex. 6 at ¶15 [Aff. of Darlene Beard]; Ex. 9 at ¶20 [Aff. of Monica Davis].)

When Darlene left the children alone she told them she would be right back but then did not return for several days. The older children were forced by necessity to care for the younger children—making sure they were fed and got to school on time. Darlene sometimes left money for food and Monica or Malcolm went to the convenience store to buy it, but often times she did not leave money and the children were forced to live off of whatever they could find. Monica made pancakes by mixing flour and water and then made syrup from sugar and water. (Ex. 14 at ¶6 [Aff. of Malcolm Mitchell]; Ex. 9 at ¶20 [Aff. of Monica Davis].)

Darlene tried to leave Zenon for good, taking the children and fleeing to SK's house. Zenon followed them there and when SK denied they were in the house, Zenon shot up all of the windows with Darlene and the children inside. Zenon told Darlene that he would kill them all if she did not return to him and so she did. (Ex. 6 at ¶15 [Aff. of Darlene Beard]; Ex. 9 at ¶24 [Aff. of Monica Davis].)

Monica was desperate to get away from Zenon. She ran away from home almost every weekend, either with Darlene or on her own. Eventually no one except SK would take any of them in because they too were afraid of Zenon. Monica left home for good when she was fifteen, choosing to move to Lubbock and marry a man eleven years her senior, rather than return to a life that included Zenon. Monica got pregnant shortly after moving to Lubbock, and at sixteen years old she got married and gave birth to her daughter, Necole. (Ex. 9 at ¶25 [Aff. of Monica Davis].) Malcolm also left home because he could not continue to see his mother get hurt and he himself did not want to get hurt. Malcolm started working for a moving company. (Ex. 14 at ¶8 [Aff. of Malcolm Mitchell].) Beverly left the family as well. (Ex. 21 at ¶10 [Aff. of Beverly West].)

With the older children out of the house, the responsibility for taking care of the little ones fell to the next in line—Truman. He would take the younger children back and forth to school and they all were responsible for feeding themselves. (Ex. 10 at ¶8 [Aff. of Truman Jackson].)

In November 1983, Darlene shot and killed Zenon in self-defense. The two got into an altercation in the street and Zenon pulled a gun on Darlene. There was a struggle, the gun went off, and then Darlene shot him several more times. The police responded to the scene but Darlene was never charged with any crime. (Ex. 6 at ¶16 [Aff. of Darlene Beard]; Ex. 17 at ¶10 [Aff. of Rowena Scott]; Ex. 9 at ¶26 [Aff. of Monica Davis].)

After Zenon's death, Darlene and the children stayed with SK for a brief time before moving into government-run apartments. Darlene became involved with Eugene Beard ("Eugene") shortly after Zenon's death, eventually moving in with and then marrying him. Eugene was the only man Darlene ever married. They separated briefly but reconciled and were still married at the time of Eugene's

: 00003

death in 2007. (Ex. 6 at ¶¶18, 25 [Aff. of Darlene Beard]; Ex. 17 at ¶12 [Aff. of Rowena Scott]; Ex. 9 at ¶¶28-29 [Aff. of Monica Davis].)

Darlene did not have financial or emotional support from the fathers of her children. She was steadily employed and did not rely on government assistance. However, her schedule also meant that she had to work long hours and either rely on other people to watch her children, or leave her children unattended. (Ex. 6 at ¶19 [Aff. of Darlene Beard].) The older children took on a tremendous amount of responsibility for caring for the younger children, feeding them, bathing them, and putting them to bed. Despite this Darlene was still hard on the children and would strike them with her hand, belt, or anything else that she had. (Ex. 9 at ¶21 [Aff. of Monica Davis]; Ex. 14 at ¶6 [Aff. of Malcolm Mitchell]; Ex. 21 at ¶8 [Aff. of Beverly West].)

### 6. Maternal Family History: Rowena's Childhood and Adolescence

When Darlene moved in with Eugene, she left the children behind with SK. A few months later she brought Rowena, Truman, Christopher, and Willie to Eugene's house. Eugene was a widower and lived with his children Melissa Beard ("Melissa") and Eugene Beard Jr. ("Gene"). Rowena shared a room with Melissa and Gene. She had her own bed and Melissa and Gene had bunk beds. (Ex. 17 at ¶12 [Aff. of Rowena Scott].)

Eugene was an alcoholic, drinking throughout the day. He mostly drank beer, but would sometimes also have a shot of whiskey. When he was drunk he spoke harshly. (Ex. 7 at ¶5 [Aff. of Melissa Beard-Carter].)

Darlene did not have a lot of rules, but when she said "no" she meant it. She regularly disciplined all of her children by hitting them with her hand, belt or whatever object she could find. She was particularly hard on Rowena, Melissa, and Gene. (Ex. 17 at ¶11 [Aff. of Rowena Scott]; Ex. 14 at ¶6 [Aff. of Malcolm Mitchell]; Ex. 7 at ¶6 [Aff. of Melissa Beard-Carter].)

Darlene was not affectionate to her children and did not tell them that she loved them. She was unsympathetic to the children's suffering and resulting trauma from the situation with Zenon. She did not acknowledge Zenon's abuse of the children, nor did she apologize or explain why she was unable to protect them. Instead, she refused to talk about it and acted as though it never happened. (Ex. 17 at ¶13 [Aff. of Rowena Scott]; Ex. 9 at ¶27 [Aff. of Monica Davis]; Ex. 14 at ¶9 [Aff. of Malcolm Mitchell].)

Because Darlene could not provide the affection that Rowena craved, Rowena sought affection from other people, especially boys. She did not have dating relationships, but rather started engaging in sexual activity at the young age of fourteen. Darlene did not talk to Rowena about sex. Rowena did not really understand what sex was about or know anything at all about birth control, but she engaged in sexual activity with multiple partners. (Ex. 17 at ¶13 [Aff. of Rowena Scott].) Rowena was insecure, very overweight, and suffered from low self-esteem. Rowena had the reputation in the neighborhood of being a girl willing to have sex with anyone. (Ex. 9 at ¶30 [Aff. of Monica Davis].)

Rowena had sex with a much older man and became pregnant. She was aware of the pregnancy but did not tell anyone about it, did not see a doctor, and received no medical assistance or pre-natal care. Much like her mother before her, Rowena was able to physically hide the pregnancy, only revealing the existence of the baby when the reality of the situation became undeniable. (Ex. 17 at ¶¶14-15 [Aff. of Rowena Scott].)

### 7. Teddrick: Infancy and Early Childhood

As discussed in greater detail above, Teddrick's home birth was a surprise to the entire family. Once Teddrick was born he lived with Rowena at Darlene and Eugene's house. At first Darlene was angry because Rowena had concealed the pregnancy, but ultimately she adjusted to the idea. Darlene supported Rowena

67

financially and took care of Rowena and Teddrick both. Rowena was just a baby who had a baby. (Ex. 6 at ¶21 [Aff. of Darlene Beard]; Ex. 17 at ¶17 [Aff. of Rowena Scott].)

Rowena moved Teddrick into the bedroom she shared with Melissa and Gene. Teddrick slept with Rowena in her bed while Melissa and Gene continued to sleep in the bunk beds. Rowena stayed in high school and Beverly watched Teddrick during the day. (Ex. 21 at ¶11 [Aff. of Beverly West]; Ex. 17 at ¶18 [Aff. of Rowena Scott].)

When Teddrick was about nine months old he got very sick. He was crying in his sleep and Darlene and Rowena took him to the emergency room. (Ex. 6 at ¶22 [Aff. of Darlene Beard]; Ex. 17 at ¶19 [Aff. of Rowena Scott].) Teddrick arrived at the hospital lethargic and with a 105.8 degree fever. He was diagnosed with H. influenzae meningitis and spent nine days hospitalized. (Trial Def. Ex. 20, 35 RR at 43-58.)

### 8. Teddrick: Unpredictability and Residential Instability

Rowena and Teddrick lived at Darlene's house for the first five years of Teddrick's life. In 1992, Rowena met a man named Kevin Noel ("Kevin Sr.") on her way to a car wash and became romantically involved with him, giving birth to Kevin Noel Jr. ("Kevin") that same year. When Kevin was about six months old, Rowena and her sons moved in with Kevin Sr. (Ex. 17 at ¶20 [Aff. of Rowena Scott].)

Kevin Sr. only lived with Rowena for about six months before Rowena discovered Kevin Sr. was still seeing other women and she ended the relationship and moved out. Rowena later discovered that Kevin Sr. was using crack while they were living together. (Ex. 17 at ¶21 [Aff. of Rowena Scott].) Rowena, Teddrick, and Kevin moved in with Beverly for a few months and then moved in with Monica and her children for about a year. Rowena and Kevin Sr. were no

longer in a committed relationship, but continued to be sexually involved. (Ex. 17 at ¶22 [Aff. of Rowena Scott].)

When she was living with Monica, Rowena got her first job—a temporary position on the assembly line at Compaq. (Ex. 17 at ¶23 [Aff. of Rowena Scott].) Monica did not permit Rowena to have male company at the house because she believed it would be a bad influence on her own young daughter. This angered Rowena and she moved out. (Ex. 9 at ¶35 [Aff. of Monica Davis].)

Rowena went to a homeless shelter briefly and then moved with Teddrick and Kevin to their own place a few months later, a government subsidized apartment in a low-income housing community in Houston called Acres Homes. It was not a good neighborhood. Rowena paid twenty-five dollars a month in rent until she got laid off, and then she paid nothing. Teddrick and Kevin Jr. went to a government subsidized day care in the apartment complex. Eventually Rowena got a permanent job on the assembly line at Compaq. (Ex. 9 at ¶37 [Aff. of Monica Davis]; Ex. 17 at ¶23 [Aff. of Rowena Scott]; Ex. 5 at ¶12 [Aff. of Necole Baldwin].)

Rowena met Jerome Scott ("Jerome") shortly after moving into her own apartment, through his sister who lived in the same complex. They met in 1996 and married in 1997. Jerome had a serious drug problem, unbeknownst to Rowena when they first became involved. As soon as they were married one of Jerome's nieces told Rowena that Jerome was a crack head. (Ex. 17 at ¶27 [Aff. of Rowena Scott].) Jerome worked as a cook during the day and often watched Teddrick and Kevin Jr. while Rowena worked nights. Jerome bought drugs on credit and then had to pay his dealers back once he got a check from work. Jerome got paid on Tuesdays and then disappeared until Friday or Saturday. One night, Jerome was supposed to pick Rowena up from work but called and said he could not do it because he got robbed. Rowena got home and Jerome was high. He had not been

69

robbed; rather he had spent all of his money on drugs. (Ex. 17 at ¶¶28-29 [Aff. of Rowena Scott].) Jerome and Rowena argued and fought, which was very upsetting to Teddrick. (Ex. 15 at ¶11 [Aff. of Kevin Noel Jr.].)

Teddrick did not get along with Jerome. Jerome got angry with Teddrick for minor things, yelled, and threatened to "whoop" him. (Ex. 17 at ¶30 [Aff. of Rowena Scott].) Jerome was harder on Teddrick than he was on Kevin. Jerome showed a preference for Kevin and would say things like he was going to buy things for Kevin but not for Teddrick. (Ex. 15 at ¶12 [Aff. of Kevin Noel Jr.].)

Teddrick was aware that Jerome had a serious drug problem. Jerome took things from the house like the DVD player and microwave and pawned them for drug money. One year, Jerome said that he was going to get Kevin a remote controlled car for Christmas but he never did. Teddrick asked Jerome where the car was, even though he knew the entire time that Jerome had spent the money on drugs. (Ex. 15 at ¶¶11-12 [Aff. of Kevin Noel Jr.].) Jerome was mentally and emotionally abusive to Rowena, with others suspecting that he was physically abusive as well. (Ex. 9 at ¶38 [Aff. of Monica Davis]; Ex. 17 at ¶32 [Aff. of Rowena Scott].)

Rowena moved Teddrick and Kevin around a great deal over the years. Several times Rowena had financial problems that got her evicted and they would stay with Darlene until Rowena recovered financially. (Ex. 15 at ¶14 [Aff. of Kevin Noel Jr.].) Every time Rowena moved she would register Teddrick at the local school. (Ex. 17 at ¶24 [Aff. of Rowena Scott].) Teddrick attended seven different elementary schools and four different intermediate schools due to the moves. (Trial Def. Ex. 18, 35 RR at 22-39.)

Rowena worked long hours throughout Teddrick's childhood and as a result he had to be very independent. From a young age he was responsible for feeding himself, getting ready, and catching the bus to school. Teddrick and his brother

70

rode the city bus to and from school. After school they would be alone for several hours in the apartment. Teddrick had very little supervision and was allowed to leave the apartment on his own. (Ex. 15 at ¶16 [Aff. of Kevin Noel Jr.].)

When Teddrick and Kevin were home alone they sometimes watched pornography that belonged to their uncle. Teddrick was ten years old and Kevin was five. They therefore knew about things before they should have. Their uncle caught Teddrick viewing the pornographic movie and made him watch the entire thing, beginning to end. (Ex. 15 at ¶17 [Aff. of Kevin Noel Jr.].)

Rowena was a "laid back" parent. (Ex. 15 at ¶16 [Aff. of Kevin Noel Jr.].) Rowena acted like Teddrick's friend, not always his mother. When Teddrick was in trouble, Rowena called him over and punched him in the chest rather than disciplining him. (Ex. 9 at ¶39 [Aff. of Monica Davis].)

### 9. Social Disorganization Theory

A supplemental theory of criminal behavior that applies to Teddrick's upbringing is Shaw and McKay's (1929) "Social Disorganization Theory." The primary contention of Social Disorganization Theory is that disorganized neighborhoods (or "transition zones") themselves, as opposed to the specific resident, produce increased rates of criminal behavior by individuals within particular neighborhoods. More specifically, the theory suggests that persons who are raised in disorganized households within disorganized neighborhoods will organize their lives and living conditions in a non-traditional manner. (Ex. 3 at ¶¶74-75 [Aff. of Dr. Bowman].)

There are three aspects of "disorganized" areas that directly correlate to high-crime neighborhoods: the physical status of the neighborhood; the economic status of the neighborhood; and the population composition. More specifically, the "physical status" of the neighborhood refers to such things as condemned, run-down homes and buildings, and levels of multigenerational residence. The

71

"economic status" refers to such things as the percentage of families on welfare, residential renting (as opposed to residential ownership), and limited employment possibilities, and the "neighborhood composition" refers to such things as the number of illegitimate births, low-levels of education, high-levels of crime, violence, and drug and alcohol addiction. (Ex. 3 at ¶76 [Aff. of Dr. Bowman].)

Teddrick's maternal family history and his own upbringing are consistent with these aspects of Social Disorganization Theory. For example, the night Rowena was born, Monica heard what she thought was a doll crying after Darlene left to go to work. Monica tracked the crying sound to a bedroom closet and discovered that it was not a doll at all, but a newborn baby. Darlene gave birth in the house, put the baby on a pillow on the top shelf of the closet, and then left the house without telling anyone. That is how the family discovered that Rowena had been born. (Ex. 3 at ¶77 [Aff. of Dr. Bowman].)

Another example is the fact that Darlene was a twenty-six year old single mother with six children fathered by five different men. All of her children were born at home and were not issued birth certificates. Yet another example is the fact that Rowena briefly lived at a homeless shelter and then moved Teddrick and Kevin into a government subsidized apartment in a low-income housing community in Houston called Acres Homes, which has historically been known as a rough neighborhood with high levels of crime. Rowena soon met Jerome, a drug addict, married him, and moved her children in with him. Each of these examples is representative of the fact that Teddrick and his family were consistently living a "socially disorganized" existence.[25] (Ex. 3 at ¶78 [Aff. of Dr. Bowman].)

---

[25] Teddrick experienced "lots of moves that were all on the north side" and that all of the locations were "ghetto" until he turned fifteen. When he relocated to the suburbs at age fifteen, he still was "going back to the old neighborhood every day" and was "living two lives at the same time." (Ex. 3 at ¶79 [Aff. of Dr. Bowman].)

This type of upbringing blurs what are believed to be clearly defined mores, values, and laws within traditional, socially organized families and neighborhoods. Traditional families tend to have dual-parent families with children born of the same parents (in hospitals), minimal parental violence (both towards each other and towards their children), no drug and alcohol abuse (or at least well-concealed), and residential stability. Teddrick had none of these organizational structures. (Ex. 3 at ¶80 [Aff. of Dr. Bowman].)

Equally important to the theory, while Teddrick's family believed that their efforts were not harmful and were more in line with an "appropriate" upbringing consistent with their multi-generational efforts, most any outside observer of Teddrick's upbringing would contend that his family interactions were both detrimental to his upbringing and indirectly contributive to his delinquency. Teddrick's family was not knowledgeably and/or purposefully underproviding—they were merely acting in accordance with the structure of their multigenerational family and neighborhood. (Ex. 3 at ¶81 [Aff. of Dr. Bowman].)

### 10. Teddrick: Adolescence and the Juvenile Justice System[26]

Teddrick was popular as a young teenager. He made decent grades, had perfect attendance, and played sports in school. But then Teddrick started hanging out with kids who were older. Teddrick saw things on the street and learned to do petty things like steal candy or kick holes in gates. (Ex. 15 at ¶¶18-19 [Aff. of Kevin Noel Jr.].) Teddrick also started acting out at school, fighting and violating school policies. In the eighth grade, Teddrick received twenty-two disciplinary actions and several suspensions. (Trial Def. Exs. 15, 17, 34 RR at 206-60; 35 RR at 5-19.) Rowena was unaware that Teddrick was in a time of crisis. By the time Teddrick reached the eighth grade, his "outer" containment became structurally

---

[26] For a complete discussion of Teddrick's history with the juvenile justice system and its lasting impact on his development, see Claim Two, *ante*.

weaker (unaware of crisis), while the "pushes" and "pulls" of delinquency began to erode his "inner" containments. (Ex. 3 at ¶82 [Aff. of Dr. Bowman].)

When Teddrick was fourteen years old he was introduced to an alleged gang member and began wearing blue and "dropping knowledge" about the Crips at school, despite the fact that he did not have any actual gang affiliation. (Ex. 3 at ¶83 [Aff. of Dr. Bowman].) In middle school, Teddrick met Stephanie Soliz ("Stephanie") and started hanging out with her and her friends and selling prescription pills to other kids. Teddrick came home with bikes and other new things. He stored his new possessions at friends' houses. Also in the eighth grade Teddrick got his first tattoo, "MOB" (Money Over Bitches). Several kids at the school had the same tattoo. (Ex. 15 at ¶20 [Aff. of Kevin Noel Jr.]; Ex. 3 at ¶84 [Aff. of Dr. Bowman].)

In May 2003, Teddrick got caught selling Ritalin to someone at school. Because the school had a "zero tolerance policy" for crimes committed on school grounds, Teddrick was immediately arrested and expelled. (Ex. 3 at ¶85 [Aff. of Dr. Bowman]; Trial Def. Ex. 17, 35 RR at 5-19.) Teddrick was adjudicated delinquent in the juvenile justice system and sent to Excel Academy for an entire summer and subsequent academic year. (Ex. 3 at ¶86 [Aff. of Dr. Bowman]; Trial Def. Ex. 17, 35 RR at 5-19.) Teddrick spent a long time on the bus every day to and from school and was exposed to juveniles who taught him how to steal cars. (Ex. 3 at ¶87 [Aff. of Dr. Bowman].)

Teddrick entered his freshman year at Cy-Ridge High School in January 2003. Teddrick had a strong desire to get involved in sports but missed the fall football season because he was in JJAEP and as a result could only participate in spring training, not the actual football season. (Ex. 3 at ¶87 [Aff. of Dr. Bowman].) Stephanie returned from ALC and entered Cy-Ridge at the same time. They immediately started dating. Teddrick was a good boyfriend. Some kids at

: 00092

school gave them a hard time for being an inter-racial couple, but Teddrick consistently stood up for Stephanie. At age fifteen he tattooed her name across his chest. (Ex. 20 at ¶8 [Aff. of Stephanie Soliz].)

Teddrick started to steal cars, mainly so that he could go and visit Stephanie and they could ride around together. Teddrick was arrested twice, first in May and again in June 2003 for the unauthorized use of a motor vehicle. As a result of these two arrests, Teddrick was again adjudicated delinquent and placed in the custody of the Juvenile Probation Officer for Harris County. (Ex. 20 at ¶9 [Aff. of Stephanie Soliz]; Ex. 3 at ¶90 [Aff. of Dr. Bowman]; Trial Def. Ex. 17, 35 RR at 5-19.)

This time, Juvenile Probation first placed Teddrick at Burnett-Bayland Rehabilitation Center ("BBRC") and then at Delta Boot Camp, where he stayed until December 2003. (Ex. 3 at ¶91 [Aff. of Dr. Bowman]; Trial Def. Ex. 17, 35 RR at 5-19.) Just as Teddrick left boot camp, his mother moved out of the Cy-Fair district and into an apartment near the Acres Homes neighborhood near Eisenhower High School—a notoriously high crime area where there was extensive drug dealing, prostitution, and other crimes. Teddrick was thrust into a rough, "socially disorganized" neighborhood where he knew no one and went to a school with considerable gang activity. He was far away from Stephanie and did not have access to a car. (Ex. 20 at ¶11 [Aff. of Stephanie Soliz]; Ex. 2 at ¶40 [Aff. of Charles Rotramel]; Ex. 3 at ¶¶92-93 [Aff. of Dr. Bowman].)

Two months later in February 2004, Teddrick was again arrested for unauthorized use of a motor vehicle. When Teddrick was adjudicated delinquent for the third time he was sentenced to the custody of TYC, and sent to the Sheffield campus. (Ex. 3 at ¶31 [Aff. of Dr. Bowman]; Trial Def. Ex. 17, 35 RR at 5-19.)

Teddrick's experience at TYC's Sheffield Boot Camp proved transformative and he was thrust into an environment where he was forced to affiliate with a gang

in order to survive the experience. Sheffield was a facility deep in West Texas, with a reputation for being a harsh and isolating experience. The location was far from Teddrick's home, family, loved ones, and comfort zone. Teddrick's affiliation with the Crips at Sheffield was a matter of his own protection and survival in an unfamiliar and dangerous institution far removed from everything and everyone he knew. (Ex. 20 at ¶12 [Aff. of Stephanie Soliz]; Ex. 3 at ¶94 [Aff. of Dr. Bowman].)

Stephanie and Teddrick broke up when he was away, because Stephanie knew it would be impossible to maintain constant contact between them. She dated someone else while Teddrick was gone and became pregnant. Stephanie and her new boyfriend stayed together about a year, but the father ended up going to jail and the relationship ended. (Ex. 20 at ¶10 [Aff. of Stephanie Soliz].)

### 11. Teddrick: Trying To Be an Adult

Teddrick was released from Sheffield and returned to Houston, but he was different. He was harder and tougher, more street-wise. He also had more tattoos, many of which were gang related. He came out of the TYC experience having better connections to drugs and with more sophisticated knowledge of how to steal cars. (Ex. 20 at ¶11 [Aff. of Stephanie Soliz]; Ex. 5 at ¶14 [Aff. of Necole Baldwin]; Ex. 18 at ¶5 [Aff. of Danyell Soliz].) The process of individuals making unique and specific adjustments to being incarcerated is known as "prisonization." (Ex. 3 at ¶96 [Aff. of Dr. Bowman].)

Prisonization is "taking on in a greater or lesser degree the folkways, customs, and general culture of the penitentiary," where "...a process of assimilation, in which prisoners adopt a subordinate status, learn prison argot (language), take on the habits of other prisoners, engage in various forms of deviant behavior . . . develop antagonistic attitudes toward guards, and become acquainted with inmate dogmas and mores." Most conceptualizations of

: 000094

prisonization are associated with adults; however, there is abundant support for the increased effects of prisonization on juveniles. (Ex. 3 at ¶¶97-98 [Aff. of Dr. Bowman].)

One outcome of prisonization for juveniles who are released from juvenile state facilities is high recidivism rates. For a juvenile who experiences imprisonment and subsequent prisonization, it would be assumed that adjusting to a post-imprisonment life would prove challenging. Teddrick's experiences of prisonization had a direct effect on his views of gang activity and delinquency, and created stronger connections to other criminals. Moreover, the juvenile recidivism rates (defined as being re-incarcerated within three years of release from a TYC facility) for 2004 were slightly less than fifty percent, suggesting that one of every two juveniles released during the same year that Teddrick was released were re-incarcerated within three years. (Ex. 3 at ¶99 [Aff. of Dr. Bowman].)

Despite the fact that Teddrick had made certain associations, gang culture and lifestyle still did not dominate his life. His family remained unaware that he was affiliated. (Ex. 17 at ¶3 [Aff. of Rowena Scott]; Ex. 9 at ¶42 [Aff. of Monica Davis]; Ex. 21 at ¶12 [Aff. of Beverly West].) Teddrick had dabbled in drugs during his early adolescence, but after being discharged from TYC he smoked marijuana frequently, sometimes on a daily basis. He did not want his family, especially Kevin, to know that he smoked. (Ex. 15 at ¶21 [Aff. of Kevin Noel Jr.]; Ex. 12 at ¶11 [Aff. of Ricardo Lara].)

Teddrick and Stephanie resumed their relationship when he returned to Houston, even though she was pregnant with a child who was not his. Teddrick got a job at Sonic and then Babies R Us and committed to providing for Stephanie and the baby. He was seventeen years old. Teddrick moved in with Stephanie and her mother after they were in a car accident and took care of them. Teddrick got a job at Wal-mart because it was close to Stephanie's apartment. Teddrick was at

: 00095

the hospital with Stephanie when her son Kash Soliz was born on November 25, 2005. Stephanie tried to go back to school after Kash was born and Teddrick watched the baby during the day when Stephanie was gone and then worked at Wal-mart at night. (Ex. 20 at ¶14 [Aff. of Stephanie Soliz].)

Teddrick took a series of other low paying, back breaking jobs. He worked for Stephanie's father at the rodeo and also for his landscaping business. Teddrick was a hard worker. But what Teddrick really wanted was a "legitimate" life—one with a steady job, cars, and a house. Although he got his GED while at Sheffield, Teddrick regretted not finishing high school. He was not particularly interested in school, but lamented that he never got the opportunity to be competitive at sports. Teddrick's own failure became one of his greatest hopes for his own children; that they would do well in school and excel in sports. (Ex. 20 at ¶15 [Aff. of Stephanie Soliz]; Ex. 19 at ¶5 [Aff. of Raul Soliz]; Ex. 18 at ¶10 [Aff. of Danyell Soliz].)

Teddrick was constantly looking for ways to make more money for Stephanie and would take various jobs like the overnight shift at the Office Depot distribution center and at an air conditioner factory. He earned enough money to buy a car and he and Stephanie moved into an apartment of their own with some friends from high school, Micaela and Ricardo Lara ("Mickey" and "Rico"). (Ex. 20 at ¶16 [Aff. of Stephanie Soliz]; Ex. 11 at ¶12 [Aff. of Micaela Lara].)

Things were difficult for the two young couples. Teddrick lost his job. Stephanie was not working and Teddrick felt as though he had to bear the burden of supporting them, because he was the man and that was his responsibility. (Ex. 11 at ¶12 [Aff. of Micaela Lara].) The situation became even more complicated when Stephanie found out she was pregnant for the second time. Teddrick was unsure whether he wanted to be in a relationship with Stephanie or if he even wanted the baby. Stephanie left and moved back in with her mother and Teddrick

moved back in with Rowena. (Ex. 20 at ¶18 [Aff. of Stephanie Soliz]; Ex. 11 at ¶12 [Aff. of Micaela Lara].)

Despite the fact that they had broken up, Teddrick continued to support Stephanie and Kash financially. In order to do so he began stealing cars in order to sell the rims. Once Stephanie decided to keep the baby, Teddrick went with her to her doctor appointments. One day, Teddrick called Stephanie out of the blue and said that he was sorry for all of the hurt he had caused her and he was glad that she decided to have the baby. Teddrick told her that he wanted them to be back in a relationship and was on his way to her house. He never showed up and two days later Stephanie got a call from the jail that he had been arrested for stealing a car. (Ex. 20 at ¶19 [Aff. of Stephanie Soliz].)

Teddrick was sentenced to five months in state jail. (Ex. 25 [State Jail Records].) Stephanie and Teddrick agreed that they would live together once he got out and try to make their family work. Alex Batiste was born on September 7, 2007. Several weeks later, Teddrick was released from state jail. (Ex. 20 at ¶20 [Aff. of Stephanie Soliz].)

While Teddrick was in state jail, Mickey and Rico moved to Denton, Texas, because Mickey was pregnant and they wanted a fresh start. Teddrick was in touch with Mickey and Rico when he was locked up and they decided that as soon as he got out it would be a good idea for him to move to Denton as well. In the fall of 2007, Rico drove down to get Teddrick when he was released from state jail and brought him to Denton. Stephanie, Kash, and baby Alex followed a few weeks later. (Ex. 20 at ¶¶20-21 [Aff. of Stephanie Soliz]; Ex. 11 at ¶15 [Aff. of Micaela Lara]; Ex. 12 at ¶7 [Aff. of Ricardo Lara].)

Mickey's pregnancy ended in tragedy when her daughter was stillborn. During this difficult time, Teddrick was a great source of emotional support to Mickey and Rico. They were devastated by the loss of their daughter and Teddrick

79

: 00097

helped them through a terrible time in their lives, being there for them and listening. (Ex. 11 at ¶16 [Aff. of Micaela Lara].)

Teddrick quickly got a job as a roofer's assistant and worked hard. He felt a lot of pressure to provide for Stephanie. When he was not working Teddrick would cook, clean, and take care of the kids. For a short time, Stephanie worked nights at a grocery store. She would sleep in and Mickey and Teddrick would take care of the kids. (Ex. 11 at ¶17 [Aff. of Micaela Lara]; Ex. 12 at ¶9 [Aff. of Ricardo Lara].)

Stephanie suffered from personal issues that caused problems between her and Teddrick. Her hormonal birth control caused her to have heavy bleeding, mood swings, and extreme emotions. The young couple's relationship was strained because of it and they broke up. Stephanie and the children returned to Houston. (Ex. 20 at ¶22 [Aff. of Stephanie Soliz.] Teddrick wanted to stay in Denton because he was doing well, but he also wanted to be there for his kids. (Ex. 11 at ¶18 [Aff. of Micaela Lara].)

Mickey and Rico left for a weekend and while they were gone, Teddrick was arrested for breaking into a car. Teddrick spent several months in the Denton County Jail and as soon as he was released he took a bus back to Houston to be with Stephanie and their boys. (Ex. 11 at ¶¶19-20 [Aff. of Micaela Lara]; Ex. 12 at ¶10 [Aff. of Ricardo Lara].) Back in Houston, Teddrick moved in with Rowena and got a job first at a television repair shop and then at Forge USA, a steel forging company. Teddrick spent as much time as possible with Kash and Alex, and tried to make things work with Stephanie. In December 2008, Teddrick moved with Stephanie into an apartment of their own. Stephanie stayed home with the children and Teddrick supported the family. (Ex. 20 at ¶24 [Aff. of Stephanie Soliz.]

Teddrick worked a great deal of overtime at Forge and brought in a significant amount of money. Soon after moving into the apartment, his hours

were cut and he was no longer working overtime. Teddrick had serious money issues and a lot of expenses. Stephanie got into an accident in her sister's car and Teddrick had to pay for that car as well as the damage to the other car. Teddrick did not want Stephanie to work, because he knew first-hand how difficult life was for a single mother. Teddrick wanted to be the sole provider for his family, and the weight of the world was on his twenty-two year old shoulders. (Ex. 20 at ¶25 [Aff. of Stephanie Soliz.] He had a great deal of pride and did not want to ask anyone for help. (Ex. 11 at ¶26 [Aff. of Micaela Lara].)

Teddrick either made new connections with gang affiliated people or re-ignited old ones, in large part to find a way out of his mounting financial pressures. Either way, he started spending time on the streets. He made money shooting dice and showed young associates how to steal cars. Because they needed the money so badly, Teddrick also started to steal cars himself. (Ex. 20 at ¶26 [Aff. of Stephanie Soliz.]

Teddrick was caught between two worlds—the legitimate world where he had a family, a job, and responsibilities; and the criminal world, where he could make significant amounts of money quickly and was a role model to young associates. Teddrick was struggling to maintain and strengthen his inner containment, while the pull of economic gain were strong. (Ex. 3 at ¶117 [Aff. of Dr. Bowman].)

Teddrick spent time with Melissa and her husband Dytaniel Rod Carter ("Rod") hanging out at their house. They would eat and relax and play games with Melissa and Rod's three kids. Sometimes Teddrick would bring Kash and Alex over as well. (Ex. 7 at ¶15 [Aff. of Melissa Beard-Carter; Ex. 8 at ¶3 [Aff. of Dytaniel Carter.] Teddrick confided in Rod about the pressures he was feeling to provide for and take care of his family. Teddrick was beginning to feel desperate, like the walls were closing in on him and he was trapped. Teddrick was searching

81

for love and honesty from someone and any kind of positive influence in his life. (Ex. 8 at ¶4 [Aff. of Dytaniel Carter.]

A lot of people in Teddrick's life were shocked when he was arrested for homicide. Teddrick did not have a history of violence and no one could believe he was capable of the crime he was alleged to have committed. (Ex. 21 at ¶12 [Aff. of Beverly West]; Ex. 10 at ¶13 [Aff. of Truman Jackson]; Ex. 18 at ¶11 [Aff. of Danyell Soliz]; Ex. 11 at ¶26 [Aff. of Micaela Lara]; Ex. 12 at ¶14 [Aff. of Ricardo Lara]; Ex. 7 at ¶16 [Aff. of Melissa Beard-Carter].)

### 12. Teddrick: The Gang Influence and Affiliation[27]

Throughout much of Teddrick's life, the presence of gang influences, gang members, and gang activities have been incontrovertibly present in his schools, his neighborhoods, and the juvenile justice system. While it can be debated whether or not a juvenile can rationally choose to join a gang (e.g. issues of protection), the likelihood of a person associating with a gang in some way dramatically increases according to his location of residence in not only the United States, but also specifically the state of Texas. (Ex. 3 at ¶120 [Aff. of Dr. Bowman].)

Within the United States, it has been estimated that there are nearly 30,000 different gangs and more than 750,000 gang members. NATIONAL GANG CENTER, http://www.nationalgangcenter.gov. In addition, these gang members are largely concentrated in larger cities (57.1%) and suburban counties (24.0%). *Id.* Consistent with the data on geographic location and gang membership, it is estimated that twelve percent of all homicides are gang-related and that sixty-three percent of all homicides take place in cities with populations of more than 100,000. (Ex. 3 at ¶121 [Aff. of Dr. Bowman].)

---

[27] For a complete discussion of the gang influence in Teddrick's life see Claim Two, *ante.*

82

: 001000

Within the state of Texas, it has been estimated that there are approximately 2,500 different gangs. Specifically within Harris County, the issue of gang membership is considerably intensified, as the Houston region/Harris County hosts the most gangs (approximately 225) and gang members (approximately 10,000) in the state of Texas. Unmistakably, the statistics that are provided for Harris County are not indicative of equivalent distribution of gangs and gang members throughout the entire county, as there are concentrated pockets of gang activities within Harris County. (Ex. 3 at ¶122 [Aff. of Dr. Bowman].)

Both gang presence and gang activities are most often correlated to socially disorganized neighborhoods. With the majority of gangs and gang members residing in areas that are large urban centers like Houston, the overall likelihood of exposure to gangs and gang activities was heightened for Teddrick. There is extensive research that establishes categories and risk factors associated with likely gang membership. First, there are five categories that generally influence teens and their potential for gang activity: individual factors, family factors, peer group factors, school factors, and neighborhood factors. Risk factors are then assigned within each category.[28] As a predictor of joining a gang based on the

---

[28] Within the "individual factors" category, the authors found associations with low religious-service attendance, early marijuana use, early violence, antisocial beliefs, early drinking, externalizing behaviors, and poor refusal skills. Within the "family factors" category, the authors found associations with family structure, single parent households, households with one parent plus other adults, parental attitudes favoring violence, low-bonding with parents, low household income, sibling antisocial behavior, and poor family management. Within the "peer group factors" category, the authors found associations with friends who engage in problem behaviors. Within the "school factors" category, the authors found associations with being learning disabled, low academic achievement, low school attachment, low school commitment, and low academic aspirations. Within the "neighborhood factors" category, the authors found associations with availability of marijuana,

83

aforementioned risk factors, those experiencing two to three risk factors were three times more likely to join a gang, those experiencing four to six risk factors were five times more likely to join a gang, and those who experience seven or more risk factors were thirteen times more likely to join a gang. Teddrick experienced as few as twenty and as many as twenty-three of the risk factors. Therefore, despite placing a focus on the positive aspects of his life as a predicator for gang avoidance, the reality is that he was (at a minimum) thirteen times more likely to join a gang based on his mere existence and the risk factors associated with his existence. (Ex. 3 at ¶¶124-28 [Aff. of Dr. Bowman].)

Gang association can offer acceptance (in contrast to social discrimination or rejection), a surrogate family (in contrast to an absence of a family, positive adult role models, and proper discipline), power (in contrast to a basic feeling of powerlessness), security (in contrast to a fear or feeling of a lack of security), a means of earning money (in contrast to economic deprivation), an alternative to school (in contrast to school failure), opportunities to build high self-esteem (in contrast to low self-esteem), and a setting to "act in an aggressive manner" (based on pathological needs). (Ex. 3 at ¶129 [Aff. of Dr. Bowman].)

The distance between Teddrick and his mother and other family members and the complete absence of his father is well-documented. Teddrick was only fourteen years old when he first met Daron, who was a member of the Five Deuce Hoover Crips, and he was exposed to an inordinate number of gang affiliated youth during his time at the alternative school and TYC. His association with these gang friends superseded other associations, like friendships he had with sports friends, and Teddrick got his first tattoo along with other kids at school to strengthen his

---

neighborhood youth in trouble, and low neighborhood attachment. (Ex. 3 at ¶¶124-28 [Aff. of Dr. Bowman].)

84

sense of belonging.  (Ex. 3 at ¶130 [Aff. of Dr. Bowman]; Ex. 15 at ¶20 [Aff. of Kevin Noel, Jr.].)

Teddrick was not born into a "gang family," nor was he initiated or "jumped in."  Instead, Teddrick associated himself with negative peers and adopted a "gangster" identity, perhaps as a way of seeking acceptance, security, and self-esteem.  (Ex. 3 at ¶131 [Aff. of Dr. Bowman].)  There are numerous instances where the "pushes" and "pulls" of this street life seemed to oppose the "internal" and "external" containments that Teddrick continued to try to establish.  For example, Teddrick was simultaneously associating with gang members while at the same time working normal, conforming jobs, and attempting to establish a commitment to his new family – including raising a child that he knew was not his.  The constant struggle between Teddrick's "pushes and pulls" and his "internal and external" containments have been greatly underestimated in his larger social history.  (Ex. 3 at ¶132 [Aff. of Dr. Bowman].)

### 13. Teddrick: The Importance of a Father-Figure

From the time that Kash Soliz was born, a child who was not biologically his, Teddrick tried desperately hard to be a present, responsible, and loving father.  A positive male role model was something that had always been missing from his life and he was determined that his children would not suffer the same fate.  Failed father figures were a common and constant disappointment in Teddrick's life.  Teddrick never knew his biological father or any real details about him.  The true identity of Teddrick's father has been a source of speculation within the family for years, leaving Teddrick with no real answers.  (Ex. 3 at ¶¶133-34 [Aff. of Dr. Bowman].)

Unfortunately, the absence of fathers is a common experience for African-American families in the United States.  While twenty-five percent of all children in the United States are raised by a single parent, the statistic skyrockets to

seventy-two percent when specifically examining African-American families. This issue has been correlated to the increased incarceration rates of African-American males (nearly 5,000 per 100,000), limited employment opportunities, and abject, multigenerational poverty. (Ex. 3 at ¶135 [Aff. of Dr. Bowman].)

As a very young child, Teddrick was close to Eugene Beard, his step-grandfather. However, Teddrick no longer lived with Eugene after Rowena left the house and his interaction with both Darlene and Eugene was sporadic in later years. Although Teddrick had great affection for his grandparents they were not involved with him on a daily basis and Eugene in particular could not fulfill the paternal role that Teddrick needed. Eugene passed away in 2007 when Teddrick was incarcerated. (Ex. 3 at ¶136 [Aff. of Dr. Bowman].) The first real "father" Teddrick had was Kevin Noel Sr., the biological father of his half-brother. Despite the fact that Rowena and Kevin Sr.'s relationship did not work out, Kevin Sr. treated Teddrick like a son and initially included him when he would take Kevin for visitation. (Ex. 15 at ¶8 [Aff. of Kevin Noel, Jr.].)

Soon after Rowena married Jerome, Kevin Sr. and Jerome got into an altercation about the boys, and Kevin Sr. said he only cared about how Jerome treated Kevin and not Teddrick because Teddrick was not actually his son. (Ex. 16 at ¶¶7-8 [Aff. of Brian Fayhee].) After the fight, Kevin Sr. came around less often and when he did come around, he often only took Kevin with him, leaving Teddrick behind. (Ex. 15 at ¶9 [Aff. of Kevin Noel, Jr.].) Teddrick never connected with Jerome, despite the fact that he was his step-father, but rather resented him for interfering in the family dynamic. Jerome's presence in Teddrick's life was not nurturing; it was stressful and antagonistic. (Ex. 17 at ¶¶30-31 [Aff. of Rowena Scott].)

Other men came in and out of Rowena's life. Some of the men Rowena dated were around long enough to become well known to Teddrick, while others

were only present for a short time.  Almost all of them had criminal histories and problems with substance abuse.  (Ex. 9 at ¶36 [Aff. of Monica Davis]; Ex. 15 at ¶13 [Aff. of Kevin Noel, Jr.].)

When he became a father himself, Teddrick's desire for his own male role model became even more profound.  Teddrick sought out a connection to Raul Soliz, Stephanie's father, and looked up to him as an example of the hard working family man he wanted to be.  When Teddrick and Stephanie lived with Raul, Teddrick helped around the house, did yard work, and paid rent.  Raul liked having him around.  Teddrick started calling Raul, "Pops."  (Ex. 18 at ¶6 [Aff. of Danyell Soliz]; Ex. 19 at ¶5 [Aff. of Raul Soliz].)

Although he did not often talk about it, it bothered Teddrick that he did not know anything about his biological father.  Something once showed up on a phone bill and Teddrick thought it might be his father trying to get in contact with him.  Rowena told Teddrick the number had nothing to do with his dad, making him feel both stupid and hurt.  Teddrick asked Rowena questions about his dad, but she became angry and told him that he already knew as much as she did.  As a result, Teddrick never asked about his dad again.  (Ex. 20 at ¶13 [Aff. of Stephanie Soliz].)

In 1965, Senator Daniel Patrick Moynihan facilitated a report entitled "The Negro Family: The Case for National Action" (U.S. Department of Labor, 1965).  This report is often referred to as the "Moynihan Report[29]."  At the start of the chapter on "The Negro American Family," the Moynihan Report explains "at the heart of the deterioration of the fabric of Negro society is the deterioration of the Negro family."  The study goes on to detail many of the issues that African

---

[29] The Moynihan Report, due to the time of its publication, uses antiquated language with regard to the description of the African-American population.  However, the concepts and ideals it references are still very relevant today.

: 00105

American families were facing in 1965. In comparing White and Black family structure during the time, the report indicated "by contrast, the family structure of lower class Negroes is highly unstable, and in many urban centers is approaching complete breakdown." (Ex. 3 at ¶¶143-44 [Aff. of Dr. Bowman].)

Much like the contemporary presentation of Teddrick's upbringing, the Moynihan Report signified issues such as comparatively higher rates of unemployment, illegitimate births for African-Americans, and welfare dependency; the increasing presence of female, single head-of-household African-American families; and the clear absence of African-American males as financial and parental providers. The greatest emphasis in the report was placed upon the absence of African-American fathers/husbands. (Ex. 3 at ¶145 [Aff. of Dr. Bowman].)

In the section entitled the "Tangle of Pathology", the Moynihan Report points to a series of factors that are arguably the result of the breakdown of the African-American family. The aspect that is most relevant to Teddrick is the subsection entitled "delinquency and crime." The first sentence of the subsection reads, "the combined impact of poverty, failure, and isolation among Negro youth has had the predictable outcome of a disastrous delinquency and crime rate." Within the remainder of the section, the report details statistical trends and African-American overrepresentations within the criminal justice system that are consistent with the contemporary, comparative data. (Ex. 3 at ¶146 [Aff. of Dr. Bowman].)

While Moynihan indicates at the beginning of his report that "the statistics on the Negro family and most other subjects treated in this paper refer to only a specific point in time... they do not measure the experience of individuals over time," contemporary statistics do in fact indicate that African American families are stuck in the types of abject poverty and importunate underclass that existed

88

decades ago.   Consequently, many of the statistics and trends discussed in regarding Teddrick's life (e.g. absent fathers, unemployment rates, income/wealth gaps, rates of African-American juvenile delinquency) are categorically worse than fifty years ago. (Ex. 3 at ¶147 [Aff. of Dr. Bowman].)

Similar to the findings of the Moynihan Report, the mere absence of a positive, consistent, mentoring African-American father figure in Teddrick's life was the beginning of life-long challenges in finding and maintaining his own constructive, productive African-American manhood. Furthermore, the presence of inconsistent, violent, and absent father figures turned many of the aforementioned challenges into both modeled behaviors and opportunities for non-positive role models to capture Teddrick's need for acceptance, love, and belonging. Sadly, this will presumably be the same challenge that his children will face, further perpetuating the cycle of absent African-American fathers and husbands. (Ex. 3 at ¶148 [Aff. of Dr. Bowman].)

### 14. Teddrick: The Importance of Rap Music

Rap music was a profoundly significant part of Teddrick's life.  This was evident through the multitudes of lyrics that Teddrick wrote during his incarceration at the county jail during the pendency of his capital trial that were ultimately used against him at the punishment phase of trial.  At first glance it may have appeared as though Teddrick's rap lyrics were correlative to his violent actions and criminal behavior.   However, Teddrick's writing was a form of expression, deeply embedded in his childhood.   Teddrick listened to rap music consistently since the fourth grade and spent a significant amount of time "free-styling" (spontaneously making up rap lyrics) while on the school bus. (Ex. 3 at ¶¶149-50 [Aff. of Dr. Bowman].)

Teddrick equated writing rap lyrics as synonymous with writing poetry. Teddrick made up freestyle raps early in his childhood, but the growth and

: 00167

advancement in his contemporary lyrical writing was directly associated with the poetry program that he attended while detained at TYC. The program assisted Teddrick in channeling his emotions and experiences into his poetry. Teddrick wrote rap lyrics "all day, every day" while at TYC and even won first place in a TYC poetry contest. Correlations amongst rap music, the larger hip-hop culture and lyrical poetry writings are well documented, including the establishment of "slam poetry," where poets present emotional, political, and cultural verses in an overarching hip-hop setting. In addition, despite the traditional narratives of rap music presenting negative, violence and drug glorifying, misogynistic lyrics, research suggests that the lyrics can prove empowering. (Ex. 3 at ¶¶151-52 [Aff. of Dr. Bowman].)

Teddrick was not bragging about his actions in his lyrical writing. Instead, for Teddrick, rap music and lyric-construction was "a way of coping" and an opportunity to "look at the mirror." These were not the writings of a cold, calculating person, but rather the writings of a thoughtful, yet emotionally challenged and misguided person. (Ex. 3 at ¶153 [Aff. of Dr. Bowman].)

### 15. Teddrick: A Family and Community That Failed Him

No one could possibly have imagined that Teddrick would have ended up where he did. Rowena did the best she could for Teddrick, however the tools she had were inadequate for the job. There are significant patterns throughout Teddrick's family history that have undoubtedly influenced his development and understanding of family and sense of responsibility. His grandmother Darlene had six children by five different men, beginning in her teenage years. Few of her children ever had the opportunity to even know their biological fathers, and certainly did not receive emotional or financial support from them. Darlene was no doubt a hard worker, but her children were frequently left in the care of others and responsible for far too much at too young an age. Darlene hid her pregnancies

: 00108

from her children and gave birth at home each time.  There was no sense of joy or expectation at the arrival of a new baby, simply the realization of another mouth to feed.  (Ex. 3 at ¶¶154-55 [Aff. of Dr. Bowman].)

The family moved often, and never had the opportunity to put down roots in one place, or develop strong social support systems.  And until her marriage to Eugene, a number of men came in and out of Darlene's life, including violent, dangerous men like Peter Paul Zenon.  As a result, members of Teddrick's family have largely gone their separate ways as adults, seeing each other infrequently and communicating with one another out of obligation rather than affection.  They never really learned how to support one another in times of turmoil and stress.  (Ex. 9 at ¶20 [Aff. of Monica Davis]; Ex. 14 at ¶10 [Aff. of Malcolm Mitchell]; Ex. 10 at ¶10 [Aff. of Truman Jackson]; Ex. 5 at ¶5 [Aff. of Necole Baldwin]; Ex. 3 at ¶156 [Aff. of Dr. Bowman].)

Like her mother, Rowena's boys also have different fathers.  At age fourteen she hid her first pregnancy and gave birth at home.  Like her mother, Rowena worked hard, but made very little money.  She also moved around frequently and had romantic relationships with multiple men, all of whom proved to be more of a drain on the family's emotional and financial resources than a benefit.  Rowena may have wanted to do things differently than Darlene, and she even succeeded in some respects, but she was simply ill-equipped to fully break out of the maladaptive patterns established by her own mother, or provide a stable life for her children.  (Ex. 3 at ¶157 [Aff. of Dr. Bowman].)

Teddrick tried to do things differently.  He worked hard to provide for Stephanie and his sons, refusing to allow her to suffer the same fate as his mother and grandmother.  By all accounts, he was also a loving and present father who showered his boys with affection.  But, he also started that family as a teenager, before he was ready emotionally or financially to take on the responsibility.  In

some ways, his struggle to escape his family's patterns of poverty and strife got him into deeper trouble due to his insistence on taking on more responsibility than he could handle, without ever asking for help. (*See* Ex. 20 at ¶25 [Aff. of Stephanie Soliz]; Ex. 5 at ¶12 [Aff. of Necole Baldwin]; Ex. 3 at ¶158 [Aff. of Dr. Bowman].)

Teddrick's life has been a constant battle between the pushes and pulls of the neighborhood—and it's numerous and multigenerational delinquent opportunities—and the inner containment that he established for himself and limited outer containments of family, school, and community. Teddrick had an intrinsic desire to be a better parent and mate than what he had experienced growing up and desperately wanted to escape the pushes and pulls that entangled him. (Ex. 3 at ¶159 [Aff. of Dr. Bowman].)

For Teddrick, he simply could not manage the pushes and pulls of a delinquent life—particularly living in a socially disorganized neighborhood where gang affiliation and delinquent behavior are at best accepted and at worst glorified. The strength of these pushes and pulls seemed to consistently outweigh his inner and outer containments. Regardless of a fundamental need to maintain parental responsibility for his children, consistent physical and economic support to his girlfriend, and opportunities for legitimate employment, the power of the pushes and pulls consistently and eventually took precedence in Teddrick's life. With more consistent outer containments (e.g. stable, consistent, disciplinary parents; teachers, coaches and administrators who were consistently a part of Teddrick's life; a community that unmistakably valued conforming behavior, higher education, and gainful employment), Teddrick's life would have been different. He might have been a standout college athlete, a college graduate, or even a military officer. (Ex. 3 at ¶160 [Aff. of Dr. Bowman].)

: 00119

Teddrick was a product of his personal, social, and structural environment. Factors beyond Teddrick's control, including but not limited to the absence of a consistent father figure, residential and educational instability, the opportunity of gang affiliation and the emotional and financial benefits associated with it, and the effects of prisonization upon release from his first detainment in TYC ,inexorably shaped him during his formative years. Because of his disorganized upbringing, as well as the constant pushes and pulls that he experienced throughout his young, tumultuous life, Teddrick was motivated by a desire for stability—or in academic terms, social organization and collective efficacy—in his world. Unfortunately, Teddrick experienced more economic and emotional value and learned support in the pushes and pulls towards delinquency, compared to the limited, deficient, and often unlearned inner and outer containments that are designed to produce conforming behavior. (Ex. 3 at ¶¶161-62 [Aff. of Dr. Bowman].)

### D. That the Jurors Did Not Hear Testimony from an Expert Prejudiced the Outcome of Batiste's Case

During Batiste's punishment trial, the State called a plethora of witnesses to testify in support of their position that because (1) Batiste was a future danger; and (2) there was no sufficiently mitigating evidence to warrant a sentence of life without parole, jurors should sentence Batiste to death. (18-23 RR *passim*.)

Therefore it stands to reason that if Dr. Scott Bowman or a similarly qualified expert had been presented, he or she would have testified about Batiste's life experiences as described above, which informed who he is and what he did. An expert would have been able to weave together the disparate threads of Batiste's life into a single, compelling narrative that would have humanized Batiste and provided some context for his behavior, allowing jurors to view him more fully, as more than—or not simply—a young man convicted of a terrible crime. Having heard such a compelling narrative, jurors would have been able to consider

93

whether any of the information presented reduced Batiste's moral culpability for his crime, thus sparing him from execution.  Given the likelihood of even just one juror finding any of the information that should have been presented through an expert mitigating, Batiste would not be facing certain death.  *Wiggins*, 539 U.S. at 536.

**CLAIM FOUR**

**TRIAL COUNSEL FAILED TO PROPERLY INVESTIGATE AND PREPARE LAY WITNESSES FOR THE PUNISHMENT PHASE OF BATISTE'S TRIAL**

Batiste's defense counsel was expected to investigate and prepare a full mitigation presentation for the punishment phase of Batiste's trial. However, counsel's incomplete investigation and lack of preparation of testifying lay witnesses failed to ensure Batiste received the effective assistance of counsel guaranteed by the Constitution.

At the heart of the punishment phase of a capital trial is the presentation of mitigation evidence and the concept of moral culpability.  Moral culpability acknowledges an elementary psychological reality—that people do not arrive at their choices from the same path. Thus, it follows that the degree of "blameworthiness" of an individual for capital murder may vary depending on what factors and experiences shape, influence, and/or compromise that choice.  A jury's understanding of the evidence impacting the moral culpability of a defendant is critical to a jury's consideration of the appropriate punishment for a capital offense.

Mitigating evidence is not developed to provide a defense to the crime or to challenge evidence of guilt; nor is it an excuse or explanation for a crime.  Instead, it provides a context for the crime by describing an individual's life experiences that serve to inspire compassion, empathy, mercy, and/or understanding.  Indeed,

94

mitigating evidence is *any* evidence that "might serve 'as a basis for a sentence less than death.'" *Tennard v. Dretke*, 542 U.S. 274, 287 (2004) (quoting *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986)) (emphasis added).

The failure of trial counsel to properly investigate and prepare their lay witnesses for Batiste's trial prejudiced Batiste's punishment phase presentation and violated his applicable state and federal Constitutional rights, as well as state statutory law and state case law. Therefore, Batiste's death sentence should be vacated.

## A. Trial Counsel Failed to Properly Develop the Lay Witnesses Who Were Called to Testify During the Punishment Phase of Batiste's Trial

Professional norms require that counsel's investigation should include the thorough interviewing and development of witnesses such as family members and friends. *ABA Guidelines*, Guideline 10.7 (commentary) ("penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history"); *Texas Guidelines*, Guideline 11.1(A)(3)(b)(i) ("The investigation for the punishment phase of the trial should generally encompass . . . [d]evelopment of character witnesses and family background evidence.").

Batiste's trial counsel presented eight witnesses at the punishment phase of his trial who spoke about various aspects of Batiste's life history. These witnesses included a high school football coach (23 RR at 113-23); a former boss (23 RR at 129-34); Batiste's girlfriend and her mother (23 RR at 151-58; 24 RR at 3-13); a close friend (24 RR at 55-63); and Batiste's brother, mother, grandmother, and second cousin (24 RR at 23-35, 73-89, 94-111.) The mitigation evidence presented by these witnesses was incomplete, and often times, inaccurate. By presenting Batiste's life story in such a simplistic way, defense counsel not only denied the jury the opportunity to hear the "real" story of Batiste's life (*see also* Claim Three, *ante*), but left them with the impression that Batiste was from a supportive and

95

loving family, yet still made the decision to embark on a life of crime. Trial counsel's failure to investigate and prepare their lay witnesses was manifested in three ways:

First, trial counsel failed to uncover detailed mitigating information from family members and friends about Batiste's background, and then failed to properly and adequately prepare these witnesses for their testimony. The witnesses either met briefly with Batiste's attorneys before trial, or not at all, and were only given a general idea of the kinds of questions they would be asked. Specifically, the family members were simply told to wait in a large room together and someone from the defense team, presumably the mitigation specialist, came in to tell them who was next to testify. (*See* Ex. 21 at ¶3 [Aff. of Beverly West]; Ex. 17 at ¶2 [Aff. of Rowena Scott]; Ex. 15 at ¶6 [Aff. of Kevin Noel Jr.]; Ex. 2 at ¶2 [Aff. of Darlene Beard]; Ex. 11 at ¶5 [Aff. of Micaela Lara]; Ex. 20 at ¶4 [Aff. of Stephanie Soliz].) The result was that the testifying family members and friends were not given the opportunity to provide compelling and accurate information regarding Batiste's complex and nuanced life history.

Secondly, in addition to not providing mitigation evidence in its entirety, several witnesses were also completely ill-equipped to answer questions they were asked during cross-examination because they had not been prepared by the defense team to anticipate questioning by the State. In particular, Both Kevin Noel Jr. and Micaela Lara were broadsided by the State's questions regarding letters they received from Batiste, as they had not been informed by defense counsel that the introduction of such evidence was a possibility. Similarly, Stephanie Soliz was not aware that the State would go into the sensitive areas that they did, and was not prepared to answer questions in a truthful, yet still beneficial way for Batiste. (Ex. 20 at ¶¶4-5 [Aff. of Stephanie Soliz]; Ex. 15 at ¶6 [Aff. of Kevin Noel Jr.]; Ex. 11 at ¶6 [Aff. of Micaela Lara].)

Finally, trial counsel's failure to fully investigate and prepare their lay witnesses resulted in the presentation of damaging evidence by two of their own witnesses, Gary Thiebaud and Kristopher McSherry. The testimony of both witnesses was detrimental to Batiste's case in mitigation and served no strategic purpose.

### 1. Trial Counsel's Presentation of Lay Witness Testimony at the Punishment Phase Did Not Adequately Inform the Jury of Batiste's Complicated Familial and Social History

Trial counsel presented three witnesses to provide information regarding Batiste's childhood and family history: Rowena Scott, Darlene Beard, and Beverly West. There was a tremendous amount of compelling mitigation information that trial counsel failed to elicit, denying Batiste the presentation of an accurate psychological and social history.[30]

### a. Rowena Scott

Rowena Batiste Scott ("Rowena"), Batiste's mother, testified at the punishment phase of her son's trial. Rowena testified that she did not tell anyone she was pregnant with Batiste because she was scared, and after Batiste was born they lived with her mother who helped her take care of the baby and who had great influence on him. She testified that Batiste was born with meningitis of the brain but recovered.[31] Rowena identified multiple photographs that were admitted of

---

[30] Batiste's family members could have presented testimony not only about Batiste individually, but about their own life history, including the trauma they suffered and instability they experienced. As was discussed in Claim Three, *ante*, the life events of Batiste's relatives, Rowena in particular, are relevant because these experiences had a tremendous impact on Batiste himself. The multi-generational effects of social, financial, and personal instability are pervasive and significantly contributed to Rowena's ability to effectively parent and Batiste's own developmental dysfunction.

[31] Batiste was not born with meningitis, but rather he was taken to the emergency room on September 21, 1988, at the age of approximately nine months, and

: 00115

Batiste and various family members. Rowena testified that she and her husband Jerome Scott argued in front of Batiste and Batiste did not like it, but that Batiste and Jerome had no other problems. Rowena testified that she was sad and disappointed when Batiste got into trouble for stealing cars. Rowena testified that Batiste took care of his girlfriend Stephanie and her baby even though the baby was not his. Rowena testified that despite the fact that Batiste had tattoos, she did not suspect he was in a gang and would not have allowed it. (24 RR at 94-111.)

Rowena met with the mitigation specialist a few months before the trial and later met with one of the defense attorneys right before the trial. She was just asked what Batiste was like as a child. (Ex. 17 at ¶2 [Aff. of Rowena Scott].) There is no indication that anyone on the defense team explained to Rowena what mitigation was or what her role in the presentation of Batiste's life story might be. There was a wealth of information about Batiste's family history and childhood that Rowena could have testified to if she had been asked, including but not limited to, the following:

Rowena could have testified about her complicated and nomadic family history, as well as the absence of a father figure in her own life. Rowena was told her father was a man named Clarence Batiste, but she did not know him nor was he involved in her life. It was not until she was thirty-three years old that she learned her real father was a man named Ulysee Bean. Rowena could have testified that she moved around a great deal when she was young, never establishing real roots. She would sometimes live with her mother, Darlene, but would also live with her great aunt or other family members. Rowena could have testified about Darlene's

---

subsequently diagnosed with *H. Influenza Meningitis*. He was hospitalized for nine days. (Def. Ex. 20, at 35 RR.) Despite the fact that this was a life-threatening disease directly affecting the brain, trial counsel failed to consult with an expert regarding the potential consequences of such an illness. (*See* Claim One, *ante*.)

: 00116

horribly abusive boyfriend and the terror that he imposed on the entire family for many years. She could have testified regarding the physical and mental abuse inflicted upon her by her mother's boyfriend, as well as the neglect she suffered at the hand of her mother. (*Id.* at ¶¶5-13.)

Rowena could have explained to the jury that because she did not receive affection or love from Darlene, she sought it from boys, becoming sexually promiscuous at a very young age. She could have explained that she was never able to tell Batiste anything about his father because she did not have any information herself, the pregnancy being the result of a single sexual encounter when she was fourteen years old. (*Id.* at ¶¶13-14.)

Rowena could have also testified regarding her complicated romantic history, and the various men that came in and out of Batiste's life. She would have been able to explain that both Kevin Noel Sr. and Jerome Scott had drug problems. She would have also told the jury that despite the fact that she worked, and worked hard, she was forced to live with her children in low-income neighborhoods in government subsidized housing. She would have testified that she moved frequently, staying with different relatives or boyfriends, and as a result, Batiste had to go to many different schools. Batiste was forced to learn how to take care of himself early on. Rowena could have testified regarding Batiste's desire for a father and his disappointment to learn that Kevin Sr. was not his father. (*Id.* at ¶¶20-29.)

### b. Darlene Beard

Darlene Mitchell Beard ("Darlene"), Batiste's grandmother, also testified at the penalty phase of Batiste's trial. Darlene testified that she had six children of her own and Batiste was born in her house where Rowena was living at the time. No one knew Rowena was pregnant. Darlene testified that she was the primary caretaker for Batiste until he was nine years old, and she would later see him at

: 00117

holidays. She believed Batiste was kind to his girlfriend and kids. Darlene testified that Batiste did not have a father figure when he was born, but Rowena had several men in her life who were positive influences on Batiste. (24 RR at 81-89.)

Darlene did not know what the lawyers were going to ask her or what she was supposed to testify before taking the witness stand. (Ex. 6 at ¶2 [Aff. of Darlene Beard].) Darlene could have provided invaluable information regarding Batiste's family history, especially with regard to her own, as well as Rowena's, childhood. Darlene could have testified that she had her first child at age sixteen, and by the time she was in her early twenties, she was a single mother of six children from five different fathers. (*Id.* at ¶¶7-14.) Darlene could have talked about the brutal abuse she and her children, including Rowena, suffered at the hands of her boyfriend, and how she ultimately killed him in self-defense. (*Id.* at ¶¶15-17.) Darlene could have explained to the jury that she and her children had a nomadic lifestyle and moved around a great deal. She worked a lot and the children were often left in the care of other people. (*Id.* at ¶¶18-19.)

Furthermore, Darlene provided information to the jury that was incomplete or inaccurate, but because Batiste's trial counsel had not done a complete and thorough investigation into Batiste's life history, they were seemingly unaware of the inconsistency. For example, Darlene testified that she was Batiste's primary care-taker from the time of his birth until he was approximately nine years old. (24 RR at 83-84.) A complete investigation reveals that is not accurate. When Batiste was an infant, he was cared for during the day by Rowena's cousin, Beverly West, and then later in day care. Rowena moved out of Darlene's house when Batiste was approximately three years old, and following that time Darlene would care for Batiste schedule permitting. (*See also* Claim Three, *ante*; Ex. 21 at ¶11 [Aff. of Beverly West]; Ex. 17 at ¶18 [Aff. of Rowena Scott]; Ex. 9 at ¶32 [Aff. of Monica

100

Davis].) While Darlene certainly cared for Batiste, he did not have one stable and consistent care giver from birth until age nine as Darlene testified.

An additional example is Darlene's testimony that three of Rowena's boyfriends: Kevin Noel, Jerome Scott, and Shun Armington had a positive influence on Batiste. (24 RR at 88-89.) A thorough and complete investigation reveals that Rowena's romantic relationships were in reality a cause of stress, discord, and suffering for Batiste, most notably being Jerome Scott, whose drug use and abuse of Rowena was a significant source of trauma. (*See also* Claim Three, *ante*; Ex. 17 at ¶¶27-32 [Aff. of Rowena Scott]; Ex. 15 at ¶38 [Aff. of Kevin Noel, Jr.]; Ex. 9 at ¶38 [Aff. of Monica Davis].)

### c. Beverly West

Beverly West ("Beverly"), Batiste's second cousin, testified at the penalty phase of Batiste's trial. Beverly testified that she was Rowena's cousin but did not live with the family when Batiste was born. She testified that she would see Batiste periodically as he was growing up but did not really know Batiste's girlfriend or their children. She was surprised that Batiste was involved in a capital case. (24 RR at 73-80.)

Beverly was contacted by someone on Batiste's defense team by phone and did not meet the lawyers until the day she came to testify. She waited in a room with other family members and someone came in and told them collectively to just answer the questions they were asked. (Ex. 21 at ¶3 [Aff. of Beverly West].)

Beverly could have provided the jury with information regarding Batiste's family history, including important details from Rowena's childhood. Beverly could have testified that after her mother died in childbirth she was raised by her grandmother, Susan. Her grandmother was also raising her siblings and two of Darlene's children, Malcolm and Monica. When her grandmother died, Beverly had to move in with Darlene. Because Darlene worked a lot, Beverly had to help take care of

the smaller children. Beverly was afraid of Darlene, who would hit her and the other children. Beverly also knew Darlene's abusive boyfriend and knew the family was very afraid of him. (*Id.* at ¶¶5-9.)

Beverly could have testified that she was shocked when Batiste was born because no one knew Rowena was pregnant or who the father was. Beverly took care of Batiste during the day when he was a baby so that Rowena could finish school. Someone would bring Batiste to her in the morning and then pick him up at the end of the day. She was asked to take care of Batiste because no one else was available. (*Id.* at ¶11.)

## 2. Trial Counsel's Presentation of Lay Witness Testimony at the Punishment Phase Did Not Adequately Inform the Jury of Batiste's Complicated Social History and the Inadequate Preparation of These Witnesses Left Them Vulnerable to Damaging Cross-Examination

During the punishment phase of Batiste's trial, counsel presented the testimony of Batiste's girlfriend, Stephanie Soliz; his brother, Kevin Noel Jr.; and his good friend, Micaela Lara. Not only did trial counsel fail to elicit persuasive and meaningful mitigation from these witnesses, but counsel also failed to adequately prepare them to testify, leaving each of them vulnerable to damaging cross examination by the State.

Failing to prepare lay witnesses falls short of the "objective standard of reasonableness" upon which defense counsel are judged. *Strickland*, 466 U.S. at 688. And no reasonable strategic explanation can account for this failure. *Id.* ("[T]he performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances."). Considering this, trial counsel's failure to properly prepare their lay witnesses was neither strategic nor reasonable. *Ibid.*

### a. Stephanie Soliz

Stephanie Soliz ("Stephanie"), Batiste's girlfriend and mother of his children, testified at the punishment phase of Batiste's trial. Stephanie testified

102

: 000120

that she met Batiste in middle school and started dating him in high school. She got involved with Batiste when she was pregnant and Batiste moved in with her and her mother and took care of them, even though the baby was not biologically his. Stephanie testified that she and Batiste moved into their own apartment and she got pregnant again. Batiste did everything for her and the children, providing for them financially as well as helping out around the house. Stephanie testified that Batiste was the best father for her children that she could have asked for. Stephanie also testified regarding the various jobs Batiste had while they were together. (23 RR at 150-58.)

On cross-examination, Stephanie was questioned regarding the tint that Batiste had recently gotten on his windows, suggesting that the family could not have been having financial difficulties if they had money to spend on window tint. Stephanie was also asked if she knew when and where Batiste got his tattoos, and where the money they lived on came from. Stephanie was also asked to recount details of her actions the night Batiste was arrested and to describe the person who came to her apartment with keys to Batiste's car. She was asked identifying details about Leon Thompson and Cornell Smith. Stephanie was also questioned regarding the amount of marijuana she and Batiste smoked and how they were able to buy it. Stephanie was asked about an alleged illegal fencing business that Batiste was running out of their apartment and how Batiste had friends who were stealing things for him. Stephanie was further questioned about the hours Batiste worked and if she knew what Batiste was doing when he was not working. (23 RR at 159-74.)

Because of her peripheral involvement in the alleged tattoo parlor incident, Stephanie was interviewed multiple times by law enforcement and the District Attorney's Office. She was interviewed by the District Attorney very close to the time of trial. (Ex. 20 at ¶5 [Aff. of Stephanie Soliz].) Stephanie felt as though the

103

prosecutor was very nice to her in person but then "flipped" everything she said. Stephanie expected to be cross-examined, but was shocked by the extent of it, and the end result was that the picture that was painted of Batiste was completely wrong. (*Id.* at ¶¶4-5.) The fact that Stephanie had been interviewed by the State multiple times heightened the need for trial counsel to adequately prepare her to testify on Batiste's behalf.

Stephanie was in a very unique position as a social historian, because she was one of the few people who intimately knew Batiste both before and after he experienced the juvenile justice system. She was privy to the transformation that he underwent and saw first-hand the pressure he was under to recover from the institutionalization and trauma he suffered while at the alternative school, boot camp, and TYC. (*See* Claim Two, *ante.*) Stephanie and Batiste's story was not as simple as "they met in middle school and dated in high school." Rather, they were in the same social circle at middle school and both got into trouble—Stephanie for truancy and Batiste for selling prescription pills. Batiste was not doing anything that out of the ordinary, as a lot of the students at school were also selling pills. (Ex. 20 at ¶6 [Aff. of Stephanie Soliz].)

Stephanie could have testified that she was sent to a different alternative school than Batiste and as a result they did not start dating until they entered their freshman year at Cy-Ridge High School. Batiste was into sports and trying his best to stay out of trouble. He was a good boyfriend and consistently stood up for Stephanie. (*Id.* at ¶¶7-8.)

Stephanie was in a unique position to testify regarding how she and Batiste spent their time, mainly hanging out with her sister or older kids. They played basketball and socialized outside various people's apartments. Stephanie would have testified that when Batiste was arrested for stealing cars and sent to boot camp and then TYC, he was doing it so that he could come and see Stephanie and

104

: 00122

they could ride around together. (*Id.* at ¶9.) While certainly not a justification for delinquent behavior, Stephanie would have been able to contextualize Batiste's criminal activity with an adolescent and understandable motivation—he just wanted to see his girlfriend. (*See* Claim Two, *ante.*)

Stephanie would have further testified that it was difficult to keep in touch with Batiste while he was at TYC and she dated someone else and became pregnant. Batiste came out of TYC knowing more and better ways to steal cars—learning these techniques from the people he met there. Batiste also came out with more connections to drugs. Stephanie would have also testified that Batiste did not have a true association with the Five Deuce Crips until he returned from TYC. (Ex. 20 at ¶¶9-12 [Aff. of Stephanie Soliz].)

Stephanie would have testified that it bothered Batiste that he never knew his father. She could have talked about the time that a number showed up on a phone bill and Batiste thought it was his father trying to get in contact with him. Batiste's mother told him that the number had nothing to do with his father and Batiste felt so "stupid and hurt." Stephanie would have described another time in which Batiste asked his mother a few questions about his father and she yelled at him and said he already knew all that she did. Batiste never asked questions about his father again. (*Id.* at ¶9.)

It is critical that the jury understands how evidence impacts the moral culpability of a defendant and how their factors and experiences shape and influence their path in life. As his partner, Stephanie was aware of Batiste's strength of character, but also his struggles, both because of his own background and his young age. Stephanie could have testified that Batiste grappled with the news that she was pregnant a second time and was not sure that he wanted to be in a relationship with her or for her to have the baby. Stephanie would have

105

explained that despite his reservations, Batiste stepped up to the plate and took responsibility for her and the children. (*Id.* at ¶¶8-19.)

Stephanie could have testified in much greater detail regarding Batiste's time in Denton and his success with a manual labor job, and his tremendous strength as a father. Stephanie could have explained that the difficulties Batiste faced in Denton was in large part due to her emotional instability and decision to move back to Houston with the children. (*Id.* at ¶¶21-23.)

Stephanie could have also provided the jury with an understanding of what kind of risk taking behavior Batiste was engaged in, in order to support the family financially. (*Id.* at ¶27; *see also* Claim One, *ante.*) She would have been able to talk about the kind of pressure Batiste was under, not only to provide for her and the children, but also to be loyal to his associates on the street, and how that loyalty ultimately dictated much of his actions. (Ex. 20 at ¶¶28-29 [Aff. of Stephanie Soliz]; *see also* Claim Two, *ante.*)

An inordinate amount of damaging evidence regarding Batiste's actions in the months leading up to his arrest came out during Stephanie's testimony.[32] She was surprised by the extent of the cross-examination and that the prosecutor was able to "flip" everything she said to harm Batiste. Trial counsel did nothing to rehabilitate Stephanie and did not ask her any questions on re-direct examination, which would have allowed her, at the very least, to provide context for Batiste's actions. (Ex. 20 at ¶¶4-5 [Aff. of Stephanie Soliz].)

**b. Kevin Noel Jr.**

Batiste's brother, Kevin Noel Jr. ("Kevin"), testified at the punishment phase of Batiste's trial. Kevin testified that Batiste was a good brother who never tried to

---

[32] Trial counsel was ineffective for failing to object to a myriad of questions that Stephanie was asked during cross-examination. This systemic failure on the part of trial counsel is discussed in detail in Claim 11, *post.*

: 001245

involve him in gang activity or committing crimes. Kevin testified that Batiste was a good father and provider to his young children. Kevin testified that he and Batiste grew up with their step-father Jerome Scott who would argue with their mom and Batiste would try to stop it. Kevin knew Batiste got into trouble as a juvenile but he did not know Batiste was in a gang. (24 RR at 23-35.)

On cross-examination, Kevin testified that he knew Batiste was getting into trouble as a juvenile and that he had smoked marijuana with Batiste. He was asked by the prosecutor about several letters that he and Batiste exchanged when Batiste was in jail; including letters about a person named Rome, various tattoos Batiste suggested Kevin get, Batiste's desire to have sex with women, Batiste's requests for pictures of women, and a sexual experience that Batiste had in the hospital. Kevin also testified that he was affiliated with the Line Five Piru Bloods. (24 RR at 36-54.)

Kevin met with the mitigation specialist before trial, but no one told him that the prosecutor would be using any of the letters Batiste sent to him. (Ex. 15 at ¶6 [Aff. of Kevin Noel Jr.].) Because trial counsel did not even inform Kevin the letters would be introduced, it is not possible that they prepared him for how to effectively contextualize the content of the letters.

Kevin was in a unique position to be able to provide compelling mitigation regarding key elements of Batiste's childhood, as he witnessed first-hand the residential instability, lack of supervision, and lack of a father figure, that influenced Batiste during his formative years.

Had he been given the opportunity, Kevin would have described how his father, Kevin Noel Sr., took both him and Batiste for visitation during the weekends. Kevin Sr. was a recovered alcoholic and would take the boys to AA meetings. When their mother Rowena married Jerome Scott, Kevin Sr. stopped coming around as often. Kevin knew that Jerome was jealous when Kevin Sr.

: 00125

picked up him and Batiste, and so Kevin Sr. often just took Kevin, leaving Batiste behind. Kevin Sr. was not a stable influence in either Batiste or Kevin Jr.'s life. He would come in and out and there would be long periods of time that no one saw Kevin Sr. at all. (*Id.* at ¶¶8-10.)

Kevin would have also testified that Jerome was a drug addict. Jerome took things from the house, like electronics and appliances, and pawned them for drug money. Jerome went missing for days. This caused Jerome and Rowena to fight, upsetting Batiste greatly. Jerome was harder on Batiste than he was on Kevin and would say he was going to get things for Kevin, leaving Batiste out. Jerome would promise things and not be able to deliver, and Batiste knew it was because Jerome had spent the money on drugs. (*Id.* at ¶¶11-12.)

Kevin would have also testified that Rowena had a lot of men who would come and go from their lives. Rowena moved Batiste and Kevin around a great deal and they lived in many different places. When Rowena got evicted because of financial problems, they would have to move in with relatives until she could get back on her feet. (*Id.* at ¶¶13-14.)

Kevin could have testified that because Rowena was gone a great deal, Batiste had to be very independent by a young age and was responsible for getting himself to school every day on the city bus. Batiste was alone after school each day for several hours and had a lot of freedom. Batiste was exposed to adult things from an early age, including pornography. Batiste, as early as age ten or eleven, would watch pornography that belonged to his uncle. (*Id.* at ¶¶16-17.)

Kevin would have testified that Batiste needed and wanted a positive male role model at home and all he had was someone who was doing drugs. Batiste was exposed early on to things on the street and learned from older kids how to do petty things, like steal candy or kick holes in gates. A white kid turned Batiste on to selling pills and Batiste would come home with new things, like a bike. Batiste

108

would show Kevin but then hide the things from Rowena. Batiste's first tattoo was in eighth grade and it was "MOB" which stands for "money over bitches." It was a popular tattoo and Batiste was just following the crowd. (*Id.* at ¶¶19-20.)

Kevin's testimony could have provided the jury with mitigating evidence by which to find that his life experience had in many ways been dictated by factors beyond his control. Furthermore, if he had been notified by trial counsel that the State would be using Batiste's letters to Kevin against him, Kevin could have been prepared to contextualize the letters in a way that was less damaging and potentially beneficial to Batiste.[33]

### c. Micaela Lara

Micaela Lara ("Mickey"), Batiste's close friend, testified at the punishment phase of Batiste's trial. Mickey testified that she and her husband Rico lived with Batiste and his girlfriend Stephanie in Houston and then again in Denton. Mickey testified that Batiste got into some trouble in Denton and went to jail. Mickey testified that she spent a lot of time seeing Batiste interact with other people and he was good to Stephanie and their children. She was shocked at Batiste's arrest for capital murder. On cross-examination, Mickey testified that she was aware of Batiste's criminal history. She was also extensively cross-examined regarding letters that she and Rico received from Batiste after his arrest. (24 RR at 55-72.)

Mickey spoke to Batiste's mitigation specialist over the phone. She never met with either of Batiste's attorneys before she testified. There was a woman who talked to the entire group of people waiting to testify and she would tell the group who was next. The woman told Mickey that the attorneys would just be asking her what Batiste was like. No one told her that the prosecution would be bringing up the jail letters. (Ex. 11 at ¶¶5-6 [Aff. of Micaela Lara].)

---

[33] A full discussion of the "jail letters" can be found at Claim Eight, *post.*

: 00127

Mickey could have testified that she and Batiste were very good friends and she felt very close to him. They were able to joke around with each other and she was like his older sister. (*Id.* at ¶11.) Mickey could have testified that when she lived with Batiste and Stephanie in Houston, the situation was tense because Batiste felt as though he had to bear the burden of supporting them. Batiste felt because he was the man, it was his responsibility to take care of Stephanie and the baby. (*Id.* at ¶12.)

Mickey could have testified that she and Rico moved to Denton because she was pregnant and they wanted a fresh start. Soon after they moved to Denton their daughter was stillborn. Batiste was a critical source of support for Mickey and Rico after they lost their daughter. Batiste did not avoid them like many other people did, but rather listened to them and showed that he cared. Batiste was there for Mickey and Rico and was a good friend to them during the most difficult time in Mickey's life. (*Id.* at ¶¶15-16.)

Mickey could have testified that Batiste had a good job as a roofer's assistant in Denton and did well with the job. Mickey could have told the jury that Batiste and Stephanie broke up because Stephanie was hormonal and emotional due to a birth control she was using. After Stephanie left, Batiste would stay out late and when Mickey and Rico left for a weekend, Batiste got into trouble. (*Id.* at ¶¶18-19.)

Mickey could have also testified that Batiste wanted to help his younger brother do the right thing. Batiste regretted that he did not finish school because he was really good at school and could have done something with it. Mickey did not know that Batiste was in a gang because where they went to middle and high school everyone acts like a gangster, but were not really involved. (*Id.* at ¶¶24-25.)

Mickey's testimony could have provided the jury with mitigating evidence by which to find that Batiste's life experiences inspired compassion, empathy,

110

mercy, and/or understanding.   Furthermore, if she had been notified by trial counsel that the State would be using Batiste's letters to her and her husband against Mickey, she could have been prepared to contextualize the letters in a way that was less damaging and potentially beneficial to Batiste.[34]

### 3. Trial Counsel's Presentation of Lay Witness Testimony at the Punishment Phase Harmed, Rather Than Helped, Batiste's Case in Mitigation

Trial counsel's deficient conduct prejudiced Batiste's right to a full presentation of mitigation evidence at the punishment phase of his trial.   *See Williams*, 529 U.S. at 393 ("[I]t is undisputed that Williams had a right—indeed, a constitutionally protected right—to provide the jury with the mitigating evidence that his trial counsel either failed to discover or failed to offer.").   Due to a lack of investigation and preparation, trial counsel presented two lay witnesses, Gary Thiebaud and Kristopher McSherry, who were ultimately damaging to Batiste's case in mitigation.

There could have been no strategic reason for counsel to present witnesses that actually worked against the defense theory that Batiste was a good father and provider and thus deserved the jury's mercy.   Counsel's performance is therefore deficient.   *Wiggins*, 539 U.S. at 527 ("Even assuming [counsel] limited the scope of their investigation for strategic reasons, *Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy.   Rather a reviewing court must consider the reasonableness of the investigation said to support that strategy.").

### a. Gary Thiebaud

The first lay witness called by the defense at punishment Gary Thiebaud ("Thiebaud") the head football coach at Cy-Ridge High School.   Thiebaud testified

---

[34] Again, a full discussion of the "jail letters" can be found at Claim Eight, *post.*

: 00129

that he saw Batiste run track in middle school and was impressed by his talent, so he got Batiste involved in the athletic program at the high school. Thiebaud had Batiste run track and participate in the off-season football program. Thiebaud counseled Batiste and tried to get him to broaden his vision of the future, because he saw that Batiste was being pulled in different directions. Thiebaud believed that Batiste was easily influenced by other people and could not focus on what his talent might do for him. He gave Batiste the opportunity to succeed in athletics but Batiste instead got involved in car thefts and disappeared from the athletic program. (23 RR at 113-23.)

On cross-examination, Thiebaud testified that he only worked with Batiste for one spring semester and he tried to help Batiste. Thiebaud received a letter from Batiste when he was in jail and had sporadic communication with Batiste after that. He never cut ties with Batiste and consistently tried to give him good advice and influence Batiste in a positive way. (23 RR at 123-28.)

It is inconceivable that defense counsel would present a witness to make the State's case for them—that Batiste was given a multitude of opportunities to make his life better, but instead he chose a life of crime. Thiebaud was a peripheral figure in Batiste's life at best; involved briefly with Batiste once he had already been introduced to the juvenile justice system. One of the primary reasons Batiste was not ultimately able to stay with the high school football program was because he was introduced to it during the off-season in the spring, rather than during the peak performance season during the fall.[35] Although Thiebaud acknowledged that

---

[35] Competing with a team of positive peers and accomplishing a goal with others is genuinely life-changing for many at-risk youth. For youth who have only been exposed to negative peer relations and who lack true genuine friendships, the camaraderie and sense of belonging and accomplishment a team sport can provide is enormous. The connections they make with their teammates and the opportunity to highlight their skills in the arena of competition has a long-lasting effect on

Batiste felt torn between two worlds, he could not provide any context for why this was the case or what about Batiste individually made him unsuccessful in the football program. (*See* Claim Two, *ante*.) The result was that Batiste was portrayed as someone who was given support and encouragement and despite those privileges, he still rejected that world. This was contrary to the very purpose of mitigation.

### b. Kristopher McSherry

Of all of the "mitigation" witnesses offered by Batiste's defense, none was more egregiously prepared and presented than Batiste's former boss, Kristopher McSherry ("McSherry"), a witness who operated on the mistaken impression that he was actually there to testify on behalf of the State. (Ex. 13 at ¶4 [Aff. of Kristopher McSherry].)

Trial counsel was particularly ineffective when it called McSherry to testify. Having failed to fully investigate and prepare McSherry, defense counsel put him on the stand apparently unaware that McSherry would completely undermine the defense mitigation theory that Batiste was a family man and responsible employee. Instead, McSherry provided the jury with undeniably damaging information about Batiste's character.

McSherry testified on direct examination that he was the plant manager and supervisor at Forge USA and Batiste was the helper on a forging crew. He told the jury that Batiste performed difficult and physically demanding work, and that Batiste never had a problem with anyone there, never got into a fight, and was able

---

young people, particular those who are in need of a positive outlet. Because Batiste missed the fall football season he did not get to participate in any actual games, rather he just attended spring training. As a result he never got to truly experience competitive sports in an active and engaged manner. (*See* Claim Two, *ante*.)

113

to follow instructions. McSherry also testified that Batiste did not tell him that he had been arrested for marijuana possession in April of 2009. (23 RR at 129-34.)

On cross-examination, McSherry testified that he guaranteed Batiste at least forty hours a week of work. He also told the jury of an incident where Batiste was late to work and Batiste told McSherry that he walked into a tattoo parlor near Forge and there were people shot and dead on the floor. Batiste had to give a statement to the police and that was why he was late. Batiste first told McSherry that he left the scene right away, but then Batiste changed his story and said that he had to stay behind. (23 RR at 141-42.)

McSherry further testified that Batiste listed a 1997 Buick LaSabre[36] on his employee information form. He also testified that after Batiste started work, he discovered Batiste had lied on the employment application regarding his criminal history. When he confronted Batiste about the issue, Batiste told him that he lied because he needed a job to feed his family and so McSherry did not terminate him. Finally, McSherry testified that he had conversations with Batiste about Batiste's family and wife. Batiste once showed him a picture on his cell phone of naked women and the implication was that Batiste was running around with them. (23 RR at 144-47.)

McSherry did not want to testify at Batiste's trial and only did so because he believed he had been subpoenaed and had no choice. He was not aware that he was presented by the defense, he was actually under the mistaken belief that he had been called to testify by the State. (Ex. 13 at ¶4 [Aff. of Kristopher McSherry].) It was difficult for McSherry to look at Batiste while testifying because he felt as though he was not testifying in Batiste's favor. (Id. at ¶8.) Although he had been contacted by a defense investigator prior to trial, McSherry did not meet Batiste's

---

[36] The LaSabre was the same car alleged to have been used in both the Black Widow and Exxon homicides.

114

lawyers until immediately before his testimony at trial. The lawyer simply told McSherry he would be asking about Batiste's character and family and what kind of employee he had been. (*Id.* at ¶6.)

McSherry's confusion was understandable. He had been contacted by both defense and law enforcement investigators and was also interviewed by someone in the District Attorney's Office. (*Id.* at ¶7.) What was *not* understandable was the decision of trial counsel to put McSherry on the stand, despite the fact they were on notice that he had made inflammatory and potentially devastating statements to the State.

In discovery, the District Attorney's Office provided defense counsel with an interview memorandum dated April 27, 2011. Trial counsel acknowledged receipt of the memorandum on May 2, 2011. (Ex. 23 [State's Report of Interview with McSherry].) The memorandum detailed the efforts made by the office to serve McSherry with a subpoena for all records pertaining to Batiste for Forge USA, Batiste's place of employment at the time of his arrest. The investigator served the subpoena for records on April 13, 2011, and on April 25, 2011, the investigator was notified that the records were ready to be picked up. The investigator went to Forge USA to get the records and interviewed McSherry on April 26, 2011. During the course of this interview, McSherry revealed that he had a casual working relationship with Batiste and did not know him to cause any trouble. Batiste was a good, not excellent, employee. McSherry revealed that Batiste showed him cell phone photos of several naked women and talked about running around on his wife. McSherry also told the investigator that the morning after the tattoo parlor killing, Batiste said he was there and saw the dead man on the floor. Finally, McSherry revealed to the investigator that there had been statements made by other employees regarding Batiste's possible involvement in other crimes. (Ex. 23 [State's Report of Interview with McSherry].)

: 00133

Trial counsel's uninformed and unreasonable decision to put McSherry on the stand harmed Batiste's case. It was objectively unreasonable for trial counsel to call a witness during the punishment phase of Batiste's trial who directly contradicted the defense theory that Batiste was a good family man. With the knowledge that McSherry had made devastating statements to law enforcement there could be no strategic reason for trial counsel to put him on the stand, and the decision to do so amounted to ineffective assistance of counsel. *See Wiggins*, 539 U.S. at 527.

## B. Conclusion

Trial counsel's minimal investigation and woefully deficient presentation at the punishment phase of Batiste's trial provided the jury very little evidence about Batiste's family history, background, and the external forces that influenced his path as an adolescent and young adult. Had trial counsel thoroughly investigated, interviewed, and properly prepared witnesses prior to their testimony, each of the witnesses could have presented the additional mitigating evidence set out above. Furthermore, had trial counsel adequately prepared their witnesses for testimony on direct, as well as cross-examination, the witnesses would have been able to testify to substantially available mitigation evidence about Batiste and his family, which might have caused at least one juror to sentence Batiste to life instead of death. *Wiggins*, 539 U.S. at 536.

Further, had trial counsel investigated and properly presented the above-discussed evidence, the defense could have hired an expert to testify to the significance these events had on Teddrick's life trajectory. (*See* Claim Three, *ante*.)

Trial counsel's deficient performance prejudiced the punishment phase of Batiste's trial because the jury was denied the opportunity to consider the full story of Batiste's complicated familial, economic, and social history. The type of

116

information trial counsel could have uncovered about Batiste's difficult life is the kind of information courts have ruled is relevant to assessing a defendant's moral culpability. *Wiggins*, 539 U.S. at 535. Some aspect of that story; some seemingly minute detail, could have been the one fact that caused a single juror to decide that Batiste's life should be spared.

**CLAIM FIVE**

**BATISTE'S COUNSEL FAILED TO INVESTIGATE AND PRESENT
EVIDENCE FROM ADDITIONAL WITNESSES THAT WOULD HAVE
STRENGTHENED BATISTE'S MITIGATION PRESENTATION**

In addition to inadequately presenting evidence from the lay witnesses that trial counsel did identify (*see* Claim Four, *ante*), counsel was also ineffective in the overall investigation of Batiste's life history by failing to identify, interview, and/or present evidence from several additional witnesses who would have testified on Batiste's behalf during the punishment phase. As a result, the jury was left with a one-dimensional and wholly inadequate story of Batiste's life to consider. This error prejudiced Batiste's punishment phase presentation and violated his applicable state and federal Constitutional rights, as well as state statutory law and state case law. Therefore, Batiste's death sentence should be vacated.

### A. The Investigation and Development of Lay Witnesses for Batiste's Trial Was Deficient

The standard for professional norms for capital representation requires that trial counsel make an informed decision regarding the implementation of an effective defense strategy. *ABA Guidelines*, Guideline 10.7 (commentary) (noting that a "penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history."); *Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 36 HOFSTRA L.

117

: 001135

Rev. 677, 688 (2008) ("It is the duty of counsel to lead the team in conducting an exhaustive investigation into the life history of the client. It is therefore incumbent upon the defense to interview all relevant persons and obtain all relevant records and documents that enable the defense to develop and implement an effective defense strategy.").

The defense team, by way of the mitigation specialist, conducted interviews of various family members of Batiste. Many of these interviews were conducted by phone and with the exception of Batiste's immediate family members, the witnesses were only interviewed once. There were several family members and one friend of Batiste's that were interviewed (Monica Davis, Truman Jackson, Malcolm Mitchell and Ricardo Lara), but ultimately not presented to the jury despite the fact that they were able to provide compelling and beneficial mitigation evidence. Furthermore, there were a multitude of witnesses (Melissa Beard-Carter, Dytaniel Rod Carter, Danyell Soliz, Raul Soliz, Necole Baldwin, and Kevin Noel Sr.) that were never contacted by the defense team in the first place. Identification of these witnesses would have been obvious from the most basic investigation into Batiste's life history.

It was because of this deficient investigation, and not for strategic reasons, that counsel only identified only eight witnesses to present Batiste's entire mitigation case. *Wiggins*, 539 U.S. at 527 ("Even assuming [counsel] limited the scope of their investigation for strategic reasons, *Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather a reviewing court must consider the reasonableness of the investigation said to support that strategy."). As will be detailed below, trial counsel's investigation was woefully inadequate and consequently was insufficient.

118

**B. Counsel's Deficient Investigation Meant That Testimony of Several Valuable Witnesses Was Absent From Trial, Prejudicing Batiste's Mitigation Case**

Trial counsel's unreasonable failure to call several available witnesses who could have presented additional mitigating evidence constitutes deficient performance. *See Strickland*, 466 U.S. at 688. As discussed in Claims Three and Four, *ante*, the presentation of mitigation evidence is the fundamental part of the punishment phase of a capital trial. The jury is entitled to hear evidence that relates to moral culpability and the idea that the "blameworthiness" of an individual for capital murder may vary depending on what factors and experiences shape, influence, and/or compromise that choice. A jury's understanding of the evidence impacting the moral culpability of a defendant is critical to a jury's evaluation of punishment. Mitigating evidence does not seek to provide a defense to the crime, rather mitigating evidence is *any* evidence that "might serve 'as a basis for a sentence less than death.'" *Tennard*, 542 U.S. at 287 (quoting *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986).

Counsel's deficient investigation failed to fully develop or uncover several valuable witnesses. Had trial counsel conducted a truly thorough investigation, they would have identified several more useful witnesses both from people they interviewed too briefly and from people that were never interviewed or even identified. Thus, counsel's "decision" not to call these witnesses was not a strategic decision based on sound evidence as expected by professional norms, but was instead based on an unreasonable investigation. *Sears*, 130 S. Ct. at 3265 ("[T]hat a theory might be reasonable, in the abstract, does not obviate the need to analyze whether counsel's failure to conduct an adequate mitigation investigation before arriving at this particular theory prejudice [the defendant]."); *Wiggins*, 539 U.S. at 523 ("Rather, we focus on whether the investigation supporting counsel's

: 88137

decision not to introduce mitigating evidence . . . *was itself reasonable.*") (emphasis in original).

As discussed *ante*, trial counsel represented Batiste's life story in an inaccurate and incomplete way. The narrative that Batiste came from a loving and supportive family who only wanted good things for him and that Batiste made poor choices and committed two homicides in spite of what he had been given, was not a compelling mitigation presentation. This is especially true in light of the State's argument that Batiste was a heartless and callous killer who valued monetary possessions over human life. (25 RR at 47-78.) Post-conviction investigation revealed ten lay witnesses who would have provided deeply moving and meaningful mitigation evidence that could have conveyed to the jury that Batiste's life history was anything but simple and provided the context they needed to find that Batiste's life was worth saving.[37]

### 1. Monica Davis

Batiste's maternal aunt Monica Davis ("Monica") was interviewed once over the phone by the mitigation specialist. She was told she would be testifying at trial and waited with the other family witnesses in a room at the courthouse. At some point during the punishment trial, she was told by one of the lawyers she would not be testifying. She was ready and willing to testify on Batiste's behalf. (Ex. 9 at ¶2 [Aff. of Monica Davis].)

---

[37] Batiste's family members could have presented testimony not only about Batiste individually, but about their own life history, including the trauma they suffered and instability they experienced. As was discussed in great detail in Claim Three, *ante*, the life events of Batiste's relatives, Rowena in particular, are relevant because these experiences had a tremendous impact on Batiste himself. The multi-generational effects of social, financial, and personal instability are pervasive and significantly contributed to Rowena's ability to effectively parent and Batiste's own developmental dysfunction.

120

: 00138

The failure of counsel to present Monica was inconceivable, as she possessed invaluable insight into Batiste's family history and the multi-generational struggles the family had with abuse, neglect, dysfunction, and instability. (*Id.* at ¶¶4-32.) Monica could have told the jury about how her mother Darlene had six children by five different men at a very early age, and because of financial and personal circumstances, could not provide Teddrick's mother Rowena, or any of Darlene's other children, with stability or consistency. Darlene did not raise Monica or her older brother when they were small children, instead leaving them solely in the care of her mother. (*Id.* at ¶¶4-16.)

Monica could have also discussed that Darlene hid at least two of her pregnancies from the family, including the pregnancy with Rowena, giving birth at home and leaving the infant alone in a closet to be discovered by others. (*Id.* at ¶¶11-12.) Monica would also have been able to talk in great detail about Darlene's abusive boyfriend, Peter Paul Zenon, a man who mistreated and terrorized Rowena, Darlene, and other family members for years before Darlene shot and killed him in self-defense. Monica would have testified that she and her siblings, including Rowena, watched as their mother was brutally beaten time after time. Monica could have told the jury that everyone in the house was terrified of Zenon and Darlene would leave the children alone for days in her attempt to escape from him. (*Id.* at ¶¶17-27.)

Monica would have testified regarding Darlene's inability to effectively parent due to her focus on work and her own dating life, and how the older children were forced to care for the younger children, including Rowena. (*Id.* at ¶¶20-21.) Monica could have provided valuable information about what Rowena was like as a young girl, how she suffered from low self-esteem and insecurity and was sexually promiscuous. Monica would have discussed Rowena's surprise

121

pregnancy and the controversy surrounding the identity of Batiste's biological father. (*Id.* at ¶¶30-31.)

Monica would have discussed the financial and personal difficulties Rowena faced as a young mother. She would have testified regarding Rowena's dysfunctional romantic relationships and the negative influence that the men had on Rowena and Batiste both. She could have testified regarding how Batiste was frequently relocated, including to her house, because of Rowena's economic instability. Having known Batiste since his birth, Monica could have talked about Batiste's lack of supervision as a child and adolescent and Rowena's limitations as an effective disciplinarian. (*Id.* at ¶¶35-40.)

Finally, Monica would have discussed the fact that Batiste was a good and involved father, despite the lack of any positive male role models in his own life. Monica would have confirmed the fact that no one in the family knew that Teddrick was affiliated in a gang or involved in gang activity. (*Id.* at ¶¶41-42.)

Monica was in a unique position to act as a historian for the family, as she witnessed first-hand how difficult life was like for Rowena as a child as also as an adult. She could testify to the struggles Rowena faced both personally and economically and the circumstances that Batiste was born into. Monica was also a critical witness to describe the dysfunction surrounding Rowena's relationships, especially given Darlene's incomplete memory and/or understanding of that area of Rowena's life. (*See* Claim Four, *ante.*)

### 2. Truman Jackson

Truman Jackson ("Truman"), Batiste's maternal uncle, was asked to go to court to testify on Batiste's behalf, after having been briefly interviewed by the mitigation specialist over the phone. He went to court and was told to wait in a room with other family members but he was never called to testify or told what

: 001148

was going on.  He was willing to testify on Batiste's behalf.  (Ex. 10 at ¶3 [Aff. of Truman Jackson].)

Truman, Rowena's older brother, would have provided the jury with valuable insight into Batiste's troubled family history.  He would have testified regarding the instability and dysfunction he, as well as Rowena, faced growing up and the violence they both experienced at the hand of their mother's boyfriend.  (*Id.* at ¶¶4-7.)  Truman would have talked about his mother's frequent absence and the responsibility the older children in the family had to take to care for and protect the younger children.  (*Id.* at ¶7.)

Truman could have talked about the circumstances surrounding Batiste's birth, namely that Rowena's pregnancy was a surprise to everyone and the identity of Batiste's father was a mystery.  (*Id.* at ¶9.)  Truman would have also corroborated that the family was unaware that Batiste was in a gang and although he knew Batiste was stealing cars, Batiste's arrest for murder was shocking.  (*Id.* at ¶¶13-14.)

Truman would have provided valuable corroboration for his siblings regarding the abuse and dysfunction that Rowena endured as a child and again as an adult.  He would have been critical in establishing the multi-generational patterns of instability that plagued Batiste from early childhood until the time of his arrest.

### 3. Malcolm Mitchell

Malcolm Mitchell ("Malcolm"), Batiste's maternal uncle, was interviewed by the mitigation specialist by phone.  He would have been willing to testify on Batiste's behalf if he had been asked.  (Ex. 14 at ¶2 [Aff. of Malcolm Mitchell].)  Malcolm, Rowena's oldest brother, would have provided the jury with valuable family history and details regarding the difficulties and dysfunction of Rowena's

123

: 001141

childhood. Malcolm would have described how he never knew his mother was pregnant and it would be a surprise when a new baby showed up. He could have also told the jury about Darlene's limitations as a parent and how he and Monica were responsible for the care of the younger children. (*Id.* at ¶¶5-6.)

Malcolm could have also corroborated the horror that surrounded living with Darlene's boyfriend and the abuse that was inflicted upon all of them. (*Id.* at ¶¶7-9.) Malcolm could have corroborated the circumstances surrounding Batiste's birth, namely that Rowena's pregnancy was a surprise to everyone and the identity of Batiste's father was a mystery. (*Id.* at ¶11.) Malcolm saw Batiste periodically and knew that Rowena worked long hours, often at night. Batiste had to be both a brother and father to his sibling, Kevin. (*Id.* at ¶12.) Malcolm would have confirmed that the family did not know Batiste was in a gang. (*Id.* at ¶13.)

Much like Truman, Malcolm would have provided valuable corroboration for his siblings regarding the abuse and dysfunction that Rowena endured as a child and again as an adult, and would have been critical in establishing the multi-generational patterns of instability that plagued Batiste from early childhood until the time of his arrest.

### 4. Ricardo Lara

Ricardo Lara ("Rico"), a close friend of Batiste's, was interviewed by the mitigation specialist over the phone, but was not asked to testify. He would have been willing to testify on Batiste's behalf had he been asked. (Ex. 12 at ¶2 [Aff. of Rico Lara].)

Rico was close to Batiste and lived with him several times when Batiste was in his late teens and early twenties. Batiste would give someone the shirt off his back if they needed it. (*Id.* at ¶16.) Rico would have testified that he and Batiste met after Batiste was released from TYC and involved with Stephanie. Batiste was taking care of a child that was not his and providing for Stephanie. Rico would

: 00142

have explained that he and his wife Micaela ("Mickey") lived together in an apartment in Houston with Batiste, Stephanie, and her baby. Rico would have told the jury that Batiste loved Stephanie and felt an enormous amount of pressure to provide for her. Batiste worked outside of the house but also assumed the majority of the responsibilities at home—cooking, cleaning, and taking care of the baby. (*Id.* at ¶¶4-6.)

Rico could have explained how he and Mickey moved to Denton and then when Batiste got out of state jail, Rico drove Batiste from Houston to Denton so Batiste too could have a fresh start. Rico got Batiste a job as a laborer and Batiste did really well. Stephanie also came to Denton with the children and they all lived together. Rico would have talked about how Stephanie got a job for a brief period of time and it caused a great deal of stress because she felt she should not have to talk care of the children as much. Stephanie slept in a lot and Mickey would have to take care of the children. As soon as Batiste got home from work he would immediately take over the care of the children. (*Id.* at ¶¶7-9.)

Rico would have testified that Stephanie and the children went back to Houston after she and Batiste argued. Rico believed that Stephanie wanted to party and have a good time and there was not enough for her in Denton. Batiste felt torn because he was doing well in Denton but also wanted to be with his children. Rico could have explained that he and Mickey left Denton for the weekend and when they returned they learned Batiste had been arrested for burglary of a vehicle. (*Id.* at ¶10.)

Rico could have also provided the jury with an invaluable insight into the true nature of Batiste's gang affiliation. Rico believed Batiste was affiliated with the Crips and hooked up with them at TYC. It was a common thing to do at the time and not a big deal to Batiste. By the time Rico and Batiste were first living together in Houston, it was already a thing of Batiste's past. Rico believed that

125

Batiste got involved again when he lived in a problematic neighborhood in Houston. Rico saw Batiste just a few weeks before he was arrested and Batiste was very stressed about his work hours being cut. (*Id.* at ¶¶12-14.)

Rico knew Batiste at a critical time in his life, a time of personal and financial instability when Batiste was trying to establish himself in the world. Rico knew Batiste as a friend and confidante, a hard worker and a good provider. Rico was one of the only people that Batiste considered a true friend (*see* Ex. 2 at ¶67 [Aff. of Charles Rotramel]), and Rico would have humanized Batiste to the jury in a way that no one else could have done.

### 5. Kevin Noel Sr.[38]

Kevin Noel Sr. ("Kevin Sr.") was the ex-boyfriend of Batiste's mother and father of Batiste's brother, Kevin. He lived with and helped raise Batiste as a child. He was never contacted by anyone on Batiste's defense team, but would have testified for Batiste had he been asked. (Ex. 16 at ¶¶2, 11 [Aff. of Brian Fayhee (Kevin Noel Sr.].)

Kevin Sr. could have told the jury that he was romantically involved with Batiste's mother, Rowena, and they had a child together named Kevin. After the relationship ended, Kevin Sr. continued to see both Batiste and Kevin. Kevin Sr. was unhappy regarding the way he thought his son was being treated by Rowena's new husband, Jerome, and Kevin Sr. and Jerome got into a verbal altercation. Kevin Sr. would have testified that he told Jerome that he only cared how Jerome treated Kevin, and not Batiste, because Batiste was not his son. Batiste overheard this conversation and asked Kevin Sr. if it was true that he was not Kevin Sr.'s son. (*Id.* at ¶¶5-9.)

---

[38] Kevin Noel Sr. died in August 2012, over a year after Batiste was sentenced to death. He was interviewed by post-conviction investigator Brian Fayhee before his death.

Kevin Sr. was a tremendously important person in Batiste's life during his formative years and would have provided critical insights into Batiste's struggle over not knowing his father or having a male role model that he could count on and look up to.

### 6. Necole Baldwin

Necole Baldwin ("Necole"), Monica's daughter and Batiste's first cousin, was not contacted by anyone on Batiste's defense team. Necole had known Batiste his entire life and would have testified on his behalf had she been asked. (Ex. 5 at ¶¶3-5 [Aff. of Necole Baldwin].)

Necole could have told jurors that her mother Monica was very affected by her own violent and dysfunctional childhood. Necole would have been able to tell the jury that Rowena struggled a great deal as a young, single mother and that Rowena, Batiste, and Kevin stayed with her and her family for an extended period of time when Batiste was young. Necole would have explained that Batiste did not have stability growing up and had to move around a great deal. Rowena never had a great job, struggled financially, and had to live in bad neighborhoods. (*Id.* at ¶¶10-12.)

Necole would have testified that Rowena did not make good choices when it came to romantic relationships, marrying someone with a criminal history and drug problem. (*Id.* at ¶¶12-13.) Necole would have also been able to talk about what Batiste was like after he was released from juvenile detention—that he was harder, like he had learned the ways of the streets. (*Id.* at ¶14.)

Necole was a valuable witness in that she could have provided unique knowledge about the family's history and Batiste's struggles growing up in such an unstable and uncertain atmosphere. Necole was an important historian regarding the change in Batiste once he returned from TYC, and the impact that the detention had on him.

127

### 7. Danyell Soliz

Danyell Soliz ("Danyell"), the sister of Batiste's girlfriend, Stephanie Soliz, was never contacted by anyone on Batiste's defense team. She would have been willing to testify on Batiste's behalf if called to do so by trial counsel. (Ex. 18 at ¶2 [Aff. of Danyell Soliz].)

Danyell would have provided the jury with invaluable insight into what Batiste was like as an adolescent and her perception of his gang involvement. Danyell would have testified that she first met Batiste when he was dating her sister Stephanie. Danyell would have explained that Batiste was not affiliated with a gang until he went to TYC and even then it seemed like it was something Batiste did just to fit in socially. Danyell would have said that Batiste was really funny and goofy, which is not the way a "gangster" acts. She never saw Batiste angry or fighting, rather he was social and easy to get along with. (*Id.* at ¶¶3-5.)

Danyell would have said that Batiste was a good father and provider and was the first one of her sister's boyfriends that her father actually liked. Batiste stayed with Danyell's father and he paid rent, did chores, and helped with the bills. Batiste also was attentive to his kids. Danyell could have told the jury that Batiste told her about how much he regretted getting in trouble in high school and how he wished he stayed in school because he did not think he could get a good job because of it. (*Id.* at ¶¶6-10.)

Danyell was a critical witness to Batiste's mitigation case because she could humanize him. She saw first-hand that he was not a hardcore "gangster" but rather someone who just wanted to belong. Danyell witnessed Batiste trying desperately hard to provide for his family and earn the respect of Stephanie's family.

### 8. Raul Soliz

Raul Soliz ("Raul"), the father of Batiste's girlfriend, Stephanie Soliz, was never contacted by anyone on Batiste's defense team. He would have been willing

to testify on Batiste's behalf if called to do so by trial counsel. (Ex. 19 at ¶2 [Aff. of Raul Soliz].)

Raul would have testified that he met Batiste after Batiste got out of TYC. Batiste was a family guy and a good worker. Raul would have told the jury that Batiste was looking for a father figure and called him "Pops." Batiste told Raul that the most important thing to him was his kids and he wanted them to be good at sports. Batiste also told Raul that he wanted a life like Raul's—with a steady job, cars, and a house. (*Id.* at ¶¶3-6.)

Batiste lived with Raul for a while and when he was there Batiste would help out and do housework. Batiste was having a difficult time at this job at Forge USA because his hours were cut and he was being given the most dangerous jobs. (*Id.* at ¶¶7, 9.)

Raul could have provided a piece of the mitigation story that was sorely lacking in the evidence that was presented—that Batiste desperately wanted a "normal" life and was ill-equipped to be able to find it.

### 9. Melissa Beard-Carter

Melissa Beard-Carter ("Melissa"), Batiste's step-aunt, was never contacted by anyone on Batiste's trial team. She would have been willing to testify on Batiste's behalf had she been asked. (Ex. 7 at ¶3 [Aff. of Melissa Beard-Carter].)

Melissa would have provided important information regarding Batiste's family history, especially the conditions at the home where both Rowena and Batiste were raised. Melissa would have testified that she had to move in with her father, Eugene Beard, and her step-mother, Darlene (Batiste's grandmother) when she was five years old and her mother died. Eugene was an alcoholic who drank every day. Darlene was very strict and would beat all of the children. (*Id.* at ¶¶4-6.)

129

Melissa could have told the jury that she did not have good memories of living with Darlene, who was verbally, physically, and mentally abusive. Melissa was in middle school when Rowena had Batiste. Melissa did not even know that Rowena was pregnant. Melissa lived with Batiste until he was three or four years old and he was a typical child. Melissa did not see Batiste again until many years later. (*Id.* at ¶¶8-10.)

Melissa would have testified that she spent a lot of time with Batiste when he was in his early twenties, and he would come over and hang out at her house. Batiste would either come alone or bring his kids. There was no partying, rather they would relax, talk, eat, and play with the kids. She was shocked when she heard he was arrested, as that night he was supposed to come over to her house for pizza. Melissa would have told the jury that she had no idea Batiste was in a gang, she saw that his entire life was his kids. (*Id.* at ¶¶15-17.)

Like Rowena's siblings, Melissa would have challenged the notion that Batiste was from a solid, loving family that provided him with support and security. Instead, she would have corroborated the fact that Darlene subjected her children to significant challenges and as a result, Rowena was not in a position to effectively parent or pull Batiste out of the generational cycle of poverty and instability.

### 10. Dytaniel Rod Carter

Dytaniel Rod Carter ("Rod"), Batiste's step-uncle, was never contacted by anyone on Batiste's defense team. He would have been willing to testify on Batiste's behalf had he been asked. (Ex. 8 at ¶2 [Aff. of Dytaniel Rod Carter].) Rod knew Batiste through his wife Melissa, and Batiste used to hang out at his house. Rod would have explained to the jury that Batiste was looking for a father figure and would often call him to talk. Batiste talked to Rod a lot about the pressure he was under and how he was trying to do right by Stephanie and his kids.

Batiste felt as though it was his responsibility to provide his family with the things they needed and Batiste felt as though the walls were closing in on him. Rod would have testified that Batiste had a lot of negative people in his life and was crying out for help. (*Id.* at ¶¶3-5.)

Rod was also in a unique position, as one of the few people who spent a significant amount of time with Batiste in the months leading up to his arrest. Rod saw first-hand the tremendous amount of pressure Batiste was under to provide for his family financially and the utter lack of guidance Batiste had from anyone positive in his life.

### C. Conclusion

Trial counsel's failure to present Monica Davis, Truman Jackson, Malcolm Mitchell, Ricardo Lara, Kevin Noel Sr., Necole Baldwin, Danyell Soliz, Raul Soliz, Melissa Beard-Carter, and Dytaniel Rod Carter left vital areas of Batiste's life unexplained for the jury. Had a jury heard these stories, they would have been presented a picture of Batiste's life significantly different than what was presented at trial—Batiste was not a simply a boy from a good family who made bad choices. Instead, he was the product of three generations of poverty, teenage pregnancy, residential instability, and lack of positive male role models. He was also searching desperately for a way out of the path he was on, a person who helped other people and provided for his family when he could. A prepared and well-developed presentation from these lay witnesses would have "struck a different balance" for the jury between mitigating and aggravating evidence. *Wiggins*, 539 U.S. at 537. The testimony of the witnesses described above offered some of the most humanizing aspects of Batiste's life to the jury, substantially increasing the likelihood that a juror would have found a mitigating factor warranting a life sentence.

But for trial counsel's error, at least one juror would have found a reason to reject a death sentence. *See Walbey v. Quarterman*, 309 Fed. Appx. 795, 802 (5th Cir. 2009) (per curiam) ("This standard clearly contemplates that even when *some* mitigating evidence is presented at trial, prejudice is still possible if that evidence is substantially incomplete.") (emphasis in original). In light of these statements, it is certainly a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Ex parte Ellis*, 233 S.W.3d 324, 330 (Tex. Crim. App. 2007); *Ex parte Chandler*, 182 S.W.3d 350, 354 (Tex. Crim. App. 2005).

## CLAIM SIX

### TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PRESENT EVIDENCE THAT BATISTE WOULD NOT BE A FUTURE DANGER

At the most fundamental level, defense counsel has a basic "overarching duty to advocate the defendant's cause." *Strickland*, 466 U.S. at 688. Prevailing professional norms at the time of Batiste's trial dictated that this duty encompassed an "obligation to conduct a thorough investigation of the defendant's background" and to present evidence that will weigh on the punishment determination of the jury. *Porter*, 130 S. Ct. at 452. In Batiste's case, half of that determination was answered when the jury considered the probability of future danger in answering Special Issue Number One. Yet, Batiste's trial counsel failed to present any evidence that Batiste was not likely to commit criminal acts of violence in the future. This failure prejudiced Batiste's applicable state and federal Constitutional rights, as well as state statutory law, United States Supreme court and Texas state case law. Therefore, Batiste's death sentence should be vacated.

132

: 00150

## A. Future Dangerousness is a Central Piece to Any Capital Verdict

A sentence of death depends on a jury's answers to two specific questions.[39] The first of these questions asks a jury "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex. Code Crim. Proc. art. 37.071 § 2(b)(1). In upholding Texas' death penalty statute, the Supreme Court reviewed this special issue and noted the central role a prediction of future behavior plays in criminal justice. *Jurek v. Texas*, 428 U.S. 262, 274-75 (1976). The Court stated that "prediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system." *Id.* at 275; ABA Guidelines, Guideline 10.11 (commentary) ("Studies show that future dangerousness is on the minds of most capital jurors, and is thus at issue in virtually all capital trials, whether or not it is argued by the prosecution or is a statutorily mandated sentencing consideration.") (internal quotations omitted).

## B. Relevant Factual Background

The State presented its punishment case against Batiste by offering a series of witnesses in an attempt to establish that Batiste would be a future danger if sentenced to life in prison without parole, rather than death. This presentation included the following:

### 1.   Justin Loughridge

Justin Loughridge, Batiste's juvenile probation officer after Batiste was released from boot camp, testified about Batiste's juvenile delinquencies, including the sale of a controlled substance and multiple counts of unauthorized use of a

---

[39] In Batiste's case, because of the law of parties, the jury was actually asked to answer *three* special issues, the second one being whether they believed Batiste himself actually caused the death of the victim, intended to kill the victim, or anticipated that a human life would be taken. (7 CR at 1713.)

: 000151

motor vehicle. Loughridge detailed what juvenile facilities Batiste was sent to and his performance at each facility. (18 RR at 5-32.)

### 2.   Dr. Scott Krieger

Dr. Scott Krieger, a juvenile detention psychologist who evaluated Batiste in 2004, testified that Batiste was one point shy of the normal intelligence range. Krieger diagnosed Batiste when he was a juvenile with disruptive behavior non-specified and cannabis dependence. Krieger further testified that Batiste did not have empathy for the victims of his crimes. (18 RR at 37-63.)

### 3.   David Davis

David Davis, a classifications sergeant with the Harris County Sheriff, testified regarding how inmates are classified within the prison system. He further testified regarding the specific disciplinary infractions levied against Batiste during his incarceration at Harris County jail from April 2009 until the time of his capital trial.[40] (18 RR at 101-52.)

### 4.   Irma Fernandez

Irma Fernandez, a security threat group specialist with the Department of Criminal Justice, testified about the security threat group status of the Crips and the violent and predatory behavior historically attributed to the Crips in a prison setting. Fernandez testified that Batiste was classified as a Crip by the Security Threat Group division of TDCJ. Fernandez also testified regarding the movement and privileges attributed to an inmate in general population and what an inmate's daily life might look like. She further testified that inmates serving a sentence of

---

[40] Specifically, Davis referenced the following infractions: unauthorized contact with staff on May 22, 2009; assault of an inmate on June 19, 2010; refusing to obey an order on June 26, 2009; possession of an intoxicant on December 5, 2009; fighting on August 8, 2010; destroying or damaging property on September 25, 2010; threatening an inmate on October 1, 2010; assault on an inmate on October 12, 2010; group demonstration on December 19, 2010; possession of a weapon on December 19, 2010; and fighting on December 2, 2010. (18 RR at 130-49.)

134

life without parole are more assaultive towards staff and other offenders, have no incentive to avoid confrontation, and are more likely to possess weapons and contraband. (19 RR at 32-72.)

### 5. Robert Dean

Robert Dean, an offender who served time at the county jail with Batiste, testified regarding Batiste's behavior on the unit, which included running the television, picking fights, taking other offender's shoes, and organizing a group of inmates into picking on weaker offenders. Dean testified regarding an incident where Batiste or another member of his "group" hit a weaker offender with a tray. The same group assaulted an inmate at the dominoes table. Dean testified that he saw Batiste intimidate and threaten other inmates. Dean further testified regarding an incident where he alleged Batiste and his "friends" tried to jump him. They did not succeed and Batiste was charged with threatening. (19 RR at 105-36.)

### 6. Aggravated Robbery

The State presented evidence that Batiste participated in the armed robbery of the Phat Kat Tats tattoo shop, including the testimony of victim Walter Jones (19 RR at 166-214); victim Kari Jones (20 RR at 4-20); and Harris County Sheriff sergeant Robert Tonry (20 RR at 22-46).

### 7. Black Widow Homicide

The State presented evidence that Batiste participated in the armed robbery of the Black Widow tattoo shop and homicide of its owner Steve Robbins, including the testimony of Houston police officer Ernest Aguilara (20 RR at 74-122); firearms analyst Kim Downs (20 RR at 145-69); Medical Examiner Dr. Merrill Hines (21 RR at 3-18); police detective Mike Miller (21 RR at 28-74); victim Anthony Moore (21 RR at 83-116); victim Joshua Norsworthy (21 RR at 121-52); and victim Christie Moore (22 RR at 15-31)

135

## C. Trial Counsel Failed to Adequately Communicate With and Prepare Their Own Expert

In response to the State's case, the defense failed to present any evidence establishing that Batiste would not in fact be a future danger if he were to be sentenced to life in prison without parole instead of death. Instead, they presented their only expert witness, Dr. Mary Elizabeth Pelz, to testify regarding issues of classification within the prison, and describe where Batiste was likely to be housed should he be sentenced to life in prison without parole. However, as will be established below, Dr. Pelz was not utilized by the defense in an appropriate manner. Had she been presented regarding the issue of future danger and not classification, a subject she was not an expert in, the jury would have been provided with compelling evidence that Batiste was not a future danger to society and should be sentenced to life in prison without parole.

On or around April 28, 2011, Dr. Pelz[41] was appointed by the trial court to act as a defense expert in criminal justice. She was retained by Batiste's trial attorneys, specifically R.P. "Skip" Cornelius, to provide an expert opinion regarding whether or not Batiste would be a future danger, should he be given a sentence of life without the possibility of parole. (Ex. 4 at ¶6 [Aff. of Dr. Pelz].)

---

[41] Dr. Pelz, the Dean of the College of Public Service at the University of Houston Downtown, had served the University in many ways over the past twenty years, including as its Interim Dean of the College of Public Service, the chair and assistant chair of the department, as an associate and assistant professor, and as an instructor. Her area of expertise within the criminal justice system was inmate sub-cultures, specifically prison gangs. Dr. Pelz authored and co-authored numerous journal articles on those topics as well as other subjects in the field of criminal justice. She was a frequent presenter on these same topics at conferences throughout the academic and criminal justice communities, and she previously testified as an expert witness in capital trials on prison gangs, inmate sub-culture, and mitigation issues. Prior to her work as an academic, from 1986 to 1989 Dr. Pelz was a correctional counselor at the Ramsey One Unit at the Department of Corrections. (Ex. 4 at ¶¶1-5 [Aff. of Dr. Pelz].)

136

Dr. Pelz was provided records related to Batiste by the mitigation specialist, Gina Vitale. The records Dr. Pelz reviewed included those from TYC, Harris County Juvenile Probation, and Harris County jail disciplinary records. She met with Batiste for approximately one hour at the Harris County jail and listened to the statement he made to law enforcement following his arrest. She also reviewed the June 14, 2011, testimony of the State's expert in security threat group classification, Irma Fernandez. (Ex. 4 at ¶7 [Aff. of Dr. Pelz].) Dr. Pelz asked for but did not receive any disciplinary records for the time Batiste spent at state jail. (*Id.* at ¶8)

In her experience testifying at capital trials, Dr. Pelz typically met with the trial attorneys for an extensive amount of time before her testimony in order to discuss her findings and opinions. She became increasingly concerned in the days leading up to her scheduled testimony in Batiste's case because she had not communicated with trial counsel. She was scheduled to testify on Monday, June 20, 2011, and the first contact she had with trial counsel was a phone call she received from Mr. Cornelius on Saturday morning, June 18, 2011. During this conversation, Mr. Cornelius asked Dr. Pelz if she was able to discuss issues related to the classification of inmates in prison. She told him that she could discuss the concept generally, but was not an expert in the field of classification. (Ex. 4 at ¶¶9-10 [Aff. of Dr. Pelz].)

Following this brief telephone conversation, Dr. Pelz received an email from Mr. Cornelius with a list of topics he intended to address during her testimony. This list included specific classification topics, such as the different levels of custody, what grade Batiste would enter the system at, the training and competency of prison staff; and levels of security within the prison system itself. Dr. Pelz immediately responded to Mr. Cornelius and communicated that all of her knowledge of classification policies and procedures came from published policy

: 00155

manuals and staff training resources, rather than from any kind of inside working knowledge of the current prison system. She communicated that her personal knowledge of classification was from more than twenty years prior, even before the system of classifying inmates by G-1 to G-5 was instituted. The first time Dr. Pelz met with Mr. Cornelius in person was twenty minutes before she testified on Monday morning. (Ex. 4 at ¶¶11-13 [Aff. of Dr. Pelz].)

Dr. Pelz was not asked during her testimony whether, in her expert opinion, Batiste would be a future danger if given a sentence of life without the possibility of parole.[42] Instead she testified regarding her experience in the late 1980's as a correctional counselor at the Ramsey One Unit, and how incoming inmates were classified according to their history of past incarceration and other factors. She generally discussed how and why a prison setting is different than the free world and how prison sub-cultures enable inmates to peacefully live in proximity to others, as well as the fact that in her experience, people who do not function well in the free world can be successful in the structured environment of prison. (Ex. 4 at ¶14 [Aff. of Dr. Pelz].)

Dr. Pelz testified extensively regarding the general movement of a G-3 classified inmate, including where he would be able to move within the prison grounds and what his ability to work would be. She testified that studies have generally shown that inmates sentenced to life in prison are manageable and do not demonstrate an increase in acts of violence; and an inmate facing such a sentence has to decide soon after arriving if he will commit suicide, have a mental breakdown, or adapt to his new environment. She testified that the research

---

[42] During the direct examination of Dr. Pelz, outside the presence of the jury, trial counsel told the court they had not asked Dr. Pelz about future dangerousness of Batiste during their previously questioning and did not intend to go into that subject area at all. (23 RR at 73.)

: 00156

indicates that young inmates given a sentence of life without parole adjust well to being in prison and realize how valuable privileges are and act accordingly. She testified that during the time she was a correctional counselor, inmates who identified as ex-gang members were put into administrative segregation for two reasons—to protect them from violence by other gang members, and to isolate them from the general population in case they were not completely out of the gang. (Ex. 4 at ¶15 [Aff. of Dr. Pelz].)

Dr. Pelz testified generally about the structure of the prison and how safe it is. She testified generally that the most significant indicator of how a person will behave in prison is how they have behaved in prison before, not their behavior in the free world. Dr. Pelz testified that although she requested Mr. Batiste's state jail records from trial counsel she never received any and was not aware whether Batiste had any disciplinary issues while at state jail. Dr. Pelz testified very generally regarding what a day in prison would be like for an inmate in general population, including what would happen if he were to misbehave. She also testified generally regarding what a day in prison would be like for an inmate on an administrative segregation unit and what kind of job or activity an inmate might be involved in during his time in prison. (Ex. 4 at ¶¶16-18 [Aff. of Dr. Pelz].)

Specific to Batiste, Dr. Pelz discussed the fact that a fist fight is much less serious of an infraction than a fight with weapons, and that it was significant that Batiste never had a physical altercation with a staff member during any of his incarcerations. She testified that it might be inevitable that Batiste participate in a fight in prison at some point because he may need to protect himself from a physical or sexual assault. (Ex. 4 at ¶17 [Aff. of Dr. Pelz].)

On cross-examination Dr. Pelz testified that she was never a uniformed correctional officer nor walked the unit on a daily basis, and Ramsey had never been a unit where a life without parole offender would be sent. She testified that

139

someone convicted of capital murder would not automatically be assigned a higher security classification, rather it would be based on their institutional history.  In that respect, violent and non-violent offenders could potentially be housed together.  She also testified that someone convicted of a capital crime could potentially be given access to activities, contact visits, work programs, and enjoy some movement within the prison.  She testified that death row was like administrative segregation with the most secure housing available from the Department of Corrections, and despite the intense security there have been escapes and attacks on staff.  (Ex. 4 at ¶19 [Aff. of Dr. Pelz].)

Dr. Pelz testified that the way an individual inmate will react to provocation in a prison setting will depend on their perception of what has been done to them and their ability to assess and adapt.  She was specifically asked about the incident where Batiste assaulted another inmate for hanging up the phones, the incident where Batiste assaulted another inmate named Bobby Ortiz, the incident where Batiste was involved in a group demonstration and was cuffed, as well as fights Batiste had with other cadets at TYC, an incident where Batiste used aggressive language with a staff member, and incidents of misconduct at the Harris County jail.  Dr. Pelz further testified on cross-examination that membership in the Crips was not enough for an inmate to automatically be housed in an administrative segregation capacity.  (Ex. 4 at ¶20 [Aff. of Dr. Pelz].)

Ultimately Dr. Pelz was very uncomfortable with the outcome of her testimony.  Her understanding was that she was retained by defense counsel to provide an expert opinion on whether Batiste would be a future danger if sentenced to life in prison, not provide expert testimony with regard to prison classification

140

policies[43] and procedures. (Ex. 4 at ¶21 [Aff. of Dr. Pelz].) Despite the fact that Dr. Pelz communicated this to Mr. Cornelius, trial counsel instead chose to put her on the stand to testify regarding a subject matter outside of her expertise.

### D. Trial Counsel Was Ineffective For Failing to Present Expert Evidence That Batiste Would Not Be a Future Danger

Because they did not utilize Dr. Pelz in an appropriate manner, trial counsel relied solely on the cross-examination of the prosecution's witnesses in their inadequate attempt to rebut the issue of future danger. Had trial counsel fully investigated and prepared for trial, they could have presented compelling testimony from Dr. Pelz regarding Batiste's likelihood of committing future acts of criminal violence. Had counsel done so, the jury would have heard the following:

Analysis of a defendant's past behavior pattern (in a similar prison-like setting) is the most reliable approach in assessing the likelihood of future violent behavior in a prison context. The question of whether someone will commit violence in the future cannot be scientifically answered "yes or no" for the defendant or anyone in the courtroom. There is always some risk or probability that *anyone* may perpetrate violence in the future. To that end, probability must mean something more than mere possibility for the issue to hold any significance. The probability of future violence by an inmate varies directly with the severity of the forecasted violence. For example, the likelihood that someone sentenced in

---

[43] Dr. Pelz had never previously testified regarding classification. When she was a correctional counselor at Ramsey One, she processed inmates as they came off the bus and presented them to the unit classification committee who determined where on the unit the inmate would live, what their job would be, and the immediate privilege or restrictions that would be given to them. She would coordinate jobs for inmates and would tweak housing assignments for inmates if they had disciplinary or other issues. At the time, inmates were classified as minimum, medium, or closed custody. Eventually this system was transitioned to what it is today, which is classification from G1 to G5. (Ex. 4 at ¶21 [Aff. of Dr. Pelz].)

: 000159

their early twenties will shove another inmate at some point during the course of a life sentence is very high. Inmates often have to demonstrate a willingness to stand up for themselves in order to prevent more serious violence and victimization. On the other hand, the probability that an inmate will kill a correctional officer or other inmate is small. (Ex. 4 at ¶¶25-26 [Aff. of Dr. Pelz].)

Batiste's institutional history is unremarkable. It is extremely significant that Batiste received no disciplinary write-ups during his incarceration in state jail, where Batiste was incarcerated from May 17 to October 31, 2007.[44] This was the first time and only time he had been incarcerated at a facility other than a juvenile or county jail facility. The environment at the state jail most closely resembles the environment Batiste would experience at a state prison and the fact that he was infraction free was indicative of what he might experience during a permanent period of incarceration. (Ex. 4 at ¶27 [Aff. of Dr. Pelz].)

Batiste had a small number of incidents while he was incarcerated as a juvenile, but none that would significantly impact his ability to successfully acclimate to an adult prison environment. Similarly, the disciplinary infractions he received while at the county jail during the pendency of his trial are of limited significance to the overall determination of the probability of future violence. (Ex. 4 at ¶28 [Aff. of Dr. Pelz].)

---

[44] There was no representation by the State that Batiste had disciplinary issues at state jail, but Dr. Pelz was unable to definitively say during the course of her testimony that he was free of infractions during that time period because she was not provided with any documentation by trial counsel. It was not until she received the affidavit from the custodian of records at Pam Lychner State Jail during post-conviction investigation that there were no disciplinary infractions that she could definitively rely on the fact that Batiste did not have disciplinary issues during that period of incarceration in asserting that he was likely to successfully adjust to life in prison following his capital conviction. (Ex. 25 [Affidavit re: Batiste State Jail Records].)

: 88168

There is a tremendous difference in the free world as compared to the sub-culture of incarceration and these differences permeate all levels of human behavior and interaction.  There is symbolism in both spoken and body language that is unique to penal institutions, where a simple word or gesture can take on great meaning.  As a result, even the slightest infraction of language can be viewed as an act of disrespect and potentially lead to confrontation.  For example, the altercation between Batiste and the inmate who hung up the phone was not an incident of a dominant inmate preying on a weaker inmate and acting aggressively towards him for a seemingly minor infraction, but rather something far more significant—that his contact, and other inmates contact, with the outside world was being threatened.  (Ex. 4 at ¶29 [Aff. of Dr. Pelz].)

It is unreasonable to expect an inmate to be free of any disciplinary action whatsoever.  Prison is by its very nature a punitive environment, where its inhabitants lose almost all of their personal autonomy.  There is no mechanism by which an inmate can release frustration or experience a normal emotional response to a stressful situation.  Any perceived acting out, even something as seemingly inconsequential as harsh words exchanged with another inmate or staff member, is characterized as an "offense" and subject to discipline.  This is not an indication that they are presently a danger to others or that it is more probable they will be a danger to others in the future.  Rather, it is indicative that they are human beings, with human flaws, and human reactions to situations of stress and dissatisfaction.  (Ex. 4 at ¶30 [Aff. of Dr. Pelz].)

Furthermore, there is profound discord, anxiety, and apprehension that can occur when an inmate first arrives at an institution or is subjected to continuous change in environment and circumstances, all of which is common during an extended period of incarceration at a county jail.  Once an inmate has the opportunity to acclimate to an environment they will remain in for an extended

: 00161

period of time, the stress level and potential for acting out is lessened. (Ex. 4 at ¶31 [Aff. of Dr. Pelz].)

There are currently approximately 41,000 inmates across the country serving life without parole sentences. This is a large population and extensive research studies have been done that isolate factors that have an impact on the probability of violent behavior after incarceration. In addition to Batiste's unremarkable disciplinary history, there are numerous other factors present that support the assertion that he had a high probability of successfully acclimating to life in a prison environment. (Ex. 4 at ¶32 [Aff. of Dr. Pelz].)

The first of these factors is Batiste's age. Batiste would have been only twenty-three years old with no previous prison history at the time of sentencing. With a potentially long life ahead of him Batiste would have been forced to adapt to the prison environment in order for him to cultivate any sort of "normal" life. (Ex. 4 at ¶33 [Aff. of Dr. Pelz].)

The second factor is education. Batiste obtained his GED while at TYC. The relationship between education and positive (i.e., non-violent) adjustment to prison has been demonstrated in large-scale investigations of prison misconduct and violence. Research has concluded that inmates with at least a high school diploma or GED are less likely to perpetrate assaults in prison. Level of education or literacy level has demonstrated an inverse relationship with assaultive prison misconduct. (Ex. 4 at ¶34 [Aff. of Dr. Pelz].)

The next factor is employment history. A history of gainful employment in the community is indicative of an individual's ability to make a positive prison adjustment. Research has found that inmates with histories of community employment tend to become "industrious" inmates in prison, occupying themselves in constructive ways and being less likely to be involved in prison misconduct and violence. Despite moving around frequently, during periods of

144

non-incarceration, Batiste was consistently employed in some capacity from the time he was released from TYC to the time he was arrested. (Ex. 4 at ¶35 [Aff. of Dr. Pelz].)

The next factor is the strength of relationships. A significant factor supporting the conclusion that Batiste would adjust to a capital life term in a Texas prison without serious violence was his continuing contact relationship with family, friends, and his two young children. Inmates who have continuing relationships and contact with community members through visitation, telephone, and/or correspondence tend to have better prison adjustments. This is best explained by their remaining somewhat anchored to community values and the power of visitation and telephone privileges as incentives for compliance with institutional rules. Batiste acknowledged that he had a lot to live for, in particular his desire, despite the circumstances, to be a positive role model to his two young sons. This would be entirely incumbent on his ability to communicate with them. Thus he has every reason in the world to maintain a status free of major disciplinary infractions in order to maintain the privileges that would afford him avenues of communication. (Ex. 4 at ¶36 [Aff. of Dr. Pelz].)

The last factor relevant to Batiste is the significance of privileges. Inmates who demonstrate either good behavior or a lack of disciplinary infractions can become eligible for privileges beyond communication with the outside world. They can participate in work and educational programs, various recreational activities, and can enjoy a limited (yet controlled) amount of movement within the prison. These privileges are far more valuable to an inmate sentenced to life without parole than to one serving a shorter sentence because the inmate with a shorter sentence understands that he will enjoy the outside world at some point in the future. For a capitally convicted defendant, the outside world is no longer attainable and the life that can be constructed within the prison walls is the only

145

life they will get. The only way to survive is to get and keep as many privileges as possible and this requires an abstention from violent or aggressive behavior. (Ex. 4 at ¶37 [Aff. of Dr. Pelz].)

If given the opportunity, Dr. Pelz would have testified that in her professional and personal opinion, there was nothing in Batiste's history that led her to believe that he would be a future danger if sentenced to life in prison without the possibility of parole, rather than death.[45]  Instead, it was far more probable that Batiste would adjust to a prison environment—taking advantage of the privileges afforded him, while maintaining a meaningful relationship with his children, friends, and family members. (Ex. 4 at ¶39 [Aff. of Dr. Pelz].)

By not utilizing Dr. Pelz in the appropriate manner, trial counsel denied the jury the opportunity to hear compelling information from an expert that would likely alter their perception of the future risk to society that Batiste presented.

**E. Trial Counsel's Failure to Present Any Evidence Regarding Future Danger Constituted Deficient Performance**

The Court of Criminal Appeals has recognized that the future danger special issue "focuses upon the character for violence of the particular individual, not merely the quantity or quality of the institutional restraints put on that person." *Coble v. State*, 330 S.W.3d 253, 268 (Tex. Crim. App. 2010). While it would be "theoretically possible to devise a prison environment so confining, isolated, and highly structured that virtually no one could have the opportunity to commit an act

---

[45] At the time of trial, Batiste's counsel was unaware of Batiste's frontal lobe brain damage that affects his ability to conceptualize and perceive risk. (*See* Claim One, *ante.*)  If Batiste's brain dysfunction had been discovered, Dr. Pelz could have further testified that Batiste's lack of disciplinary history at the state jail was indicative that a highly structured environment was, and would likely continue to be, conducive to controlling the negative effects of this type of dysfunction. (Ex. 4 at ¶38 [Aff. of Dr. Pelz].)

146

: 001104

of violence . . . incapacitation is not the sole focus of the Legislature or of our death penalty precedents." *Id.* at 269.

Despite this need, the defense's entire presentation focused on the classification procedures at the prison, how secure the prison would be, and the methods employed to keep in inmate like Batiste restrained. (*See* 23 RR at 40-75.) This was inadequate to address the issue of future danger, and the failure constituted deficient performance that was not reasonable under prevailing professional norms. ABA Guidelines, Guideline 10.11 (commentary, n.276) (*citing Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986) as holding that "evidence of defendant's positive adaptation to prison is relevant and admissible mitigating evidence even though it does 'not relate specifically to petitioner's culpability for the crime he committed'".)

Instead of presenting generalities regarding the prison classification system, trial counsel should have offered affirmative evidence by way of Dr. Pelz detailing the *specific* reasons why Batiste himself would successfully adjust to life in prison, and the established factors that would make his adjustment likely, both theoretically and practically. Additionally, trial counsel could have presented affirmative evidence regarding the likelihood that Batiste would successfully and quickly adjust to a term of life in prison by way of a neuropsychologist. Such an expert would have testified regarding Batiste's frontal lobe damage, and the fact that the brain dysfunction that caused Batiste to escalate risk taking behavior can effectively be controlled with medication widely available in the Texas prison system. Furthermore, the neuropsychologist could present evidence that Batiste's escalation of risk taking behavior, caused by his frontal lobe damage, is also effectively controlled by confinement to a structured and stable environment like a prison. (Ex. 1 at ¶¶ 34-35 [Aff. of Dr. Underhill].)

147

Counsel's deficiency is particularly apparent when judged in the context of the amount of aggravating evidence that was presented by the State in attempt to establish that Batiste would be a future danger to society. *Strickland*, 466 U.S. at 688 ("[T]he performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances.")    As such, trial counsel's performance clearly fell below the "objective standard of reasonableness" upon which defense counsel are judged and no reasonable strategic reasons can possibly account for their failures. *Id.*

## F. Trial Counsel's Deficient Performance Prejudiced Batiste's Trial

Had counsel presented the relevant testimony from an expert such as Dr. Pelz (and Dr. Underhill) the jury would have heard evidence that Batiste was not likely to be a future danger. Specifically, the jury would have heard that Batiste's age; education; employment history; desire to maintain relationships and privileges; and most importantly, his prior incarceration record all indicated he would adapt to a secure prison environment in a positive, non-violent way. (Ex. 4 at ¶¶25-37 [Aff. of Dr. Pelz].)  In addition, the jury could have heard from an expert neuropsychologist regarding Batiste's frontal lobe damage and the high probability that his potential for risk taking behavior could be effective controlled with a stable environment and/or medication.  (Ex. 1 at ¶¶34-35 [Aff. of Dr. Underhill].)

Instead, the jury heard only evidence from the prosecution about Batiste's prior criminal acts and the lack of empathy for his victims, leaving the jury with the impression that if given the chance, Batiste would continue to commit dangerous and violent acts in prison. Testimony from an expert like Dr. Pelz would have directly rebutted this evidence.

If presented, this evidence would more than reasonably have tipped the scales by adding mitigating evidence and rebutting aggravating evidence. *Porter*,

148

: 00166

130 S.Ct at 454. It might have even tipped the scales so far as to render the prosecution's evidence insufficient to prove Batiste's future danger. *See Berry v. State*, 233 S.W.3d 847, 863-64 (Tex. Crim. App. 2007). At a minimum, it would have given at least one juror a reason to reject a death sentence. *Wiggins*, 539 U.S. at 536. To that extent is certainly a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Ex parte Ellis*, 233 S.W.3d 324, 330 (Tex. Crim. App. 2007); *Ex parte Chandler*, 182 S.W.3d 350, 354 (Tex. Crim. App. 2005). Batiste's death sentence must therefore be reversed.

## CLAIM SEVEN

## TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PREPARE BATISTE TO TESTIFY

With little preparation, trial counsel thrust Batiste into the witness box to testify, ill-prepared for what questions to expect from his own defense team much less what the prosecution might bring up on cross-examination. On trial for his life and with scant preparation, Batiste's testimony gave the appearance of a "hail Mary" last ditch effort to make the case for life. However, without such preparation, Batiste's testimony hurt more than helped his case.

The decision whether or not to testify in one's own case is a weighty one to be made only after careful consideration and after full discussion with counsel. To make this decision in a haphazard manner ultimately does more harm than good. Here, once the decision had been made to testify, trial counsel had a duty to prepare Batiste for his testimony. This is true in any case, but even more so in the punishment phase of a death penalty case.

Trial counsel was ineffective and Batiste was prejudiced by their failure to advise him and properly prepare him to testify. Batiste's sentence of death was therefore unlawfully and unconstitutionally imposed in violation of his applicable

149

state and federal Constitutional rights, state statutory law, and United States Supreme Court and state case law.

## A. Relevant Facts

After presenting testimony from Batiste's family members and loved ones, trial counsel called Batiste to the stand as their last witness. (24 RR at 112.)

Batiste first gave a summary of his childhood and where he went to school growing up. (*Id.* at 113-19.)  Trial counsel then elicited testimony from Batiste that he got "legitimate work" starting at sixteen years old, but also elicited testimony that he committed crimes in order to keep money in his pocket. (*Id.* at 122.)  They elicited testimony from Batiste that if he could not get enough money from working legitimate jobs, he would turn back to the streets to get what he needed. (*Id.* at 123.)

Trial counsel then elicited testimony regarding Batiste's relationship with Stephanie Soliz and their children.  Batiste testified that he loved their son Alex and Stephanie's son Kash equally and raised them both as his own children. (*Id.* at 126.)  He testified that he would give his children advice and try to guide them to not make the same mistakes he made. (*Id.* at 126-27.)  Trial counsel then elicited that Batiste was given similar counseling by others, such as coaches and teacher at TYC, but he did not follow that advice. (*Id.* at 127.)

Trial counsel elicited testimony that Batiste was able to visit with his children on Father's Day, but that because of his actions, his victims' families did not have the same opportunity. (*Id.* at 128.)  Trial counsel then asked Batiste how the jury could know that he has learned anything from his mistakes.  Batiste could not answer the question. (*Id.* at 131.)

Batiste testified that when he worked at Forge USA, he worked as much as possible because "more money is always better." (*Id.* at 132.)  Then trial counsel elicited that Batiste spent some of the money he earned to buy marijuana. (*Id.* at

133.)   Trial counsel also elicited testimony that Batiste was running a fencing operation during the evenings with other people from his neighborhood in order to supplement his income.  (*Id.* at 135.)

Trial counsel also elicited testimony from Batiste about accepting responsibility for his involvement in the two murders and the one armed robbery for which he was accused.  (*Id.* at 135-36.)  He testified that he knew he would at least be going to prison for the rest of his life and that he deserved this punishment.  (*Id.* at 136.)  He testified that he felt he could be a good influence while in prison and that he planned to renounce his affiliation with the Crips and distance himself from other Crips gang members.  (*Id.* at 138.)  He testified that he was familiar with a program in prison that will help him disassociate from the gang.  (*Id.* at 139.)

On cross-examination, Batiste admitted that he was not showing the jury now the same side of him that he showed the victims in his cases, nor was he soft-spoken in front of his victims as he was in front of the jury.  (*Id.* at 142-43.)

Contrary to his testimony on direct that he would follow the rules in prison, on cross-examination the prosecution elicited that Batiste had gotten in trouble for multiple assaults and fighting while in jail awaiting trial.  (*Id.* at 144.)  When Batiste tried to suggest that he only fought in self-defense, the prosecution impeached him with a letter he had written to his friend Rico Lara suggesting that it was not self-defense or mutual combat.  (*Id.* at 135-46.)

On cross-examination, the prosecution elicited testimony that Batiste would say whatever he needed to say—even lie if necessary—to get what he wanted.  (*Id.* at 150-51.)  He did this even though he had the constant and loving support of his family and he never wanted for anything growing up.  (*Id.* at 152-56.)  In contradiction to his prior testimony that he would steal in order to provide for his family, the prosecution elicited that Batiste did not spend the money he gained

from theft on his family's needs, but instead spent money on window tints for his car and $150 to $175 a week on marijuana. The prosecution further elicited that Batiste and his family were receiving food stamps to help with their basic needs, casting more doubt on Batiste's need for money to support his family. (*Id.* at 163.)

The prosecution elicited testimony that Batiste had many opportunities for change and many institutional interventions in his life from—from the discipline of boot camp to the resocialization program of TYC. (*Id.* at 165-66.) In the resocialization program, Batiste admitted to learning that "the choices you make . . . determine where you [end] up." (*Id.* at 166.) The prosecution questioned Batiste at length about what he learned through TYC's resocialization program: how to talk about his upbringing and life; how to express himself positively when his needs were not being met; and, that he did not need to break the law to get his needs met. (*Id.* at 167-68.) Additionally, the resocialization program taught him about "thinking errors," such as deceit and justification, or "making excuses for your own actions." (*Id.* at 168.) Batiste agreed that it was justification to lie by saying that "you needed to steal because you were poor, when you weren't really all that poor." (*Id.*) The prosecution elicited from Batiste that the program taught him about empathy, which Batiste defined as "being able to put yourself in someone else's shoes and see the world through other's eyes." (*Id.* at 170.) The prosecution elicited that Batiste stated during his post-arrest statement to police that he had empathy for Holiday, but that did not stop him from shooting him again. (*Id.* at 171.) Furthermore, the prosecution elicited that Batiste weighed the choice between helping Holiday or shooting him and taking his car, and he chose to shoot him and take his car. (*Id.*)

The prosecution elicited that Batiste did not express remorse or empathy with his victims to Dr. Krieger, a psychologist at TYC, because he does not "open up to anybody like that" and that he just told Dr. Krieger whatever he needed to

: 00178

say to get him out of his face. (*Id.* at 174.) Batiste admitted that he was aware that someone had to explain to Holiday's children and Robbins's loved ones about what happened to them. (*Id.*)

Impeaching Batiste's statement on direct that he wished to get out of the gang, the prosecution insinuated that he had never before expressed this desire until he was in front of the jury seeking leniency. (*Id.* at 179.) The prosecution confronted Batiste with letters that he had written to his brother Kevin Noel, Jr. just a few weeks prior in which Batiste provided guidance to him about joining a gang, signing the letter with the name of his set, "Five Deuce." (*Id.* at 180.)

Also through Batiste's testimony, the prosecution admitted numerous letters that Batiste had written to various friends and family members (*See* State's Trial Exs. 216, 217, 220, 221, 392-97, 399.) The prosecution spent a considerable amount of time confronting Batiste with things he had written in the form of rap lyrics in his letters. (24 RR at 182-89.) The prosecution pointed out several lyrics that refer to the victims of his crimes and that the prosecution suggested show a lack of remorse, concern or care about them or their families. (*Id.*) The prosecution highlighted a passage where Batiste referred to shooting a man that Stephanie Soliz, the mother of his children, began dating after Batiste's incarceration. (*Id.* at 184.) On several occasions the prosecution insinuated that Batiste's lyrics glorified the gangster lifestyle, violence, and misogyny. (*Id.* at 185-86.) To these insinuations, Batiste countered that much of his lyrical content was just "hypemusic," and not to be taken seriously or literally. However, the prosecution challenged Batiste's assertions that his lyrics did not refer to his crimes by pointing out passages that referred to specific details of his case. (*Id.* at 186-89.) The prosecution elicited that Batiste wished to get away with the robbery and

: 00171

murder of Holiday and that at one time he was angry with his unarrested co-defendant for not helping him get away. (*Id.* at 188.)[46]

The prosecution went through each of Batiste's crimes in meticulous detail through cross-examination. Batiste admitted that everyone in the Phat Kat robbery had a role to play and that Batiste was in charge and had recruited the others to participate. (*Id.* at 192.) Again, with regard to the Black Widow robbery, Batiste admitted to being the leader and planning the robbery. (*Id.* at 201.) During cross-examination, the prosecution elicited that Batiste lied to the officer that initially interviewed him regarding the crime when he said that he knew victim Robbins and had gotten a tattoo from him before. (*Id.* at 202-03.) Batiste also admitted that it was a lie when he told the interviewing officer that his friend "Lee Three" shot Robbins, not him. (*Id.* at 207.) He further admitted that he was disappointed that they did not gain anything from the robbery. (*Id.* at 210.)

Finally, the prosecution again took Batiste step-by-step through the murder of Holiday. (*Id.* at 210-25.) Batiste admitted that he was out committing crimes late at night despite the fact that Stephanie Soliz and children were at home, and that Soliz had been texting him to come home on the night of the Holiday murder because she was worried about what he might be doing. (*Id.* at 194-95.) In conclusion, the prosecution got Batiste's agreement that it would be his own fault if the jury gave him the death penalty because it was the bed that he made for himself. (*Id.* at 225.)

Trial counsel conducted a brief re-direct examination to elicit that it was difficult to take the stand and testify and that Batiste did not have to testify or admit to any of his crimes. (*Id.* at 227.)

---

[46] *See* Claim Eight, *post.*

154

## B. Trial Counsel Performed Deficiently by Failing to Prepare Batiste to Testify and that Failure Prejudiced Him

Trial counsel's failure to adequately and sufficiently prepare Batiste to testify during the punishment phase of trial hamstrung trial counsel's case for a life sentence. The impact of Batiste's testimony on the jury is immeasurable. The effect of hearing ill-prepared testimony from Batiste was exponentially worse than the potential effect of not hearing from him at all. There could be no strategic justification for presenting testimony from a defendant in the punishment phase of a capital case without the proper preparation.[47] Had trial counsel properly prepared Batiste to testify and adequately advised him of the potential dangers and pitfalls inherent in testifying, the jury would have never heard such damaging and prejudicial testimony (as outlined in Section A), either because Batiste would have been more equipped to respond to the inevitable challenges of cross-examination, or because he would have chosen not to testify at all.

Trial counsel had a duty to do more than merely inform Batiste of his right to testify. Trial counsel also had a duty to advise Batiste of the dangers inherent in testifying and to fully prepare him for both direct and cross examination. "Assuring that the defendant's decision is an informed one also necessitates that counsel discuss the strategic implications involved in the decision to testify." *Rayborn v. United States*, 489 Fed. Appx. 871, 880 (6th Cir. 2012); *see also Harrison v. Motley*, 478 F.3d 750, 756 (6th Cir. 2007) ("[D]efense counsel has an obligation to discuss potential strategies with [the defendant]," including whether or not to testify.); *Cannon v. Mullin*, 383 F.3d 1152, 1171 (10th Cir. 2004). While

---

[47] Trial counsel elicited during re-direct examination that they talked with Batiste about testifying "at length." (*Id.* at 226.) First, quantity of time spent discussing whether to testify is not a substitute for quality preparation for testifying. Second, Batiste's opinion on the adequacy of preparation is neither dispositive nor particularly informative to the issue of the adequacy of the preparation.

155

the decision whether to testify ultimately belongs to the accused, trial counsel's duty to advise "typically includes a recommendation one way or the other." *Rayborn*, at 489 Fed. Appx. at 880; *see also Cannon*, 383 F.3d at 1171. Trial counsel bears the primary responsibility for advising a defendant of "the strategic implications" of choosing to testify or not. *United States v. Teague*, 953 F.2d 1525, 1533 (11th Cir. 1992). "Moreover, if counsel believes that it would be unwise for the defendant to testify, counsel may, and indeed should, advise the client in the strongest possible terms not to testify." *Id.*

A defendant who testifies in a criminal case, much less in a capital case, often does so at his own peril. By taking the stand during a punishment phase of a capital trial, the defendant inevitably opens himself up to harsh and relentless cross-examination in front of a jury who has already found him guilty of the most severe crime in the criminal code. When a defendant takes the stand in a criminal case, "it is often the defendant, above all others, who is the most influential witness to a jury." *Rayborn*, 489 Fed. Appx. at 882; *see also Ferguson v. Georgia*, 365 U.S. 570, 582 (1961). Because a defendant's testimony becomes the most influential witness to a jury, "[n]o conceivable, tactical justification can undo the harm inflicted by improperly conducting the testimony of *the* key witness in the case. *Rayborn*, at 882 (internal quotations omitted)(emphasis in original) (*citing Higgins v. Renico*, 470 F.3d 624, 633–35 (6th Cir. 2006).

### 1. Batiste's Testimony Contradicted and Discredited the Defense's Mitigation Theory

Trial counsel's presentation of Batiste's testimony through direct examination, and their lack of objections during cross-examination, could not have been the result of a reasoned strategic decision. Trial counsel's presentation of Batiste's testimony contradicted many times over the story they attempted to tell in the rest of their mitigation case.

156

: 00174

For instance, by eliciting testimony that Batiste committed crimes just to keep money in his pocket and that "more money is always better," contradicted their mitigation theory that Batiste was a hard-working family man that just wanted to provide for his family.  (24 RR at 132.)  By eliciting such testimony, trial counsel essentially discredited all of their mitigation witnesses that had previously testified.  Also contrary to trial counsel's mitigation case that Batiste was a committed, hard-working family man, the prosecution elicited on cross-examination that he had been out late committing robberies and murders rather than at home being a father to his children.  (*Id.* at 194.)  Even more damaging, trial counsel elicited testimony that Batiste was running a fencing operation out of his apartment, in direct contradiction to their mitigation theme that all Batiste wanted was a legitimate job to provide for his family.  Again, the impact of this testimony offset and discredited the defense's mitigation witnesses presented earlier.

## 2. Trial Counsel's Failure to Prepare Batiste to Testify Led to His Portrayal as Remorseless

If trial counsel's intent was to show that Batiste was remorseful and empathetic, the result was the opposite.  The picture the jury was left with was of a young man who was greedy and materialistic, and who, despite having a loving family and a good job, was willing to commit crimes to get what he wanted.

In assessing trial counsel's ineffective preparation for and presentation of Batiste's testimony, the impact of remorse during a capital trial's punishment phase should not be underestimated.  Empirical studies of jury decision-making show that a defendant's remorse, or lack of remorse, is one of the primary considerations that drives jurors' decision between life and death.  John E. Blume, Sherri Lynn Johnson & Scott E. Sundby, *Competent Capital Representation: The Necessity of Knowing and Heeding What Jurors Tell Us About Mitigation*, 36

: 00175

HOFSTRA L. REV. 1035, 1037 (2008) (hereinafter "*Competent Capital Representation*"). A defendant's degree of remorse is a frequently discussed issue in the jury room and a factor that, in some studies, a majority of jurors cite as the most compelling reason for their decision. Scott E. Sundby, *The Capital Jury and Absolution: The Intersection of Trial Strategy, Remorse, and the Death Penalty*, 83 CORNELL L. REV. 1557, 1560 (1998) (hereinafter "*The Capital Jury and Absolution*").

Not surprisingly, the more sympathy a juror feels for the defendant, the more likeable she finds the defendant to be; and the more able she is to imagine herself in the defendant's situation, the more likely a juror is to vote for life. *Competent Capital Representation* at 1051; Stephen P. Garvey, *The Emotional Economy of Capital Sentencing*, 75 N.Y.U. L. REV. 26, 63 (2000). Showing that the defendant is remorseful often is a key component to creating this sympathetic reaction in the jury. Conversely, when jurors believe that the defendant is not remorseful, they see little of value in the defendant that is worth saving. *Competent Capital Representation* at 1049.

The presence or absence of remorse in the defendant is so influential in shaping the outcome of capital trials that, whenever possible, prosecutors emphasize the defendant's apparent lack of remorse in their closing argument. *The Capital Jury and Absolution* at 1558. This case was no exception. In closing, the prosecution highlighted Batiste's lack of remorse, saying: "He's not sorry. He couldn't care less. He wants you to think he's sorry. Mr. Cornelius shed more tears for Teddrick Batiste this morning than [Batiste] ever shed for any of his victims." (25 RR at 76.) Furthermore, during cross-examination of Batiste, the prosecution challenged him about his lack of remorse several times, asking: "You're not sorry for what you did to Horace Holiday, are you"; then, "Never once in your lyrics do you talk about feeling sorry for Horace Holiday, do you";

: 001 75

then, "there's no remorse in that line [from your lyrics] in there"; and again, "There's no remorse in that line, is there, Mr. Batiste?" (24 RR at 185-89.) The prosecution's continued reference to Batiste's lack of remorse invited the jury to share in the prosecution's outrage.

Trial counsel's failure to prepare Batiste for such rigorous cross-examination on his perceived lack of remorse had a tremendous impact on the jury. Their failure to prepare Batiste to anticipate questions about the content of the rap lyrics he sent to loved ones from jail further prejudiced Batiste. Had trial counsel either properly prepared Batiste to address the issue of remorse, or had trial counsel prepared their examination with the knowledge of how significant the concept of remorse is to most jurors in a capital case, trial counsel could have presented evidence of Batiste's remorse to the jury by, for instance, highlighting portions of Batiste's letters that directly show evidence of his remorse[48] or, alternatively, could have determined that it would be best if Batiste did not testify at all to avoid the pitfalls of cross-examination.

### 3. Presenting Batiste as a Witness Allowed the Prosecution to Introduce into Evidence Letters Batiste Wrote from Jail that Would Have Otherwise Been Inadmissible

Lastly, had Batiste not testified, the prosecution would not have been able to introduce many of the letters that Batiste wrote while in jail. Without Batiste's testimony, the prosecution would not have been able to lay a proper foundation for their admission into evidence. The admission of these letters, which would have been otherwise inadmissible, prejudiced Batiste. It was through these letters that the prosecution made their case that Batiste was not remorseful, that he glorified

---

[48] Trial counsel did nothing to rebut the prosecution's use of Batiste's letters to show lack of remorse when there was abundant evidence of Batiste's remorse and regret in his letters that could have been highlighted by trial counsel. (*See* Claim 8, *post.*)

: 00177

the gangster lifestyle, violence and misogyny, and that he had no intention of leaving the gang lifestyle behind. (24 RR at 182-89.) Through the admission of these letters, the prosecution was able to dismantle each point made on direct examination.

Had trial counsel prepared Batiste for the use of these letters during cross-examination, it is possible that Batiste would not have testified at all, in order to prevent the admission of these letters. Alternately, had trial counsel actively prepared for the prosecution's use of the letters, trial counsel could have rebutted the prosecution's suggestions that Batiste's lyrics portray a violent and misogynistic gangster. To the contrary, trial counsel could have elicited testimony from Batiste that placed the prosecution's selections from his lyrics into the larger context in which they were intended to be read. (*See* Claim 8, *post*.) Trial counsel could also have highlighted passages from Batiste's letters that were not read to the jury by the prosecution that would have elicited more sympathy and would have countered perceptions that Batiste was cold, heartless and remorseless. Passages from Batiste's letters that were not read to the jury depict a young man overwhelmed with emotions and remorse about what had happened. (*See* Claim 8, *post*.) Either by advising Batiste not to testify, or by better preparing both him and their own direct examination to address the content of the letters, trial counsel could have prevented much of the damaging testimony that the prosecution elicited regarding Batiste's character. Because they failed to do either, trial counsel's lack of preparation prejudiced Batiste tremendously.

## C. Conclusion

Based upon the above, counsel's ineffectiveness in preparing Batiste to testify caused prejudice to Batiste's punishment case. Had counsel adequately prepared Batiste to testify, at a minimum, at least one juror would have had a reason to reject a death sentence. *Wiggins*, 539 U.S. at 536. Therefore trial

counsel's deficient conduct created "a probability sufficient to undermine confidence in" the outcome at trial. *Porter*, 130 S. Ct. at 455-56 (quoting *Strickland*, 466 U.S. at 693-94).

## CLAIM EIGHT

### TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO CHALLENGE THE PROSECUTION'S USE OF BATISTE'S JAIL LETTERS DURING THE PUNISHMENT PHASE OF TRIAL

Batiste's trial counsel failed to challenge the prosecution's use of the letters that Batiste wrote—often in the form of rap lyrics—to friends and family while he was in jail awaiting trial. By failing to challenge the prosecution's use of Batiste's jail letters, trial counsel allowed the prosecution to characterize Batiste as a cold, remorseless criminal. Had trial counsel prepared witnesses to discuss the jail letters, and had counsel consulted with and presented testimony from an expert qualified to discuss the meaning and significance of Batiste's lyrics, a much different picture would have emerged.

Trial counsel's failure to investigate and present evidence to rebut the prosecution's use of the jail letters fell below the generally recognized standard of care in a capital case. Thus because trial counsel's failure violated Batiste's rights pursuant to the state and federal Constitutions, state statutory law, and United States Supreme Court and state case law, Batiste's sentence should be overturned.

### A. Relevant Factual Background

Prior to trial, the prosecution filed and served a "Supplemental Notice of the State's Intent to Use Extraneous Offenses and Prior Convictions for Impeachment and/or Punishment." (6 CR at 1426-30.) This supplemental notice provided trial counsel with notice of the prosecution's intent to introduce the contents of Batiste's jail letters into evidence.

: 00179

During cross-examination of defense witnesses Kevin Noel, Jr. and Micaela Lara, the prosecution introduced letters written by Batiste to those witnesses. (24 RR at 43, 50, 68.) Then when Batiste himself testified, the prosecution introduced many more letters. (*Id.* at 149, 182.) The prosecution referred to Batiste's letters and the rap lyrics contained in them throughout their cross-examination, using Batiste's lyrics to portray him as being remorseless, violent, and misogynistic gang member. The prosecution also moved numerous letters into evidence at the close of testimony. (23 RR 174.) Trial counsel did not object to the admission of any letters. To the contrary, trial counsel themselves moved over 225 pages of letters into evidence at one time. (25 RR at 10-11; 33 RR 43 - 281.)

## B. Trial Counsel Performed Deficiently by Failing to Present Testimony from an Expert on the Meaning and Significance of the Rap Lyrics in Batiste's Letters

Trial counsel knew the prosecution was going to use the letters Batiste wrote from jail as evidence of extraneous offenses and impeachment. They knew or should have known that the contents of the letters had the potential to be extremely prejudicial. However, in the punishment phase, trial counsel allowed the prosecution's evidence to go unchallenged and unrebutted. Trial counsel had a duty to challenge the prosecution's use of Batiste's letters. Thus, trial counsel's failure to present testimony from a gang expert constituted deficient performance and fell below the generally accepted standards for capital defense counsel. *See Strickland*, 466 U.S. at 688.

The standards of professional competence at the time of Batiste's trial were set by the American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases. The Guidelines state that "[c]ounsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty." ABA Guidelines,

Guideline 10.7.  Moreover, the Guidelines state that "counsel at every stage of the case have a continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation *or rebuts the prosecution's case in aggravation.*"  *Id.* at Guideline 10.11(A) (emphasis added).  Finally, counsel should consider hiring experts to "rebut or explain evidence presented by the prosecutor."  *Id.* at Guideline 10.11(F)(2).  Based on these accepted minimum standards of professional competence, trial counsel performed deficiently by not presenting testimony from an expert on the meaning and significance of rap lyrics.

Trial counsel was on notice that the prosecution intended to use Batiste's letters as impeachment and evidence of extraneous offenses during the punishment phase of trial.  Therefore trial counsel had a duty to challenge and rebut this evidence.  No reasonable strategy justifies leaving aggravating evidence unchallenged.  Trial counsel could have rebutted the state's use of Batiste's letters by presenting testimony from an expert on the meaning and significance of rap lyrics.  Had trial counsel called an expert such as Charles Rotramel[49], he or she could have testified to the following.

### 1. Introduction

The rap lyrics that Teddrick[50] wrote to his friends and family from jail show an emotionally complex young man trying to come to terms with the consequences of his actions and trying to prepare himself for a life of incarceration.  Using the common tropes and argot of hip hop music, Teddrick's letters show him vacillating between being overwhelmed by emotion and trying to hide or bury his emotions.

---

[49] Charles Rotramel has over thirty years of experience working with gang-affected youth and the juvenile justice system.  Through Youth Advocates, an organization he founded, Rotramel has conducted hip hop poetry open mics and rap and writing workshops for over fifteen years.

[50] First names will be used for this section of the claim.

163

00181

His letters also show him vacillating between typical empty rap braggadocio and genuine emotional expression. (Ex. 2 at ¶76 [Aff. of Charles Rotramel].)[51]

Rap lyrics are frequently misunderstood, misconstrued and taken too literally. Rappers commonly use hyperbolic and grandiose language to convey the intensity of emotions felt by frequently marginalized youth. While rap lyrics can sometimes be shockingly raw, it is a mistake to always construe them as glorifying, much less encouraging violence. For Teddrick, and for many other youth of his age, generation, and demographic, writing lyrics is a form of expressing these intense, complex and often overwhelming feelings. (Ex. 2 at ¶77 [Aff. of Rotramel].)

### 2. Remorse and Being Overwhelmed with Emotion

For Teddrick, writing was the one outlet he had while in jail to try to make some sense out of his situation. He expressed how writing helps him cope with the thoughts and feelings that overwhelm him while sitting in his cell. He wrote, "so now I'm in a cell and forced to broadcast my skills / that's the only cope I got, besides my pain bein spilled." (28 RR at 78; Ex. 2 at ¶78 [Aff. of Rotramel].) [52]

In several lyrics, Teddrick expresses that nobody knows the tremendous amount of emotion that he has welled up inside him. For instance, he wrote, "A lot of people think they know / but out of generocity, they speak kindness out they soul / the feelins I tend to hold, has turned me into a walkin eyemax [IMAX]." (28 RR at 77; Ex. 2 at ¶79 [Aff. of Rotramel].) Because of what Teddrick has been

---

[51] For the ease of the reader, Rotramel's analysis in this claim is not set out in block quotations, but it comes directly from his expert affidavit and is cited as such.
[52] In the interest of maintaining the flow of the quoted sections from Teddrick's letters, slang spellings and misspellings will remain the way they appear in the original letters. In the event that a word is so misspelled that clarity is necessary, the correct spelling will appear in brackets after the misspelled word.

through, he has an IMAX theatre's worth of emotion inside him, but he does not show it to others. Later, he expresses that at times he has such a huge emotional outburst that he is "punchin the walls until they start to hit me bacc / and hollering like I'm lost." (*Id.*)

Much of the emotion that overwhelms Teddrick comes from a deep sense of remorse. For instance, he writes, "[I] built my own bridge, but I sliped and now I free fall." (28 RR at 77.) Teddrick recognizes that he is solely responsible for his actions and does not attempt to shift blame to anyone or anything else. (Ex. 2 at ¶80 [Aff. of Rotramel].)

Contrary to the prosecution's portrayal of Teddrick, his lyrics do not reveal him to be cold and heartless. Indeed, they reveal just the opposite: "If I could be anything besides free it would be heartless." (28 RR at 78.) He recognizes that he is in fact not heartless, not emotionless, and not a hardened gangster. He wishes that he could be emotionless, because it would be easier to not feel anything than to deal with the complex emotions that he is facing: remorse, fear, disappointment, and loneliness. When Teddrick does let his emotion spill over, he cries out, but nobody hears his pain except "haters" who have no intention of helping him. He wrote, "I'm screamin like a ma'fucca, but it seems only hattas [haters] here my sound / I truly need help cuz the ones I love don't even know me." This is consistent with a feeling of isolation and abandonment. As Teddrick puts it elsewhere, "my circle's one deep," meaning there is nobody in his circle but himself. (*Id.* at 141; Ex. 2 at ¶82 [Aff. of Rotramel].)

Teddrick's sense of isolation leads him to a feeling that he needs to be a rock, completely emotionless, dependent on no one. This is a common survival tactic in the process of institutionalization. As Teddrick writes to Stephanie, "I've learned to neva get too close to anything or someone I can't turn away from in five minutes." (28 RR at 128; Ex. 2 at ¶83 [Aff. of Rotramel].)

: 00183

Because of the overwhelming nature of the emotions that he feels, at times during Teddrick's letters, he feels that he has to shut down all feeling and bury them away in order to survive in the institutional setting. For instance, he stated, "I got no love for no soul / fucc these hattas [haters] and hoes." (28 RR at 83.) Teddrick masks his emotional vulnerability behind the thin veneer of typical rap braggadocio and toughness. Teddrick is attempting to convince himself and others that he is not "soft" or weak. To do so, he tries to convince himself that he is a monster. For instance, he wrote, "Ain't nothing soft about me, I spit and drink hard / sip blood from six infected vampires, and spit box from caprice cars." (*Id.* at 81.) At times, living with the consequences of his actions is too much to bear, and so tries not to feel, because it is too painful to feel. He stated: "I woke up with a problem cuz all I see is death / scared of sowen [sowing] what I reap, so I shoot drama to someone else / and I'm numb to the world, but every hatred slug is felt / and I know no other way to cope, so the inner me is kept." (*Id.* at 90; Ex. 2 at ¶85 [Aff. of Rotramel].)

Teddrick also feels like he is in a free fall because of the lack of guidance he had while growing up. He stated, "I need the guidance of an experienced man." (28 RR at 82.) Growing up, Teddrick never had a positive male role model. His family members mention this as a major factor in Teddrick's development. This lack of positive male guidance lead to Teddrick's sense that he is "lost" or in a "free fall." (Ex. 7 at ¶ 9 [Aff. of Melissa Beard-Carter]; Ex. 9 at ¶¶ 35-41 [Aff. of Monica Davis].) As Teddrick put it in his lyrics, "I was thrown in the street and neva had a scremige [scrimmage]." (28 RR at 120.) Because he lacked guidance at home, he turned to the street, where he was forced to act like a grown-up with no training or practice. (Ex. 2 at ¶84 [Aff. of Rotramel].)

Because of his lack of guidance growing up, Teddrick does not know any other way to cope other than making himself numb. But, however much he tries to

166

: 00184

suppress his feelings and become a hardened gangster, his emotions keep showing up, refusing to be contained. He wrote, "I ain't seen ya'll in a minute, I let my emotions smoke my visit / and Momma I do listen, but the bullshit got me twisted...My emotions, got it showing, all in my bacc." (28 RR at 82; Ex. 2 at ¶86 [Aff. of Rotramel].)

During the punishment phase of trial, the prosecution highlighted two lines from Teddrick's letters: "[My lawyer] sent me a letta, sayin the DA want off with my head / that's the results when you smoke a nigga and take off with his bread." (28 RR at 90.) The prosecution alleged that these lines showed Teddrick's callousness and a lack of remorse. However, in the context of the letter, these lines suggest the opposite. Teddrick seems to recognize that the path he has taken leads to death. Immediately following the two lines highlighted by the prosecutor, Teddrick continues, "It's time for a change, I'm hit and about to fumble / how much more of this can I take before I crumble / but fucc life you can have it, just let my kids know I love them / let them know I'm still me, and nothing will go above them / and to my victim's family, the inner me is lost / so hold yo comments to yo self, cuz you don't know what I'm about." (*Id.*) Taken in its entirety, this letter reads like a goodbye letter, even a suicide note. He is expressing that nobody seems to understand the genuine regret, remorse, hurt and pain that he feels. (Ex. 2 at ¶78 [Aff. of Rotramel].)

Remorse is a common theme in Teddrick's letters. He feels severe depression and regret about his decisions and never dodges responsibility for his actions. "This situation got me wipen drops, like a windshield wiper." (28 RR at 118.) "I fucced up cuz, I knew how to accomplish, but still a nigga cheated." (*Id.* at 120.) Teddrick recognizes that he knew better, that he had an opportunity to make it by following the rules, working hard and providing for his family, but instead he "cheated" by committing crimes. In a particularly remorse-filled

: 00185

passage, Teddrick writes, "I know I'm fucced up, cuz now I'm feelin what they see / I'm lookin in the mirror, sayin Stephanie, why me / but cuz lets ride was more important than daddy don't leave…my betta half was right, the streets is no longer my life / I got my family but still tryin to earn stripes." (*Id.* at 119.)  This passage expresses Teddrick's regret that he put his gang associates before his family. Teddrick is now able to see himself as others saw him, and he does not like what he sees.  (Ex. 2 at ¶89 [Aff. of Rotramel].)

### 3. Preparation for Institutionalization

Much of Teddrick's attempt to swallow back his emotional side has to do with his preparation for a life of institutionalization.  For him, acting hard is a matter of survival—it is the only way he can defend himself in a brutal, violent environment.  This is behavior he learned from experience as a child while detained at places like Sheffield Boot Camp.  (Ex. 2 at ¶¶46-58, 87 [Aff. of Rotramel].)

Teddrick's attempt to harden himself and push his emotions deep inside him is clear preparation for a life of incarceration.  Based on his prior experiences, especially at Sheffield, he knows that he will have to act hard in order to just survive in the institutional setting.  Thus, in preparation for the brutal institutional life that he knows is ahead of him, he focuses on "teachin my self to cope without feelins up in my brain."  (28 RR at 91.)  However, even in his attempt to bury his feelings, he knows it is futile: "how do I release pain, the voices won't neva stop." (*Id.*)  Teddrick recognizes that even in his attempt to swallow back his emotions, he will never be able to mask his true feelings.  (Ex. 2 at ¶90 [Aff. of Rotramel].)

### 4. Hypemusic

Many of Teddrick's letters are filled with typical rap boasts and braggadocio and can be read in the context of the general lyrical subjects of hip hop.  In these sections he attempts to portray himself as tough and in control.  He says things

like, "I go so hard, a def man with cement in his ears can't ignore me." (28 RR at 83.) Such hyperbole is common and typical in hip hop lyrics. However, when Teddrick gives detail in his rhymes, he reveals a more complex and human side to himself. (Ex. 2 at ¶81 [Aff. of Rotramel].)

Teddrick himself attempted to explain this to the prosecution when challenged with some of the violent imagery that appears in his lyrics. For instance:

> MR. RAMIREZ: In your jail letters, you made it very clear that you write those letters, you write those lyrics because it helps you to say what you really feel; isn't that right?
> MR. BATISTE: Not necessarily all the time. It might be just hypemusic sometimes.

(24 RR at 144.) Teddrick attempted to explain to the prosecution that while at times his lyrics are a literal expression of how he feels, many lyrics are just "hypemusic," or overstated, hyperbolic braggadocio. Still other sections which purport to be violent, blunt and raw are simply standard rap tropes and clichés, not to be taken too literally or too seriously. This nuance was lost on the prosecution, who sought to portray all of Teddrick's lyrics as literal.

Teddrick attempted to explain this concept several times to the prosecution, but it falls on deaf ears. The prosecution questioned Teddrick about a line he wrote to his cousin, "I realize I love drama. Like a fiend love stones." After the prosecution attempted to connect this line with the death of victim Holiday, Teddrick responded, "No, sir. It was just hype." (*Id.* at 182.)[53]

### 5. Teddrick's Gang Affiliation

At a certain point, Teddrick comes to a realization that despite all of his attempts to present himself as an emotionless, hardened individual, he finally states

---

[53] Other attempts by Teddrick to explain "hypemusic" to the prosecution can be found at 24 RR at 184, 186, 227-28.

plainly, "This street shit, I'm startin to think it ain't a part of me / wise as I'm allowed to be." (28 RR at 95.) These lines suggest that Teddrick recognizes that he is not as "street" as he at times appears or attempts to present himself. (Ex. 2 at ¶91 [Aff. of Rotramel].)

Conspicuously absent from Teddrick's raps and letters are any explicit gang references, slang, or symbolism that typify letters from hard-core gang members. Nearly the only suggestion of Crip affiliation in Teddrick's letters are the replacement of the letter "k" with the letter "c" as in "bacc" instead of "back." Typically, a hard-core gang member will riddle their letters with gang references, complex gang symbology and sayings. The only references to gangs are in letters to his brother Kevin and his younger cousin Dominik Jackson. Interestingly, there is little reference to Teddrick's own gang affiliation in these letters. The references to gang culture only come in the form of offering knowledge and information about other gangs, not his own. To Kevin, Teddrick writes that the gang he has been trying to affiliate with does not exist and that the tattoo he has is not a tattoo used by any gang. (29 RR at 212.) Here, Teddrick is not trying to give advice on joining a gang, he is merely trying to protect his younger brother from getting embarrassed. To his cousin Dominik, Teddrick advises against using a star symbol for fear that it would be misconstrued as a symbol associated with a Latino gang, the Houstones, that could get him killed. (28 RR at 113.) Interestingly, in the same letter Teddrick encourages Dominik to keep doing well in school and do his homework. (*Id.* at 114.) The letters to Kevin and Dominik reveal a young man trying to keep his younger brother and younger cousin from making very serious mistakes that could endanger their lives. (Ex. 2 at ¶92 [Aff. of Rotramel].)

Another indication that Teddrick is not a hard-core gang member is his use of the term "O.G." in a letter to his friend Rico Lara. O.G. stands for original gangster, a term gang members use to refer to an older established gang member in

170

a position of leadership and respect. In his letter, Teddrick refers to Rico as an O.G. for settling down, working diligently, and raising his family. (28 RR at 155-56.) This is the opposite of the way that a gang member would use the term O.G. (Ex. 2 at ¶93 [Aff. of Rotramel].)

In contrast to the hardened gangster, Teddrick's letters show him struggling to accept his fate, knowing that his co-defendant has not been arrested. The concept of loyalty to his associates trumps any self-interest he may have in "snitching" and turning in his co-defendant. That loyalty would override the natural interest of self-preservation speaks to the level of institutionalization which Teddrick has already reached. He writes, "It's a fact, I'm not a rat, I got a co-defendant on the loose / livin off cake of the fiends and no empathy for number two." (28 RR at 82; Ex. 2 at ¶94 [Aff. of Rotramel].)

Frequently, the social construct of "loyalty" will take the place of true friendship among youth who have been institutionalized. Having never experienced long lasting relationships, the institutionalized youth overemphasizes loyalty to their associates. Loyalty becomes a proxy for the unconditional positive regard which they have never experienced. Everyone the institutionalized youth has gotten close to has abandoned them, and all of their relationships are tentative and temporary. To the institutionalized youth, being loyal to another person is an essential character trait that makes them better than all the people who have abandoned them. Loyalty consequently becomes the most important thing for these youth. If a youth in an institutional setting can find someone or some group that is loyal to them, then that becomes something that the youth cannot let go. This also explains why associates in a gang will go out of their way to take credit for the crime of another or refuse to "snitch" on another, even someone they may not be particularly close to. Loyalty trumps friendship at every turn. (Ex. 2 at ¶68 [Aff. of Rotramel].)

Teddrick is acutely aware of how his is seen by others and how his self-image differs from what others see him as and expect him to be. Frequently Teddrick expresses a feeling that he is different from how he is seen by others or how he is expected to be. Because he does not feel that he is the person that people expect him to be, he feels alone. For instance, "everybody gone, even tha victims and tha killas." (28 RR at 143.) He draws a distinction between himself and the killer that he has been labeled as. (Ex. 2 at ¶95 [Aff. of Rotramel].)

Labeling theory helps understand the sentiment that Teddrick expresses throughout his letters. Labeling theory is a sociological theory that explains how individuals come to fulfill the role that they are expected to play. Put simply, if people are labeled a certain way, they will respond by acting in a way consistent with that label. For instance, if someone is treated by others as a criminal, then they will begin to perceive themselves in the same way, and may ultimately adopt that role as their own. The label that society gives the person can change the person's social identity and concept of self. (Ex. 2 at ¶96 [Aff. of Rotramel].)

Throughout his letters, one can see Teddrick struggling with the label he has been given. Teddrick says this explicitly—"tha hood labeled me a 'G'." (28 RR at 122.) At times he adopts the role of a gangster, while at other times he struggles to distance himself from that perceived role and attempts to redefine himself based on his own self-perception. At one point in his lyrics, Teddrick begins to list his good qualities, such as loyalty, honesty, and having heart for people. But just as quickly as he mentions his good qualities, he recognizes the futility trying to convince anyone that he is a good person: "I know this don't mean shit and knobody know or cares how I feel." (*Id.* at 141.) This passage shows that Teddrick is attempting to separate himself out from the way he has been defined, while at the same time he has an acute awareness of the fact that no one will believe him. Teddrick even

172

begs to be saved from the role that he has fulfilled: "Lord, please guide a nigga from tha grimmy ways of tha street." (*Id.* at 145; Ex. 2 at ¶97 [Aff. of Rotramel].)

Teddrick feels regret and remorse about allowing himself to become the label that he was expected to be: "I neva ask[ed] to be a gangsta, just wanted to be something in life / positive, successful, but instead I'm tha gunman at night." (28 RR at 129.) Teddrick remorsefully takes responsibility for what he has become and what he has done. Because he recognizes that there is no way to undo the harm he has done, he can only hope that his son does not step into his shoes and fulfill the same role that he played: "So now I'm labled a killa and a threat to the street / and when I left, my son played with my shoes, but I hope he walk betta than me." (*Id.* at 144; Ex. 2 at ¶98 [Aff. of Rotramel].)

### 6. Conclusion

Ultimately, Teddrick's lyrics are typical of what one would expect from someone with Teddrick's upbringing, early institutionalization, and grim prospects. The lyrics are filled with the type of generic boasting about how "gangsta" and tough he is that is expected in hip hop lyrics. Teddrick inherits this from hip hop culture generally, meaning that it does not come sincerely or specifically from him. What makes Teddrick's lyrics unique and insightful though, are the times when Teddrick cannot hide behind the generic "gangsta" image that he attempts to portray. His individual expression comes through even when he tries to suppress it. What comes through consistently in his lyrics, is a young man struggling with remorse over his actions while also struggling with the dichotomy between what he has been labeled as and the person he actually is. Far from the picture of a hardened gangster with no remorse and callousness toward the victims of his crimes, Teddrick's letters paint the portrait of a complex young man coming to grips with where his actions have led him in life, expressed in the medium of hip hop poetry. (Ex. 2 at ¶99 [Aff. of Rotramel].)

173

**C. Trial Counsel Performed Deficiently by Failing to Prepare Their Witnesses for the Prosecution's Use of Batiste's Letters from Jail**

Professional norms require that trial counsel's investigation should include the thorough interviewing and development of witnesses such as family members and friends. ABA Guidelines, Guideline 10.7 (commentary) ("penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history"); Texas Guidelines, Guideline 11.1(A)(3)(b)(i) ("The investigation for the punishment phase of the trial should generally encompass . . . [d]evelopment of character witnesses and family background evidence.").

Trial counsel failed to properly and adequately prepare mitigation witnesses for their testimony. The witnesses either met briefly with Batiste's attorneys before trial, or not at all, and were only given a general idea of the kinds of questions they would be asked. Specifically, the family members were simply told to wait in a large room together and someone from the defense team, presumably the mitigation specialist, came in to tell them who was next to testify. (*See* Ex. 15 at ¶6 [Aff. of Kevin Noel Jr.]; Ex. 11 at ¶5 [Aff. of Micaela Lara].) The result was that these witnesses were not adequately prepared for their testimony.

As a result of trial counsel's failure to prepare their witnesses to testify, these witnesses were also completely ill-equipped to answer questions they were asked during cross-examination. In particular, Both Kevin Noel Jr. and Micaela Lara were broadsided by the State's questions regarding letters they received from Batiste, as they had not been informed by defense counsel that the introduction of such evidence was a possibility. (Ex. 15 at ¶6 [Aff. of Kevin Noel Jr.]; Ex. 11 at ¶6 [Aff. of Micaela Lara].)

On cross-examination, Batiste's brother, Kevin Noel Jr., answered that he did not know a gang associate by the name of Rome. The prosecution impeached Kevin's answer with a letter Teddrick wrote to him regarding this associate. (24

174

RR at 41-43.) Then after Noel Jr. stated on cross-examination that Batiste had never given him any advice on getting gang-related tattoos, the prosecution again impeached him with a letter that Batiste had written to him regarding what tattoos he should get. (*Id.* at 44-47, 51-53.) Trial counsel did not attempt to rehabilitate Noel Jr. Had trial counsel prepared Noel Jr. to testify or, at a minimum, informed him of the likelihood that the prosecution planned on using Batiste's letters, Noel Jr.'s testimony would have been more credible and would have provided a more complete picture of Batiste (*See* Section B, *ante*.)

During cross-examination of defense witness Micaela Lara, the prosecution brought up two letters that Batiste had written to her and her husband Rico. (24 RR at 67-71.) They used these letters to introduce evidence that Batiste made a contraband alcoholic beverage called "hooch" while in jail and that he beat up a fellow inmate, breaking his jaw. (*Id.* at 69-70.) The prosecution had pre-marked the letters with the portion that they wished for Lara to read and then placed the highlighted section on an overhead projector for the jury's benefit. (*Id.*) However, as Lara points out: "The prosecution had highlighted the parts they wanted me to read out loud. The very next line would say something like, "I am trying to do my best," but I was not allowed to read that part." (Ex. 11 at ¶6 [Aff. of Micaela Lara].) In fact, the very next line in the letter quoted by the prosecution stated, "I'm tryin Mickey, but I'm loosin faith, I'm just scared of my outcome. I love y'all." (28 RR at 154.) As Lara noted, quotes from Batiste's letters were taken completely out of context to portray Batiste as rule-breaking, remorseless and violent. Also in the same letter quoted by the prosecution, trial counsel could have elicited that Batiste praised Micaela and her husband Rico Lara for being successful, hard-working, good parents. (*Id.* at 156.) Had trial counsel prepared Lara for her testimony and had they used the positive portions of Batiste's letters to Lara (assuming counsel themselves had read the letters in question), trial counsel

175

could have countered the prosecution's portrayal of Batiste and provided evidence of Batiste's good character as well as evidence that Batiste broke jail rules by making a homemade alcoholic drink called "hooch." (24 RR at 69-70.)

Lastly, trial counsel failed utterly to adequately prepare Batiste himself for the prosecution's use of his letters against him. Throughout the prosecution's cross-examination of Batiste, the prosecution used Batiste's letters to portray him as someone who would continue to be a future danger and whose character left nothing to mitigate against imposition of the death penalty. (*See generally*, *id.* at 144-46, 148-49, 179-89, 227-28; *see also* Claim Seven, Section B, *ante*.) The prosecution used Batiste's letters to portray him as someone who would continue to be a future danger and a bad influence on others while in prison. (24 RR at 148-50.) The prosecution used his letters to impeach Batiste's statement on direct that he we seeking to get out of the Crips while in jail. (*Id.* at 180.) They used his letters to suggest that Batiste enjoyed the thrill and the drama of committing crimes. (*Id.* at 182.) They used his letters to suggest that Batiste would kill again if he needed to. (*Id.* at 183-85.) They used the letters to suggest that Batiste glorified violence and the gangster lifestyle. (*Id.* at 185.) Finally, and most damagingly, the prosecution used the letters as evidence that Batiste was remorseless about his crimes, heartless toward his victims' families, and that the only thing he regrets is getting caught. (*Id.* at 186-89.)

However, the prosecution misconstrued, distorted and took Batiste's lyrics out of context. It was therefore incumbent upon trial counsel to undo those misconceptions and distortions and to put his lyrics back into the context in which they were intended to be read. While Batiste made an attempt to explain to the prosecution that much of what he wrote in his lyrics were just "hype" or "hypemusic," trial counsel made no attempts to give Batiste an opportunity on re-direct to explain exactly what he meant by that. (*See* Section B(4), *ante*.) Had

176

: 00194

they prepared Batiste for the prosecution's use of his lyrics, Batiste would have been better equipped to explain the meaning in his lyrics. Also, had trial counsel consulted with and offered the testimony of an expert like Rotramel, the jury would have had an alternate view and a more complete picture of Batiste's character. (*See generally,* Section B, *ante.*) Because trial counsel failed to both prepare Batiste for the prosecution's use of the letters and to offer expert testimony to rebut the prosecution's use of the letters, the jury was left nothing to rebut the prosecution's portrayal of Batiste.

### D. Batiste was Harmed by Trial Counsel's Deficient Performance

The prosecution relied on Batiste's letters to portray him as remorseless. The letters were central to their strategy to discredit Batiste's testimony. Because remorse is one of the primary considerations that drives jurors' decision between life and death in a capital trial, it was incumbent upon trial counsel to challenge and rebut the prosecution's portrayal. (*See* Claim 7, *ante.*) Had trial counsel presented testimony from an expert such as Rotramel and adequately prepared their witnesses for cross-examination, the jury would have had a much more sympathetic perception of Batiste. Batiste was prejudiced because trial counsel failed utterly to rebut the prosecution's assertion that Batiste was remorseless when there was abundant evidence of his remorse available to them.

By presenting an expert on the meaning and significance of rap lyrics, trial counsel could have provided a nuanced portrayal of Batiste as someone who was overwhelmed with remorse and regret over his actions, in contrast to the prosecution's portrayal of him as remorseless. Instead of presenting testimony from an expert like Rotramel, trial counsel actually made the situation worse by dumping over 200 pages of letters on the jury for them to sort through on their own, with no guidance or context. (25 RR at 10-11; 33 RR 43 - 281.) Testimony from such an expert would have illuminated positive aspects of Batiste's character

177

that would have humanized him for the jury, cast him in a more sympathetic light, and given the jury powerful and convincing evidence that Batiste's life was worth saving.

Trial counsel's failure to prepare for the prosecution's use of Batiste's letters led the prosecution to effectively impeach and discredit the testimony of Batiste's brother, Kevin Noel, Jr., a witness who was central to the defense's mitigation case. Trial counsel's failure to prepare Micaela Lara for the prosecution's use of the letters caused trial counsel to miss an opportunity to highlight Batiste's positive character traits. Had they prepared Lara effectively, they could have elicited evidence from Batiste's letters to her that highlighted Batiste's struggles to cope with the consequences of his actions and his positive valuation of working hard, providing for a family, and being successful through legitimate work. Lastly, trial counsel's failure to prepare Batiste for the prosecution's use of his letters led to his testimony arguably causing more damage than it was helpful. Had trial counsel adequately prepared Batiste and had they challenged the prosecution's assertions, Batiste's testimony would have been an opportunity to see Batiste not as a hardened gangster, but as an emotionally complex young man, struggling with intense feelings of remorse and regret and preparing himself to live and cope with the consequences of his actions.

Trial counsel's failure to challenge and rebut the prosecution's use of Batiste's letters prejudiced Batiste. If even one juror had found that testimony from an expert such as Rotramel negated or even cast doubt on the prosecution's portrayal of Batiste as a remorseless gangster, Batiste would not have been sentenced to death. *Wiggins*, 539 U.S. at 536.

: 00196

## CLAIM NINE

## BATISTE'S CONSITUTIONAL RIGHT TO A FAIR TRIAL WAS DENIED BY THE STATE'S FAILURE TO DISCLOSE RELEVANT IMPEACHMENT EVIDENCE

Little is more essential to a fair criminal justice system than prosecutorial disclosure of information to the defense.  Disclosure laws, rules, and policies should contribute to the fair and efficient administration of criminal justice by minimizing the undesirable effect of surprise at the trial and contributing to an accurate determination of the issue of guilt or innocence.  Prosecutors have an affirmative constitutional duty to disclose exculpatory evidence to a defendant, including evidence relevant to the impeachment of a State's witness.  *See Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 153-54 (1972).

The prosecution's failure to disclose the criminal history of one of its material witnesses during the punishment phase of trial violated Batiste's constitutional right to due process, a fair trial, and an absence of arbitrariness in the death sentencing process.  *See Johnson v. Mississippi*, 486 U.S. 578, 584-85 (1988); *Zant v. Stephens*, 462 U.S. 862, 885 (1983).  Thus, Batiste's sentence of death violates his applicable state and federal Constitutional rights, as well as state statutory law, and United States Supreme Court and state case law and should be vacated.

### A. Relevant Proceedings

The centerpiece of the State's punishment case against Batiste was the presentation of evidence regarding the Black Widow tattoo parlor robbery and shooting death of the shop's owner.  This presentation included the testimony of three eyewitnesses to the crime, Anthony Moore (hereinafter "Moore"), his wife Christie Ingram-Moore, and their friend Joshua Norsworthy.  Moore was the first

: 00197

of the three witnesses to testify at the punishment trial. He testified that he was asleep when three men entered the tattoo shop in order to rob it. He woke up and immediately pulled his wife behind him in order to protect her. Moore also testified regarding the actions of the three men, including his belief Batiste was in control and in charge of the other men and that Batiste was the individual who ultimately shot and killed the shop owner. (21 RR at 90-101.)

During cross-examination, trial counsel played the audio recording of the statement Moore gave to law enforcement shortly after the incident. (22 RR at 9-11.) At no point in time was any evidence introduced, by either the State or the defense, regarding Moore's prior criminal history or current probation status.

Post-conviction investigation has revealed that at the time of his punishment phase testimony, Moore had multiple felony convictions and was an absconder from probation on a conviction from Oakland County, Michigan. (Ex. 24 [Public Record, re: Anthony Moore].) This information was material, relevant, and admissible for the purposes of impeaching Moore. *See* Tex. R. Evid. 609(a) ("[f]or the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record . . . if the crime was a felony or involved moral turpitude . . .")[54]

---

[54] Public records indicate that at the time of trial, Moore had multiple relevant convictions. First, there are two convictions for larceny of a building, a felony, in case number 03189790-FH, out of Oakland County, Michigan, one with a sentence of two years and the other with a sentence of five years. Second, there are two convictions for uttering and publishing, a felony, in case number 03189648-FH, out of Oakland County, Michigan, one with a sentence of two years and the other with a sentence of five years. The conviction with a five year sentence imposed on May 20, 2003, is still active due to the fact that Moore absconded from probation on December 1, 2006. (Ex. 24 [Public Record, re: Anthony Moore].)

**B. Batiste's Constitutional Right to a Fair Trial Was Violated by the State's Failure to Disclose the Criminal History and Probation Status of Anthony Moore**

Prosecutors have an affirmative constitutional duty to disclose exculpatory evidence to a defendant. The State's suppression of evidence favorable to the defense "violates due process where the evidence is material to guilt and punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. Evidence is material if "there is a reasonable probability that [a defendant's] conviction or sentence would have been different had these materials been disclosed." *Strickler v. Greene*, 527 U. S. 263, 296 (1999).

Brady material includes evidence relevant to impeach a prosecution witness. *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Giglio*, 405 U.S. at 153-54. A defendant need not request the favorable and material evidence to trigger the prosecution's duty to disclose. *Strickler*, 527 U.S. at 280 ("[w]e have since [Brady] held that the duty to disclose such evidence is applicable even though there has been no request by the accused . . . .") The evidence regarding Moore's prior criminal convictions and his status as a probation absconder was both relevant and material to the determination of his credibility as a witness, and as such the jury was entitled to full disclosure.

The prosecution is deemed to have knowledge of any criminal history information pertaining to its witnesses that would be revealed by a routine check of FBI and state crime databases, including a witness' state "rap sheet." The appellate court based this holding on the recognition that the prosecution has ready access to certain types of information that are often crucial to the defense. The prosecution should bear the burden of obtaining and disclosing the criminal history of its witnesses "in the interests of inherent fairness." *United States v. Auten*, 632

F.2d 478, 480 (5th Cir.1980); *Calley v. Callaway*, 519 F.2d 184, 223 (5th Cir.1975); see also *East. v. Scott*, 55 F.3d 996, 1003 (5th Cir. 1995).

Furthermore, a conviction obtained using knowingly perjured testimony violates due process. *Alcorta v. Texas*, 355 U.S. 28, 31 (1957) (per curiam) (due process was violated when the prosecution allowed the jury to be presented with a materially false impression); *Mooney v. Holohan*, 294 U.S. 103, 112 (1935) (per curiam). A state denies a criminal defendant due process when it knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected. *Faulder v. Johnson*, 81 F.3d 515, 519 (5th Cir. 1996); *United States v. Barham*, 595 F.2d 231,240-41 (5th Cir. 1979). The prohibition against the use of false testimony applies even when the testimony in question was relevant only to the witness's *credibility*. This is because, "[t]he jury's estimate of truthfulness and reliability of a given witnesses may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

The nondisclosure of information which would materially impeach a prosecution witness violated Batiste's right to confront and cross-examine Moore, and resulted in a deprivation of his fundamental constitutional rights.[55] A reversal of his death sentence is therefore warranted.

---

[55] Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty. ABA Guidelines, Guideline 10.7(A). As a result, counsel should prepare for the prosecutor's case at the sentencing phase in much the same way as for the prosecutor's case at the guilt/innocence phase. This includes investigating all sources of possible impeachment of defense and prosecution witnesses. ABA Guidelines, Guideline 10.7 (commentary). Modern technology has made access to information easy and inexpensive. Moore's criminal record was public and discoverable through a simple computer search. To the extent that trial counsel failed to conduct a

## C. Conclusion

When denied relevant evidence by the prosecution, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Moore was a tremendously significant part of the prosecution's case at punishment and the fact that the jury was not provided with all relevant information regarding his credibility, precludes the ability of Batiste to receive a fair trial. As a result, Batiste's sentence of death must be reversed.

## CLAIM TEN

## BATISTE'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL WERE VIOLATED BY JUROR MISCONDUCT

The right to a fair trial by a panel of impartial, indifferent jurors lies at the very heart of due process. *Irvin v. Dowd*, 366 U.S. 717, 721-22 (1961); *see also Franklin v State*, 138 S.W.3d 351, 354 (Tex. Crim. App. 2004) ("The Sixth Amendment guarantees the right to a trial before an impartial jury."). The very nature of the voir dire process is designed to seat jurors who are fair, open-minded, and unbiased. Jurors must be "capable and willing to decide the case solely on the evidence before it." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). Each juror selected swears to abide by and fulfill certain oaths, duties, and admonitions. When any juror violates these promises, either intentionally or inadvertently, by discussing the case prior to deliberations, the defendant's Sixth Amendment right to a trial by an impartial jury is threatened. *United States v. York*, 600 F.3d 347, 356 (5th Cir. 2010).

---

comprehensive background and criminal history check of all witnesses testifying for the State, Batiste was denied the effective assistance of counsel. *See Rompilla v. Beard*, 545 U.S. 374, 383-84 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003).

: 00201

The jury seated to decide whether Batiste lived or died committed misconduct by discussing an outside event and the impact the event had on their perception of the case prior to the start of deliberations. Further, appellate counsel was ineffective for failing to raise these issues on direct appeal and thereby preserve the claim for review. These errors individually and cumulatively violated Batiste's rights pursuant to applicable state and federal Constitutional law, state statutory law, and United States Supreme Court and state case law.

### A. Relevant Facts

On June 14, 2011, the second day of Batiste's punishment hearing, as juror Upshaw was riding the elevator on her way to court, a man with a turquoise colored shirt also got on the elevator and stood directly in front of her. The man had tattoos of guns and initials behind both ears. A large group of people entered the elevator on the first floor, but as it ascended the elevator started to empty. At one point the tattooed man in the turquoise shirt turned around, looked at Upshaw's juror badge, and made a comment to her.[56] Despite the fact that there was now plenty of room on the elevator, the man stayed in the same place—directly in front of Upshaw. She went into shock and could not breathe. (19 RR at 3-4.)

Upshaw looked to her right and saw juror Coleman, another juror from Batiste's trial, on the elevator with her. They both exited the elevator on the 19th floor and Coleman asked Upshaw if she was okay. Upshaw replied, "Now I can breathe. I couldn't breathe." Coleman could see that Upshaw was uncomfortable during the elevator ride and three unknown people had stayed too close to her. When Upshaw and Coleman reached the jury room they told the rest of the jurors

---

[56] When Upshaw gave her account of the confrontation to the court, she reported: "He looked at my juror badge and he said: You okay? And I go: Yeah." There were no other words exchanged. (19 RR at 3.)

what had taken place. There was concern, particularly amongst the women, and people tried to calm one another. (19 RR at 4-5, 7-8.)

The jurors discussed the measures they would take to protect their safety. The jury decided they would come and go in groups and some people made plans to take the park and ride together. There was also discussion about whether the jurors could get their own elevator. (19 RR at 5-7.)

The jury foreman informed the bailiff of the incident and the bailiff reported the incident to the court. (19 RR at 4.) In response, the court questioned both Upshaw and Coleman in chambers. After detailing what happened on the elevator, they both indicated the events of the morning would not prejudice the way they would make a decision in the case. (*Id.* at 4, 7.)

Defense counsel expressed that since the entire jury was told about the incident, the court must address it with them. The State indicated they did not see the need to draw more attention to the incident and would be satisfied with the court telling the jury to come forward individually if any of them had a concern. Ultimately, it was decided each of the jurors would be questioned in chambers with one prosecutor and one defense attorney present.[57] (19 RR at 8-14.) Defense counsel waived Batiste's appearance in chambers because they believed it would be more intimidating for the jurors to have him in there with them. (*Id.* at 13-14.) The jurors were brought individually into chambers. The court told each juror that the court was aware of what happened on the elevator that morning and then asked

---

[57] After a brief discussion regarding the appropriate steps to take, but before the individual jurors were questioned in chambers, there were two discussions held off the record. (19 RR at 8, 13.) Because the subsequent statements were not recorded, it is impossible to know what reasoning the court, or either party, gave for deciding to take the particular course of action that followed. The decision to go off the record, especially at a critical juncture such as this one, denied Batiste his constitutional right to meaningful appellate review. (*See* Claim Sixteen, *post.*)

: 002003

each juror if they could decide the case free from outside influence. Each juror confirmed that they would be able to do that.[58] Neither defense counsel nor the prosecutor asked any juror further questions. (*Id.* at 15-27.)

## B. The Jurors Committed Misconduct by Discussing the Case Before Deliberations

During the initial group voir dire, the court informed the jurors that they could not discuss the case with anyone else. (3 RR at 16.) Jurors were also told not to watch anything about the case on the news or read about it in the paper. (*Id.*) Jurors were again reminded not to discuss the case with anybody when they were accepted and took the oath. (3 RR at 118, 158; 4 RR at 145; 5 RR at 82-83, 130; 7 RR at 106, 147-48; 8 RR at 41, 45; 9 RR at 84, 194; 10 RR at 45-46.) The court repeated these warnings to the jury when they were sworn in at the beginning of the trial. (13 RR at 7-8.) As a standard practice, additional warnings and reminders not to discuss the case even amongst themselves were given periodically before breaks, lunch, and recessing for the day. (*Id.* at 62, 103.)

Despite these warnings, juror Upshaw violated the court's orders when she told the rest of the jury about the confrontation in the elevator. The subsequent discussion amongst the rest of the jurors was also improper. The fact that a man stood close to Upshaw in a crowded elevator and chose not to move over as the elevator emptied is not in of itself suspect. However, Upshaw had a heightened sense of awareness due to the testimony of the State's gang expert Clint Ponder that she had heard the previous day.[59] Upshaw herself stated, "I would have never

---

[58] Juror Strobel indicated that when he got off the elevator that morning a young man wearing a blue shirt was handcuffed and taken away and the incident with Upshaw was "probably related to that." The court assured Strobel that what he saw had nothing to do with Batiste's case. (19 RR at 26.)

[59] Clint Ponder, the State's "gang expert" testified extensively about the Crips, gang life, and how to identify Crip gang members by their physical appearance.

: 00204

paid attention to anything like that before, but the guy in front of me, he had a gun tattoo like behind both ears and some initials . . . Maybe I just got paranoid from what I saw yesterday." (19 RR at 4.) She also specifically mentioned that the man looked at her juror badge which showed which courtroom she was assigned to. Upshaw felt intimidated, went into "shock" and felt as though she could not breathe. (*Id.* at 4-5.) Her reaction was so extreme because she believed the man on the elevator had something to do with Batiste's case.

"It is a generally accepted principle of trial administration that jurors must not engage in discussions of a case before they have heard both the evidence and the court's legal instructions and have begun formally deliberating as a collective body." *United States v. Resko*, 3 F.3d 684, 688 (3d Cir. 1993); *see also United States v. York*, 600 F.3d 347, 356 (5th Cir. 2010) ("Deliberations prior to the close of evidence threaten that impartiality.").[60]  Furthermore, the only evidence jurors can consider "shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Turner v. Louisiana*, 379 U.S. 466, 473 (1965).

It is improper for jurors to discuss a case before deliberations begin. This is because jurors engaging in premature discussions may reach conclusions unfavorable to the defendant before the defense has a chance to present its case or the court has the opportunity to properly instruct the jury, and these conclusions will likely influence other jurors. Once a juror expresses his or her views in the

---

Specifically, Ponder testified that blue was the color associated with the Crips. (18 RR at 167-77.)  Ponder also spent a considerable amount of time discussing Batiste's multiple gang related tattoos, including ones depicting guns and initials. (*Id.* at 178-97.)

[60]  Although there are no Texas State cases laying out specific factors for determining the impact of jurors discussing the case prior to deliberations, several courts have provided guidance.

: 00205

presence of other jurors, he or she is more likely to adhere to that opinion and place more weight on evidence that comports with that opinion. *See York*, 600 F.3d at 357; *Resko*, 3 F.3d at 689.

Additionally, the jury system is designed for decision-making as a collective, deliberative process and premature discussions among individual jurors may thwart that goal. *See York*, 600 F.3d at 357; *Resko*, 3 F.3d at 689. Moreover, when jurors form premature conclusions about the case before the defense has completed presenting evidence; the burden of proof will have been, in effect, shifted from the State to the defendant, who then has "the burden of changing by evidence the opinion thus formed." *York*, 600 F.3d at 357 (*quoting Resko*, 3 F.3d at 689). Therefore, requiring the jury to refrain from discussion prior to deliberations protects a defendant's Sixth Amendment right to a fair trial as well as his or her due process rights and insures the burden remains on the State to prove the case beyond a reasonable doubt. *See York*, 600 F.3d at 357; *Resko*, 3 F.3d at 689.

While it is important to prohibit all premature juror discussions, courts have made a distinction between evidence of improper intra-jury communications and extra-jury influences. "It is well-established that the latter pose a far more serious threat to the defendant's right to be tried by an impartial jury. . . . Extra-record influences pose a substantial threat to the fairness of the criminal proceeding because the extraneous information completely evades the safeguards of the judicial process." *Resko*, 3 F.3d at 690 (internal citations omitted).

The jury's perception of Batiste as a dangerous person was central to their determination of the special issues. Most notably, the jury was asked to determine whether they believed Batiste would be a future danger to society. The belief, even if mistaken, that there were individuals in the free world that were connected to Batiste and could potentially cause the jurors harm, was incredibly prejudicial.

188

Moreover, once juror Upshaw shared the details of the elevator incident with the other jurors, this perception infected the entire panel—resulting in the jurors making plans to travel together and ask for their own elevator.

This kind of outside influence is precisely the type courts have stated are a serious threat to the defendant's rights. "An 'outside influence' originates from sources other than the jurors themselves." *McQuarrie v. State*, 380 S.W.3d 145, 151 (Tex. Crim. App. 2012). For instance, the court in *McQuarrie* had to determine whether information obtained by one juror from internet research and shared with the other jurors constituted an outside influence since the juror was person who shared the information. *Id.* at 154. The court concluded that the internet research, not the communication by the juror to other jurors, constituted an outside influence. Here, the confrontation with the third party was the outside influence, not the communication about the confrontation. However, the communication about the incident and the subsequent discussion between the jurors led to a premature discussion about Batiste and matters directly related to special issues in the case. This premature discussion violated Batiste's right to a fair trial, and to due process under both the Texas and Federal Constitutions, and United States Supreme Court and state case law.

### C. Batiste Was Prejudiced by the Juror Misconduct

The fact that jurors started discussing doing everything in a group shows that they were concerned for their safety after Upshaw told them she was intimidated because she was a juror on Batiste's case.[61] Going so far as to ask for a private

---

[61] Juror Bevers expressed concern about being harassed or threatened as a juror on the case during her individual voir dire. Her uncle was a juror on John Gotti Sr.'s trial and was a victim of juror harassment and threat on his life. Bevers stated she and her family were concerned and she specifically asked about security during the trial. Knowing she was predisposed to have these concerns, it is likely she was prejudiced by the event. Bevers was also instructed to immediately report any

189

elevator and potentially carpool indicates the discussion went beyond simply deciding to walk in and out together. The jurors did not try to make any of these arrangements prior to the confrontation, instead their actions were directly related to the incident discussed in the jury room. The court's actions further validated the jurors' concerns. After talking to the jurors, observing their demeanor, and listening to their concerns, the court decided to have the bailiff escort jurors to and from the elevators so they could all ride the elevator in a group. (19 RR at 12.) A mere six trial days after the confrontation in the elevator and ensuing concern, the jurors answered that Batiste would in fact be a future danger. It would be unreasonable to assume that jurors who were taking safety precautions throughout the remainder of the trial were unaffected by the elevator incident when deciding punishment.

As discussed above, when jurors make conclusions before all evidence is presented, they tend to give weight only to the evidence that comports with their opinion. The results can be catastrophic when jurors ignore or fail to listen to mitigating evidence still to come. The burden has essentially shifted to the defendant to prove he is not a future danger when the jury makes these premature decisions. It is impermissible for this to happen. The State had the burden to show Batiste was a future danger, but once the jury was influenced by outside sources and misconduct, they were essentially shifting the burden for Batiste to prove he was not a future danger.

Because of the prejudice caused by the misconduct for discussing the extra-jury influence introduced by Upshaw, and the impermissible burden shifting, Batiste's sentence of death should be vacated.

---

problems of this sort to the bailiff, but when it happened she failed to do so. (4 RR at 142-43.)

**D. Appellate Counsel was Ineffective for Failing to Assert Claims of Juror Misconduct on Appeal**

Appellate counsel failed to raise the claim that the jurors committed misconduct by prematurely discussing the case. As shown above, this error is clear on the face of the record. Appellate counsel has a duty to review the record and present any potentially meritorious claims. *Meza*, 206 S.W.3d at 689 (noting appellate counsel's "constitutional duty to review the record for any arguable error"). By failing to raise this issue as part of Batiste's direct appeal, appellate counsel's performance fell below the reasonable standards of professional conduct. *Evitts*, 469 U.S. at 394 n.6 ("In a situation like that here, counsel's failure was particularly egregious in that it essentially waived respondent's opportunity to make a case on the merits; in this sense, it is difficult to distinguish respondent's situation from that of someone who had no counsel at all."). This failure violated Batiste's rights pursuant to applicable state and federal Constitutional law, state statutory law, and United States Supreme Court and state case law.

**E. Conclusion**

Jurors in Batiste's trial committed misconduct when they impermissibly discussed issues fundamental to the case prior to the full presentation of evidence and the court's instructions. This prejudiced Batiste's rights under the State and Federal Constitutions, state statutory law and United States Supreme Court and state case law. Therefore, Batiste's sentence of death should be vacated.

## CLAIM ELEVEN

### TRIAL COUNSEL FAILED TO SUFFICIENTLY PRESERVE ERROR BY MAKING PROPER, TIMELY OBJECTIONS TO THE STATE'S INTRODUCTION OF INADMISSIBLE EVIDENCE DURING THE PENALTY PHASE OF TRIAL

During the cross-examination of the defense's eleven penalty phase witnesses, the State asked numerous impermissible questions that called for

191

hearsay,[62] improperly impeached witnesses,[63] or related to irrelevant events.[64] Despite this, trial counsel objected only twice,[65] ignoring at least fifty other plausible objections.  This failure to object constituted ineffective assistance of counsel and prejudiced Batiste through the introduction of damaging evidence.

Trial counsel's failure to preserve error prejudiced Batiste's punishment phase presentation and violated his applicable state and federal Constitutional rights, as well as state statutory law and state case law.  Therefore, Batiste's death sentence should be vacated.

### A. Trial Counsel was Ineffective for Failing to Preserve Error by Making Proper, Timely Objections and that Failure Prejudiced Batiste

In order to preserve error at trial on the admission of improper evidence, counsel must make a timely, proper objection and obtain a ruling.  *Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003).  Texas Rule of Appellate Procedure 33.1(a) states that in order to preserve an error on appeal, the record must show that counsel complained "to the trial court by a timely request, objection, or motion that stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." Tex. R. App. Proc. 33.1(a).

---

[62] At least twenty-three different hearsay objections could have been raised at 23 RR at 125, 126, 127, 141, 145, 146, 147, 171 and 24 RR at 14, 16, 18, 20, 21, 41, 47, 48, 49, 50, 51, 53, 90, 92, 195.

[63] At least twenty-two different character or impeachment objections could have been raised at 23 RR at 136, 142, 147, 167, 168, 170, 171 and 24 RR at 15, 16, 17, 19, 37, 38, 40, 41, 43, 64, 69, 70, 71, 147, 178.

[64] At least ten different relevance based objections could have been raised at 23 RR at 161, 162, 165 and 24 RR 19, 44, 46, 47, 90, 159, 173.

[65] At 23 RR at 36 and 24 RR at 145.

: 00218

Additionally, Texas law requires counsel to continuously object to the inadmissible evidence each time it is offered. *Ethington v. State*, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991). If the inadmissible evidence is admitted elsewhere in the trial without objection, the error is cured. *Id.* There are two exceptions to this contemporaneous objection rule. *Id.* When counsel makes an objection to all testimony on a given subject outside the presence of a jury or requests a running objection, the error is preserved. *Id.* at 858-59.

Trial counsel failed to properly object to at least fifty questions by the State. The most egregious examples are described below.

### 1. Trial Counsel Failed to Object to the State's Improper Questioning of Stephanie Soliz about Collateral Matters

Trial counsel called Stephanie Soliz, the mother of Batiste's children, as a witness. (23 RR at 150.) During cross-examination, the State impermissibly questioned her about specific instances of conduct. The state asked Soliz, "[w]ould you say that marijuana was smoked regularly in *your* apartment?"; "[h]ow much marijuana did *y'all* keep in the apartment?"; "I believe you told me that *you* purchased marijuana about once a week?" (23 RR at 168-69 (emphasis added).) While prior bad acts of the defendant may be admissible under Texas Rules of Evidence 404(b), specific instances of a witness's conduct may not be inquired into on cross-examination nor proved by extrinsic evidence. Tex. R. Evid. 608(b). All three of these questions implicated the witness's character, related to specific instances of her conduct, and were not appropriately constrained to implicate Batiste only. Nevertheless, trial counsel failed to object to any of these questions as impermissible impeachment evidence that violated Texas Rules of Evidence 608(b).

The State also asked whether Soliz stole cars with Batiste. (23 RR at 171.) The State's question implicated specific conduct of the witness, impeached her

: 00211

character, and is expressly disallowed by Texas Rules of Evidence 608(b). If trial counsel had objected, this question would have been stricken from the record. Instead, because trial counsel failed to object, testimony came into evidence that Soliz was just as involved in criminal activity as Batiste.

### 2. Trial Counsel Failed to Object to the State's Improper Questioning of Terry Soliz about Other Witness' Prior Bad Acts

After calling Stephanie Soliz, trial counsel called her mother Terry Soliz, the maternal grandmother of Batiste's children, as a witness. (24 RR at 3.) During cross-examination, the State continued its impermissible line of questioning by asking Terry Soliz, "[w]hen did you find out that your daughter and the defendant would steal cars?" (*Id.* at 16.) The State then asked, "[s]o, at that point did you tell them: Hey, you guys, I don't want you hanging out together? Did you tell them that?" (*Id.*) Trial counsel failed to object to this line of questioning as impermissible impeachment and hearsay. The State's first question implicated a prior defense witness, Stephanie Soliz, and impeached her character through the use of specific instances of conduct, by claiming that she used to steal cars. These questions also suggested that Terry Soliz was not a good mother and that she should have intervened to either change Batiste's behavior or influence her daughter to leave him. This impeachment evidence is a clear violation of the rule against questioning regarding specific instances of a witness's conduct. Tex. R. Evid. 608(b). In addition, the State's follow up questions called for hearsay, asking the witness to retell or confirm an out of court statement offered to prove the truth of the matter asserted, in violation of Texas Rules of Evidence 801.

The State then continued to ask questions that called for hearsay. For example, the State asked, "[d]id you bother to find out why he had been to TYC?"; "[d]id you ask him about it? Did you say: Teddrick, why did you go to TYC?" (24 RR at 18.) These questions plainly asked Soliz about out of court statements,

: 00212

offered by the State to prove the truth of the matter asserted, whether she asked him if he went to TYC.  Besides violating the prohibition on hearsay, Tex. R. Evid. 801, the questions are irrelevant under Texas Rules of Evidence 401.  The fact that Soliz did or did not ask Batiste about going to TYC had no bearing on the three special issues presented to the jury during the penalty phase of trial.  It is therefore irrelevant and inadmissible under Texas Rules of Evidence 401.  Finally, these questions ask about a collateral matter and a specific instance of Soliz's conduct, in violation of Texas Rules of Evidence 608(b).

Trial counsel failed to raise any of these three separate grounds for inadmissibility.  Had they objected, the court would have likely sustained the objections.  Therefore, trial counsel's failure to object prejudiced Batiste through the introduction of harmful evidence.[66]

### 3. Trial Counsel Failed to Object to the State's Improper Questioning of Kevin Noel Jr. Regarding Specific Instances of Conduct

Trial counsel then called Kevin Noel Jr., Batiste's brother, to testify.  (24 RR at 23.)  The State again improperly impeached him by asking questions concerning specific instances of conduct.  For example, the State asked, "[d]id you smoke dope with them? . . . With the kids being in the apartment?"  (*Id.* at 38.)  Collateral evidence of a witness's drug use is inadmissible under Texas Rules of Evidence 608(b).  *Ramirez v. State*, 802 S.W.2d 674, 676 (Tex. Crim. App. 1990) (finding evidence of witness's heroin use inadmissible because of the prohibition on specific instances of conduct in Rule 608(b)).

---

[66] At least two other questions asked of Terry Soliz could have been objected to on similar grounds: "Ms. Soliz, when he got back involved in your daughter's life at that time, did you make an effort to find out the trouble he had been in?"  (24 RR at 20); "[a]nd naturally when you smelled [marijuana in the apartment], you told your daughter they shouldn't be doing that.  Is that right?"  (*Id.* at 21.)

The State also improperly impeached Noel with his gang membership. The State questioned Noel whether he had gang-related tattoos and whether he was a member of the Bloods and Noel answered yes to both questions. (24 RR at 44-45.) Evidence of Noel's gang membership is inadmissible character evidence under the Texas Rule of Evidence 608. Trial counsel did not object to this highly prejudicial and inadmissible evidence coming in. Instead, they sat by while the State used an impermissible line of questioning to undermine a defense witness's credibility. Had trial counsel objected, this evidence would have been excluded.

### 4. Trial Counsel Failed to Object to the State's Improper Questioning Regarding Other Witness' Prior Bad Acts

By the time Batiste himself took the stand, the State had already discredited many of the defense witnesses by undermining their character in impermissible ways. However, the State continued to focus on impeaching prior defense witnesses. For example, the State asked Batiste "[a]nd your wife smoked a pack of cigarettes a day, didn't she?"; "[y]our wife smoked cigarettes, didn't she?"; "[s]he smoked regularly, didn't she?" (24 RR at 159.) This testimony served to discredit Stephanie Soliz's prior testimony that the family spent their money to provide for basic necessities. Furthermore, it drew an inference that Stephanie could have been responsible for her husband's thefts, as she needed money to purchase cigarettes regularly. Whether or not Stephanie smoked cigarettes daily has no relation to the three special issues that the jury was asked to decide, therefore these questions were irrelevant under Texas Rules of Evidence 401. Furthermore, the questions ask about a witness's specific acts of conduct, in violation of Texas Rules of Evidence 608(b). However, trial counsel did not object to these questions as impermissible impeachment or irrelevant evidence. Had they objected, the trial court would have likely sustained the objection. By failing to object, trial counsel allowed the State to continue to discredit the defense's mitigation witnesses.

196

## B. Conclusion

Trial counsel's failure to protect their own witnesses from impermissible cross-examination by objecting to improper questions prejudiced Batiste. Trial counsel's failure undermined the defense mitigation case. In essence, trial counsel presented witnesses to make the case for saving Batiste's life, only to then allow the State to impeach them with improper character evidence. The effect of this failure was to allow the State to smear their witnesses' credibility and implicitly cast judgment on their character and their behavior.

By failing to object, trial counsel allowed the State to slander the character and reputation of nearly all of the defense mitigation witnesses. This failure tarnished the credibility of their own witnesses, diminished the strength of the mitigating evidence these witnesses attempted to share, and crippled trial counsel's effort to make a compelling case for Batiste's life.

No conceivable trial strategy could justify allowing prejudicial and inadmissible evidence to be used to impeach some of the key mitigation witnesses in a capital trial's punishment phase. For the reasons stated above, trial counsel's failure to raise proper, timely objections at trial failed to preserve errors for appeal and constitutes ineffective assistance of counsel. These errors, both individually and cumulatively, prejudiced Batiste and therefore his death sentence should be vacated.

## CLAIM TWELVE

### THE TRIAL COURT COMMITTED ERROR FOR GRANTING A FLAT FEE TO TRIAL COUNSEL AND TRIAL COUNSEL WAS INEFFECTIVE FOR ACCEPTING THE FLAT FEE

The trial court authorized a flat fee arrangement to trial counsel for their work representing Batiste against charges of capital murder. A flat fee payment, however, does not adequately compensate counsel for their work at an hourly rate.

: 00215

The flat fee arrangement injects arbitrariness and unreliability into the trial process because it cannot ensure that trial counsel has the time, resources, and means to conduct an effective investigation and provide for an effective defense. Batiste's capital sentence was thus tainted by this fundamental error. As such, Batiste's conviction and sentence of death violates his applicable state and federal Constitutional rights, as well as state statutory law and United States Supreme Court and state case law and should be vacated.

### A. Relevant Facts

On January 21, 2010, Gerald Bourque and R.P. "Skip" Cornelius, Batiste's appointed counsel, filed an ex-parte motion with the court asking for a flat fee of $70,000 each for their work on Batiste's case. (1 CR at 110-12.) The justification for $70,000 was achieved by doubling the "contract fee" of $35,000 per case, given the fact that there would be two homicides and one aggravated robbery litigated.[67] The trial court granted the motion the same day. (*Id.* at 113.)

From 2009 to the present, there has been no other capital case which has resulted in a death sentence in Harris County where lawyers were given a flat fee for their representation. Providing a flat fee is neither standard nor customary practice in Harris County nor anywhere else in the State of Texas.

### B. Flat Fee Payments Are Improper in a Capital Case

Professional guidelines that dictate funding and compensation in capital cases provide that, "[c]ounsel in death penalty cases should be fully compensated at a rate that is commensurate with the provision of high quality legal representation and reflects the extraordinary responsibilities inherent in death penalty representation." ABA Guidelines, Guideline 9.1(B).

---

[67] The April 8, 2009, capital homicide of Steve Robbins, as well as the March 23, 2009, aggravated robbery of Walter and Kari Jones, were used as an extraneous offense against Batiste. (*See* 4 CR at 845-849.)

: 00215

Furthermore, "[f]lat fees, caps on compensation, and lump-sum contracts are improper in death penalty cases." ABA Guidelines, Guideline 9.1(B)(1). The Texas Guidelines for Capital Counsel mirror the ABA Guidelines. Texas Guidelines, Guideline 8.1(B).

The Texas Center for the Judiciary's Capital Cases Bench Book states that even though there are no mandatory fee schedules set by statute, "[f]lat fees, caps on compensation, and lump sum fees are improper in capital cases." TEXAS CENTER FOR THE JUDICIARY, CAPITAL CASES BENCH BOOK 5 *available at* https://www.yourhonor.com/benchbookhold/CCBB2/export.cfm?c=all&s=all.

> [F]lat fee schemes are disfavored because they create an unacceptable risk that appointed counsel will limit the amount of time invested in the representation in order to maximize the return or minimize any potential loss on the fixed fee. Moreover, because counsel working for a 'flat fee' is not required to document [their] actual work . . . it is impossible for the court or the public to monitor or review the quantity of effort expended by defense counsel, resulting in a lack of oversight and accountability.

TEXAS APPLESEED FAIR DEFENSE PROJECT, THE FAIR DEFENSE REPORT: FINDINGS AND RECOMMENDATIONS ON INDIGENT DEFENSE PRACTICES IN TEXAS 18-19, *available:* http://www.texasappleseed.net/pdf/projects_fairDefense_fairreport.pdf.

Flat fee arrangements in capital cases discourage and disincentivize comprehensive investigation and pre-trial preparation. Because of the very real and immeasurable danger that a capital defendant will not receive minimally competent counsel, both the Texas and the ABA Guidelines direct that trial counsel in a capital case should be compensated for *actual time and service* provided to the capital defendant "at an hourly rate commensurate with the prevailing rates for similar services performed by retained counsel in the jurisdiction, with no distinction between rates for services performed in or out of court." ABA Guidelines, Guideline 9.1(B)(3); Texas Guidelines, Guideline 8.1(B)(3).

: 00217

The Guidelines state that flat fees are improper because of the merely *possible*—not likely or even probable—effect that such a flat fee would "discourage lawyers from doing more than what is minimally necessary to qualify for the flat payment." ABA Guidelines, Guideline 9.1 (History of Guideline) (*quoting* ABA STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES, Standard 5-2.4 (3d ed. 1992)). As the Commentary to the Guidelines summarizes: "The Guideline's strong disapproval of flat fees, statutory caps, and other arbitrary limitations on attorney compensation is based upon the adverse effect such schemes have upon effective representation. Rather, compensation should be based on the number of hours expended plus the effort, efficiency, and skill of counsel." *Id.* (commentary).

This strong disapproval of flat fees is grounded in the historically justified fear that if counsel in a capital case is not fully compensated at a reasonable hourly rate for their services, there is a great risk that trial counsel will be economically prevented from providing effective assistance.

> When assigned counsel is paid a predetermined fee for the case regardless of the number of hours of work actually demanded by the representation, there is an unacceptable risk that counsel will limit the amount of time invested in the representation in order to maximize the return on the fixed fee.

ABA Guidelines, Guideline 9.1 (commentary).

> Addressing this fear, one state Supreme Court has held that:

> [A] lawyer may not be capable of properly balancing the obligation to expend the proper amount of time in an appointed criminal matter where the fees involved are nominal. The risk lay with his personal concerns to earn a decent living by devoting his time to matters wherein he will be reasonably compensated. The indigent client, of course, will be the one to suffer the consequences if the balancing job is not tilted in his favor.

*Bailey v. State*, 424 S.E.2d 503, 506 (S.C. 1992).

## C. Trial Court Committed Reversible Error by Granting a Flat Fee Payment to Trial Counsel

Trial court committed fundamental and structural error by granting defense counsel's motion to be paid a flat fee for their representation of Batiste. This error requires that Batiste's sentence and conviction be overturned and a new trial granted. Limiting trial counsel's compensation by a flat fee injected arbitrariness into the process in which Batiste's sentence and conviction were obtained. Since this error is structural and infects the entire proceeding used in obtaining Batiste's sentence and conviction, the proper remedy is a new trial.

The court must grant a new trial because it is impossible to identify with any reliability how pervasive was the effect of depriving Batiste of counsel that were fully compensated for their work at an hourly rate. While one could point to examples where it is possible that the financial restrictions inherent in a flat fee arrangement affected trial counsel's ability to provide an adequate and fair defense for Batiste, such a laundry list would be speculative and incomplete at best.[68] Since the flat fee arrangement itself created this lack of accountability, habeas counsel cannot effectively litigate how exactly the flat fee arrangement affected trial counsel's representation. Therefore the only remedy available to Batiste is a new trial.

A harmless error analysis is inappropriate on this issue because any attempt to determine the exact scope of the harm suffered as a result of the flat fee compensation would be purely speculative. In such cases, any "inquiry into a

---

[68] Nonetheless, habeas counsel will attempt below in Section D to highlight specific instances where the financial restrictions placed upon trial counsel affected their ability to effectively defend Batiste's life. Such instances show a failure to investigate and prepare for trial where trial counsel had a duty to investigate and adequately prepare.

: 00219

claim of harmless error here would require, unlike most cases, unguided speculation." *Holloway v. Arkansas*, 435 U.S. 475, 491 (1978).

### D. Trial Counsel was Ineffective for Requesting and Accepting a Flat Fee as Compensation for their Work which Caused Trial Counsel to Commit Errors thereby Harming Batiste

Should the court disagree that the improper use of a flat fee payment was not a structural error and that a harmless error analysis applies, trial counsel's failure to investigate and prepare for trial as a result of the flat fee payment harmed Batiste. Batiste was harmed by trial counsel's failure to investigate and prepare witnesses for trial when they had a duty to do so.[69]

Because trial counsel was paid a flat fee rather than a reasonable hourly rate for their work, trial counsel conducted an incomplete investigation and did not adequate prepare witnesses to testify. Trial counsel failed to investigate evidence that Batiste suffered from neurological damage and thereby failed to hire an expert to testify to such, failed to defend against the prosecution's presentation of evidence of Batiste's gang membership, failed to properly prepare future danger expert Dr. Beth Pelz to testify, failed to properly prepare Batiste himself to testify,

---

[69] It is worth noting that Batiste's case was the third capital trial Gerald Bourque handled in less than a year. Following a jury trial, Garland Harper was convicted of capital murder on October 7, 2010, and sentenced to death on October 18, 2010. (*See* Brian Rogers, *Houston Man Gets Death Sentence in 2008 Triple Killing*, HOUSTON CHRON, October 18, 2010, available at http://www.chron.com/news/houston-texas/article/Houston-man-gets-death-sentence-in-2008-triple-1716682.php (last visited April 28, 2013). Travis Mullis was convicted of capital murder on March 11, 2011, and sentenced to death on March 21, 2011, also following a jury trial. (*See* Harvey Rice, *Galveston Jury Sentences Baby-Killer Dad to Death*, HOUSTON CHRON., March 21, 2011, *available at* http://www.chron.com/news/houston-texas/article/Galveston-jury-sentences-baby-killer-dad-to-death-1687410.php (last visited April 28, 2013.) Pre-trial motions in Batiste's case commenced on April 7, 2011—less than two weeks after the Mullis death verdict. (*See* 1 RR at 3-7.)

failed to conduct a comprehensive mitigation investigation, and failed to adequately prepare to defend against the prosecution's use of letters Batiste sent from jail. (*See* Claims One, Two, Three, Four, Five, Six, Seven, and Eight, *ante*.)

The failure of trial counsel to request payment at a reasonable hourly rate created an environment where trial counsel either could not effectively and properly investigate and prepare witnesses for trial due to time and financial restraints, and/or could not be held accountable for their lack of investigation and preparation. Such failure harmed Batiste and denied him a fair trial and the right to effective assistance of counsel. Taken separately and cumulatively, trial counsel's failures to investigate and prepare for trial as a result of the flat fee arrangement harmed Batiste. These failures denied Batiste a fair trial and the effective assistance of counsel, thus violating Batiste's applicable state and federal Constitutional rights, as well as state statutory law and state case law. Therefore, Batiste's conviction and death sentence should be vacated.

## CLAIM THIRTEEN

### TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO SUFFICIENTLY PRESERVE ERROR BY MAKING A PROPER, TIMELY FIRST AMENDMENT OBJECTION TO THE INTRODUCTION OF RELIGIOUS SCAPULAR EVIDENCE

On June 25, 2012, Batiste filed his opening appellate brief, *Teddrick Batiste v. The State of Texas*, cause number AP-76,600 in the Texas Court of Criminal Appeals ("CCA"). In this brief, Batiste filed eight points of error regarding the improper introduction of testimony about religious symbols and Batiste's individual practice of religion during the course of his capital trial. Of those points of error, two asserted that Batiste's constitutional right to the free exercise of religion was violated by the admission at trial of a Santa Muerte necklace worn by Batiste at the time of his arrest.

203

: 00221

In order to preserve error at trial on the admission of improper evidence, counsel must make a timely, proper objection and obtain a ruling. *Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003). Texas Rule of Appellate Procedure 33.1(a) states that in order to preserve an error on appeal, the record must show that counsel complained "to the trial court by a timely request, objection, or motion that stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." Tex. R. App. Proc. 33.1(a).

Trial counsel did object to the introduction of the religious scapular during trial, but they did so on grounds of "relevance, lack of foundation on the part of the witness . . . and a 403 objection." (18 RR at 174.) Trial counsel failed to object to this piece of evidence on First Amendment grounds, as it relates to the free exercise of religion.[70]   By failing to object on First Amendment grounds, trial counsel waived the objection and failed to preserve the error for appeal.[71]   Due to trial counsel's ineffectiveness, Batiste's sentence of death violates his First Amendment rights under the United States Constitution, comparable provisions of the Texas Constitution and statute, and United States Supreme Court and state case law, and the sentence should be reversed.

---

[70] The religious scapular evidence was argued on First Amendment grounds on direct appeal. Here, Batiste asserts that trial counsel was ineffective for failing to properly object to the admission of the religious scapular on First Amendment grounds.

[71] While Batiste's direct appeal is still pending, this claim is being raised now for purposes of preservation should the Court ultimately decide against granting relief based on this point of error.

: 00222

## A. Relevant Facts

During the guilt-innocence proceedings of Batiste's trial, Deputy William Campbell testified about items of clothing he removed from Batiste at the time of his arrest. (14 RR at 184.) Campbell identified State's Trial Exhibit 141 as "[a] blue necklace that was around [Batiste's] neck" and removed along with other articles of clothing. (*Id.*) The blue necklace was a religious scapular with the image of Santa Muerte, a saint worshiped by many individuals for a variety of religious reasons. Although the exhibit was identified by Deputy Campbell, it was not admitted into evidence during his testimony.

The State moved to introduce the religious scapular into evidence as State's Trial Exhibit 141 during testimony by Officer Clint Ponder in the punishment phase of trial. (18 RR at 172.) When Exhibit 141 was offered, the parties approached the bench and the following exchange occurred:

MR. CORNELIUS: May we approach the bench?
THE COURT: You may.
(At the Bench, on the record)
MR. CORNELIUS: I have an objection as to relevance. I don't know what the relevance is.
THE COURT: What is the relevance?
MS. BENNETT: The defendant was wearing it at the time of his arrest. It's blue. I'll be glad to go ahead and have the officer identify what it is before we reintroduce it.
THE COURT: You would?
MS. BENNETT: Absolutely, if that's what the Court wants me to do.
MR. CORNELIUS: Well, I will still object to it. What is it?
MS. BENNETT: It's a Santa Muerte – I don't try to speak Spanish. I'll butcher it.
THE COURT: I was raised by a Mexican family, so do I.
MS. BENNETT: It's commonly worn by individuals—
THE COURT: It's a scapular.
MS. BENNETT: Yes, sir, it's very similar to a scapular, but it's actually – instead of a Catholic saint, that is what would be known in English as Saint Death.

: 00223

MR. CORNELIUS: Who knows this?

MS. BENNETT: He does.

MR. CORNELIUS: She says he knows this.

MS. BENNETT: They're commonly worn, especially in Hispanic gangs more often in the drug cartels. Before they go and commit crimes, they wear them as a form of protection from the police.

THE COURT: He was wearing this?

MS. BENNETT: Yes. Deputy Campbell testified that that was one of the clothing items removed from his body at the time.

MR. CORNELIUS: And –

MS. BENNETT: Well, he's married to a Hispanic person.

THE COURT: He was wearing the Saint Death?

MS. BENNETT: At the time – when he committed the offense, yes, sir.

MR. CORNELIUS: Our objection is going to be relevance, lack of foundation on the part of the witness. Not that they didn't try to get it in. And a 403 objection.

THE COURT: Admitted over objection.

(18 RR at 172-74.)

## B. Admission of the Religious Scapular Violated Batiste's Right to Free Exercise of Religion Under the First Amendment and Trial Counsel was Ineffective for Failing to Object on First Amendment Grounds

Evidence of beliefs and associations that are protected by the First Amendment may be admissible "if it is shown to be relevant to the issues involved in the case." *Davis v. State*, 329 S.W.3d 798, 805 (Tex. Crim. App. 2010), reh'g denied (Jan. 12, 2011), *cert. denied*, 132 S. Ct. 128 (U.S. 2011).

In *Davis*, evidence, including writings and drawings depicting violent imagery, was introduced during a punishment re-trial to show that Davis was a Satanist. *Id.* at 803-04. The State presented an expert to explain Satanism's occasional acceptance of human sacrifice. *Id.* at 804. Because of the violent activities Satanists participated in, the court held that evidence showing the defendant' status of a Satanist was admissible. *Id.* at 805-06.

206

In determining whether this type of religious evidence was admissible, the Court considered the First Amendment's "freedoms of religion and association." *Id.* at 805. The two freedoms are not addressed separately. The analysis for freedom of religion is the same as freedom of association under most constitutional analyses. *Id.* "In order to prove the relevance of a defendant's membership in an organization or group, the State must show (1) proof of the group's violent and illegal activities, and (2) the defendant's membership in the organization." *Mason v. State*, 905 S.W.2d 570, 577 (Tex. Crim. App. 1995).

Here, it was only established that the Santa Muerte scapular is a religious item and that Batiste was wearing that item at the time of his arrest. (18 RR at 172-76.) Allowing the free exercise of a person's religion to expose them to criminal accusations eviscerates the First Amendment. In Batiste's case, it is the most extreme situation—the government sought the death penalty and used the possession of a religious item to obtain the ultimate punishment.

There was no evidence that Batiste was a member of a religion that participated in violent or illegal practices. Rather, the Santa Muerte scapular is commonly associated with Catholicism, a mainstream religion that is practiced around the world that is not considered violent or illegal.

### 1. The Scapular is Religious

The State introduced the religious scapular into evidence under the pretext that the scapular was evidence of Batiste's status as a Crip and was not a religious artifact. However, during the initial bench conference on the admission of the religious scapular, the Judge interrupted the State to identify the item in question: "It's a scapular." (18 RR at 173.) The State further agreed with the Judge and then discussed the non-criminal, religious significance of the scapular:

> Q. Now, to be fair, do non-gang members, non-criminals, also have items that might have Santa Muerte on them?

: 00225

A. Yes, ma'am.

Q. Not everybody wearing a Santa Muerte is a criminal?

A. Correct.

(18 RR at 176.)

The State attempted to connect the Santa Muerte scapular to Batiste's association with the Crips through the testimony of Officer Ponder, the State's gang expert. Officer Ponder obtained his knowledge and qualifications "[f]rom the streets talking to gang members themselves. . . . As a general rule, gang members . . . have a lot of knowledge. They know a lot and they want to put that out there." (18 RR at 161.) Officer Ponder testified that Santa Muerte's link to the criminal world was primarily through drug trafficking. "If you're making a big drug run across the state, a big package of marijuana from one state to the next, you wear this in hopes that you get to your destination without the cops stopping you." (*Id.* at 175.) Further, during the bench conference, the State argued that Santa Muerte scapulars are "commonly worn, especially in Hispanic gangs more often in the drug cartels." (*Id.* at 174.)

The problem with Ponder's testimony is that it was completely irrelevant to Batiste's case. There was no evidence that Batiste was in a Hispanic gang, a drug cartel, or that he was making a drug run in this case. The fact that someone in a drug cartel might wear a Santa Muerte scapular during a drug run is not indicative of a gang connection to a completely unrelated activity.

Further, the fact that Batiste's Santa Muerte scapular was blue could have any number of innocuous explanations that have nothing to do with an association with the Crips.[72] Therefore, the evidence presented by the State linking the Santa Muerte scapular to criminal gang activity was completely irrelevant in this case.

---

[72] Santa Muerte is worshiped by millions of people around the world. Santa Muerte became popular among the very poor, uneducated, and marginalized

208

Trial counsel should have objected to the introduction of the Santa Muerte scapular on First Amendment grounds to preserve this error for appeal. The State claimed that the religious scapular was indicative of Batiste's status as a Crip, but testimony supporting the admission of the religious scapular does not support this contention and should have been excluded on First Amendment grounds. Trial counsel's failure to object on this basis was in error and highly prejudicial.

## C. Trial Counsel was Ineffective for Failing to Cross Officer Ponder

As discussed above, trial counsel should have objected on First Amendment grounds to the admission of the religious scapular evidence during Batiste's trial. However, in the alternative, if it is determined that the trial court properly admitted the evidence, trial counsel should have questioned Officer Ponder further about Santa Muerte and additional non-criminal reasons for wearing the scapular. Since testimony about Santa Muerte scapulars was limited to drug cartels and did not discuss connections between criminal activity in general and religious scapulars, the Santa Muerte scapular evidence in Batiste's case could not establish that he

---

sectors of society and was adopted by people who feel overlooked by official religious, political, and social systems. Santa Muerte has been gaining popularity and the growing devotional base is a heterogeneous group with various afflictions and aspirations. There are various prayers and colors associated with the wide range of problems devotees seek her intervention for. These include: love, romance and passion (red); protection from others seeking vengeance and harm (black); purity, protection, and gratitude (white); wisdom and education (blue); enlightenment, discernment, and wisdom (brown); money, prosperity, and abundance (gold); supernatural healing (purple); justice and equality before the law (green); and overcoming addiction (yellow). *See* Laura Sesana, *Santa Muerte: Unusual Saint Gaining popularity in Mexico and the US*, WASH. TIMES COMMUNITIES, March 6, 2013, *available at* http://communities.washingtontimes.com/neighborhood/world-our-backyard/2013/mar/6/santa-muerte-unusual-saint-gaining-popularity-mexi/ (last visited April 13, 2013). R. Andrew Chesnut & Sarah Borealis, *Santa Muerte*, WORLD RELIGIONS & SPIRITUALITY PROJECT, February 20, 2012, *available at* http://www.has.vcu.edu/wrs/profiles/SantaMuerte.htm (last visited April 13, 2013).

: 00227

was a Crip. Trial counsel had the duty to challenge the prosecution's assertion that the religious scapular was anything other than a sign of Batiste's religious devotion.

However, instead of addressing Officer Ponder's irrelevant testimony about drug cartels, trial counsel simply announced "[n]o questions at this time, Judge" at the State's conclusion of their direct examination. (18 RR at 200.) Trial counsel never recalled Officer Ponder as a witness at any later point in the trial. Trial counsel's failure to question Officer Ponder further about the scapular left the jury with the faulty and prejudicial impression that Batiste was wearing the religious scapular because he was a Crip and potentially connected with dangerous and deadly drug cartels.

Furthermore, around the time of Batiste's trial, the local news was filled with alarming stories about drug cartels, including several reports that identified the cartels as terrorist organizations and connected them to brutal killings.[73] It is common knowledge that there has been an influx of dangerous drug cartel activity across the border in Mexico and also here in the United States. The failure of trial counsel to make a distinction between the activity of drug cartels and Batiste

---

[73] *See, e.g.*, Richard Dunham, *Todd Staples Says Drug Cartels Have Invaded U.S.: "The Sovereignty of the United States is Under Siege on Texas Soil"*, HOUST. CHRONICLE, May 17, 2011, *available at* http://blog.chron.com/txpotomac/2011/05/todd-staples-says-drug-cartels-have-invaded-u-s-the-sovereignty-of-the-united-states-is-under-siege-on-texas-soil/; Stuart Powell, *Democrats Resist Rep. Michael McCaul's Proposal to Designate Drug Cartels "Terrorist Organizations"*, HOUST. CHRONICLE, March 31, 2011, *available at* http://blog.chron.com/txpotomac/2011/03/democrats-resist-rep-michael-mccauls-proposal-to-designate-drug-cartels-terrorist-organizations/; Dane Schiller, *Mexican Crook: Gangsters Arrange Fights to Death for Entertainment*, HOUST. CHRONICLE, June 11, 2011, *available at* http://www.chron.com/news/nation-world/article/Mexican-crook-Gangsters-arrange-fights-to-death-1692716.php.

210

: 00228

allowed the jury to incorrectly associate Batiste's activities with drug cartels. Trial counsel's failure to correct this dangerous connection in the minds of the jurors through cross-examination of Officer Ponder was prejudicial.

### D. Appellate Counsel was Ineffective for Failing to Raise Ineffective Assistance of Trial Counsel on Direct Appeal

Batiste's rights were further prejudiced by the failure of his direct appeal counsel to raise the issue of ineffective assistance of trial counsel in not objecting properly to the religious scapular. As shown above, this error is clear on the face of the record. Appellate counsel has a duty to review the record and present any potentially meritorious claims. *Meza*, 206 S.W.3d at 689 (noting appellate counsel's "constitutional duty to review the record for any arguable error"). By failing to raise this issue as part of Batiste's direct appeal, appellate counsel's performance fell below the reasonable standards of professional conduct. *Evitts*, 469 U.S. at 394 n.6 ("In a situation like that here, counsel's failure was particularly egregious in that it essentially waived respondent's opportunity to make a case on the merits; in this sense, it is difficult to distinguish respondent's situation from that of someone who had no counsel at all."). For all the reasons expressed above, this failure prejudiced Batiste's constitutional and statutory rights under federal and state law. Thus, his conviction and sentence of death should be vacated and Batiste afforded a new trial.

### E. Conclusion

Trial counsel's failure to properly object to the religious scapular evidence on First Amendment grounds was ineffective because the error was not preserved for appeal. Furthermore, appellate counsel was ineffective for failing to raise ineffective assistance of trial counsel on direct appeal for this issue. Trial counsel was also ineffective for failing to clarify Officer Ponder's testimony for the jury, leaving the damaging impression that Batiste wore the religious scapular because

he was a Crip and that he was as dangerous as drug cartels. Even if one error does not rise to the level of ineffective assistance of counsel, in the aggregate, the errors combined prejudiced Batiste's sentence of death. Therefore, Batiste's sentence of death should be vacated.

## CLAIM FOURTEEN

## BATISTE'S DEATH SENTENCE IS UNCONSTITUTIONAL BECAUSE IT WAS ASSIGNED BASED ON TEXAS' ARBITRARY SYSTEM OF ADMINISTERING THE DEATH PENALTY

Because of the prosecutorial discretion established under Texas' system of administering criminal justice, a vast minority of Texas counties are responsible for a sizable majority of death sentences assessed over the last thirty-six years. Both geographic and racial disparities have created a system of capital punishment in Texas that punishes, not based on the heinousness of a defendant's crime, but on the irrelevant factors of where he lives and what races were involved in the crime. Batiste's capital sentence was handed down in the midst of this arbitrary system. As such, he has been denied his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Batiste's sentence of death violates his applicable state and federal Constitutional rights, as well as state statutory law, and United States Supreme Court and state case law and should be vacated.

### A. Supreme Court Precedent Mandates That the Death Penalty Not Be Applied Arbitrarily

The United States Supreme Court has long held that proceedings surrounding the imposition of a death sentence must meet a "heightened standard of reliability" because of the severe and irreversible nature of the death penalty. *Ford v. Wainwright*, 477 U.S. 399, 411 (1986) ("This especial concern is a natural consequence of the knowledge that execution is the most irremediable and

212

unfathomable of penalties; that death is different."). The Court briefly suspended the death penalty in *Furman v. Georgia* during the 1970s based on this heightened standard. *Furman v. Georgia*, 408 U.S. 238 (1972) (per curiam). The Court rested its decision on the basis that the lack of guidance and narrowing in a jury's decision of who was to receive the death penalty created an arbitrariness too cruel and unusual to withstand constitutional scrutiny. *Id.* at 309 (Stewart, J., concurring) ("These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual").

Following *Furman*, the Court has been careful to weigh a death penalty sentencing scheme to determine whether there are suitable safeguards to prevent the arbitrary assignment of death. *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (noting "the need for reliability in the determination that death is the appropriate punishment in a specific case."). In finding mandatory death sentencing unconstitutional, the Court noted that juries will often refuse to convict defendants because they are deterred from automatically sentencing someone to death. *Id.* at 302. "Instead of rationalizing the sentencing process, a mandatory scheme may well exacerbate the problem identified in *Furman* by resting the penalty determination on the particular jury's willingness to act lawlessly." *Id.* at 303. Instead, a death penalty scheme must have "objective standards to guide, regularize, and make rationally reviewable the process for imposing a sentence of death." *Id.*

In 1976, the Court believed States had developed an answer to *Furman* test that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia*, 428 U.S. 153, 189 (1976). The Court held that procedural reforms—such as a bifurcated trial, narrowing of death

213

eligible crimes, and proportional appellate review—"focus the jury's attention on the particularized nature of the crime and the particularized characteristics of the individual defendant" preventing it from "wantonly and freakishly impos[ing] the death sentence." *Id.* at 206-07.

Even those procedures, however, continue to be reviewed for their effectiveness in preventing the arbitrary assessment of death. *Godfrey v. Georgia*, 446 U.S. 420, 432-33 (1980) (reviewing the application of Georgia's aggravating factor that a crime by "outrageously or wantonly vile, horrible or inhuman"). When it can be said that "[t]here is no principled way to distinguish [a] case, in which the death penalty was imposed, from the many cases in which it was not," a state's death penalty scheme can no longer be said to be imposing a death sentence "based on reason rather than caprice or emotion." *Id.* at 433 (internal quotation omitted).

## B. Texas' Death Penalty Scheme Is Unconstitutional

The Supreme Court upheld Texas' death penalty statute in *Jurek v. Texas* in 1976. 428 U.S. 262, 273-74 (1976) ("[T]he Texas capital-sentencing procedure guides and focuses the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a sentence of death."). The Court found that Texas' narrowing of death eligible crimes and bifurcation of the guilt/innocence and penalty trials would likely ensure "the evenhanded, rational, and consistent imposition of death sentences under law." *Id.* at 276. However, even this judgment has been the subject of repeated review to ensure that the practical effect of Texas's system is not the creation of an arbitrary assignment of death. *See, e.g., Penry v. Johnson*, 532 U.S. 782 (2001) (invalidating Texas' supplemental instruction on mitigation for failing to sufficiently provide a jury the mechanism to consider mitigation

214

evidence); *Penry v. Lynaugh*, 492 U.S. 302 (1989) (invalidating Texas' statute for failing to instruct juries they may consider mitigating evidence).

Were a court to review the state of the death penalty in Texas today, it would find much the same "lightning strike" phenomenon that was found unconstitutional in *Furman*. 408 U.S. at 309 (Stewart, J., concurring). In 2010, Texas had 1,248 murders. Tex. Dep't of Pub. Safety, *Index Crime Analysis 2010*, *available at* http://www.txdps.state.tx.us/crimereports/10/citCh3.pdf (last visited April 26, 2013). Yet, only nine death sentences were assessed by Texas juries in 2010. Tex. Dep't Crim. Justice, *Offenders on Death Row*, *available at* http://www.tdcj.state.tx.us/stat/dr_offenders_on_dr.html (last visited April 26, 2013). Further, the number of death sentences assessed throughout the state has declined significantly over the three decades. (*Id.*) Despite being the "capital of capital sentencing," the numbers show that even in Texas a death sentence is becoming increasingly rare as a utilized punishment.

Although Texas juries continue to be guided by the special issues under Texas law in making a judgment in an individual capital case, there are other factors at work that mean that Texas' system no longer functions as an "evenhanded, rational, and consistent imposition of death." *Jurek*, 428 U.S. at 276.

**1. Geography**

As of September 2012, there have been 782 offenders that either have been executed or are currently housed on death row in Texas. Tex. Dep't Crim. Justice, *Death Row Information*, *available at* http://www.tdcj.state.tx.us/death_row/index.html (last visited September 20, 2012). Yet only 102 out of the 254 counties in Texas have contributed an offender to that

215

list.[74]  *Id.*  Seven counties (including the instant county) (Bexar, Dallas, Harris, Montgomery, Nueces, Smith, and Tarrant) accounted for nearly sixty percent of these offenders.  *Id.*

Texas is not alone ·in this phenomenon.  Multiple studies conducted throughout the country have identified geographic discrepancies with the imposition of the death penalty within a particular state.[75]  *See, e.g.*, Jules Epstein, *Death-Worthiness and Prosecutorial Discretion in Capital Case Charging*, 19 TEMPLE POL. & CIVIL RIGHTS L. REV. 389 (2010) (discussing studies in Arizona, Pennsylvania, Missouri, and South Carolina); Adam Gershowitz, *Statewide Capital Punishment: The Case For Eliminating Counties' Role in the Death Penalty* (March 2009), *available at* http://works.bepress.com/adam_gershowitz/5/ (last visited April 26, 2013).  In one study, the authors found that over a four year period in Missouri, seventy-six percent of cases charged as either murder one, murder two, or involuntary manslaughter met the statutory definition to be eligible for the death penalty.  Katherine Barnes, et al., *Place Matters (Most): An Empirical Study of Prosecutorial Decision-Making in Death-Eligible Cases*, 51 ARIZ. L. REV. 305, 309-311 (2009).  However, only five percent of those ever faced a death

---

[74] Only 120 counties of the 254 have ever sentenced an inmate to death, including people who are no longer on death row, making up the over 1000 inmates that have received a death sentence in Texas since 1976. Tex. Dep't Crim. Justice, *Number of Offenders Sentenced to Death From Each County*, *available at* http://www.tdcj.state.tx.us/death_row/dr_number_sentenced_death_county.html (last visited April 26, 2013).

[75] This, of course, says nothing of the geographic discrepancy identified *between* the various states that assess the death penalty.  *See* Jeffrey Kirchmeier, *Aggravating and Mitigating Factors: The Paradox of Today's Arbitrary and Mandatory Capital Punishment Scheme*, 6 WM. & MARY BILL OF RIGHTS J. 345, 386-87 (1998) ("Because each jurisdiction creates its own death penalty statute, each statute is unique. The result is that-not only does punishment differ between death penalty jurisdictions and jurisdictions without the death penalty-significant discrepancies exist among the death penalty jurisdictions.").

: 00234

penalty trial.  *Id.* at 309.  As a result, prosecutors throughout the state made the decision not to seek death in seventy-one percent of death eligible cases.  *Id.*  This discretion was not spread evenly, though, as prosecutors in St. Louis City and Jackson County charged capital cases far less frequently (6.5 percent of cases) than prosecutors in the rest of the state (20 percent).  *Id.* at 344.

A commission created to study the death penalty in New Jersey similarly noted concern about "the existence of variability among counties in the application of the death penalty."  New Jersey Death Penalty Commission Report at 43 (Jan. 2007) available at http://www.njleg.state.nj.us/committees/dpsc_final.pdf (last visited April 26, 2013).  The commission considered a hypothetical where:

> The exact same case of a killing occurs in neighboring counties.  All of the circumstances are the same.  In one county the defendant is capitally prosecuted, is subject to a penalty trial, and is subject to the ultimate outcome of death.  In the other county the defendant is not so treated; either through a plea bargaining or other processes he receives a penalty that is much less harsh.

*Id.* at 43.  Although the facts of the hypothetical could be attributed to multiple factors, the commission was "troubled by the degree to which the geographic location where the crime was committed appears to affect the ultimate disposition of the case."  *Id.*

In *Jurek* and in *Gregg*, the Supreme Court considered the issue of whether prosecutorial discretion in choosing which cases to seek the death penalty created an impermissible arbitrariness in capital sentencing.  *Gregg*, 428 U.S. at 199; *Jurek*, 428 U.S. at 274 ("[W]e reject it for the reasons set out in our opinion today in *Gregg*.").  The Court determined that this decision-making worked to remove defendants from the risk of death and did not violate the constitution, as long as the "decision to impose [a death sentence was] guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime

: 00235

and the defendant." *Gregg*, 428 U.S. at 199.  Justice White, in his concurrence, noted that the decision of prosecutors would likely mirror that of juries in deciding which cases to seek death based on the seriousness of the offense.

> Absent facts to the contrary it cannot be assumed that prosecutors will be motivated in their charging decision by factors other than the strength of their case and the likelihood that a jury would impose the death penalty if it convicts.  Unless prosecutors are incompetent in their judgments the standards by which they decide whether to charge a capital felony will be the same as those by which the jury will decide the questions of guilt and sentence.

*Id.* at 225 (White, J., concurring).

Experience of the last thirty-six years has shown that the practical effect of the use of prosecutorial discretion has not been to narrow the field of death eligible defendants to the most serious and heinous cases.  It stretches credulity to imagine that the seven counties in Texas that are responsible for sixty percent of the inmates executed or currently on death row correspondingly have significantly more heinous crimes occurring than other counties.  Rather, other factors like ideological beliefs regarding the death penalty, the depth of experience in prosecuting capital cases, and the available resources (both time and money) to prosecute a capital case impact a prosecutor's decision whether the seek the death penalty.  *See* Gershowitz, *Statewide Capital Punishment*, at 11-15 (noting various times prosecutor offices have declined to pursue the death penalty because of available resources).

The influence of such factors on the capital system in Texas renders it no longer the "evenhanded, rational, and consistent" system of imposing the death penalty the Supreme Court expected it to be in 1976.  *Jurek*, 428 U.S. at 276.  The Court on a prior occasion reversed course in its belief that the Texas system would work properly in practice.  *Compare Penry v. Lynaugh*, 492 U.S. at 318 ("the facial validity of the Texas death penalty statute had been upheld in *Jurek* on the basis of

218

assurances that the special issues would be interpreted broadly enough to enable sentencing juries to consider all of the relevant mitigating evidence a defendant might present."), *with Jurek*, 428 U.S. at 272 (noting the Texas CCA indicated it would "interpret this second question so as to allow a defendant to bring to the jury's attention whatever mitigating circumstances he may be able to show"). The geographic disparities in the imposition of the death penalty in Texas offer equally compelling grounds to abandon the expectation that prosecutorial discretion can offer a consistent application of the law. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803) ("The government of the United States has been emphatically termed a government of laws, and not of men.").

### 2. Race

In addition to geography, studies continue to show that race is a motivating factor behind jury verdicts in capital cases. David C. Baldus, et al., *Race and Proportionality Since* McCleskey v. Kemp *(1987): Different Actors with Mixed Strategies of Denial and Avoidance*, 39 COLUM. HUM. RTS. L. REV. 143 (2007); Scott Phillips, *Racial Disparities in the Capital of Capital Punishment*, 45 HOUS. L. REV. 807 (2008) (finding that prosecutors were more likely to pursue capital cases for white victims than black victims); Isaac Unah, *Choosing Those Who Will Die: The Effect of Race, Gender, and Law in  Prosecutorial Decision to Seek the Death Penalty in Durham County, North Carolina*, 15 MICHIGAN J. OF RACE & LAW 135 (2009) (same).

One study considered the Harris County District Attorney's decisions regarding the charging of capital cases. Phillips, 45 HOUS. L. REV. at 816. The study found that disparities existed between the treatment of black and white defendants and victims. *Id.* at 830. Although black and white defendants were charged with capital murder at relatively similar rates, black defendants were more likely to have committed a less serious offense than their white counterparts. *Id.*

: 00237

In contrast, black victims were significantly less likely to prompt a capital charge than white victims. *Id.* at 834.

In another study, a random sample of 276 adults were given a file summary for a triple murder case. Epstein, 19 TEMPLE POL. & CIVIL RIGHTS L. REV. at 407-08. The variables in the experiment were 1) some of the group was given a maximum sentence to allot of life without parole, while others could give a death sentence and 2) the suspect's name for some was a race-neutral name and for others was a name traditionally associated with minorities. *Id.* The results of the study showed that the verdicts of guilt varied little when only life without parole was possible, but when the maximum sentence was death the defendants with traditional minority names were significantly more likely to be found guilty. *Id.*

The existence of racial disparities in capital sentencing can also cut in the opposite direction, depending on the geographic region of the study. *See* Barnes, 51 ARIZ. L. REV. at 348. A study of Missouri's death penalty revealed that black defendants were about a third as likely to face a capital charge as white defendants. *Id.* White defendants were also more likely to have those capital charges go to trial, while black defendants were more likely to have a jury reject the capital charge. *Id.*

Regardless of the direction of the disparity, these studies show that race continues to be a motivating factor behind the imposition of the death penalty—even if that factor is unconsciously applied. When the law is utilized in such a way that it becomes more directed at a "particular class of persons," especially in the context of racial discrimination, the implementation of that law violates an individual's right to equal protection under the law. *See Yick Wo v. Hopkins*, 118 U.S. 356, 373 (1886).

: 00238

## C. Conclusion

For the foregoing reasons, Texas' death penalty scheme is unconstitutional. Therefore, Batiste's sentence of death should be vacated.

### CLAIM FIFTEEN

### BATISTE'S RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE VIOLATED WHEN THE TRIAL COURT WAS PROHIBITED FROM INSTRUCTING THE JURY THAT A VOTE BY ONE JUROR WOULD RESULT IN A LIFE SENTENCE

The 10-12 jury instruction in the Texas capital sentencing scheme violates Batiste's applicable state and federal Constitutional rights, as well as state statutory law and state case law. Therefore, Batiste's death sentence should be vacated.

Under Texas law, up to three special issues are submitted to the jury during the sentencing phase of a capital trial: (1) whether there is a probability that the defendant constitutes a continuing threat to society; (2) whether the defendant actually caused, intended, or anticipated the death of the deceased;[76] (3) and whether, considering all the evidence, there are sufficient mitigating circumstances to warrant life without parole rather than death. Tex. Code Crim. Proc. art. 37.071 § 2(b)(1)-(2), (e)(1).

The court shall sentence a defendant to death if the jury answers "Yes" to the first two special issues and "No" to the third special issue. If the jury returns a "No" answer to either of the first two special issues, a "Yes" to the third special issue, or if the jury is unable to answer all of the questions submitted to them under

---

[76] This second special issue is used in cases in which the jury charge at the guilt stage permitted the jury to find the defendant guilty under the law of parties. Tex. Code Crim. Proc. art. 37.071 § 2(b)(2). In Batiste's case the jury was given all three special issues. (25 RR at 17; 7 CR at 1704-11.)

these guidelines, the court shall sentence the defendant to life without parole. Tex. Code Crim. Proc. art. 37.071 § 2(g).

However, the jury is statutorily misinformed about the full impact of the way it answers these special issues. The jury is instructed that it cannot answer "Yes" to either of the first two special issues without unanimous agreement and that it cannot answer "No" to those questions unless at least ten jurors agree. Tex. Code Crim. Proc. art. 37.071 § 2(d)(2). Similarly, the jury is to be instructed that it may not answer "No" to the third special issue without unanimous agreement and that it may only answer "Yes" if at least ten or more jurors agree. *Id.* at § 2(f)(2). The jury is informed by the judge that if the jury unanimously finds a mitigating circumstance under the third special issue, the defendant will be sentenced to life without parole. *Id.* at § (e)(2). Yet, the jury is not instructed about, and indeed is prohibited from being informed of, the effect of a failure to agree on any of the questions submitted to them, which also renders a life without parole sentence. *Id.* at § 2(a)(1).

Trial counsel filed a pre-trial motion to declare the Texas capital sentencing scheme unconstitutional, including a challenge to the constitutionality of the 10-12 instruction, on January 12, 2010. (7 CR at 1644.) The court denied defense counsel's motion on June 8, 2011. (7 CR at 1663; 12 RR at 15.) Trial counsel filed a second pre-trial motion asking that the jury be instructed on the consequences of the failure to agree on the special issues on June 23, 2011. (7 CR at 1738.) The court denied this motion on the same day. (7 CR at 1741; 25 RR at 4.) Despite the pre-trial defense motion that this statutory "10-12 rule" would mislead the jury, the court instructed the jury in accordance with the requirements of the statute. (25 RR at 17; 7 CR 1707-09.) Following deliberations, the jury returned unanimous answers of "Yes" to the continuing threat question, "Yes" to

: 00248

the question of whether Batiste actually caused or intended to cause the death of Holiday, and "No" to the mitigating circumstances question. (25 RR at 81.)

Because this statutory scheme misinforms the jury and brings outside considerations that impermissibly bear on the jury's verdict, the Texas statute violates the principles of the Eighth and Fourteenth Amendments, depriving Batiste of a fair sentencing trial.

## A. The Supreme Court Has Invalidated Jury Instructions That Place An Added Burden on the Sentencer Before Finding Mitigating Circumstances.

In *Mills v. Maryland*, 486 U.S. 367 (1988), the Supreme Court considered a capital sentencing scheme that required jurors to unanimously agree on mitigating factors. In the state of Maryland, the capital sentencing jury proceeded through three sections of a verdict form. In Section I, the jury was asked to evaluate whether any of ten aggravating factors was present. *Id.* at 385-86. If the jury unanimously found at least one aggravating factor, it was instructed to move on to Section II, where it was instructed to mark "Yes" next to any mitigating factors it unanimously found. *Id.* at 386-88. The jury was only instructed to move on to Section III if one of more of the mitigating factors in Section II had been marked "Yes."[77] *Id.* at 388. If all the mitigating factors in Section II were marked "No," the defendant was sentenced to death. *Id.* at 389.

In assessing the constitutionality of this sentencing scheme, the *Mills* Court noted that "in a capital case 'the sentencer [may] not be precluded from considering, *as a mitigating factor*, any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence of less than death.'" 486 U.S. at 374 (alteration and emphasis

---

[77] In Section III, jurors were asked to balance the mitigating circumstances marked "Yes" in Section II against the aggravating circumstances marked "Yes" in Section I. *Mills*, 486 U.S. at 388-89.

: 00241

in original) (quoting *Eddings*, 455 U.S. at 110 (quoting *Lockett*, 438 U.S. at 604 (1978) (plurality opinion))). The *Mills* Court held that the Maryland capital sentencing scheme was unconstitutional because a reasonable jury could have interpreted the jury instructions and the accompanying verdict form as requiring that the jury should mark "No" next to a mitigating factor unless the jurors were unanimous, even if all but one of the jurors thought that factor was present. *Id.* at 378-79, 384. Given this potential interpretation by a reasonable juror, there was an unacceptable risk that the jury could be prevented from reaching the balancing stage even if all twelve jurors believed that some mitigating circumstance was present but could not agree on a particular mitigating factor. *Id.* at 384 ("[T]he sentencer must be permitted to consider all mitigating evidence. The possibility that a single juror could block such consideration, and consequently require the jury to impose the death penalty, is one we dare not risk.").

Similarly, in *McKoy v. North Carolina* the Supreme Court examined a North Carolina capital sentencing scheme that burdened the ability of a majority of a jury to reach a life sentence. 494 U.S. 433 (1990). In that case, the requirement that the jury find the presence of an individual mitigating factor unanimously was explicit in the statute. *Id.* at 435. Because the unanimity "requirement prevent[ed] the jury from considering, in deciding whether to impose the death penalty, any mitigating factor that the jury does not unanimously find," the North Carolina statute violated the Eighth and Fourteenth Amendments "by preventing the sentencer from considering all mitigating evidence." *Id.*

## B. Texas' 10-12 Sentencing Scheme Impairs the Ability of a Majority of Jurors to Reach a Life Sentence

*Mills* and *McKoy* establish that a jury should not be instructed in a way that allows a minority of the jury to sway the verdict to a sentence of death. *Mills*, 486 U.S. at 384 ("The possibility that a single juror could block such consideration, and

224

consequently require the jury to impose the death penalty, is one we dare not risk."). Yet the 10-12 rule embodied in the Texas scheme does just this.

Batiste's jury was asked to consider (1) whether he posed a future danger, (2) whether he caused, intended to cause, or anticipated the death of Holiday, and (3) whether any mitigating factors warranted a life sentence. (25 RR at 81.) This situation is best explained with a hypothetical. Suppose that in Batiste's jury, jurors one through five wanted to answer "No" to the future dangerousness question. Under Texas' scheme, they would not have the ten votes needed to answer the first special issue. In addition, they were instructed that they could not answer the question without a unanimous "Yes" vote or ten votes of "No." It is a reasonable probability that these five jurors might be swayed by the seven vote majority to come to an agreed "Yes" vote, fearing that not answering the question might result in a mistrial.

Suppose then, jurors five through eight wanted to answer "No" to the question whether Batiste acted intentionally. Under Texas' scheme, they would not have the ten votes needed to answer the second special issue in the negative. In addition, Batiste's jurors were instructed that they could not answer the question in the affirmative without a unanimous "Yes" vote. It is a reasonable probability that these four jurors might be swayed by the eight vote majority to come to an agreed "Yes" vote, fearing that not answering the question might result in a mistrial.

Lastly, suppose that during deliberations on the second special issue, jurors six through ten wanted to answer "Yes" to finding mitigating evidence. Again, their five votes would be short of the ten needed to get a life sentence and would be subject to pressure from the seven vote majority to agree to a unanimous "No" vote. Without knowledge that under Texas law a single holdout "No" juror on this special issue would result in a life sentence, there is a reasonable possibility that

225

these jurors would change their vote instead of allow what they perceived to be a mistrial.

With the jury thus answering the future dangerousness special issue "Yes," the intentionality issue "Yes," and the mitigation special issue "No" under these circumstances, Batiste would be sentenced to death.  Yet under the hypothetical, ten jurors would have found a valid statutory reason to grant a life sentence.  Only two jurors would have answered the special issues in a way that would lead to a death sentence.  Yet the requirement under the statute to instruct that ten votes for *each* special issue are needed to answer a special issue, and the simultaneous prohibition under the statute from telling the jury the truth that a single vote is enough to assign a life verdict, allows a minority of jurors to rule while impairing the ability of the majority of jurors to effectuate their desire for a life sentence.  This is exactly the risk the Supreme Court expressed in *Mills* and *McKoy* violates the protections of the Eight and Fourteenth Amendments.  Thus, the capital sentencing scheme employed in Texas is unconstitutional.

## C. The 10-12 Rule Constitutes an Impermissible Outside Influence on Jury Deliberations

In addition to violating the Supreme Court precedent of *Mills* and *McKoy* by giving undue effect to a minority voice in the jury, the effect of Texas' 10-12 rule creates an impermissible outside influence on jury deliberations.  By misleading jurors as to the result of their failure to reach a unanimous or ten vote agreement, the statute improperly coerces juries into death sentences on the basis of stimuli divorced from the merits of the case.

It is a classic and common feature of American jurisprudence that when a jury is unable to agree a mistrial may be declared and a new trial held.  *Arizona v. Washington*, 434 U.S. 497, 509 (1978); *Downum v. United States*, 372 U.S. 734, 736 (1963).  Yet this option is so costly and cumbersome, the law presumes that

226

jurors should enter deliberations able to be swayed in their opinion in order to reach a verdict. *Allen v. United States*, 164 U.S. 492, 501 (1896). A reasonable juror should feel the weight of the instructions from the trial court and attempt to avoid reaching an impasse.

This concern over having a mistrial understandably rises to new heights in a capital case. Unlike nearly all other cases, the constitutionally required procedures and safeguards that take place in a capital trial create an atmosphere in which a juror is keenly aware of the expense and care being taken. Jurors are routinely told of the time that is spent and the number of veniremen who are questioned in order to find twelve suitable jurors. They are told to expect (and usually sit through) a long trial with copious amounts of evidence from lay and expert witness. They are led to believe that all manner of experts could be retained at great expense to testify at the trial. They are treated to not one, but two sets of opening argument, closing argument, and jury instructions.

In this setting, a reasonable juror would understandably be loath to be the cause of a mistrial by failing to reach a verdict. The jurors are then instructed that they must reach a unanimous (or ten-person) vote in order to answer the special issues in the punishment phase. Yet, unlike any trials that a juror might be generally familiar with, under Texas law a verdict will be reached if the jury fails to answer the special issues during the punishment phase. The law's desire for unanimity no longer operates.

However, by intentionally failing to instruct the jury that a sentence of life without parole will result, even if the jury fails to reach an agreement on any of the special issues, the statute misleads a juror about the effect of their vote. A reasonable juror could, therefore, labor under the impression that a failure to reach an agreement with the other eleven jurors would result in a costly re-trial. Instead

: 00245

of operating as an intended incentive to reach a verdict, in a capital case the 10-12 rule creates an outside influence on a juror's deliberation and vote.

### D. Conclusion

Because of the reasons stated above, the Texas death penalty scheme violates the Sixth, Eighth, and Fourteenth Amendments of the Constitution. Thus, Batiste's death sentence was impermissibly obtained and should be vacated.

**CLAIM SIXTEEN**

**TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PRESERVE THE RECORD FOR APPEAL**

Batiste's conviction and sentence of death was unlawfully and unconstitutionally imposed in violation of his applicable state and federal Constitutional rights, state statutory law, and United States Supreme Court and state case law, because trial counsel failed to preserve the record for appeal by acquiescing to a multitude of off-the-record conferences.

### A. Given the Importance of Preserving Issues for Appeal and the Clear Mandate of the ABA Guidelines to Do So, Failure to Preserve the Trial Record Constitutes Ineffective Assistance of Counsel

Under Texas Rule of Appellate Procedure 13.1, a court reporter is required to record all bench conferences that occur after the trial proceedings are underway. *See, e.g., Tanguma v. State*, 47 S.W.3d 663, 670 (Tex. App.—Corpus Christi 2001). However, if the defendant fails to make a pretrial motion to record bench conferences, the issue is not preserved on appeal should the court reporter fail to do so. *Valle v. State*, 109 S.W.3d 500, 508-09 (Tex. Crim. App. 2003) (holding that violations of Rule 13 are not preserved for appeal unless defense counsel objects to each individual unrecorded bench conference at trial).

The clarity and integrity of the trial record is vital to preserving the possibility of meaningful appellate review. *See, e.g.,* Michael Catalano, Making

228

and Preserving the Record – Objections, 6 Am. Jur. Trials 605 (1967); *see also Moosavi v. State*, 711 S.W.2d 53, 54 (Tex. Crim. App. 1986) (noting that "error must be properly preserved during trial so that a complete record of the error can be reviewed on appeal"); *Mathews v. State*, 635 S.W.2d 532, 537 (Tex. Crim. App. 1982) (noting that "the record must be complete on the issue urged [on appeal]"). It is the duty of defense counsel to "keep the trial record clear, correct, and complete, so that at the end of the trial there will be an accurate history of the proceedings." Catalano, 6 Am. Jur. Trials at 605. This duty is of paramount importance in a capital murder trial, as the imposition of the death penalty is subject to automatic appeal. Tex. Crim. Pro. art. 37.071 § 2(h).

The ABA Guidelines highlight the importance of preserving the record, stating that counsel must "ensure that a full record is made of all legal proceedings . . . ." ABA Guidelines, Guideline 10.8(B)(2). The commentary provides further guidance, noting that:

> One of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review. Failure to preserve an issue may result in the client being executed even though reversible error occurred at trial. For this reason, trial counsel in a death penalty case must be especially aware not only of strategies for winning at trial, but also of the heightened need to fully preserve all potential issues for later review.

*Id.* (commentary). Based on these guidelines, a failure to preserve the record in a capital trial should be considered deficient performance.

The CCA has never directly addressed the issue of ineffective assistance of counsel for failing to ensure the preservation of a complete and clear record. However, there are a number of indications that failure to do so satisfies the deficient performance prong of *Strickland*. First, in considering these claims, a number of lower appellate courts in Texas have moved directly to the *Strickland*

229

prejudice prong, implicitly finding that failure to ensure a complete record may constitute deficient performance. *See, e.g., Howard v. State*, 239 S.W.3d 359, 367 (Tex. App.—San Antonio 2007) (noting that "competent trial counsel should ensure all rulings [occurring during bench conferences] appear in the record"); *Medina v. State*, 2004 WL 764444, *6 (Tex. App.—Texarkana 2004) (unpublished) ("assuming, *arguendo*, that trial counsel erred" by failing to ensure that the court reporter recorded all bench conferences). The Fifth Circuit has done the same in similar cases. *See, e.g., Green v. Johnson*, 160 F.3d 1029, 1042-43 (5th Cir. 1998). No Texas, state, or federal court has ever rejected the claim that defense counsel's failure to ensure a complete record may constitute deficient performance. Given the importance of preserving a complete and clear record for appeal, and the ABA Guidelines' explicit requirements on this point, failure to ensure that off-the-record discussions are memorialized constitutes deficient performance under *Strickland*.

### B. Even if Failure to Preserve the Trial Record Will Not Always Automatically Satisfy the Deficient Performance Prong of *Strickland*, the Deficient Conduct of Batiste's Counsel in This Case Warrants a Finding of Deficient Performance

Before the start of Batiste's capital trial, defense counsel failed to request that the court reporter record all proceedings including, but not limited to, bench conferences, discussions in chambers that concerned the case, and all objections and rulings therein—despite the fact that this failure waived any appellate claims originating from those discussions. *See Valle*, 109 S.W.3d at 508-09. This failure was compounded by counsel's repeated acquiescence to off-the-record bench conferences once proceedings began. During Batiste's trial, the court repeatedly held substantive discussions off the record and counsel repeatedly failed to go back on the record to re-create what was said or ordered by the court during those discussions.

230

According to the transcript, twenty-seven discussions were held off the record during voir dire, pre-trial proceedings, the guilt phase, and the punishment phase.[78]  Batiste's counsel continually failed to object to this practice, and often times even requested the off-the-record conference themselves, simultaneously allowing significant gaps in the trial transcript and failing to preserve the issue for appeal. *See Valle*, 109 S.W.3d at 508-09 (holding that violations of Rule 13 are not preserved for appeal unless defense counsel objects to each individual unrecorded bench conference at trial).

Myriad examples are available to illustrate counsel's deficiency.  For example, on the second day of the punishment trial, a juror reported being intimidated in the elevator on her way to the courtroom that morning. (*See* Claim Ten, *ante*.)  During the subsequent individual questioning of all of the jurors regarding the incident there were two separate off-the-record discussions that were not recorded. (19 RR at 8, 16.)  While ultimately it was decided to proceed with the jury intact, because of trial counsel's failure to preserve the trial record, it is not possible to fully ascertain what was being discussed during the process.

As a second example, also during the punishment trial, during the testimony of the medical examiner in the extraneous homicide, the prosecutor indicated that testimony had twice been interrupted by a phone in the audience and the prosecutor knew exactly where the noise was coming from.  (21 RR at 25.)  Although no recording was made of how the situation was handled, it was important enough that the judge immediately retired the jury and requested a "young lady" be brought in front of him. (*Id.* at 25-26.)  The identification of the person from the

---

[78] (2 RR at 6; 3 RR at 73, 75, 117, 117, 118, 156; 4 RR at 3, 46, 110; 5 RR at 4; 9 RR at 25; 10 RR at 44; 11 RR at 6; 13 RR at 180; 14 RR at 96; 18 RR at 154; 19 RR at 8, 13; 20 RR at 57; 21 RR at 26; 21 RR at 26, 60, 120; 23 RR at 137; 24 RR at 231; 25 RR at 15.)

231

audience, as well as the entire conversation regarding the disturbance, is missing from the record.

In sum, trial counsel's failure to request that bench conferences be recorded in order to preserve the record must be considered deficient performance, as it effectively waived Batiste's ability to raise appellate claims regarding the issues discussed off the record.

## C. This Inquiry Must Take Into Account the Inherent Difficulties of Establishing Prejudice When a "Substantial and Crucial Portion" of the Transcript is Missing

In the absence of a clear and complete record, it is difficult to determine what took place during trial. As such, arguments about possible prejudice suffer since they will frequently be viewed as speculative. Recognizing this, the Fifth Circuit has held that specific prejudice need not be shown if one can establish that a substantial portion of the trial transcript is absent. In *United States v. Selva*, 559 F.2d 1303, 1305-06 (5th Cir. 1977), the court held that an appellant need not show prejudice on direct appeal if: (1) a "substantial and crucial portion" of the trial transcript is missing and (2) he is represented on appeal by counsel other than his trial lawyer. The court reasoned that, under those circumstances, "counsel cannot reasonably be expected to show specific prejudice" because "even the most careful consideration of the available transcript will not permit us to discern whether reversible error occurred while the proceedings were not being recorded." *Id.* at 1306. Although the Fifth Circuit ruling is not binding on a state court, the reasoning in *Selva* nevertheless applies here.

In Batiste's case, there are few contextual clues for determining the subject matter of the majority of the twenty-six unrecorded discussions. Defense counsel's deficient performance in failing to preserve a complete record leads to a most troubling result: insulation from meaningful appellate review. Therefore a reversal

: 00258

of Batiste's conviction and sentence is merited, as both deficient performance and prejudice are satisfied.[79]

### CLAIM SEVENTEEN

### BATISTE'S DEATH SENTENCE SHOULD BE VACATED BECAUSE THE PUNISHMENT PHASE JURY INSTRUCTIONS RESTRICTED THE EVIDENCE THE JURY COULD DETERMINE WAS MITIGATING

The "Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604 (emphasis in original, footnote deleted); *id.* at 605 (a statute that prevents the sentencer in a capital case from giving independent mitigating weight to aspects of the defendant's character, record and circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty). Texas' statute governing capital trials expressly limits the evidence that a jury may consider mitigating, in violation of this Constitutional mandate. Therefore, Batiste's death sentence violates his applicable state and federal Constitutional rights, as well as state statutory law, United State Supreme Court case law, and state case law, and should be vacated.

---

[79] To the extent this claim should have been raised on appeal, appellate counsel was ineffective for failing to present it. *Robbins*, 528 U.S. at 285. Further, if it is deemed that trial counsel did everything they could to preserve the record, then the fault lies with the trial court for not insisting the record be preserved, and for appellate counsel for not raising the trial court error issue on appeal. *See Wardius v. Oregon,* 412 U.S. 470, 472 (1973) (holding that a trial court error rising to the level of a due process violation required reversal of the conviction.)

: 00251

## A. The Texas Statute and Batiste's Jury Instructions

Article 37.071 of the Texas Code of Criminal Procedure governs the instructions given to Texas capital juries. The statute instructs that a trial court shall submit at least two issues[80] to the jury: (1) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and (2) whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed. Tex. Code Crim. Proc. art. 37.071 § 2(b)(1), (e)(1).

Regarding the final special issue, the trial court shall also instruct the jury that if the jury finds a circumstance warranting life, the court will sentence the defendant to life in prison and the defendant will not be ineligible for parole. *Id.* at § 2(e)(2)(A-B). Further, the court instructs that the jury must answer this question "Yes" or "No," that it may not answer "No" unless unanimous or "Yes" unless ten or more jurors agree, and that the jurors need not agree on the particular evidence that is mitigating. *Id.* at § 2(f)(1-3).

Along with these procedural instructions, the Texas statute requires the trial court to instruct the jury that it "shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's *moral blameworthiness.*"

---

[80] In Batiste's case, because there was another person alleged to have participated in the robbery of Holiday, there were three special issues presented to the jury. In addition to the questions whether he would constitute a continuing threat to society, and whether there were sufficient mitigating circumstances, the jury was also asked to answer whether Batiste himself "actually caused the death of Horace Lee Holiday, on the occasion in question, or that he intended to kill Horace Lee Holiday, or that he anticipated that a human life would be take . . . ." This question was presented as Special Issue No. 2. (7 CR at 1713.)

234

Tex. Code Crim. Proc. art. 37.071 § 2(f)(4) (emphasis added). No further definition of "moral blameworthiness" is provided. Neither are there further instructions regarding the relationship of this instruction to the dictates of the special issue itself.

As directed by the statute, the trial court in Batiste's case gave the required instructions during the punishment phase of trial before the jury retired to deliberate. (7 CR at 1704-11.) Specifically, the court instructed the jury to "consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness." (*Id.* at 1709.) In Special Issue No. 3, the court asked:

> Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, Teddrick Batiste, that there is a sufficient mitigating circumstance or circumstances to warrant a sentence of life imprisonment rather than a death sentence be imposed?

(*Id.* at 1714.)

The court did not provide further instruction on the meaning or application of mitigating evidence, and defense counsel did not request an additional instruction defining what a mitigating circumstance entails.

## B. Texas' Statute Unconstitutionally Limits the Categories of Evidence a Capital Jury May Find Mitigating and Warrant a Life Sentence

The Supreme Court has long required that a jury "must be permitted to 'consider fully' . . . mitigating evidence" and that such consideration is meaningless "unless the jury not only [has] such evidence available to it, but also [is] permitted to give that evidence meaningful, mitigating effect in imposing the ultimate sentence." *Abdul-Kabir*, 550 U.S. at 260. Each juror must have broad discretion to give impact to the mitigation evidence put forward by the defense and cannot be limited to certain categories of evidence the State approves as mitigating.

235

*Tennard*, 542 U.S. at 285 ("[A] State cannot bar the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death.") (internal quotations omitted); *McCleskey*, 481 U.S. at 304 (1987) ("[T]he Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to decline to impose the death sentence.").

Furthermore, the avenues of mitigation open to a capital jury is not, and must not be, limited to evidence that relates solely to the defendant's culpability for the crime, the nature of the crime, or even what the crime says about that individual defendant. *Abdul-Kabir*, 550 U.S. at 246 ("[S]entencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future."). For example, the Supreme Court has upheld the mitigating potential of evidence that an inmate has adjusted well in prison leading up to his trial. *Skipper*, 476 U.S. at 4-5.

In *Skipper*, the Court considered evidence that the defendant wished to present from two jailers and a visitor that the defendant had "made a good adjustment" in jail. *Id.* at 3. The Court noted that "there is no question but that [inferences drawn from the evidence] would be 'mitigating' in the sense that they might serve 'as a basis for a sentence less than death.'" *Id.* at 4-5 (quoting *Lockett*, 438 U.S. at 604.). Thus, such evidence could not "be excluded from the sentencer's consideration." *Id.* at 5.

Importantly, the Court noted that evidence regarding Skipper's adjustment in prison "would not relate specifically to petitioner's culpability for the crime he committed." *Id.* at 4; *Abdul-Kabir*, 550 U.S. at 259 ("Like Penry's evidence, Cole's evidence of childhood deprivation and lack of self-control did not rebut either deliberateness or future dangerousness but was intended to provide the jury

236

with an entirely different reason for not imposing a death sentence."). Yet the Court found that it could "hardly be disputed" that this evidence's exclusion "deprived petitioner of his right to place before the sentencer relevant evidence in mitigation of punishment." *Skipper*, 476 U.S. at 4, 7 ("[A] defendant's disposition to make a well-behaved and peaceful adjustment to life in prison is itself an aspect of his character that is by its nature relevant to the sentencing determination.").

Like the defendant in *Skipper*, Batiste presented to the jury evidence regarding his background and character as mitigation evidence. Some of this evidence related to the conceptualization of mitigation expressed in *Wiggins* that "defendants who commit criminal acts that are *attributable* to a disadvantaged background . . . may be less *culpable*." *Wiggins*, 539 U.S. at 535 (*quoting Penry v. Lynaugh*, 492 U.S. at 319) (emphasis added). However, other evidence—*e.g.*, that Batiste was a talented athlete, a dedicated and hard worker, and a loving and devoted father—bore no specific link to his legal or moral blameworthiness for the crime in question. (*See* 23 RR at 117-18, 130-34, 153-57; 24 RR at 5-10, 27-35, 62-63, 79-80, 86-87, 110-11.) Rather, such evidence offered compelling sentiment that, although legally and morally to blame for the crime, Batiste was a worthwhile person who was not deserving of a death sentence. Just as much as evidence that Batiste's background contributed to the crime, this type of evidence held equal potential for jurors to weigh and decide it mitigated Batiste's overall deservingness of being executed. *See Penry v. Lynaugh*, 492 U.S. at 327 ("[S]o long as the class of murderers subject to capital punishment is narrowed, there is no constitutional infirmity in a procedure that allows a jury to recommend mercy based on the mitigating evidence introduced by a defendant."). However, based on the language of Texas' statute, it is unclear how any evidence of a positive character and worthwhile life, as opposed to a "disadvantaged background," would be given effect by the jury.

237

Because of the statutorily mandated instruction, the jury was precluded from giving effect to any category of mitigation evidence that did not specifically relate to Batiste's "moral blameworthiness." For any of Batiste's jurors to have given full effect to evidence they found warranted a sentence of life, but that did not reduce Batiste's blameworthiness for the crime, the juror would have had to violate their instructions. *Penry v. Johnson*, 532 U.S. at 800. Because, "[w]e generally presume that jurors follow their instructions," there is a reasonable probability that the result of Batiste's trial would have been different had a constitutionally adequate instruction been given. *Id.* at 799.

### C. Batiste's Trial Counsel Was Ineffective For Failing to Request a Jury Instruction that Clarified the Meaning and Application of Mitigating Evidence

Batiste was denied the effective assistance of counsel when his trial counsel failed to request that the jury be provided with an instruction that a mitigating circumstance may include, but is not limited to, any aspect of the defendant's character, background, record, emotional stability or instability, intelligence or circumstances of the crime which they believe makes a death sentence inappropriate.[81] The Guidelines that control capital representation standards provide that, "Trial counsel should request jury instructions . . . that ensure that jurors will be able to consider and give effect to all relevant mitigating evidence. Trial counsel should object to instructions . . . that are constitutionally flawed, or are inaccurate, or confusing and should offer alternative instructions." ABA Guidelines, Guideline 10.11(K).

---

[81] Defense counsel did file a motion regarding proposed jury instructions, which was denied in its entirety. The motion did not, however, include a request for any clarifying instruction regarding what a "mitigating circumstance" may include. (7 CR at 1722-28.)

238

It is incumbent upon trial counsel to request instructions that will ensure that the jury understands, considers, and gives effect to all relevant mitigating evidence. *See* Theodore Eisenberg & Martin T. Wells, *Deadly Confusion: Juror Instructions in Capital Cases*, 79 CORNELL L. REV. 1, 11-12 (1993) (describing results of study showing jury confusion as to meaning of instructions, particularly about the mitigating circumstance burden of proof); James Luginbuhl & Julie Howe, *Discretion in Capital Sentencing Instructions: Guided or Misguided?*, 70 IND. L.J. 1161, 1167 (1995) (describing results of study showing that a substantial percentage of jurors do not understand instructions concerning aggravating and mitigating evidence, burdens of proof and unanimity). The failure to request a clarifying instruction served no tactical purpose and was therefore ineffective. *See Strickland*, 466 U.S. at 687.

### D. Conclusion

"[W]hen the jury is not permitted to give meaningful effect or a 'reasoned moral response' to a defendant's mitigating evidence—because it is forbidden from doing so by statute or a judicial interpretation of a statute—the sentencing process is fatally flawed." *Abdul-Kabir*, 550 U.S. at 264. At Batiste's trial, the jury was prohibited from giving effect to any mitigation evidence that did not meet a narrowed category of evidence, unconstitutionally limiting their ability to give that reasoned moral response. *Skipper*, 476 U.S. at 8 ("The exclusion by the state trial court of relevant mitigating evidence impeded the sentencing jury's ability to carry out its task of considering all relevant facets of the character and record of the individual offender.")

The Supreme Court previously upheld the validity of the Texas death penalty statute "on the basis of assurances that the special issues would be interpreted broadly enough to enable sentencing juries to consider all of the

relevant mitigating evidence a defendant might present." *Penry v. Lynaugh*, 492 U.S. at 318.  Since that time, repeat warnings have been

> issued from th[e] Court regarding the extent to which the jury must be allowed not only to consider such evidence, or to have such evidence before it, but to respond to it in a reasoned, moral manner and to weigh such evidence in its calculus of deciding whether a defendant is truly deserving of death.

*Brewer v. Quarterman*, 550 U.S. 286, 296 (2007).

In this case, the application of the Texas death penalty statute impaired Batiste's rights to have *all* mitigating evidence considered by the jury in assessing whether he deserved a life or death sentence. *Penry v. Lynaugh*, 492 U.S. at 320("[T]he Texas death penalty statute was applied in an unconstitutional manner by precluding the jury from acting upon the particular mitigating evidence he introduced.").  Therefore, Batiste's death sentence should be reversed.

: 00258

## V.

## PRAYER FOR RELIEF

WHEREFORE, Teddrick Batise prays that this Court:

1. Order an evidentiary hearing for the purpose of examining the merits of his claims;

2. Vacate his death sentence and conviction;

3. Grant any other relief that law or justice may require.

Respectfully submitted,

DATED: May 1, 2013                     By: _____
                                       JANET GILGER
                                       Post-Conviction Attorney[82]

---

[82] The OCW wishes to acknowledge post-conviction attorney Ryan O'Dell for his contribution to this pleading.

241

STATE OF TEXAS           §
COUNTY OF TRAVIS         §

VERIFICATION

    BEFORE ME, the undersigned authority, on this day personally appeared Janet Gilger, who upon being duly sworn by me testified as follows:

    1.    I am a member of the State Bar of Texas.

    2.    I am the duly authorized attorney for Teddrick Batiste, having the authority to prepare and to verify Batiste's Application for Post-conviction Writ of Habeas Corpus.

    3.    I have prepared and have read the foregoing Application for Post-conviction Writ of Habeas Corpus, and I believe all allegations in it to be true.


                            JANET GILGER

    SUBSCRIBED AND SWORN TO BEFORE ME on this 1st day of May, 2013.


ARIANE EIGLER
Notary Public, State of Texas
My Commission Expires
JULY 11, 2016

**Notary without Bond**

                            Notary Public, State of Texas

242

# CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Application for a Writ of Habeas Corpus by hand to:

District Clerk of Harris County
Harris County Criminal Justice Center
1201 Franklin, Suite 3138
Houston, TX 77002
(One Copy – hand delivery)

Honorable Judge Ruben Guerrero
Harris County Criminal Justice Center
1201 Franklin, 19th Floor
Houston, TX 77002
(Courtesy Copy – hand delivery)

Harris County District Attorney
ATTN: Lynn Hardaway
Harris County Criminal Justice Center
1201 Franklin, Suite 600
Houston, TX 77002
(One Copy – hand delivery)

Teddrick Batiste
Polunsky Unit #999568
3872 FM 350 South
Livingston, Texas 77351
(One Copy – via mail)

This certification is executed on May 1, 2013 at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

JANET GILGER

243

: 00261

# CAUSE NO.:  1212366-A

# POST CONVICTION WRIT

# 174TH   DISTRICT COURT

# OF

# HARRIS COUNTY, TEXAS

# TEDDRICK R. BATISTE
# APPLICANT

RECEIVED IN
COURT OF CRIMINAL APPEALS

JAN 29 2015

Abel Acosta, Clerk

# VS.

# THE STATE OF TEXAS
# RESPONDENT

# VOLUME II of IV

# **INDEX**

**PAGE**

APPLICATION FOR WRIT OF HABEAS CORPUS CONTINUED...          262

# IN THE 174th JUDICIAL DISTRICT COURT
## HARRIS COUNTY, TEXAS

FILED
Chris Daniel
District Clerk
MAY 01 2013
Harris County, Texas
Deputy

|  |  |  |
| --- | --- | --- |
| ———————————— | ) | Trial Cause No. 1212366 |
| EX PARTE | ) |  |
| TEDDRICK BATISTE, | ) |  |
|           APPLICANT | ) |  |
|  | ) |  |
| ———————————— | ) |  |

## EXHIBITS 1-25
## TO INITIAL APPLICATION FOR A WRIT OF HABEAS CORPUS

## EXHIBITS: Ex Parte Teddrick Batiste

### Expert Affidavits

Exhibit 1:    Dr. James Underhill

Exhibit 2:    Charles Rotramel

Exhibit 3:    Dr. Scott Wm. Bowman

Exhibit 4:    Dr. Mary Elizabeth Pelz

### Lay Witness Affidavits

Exhibit 5:    Affidavit of Necole Baldwin

Exhibit 6:    Affidavit of Darlene Beard

Exhibit 7:    Affidavit of Melissa Beard-Carter

Exhibit 8:    Affidavit of Dyantinel Rod Carter

Exhibit 9:    Affidavit of Monica Davis

Exhibit 10:   Affidavit of Truman Jackson

Exhibit 11:   Affidavit of Micaela Lara

Exhibit 12:   Affidavit of Ricardo Lara

Exhibit 13:   Affidavit of Kristopher McSherry

Exhibit 14:   Affidavit of Malcolm Mitchell

Exhibit 15:   Affidavit of Kevin Noel Jr.

Exhibit 16:   Affidavit of Brian Fayhee (Kevin Noel Sr.)

Exhibit 17:   Affidavit of Rowena Scott

Exhibit 18:   Affidavit of Danyell Soliz

Exhibit 19:   Affidavit of Raul Soliz

Exhibit 20:   Affidavit of Stephanie Soliz

Exhibit 21:   Affidavit of Beverly West

## Other

Exhibit 22:     Birth Certificate of Teddrick Batiste

Exhibit 23:     State's Report of Interview with McSherry

Exhibit 24:     Public Record, re: Anthony Moore

Exhibit 25:     Affidavit re: Batiste State Jail Records

: 002S4

: 00265

## AFFIDAVIT OF JAMES G. UNDERHILL, Psy.D.

I, James G. Underhill, state and declare as follows:

### A. Introduction

1. I am a psychologist licensed in the State of Texas.

2. I obtained my Bachelor of Arts degree in psychology from Southwestern University in Georgetown, Texas in 2002.

3. In 2005, I earned a Master of Arts degree in clinical psychology from the Chicago School of Professional Psychology in Chicago, Illinois. The Chicago School is accredited by the American Psychology Association.

4. In 2008, I earned a Psy.D. (doctorate in psychology) degree in Clinical Psychology from the Chicago School of Professional Psychology.

5. A Psy.D degree is intended to prepare graduates for careers as practicing psychologists. A Ph.D degree is more research focused and thus prepares the graduate to conduct research in the psychology arena, and to apply it to such.

6. From 2008 to 2010 I conducted my post doctorate fellowship in rehabilitation and neuropsychology at Austin Lakes Hospital in Austin, Texas. My clinical emphasis was on the evaluation and treatment of cognitive and behavioral disturbances associated with neurological disease, trauma, and developmental disorders.

7. Among other groups, I am a member of the International Neuropsychological Society, the American Psychological Association, the National Academy of Neuropsychology, and the Austin Neuropsychological Society.[1]

---

[1] The American Board of Clinical Neuropsychology has adopted the Houston Conference Criteria, which dictates a course of study with a two year full time

EXHIBIT 4 Page 4

8. Since 2010 I have been in private practice. The focus of my practice is the independent evaluation of cognitive and behavioral disturbances associated with neurological diseases and trauma within a medicolegal context.

9. A complete copy of my curriculum vitae is attached hereto as Attachment A.

10. At the request of the Office of Capital Writs ("OCW"), current counsel for Teddrick Batiste, I conducted a comprehensive neuropsychological evaluation of Mr. Batiste at the Polunsky Unit in Livingston, Texas on January 5 and January 6, 2012. The purpose of the neuropsychological testing was to determine whether measureable neuropsychological dysfunction or deficits were present and, if so, the nature, extent, and effects of those impairments on Mr. Batiste's behavioral, psychological, and cognitive functioning.

11. My formal assessment included portions of the Halstead-Reitan neuropsychological battery, the Meyers Neuropsychological Battery, and other standardized neuropsychological measures designed to assess a patient's frontal, parietal, temporal, and occipital lobe functions. This battery of tests assesses a broad spectrum of cognitive and sensory-motor abilities dependent on the overall integrity of the brain. All neuropsychological tests administered in my evaluation of Mr. Batiste have appropriate and documented standardization, reliability, and validity. All tests administered are often used and are generally accepted in the neuropsychology community. These tests were widely available at the time

---

fellowship. This board also requires that the applicant pass a credential review, a written exam, two reviews of work samples, and an oral examination. At the time of this document, I have passed both the credential review and the written exam.

EXHIBIT 14 Page 2

of the offense (2009), as well as at the time of his trial (2011). A full listing of the tests administered is attached hereto as Attachment B.

12. I also conducted a clinical interview of Mr. Batiste, speaking with him about his family background, personal history and experiences, and his current physical, medical and emotional state. The evaluation of Mr. Batiste, including the testing and clinical interview, took approximately sixteen hours over the course of two days.

13. Prior to my meeting with Mr. Batiste I reviewed his juvenile records from the juvenile probation department and the Texas Youth Commission; Mr. Batiste's medical records from the Harris County Sheriff's office; Mr. Batiste's disciplinary records from the Harris County jail; and Mr. Batiste's school records. In addition, I reviewed the testimony of family members and other mitigation witnesses from the punishment phase of Mr. Batiste's capital trial, as well as the testimony of Mr. Batiste himself and the State's expert witness, Scott Krieger. I also reviewed several online newspaper articles that referenced the crime and Mr. Batiste's capital trial.

14. Based upon my review of the historical data, and the neuropsychological testing and clinical interview I conducted, if called as a witness I would testify to the information set forth below:

**B. Behavioral Observations and Clinical Neuropsychological Examination**

15. Teddrick Batiste is a twenty-five year-old African-American male who is currently incarcerated at the Polunsky Unit in Livingston, Texas.

16. I saw Mr. Batiste for approximately sixteen hours of neuropsychological evaluation over the course of two days. The evaluation was conducted in a confidential contact evaluation room at the Polunsky Unit in Livingston, Texas. Mr. Batiste was not restrained during the evaluation and the evaluation was uninterrupted. The testing room was adequately lighted,

reasonably comfortable, and with an expected level of privacy for a prison. Mr. Batiste was not taking any medication at the time of testing. His visual, hearing, and tactile abilities were adequate and he was not experiencing any unusual pain. His sleep and eating prior to the testing was typical for him, as were his environmental and psychological stressors.

17. Mr. Batiste was cooperative throughout the course of the evaluation and attempted all tests that were requested of him. All indications are that Mr. Batiste expended sufficient effort to complete each test that was administered. Validity mechanisms imbedded in neuropsychological testing materials indicated that Mr. Batiste was putting forth appropriate effort on testing and revealed no evidence of malingering or exaggeration of neuropsychological dysfunction.

## C. Opinions

Intellectual Function

18. Teddrick Batiste's general mental ability was evaluated using the Wechsler Adult Intelligence Scale (WAIS-IV). The WAIS-IV consists of ten core subtests and five supplemental subtests designed to evaluate an individual's general mental ability. Two broad scores are generated, the Full Scale IQ (FSIQ) and the General Ability Index (GAI).

19. The FSIQ is based on the total combined performance of the Verbal Comprehension Index (comprised of four tests), Perceptual Reasoning Index (comprised of five tests), Working Memory Index (obtained from three tests), and Processing Speed Index (comprised of three tests). The GAI is based only on the six subtests that the Verbal Comprehension Index and Perceptual Reasoning Index comprise.

20. Mr. Batiste's performance on the WAIS-IV test demonstrates overall intellectual functioning in the normal range, with a Full Scale IQ of 93. This

EXHIBIT 16 Page 4

is consistent with previous intellectual functioning testing done of Mr. Batiste.

Neuropsychological testing

21. Teddrick Batiste's neuropsychological functioning was evaluated using a series of tests selected to evaluate his sensory, motor, attention, memory, language, visual-perceptual organization and executive functioning. Executive functioning is an umbrella term that describes an individual's ability to integrate and assess information in a manner necessary to think, reason, problem solve, anticipate consequences of actions, and if needed, change actions based on information received from the environment. Executive functioning affects all requirements of everyday functioning, decision making, impulse control, self-regulation, and goal-directed behavior, as well as insight and foresight.

22. Among other tests, I administered portions of the Meyers' Neuropsychological Battery (MNB), which is a comprehensive standardized neuropsychological testing battery. It has been used since the early 1990's to evaluate sensory, motor, attention, memory, language psycho-motor and executive functioning and provides a picture of the individual's overall brain functioning. The MNB has demonstrated accuracy in determining the presence or absence of brain damage, with a 96.1% accuracy rate of identifying brain damaged individuals.

23. Testing revealed that Mr. Batiste suffers from damage to his frontal lobe, specifically with regard to the part of the prefrontal cortex that controls risk taking.

24. The frontal lobe is the area of the brain located at the front of both cerebral hemispheres. It is positioned anterior to the parietal lobe and superior and anterior to the temporal lobes. The frontal lobe is involved in motor

function, problem solving, spontaneity, memory, language, initiation, judgment, impulse control, and social and sexual behavior. The left frontal lobe is responsible for language related movement, and the right frontal lobe controls non-verbal abilities.

25. However, for the majority of individuals, there is cross-over of function between the both sides of the frontal lobe. The frontal lobe also contains many of the dopamine-sensitive neurons in the cerebral cortex. The dopamine system is associated with reward, attention, short-term memory tasks, planning, and motivation. A common characteristic of frontal lobe damage is a difficulty in or an inability to interpret feedback from an external environment. Examples of this deficit may include, perseverating on a response, non-compliance with rules, impaired associated learning (which uses external cues to help guide behavior), and inappropriate or heightened risk taking.

26. Impulsivity and/or risk taking are often seen in individuals following frontal lobe damage. While these two concepts may seem to have the same meaning, they are indeed different; impulsivity is simply a response disinhibition, while risk taking is related to the reward-based aspects of decision-making. An impulsive person will make a decision quickly, without considering the consequences, leading ultimately to behavior that exhibits a lack of self-control. Contrarily, a person with an inability to evaluate risk will look at the consequences but not weigh them. Instead, they will jump at the opportunity of a reward even if the likelihood of receiving that reward is slim.

27. Mr. Batiste's frontal lobe functioning with regard to risk taking is impaired. In comparison, the majority of a representative sample of the United States population scored better than Mr. Batiste on the portions of the Iowa



Gambling Test designed to calculate an individual's ability to appropriately evaluate a situation involving risk.

<u>Impact of Brain Impairment on Everyday Functioning</u>

28. Individuals with damaged frontal lobes often suffer from minimal to substantial memory loss. Mr. Batiste suffers from mild impairment of memory. However, it is his inability to conceptualize risk that significantly affects his functioning. Once Mr. Batiste is engaged in risky behavior he will continue to engage in that behavior, despite having the knowledge and recognition that the behavior may ultimately have dire consequences. Mr. Batiste's brain impairment renders him unlikely to stop risky behavior once it has begun, and in fact, causes him to behave in a way that actually increases the risk associated with a given situation despite being aware of the costs.

29. Mr. Batiste's inability to perceive risk can be compared to that of an impulsive gambler. An individual affected in this manner can recognize that the chance of winning is extraordinarily slim, and the likelihood of him losing his money is great. However, once the process of gambling has begun, he experiences difficulties in stopping himself. Instead, he increases the risk by continuing to gamble, despite the fact that he can acknowledge he will almost certainly lose. This is true regardless of the extent of the risk-it does not matter if there is one dollar or 100,000 dollars on the line. His inability to stop escalating the risk is the same.

30. The impact of damage to Mr. Batiste's frontal lobe is demonstrated by his history of failure to appropriately weigh the consequence of his actions. For example, immediately prior to his arrest in this case, Mr. Batiste was employed at a steel forging company. There was a period of several weeks where he worked in excess of forty hours and earned a significant amount of

EXHIBIT 11 Page 2

money in overtime. He immediately adjusted his spending habits to reflect that expectation of income, despite the fact that there was no guarantee that the overtime hours would continue. Intellectually, Mr. Batiste could understand that the consequence of this behavior was that he would not be able to meet his financial obligations. However, he continued to spend money and increased the material expectations of his family. In order to meet this expectation when the overtime income ceased he began to engage again in illegal activities.

31. Similarly, Mr. Batiste's admission of facts in the instant crime reflects his inability to calculate risk. Once he perceived a "reward" (i.e., the rims on the victim's tires), he was unable to adjust his behavior based on the risk involved to himself and others. He began to assume an inordinate amount of risk for a relatively small reward. His actions indicate that once he was in the situation he escalated the level of risk again and again until the incident ended with tragic results.

<u>Etiology of Damage to the Frontal Lobe</u>

32. There are several possible etiologies of the brain dysfunction that Teddrick Batiste demonstrates on neuropsychological testing. The impairment can result from head trauma or illness. Impairment of frontal lobe functioning is also found in a range of psychiatric conditions. Because of the confluence of interrelated factors it is not possible to distinguish the effects of any one etiology from the others.

33. However, contributing factors to Mr. Batiste's impairment could have been the result of a lack of pre-natal care his mother received during her pregnancy and/or her diet while pregnant. Furthermore, the meningitis Mr. Batiste was reported to have suffered from as a neonate could have contributed to or been the direct cause of Mr. Batiste's impairment.

EXHIBIT 1 Page 8

Treatment for Damage to the Frontal Lobe

34. There are several ways that Mr. Batiste's frontal lobe damage can be treated and controlled within a prison environment. First, medication is available that normalizes the dopamine response within the brain. A dopamine reuptake inhibitor is a type of drug that acts as a reuptake inhibitor for the neurotransmitter dopamine. This in turn leads to increased extracellular concentrations of dopamine and therefore an increase in dopaminergic neurotransmission. In other words, the medication normalizes the amount of dopamine that is released in the brain, which in turn quells an individual's desire to engage in risk taking behaviors. In large scale studies, this class of medication has decreased criminality in adults, including those with violent criminal behavior. Methylphenidate, marketed under the brand name Ritalin, is a dopamine reuptake inhibitor that is widely available and extremely effective in normalizing behavior. As of April 1, 2013, this medication was available in the Texas Correctional Managed Care formulary.

35. Secondly, the prison environment itself is conducive to the management and control of Mr. Batiste's brain dysfunction. Life in a secure prison is by its very nature controlled. Without much opportunity for decision making, and with limited freedom of movement, Mr. Batiste would likely not be presented with the opportunity to engage in risk taking behavior. However, even if presented with such an opportunity, the structure of the prison provides for frequent intervention and interruption. The manifestation of Mr. Batiste's brain injury is not immediate. He must first be confronted with a situation. Once confronted with a situation, he fails to appropriately calculate and evaluate the amount of reward to be gained versus the risk to be undertaken. Then, he must execute his actions according to that

EXHIBIT 14 Page 9



miscalculation. If his thought process is interrupted at any point, he is unlikely to follow through with the risk-taking behavior. The mechanics of the prison environment provide for constant interruption, and therefore disruption, of Mr. Batiste's ability to engage in and follow through with risk taking behavior.

Conclusions

36. It is my opinion, which I hold to a reasonable degree of scientific certainty, that Teddrick Batiste suffers from damage to the frontal lobe of his brain. As a result, he is unable to calculate risk and appropriately weigh the consequences of his actions.

37. In my opinion, which I hold to a reasonable degree of medical certainty, the impairment revealed by this evaluation was present in 2009 at the time of the alleged offense for which Mr. Batiste is sentenced to death, and would have been found at the time of trial in 2011, had a complete battery of available neuropsychological testing been administered.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on the 2-day of April , 2013 in Austin, Texas.

DR. JAMES G. UNDERHILL

Subscribed and sworn to before me on April, 2 , 2013.

Notary Public, State of Texas



JENNIFER RENEE REHF
Notary Public, State of Texas
My Commission Expires
OCTOBER 3, 2016
Notary without Bond

EXHIBIT 1 Page 10

# ATTACHMENT A

)

: 00276

# James G. Underhill, Psy.D.      CURRICULUM VITAE

**Texas License:**      34475

**Contact:**      P.O. Box 204181
Austin, TX 78720
(512) 484-0574 — Office
(512) 879-1889 — Fax
underhill.james@gmail.com

**Education:**

2008-2010      Post-Doctoral Fellowship, Rehabilitation and Neuropsychology
St. David's Hospital, Austin, TX
William R. Stern, Ph.D., and Associates

2003-2008      Psy.D., Clinical Psychology (APA Accredited)
The Chicago School of Professional Psychology, Chicago, IL

1998-2001      B.A., Psychology
Southwestern University, Georgetown, TX

**Hospital Affiliations:**
     Austin Lakes Hospital

**Professional Memberships:**

American Psychological Association,
     Division 22, Rehabilitation Psychology
     Division 40, Neuropsychology
     Division 41, Psychology and Law
Austin Cognitive Medicine Society
Austin Neuropsychological Society
National Register of Health Service Providers in Psychology
Texas Psychological Association
National Academy of Neuropsychology
International Neuropsychological Society

**Experience:**

## RELEVANT CLINICAL EXPERIENCE

2010-present      Forensic Neuropsychology Practice

Private practice, Clinical Neuropsychology/Rehabilitation Psychology. The focus of the practice is the independent evaluation of cognitive and behavioral disturbances associated with various neurological diseases and trauma within a medicolegal context.

| 2008-2010 | Fellowship in Rehabilitation and Neuropsychology |
| | Austin Lakes Hospital, Austin, TX |

Clinical emphasis on the evaluation and treatment of cognitive and behavioral disturbances associated with neurological disease, trauma, and developmental disorders. Assessment approaches include: both embedded and derived Symptom Validity Testing (SVTs), Halstead Reitan neuropsychological battery (HRB), Meyers Neuropsychological Battery (MNB), and flexible neuropsychological assessment.

| 2007-2008 | Central Texas Internship in Clinical and Forensic Psychology |
| | Rockdale, TX |

Assessed clients' legal capacity, psychosexual disorders (assessment of sex offenders), and risk of violence and/or sexual violence. Conducted psychotherapy in both individual and group modalities, for juveniles and adults. Settings included juvenile detention facilities, offices of expert witnesses, and attorneys' offices. Chief complaints included ADHD, anxiety, depression, aggressive behavior, adjustment issues, and PTSD. Position required on call hours.

| 2006-2007 | Psychotherapy Extern |
| | Hartgrove Hospital, Chicago, IL |

Provided inpatient psychotherapy using both individual and group modalities, covering intake assessment, the creation of treatment protocols, and multidisciplinary treatment. Specialized duties included emergency room assessment, electroencephalography interpretation, crisis intervention, and outreach activities. Conducted both short-term and long-term therapy with patients from diverse ethnic, cultural, and academic backgrounds. Chief client complaints included anxiety, depression, aggressive behavior, adjustment issues, and PTSD.

| 2005-2006 | Neuropsychology Diagnostic Extern |
| | United Stand Family Counseling Center, Chicago, IL |

This practicum required the administration and scoring of a wide variety of psychometric tools within the Chicago Catholic Schools. Two clinical psychologists, focused in pediatric neuropsychology, provided supervision. The Counseling Center delivers clinical services as well as in-school consultation. Duties included diagnosis, treatment design, and educational planning for children with a wide range of difficulties. Assessment incorporated both fixed and flexible batteries. Produced reports from battery data, focusing on the educational, psychological, and familial impacts of the findings.

## RELEVANT RESEARCH EXPERIENCE

| 2005-2010 | Neuroimaging Consultant (WOC) |
| | Hines VA Hospital, Hines, IL |

Developed a format for combining MRI, SPECT, and LORETA (EEG) images into a single image. A protocol was developed to force standard Talairach space (a brain atlas for neuroimaging) onto the images, in hopes of differentiating psychiatry patients from normal controls. Further investigation

explored the integration of neuropsychological batteries into the protocol. Achieved proficiency in MEDX and HERMES neuroimaging software, LORETA software, and hardware including EEG, MRI, and SPECT. This position required detailed communication with radiologists, neuropharmacologists, psychiatrists, and the head of the Clinical Neurosciences Division. Duties included intern training, data analysis, grant writing, article writing, and presentations to medical school.

## TEACHING EXPERIENCE

2005-2008              Teaching Assistant
                       Chicago School of Professional Psychology, Chicago, IL

Served as a teaching assistant for two sections of The Biological Bases of Behavior, and two sections of Neuropsychology (for doctoral psychology students). Created test materials, graded papers, and lectured.

### Selected Publications:

Friend, J. A., Underhill, J. G., & Konopka, L. M. (2007). Use of cognitive assessment to differentially diagnose between bipolar and ADHD in pediatric populations. *Journal of the International Neuropsychological Society, 13*(S1), 116.

Underhill, J. G. (2006). Spina bifida: Hard facts and figures for new parents. *Educational Packet for New Parents.* Chicago: Spina Bifida Association of Illinois.

Underhill, J. G., Crayton, J., & Konopka, L. M. (2006). qEEG's relationship to clinical interpretation of single photon emission tomography. *Clinical EEG and Neuroscience, 37*(3), 281.

Underhill, J. G., Friend, J. A., Chennamchetty, V., Crayton, J. W., O'Donnell, K. B., & Konopka, L. M. (2006). Decreased frontal coherence and increased temporal coherence in aggressive children and adolescents with mood and disruptive behavior disorders. *Clinical EEG and Neuroscience, 37*(3), 280.

Friend, J. A., Underhill, J. G., Konopka, L. M. (2006). Decreased neuropsychological memory functioning and beta amplitude asymmetry in a PTSD population. *Clinical EEG and Neuroscience, 37*(3), 269.

EXHIBIT 1 Page 10

# ATTACHMENT B

# ATTACHMENT B

## List of Tests Given to Teddrick Batiste

Forced Choice

Animal Naming

Controlled Oral Word Association (COWA)

Dichotic Listening

Sentence Repetition

Judgment of Line Orientation

Boston Naming

Trail Making A & B

Finger Tapping

Finger Localization

Strength of Grip

Token Test

Category Test

Auditory Verbal Learning Test (AVLT)

Rey Complex Figure Test (RCFT)

Wechsler Adult Intelligence Scale IV (WAIS IV)

North American Adult Reading Test (NAART)

Green's Word Memory Test

Personality Assessment Inventory

Iowa Gambling Task

Wide Range Achievement Test

EXHIBIT 1 Page 15

: 00282

## AFFIDAVIT OF CHARLES ROTRAMEL

I, Charles Rotramel, state and declare as follows:

### A. Education and Experience

1. I am the founder and executive director of Youth Advocates, Inc. and Houston reVision. I received a Bachelor's degree in Sociology from Rice University in 1987. I have thirty years of experience working directly with at-risk and gang-related youth in the Houston area.

2. In 1988, I founded Youth Advocates, a non-profit youth development organization that provides assistance and support to young people throughout the Houston area in a variety of ways. Youth Advocates strives to move young people away from negative influences and behavior patterns and move them toward a positive future. Youth Advocates provides educational support, tutoring, positive alternative activities, substance abuse counseling, life skills training, job search assistance, and individual and group counseling. Through these programs, Youth Advocates seeks to break each youth's cycle of destructive behavior and replace negative activities with positive ones in the context of a supportive community. Youth Advocates builds a solid relationship with each youth and uses that relationship as a springboard for large life changes. Almost 90% of the youth involved in our programs avoid further trouble with the law following their admission to Youth Advocates and nearly 75% return to some educational setting.

3. Houston: reVision is a non-profit organization dedicated to helping transform the lives of at-risk youth in Harris County. The organization reVision works to transform the lives gang-affected

1

EXHIBIT 2 Page 4

youth by connecting them to positive adult role models. In the process, reVision seeks to build a new community around strong, affirming peer groups and prepare youth for promising futures through education and jobs. This organization was created in 2012 through an innovative partnership between St. Luke's United Methodist Church and St. Martin's Episcopal Church. As a result, reVision has created a unique partnership between church members and the Harris County Juvenile Probation Department. The organization's work has three main elements: pairing adult mentors with youth in the juvenile justice system; providing credit recovery and tutoring opportunities for youth facing difficulties in school; and, working with youth to set and achieve goals, connect to positive peers, and engage in constructive activities. Our staff members coordinate with other agencies and organizations to connect youth to services.

4. Through Youth Advocates and reVision, I have worked extensively with gang-affected youth from both inside the juvenile justice and criminal justice systems as well as on the streets and in neighborhoods across the Houston area. In addition to working directly with at-risk youth, I regularly work with juvenile court staff, Juvenile Probation Department officials, government and non-profit service providers, neighborhood and community leaders, and other stakeholders in the juvenile justice system.

5. My prior experience also includes working as the volunteer coordinator for Juvenile Court Volunteers of Harris County.

6. Through reVision's Gang Intervention Program, I work directly with Gang Unit Officers in the Harris County Juvenile Probation

2

EXHIBIT 2 Page 2

Department and supervise outreach workers who conduct direct intervention with juvenile gang members and adjudicated youth in Houston.

7. As part of Youth Advocates' High Risk Gang Intervention Project, from 1988 to 1994 I received referrals from the Harris County Juvenile Probation Officers on high-risk gang-affiliated probationers and provided intensive intervention services for a minimum of two years, including individual and group counseling, alternative activities, and case management services.

8. Through Youth Advocates' Street Intervention Program, from 1995 to 2009 I worked with a variety of referral sources including probation and parole Officers, school officials, and peers. For each youth, we provided intensive intervention services for a minimum of two years including individual and group counseling, alternative activities, and case management services.

9. Through Youth Advocates' Hip Hop Culture Program, in 1995 I developed and implemented formal break dancing, graffiti art, and rap poetry programs for at-risk teenagers throughout the Greater Houston area. As a result of the initial program's success, we expanded the program to many locations throughout Houston and to Austin, San Antonio, and Los Angeles, California. This program continues today.

10. From 2000 to 2009 I supervised more than 200 AmeriCorps members to work with at-risk youth populations in partnership with many non-profit and governmental agencies including the Harris County Juvenile Probation Department, Neighborhood Centers, Inc., KIPP Academy, YES College Preparatory Schools, and Houston Independent School District.

3

EXHIBIT 2 Page 5

11. In 2007, I developed a formal club soccer program for at-risk youth, with both boys and girls teams playing Division 1 and Division 2 soccer within the United States Youth Soccer Association and the United States Soccer Federation.

12. My decades of experience working with at-risk and gang-affected youth have led me to be highly sought after as an educator, trainer, and speaker on issues of gangs, gang violence, and gang intervention programs. I have delivered dozens of presentations on effective gang intervention techniques to conferences and meetings at universities, law schools, non-profits, and governmental agencies. I have testified before the Texas State Senate and House on the subjects of gangs and gang violence.

13. I have been sought out for comment and cited as a gang expert in news media such as the Houston Chronicle, the New York Times, Texas Monthly, ABC News, Fox News, KHOU-TV, KTRK-TV, and KUHT-TV.

14. A complete copy of my curriculum vitae is attached to this affidavit. (Attachment A)

**B. Involvement in Teddrick Batiste's Case**

15. I was contacted by Teddrick Batiste's (hereinafter "Teddrick") current post-conviction counsel, the Office of Capital Writs ("OCW") to evaluate Teddrick's gang affiliation and involvement in the juvenile justice system.

16. I conducted a three hour interview with Teddrick on March 22, 2013, at the Allan B. Polunsky Unit in Livingston, Texas. Teddrick was cooperative and composed during the interview. He was reflective

4

about the questions posed, offering thoughts and explanations to all questions.

17. In order to reach the opinion that follows, I have also reviewed excerpts of Teddrick's trial transcript, including the testimony of the State's witness Dr. Scott Krieger, as well as the testimony of defense witnesses Darlene Beard, Gary Thiebaud, Kevin Noel, Jr., Kristopher McSherry, Rowena Scott, Stephanie Soliz, Terrie Soliz, and Teddrick Batiste. I have read recently received affidavits of friends and family members chronicling Teddrick's life history, education, the communities where he lived and grew up, and his involvement in the juvenile justice system.[1] I have examined Teddrick's school, juvenile court, criminal, police, and employment records.  I reviewed photographs of Teddrick's tattoos and the jail letters that were introduced at trial.  A complete list of the materials I reviewed is attached to this affidavit. (Attachment B.)

18. All of the information from the above-mentioned sources is essential for understanding the social, economic, and cultural factors that influenced Teddrick's early experiences with the juvenile justice system and his subsequent gang affiliation. It also forms the basis of my expert opinion, which I hold to a reasonable degree of professional certainty.

---

[1] Specifically, I read the affidavits of Rowena Scott, Kevin Noel Jr., Stephanie Soliz, Raul Soliz, Danyell Soliz, Rico Lara, Micaela Lara, Monica Davis, Melissa Beard-Carter, and Dytaniel Rod Carter.

EXHIBIT 2 Page 5

## C. Teddrick's First Experiences with Gangs and the Juvenile Justice System

19. Unlike many gang-affiliated youth in Houston, Teddrick was not born into a gang-affiliated family. Nor was he "jumped in," "clicked in," or formally inducted into gang membership. As a result, Teddrick was never a "hard-core" gang member.

20. Hard-core gang members often inherit gang membership from family members. In other cases, they choose to join a specific gang because of the influence of older or tougher peers. Gang membership is the most important factor in the life of a hard-core gang member; nothing in a gang member's life is as significant as the gang and its members. The hard-core gang member develops strong affiliations with other members of his gang, spending large amounts of time with the gang and shunning involvement in other activities or relationships.

21. For the hard-core gang member, gang affiliation defines their identity and is a central component to their lives. Hard-core gang members do not hide their gang affiliation, nor do they compartmentalize it or separate it out from their day-to-day lives.

22. Teddrick on the other hand, never broadcast his gang membership to the world around him. Significantly, none of his family members knew that Teddrick was in a gang. (Affidavit of Melissa Beard-Carter at ¶17, Affidavit of Monica Davis at ¶42, Affidavit of Rowena Scott at ¶3.) Even his younger brother Kevin, who himself admitted to being affiliated with the Bloods, never saw Teddrick actively participate in gang activity. (Affidavit of Kevin Noel at ¶¶4-5.) This is entirely inconsistent with being a hard-core gang member. If Teddrick had been a hard-core gang member, not only would his

6

EXHIBIT 22 Page 6

family have known about it, but Teddrick would have proudly professed his membership to them. The fact that Teddrick's family did not know about his affiliation does not suggest that his family did not know him well. To the contrary, it suggests that Teddrick never actively defined himself according to his gang affiliation.

23. Growing up, Teddrick lacked consistent and steady parenting. Several of his family members note that Teddrick never had a positive, dependable male figure in his life growing up and that by necessity his mother spent much of her time working to provide for her two young sons. (Affdavit of Melissa Beard-Carter at ¶9, Affidavit of Monica Davis at ¶¶35-41.) This lack of authority, structure and direction at home ultimately lead Teddrick to seek these things out on the streets.

24. In addition, Teddrick never had a positive male role model in his life. The identity and whereabouts of his biological father were unknown, and his mother was subsequently involved in various romantic relationships that were unstable and dysfunctional. Teddrick's mother exposed him to men who were physically and emotionally abusive and had serious drug problems. (Affidavits of Rowena Scott at ¶¶20-32, Kevin Noel Jr. ¶¶8-14, and Monica Davis at ¶¶35-41.)

25. Teddrick's first actual exposure to the gang lifestyle occurred when he attended Campbell Middle School in the Cypress-Fairbanks Independent School District ("Cy-Fair ISD"). Around April 2002, when he was fourteen years old, Teddrick met a man named Daron in his neighborhood who claimed to be a Five Deuce Hoover Crip. Daron was about twenty-three years old, had a regular job, and a family. Daron claimed to be from Los Angeles—the birthplace of the

7

EXHIBIT 2 Page 7

Crips—and claimed to know a lot about the Crips. While Daron may not have actually been from Los Angeles and may not have even been a Crip (as evidenced by the fact that he had a job and a family, both uncommon for "hardcore" gang members), the actual effect that Daron had on Teddrick was profound.

26. Teddrick looked up to Daron, so as a result of meeting him, Teddrick began wearing blue and "dropping knowledge," or sharing information about the Crips while at school. However, Teddrick did not have any actual affiliation and did not belong to any clique. Teddrick was merely presenting himself as a gang member without having any actual involvement or membership. This type of behavior is common among young teenagers in some neighborhoods, where being perceived as a gang member is seen as something cool and edgy, but nothing more.

27. At the time Teddrick was in middle school at Campbell, there were very few legitimate gang members in the Cy-Fair ISD. As a result, Teddrick believed that the knowledge he learned about Crips from Daron was enough to make him a Crip, even though he did not associate with any actual gang members or participate in any organized gang activity.

28. Around this same time, Teddrick began to hang out with other students at Campbell who were breaking school rules and getting into trouble. Teddrick started selling Ritalin at school to other students. Teddrick was caught selling Ritalin at school in May of 2002. Teddrick was arrested and his entanglement in the juvenile justice system began.

8

EXHIBIT 2 Page 8

29. When Teddrick was caught selling Ritalin, the schools in the Cy-Fair ISD had a "zero tolerance policy." This policy dictated that a student that committed a crime on school grounds had to be arrested and expelled, no matter the circumstances of the "crime" or personal attributes of the student.

30. As a result of the zero tolerance policy, Teddrick was expelled from Campbell, adjudicated in the juvenile justice system, and released to the custody of his mother and step-father. However, because he had been expelled, he could no longer return to his home campus at Campbell Middle School. Instead, the Juvenile Justice Alternative Education Program ("JJAEP") placed Teddrick into Excel Academy, an alternative school. Teddrick spent an entire summer and subsequent academic year at Excel Academy for the singular offense of selling Ritalin on school grounds.

31. At the time of Teddrick's arrest, Cy-Fair ISD had the strictest zero-tolerance policy and was the largest client of Harris County JJAEP even though it was not the largest school district.

32. Excel Academy was run by The Brown Schools, who had a contract with Harris County Juvenile Probation Department at the time. The Brown Schools were facing a serious budget shortfall and did not have enough money under their contract to effectively and efficiently run the alternative schools.[2]

33. Teddrick had to take a two-hour bus ride every day to reach the Excel Academy and then another two-hour bus ride home in the afternoon. As a result, Teddrick spent at least four hours a day on the bus with

---

[2] The Brown Schools were forced to lay off staff and could not pay teacher sufficiently. Ultimately, The Brown Schools went bankrupt in 2006 and Harris County was forced to take over the JJAEP and its schools.

9

other teenagers mandated to Excel Academy. The bus ride was so lengthy because youth from all over Houston were sent to Excel Academy and the same bus had to pick up all of the students.

34. The teenagers that Teddrick encountered during his four hours on the bus going to and from Excel Academy were very different than those he encountered in the Cy-Fair ISD. Many of the students were older than Teddrick, some as old as eighteen or nineteen. Many of the students in JJAEP at the time were there for serious or violent crimes. Some were in JJAEP after already having been to Texas Youth Commission ("TYC") facilities, or even adult jail. During these bus rides, Teddrick's older classmates discussed how to steal cars and how to sell and cook crack. It was from these individuals that Teddrick would ultimately learn how to steal cars.

**D. Return to Cy-Fair ISD and Boot Camp**

35. Teddrick completed his term at Excel Academy in December 2002 and began attending Cypress Ridge ("Cy-Ridge") High School in January 2003. Teddrick had a strong desire to get involved in sports after his release from JJAEP. Coach Gary Thiebaud, the head football coach at Cy-Ridge, had seen Teddrick play football in middle school and recruited him to play football at Cy-Ridge.

36. Unfortunately, Teddrick missed the fall football season because he was in JJAEP and as a result could only participate in spring training once he arrived at Cy-Ridge. Had Teddrick been able to participate in the regular football season, the course of his life potentially could have been drastically different.

10

EXHIBIT 2 Page 10

37. Through my work with the Youth Advocates' organized club soccer program for at-risk and gang affiliated youth, I have seen first-hand the tremendously transformative power of organized team sports. Competing with a team of positive peers and accomplishing a goal with others is genuinely life-changing for many at-risk youth. Especially for gang-affiliated youth such as Teddrick who have only been exposed to negative peer relations and who lack true genuine friendships, the camaraderie and sense of belonging and accomplishment a team sport can provide cannot be overstated. The connections they make with their teammates and the opportunity to highlight their skills in the arena of competition has a long-lasting effect on young people, particular those who, like Teddrick, are in need of a positive outlet. Because Teddrick missed the fall football season he did not get to participate in any actual games, rather he just attended spring training. As a result he never got to truly experience competitive sports in an active and engaged manner.

38. Teddrick was excited about the possibility of focusing on sports but continued to associate with the teenagers he had met on the bus, including the ones who were older and had more experience with criminal activity. While he had one foot in the camaraderie of the football team, he now had another foot in the life of the streets.

39. Teddrick met a girl named Stephanie Soliz when he was at Campbell Middle School, and when he started at Cy-Ridge they began to date. Teddrick and Stephanie would hang out in groups of other kids, playing basketball or spending time outside various apartments. (Affidavit of Stephanie.)

11

EXHIBIT 2 Page 11

40. Using what he learned from his classmates at JJAEP's Excel Academy, Teddrick started to steal cars, mainly so that he could visit Stephanie. Teddrick was arrested twice for unauthorized use of a vehicle during the summer following his first semester at Cy-Ridge High School. As a result of these two arrests, Teddrick was again adjudicated delinquent and placed in the custody of the Juvenile Probation Officer for Harris County.

41. Juvenile Probation first placed Tedddrick at Burnett-Bayland Rehabilitation Center ("BBRC") and then at Delta Boot Camp. Teddrick was released from Delta Boot Camp in December 2003. Teddrick enjoyed the physical training, but did not see the point of the isolated boot camp experience unconnected to a military lifestyle.

42. It is worth noting that juvenile boot camp does not exist today as it did when Teddrick went. This is because the juvenile justice system has determined that the boot camp model is not effective. Now the boot camp is called Harris County Leadership Academy. Nationally, studies began to show in the mid-2000s that juvenile boot camps have the highest rate of recidivism of any juvenile correctional facilities in the country. Juvenile justice departments around the country began to move away from the boot camp model after a Government Accountability Office (GAO) study identified 1,619 incidents of child abuse at juvenile boot camps in the year 2005.[3]

43. While the boot camp experience did not leave a strong impression on Teddrick, he did come out of boot camp considering the idea of joining the military as a career goal.

---

[3] Ken Dilanian, "GAO study reveals boot camp 'nightmare'," (available at (http://usatoday30.usatoday.com/news/nation/2007-10-10-boot-camps-main_N.htm?csp=34).

44. However, just as Teddrick was beginning to form constructive life goals, he was placed into an environment that made it difficult to nurture positive change. Just as Teddrick left boot camp, his mother moved out of the Cy-Fair ISD and into an apartment complex directly across the street from Eisenhower High School, near the Acres Homes neighborhood. These apartments complexes around Eisenhower High School are notoriously high in crime, with extensive drug dealing, prostitution and other crimes. Eisenhower High School has a well-documented history of gangs and criminal activity among students. Teddrick was thrust into a rough neighborhood where he knew no one and forced into a school with unfamiliar faces and considerable gang activity.

45. Also as a result of his mother's move to Acres Homes, Teddrick was even farther away from Stephanie. Two months after Teddrick moved to Acres Homes, Teddrick was again arrested for unauthorized use of a motor vehicle. When Teddrick was adjudicated delinquent he was sentenced to TYC. After orientation, Teddrick was sent to the Sheffield campus, located in Pecos County, Texas.

## E. Sheffield Boot Camp and Teddrick's Exposure to Institutionalized Gang Culture[4]

46. Teddrick's experience at TYC's Sheffield Boot Camp proved transformative. Sheffield was a facility deep in West Texas, far from Teddrick's home, family, loved ones, and comfort zone. Sheffield closed in 2008 after sexual abuse scandals erupted in TYC's West

---

[4] During this section, my discussion of TYC and its facilities such as Sheffield is based on my years of experience working closely with the juvenile justice system and with at-risk youth.

Texas State School a year prior. Before its closing, Sheffield had a reputation as being an extremely harsh and isolating experience for youth. In order to survive at Sheffield, youths would have to identify with a gang. There were no individual sets or cliques—there were just large gangs such as Bloods, Crips, and MS-13. When a youth arrived at Sheffield, they quickly would establish an affiliation with an established gang for protection. The gangs at Sheffield had less in common with typical street gangs and were more similar to the large prison gangs. Juvenile street gangs are based on specific territories; members come from specific neighborhoods, apartment complexes, or areas of a city. Because youths come to TYC from all over the state of Texas, there is not enough of a critical mass for any juvenile street gang to gain influence and a following. Consequently, youth in TYC custody often organize themselves into larger, prison-style gangs based on race, ethnicity, or home gang affiliation.

47. Sheffield was understaffed at the time Teddrick was there. As a result, there was often minimal supervision, leaving the youth vulnerable to abuse and violence at the hands of other youth and staff members in their dorms.

48. Teddrick was extremely isolated during his time at Sheffield. Due to Sheffield's remote location, Teddrick's family only managed to visit once during the year he was there. (Affidavit of Rowena Scott at ¶35.)

49. During the time that Teddrick was at Sheffield, female guards would enter the dorms and perform sexual acts with some of the youth. Other guards that were gang affiliated themselves would help youth get access to contraband. (Interview with Teddrick Batiste.)

14

EXHIBIT 2 Page 14

50. Sheffield had large dorms called pods. There would be a control booth in the center of two pods, where a guard would be charged with monitoring both pods. Sometimes guards would enter the pods and while they were in one pod, the other pod would not be monitored. Other times, the guard would sleep in the control booth, leaving both pods unmonitored. As a result, the lack of supervision led to a lawless environment where each youth had to concentrate on their own individual survival. Furthermore, there were few youth from the Houston area in these west Texas facilities. The youth were from all over the state, but few were from the Houston area because it was so far away.

51. There were many other TYC facilities that were much closer to Teddrick's family in Houston. It is problematic that TYC chose to send him so far from his comfort zone and support network at such a young age. As a result of the isolation, Teddrick was forced to align himself with and rely on virtual strangers for all of his needs, both physical and emotional.

52. It is also significant that Teddrick was sent to TYC for nonviolent offenses. The juvenile justice system has changed tremendously since Teddrick's time at TYC. If Teddrick were adjudicated for the same offenses now he would not be sent to an incarceratory facility for an extended period of time. As a result of the Annie B. Casey Foundation's Juvenile Detention Alternatives Initiative, Harris County has closed two juvenile correctional facilities and has reduced the length of stay in others. They now send 81% fewer youth to the TYC (now the Texas Juvenile Justice Department) than they did as recently as 2005. This change is part of a national trend toward reducing the

15

number of youth incarcerated. This trend is driven by high levels of recidivism in such facilities, as well as numerous scandals related to systematic and repeated abuse of juveniles in such facilities. Research has shown that incarcerating youth does not reduce crime but in fact increases it, while at the same time risking the exposure of youth to dangerous and abusive conditions.[5]

53. Teddrick's affiliation with the Crips at Sheffield was a matter of his own protection and survival in an unfamiliar and dangerous institution far removed from everything and everyone he knew. As one of the youngest youth in the facility, Teddrick would have been subject to abuse and exploitation by older youth if he lacked some protection. He was able to find this protection through affiliation with the Crips at Sheffield.

54. Teddrick's experience at Sheffield ultimately institutionalized him. This means that Teddrick's long term incarceration at one of the harshest juvenile facilities at a very young age led to permanent psychological maladaptations that affected his ability to communicate and to succeed in the outside world. Institutionalization (often called prisonization) has been found to cause several psychological adaptations: (1) dependence on institutional structure and contingencies; (2) hypervigilance, interpersonal distrust, and suspicion; (3) emotional over-control, alienation, and psychological distancing; (4) social withdrawal and isolation; (5) incorporation of exploitative norms of prison culture; (6) diminished sense of self-

---

[5] Richard A. Mendel, "No Place for Kids: The Case for Reducing Juvenile Incarceration (available at http://www.aecf.org/OurWork/JuvenileJustice/JuvenileJusticeReport.aspx).

worth and personal value; and (7) Post-Traumatic Stress Disorder.[6] Teddrick's institutionalization created in him a deep distrust of other people, made him distance himself from others, made him suspicious of others, and ultimately made it difficult for him to function outside of institutional control.

55. At Sheffield, Teddrick had to beat up people to avoid being beaten up himself. He had to "run shit," meaning he had to hold his own and find his own means for survival.

56. Teddrick was one of the youngest individuals at Sheffield. Most of the youth there were older, more institutionalized, and more hardened than he was. As a sixteen year old nonviolent offender, Teddrick was housed with violent offenders from all over the state who were up to nineteen or twenty years old.

57. After spending a year at Sheffield, Teddrick was transferred to Schaeffer House—a halfway house in El Paso, which was even further from home. Teddrick's experience at Schaeffer House was just as isolating and alienating as his experience at Sheffield.

58. Both Sheffield and Schaeffer were in the West Texas TYC district which was the epicenter of the abuse scandal in 2007 which ultimately led to the dismantling of TYC entirely.

## F. Release from TYC Custody and the Beginnings of a Family

59. While in TYC custody, Teddrick earned his GED. This meant that at seventeen years old, Teddrick could not return to high school and thus could not return to the life of a typical teenager. He would no longer

---

[6] Craig Haney, "The Psychological Impact of Incarceration: Implications for Post-Prison Adjustment (available at http://aspe.hhs.gov/hsp/prison2home02/haney.htm).

17

have the ability to play football or be involved with any kind of organized sports. There was no structured environment for him and no one directing him toward any kind of life path.

60. Despite this lack of guidance, when Teddrick was released from TYC he had a strong desire to start a family with Stephanie. Stephanie had her first son, Kash, a few weeks before Teddrick was released. Even though Teddrick was not Kash's biological father, Teddrick made it clear that he wanted to raise Kash as his own, to be the father figure for him, and to provide for Stephanie and Kash.

61. Shortly thereafter, Teddrick, Stephanie and Kash moved in with Stephanie's father Raul Soliz. This was the first time that Teddrick had a stable family unit in his life. He ate three square meals a day together with his new "family," again, for the first time in his life. Teddrick responded positively to this change and stayed out of trouble during this time. He began working several jobs and ultimately began working with Raul, who had a lawn care business of his own. By all accounts, Teddrick had a strong work ethic and loved to work. He would work as many hours as possible. This period of Teddrick's life is also suggestive that, given an affirming support structure, Teddrick could be a productive, law-abiding citizen. (Affidavit of Raul Soliz at ¶¶4-6, Interview with Teddrick Batiste.)

62. It is extremely uncommon for a hard-core gang member to take on a full time job of any kind. Individuals with a strong gang affiliation rely on the gang for income and social standing. Working a full time job, particularly for minimum wage or near minimum wage, is considered "selling out" the gang. It is entirely inconceivable to

EXHIBIT 2 Page 18

believe that a serious gang member would work extra hours and multiple jobs.

63. After this period living with Stephanie and her family, the young couple began to argue, leading to a temporary break-up. Teddrick began staying with various associates in Houston. Eventually, Teddrick started hanging out with gang-related individuals back in his old neighborhood around Eisenhower High.

64. It was during this time that Teddrick became known by the nickname "New York," because he claimed to be from New York and loved all things New York. Interestingly, this is one of several different nicknames that Teddrick used. In different circles, Teddrick went by "Smoke." On another occasion, Teddrick self-reported to gang officers that his gang moniker was "Yayo" and that his affiliation with the Crips had started in California. This is a strong indication that while professing a Five Deuce Hoover Crip affiliation outwardly, Teddrick actually never had a strong gang-affiliation because he lacked a "set," or a common group of gang members with whom he associated on a regular basis. Because he was always moving around and having to make new associations with people, Teddrick would make up new associations for himself. Because Teddrick spent much of his childhood moving from neighborhood to neighborhood and spent much of his adolescence in and out of the juvenile justice system, he lacked a sense of belonging or a strong community bond.

65. Also symptomatic of his institutionalization was Teddrick's continuous changing of friends, intense mistrust of others, and failure to maintain a strong set of friends. The only time that Teddrick had

19

EXHIBIT 2-Page 19

stability during his life was when he lived with Raul, Stephanie, and Kash.

66. Almost predictably, once Teddrick lost the stability of life with Stephanie's family, Teddrick again found himself in trouble for unauthorized use of a vehicle. Teddrick pled guilty and was sent to state jail for the first time.

67. As soon as Teddrick was released from state jail, he left Houston to live with his friends Rico and Micaela in Denton. Stephanie also joined them in Denton, bringing with her Kash and Teddrick's newborn son Alex. The idea behind moving to Denton was to get away from the negative influences and old associations in Houston. Teddrick recognized that he needed to stay away from the bad influences that led him to his incarceration in state jail. Rico—likely the only true friend that Teddrick ever had in his life—saw this and made sure that Teddrick came to live with him and his family in Denton. (Affidavit of Rico Lara at ¶¶7-9, Micaela Lara at ¶¶14-18.)

68. It is common for gang-affiliated youth to have very few, if any, actual friends. Frequently, the social construct of "loyalty" will take the place of true friendship among youth who have been institutionalized. Having never experienced long lasting relationships, the institutionalized youth overemphasizes loyalty to their associates. Loyalty becomes a proxy for the unconditional positive regard which they have never experienced. Everyone the institutionalized youth has gotten close to has abandoned them, and all of their relationships are tentative and temporary. To the institutionalized youth, being loyal to another person is an essential character trait that makes them better than all the people who have abandoned them. Loyalty consequently

20

EXHIBIT 2 Page 20

becomes the most important thing for these youth. If a youth in an institutional setting can find someone or some group that is loyal to them, then that becomes something that the youth cannot let go. This also explains why associates in a gang will go out of their way to take credit for the crime of another, even someone they may not be particularly close to. Loyalty trumps friendship at every turn.

69. Rico helped Teddrick find work and the two young couples lived together in Denton until personal difficulties between Teddrick and Stephanie caused Stephanie to move back to Houston with the kids. Just days later, Teddrick was arrested for burglary of a vehicle and spent two months in jail in Denton. After his release, Teddrick and Stephanie reunited in Houston. (Affidavit of Rico Lara at ¶¶7-10, 13, Affidavit of Micaela Lara at ¶¶14-22.)

70. At this point, Teddrick was fully involved in the idea of having a family life and being the provider for his family, working more than full-time at Forge USA. Teddrick moved Stephanie and the kids into their own apartment, and Teddrick paid the rent and the bills with his earnings. However, at the same time, Teddrick began affiliating with new people in the area. He had several younger associates that he spent time with. He saw himself as trying to teach these younger youth both the ways of the street and at the same time, trying to keep them in school. Teddrick would pick them up from school to make sure they had attended that day. Again, none of Teddrick's behavior is consistent with the behavior of a hardcore gang member. While Teddrick may have seen himself as older and wiser than his younger associates, he was still working a full-time job, supporting a family, and trying to be a positive influence.

21

EXHIBIT 2 Page 21

71. Up to this point, Teddrick had never been involved in any crimes of violence. But these younger associates were "jackers," meaning they would commit armed robberies by sticking a gun in people's faces and demanding their valuables. Teddrick strongly discouraged this behavior. While Teddrick could not successfully prevent them from jacking people, they would at least not do it around him. (Interview with Teddrick Batiste.)

72. Eventually, Teddrick's hours at Forge USA got reduced and he began to feel enormous stress about not being able to provide for his family. It was a tremendously low moment in his life. During this time, some of his younger associates had a plan to "jack" a tattoo parlor. While Teddrick initially resisted, in a low moment, he decided to ride with them. As the "elder" of the group, he decided this time to give the younger associates "leeway" to pull off this robbery and let them call the shots. (Interview with Teddrick Batiste)

73. Again, the concept that loyalty is the most important thing among institutionalized and gang-affiliated youth like Teddrick likely contributed to his decision to go along with behavior of his younger associates that he would otherwise disapprove of.

### G. Analysis of Teddrick's Jail Letters

74. Through the Hip Hop Culture Program's rap and writing project, Youth Advocates has hosted an open-mic hip hop and poetry night every Thursday for the past fifteen years. As a result of my participation in this program, I have become familiar with street slang and typical language used in rap music. I have also received, read and

22

reviewed hundreds of letters over the years from gang-affiliated youth from correctional facilities that were sent to my staff and me.

75. I have read and reviewed the letters that Teddrick wrote while awaiting trial from Harris County Jail to various friends and family members and that the prosecution introduced into evidence and used against Teddrick at trial.[7] Based on my training and experience, had I been called to testify at trial, I would have testified to the following.

76. The rap lyrics that Teddrick wrote to his loved ones from jail show an emotionally complex young man trying to come to terms with the consequences of his actions and preparing himself for a life of incarceration. Using the common tropes and argot of hip hop music, Teddrick's letters show him vacillating between being overwhelmed by emotion and trying to hide or bury his emotions. His letters also show him vacillating between typical empty rap braggadocio and genuine emotional expression.

77. Hip hop lyrics are frequently misunderstood, misconstrued and taken too literally. Rappers commonly use hyperbolic and grandiose language to convey the intensity of emotions felt by frequently marginalized youth. While rap lyrics can sometimes be shockingly raw, it is a mistake to always construe them as glorifying, much less encourage violence. For Teddrick, and for many other youth like him that I have worked with, writing lyrics is a form of expressing these intense, complex and often overwhelming feelings.

78. Teddrick expressed how writing helps him cope with the thoughts and feelings that overwhelm him while sitting in his cell. He wrote, "so

---

[7] I have attached the letters I reference herein as Attachment C.

23

EXHIBIT 2 Page 23

now I'm in a cell and forced to broadcast my skills / that's the only cope I got, besides my pain bein spilled." (Attachment C at 3.)[8]

79. In several places, Teddrick expressed that people do not know the tremendous amount of emotion that he has inside him. For instance, he wrote, "A lot of people think they know / but out of generocity, they speak kindness out they soul / the feelins I tend to hold, has turned me into a walkin eyemax [IMAX]." (*Id.* at 3.) Because of what Teddrick has been through, he has an IMAX theatre's worth of emotion inside him, but he does not show it to others. Later, he expressed that at times he has such a huge emotional outburst that he is "punchin the walls until they start to hit me bacc / and hollering like I'm lost." (*Id.*)

80. Teddrick expressed remorse over his actions and recognizes that he is solely responsible for placing himself in the situation he is in now. As he wrote, "[I] built my own bridge, but I sliped and now I free fall." (*Id.*)

81. Many of Teddrick's letters are filled with typical rap boasts and braggadocio and can be read in the context of the general lyrical subjects of hip hop. In these sections he attempts to portray himself as tough and in control. He says things like, "I go so hard, a def man with cement in his ears can't ignore me." (*Id.* at 9.) Such hyperbole is common and typical in hip hop lyrics. However, when Teddrick gives detail in his rhymes, he reveals a more complex and human side to himself.

---

[8] In the interest maintaining the flow of the quoted sections from Teddrick's letters, I have chosen to leave slang spellings and misspellings the way they appear in the original letters. In the event that a word is so misspelled that clarity is necessary, I have left the original spelling intact and included the correct spelling afterward in brackets.

EXHIBIT 2 Page 24

82. Teddrick wrote, "If I could be anything besides free it would be heartless." (*Id.* at 4.) He recognizes that he is in fact not heartless, not emotionless, and not a hardened gangster. He wishes that he could be emotionless, because it would be easier to not feel anything than to deal with the complex emotions that he is facing: remorse, fear, disappointment, and loneliness. When Teddrick does let his emotion spill over, he cries out, but nobody hears his pain except "haters" who have no intention of helping him. He wrote, "I'm screamin like a ma'fucca, but it seems only hattas [haters] here my sound / I truly need help cuz the ones I love don't even know me." (*Id.*) This is consistent with a feeling of isolation and abandonment. As Teddrick puts it elsewhere, "my circle's one deep," meaning there is nobody in his circle but himself. (*Id.* at 38.)

83. This sense of isolation leads Teddrick to a feeling that he needs to be a rock, completely emotionless, dependent on no one. This is a common survival tactic in the process of institutionalization. As Teddrick writes to Stephanie, "I've learned to neva get too close to anything or someone I can't turn away from in five minutes." (*Id.* at 31.)

84. Teddrick expressed regret over a lack of guidance. He stated, "I need the guidance of an experienced man." (*Id.* at 8.) Growing up, Teddrick never had a positive male role model. His family members mention this as a major factor in Teddrick's development. This lack of positive male guidance lead to Teddrick's sense that he is "lost" or in a "free fall." (Affidavit of Melissa Beard-Carter at ¶9, Affidavit of Monica Davis at ¶¶35-41.) As Teddrick put it in his lyrics, "I was thrown in the street and neva had a scremige [scrimmage]."

25

EXHIBIT 2 Page 25

(Attachment C at 25.) Because he lacked guidance at home, he turned to the street, where he was forced to act like a grown-up with no practice.

85. Because of the overwhelming nature of the emotions that he feels, at times during Teddrick's letters, he feels that he has to shut down all feeling and bury them away in order to survive in the institutional setting. For instance, he stated, "I got no love for no soul / fucc all niggas and hoes." (*Id.* at 5.) Teddrick masks his emotional vulnerability behind the thin veneer of typical rap braggadocio and toughness. Teddrick is attempting to convince himself and others that he is not "soft" or weak. To do so, he tries to convince himself that he is a monster. For instance, he wrote, "Ain't nothing soft about me, I spit and drink hard / sip blood from six infected vampires, and spit box from caprice cars." (*Id.* at 7.) At times, living with the consequences of his actions is too much to bear, and so tries not to feel, because it is too painful to feel. He stated: "I woke up with a problem cuz all I see is death / scared of sowen [sowing] what I reap, so I shoot drama to someone else / and I'm numb to the world, but every hatred slug is felt / and I know no other way to cope, so the inner me is kept." (*Id.* at 11.)

86. Teddrick does not know any other way to cope other than making himself numb. But, however much he tries to suppress his feelings and become a hardened gangster, his emotions keep showing up, refusing to be contained. He wrote, "I ain't seen ya'll in a minute, I let my emotions smoke my visit / and Momma I do listen, but the bullshit got me twisted...My emotions, got it showing, all in my bacc." (*Id.* at 8.)

26

87. Much of Teddrick's attempt to swallow back his emotional side has to do with his preparation for a life of institutionalization. For him, acting hard is a matter of survival—it is the only way he can defend himself in a brutal, violent environment. This is behavior he learned from experience as a child while detained at places like Sheffield.

88. At Teddrick's trial, the prosecution highlighted two lines from Teddrick's letters: "[My lawyer] sent me a letta, sayin the DA want off with my head / that's the results when you smoke a nigga and take off with his bread." (*Id.* at 11.) The prosecutor alleged that these lines showed Teddrick's callousness and a lack of remorse. However, in the context of the letter, these lines suggest the opposite. Teddrick seems to recognize that the path he has taken leads to death. Immediately following the two lines highlighted by the prosecutor, Teddrick continues, "It's time for a change, I'm hit and about to fumble / how much more of this can I take before I crumble / but fucc life you can have it, just let my kids know I love them / let them know I'm still me, and nothing will go above them / and to my victim's family, the inner me is lost / so hold yo comments to yo self, cuz you don't know what I'm about." (*Id.*) Taken in its entirety, this letter reads like a goodbye letter, even a suicide note. He is expressing that nobody seems to understand the genuine regret, remorse, hurt and pain that he feels.

89. Remorse is a common theme in Teddrick's letters. He feels severe depression and regret about his decisions and never dodges responsibility for his actions. "This situation got me wipen drops, like a windshield wiper." (*Id.* at 23.) "I fucced up cuz, I knew how to accomplish, but still a nigga cheated." (*Id.* at 25.) Teddrick

recognizes that he knew better, that he had an opportunity to make it by following the rules, working hard and providing for his family, but instead he "cheated" by committing crimes. In a particularly remorse-filled passage, Teddrick writes, "I know I'm fucced up, cuz now I'm feelin what they see / I'm lookin in the mirror, sayin Stephanie, why me / but cuz lets ride was more important than daddy don't leave...my betta half was right, the streets is no longer my life / I got my family but still tryin to earn stripes." (*Id.* at 24.) This passage expresses Teddrick's regret that he put his gang associates before his family. Teddrick is now able to see himself as others saw him, and he does not like what he sees.

90. Teddrick's attempt to harden himself and push his emotions deep inside him is clear preparation for a life of incarceration. Based on his prior experiences, especially at Sheffield, he knows that he will have to act hard in order to just survive in the institutional setting. Thus, in preparation for the brutal institutional life that he knows is ahead of him, he focuses on "teachin my self to cope without feelins up in my brain." (*Id.* at 12.) However, even in his attempt to bury his feelings, he knows it is futile: "how do I release pain, the voices won't neva stop." (*Id.*)

91. In a later letter, Teddrick comes to a realization that despite all of his attempts to present himself as an emotionless, hardened individual, he finally states plainly, "This street shit, I'm startin to think it ain't a part of me / wise as I'm allowed to be." (*Id.* at 16.)

92. Conspicuously absent from Teddrick's raps and letters are any explicit gang references, slang, or symbolism. The only suggestion of Crip affiliation in Teddrick's letters are the replacement of the letter "k"

28

with the letter "c" as in "bacc" instead of "back." Typically, a hard-core gang member will riddle their letters with gang references, complex gang symbology and sayings. The only references to gangs are in letters to his brother Kevin and his younger cousin Dominik Jackson. Interestingly, there is little reference to Teddrick's own gang affiliation in these letters. The references to gang culture only come in the form of offering knowledge and information about other gangs, not his own. To Kevin, Teddrick writes that the gang he has been trying to affiliate with does not exist and that the tattoo he has is not a tattoo used by any gang. (*Id.* at 48.) Here, Teddrick is not trying to give advice on joining a gang, he is merely trying to protect his younger brother from getting embarrassed. To his cousin Dominik, Teddrick advises against using a star symbol for fear that it would be misconstrued as a symbol associated with a Latino gang, the Houstones, that could get him killed. (*Id.* at 19.) Interestingly, in the same letter Teddrick encourages Dominik to keep doing well in school and do his homework. (*Id.* at 20.)

93. Another indication that Teddrick is not a hard-core gang member is his use of the term "O.G." in a letter to his friend Rico Lara. O.G. stands for original gangster, a term gang members use to refer to an older established gang member in a position of leadership and respect. In his letter, Teddrick refers to Rico as an O.G. for settling down, working diligently, and raising his family. (*Id.* at 46.) This is the opposite of the way that a gang member would use the term O.G.

94. In contrast to the hardened gangster, Teddrick's letters show him struggling to accept his fate, knowing that his co-defendant has not been arrested. The concept of loyalty to his associates trumps any

29

EXHIBIT 2 Page 29

self-interest he may have in "snitching" and turning in his co-defendant. That loyalty would override the natural interest of self-preservation speaks to the level of institutionalization which Teddrick has already reached. He writes, "It's a fact, I'm not a rat, I got a co-defendant on the loose / livin off cake of the fiends and no empathy for number two." (*Id.* at 8.)

95. Frequently Teddrick expresses a feeling that he is different from how he is seen by others or how he is expected to be. Because he does not feel that he is the person that people expect him to be, he feels alone. For instance, "everybody gone, even tha victims and tha killas." (*Id.* at 40.) He draws a distinction between himself and the killer that he has been labeled as.

96. Labeling theory helps understand the sentiment that Teddrick expresses throughout his letters. Labeling theory is a sociological theory that explains how individuals come to fulfill the role that they are expected to play. Put simply, if people are labeled a certain way, they will respond by acting in a way consistent with that label. For instance, if someone is treated by others as a criminal, then they will begin to perceive themselves in the same way, and may ultimately adopt that role as their own. The label that society gives the person can change the person's social identity and concept of self.

97. Throughout his letters, one can see Teddrick struggling with the label he has been given. Teddrick says this explicitly—"tha hood labeled me a 'G'." (*Id.* at 27.) At times he adopts the role of a gangster, while at other times he struggles to distance himself from that perceived role and attempts to redefine himself based on his own self-perception. At one point in his lyrics, Teddrick begins to list his good qualities, such

as loyalty, honesty, and having heart for people. But just as quickly as he mentions his good qualities, he recognizes the futility trying to convince anyone that he is a good person: "I know this don't mean shit and knobody know or cares how I feel." (*Id.* at 38.) This passage shows that Teddrick is attempting to separate himself out from the way he has been defined, while at the same time he has an acute awareness of the fact that no one will believe him. Teddrick even begs to be saved from the role that he has fulfilled: "Lord, please guide a nigga from tha grimmy ways of tha street." (*Id.* at 42.)

98. Teddrick feels regret and remorse about allowing himself to become the label that he was expected to be: "I neva ask[ed] to be a gangsta, just wanted to be something in life / positive, successful, but instead I'm tha gunman at night." (*Id.* at 32.) Teddrick remorsefully takes responsibility for what he has become and what he has done. Because he recognizes that there is no way to undo the harm he has done, he can only hope that his son does not step into his shoes and fulfill the same role that he played: "So now I'm labled a killa and a threat to the street / and when I left, my son played with my shoes, but I hope he walk betta than me." (*Id.* at 41.)

99. Ultimately, Teddrick's lyrics are typical of what one would expect from someone with Teddrick's upbringing, early institutionalization, and grim prospects. The lyrics are filled with the type of generic boasting about how "gangsta" and tough he is that is expected in hip hop lyrics. Teddrick inherits this from hip hop culture generally, meaning that it does not come sincerely or specifically from him. What makes Teddrick's lyrics unique and insightful though, are the times when Teddrick cannot hide behind the generic "gangsta" image

31

EXHIBIT 2 Page 31

that he attempts to portray. His individual expression comes through even when he tries to suppress it. What comes through consistently in his lyrics, is a young man struggling with remorse over his actions while also struggling with the dichotomy between what he has been labeled as and the person he actually is. Far from the picture of a hardened gangster with no remorse and callousness toward the victims of his crimes, Teddrick's letters paint the portrait of a complex young man coming to grips with where his actions have led him in life, expressed in the medium of hip hop poetry.

## H. Conclusion

100.     It is my opinion, which I hold to a reasonable degree of academic and professional certainty, that Teddrick's gang involvement was in large part shaped by the outmoded juvenile justice system within which he found himself at an early age. Teddrick first entered the juvenile justice system as a youth with no gang affiliation whose only offense was selling pills and exited the system affiliated with the Crips and with the knowledge and skill set to commit more serious crimes.

101.     Were Teddrick to enter the juvenile justice system as it exists today in Harris County, his life would have been drastically different. The institutional responses to Teddrick's early offenses would not have been so severe.

102.     Authorities in the juvenile justice system have learned that many of the techniques used even as recently as the time that Teddrick was in the juvenile justice system are not effective, do not decrease juvenile crime, and are not good for the youth themselves.

32

103.     There is a tremendous amount of research currently being done on what is being referred to as the "school-to-prison pipeline." The Council of State Governments recently completed a study on this subject called "Breaking School Rules."[9]  Texas Appleseed also completed a massive study of this issue throughout the State of Texas called "Breaking Rules, Breaking Budgets."[10]  This research and other similar studies show that juveniles who are arrested and/or removed from their home schools for zero tolerance offenses are being unnecessarily placed in the juvenile and criminal justice systems from which they cannot later extract themselves.  Not only are these policies extremely costly, they are removing youth who could be successful in school with support and guidance, and are placing those students in the juvenile justice system where they are more likely to meet negative peers, drop out of school, develop substance abuse issues, and continue on a path toward prison.  Efforts are now being made here in Texas and around the country to end zero tolerance policies, reduce or eliminate alternative schools, keep students in their home schools, and connect them to positive activities.

104.     One example of reforms currently taking place in juvenile justice is Judge Steven Teske's model in Clayton County, Georgia. Judge Teske eliminated the zero tolerance policy and created a protocol that kids cannot be arrested for things that happen at school

---

[9] Counsel of State Governments, "Breaking Schools' Rules: A Statewide Study of How School Discipline Relates to Students' Success and Juvenile Justice Involvement" (available at http://justicecenter.csg.org/resources/juveniles)

[10] Texas Appleseed, "Breaking Rules, Breaking Budgets: The Cost of Exclusionary Discipline in Dallas ISD," (available at http://www.texasappleseed.net/index.php?option=com_docman&task=doc_download&gid=692&Itemid=)

33

that are nonviolent. Only after a third offense can a student be arrested.

105.     In the ten years since Judge Teske implemented his reforms, there has been a 60% reduction in juvenile crimes and more positively, the graduation rate is up 20%. Standardized test scores are also up.[11]

106.     The boot camps that Teddrick attended no longer exist. The Brown Schools that ran Excel Academy no longer exists. TYC itself and the facilities that Teddrick was sent to no longer exist. TYC was replaced in 2011 with the Texas Juvenile Justice Department.

107.     As a result of the reforms implemented since the time Teddrick was in the juvenile system, juvenile crime is down 40% in Harris County.[12]

108.     It is my opinion that Teddrick's gang involvement was in large part shaped by the outmoded juvenile justice system within which he found himself at an early age. Teddrick first entered the juvenile justice system as a youth with no gang affiliation whose only offense was selling pills and exited the system affiliated with the Crips and with the knowledge and skill set to commit more serious crimes.

---

[11] Steven C. Teske, Brian Huff, & Cody Graves, "Collaborative Role of Courts in Promoting Outcomes for Students: The Relationship Between Arrests, Graduation Rates and School Safety (available at http://www.school-justicesummit.org/papers/paper_9.cfm )

[12] Harris County Juvenile Detention Alternatives Initiative (JDAI) Report, Vol. 4, Issue 4, August 2012.

EXHIBIT 2 Page 34

109.    Were Teddrick to enter the juvenile justice system as it exists today in Harris County, his life would have been drastically different. All of the institutional responses to Teddrick's early offenses would not have been so severe and it is likely that his life would have taken an entirely different trajectory.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on the 2̲4̲ day of April, 2013 in Houston, Texas.

CHARLES ROTRAMEL

Subscribed and sworn to before me on *April 24*, 2013.

Notary Public, State of Texas

DEBBIE TISCH
Notary Public, State of Texas
My Commission Expires
June 28, 2014

35

# ATTACHMENT B

: 00318

## MATERIALS REVIEWED

1. Trial testimony:
   a. Scott Kreiger
   b. Clint Ponder
   c. David Davis
   d. Irma Fernandez
   e. Beth Pelz
   f. Kevin Noel, Jr.
   g. Teddrick Batiste
2. Teddrick Batiste's Records:
   a. Cy-Fair ISD Records
   b. Delta Boot Camp Records
   c. Harris County Juvenile Probation Records
   d. Texas Education Agency Records
   e. Texas Youth Commission Records
   f. Social Security Administration Earnings
3. Affidavits:
   a. Rowena Scott
   b. Stephanie Soliz
   c. Kevin Noel Jr.
   d. Raul Soliz
   e. Ricardo Lara
   f. Micaela Lara
   g. Melissa Beard-Carter
   h. Monica Davis
   i. Dytaniel Rod Carter
   j. Danyell Soliz
4. Letters written by Teddrick Batiste introduced at trial
5. Photographs of Teddrick Batiste's tattoos introduced at trial

EXHIBIT 2 Page 36

# ATTACHMENT C

STATE'S
EXHIBIT
_____

Teddrick Batiste #02279030
701 N. San Jacinto 2-6-1
Houston Tx. 77002

Stephanie Bolton
4502 Spring Valley Rd.
Houston Tx. 77041

I Love You!



USA FIRST-CLASS FOREVER

EXHIBIT 2 Page 37

2  and I dont hide behind a image
3  im to tuff as I can be, straight game, no scrimige
4  head on straight niggs, full press none stop
5  I tried grinder a lil bit, couple extasy and roccs
6  that put pressure unda a nigga feet, like heat roccs
7  why im on Tocc cause I poped and he droped
8  my poutna left me on 59 by Havaster
9  na im all out of bounce, streped up and it's hella hot
10  H.P.D cant catch me no U.S Marshalls fellas out
11  they got big ass guns I told them dont shoot and surrenda
12  or should I gangs out like a jeet and remain the number 1 contenda
13  I wish I could be like Wy-klef and only be gone to November
14  but instead, im traped niggs and I dont even know it
15  my freedom chances are slim as me, and im about to blow it
16  but when im traped, I get my scratch, I dont tap

1  I done walked lots of steps in the streets
2  put a lot of pain on top of these feet
3  and I dont undastand when a nigga say he can tell a killa
4  they come in all shapes and sizes like any otha nigga
5  same a laugh and joke and same a straight kill ya
6  play bananna with a nigga straight pill ya
7  why niggs remember when I was ballen
8  but I wouldnt nobody rube I was fallen
9  yall niggs weak, plus yall all stayed caller
10  I been a back bone, yall niggs aint had shit
11  always trippen ova a bitch and some he said shit
12  you niggs gone cresh, tryin to watch my moves and my shoes
13  you should be watchin my tool as im removin yo jewls
14  you should really be still, cause if you move then you'll loose

EXHIBIT 2 Page 38

like karmasutra posi

1 Alot of people think they ~~know~~
2 but out of generosity, they speak kindness out they soul
3 the feelins I tend to hold, has turned me into a walkin ~~eye~~ eyemax
4 still tippen, way above the rim, I drip just like some type of climax
5 I been fucced up, like a Toyota, but neva had a recall
6 built my own bridge, ~~but~~ but I slipped, so now I free fall
7 im, half past dead, who is it gone hurt, if I dont sleep
8 tha real black sheep, aint no color die in me
9 #I thought I was doin great, maintainen with all the bullshit
10 fucced ova hatred and ~~people~~ people bitchin, so I pull guica
11 they dont know, so I workout, until I passout ...
12 vains in every part of me and heart pumpin about to splash out
13 punchin the walls until they start to hit me bacc
14 and hollering, like im lost and need a shot to get bacc
15 then I ley it down and try to rocc my self to sleep
16 in 09, I had my strap in hand, I had to play for beeps
17 now look what I did to me, cant even touch my kids
18 and I forced my baby Stephanie away ~~fr~~ from me, look what I done.

1 I aint heard from knobbody in a while, plos, I dont know what the business
2 I wonda if my brtch ~~fuck~~ workin, or fuccin one of my fellow peys
3 my T-Jones aint said shit, I hope she aint ashamed of me
4 she new she had a heathen, but nevaknew I optained a beast
5 Even in my child years, crime was the thang to me.
6 It was everyware around me, in the streets and even on TV
7 help me please, im awake and im still snorin
8 the boss play games with my life, with a coin
9 but I got to be sleep, quice slap a nigga twice
10 I make it burn by touch, like bad pussy and dry ice
11 that why im cooped up, they dont wanna see me breath
12 before I learn progress from nothin, before I walk yo race, I rather ~~b~~
13 like barefoot

EXHIBIT 2 Page 39

TROL #7 - DAMN-DAMN-DAMN
- I DONE LOST IT ALL
- How CAN I continue to FALL
- IF ALL I DO IS CRAWL

1. Why when a nigga or his ass shit get thrown in his face
2. don't true dat stop movin, as they steady takeit away
3. "What" the only hope I had left, and I thought yall would ride
4. Cant ever ask for help, cause all I get is dreams and lies
5. but niggas ana jump up like bump's when they bump up
6. lay yo ass down, they wont find you with a compas
7. despise on you niggas, comin to get you like some Huntas
8. to top it off, I aint happy with none of my hoes actions
9. but fuck it ha satisfaction came, when them laws lock me back in
10. so now im in a cell and forced to broadcast my skills
11. that's the only cope I got, besides my pain bein spilled
12. I alternate my pen because I often to break it
13. and murda the army of lined paper until the card board is naked
14. plus I know I dont need it, but ama be the one to take it
15. I aint mad at nobody, and I know I aint racis
16. I faced insanity so much, I think I finally made it
17. and homie tell Bill, he betta chill, for he end up gettin killed
18. and my cereal wont be the only thing spilled
19. they say my troubles are passed on cause my son a mafucca
20. but I pray for his momma to fade it when sweets try to fuck he
21. if I could be anything besides free, it would be heartless  ⟸
22. my smiles are the smallest, and my fine years are the largest
23. so I put a bunch of green in the air, cause life stinks
24. and me, I'll make the move on yo man, before the positive side of his wife
25. in here niggas yall cant see me, get off me, in the ground
26. I hate niggas and life therefor my beef game, come in the four pound
27. im screamin like a mafucca, but then it seems only hatas hear my sound

EXHIBIT 2 Page 40

1. Uh- dont give fuc if you occupied
2. who tha fuc are you, some kind of persent that represent ~~Eith~~ allah
3. now im abott to ride my kids my might possibly scream I dred
4. cause the mission mission you supplied, was guaranteed to take lives
5. now im, fuccin society with two long as clips from my ganes
6. predators lurk to seek, but neva complete, to tryin to get me from behind
7. the easiest thing to brang belng a nigga down, cant eva get up in my mind
8. "a Bitch", is no longer one of my problems, around me they tend to stay in line
9. I just west coast fuc em down
10. they pussy I let some, but they mind I ~~tempcy~~ temporcy comfine
11. until they get it up in they cranium, that money is a major issue
12. Im tellin you, im abott to get jamed into a place wace physical needs will miss
13. and the gized will, touch and kiss you
14. producing you thangs, you aint neva had
15. havta have you beggin for common curtisy
16. but thers no respect so I place my mask and serve like gas

1. I got no love for no soul
2. fucc all niggas and hoes
3. I use to chop cadillac and ~~bladfeet~~ blades befoe a niggs took the
4. that left me bacc on the bloc, wace the doe-boys play
5. and my bitch fucc away, fuccin like its ok
6. but fucc it its cool, she was doin ha babies pappy
7. I bangerd on tha doe, she ignored as I dodged coppers
8. and when it come open, she was trippin, like I was wrong
9. for he to feel loved, she let another niggs bone
10. I wanna dawa this nigga, but instead I break glass
11. I ~~coud~~ couldit think fast
12. I sware to god, I was hurt
13. but I cant be mad at him, my bitch the one who made the pussy twas
14. I got a crazy baby momma, she will throw in yo face

EXHIBIT 2 Page 41

1. 100 percent gangsta. I been gifted
2. 92 percent of that, my nigga, I been tempted
3. tho otha 8 percent of that, I been lifted
4. I play like im part of the leage or a factor and a boss
5. ridin with a loaded fire arm, cause foes play me like im soi
6. I feel the vibe when im around, like a strobe light over my hea
7. still feedin my famm, I need the cow and the hole loaf of br
8. and yall keep shiverin, I know you feel my breez comin
9. get upset like a stomac, and vomit bullshit from it
10. I feel democratic, and I got somethin for it
11. kids get held rancim, so they cant ignore it
12. I get money, then the world, I would explore it
13. keep tha mind frame, to double up and neva blow it
14. and im tired of playin with hoes
15. and im tired of playin with foes
16. niggas force me to make hard bread, so now I play with toast

1. its been a while since I seen somebody, I ered loved befoe
2. just many niggas with short time
3. and the ones who turn they selfs from buddies to foes
4. but it really dont matter no moe
5. freedom and communication is out my doe
6. I keep filen motions for my case, but it seems like that wont go
7. thirteen months of my grimmy time, I spent it in the always
8. at seven o'clock the lights is bright, plus I cant ever stretch my a
9. so close to the next man, when I sleep, I feel like he may try to stice m
10. my freedom I had to let go, cant teach my kids what I dont kno
11. I stay on my grind, but I get no shine
12. twenty-five seven hard times remind
13. cant sleep, cause I get to peep
14. cant dream cause I tend to reap

1 in tha hood is tha same niggas
2 G's and tha lame niggas
3 all tha gangbang niggas
4 fires up tha same niggas
5 hoes hop cause tha change nigga
6 not cause the fame nigga
7 same old game nigga put yo ass to rest
8 in yo beanie or yo chesti lay you down in yo nest
9 all I know is plex, so thats what I do best
10 I make y'all image small, when you wet like zest
11 make it burn like crest, when you stress for a test
12 when it comes to hate, I need more not less
13 otha then some metals, I aint neva had much
14 but all that material shit, make hattas wonna touch
15 and all I know is buss, when yo manz try to cush
16 keep a broom on my shoulda, to take off tha dust
1 ~~when it comes to hoe for a fur nigga tha whole rest~~
2 ~~I stand as a nigga all dark and wet like a dark cloud~~
3 ~~aint nothing soft about me I spit and drink hard~~
4 ~~sip blood from infected vampires and spit box from a price wars~~
5 ~~therefore I keep money in rolls like charmin tissue~~
6 Fuck life a nigga with ~~armas~~ arms will lift you"
7 I hit a bitch with tha best of me she want the ~~test~~ rest of me
8 tellin all they friends for they mans sake, now they want tha ~~cest~~ recipe
9 aint much just some gangster and some tough love
10 take tha whole loaf and shove it in ha oven
11 I played my position but the bitch ~~start~~ got a husband
12 tryin to play games, sends him wore my g's tusslin
13 ~~but I dont run from nothin but tha otha side of me will touch him~~
14 gotta ease the homies up, they all sayin fuck em
15 the ~~choater~~ & played his part and his bitch couldn't get custom

EXHIBIT: 2 Page 43

1. Hey momma (....) you ....
2. Chad Johnson shakes it, and dead dog fukin it
3. hated by alot of small people, call it bacon bits
4. in need to be shook, or put in tha heat and fried like bacon quick
5. I know I Aint been right, but shit im on my own
6. still fucced up in a world, with my hands for my crome
7. I aint seen yall in a minute, I let my emotions smoke my visit
8. and momma I do listen, but the bullshit got me twisted
9. cant even talk to Stephanie, and not being stable is tha cause of that
10. And when I do get ahold of my ANGEL, im afraid of what I might hear, matta
11. my emotions, get it showin all in my face
12. its A fact, im not A RAT, I got a co-defendant on this lease
13. liven off cake of the fiends, and no empathy for the number two
14. you know, that big giant oak tree, well im thicca than its roots
15. behind bars, and no bond, plus they only want the truth
16. I need the guidence of a experienced man, so Shun, what I do

1. Stephanie, I need you like I need air, but what else can I say
2. your love is needed else where, so I kicc it with the grey
3. repent me for my sins, please dont push my pain away
4. I keep you in my mental, so at the sky, I often STARE
5. and if you was at the light, then I would be blinded by the glare
6. if love is really painfull, then dope me up with meds
7. a calliber holds six, baby take the first one, and put it in my head
8. and I apologize, if I aint too friendly
9. and for cap pillen the idolized and the ones who dont envy
10. because of you, I neva let anotha bitch, come close to me, unless ha nm is nine, and she a semi
11. I done had them all, crazy, stalkative so I make them va
12. but you, my lady of the spanish
13. I wanna hold you like a banji
14. .. .. if we were kids I would give EXHIBIT 2 PU Candie

1. a nigga told me, have nuts have glory
2. I told him, I go so hard, a def man with cement in his ears, cant ignore me
3. I scramble to smooth, hattas try to hit me, like a quarterback
4. wondering why im already at a half, cause I brought the quarterback
5. got brick's jumpin around the hood, like it came with a bounce
6. dope game so good, make a councler resonance
7. but that aint my hobby
8. me and my buddy, in the lobby
9. told me to check my shoes, cause my laces untied.
10. and poke me in the side, to remind me
11. to playa, to be slipper, and my joes dont come sloppy
12. if I could clean the game, would anything remain
13. or could I be the nigga, who love to toast change
14. and im so safe, cause my 40 got a 18 nigga bite brain
15. and its kind of strange, how such small thing produce so much pain
16. me and my buddy on tour, just leav wood forest
17. now we headed to "Cllise" to make it rain

1. I got no love for no soul
2. Fuck these hattas and hoes
3. I use to chop cadillac and blades, before a nigga took those
4. that left me back on the block, ware the dope boys play
5. and my bitch far away, fuccin like its ok
6. but fuck it, I guess, she was fuckin ha baby poppa
7. she ignored me knockin on the doe, as I dodged coppas
8. and when it came open, she triped out, like I was wrong
9. for her to feel loved, she let another nigga bone
10. I wanna down this nigga, but fuck it, I break some glass
11. cant think or focus, this nigga just had some of my bitches ass
12. I rush up in the room, and see my baby champ, quiet and sleep
13. tripper, but I cant go to far, I wanna let him sleep in peace

EXHIBIT 2 Page 45

STATE'S
EXHIBIT
217

Teddrick Batiste #021740030
1200 Baker St. 4th (2H2)
Houston Tx. 77002

Stay Up Baby!

Stephanie Soliz
4502 Spring Valley
Houston Tx. 77041

EXHIBIT 2 Page 336

day by day, I think im loosin my mind.
and by the bruses in my spine, you can see it hurt when im down
I wake up with a poison cur, all I see is death
scared of seein what I reap, so I shout drama to someone else
and im numb to the world, but every hatred slog is felt
and I have no other way to cope, so the inner me is kept
I dont even know how to smile no more
16 months, and my lawyer aint said how my trial might go
he sent me a letter sayin the D.A. want off with my head
thats the results when you smoke a nigga, and take off with his bread
its time for a change, im hit and about to fumble
how much more of this can I take before I start crumblin-crumble
but fuc it life, you can have it, just let my kids know I love them
let them know im still me, and nuthin will go above them
and to my victims family, the inner me is lost
so hold yo comments, to yo self cur you dont know what im abou
trapped in the line of fire, no sheld no sword
but i get a thought, that will stand me on guard
bol me in a blame ball, with denim shorts and no shirt
with a picture of the reaper and ammition to look back at his earth

I CAN'T THINK TO MUCH ON MY MIN
AND I DONT EVEN KNOW HOW to EVEN
AVOID IT. SO HOW THE HELL OMA DO
ALL I WANNA DO IS MAKE MY WIFE
AND KIDS HAPPY, BUT I CANT EVEN FUCC
STAY FREE TO SEE THEM SMILE AND LA
I WAS OUT ALL I DID WAS MADE HER
STRESS AND MAKE HER DAYS DARK I APOLOGIE

so when they call Freddo jump, I just let they clap, and they trip
bitch is mail time, I got a product, and I get to sell mine
At first off the bud, you can smell mine
they all love me mine, they all wanna touch me mine
rather it to play with my click, or 9 milli-meter rush me mine
I tell em all the same, I ain't slippa with my pants down
im learn to get money, fuck these niggas with they hands out
all gold, seein loud, tucan be pass and fen's out
niggas vote the cloud
in tha smoke you be puffin on, and tha session you be attending
when my name get to mention, yo pockets get to bendin
and yo secrets get to spendin
and I ain't even hungry, my head slice is for my bitch
I get all the bread I need, so my kids could be rich
They got me lookin to the bible, like my life don't fit
wish I was wealthier then a mutha, richer then a bitch
they said, they'd give me life again, if I turned around and snitched
I looked him in his eyes, and said, I don't remember shit
now im lookin to the stand, as my nigga raised his hand
my life flyin by, cuz he softer than a sand
but im stiffer then a semi, I ain't neva gone fold
I treat em all the same, so niggas and hoes
wish I could get away somehow, smokin a piece of shroom
I just learned it aint no cure, to my germ
but one still remain paland up in this game
teachin my self to cope without feelins up in my brain
how do I release pain, the voices that neva stop
I rather be dein in my sleep than life flighted off the block
but the world can't understand, why I don't talk, and won't do it

EXHIBIT: 2 Page 48

1  just tell me how many in, im about to go and ride
2  they scared to come outside, cuzz they known to fight and hide
3  you really want beef, I leave you while inside
4  supurbe with my tool, you'll need Jesus by yo side
5  aint nobody represent me, "Smith and Western", was my poppa
6  I Springfield Armored a nigga, and had him, stressin to the doctor
7  me my self, im already dead, life support came with me
8  close range, with a "30-30" scope, you still cant hit a gee
9  one thing about me, I leave niggas and hoes wet
10 "no Homo" but a nigga will get forced, playin with my respect
11 and hoes somethin else, I go in they mouths, like the hungry
12 they taste my unborn, and the candy I shared with my lil homies
13 but if I could have it, now, my eyes would excell
14 evaporate, from all frowd shit, cuzz even real niggas tells
15 now call it to the game, the beef is almost ova
16 so I toped it all off, with a ski-mask, six bullets, and my composure

1  k lifes a trip, I had a real nigga, ask me about my late homie
2  farr left side of my left hand, R.I.P to my late homie
3  im thinkin this nigga cool, but everytime he talk, I feel like he hate homie
4  but I stay plexed up, and anything he say, could send him to meet my late
5  homie, ... buts up, for 32 bullets grill you, like a steak homie
6  cop killers, rest in tha chamber, in a wide clip homie
7  man lifes somethin else, will I get tired of all this rumbslin
8  no worrie, cuzz I aint been hit hard enough to start fumblin
9  eyes neva slumped, for them
10 tell them Teddrick's in the jungle when they come for him
11 straped in a tree, as a threat, as they come for him
12 and unless its beef, I dont comprehend
13 when the clip is empty, I load up and dump again
14 no sin is worser than sin

EXHIBIT 2 Page 49

1. Guilty for 20 years, until they proved his innocence
2. crowds wonder why he stayed humble, and neva repented sins
3. day to day struggles, you could see my nigga gain threw it
4. fighten a life sentence, but he got no option but to do it
5. but seein no change, wiser his frame
6. motion after motion to put freedom to his name
7. and a beautiful woman, who kept it real and held him down
8. and when you look in his face, a smile aint neva hard to find
9. but homie rode it out, locc down in a box
10. buildin up a case, but he neva drove a got
11. pushin a bunch of iron, only crph with his pain
12. on a cell block, bench doors slam, and kick it with tha cans
13. wonda why tha victim took the stand, and gave a false trial
14. nigga was 15, when he walked the green mile
15. so many odd years, thinkin out why me
16. now my nigga free, and he aint even cop a plea

---

1. all free, im stallin out, all eyes on me
2. I try my best to open up and see who happyness from my smile
RIP
3. I hear a whole bunch of people, and words steady scramblin
4. I cant talk or walk, or other wise, I would go and handle them
5. my niggas knew what im bout, and knew ware I was comh from
6. I said, I give my life for happyness, but I gave it for my wheels
and whats in my trunk
7. life truly is a fuccin joke, small things will get you gone
8. I stop liven at 21, what kine of shit im on
9. a pair of wheels, will get me stucc
10. and a pair of lips, will give me up
11. but sometimes a nigga should, listen to what his bitch spit
12. it might save a nigga life, or it might leave a nigga quit

EXHIBIT 2 Page 50

1. Now that im grown. I got alot of enamies
2. but couldnt catch me, if I slep in the same bed, with a skin disease
3. plus this life is mine, and I wanted dee to burn
4. and eyes will neva be able to see me like a ober open germ
5. 't the older I get the wiser I wish
6. I toss in the well, as my niggas wait till im gone, and take from tha sh
7. but lifes a trice, and the game will make a nigga dissapier
8. like a ship with no rum, so tha pirates hit tha pier
9. smell thangs, make a nigga flip
10. a hundred dollas is a grip, to a fiend with a bunch of lip
11. and now im grown, I aint thinkin with my creme
12. violaters pay for what I own, and safely return home
13. and no moe self-centered ways, to only come up
14. but I still holla, trost no bitch, with my gun up
15. and I think about tha reaction, so the action wont get me guned up
16. I've realized, tha bottom aint for me, so I gave somethin up, "OLD WAYS"

I need to take a trip, with my grip, "I cant slip"
straped n my clip, in my whip, "as I diped
I gotta get away, to much red, and im a crip
had to shake tha seen, full of blood, plus my shirt ripped up riped
stain on my colla, cuz I dip when I sip
always down, a forklift couldnt lift
as my nigga need help, cuz he triped and got stuc
ran across a pacc of dawgs, and he had some bad luc
tried to up first, but kg cap killas hit his shalda
left arm gone, so he switced, tha gun ova
then when he got his aim, I heared bang to tha bang
one up in his chest then one up in his brain
I groove Groove on my homie, cuz his cant Rich Roll
he dien in tha heat, but his body all cold

EXHIBIT 2 Page 51

1. This street shit, im startin to think it aint apard of me
2. wise as im allowed to be
3. Got my own lable called "I Got hatters" Dot ENT
4. the moe money the moe they seek
5. the moe I creap, the moe they peep
6. if they dont tick then I dont eat
7. if I dont eat, I start to creep
8. takin butta, takin bread
9. turn yo necc, I'll take yo head
10. yeah I need them, watchin me
11. hattas dont stop plottin please
12. hate on me cuz im a "G"
13. I got game and lots of freaks
14. but hattas aint no breakin me
15. I'll ~~burn~~ burn yo ass, like satins peeps
16. and empty you like vacancy's

1. How would you feel if you coudnt cum
2. yo gun wosudnt dump and yo bitch would woudnt give you none
3. you been gone all day, now baby said, you watch yo son
4. pocects fucced up, you cant even buy a burger
5. now lifes all gone like murda
6. no plan, just visions of you bein rich
7. you bein rich, not yo family nigga
8. thats tha problem with most of us, to busy bein arrigant nigga
9. this situation im in, most people cant relate
10. I done heared it all, it aint ova, just have faith
11. I made it, so im bacc eatin beef and whole state
12. cant even break from tha grass, cuz im traped by tha old sake
13. but na homie, im dipen on my mistakes
14. held by a felony, while naita mivers get

EXHIBIT 2 Page 52

STATE'S
EXHIBIT
220

TEDDRICK BATTSTE #02279030
701 N. SAN JACINTO
HOUSTON TX. 77002

STAY UP!

DOMINIK JACKSON
11800 GRANT RD. #5203
CYPRESS TX. 77429

USA FIRST-CLASS FOREVER

EXHIBIT 2 Page 53

I JUST GOT █ LETTERS FROM YOU.

20100 I'M A SINNER TO MY OWN GRAVE/DID A MILLION SHOW'S WITH A MILLION NIGGAS/NOW I'M ON MY OWN STAGE/KICCED IT WITH THA CROOKETEST, BUT THA REALIST STAYED ON MY MIND/TH█ TIME, SQUABLED WITH MY G'S TO MAKE MIND HANDS BETTA/I THROW DOWN TO MINE/NOW I'M ON SOME PENNATRATIN GAME, IN MY LTL BROTHA AND MY CUSIN SHIT/BUT NOW I FEEL LIKE DIEN, CAUSE THA DRUGS GONE/BUT REALLY I BEEN DEAD, CAUSE ALL MY FUCCIN LOVE GONE/AND I REALIZE, I LOVE DRAMA, LIKE A F█████ LOVE STONES/SO THANKX FOR THA --LOVE AND CONSIDERA KINFOLK, BUT I RATHA KILL IT ALONE/DON'T STEP INTO MY "SMOKE" ZONE - I'M GHOST HOMES

SAY BRO, WHAT UP BOY, MAN I WAS ABOUT TO FULL WITH MY MUSIC, BUT I GET TTORED OF OF EVERYTHING AND EVERYBODY, AND I SAY FULL IT. SAY FULL I GOT SO MUCH MUSIC WROTE DOWN, BUT I WILL MAKE A NIGGA QUIT WITH MY FREESTYLE GAME. SAY NIGGA THAT ALTERNATIVE SCHOOL AIN'T WHAT IT IS, GET YOUR SHIT RIGHT NIGGA. SAY DON'T WORRIE ABOUT NO PICTURES IF YOU AIN'T GONE SEND THEM. I MEAN FULL IT MANE, SEND THEM, FULL THA POLICE, DON'T SEND NO CALENDER AND SHIT LIKE THAT, SEND PIC'S. GET ME THAT NIGGAS C.J ADDRESS, ASAP! SAY THANKX FOR TELLIN ME ABOUT THE FAM, I GOT MY SOURCES, TELL YOU MOM THANK YOU FOR PRAYIN FOR ME, AND TELL HER I GOT ALOT OF FAITH, IS IT JUST YN AND YOU MOM NOW? GOOD LUCC ON THA GRAD THATS 100. SAY THAT GET

EXHIBIT 2 Page 54

SOMETIMES, HOW MANY SONGS, HOW MANY PEOPLE? O-YEAH QUIT PUTTIN ALL THEM HOUSTONE STARS, THAT SHIT AINT THAT BELONGS TO A MEXICAN SET TANGO BLAST, IT MEANS TEXAS AGAINST GANG ORGINATION, THE ᴺG IS SILENT. FIND ANNOTHER STUMBLE, NIGGAS REALLY KILL FOR THEY SET IN JAIL MY NIGGA, THATS WHY YOU GOTTA STAY STIFF AT ALL TIMES, AND TREAT EVERYBODY THE SAME NIGGA AND HOES "MONEY OUA BITCHES ANN NEGGAS TOO," SAY THAS 1000, KEEP LOOKIN OUT FOR MY LIL BRO HE AINT GOT NOBODY, AND DONT LET KNOWBODY TRY TO FUC HIM OUA, SAY THAT T-DAWG SHE'S OUA, I SMOKE MY NIGGA, I HEAR YOU GOT SOME INK, SAY YOU AINT GONE NEVA CATCH ME, TELL MY MOM TO BRING YOU DOWN HERE, ALL YA NEED IS A ID YOU CAN COME ALONE OR WITH A FREAK, BUT YOU CANT HAVE NO WARRENTS, BUT MY INK GAME IS AT A ALL TIME HIGH, STOMAC, CHEST, BACK, FACE, WHOLE LEFT ARM, FROGER BOTH ARMS, HANDS, FINGERS, SIDE OF HAND, HALF RITE ARM, LOL, OMA EAT YOU UP NIGGA "NO HOMO", DONT TRY TO COMPETE, SAY IF I GET A LIFE OR TOO MUCH TIME OMA DO MY WHOLE BODY, IM DAMN NEAR GONE DO IT ANYWAY, "IT ASK FOR FORGIVENESS NOT PERMISSION"! YGAIL WHEN I SEE MY NIGGA, OMA HAVE TO GET AT HIM CAUSE IF THEY ENGUE FAULSA FYIN THA STORY, I DONT TELL MY MOMMA SHIT, WHA WHY THA FUC OMA TELL THA POLICE, YOU MITAS WELL KILL ME, AINT NO RATEN IN ME, B.T IF THEY WONT THAT HEAT, THEY CAN GET IT, I MADE KILLS OUT OF THEM, AINT NO STRESS, REALLY IM FUCED UP BUT I AINT GONE

EXHIBIT 2 Page 55

HELL NAW, NO DREOS, STAY WAVED UP 360 BEE LINE MY SHIT RIGHT, HARDEST IN THE DORM, NO SHIT MY NIGGA O OLD MAN JUST BEIN A DAD, AND DONT MAKE HIM LOOK LIKE A ASS, MAKE HIM SMILE BRO, GET YO SHIT RIGHT AND TIGHT, WHY THEY CALL YOU FREAKY, YOU BE EATIN PUSSY, LOL. THAT SHIT MAKE THEM HOES FALL IN LOVE. SAY FOO CALL ME, NA JUST PLAYIN, SAY NIGGA E DONT DRAW, I DEBO THE MEXICANS TO DRAW FOR ME, I GOT YOU THOUGH WHAT YOU WANT, AND HELL YEAH IM GETIN BIG I HAD TO STOP FACEIN OFF, THAT SHIT MAKE YOU WEAK, BUT IT MAKE YO DICK GROW, REAL TALK HAHA LOL, MAN I USE TO DO THAT SHIT EVERYDAY MAN OMA LET YOU GO BOY, GO DO YO HOME WORK HAHA, FOO SOME HOES FOR ME — YEAH S WHATS UP WITH HAT COLLEGE SHIT WRITE BACK.

STATE'S
EXHIBIT
221



Teddrick Batiste # 02279030 / 2-6-1
701 N. San Jacinto
Houston Tx. 77002

Stephanie Soliz
4502 Spring Valley Rd.
Houston Tx. 77041

I Love You

USA FIRST-CLASS FOREVER

EXHIBIT 2 Page 57

Stephanie.                                                    3-1-10

Say whats up baby, how you been doin? Well me in cool and still being me, I hope yall all ok and aint had no problem. How is it goin with kashes shot, you already got them for him or what? Are you still writing me or what, say mane that was fucced up, the last time I talked to you I told you I would call bac to talk to you and you talkin about no dama you dont wanna talk to me, you dont wanna fucc with me that much. Hey how has the dog been doin, my moms said that nigga is gettin big as hell. Say that shit with the Lawyer and that drunk driver aint real gone take a year to get settled is it, whats the Lawyers name and the drunk drivers name. Say I still cant beleave it mane you really dropped a nigga off, can you beleave that shit you had to off when I needed you the most. Say mane I need you at my trile when I go, dont fucc me being aginst me, I still love you man and still fucced up about tha shit, I already know my nigga, shit happens on my end too, I just hope the boys dont get tiered of comin to see me, damn I know exactly what it feels lik not haven daddy around, and step daddy around, I hope they dont come up weak, say oma let you go, I Love you, stay up. Read this to kash    Always love  Ted flick

Hey whats up, I hope you been bein good and taken care of Alex. I aint been doin nouthin but watchin tv and sleeping. I been thinkin about you. I wanna pla spiderman and batman with you and Alex, and we can eat fish stix and chiccen nuggets all day. Oma draw you a spiderman, I got to get a picture first, then oma send it to you, ok. I Love you And ACE Tha daddy

EXHIBIT 2 Page 58

1 Im here in this place, that I dont wanna be
2 My feelins taken over, sometimes I dont wanna eat
3 most times, I cant think, I react better by just actions
4 but I aint neva crashin, so my seatbelt aint fasten
5 im goin 90, on a road, that's made of paper
6 my blades cut up the lanes, so Im fallen like the cake c
   a clumbsy cater
7 And why hattas mad, im as blue as a dorf
8 TV's got the wood grain lit, call it a flic in the forest
9 And······ think I got a problem, I buck unborn shit
10 Fucc a bitch ··· gscol ha·················· I need ···
11 And I need gwap cuz Im tryin to get rich
12 Why these hoes aint shit, cuz they niggas aint shit
13 So me, I been stressin the situation im in, got me all fucced up
14 it aint even in my hands, got me all fucced up
15 so you could find me in tha hood, with blue ova my head
16 poasted on stand by like a tool in tha shced

1 I wonda if I fold, how many people gone really care
2 I mean who really gone question me, or loose a string of hair
3 I need to overcome it mane, but this shit stiffer than me
4 Im as stiff as I can be, and know the game like a freeffrrie
5 but now I lost controll, and im fallin like my babies diaper
6 This situation got me wipen drops, like a windshield wiper
7 reality just kicced in, im really alone
8 without my kids and my momma, id be tosted like a slor
9 now im primed like my lac, they tryin to hide me for a fact
10 the death pennalty is 3 shots, I think im ······ that

EXHIBIT

1 I use to tell my nigga, my wife this, and my wife that
2 but then I wrote my wife and my baby momma wrote back
3 now, what am I to do, she just speakin, from her heart
4 She tryin to keep a nigga cool, but her response hit me like a die
5 I know im fucced up, cuz now im feelin what they see
6 Im lookin in the mirror, sayin Stephanie why me
7 but cuz leb cide, was more important than daddy dont leave
8 I barley made it home, and when I did I was alone
9 big Gator went to jail for ridar dirty with the crome
10 my betta half was right, the streeb is no longer my life
11 I got my family, but still tryin to earn stripes
12 but ill neva be suprised until they line me up in chalk
13 and yas should neva sleep on me, cuz anyday I turn my doggie i
for a crip walk
14 I learned from an old lady
15 yas should neva stody the crazy
16 and always go hard, when somebody tryin to pay me

1 I know it sounds crazy, but all my dreams are threw, Im still thinkin of
2 and life wont be the same without drugs and my cheese, but its josta challenge 4
3 I wont be expectin you to hold me down, and I wont be expectin you to be there
4 I just wona make sure you love and remember me
5 I'd rather be apart of yos memories, than some one to hate and wona replace me
6 Yos know, neva want me around, like a negative vibe or bad tendacies
7 Jost cont understand it, I was daddy best employee and positive to the ones in the steet
8 To a mistake were everybody got they eyes and hands on me
9 and niggas get seayority off stress, like its the new A·G·E
10 I report repeatitly yell freedom but they over rule, sayin cage the beast
11 But oma continue to kill peds, like a lionist kill to eat
12 and oma continue to drop niggas, like a hot ass merch in the heat
13 and oma continue

2  playin with his life, and ask to ~~to~~ be traded or treated differen
3  every minute on a hour, a jacer barley misses tha ~~too's~~ cops
4  but they spend time pullin niggas over cuz they ride new, or in a dr
5  I just wanna give it back to a nigga who really need it
6  I fucced up cuz, I knew ~~did it wasd~~ how to accomplish, but still a nigga che
7  so now im in a unit and im ~~complicat, contemptai~~ contemplatin so
8  first  ~~first~~ and the last question got me same answer dont do it
9  they playin with my life, so who else could I call
10  they got two dead body's, and a gun full of my paws
11  I was thrown in the ~~street~~ street, and neva had a scremige
12  learned how to read, a nigga gettin past a image
13  ~~I aint buyin~~ shit leave the playin to the toy's
14  tha street in my vain, and tha crippen in my heart
15  and it all look good, when a nigga on top
16  but when the tires flat, they all fade off tha clocc

1  Since April 18, I been writing about my life
2  You know, shit I done good, but mostly shit that aint right
3  I talk about all my pain, and the strugglers I come across
4  how I hope the world ~~~~ would change, and people ~~would correctly~~ be a ba
5  but I dont see no differnt, tha pain is still the pain
6  pain is still the present, and the pain is still the rain
7  pain is still a chain of thoughts, that conflict the average brain
8  and aint nobody perfect, show me life without a stain
9  am I guilty or am I not, eather way I gotta face it
10  ima man up befor the judge, maybe the good will overtake it
11  shiddd, im ~~better~~ better off, robbin a bank with out a face kit
12  five in a half months, and im still lookin like a ~~burst~~ feast
13  tryin to convince the "DA", ~~that~~ I really aint a beast
14  this shit aint gan noware but I aint gone let them take i
15  neva thought I would say it, but ima fak EXHIBIT 2 Page 61 ke it

1. I'm a pimp in my own mentality
2. make niggas wanna hop fences, and throw they galls at me
3. I do all the things that yall fellas think about
4. you got problems, bring em at, I got guns bigger than down South
5. I'm hopen for a change, but I know it will neva come
6. plus everyday im sleepin creepin and eatn with my gun
7. and its the same, jus another week or a day
8. but me, I got faith, only to crall blue ova tha gray
9. I scream this worlds fucced up, but really I know its me
10. cause I wanna value hoes and live like niggas on TV
11. wace the real niggas at they don't even come a dime a dozen
12. I need them all cause my life's been spent around crime and cous
13. cant have shit, cause with a lil bit, haddes will start creepin and hustin
14. I aint neva been a hoe but im quick to leave a nigga with a problem cons
15. ~~I run the pace like a cake I supply to all the game and the world~~
16. ~~we survive both tha cloth and the work like the I.R.S. run tha street~~
17. ~~still rider for tha survey yall doff town THANG?~~
18. ~~flip and bang off my the lets feel like diamonds in tha neck~~
19. ~~I turned out a few solders to the hoe she committed to get rich~~
20. ~~Gucha so good wake up in the morning to a blunt rolled and a cold six~~
21. man lifes a bitch, play the game down or get hit

1. What yo bacc nigga, the shit I be servin is rare
2. I mean yo head over here and yo body over there
3. and yo game been steped on alot like the only pair of stai
4. I dare you hit my blocc, with no mask ova yo glares
5. and I heered hurd you drive cautious nigga, I word tha
6. if a nigga was tryn to fcu me like carnaval food

1. I Feel like, niggas cant Fuc with me
2. I Feel like, sitten bacc and smoken weed
3. I Feel like, niggas quice to sell they soul
4. for a peace and chain, set of swangs or a couple of hoes
5. I Feel like, people lookin up to me
6. to guide a nigga right and leed him out of poverty
7. I Feel like, callin in and tellin my boss
8. I aint comin into work, cause my mind is lost
9. I Feel like, I done had enought of this shit
10. I aint doin for to nobody else, yall can succ my dicc
11. I Feel like, hopen in my car body
12. and riden and riden, and riden away
13. I Feel like, turning off my phone
14. and not returning bacc home, cause the problem is strong
15. I Feel like, sometimes just breccin down
16. and if I only had a bitch, that smiled and hold me down

X6  I Feel like ~~~

17. — I got too many problems occupying of my own
18. — so once hit the bacc gate and then Im gone in my zone
19. — I Feel like, I shouldn't Fuc Around with no Friends
20. — cause now im on my ass aint knowbody here to lead
21. — I Feel like, the world shouk stop and twirl around me
22. — I been all I can "G", the hood labled me as a "G"
23. — I Feel like shit when I woke up to all this hate.
24. — and my bitch cant do ackman thing, the drugs take it away away
25. — I Feel like, if im sober I might hurt somebody
26. — so I hit the weed real fast and ecc and jerk my body
27. — And if the world moved around me, this song would, murk somebody

X6  I Feel like ~~~

EXHIBIT 2  Page 63

1. All. Money don't go, I'm tiered of being broke
2. Penatration of to a cash regesture, kills a nigga Soul
3. I like when we elope
4. I protect you from counterfit, the naked eye will neva know
5. and I dont descriminate, but peso's will neva go
6. I put ova niggas and hoes
7. Plus you a major issue, and you'll take a nigga from his family
8. and then take his soul
9. I came out of jail, my money was at a all time low
10. My attention wasdnt even cought
11. but I placed a couple goals, and my numbers finally took off
12. and greed came with it, but neva directly in my face
12. but bitches was, so I socced them like robots and pstashed they ass away
14. I still aint rich, but my game toughfor than a brice
15. and I aint talkin shit but I make em wanna commit
16. All man im the shit, Gold salava when I spit
17. I watch Spike TV, translating Phelps of ibollvine to "Lit"

I know somethin they need, so why they tryin to free me mane
my lawyer dont accept my collect calls, so why he tryin to due me mane
my celle said a prayer for me last night, and it just touched me man
he seen me with my face in the pillow, lookin so rusty mane
my T-Jones just blessed my game
in here comissary's next to fame
I'll give my heart to the strange, to see my bitch naked mane
my name on he finger, I wonda do he respect it mane
But Aaron aint crazy mane, that nigga resped my game
he's a target up in my range, extended clip to his brain
im crippen not cristlain mane, straight sippen and crippen grain
yeah I still got it in me, what they think oma change



STATE'S
EXHIBIT

Teddrick Batiste '022790680
701 N. San Jacinto - 2GF
Houston Tx. 77002

Stay Up

Stephanie Soliz
4502 Spring Valley Rd.
Houston Tx. 77041

USA FIRST-CLASS FOREVE

EXHIBIT 2 Page 65

Stephanie                                                    3-14-10

Hey beautiful how yall been doin? I Hope yall in the
best health at least Say baby how's it goin on the job
tip, you still lookin. I don't know why you quit payless it's
gone be the same thang all over again unless you got a
plan, yall well you think yall still need me, couse I need
yall! Say you aint got no certern place in mind, or anythe
especthis you dont wanna do. Well on my end I've been o
I mean damn phyc meds a motherfucca, I hate that
shit I think that shit fit's me but fucc that im a
"gee" I'd rather go crazy, than to take meds and be
made crazy, you know, so I'm alright untell I hear yo
voice, or I think about you, or even recieve mail
so I stay fucced up, it's betta that way I love you
Stephanie I still miss yall like hell mane, my momz
told me that Aaron's good around the kids, and they
stay smeling, but im still fucced up. That's good for the
boys atleast. I'm still just crazed out about my wife
turning into my pen pal, or my mistress, you wanna be m
secret admiroer. LOL? Say I finally got court next wee
month, they just gone tell me the same thang I think I
can beat one case, but we gotta tell them about al
them fucced up drug's I started using last march, and
how I started mentailly loosing it ok I need to talk
to you up in person. Say mane you said the lady to
you, you cant get a I.D over the computer so why
luo said you gone get a money EXHIBIT 2 Page 66 just s

me, I've learned to neva get too close to anything or someone I cant turn away from in five minutes, it seem's like every nigga I tend to have something in comon with with they goin home real soon so there for you my only nigga right Say mane how come you don't talk to me mane you to scared of people. LOL! No forreal talk mane, you don't want to I plan on seeing the boys today so ima let you get bacc to what you was doin I love you, Stay up take care of you and I my lil homies, stay ab baby I mean that "I'm Ghost"   baby daddy

p.s. did you go   "Smoke"

and get your stamps

EXHIBIT 2 Page 67

1  I except tha whole paccage, whateva problems you had become

2  put aside the way I get money, weather a 9-5 or a life of crime.

3  but I neva knew if I got some time, you wouda't even stick around

4  you my bottle half in every sitvation, you suppose to hold me down

5  even know at the time, gettin money for you was the only thing on my mind

6  but who knew the stress would push me off the edz of line

7  of corse you did't force me to do shit, but I dont wanna see my wife cry

8  now im livin amungs bullies, and sleepin with other victems

9  it hurk me to talk to you, but I wanna tell you to pray the judge dont convict

10  I do it for my self, and it soothes my my mind frames

11  but knowin I may neva touch you again, Im still exceptin exceptin things I cant chang

12  and in the long range, I pray you continue to be a great mother, and remain a strong bit

13  as for me im still developin hope, either this case will possibly change

14  my load, I want alot of things and not a clue on how to get em

15  but I got my faith up in the good ghost, and I know I'll soon end up with e

16  couse if anyone could speak on my behalf, they sure ment would be

17  dont kill him

1  Uh, I know pain like I know danger, and I show pain like a broke

2  and matta fact, we go together like a coat and hange

3  on top of that my niggs got 25 behind people haters and a couple l

4  now away with his ties, death to a stranger, aint even supcised

5  but fuc it more, let me hip you to what tha bizz is

6  live by die by, it aint to many forgivenesses

7  hatred is positive to some, they'll neva get rid of it

8  and thats for the pussies, either blend in or be tha dicc

9  I neva ask to be a gangsta, just wanted to be somethin in life

10  but positive, successful, but instead im the gunman at night

11  I wish tha pain could only come once a month like foodstamps

12  but instead I come across it daily like a loose tramp

13  I see niggas try to fight it but they can't

EXHIBIT 2 Page 68

1 I'm goin away, and I dont know if im comin home

2 in my physical, is a bunch of niggas, and a road my family cant come alon

3 my mental is a visual, that my bitch will be movin on

4 my plea to the D.A. is washed up, cuz we all sing tha same so

5 I really wish it really ment somethin, that on my knees, ill still be dumpi

6 for my family, or to put and end to me, of the violaters conscie

7 I wish my locs would ride with me, but we all dont think the same

8 I wish I could put in his mental, that for him, ill leak a niggas brain

9 so now im trippen on a daily, my conscious still, tryin to break me

10 I got too many problems, plus I'm stressin ova tha D.A. and my ba

11 now im on my knees prayin for my freedom, and my kids safety

12 and lately its a test, they got me sleepin with niggas that hate me

13 my lawyer aint sayin shit, so im thinkin of new way's to safety

14 damit my lord, please just let tha outside take me.

1 looks like ima be fightin this for a while, and done drained all my smiles

2 my lawyer aint got shit, and he talkin about goin to trile

3 I look him in his face, and tell him man what if we loose

4 then ima be dead as a vegstable, drained from water and roots

5 I just wanna see it first, maybe somebody smiles at me

6 its hard to do it alone, when the devels tryin to kidnap me

7 I miss tha shit out my life, cuz I neva seen this shit happen

8 man I wish I could have a favor, and not just tell somebody

9 why my story aint the same, it will touch, open and exhale somebody

10 I cant count off one hand, how many favers I've had

11 but I need more than 2 hands, to count how many, I picced up carried ad

12 I plea and beg just to come home again

13 cause, I really dont need exceptance, therefor faith and hope, are my only 2 fr

14 I recieve visions on tha daily, as is im riden by my self

15 but its capital murda, when you riden for yo wealth, and take away someones heal

16 Therefor I pray for help and loyallty upon my self

1 I took a couple of words from a shart timer
2 I bardy see tha nigga, plus he got limits, like a part timer
3 But when he seen you can see tha nigga ~~correction~~ wise like a mafia
4 22 - off tha street 30 in tha penn and tha pain got him dier like
5 a mafucca
5&6 Positive stories about how a nigga had alot goin
6 but ~~possibit~~ possibly how a nut had it out for him
7 the game has changed, hands aint really part of a mans life
8 the gun got 3 outcomes, deed, eatin spreads or boxed for life
9 its tha truth, tha burna will spread and shead some pain
10 have you lower than a piddle, or on top of tha chain
11 you can have yo momma proud of you and worrie free
12 or talkin to the pastore about you and cryin in ha sleep
13 Family first, money second and tha game last
14 Aint worried about friends cuz like rain they pass
15 I make my own choices, and omg go for it
16 And I aint stopin till mybreath is limited, and im snortin for it

1 my case, get to me, but what else can I do
2 I sit up in a dorm, and try not ~~br~~ 2 break tha rules
3 my Momms came to see me, to bare me some bad news
4 damn I hate to say it, but it only gets cilla
5 grssng, stop takin her meds, and they say its about to kill ha
6 now tha family maka plans, they tryn to put her in a home
7 I wish I could make it betta by ridein it out until she gone
8 and bad enought Im doin bad, yeah I hate to admit it
9 but I cant stop the pain I ~~oly~~ can only try to quit it
10 I wonda what they seein when hearin about my past
11 while Im stressin ova what I see behind tha glass
12 I feel tha hand print and ~~feel~~ hear me ~~conversation wonda~~ in his voice tell

EXHIBIT 2 Page 50

2 neva confosed in this game, nigga I bang with tha left
3 and some of us bang for fame, see I dont bang tha same
4 my nigga's bang for loyalty, change and survival in tha game
5 it a neva be tha same, no moe believing us mane
6 but my beleavins is tha same, im a leader in tha game
7 foer gettin change, bussin brains or fire it makin it rain
8 but most of all sometimes even a playa falls
9 weather haled by community, or hated by tha law's
10 can I speak for all, fucc em all even ya'll
11 cause when I was paid it was easy to get pleased, but I dont need u
12 and now that im rich I developed a ~~se~~ symptom called beat yo feet ba
1 so much struggle and pain I got to wipe my brain
2 I done cut my arm dama near to my ~~jagg~~ blood is drained
3 ~~it's a ~~~~my ~~~~nigga's~~~~ ~~~~ ~~~~ ~~~~ ~~~~ ~~~~ ~~~~ ~~~~~~
4 ~~eyes~~ ~~~~ ~~~~ ~~~~ ~~~~ ~~~~ ~~~~ ~~~~ ~~~~ ~~~~ ~~~~ ~~~~~~
5 ~~dont dodge~~ ~~~~ ~~~~ ~~~~ ~~~~ ~~~~ ~~~~ ~~~~ ~~~~~~
6 ~~I done sold my soul~~ ~~~~ ~~~~ ~~~~ ~~~~ ~~~~~~
7 im str, plos I cant stay out tha rain
8 my ~~pillowar~~ pillow stay wet, cus Im cryin in pain
9 no moe cuts of designer chains
10 face covered in tatties, just to hide the pain
11 yas to on my eye lids, whn I close my eyes
12 I got a back up strp, whn its tine to ride
13 cus tha one you supplied aint got enough shots
14 you wont find me dead, ~~ya~~ on ya block
15 unstrpped, all out of bounce, with my pocets out
16 and I aint tryin to be the reasn my niggs got a color
in tear drop

EXHIBIT 2 Page 74

STATE'S
EXHIBIT
224

Teddrick Batiste # 02279030
701 N. San Jacinto
Houston Tx. 77002

Hi
Love you!

Stephanie Saliz
4502 Spring Valley Rd.
Houston Tx. 77041

1 of 3

1  This is ⬤ roll call, for my troops

2  twenty-one nigga salute, on how they treated a nigga who began to groove

3  even though they the closest to me, I neva developed trust

4  I was cool, I aint break bonds or fuc a nigga up

5  it started with my bitch, and how I scooped ha from another nigga

6  homie name Aaron, I aint neva made a bond, and aint friendly to mad fuc

   nigga

7  then I met some nice niggas, phill-weed-and CJ

8  changed the game up no mo sports, now im vibes with the street pla

9  them niggas had a leader, and his name was Kory

10 I get cool with his lil bro domnique, but I really couldn't afford it

11 me, I did wrong, but neva to them niggas

12 in tha mean while, I go to bootcamp and CJ fuced my bitch

13 let a nigga name AI, try to play ha quise

14 Then some foreys name Elon and Markus, damn near took from ha

15 phill aint do shit, but turned his head and looked from ha

16 weed stayed down, he was cool as a mafuca

17 taught me some game and had me, smooths then them otha succas

18 but I done did it all, from puttin food in a niggas mouth

19 to givin a nigga clothes, and puttin lettin them sleep on my couch

20 I aint neva lied them, but they left me.

21 we suppose to dawg hoes, and fuc em up, like two left feet

22 them niggas knew how to tink more, but they couldnt gangsta ⬤ as me

23 had love for em all, but now I only love kash and Alex, wise men and a

24 I get more into the street, and did a lot of leavin

25 doin pitty as time goin to jail from season to season

26 my baby, became pregnok

27 but by a nigga I neva expected

28 he use to tell me, I got a good girl, and I should⬤ shoud take a loss

29 but when he came home from TYC, he put ha on his uncles couch, turned

31   but fucc it shit happens, like when both of his sistas, came at me

32 I turned em down, I wouldnt fucc my niggas family on handle barrs in they sleep

33   they both tried to fucc with me, straight disrespecting my chicc

34   this is why I hate my outer outer circle, if you mad, dis first, I aint to

35   im still here, plexed up, stressed out, trippen and crippen

36   and baby, I apologize, we done had our share of wrongs together

37   but ima forever hold you down, like me and you together for eva

38   and alot of shit has went down, since I kept them niggas in my t

39   I cant say I can love or hate yall niggas, but I can say yall aint right

Hook   42 - niggas gone do them and emm do me - my circles are deep - so now

playin 4 keeps - im way to involved - I make a nigga dp - a difficult ma

Im the top to seek it all - but aint no mo fucin with yall - so whe

I catch you with yo hands out - im knoccin off ya paws ~ ~ ~

Ska -b   I got a lot of partnas friends and foes, I've been hurtin to much

heart, for people, now I need a miricel and I cant even see

a smile, these niggas know wake he fuc ins up, but I dont expect

nothin from no nigga, the people I trust and expect from, get they

own lives, take this how yall want mane, I really put out and helpe

plos I fucced up alot, still I'm no idlo idolo, and shit, no god, bu

dam mane, cant no nigga eva say I fucced them ova, neva stole, viol

tried fuccin they girls, left them out hangin, well dam, Shit happens,

mane, I know this dont mean shit and knobody know or cares how I

feel, but I wont hold back, so if we eva cross again, cossin and

hassin, foreva - Plexed Up! to be continued, I got alot moe

niggas to put on blast, the list goes on, To my kids, loyalty is

best, but you got to sticc with one life style, the fast money

aint what it is, but the choice is yours, come be a slave with

me or be the boss, ya feel me and try not to get too close

to anything you cant turn away from in 5 minutes, when you on yo

toes, and fucced up, they shine on you and pu EXHIBIT 2 Page 74

1. Why a nigga gotta have a problem when I wanna get away
2. I aint fade tha pressure, im just learnin how to fade a mistake
3. and I wish a nigga would put his visions on my image, not my face
4. keep a nigga out a situation, were he might blow up and lose a cool
5. its hard enough, eatin with tha beast, and knabody respect tha grace
6. if niggas dont respect my mind, maybe they'll respect my taste
7. so I sit in my zone, and write to the feelin in my fingas fade aw
8. so many bars and caving I gotta buy a pad every otherday
9. Im as holy as I can be, but sometimes I dwell on a mistake
10. they say I got a long road ahead of me, well that aint nothin new
11. I aint trippen, I survive betta, so when I dont know what im goin thr
12. so free it day to day pain is somethin I dont mind goin threw
13. but now I understand why tha game come with glue
14. admired by the penn, and embressed by tha death before twenty-two
15. and I dont know what that do for you, but I know what it do for
16. im twenty one, and lately I been running into sharks everytime I sleep

1. ~~a nigga tired cause me been broke~~
2. ~~now im loaded~~
3. ~~but bitch~~
4. ~~keep hatters from~~
5. ~~I cant~~
6. ~~and smash~~

7. everything shows and them hatters try and admire it
8. tha games been thriven for my diven
9. when it comes to my cake, no slower to my striven
10. I done had it all, and it aint really what I need
11. I been idolized, peer pressured and ever suffered from greed
12. but I will neva be a bitch, too many niggas doin it for me to repeat

EXHIBIT 2 Page 75

1 I know some niggas need to take they cape off

2 workin for tha cops for a lousy ass payoff

3 im tha dame damn boss and you about to get a layoff

4 if you got a problem with termination we can have a spray off

5 fire tha blue mase and the crooket ass street cops

6 die with a noose and glove got a silwa muzzle make it sound like a

7 nigga doin bie-bop

7 then before we extt put a nigga in the sheet rocc

8 bloody my ass all nigga when it hit tha cheek leak oot

9 when Ferguson slide I pass up like a peep hole

10 burn a mommy spread close the top off tha reevos?

11 Ferguson pic my hand dapping get rid of tha gun pawdas

12 residence regardless lenges use blaa from tha disorder pawda

13 everybody gat us us us us us chim chim chilla

14 my flo make em mon I can live I started clampin at tha thrilla

15 slow up in tha rain wars my umbrella

16 LI-KE a wet ass fella

17 and I stay spaced out like a jet-r

1 I made it anither day lord and I plan to see some mo

2 lives with all theese visiters as theese visiters come and go

3 but I neva get too close I always play em out of sight

4 its the same when I played em in all blac but now I play em in all of __Play__

5 I keep my grass cut so I can scope out all the snakes

6 coz they'll strike quice and have a nigga with nothin on his plate

7 but cautious is me and swift is my goal

8 e-mansipation of a sucessed achieved niggas as you grows dawn my soul

9 it aint enough wealth to fill up all theese __hexfl__

10 C__ I t__ __ __ __EXHIBIT 2 Page 76__

1 Now tha Im here, I got no option of lyin down for it
2 im my own team, so im the one who's goin down for it
3 and I been here, just behind smoke for tha up and comin
4 but if I aint rappin, then im gettin money or losin somethin
5 and when im troubled, I ease up and start dumpin somethin
6 and for the cops, I stashed tha tool, so now searchin for nothin
7 I got people caren about me, like im hurt or somethin
8 plus tha streets gossip my name, like I murk somethin
9 but its all, for tha good and betta
10 cause my mouth absorb bitches like tha smell of shit and kitty litt
11 I got niggas listen, like I got somethin, to do with freedom
12 and they stay straped, with they game face on as if the game o
to cheat em

1 Gun shot wounds got a nigga lippd up in Ben taub
2 thats what he get for ms alldog like he bein robbed
3 not homicide Sgt Sidney Miller seen hella a somethin who did it
4 but he dont know cause he was slipp and out of when a nigga got o
5 all out of bounce, unstraped caked up
6 put tha heat on a nigga and make him rise like a cake cuzz
7 but tha shit aint no hobby niggas its just a huscle
8 and when a nigga on his ass he got to boguard, or flex a muscle
9 and a nigga quicc to holla ill down a jacca
10 you suppose to cuz if you catch him slippen, tap in to him like a hatt
11 they say I aint no betta, cuz since 12, I been a placca
12 I cant help it, if my feelins say he green, then I just hafta
13 I been blessed, I neva bleed but bowed to the barrel
14 but I got heart, most niggas get jahjamed up, and bowed to the bea
15 death before I rat, and if I do, ima have my mouth to
16 tha barred
16 So now im labled a killa and a threat to the street

1 All these deffrent mentallettes "

2 they got one thing in common, they all heared the word freez

3 but not me I surreadured, to tha $milli and the Ak-4 Flover

4 in tha streets I neva had to fit race

5 cuz I was everything another nigga wanted be

6 I neva been hit with tha led but tha hatred shells tend to knoc

a nigga knee's

7 I wanted for certain thing's in life and neither one of them is

to be pleased

8 Plus I stay around stiff G's, that squeez like commissary cheese

9 lord please guide a nigga from tha grimmy ways of tha street

10 cuz I neva been pushed to do anything I just reacted off the way

a nigga treated me

11 I wanna be erased from all evil deeds but I knoe I'll still doe

anything to get freez

11 theese niggas dnt enderstand, FH

13 if I could turn back tha hands it would be one less dead man

1 Say, I ate the game up like I just came off a diet

2 hang a nigga up every were I go like ney adlett's a riot

3 I supply it yall buy it

4 game make a bitch open up like she aint neva tried to hide it

5 be-he gon ass niggas, only bang under pressure

6 problem cheld dednt learn when I was two now in 22 and still I'll

7 I grew up with a nigga Seemore

8 fuc with him on a daily cuz I he stay pee with purple like Easter

9 keeped colided in tha studio with E-roc

10 now bitches loop, so I pass them ova tha frame like sheet rac

11 bancin to tha pussy, call it tha nigga hop

12 fuc ha to ha lover at pop

13 I'm so theezy I make it look easy

STATE'S
EXHIBIT
220





Rico: Mickey Lara
1015 Cresent Street
Denton Tx. 76201

Teddrick Batiste #02279030
701 N. San Jacinto "6.D.2
Houston Tx. 77002

Good luck on the school
Rico gone be yo doctor and you the nurse, "LOL"
I guess oma be havin two god kids "LOL"
Take care good luck!
Mickey                                                    6:27?

Hey How Yall Doin? Say I Hope Yall All Fine
And Stable. Say I Wanna Tell Yall, The Baby Looks
Like A Model, I Mean He Has A Glow. He And
His Daddy Look Like Happy Cop's "LOL" Well Me
I Got Real Sick And Lost Some Weight, But
I Bounced Back, So Now, Im Cool. Say Mickey,
It Dont Matter If Yall Write Short or Long
Letters, I Still Smile. I Got Yall, Plus My Nigga
Rico Holdin Me Down Like No Other, He A Tru Friend
I Owe Him So Much. How You Like The House, Yall
Are Doin Good To Be So Young, Thats Whats Up. I Like
This Pen, It's "Shank" Proof So It's Flexable. What
Does The Dog Think About The New Place, D—
He Mark His Territory "LOL" Hey I Need You To
Tell To Print Me Out A Book Called "48 Laws of
Power" I Think Thats The Name. If You Can, Print
It Out And Send It To Me. If You Cant Dont
Worrie. O- Yeah I Got The Pic's, I Look So Damn
Mad, And I Look Like I Was Doin Bad, And I Was
Broke. Anyways Im Writing With A Broken Hand, I Had
To Beat Up A White Guy From The Mecclenary. He Hung
Up My Phone Call, And I Lost It, I Fucced My Self,
Now I Have A Assult Case. Cuz The Guy Has A
Broken Jaw And Staples, Im Tryin Mickey, But Im Los—
Faith, Im Just Scared Of My Love I

EXHIBIT 2 Page 30

PICO.                                                                    6-27-1

1. Now I Took a Pill so I CHILL, LIKE ICE
on THE TOP oF My DRANK, mixed wITH sprite or slice

2. and aint no haters in my box, just commIssary and kites
and rap's on how I wIsh I had a betta life

3. but I got a real nigga and his name RIcardo
he keepin it too, while my hard times flo

4. he's a real "G", and keep it real with his self
his eye's on his future and makin enough wealth

5. family doin good, and he gone work hard till death
I found a real loc, and pulled away from all the foes

6. and I still keep it real, neva hoes ova bro's
I'd give it all nigga just to get up in yo shoes

7. life is a bitch, and the game pick and choose
I know Im goin threw it, but for lucc, I KEEP A smile

8. but really a nigga dien, cuc Im bout to loose trile
what happen to my values, they all faded away

9. my bitched walked away, and my life turned gray
Say homie I aint gone, but people say its ova

10. if I could turn it around, I would be a soldja
but they say Im a threat, and they dont ~~wanna see me~~ wanna see me free

11. you the first per person oma tell, im about to be free
I mean oma give up, Im tired of reapin when I slee

12. therse alot ~~that~~ ~~nee~~ to be spoken up
but tha pain got a nigga, not wantin to open up

13. aint no quicc send in tha hood, so ~~I~~ Now I Enp UP STUCC
Even with my lucc a life sentence, wont make me b
Good luce on tha new place, keep a spot for me

EXHIBIT 2 Page 81

I know you probly wondering why I wrote in a rap, well it helps me say what I need to say, an how I feel. Anyways what could be betta, home t yo celf, Im happy for you cuz You are a OG" % done the bad, you gave bacc and made amends, and know now you a grown man, with yo head on right, y got that from me, I gave you that and it came from all the loc's, real and fake, they like what you doin, so keep on O.G. Good luc my nigga Hey on the good hand you aint gone neva have a roof problem. How's things goin with yo company, they could use some help in Cancun right now "LOX" Well pain pills got me sl plus my head hurt, I love you homes. Take care, and tell the lil champ, I lae him also, pray 4 me, I ho my faith, but I come in and out at times, Im Gh0st

P.S. bitch you was fly        Sincerly,
at chuckey cheese, that       Cedrick
place has changed alot.      Thank's for takin my
the homies say you look      kids out. Thats loo Rico
that, I say its legal when
you do it at home "LOL"

STATE'S
EXHIBIT
388

USA FIRST-CLASS / FOREVER

T Goodrick Broots #0229030
6.H.9
1701 N. San Jacinto
Houston TX. 77002

Karen Nogl
1010 Sun Prairie #503
Houston TX. 77090

STAJ OP MS NBGA

EXHIBIT 2 Page 83

P.S. PLEASE CALL THE KIDS AND TELL THEM I SAID I LOVE THEM. PLEASE ASAP.

Lil Bro                                                                5/6/11

Sup What's Goin My Nigga? Aint Much Movin On My End, Buildin Up My Faith And Talkin About All Kind Of Bullshit. Say Lil Bro I Cant And Wont Tell You What To Do, But You Need To Get That 4 Point Crown Conceded Up There Is No Such Thing. I Been Waitin On The That Nigga Chief To Correct That But I Guess He Aint Got The Right Guidance That I No Such Thing Ol Set Called 5 9 Piru Tho Is Made Up If You Gone Do That Shit Do It Right. I Hate Comin At You Like That But I Dont Want Nobody Comin At You Wrong About Some Bullshit. Anyway I Miss You. Mane Say Do That Army Thing. Please My Nigga, That Yo Meal Ticket To Success. You Aint Got To Go To War, You Can Do All Kind Of Shit, You Aint Do No Research, Thats Gone Be A Headstart For You, And You Gone Travle The World They Got "Thousands" Of Hoe Real Game Lil Bro, Dont Stay Around And Wait To See What Happen Or On Something To Come To You, Be Like me "RESPONSIBILITY", I Mean The Grind I Did On My Own, I Need You To Help Me Down The Line, You Gone Be All I Got After Momma Pass Away And I Need You To Be Reliable, Maybe You Can Help Me Get My Time Back On Appeal. Stay Up My Nigga I Love You Bro. Im Gone T Go EXHIBIT 2 Page 343

: 00369

# AFFIDAVIT OF SCOTT WM. BOWMAN, Ph.D.

I, Scott Wm. Bowman, state and declare as follows:

## A. Education and Experience

1. I am an Assistant Professor at Texas State University's School of Criminal Justice.

2. I obtained my Bachelor of Arts degree in Psychology at Arizona State University in 1992, and I earned my Bachelor of Science degree in Justice Studies at Arizona State University in 1996.

3. In 2002, I obtained my Masters of Science in Justice Studies at Arizona State University. My thesis was entitled *Ritual Arts of the Collective: A Comparative Analysis of Southern Lynching and Northern Sporting Event.*

4. In 2007, I earned a doctorate in Justice Studies (Ph.D.) from Arizona State University. My dissertation was entitled *Wealth and Asset Decision Making of Black Middle Class Families: The Rationalization of Economic Growth and Justice.*

5. My academic experience in higher education includes two years as an Adjunct Lecturer and Lecturer at Arizona State University in the Justice Studies and Criminal Justice Departments, as well as one year as a Lecturer at the Texas State University School of Criminal Justice. Since 2007, I have been an Assistant Professor at Texas State University.

6. At both Arizona State University and Texas State University, I have taught courses related to the criminal justice system including Crime Theory, Corrections, Juvenile Justice, and Race, Ethnicity, and Crime. I have taught courses at both the undergraduate and graduate levels.

1



EXHIBIT 3 Page 4

7. In addition, I have published scholarly articles and presented at conferences on the topics of: African-American incarceration, prisoner reentry, rap music and positive youth development, and am currently editing a soon-to-be published book on race and the prison system.

8. A complete copy of my curriculum vitae can be found below. (Attachment A)

## B. Involvement in Teddrick Batiste's Case

9. I was first contacted by attorneys from the Office of Capital Writs ("OCW"), current counsel for Mr. Batiste, in August 2012. The OCW retained me to act as an expert in Mr. Batiste's case shortly thereafter.

10. I was asked to evaluate Mr. Batiste's background in order to determine what social, familial, economic, and societal factors shaped his development.

11. In order to reach the opinions that follow, I examined school, medical, employment, juvenile, and criminal records of Mr. Batiste. I reviewed affidavits from Mr. Batiste's family members and friends including: Necole Baldwin, Darlene Beard, Melissa Beard-Carter, Dytaniel Rod Carter, Monica Davis, Truman Jackson, Micaela Lara, Ricardo Lara, Malcolm Mitchell, Kevin Noel Jr., Kevin Noel Sr., Rowena Scott, Danyell Soliz, Raul Soliz, Stephanie Soliz and Beverly West. I also reviewed the expert affidavit of Charles Rotramel regarding Mr. Batiste's experience in the juvenile justice system and his subsequent gang affiliation. I reviewed excerpts of testimony from the punishment phase of Mr. Batiste's trial.

12. Finally, I conducted an interview of Mr. Batiste at the Polunsky Unit in Livingston, Texas on January 10, 2013. I spoke with Mr. Batiste about

EXHIBIT 3 Page 2

his family background and personal history and experiences, from his early childhood through the time of his arrest.

13. The interview lasted approximately three hours and was conducted in a private evaluation room where we were seated at a table together.  Mr. Batiste was alert and cooperative throughout the course of the interview.

14. Based upon my review of the aforementioned materials, my interview of Mr. Batiste, and my academic and professional experience, I will testify to the following information if called as a witness:

## C. Introduction: A Life Rooted in Instability

15. Teddrick Batiste's (hereinafter referred to as "Teddrick") life thus far has been an unending search for emotional, structural and financial stability in a critically unstable environment.  Never was there a point where his family, personal, and structural life were such that he could effectively produce the balance he craved and needed.  Additionally, due to a number of social, psychological, and emotional factors, some of which began before he was even born, his quest frequently led him down the wrong paths.

16. Many factors in Teddrick's environment contributed to this lack of balance, including but not limited to: multi-generational patterns of poverty and ineffectual parenting; a complete lack of prenatal care; unsupervised home birth; meningitis as a neonate;  psychological and emotional trauma associated with the lack of, and abandonment by, any appropriate father figures; frequent relocations and subsequent new schools; lack of parental supervision due to his mother's work responsibilities; influence of his external environment, such as neighborhoods and peers; early and influential interaction with the juvenile justice system; gang affiliation; use of illicit drugs, including

3

EXHIBIT 3 Page 3

marijuana; and finally, his overwhelming desire, but ultimately unattainable goal—to be the sole provider for his own family.

17. All of these factors were present in Teddrick's life before he had reached eighteen years of age.  Some, but certainly not all, of these factors and concepts were introduced during his capital trial, but they were presented in a disjointed and unorganized way; they were never analyzed in their totality as to the extent and impact they made on Teddrick's physical, intellectual, emotional, psychological, and social development from utero to young adulthood.

18. According to the literature of criminal delinquency, there are several theories that attempt to explain why individuals commit crimes. The application of theoretical approaches to particular individual and social circumstances usually produce the most logical and applicable theories. While several theories will be presented within this affidavit, the overarching theory that will be utilized is Walter Reckless's (1961) "Containment Theory."

19. Reckless's "Containment Theory" is a well-known, well-studied theory and is considered one of the canonized theories within the field of criminal justice. In my experience, most every crime theory book that I have either used or reviewed has included Reckless's "Containment Theory."

20. The main contentions within this theory are that: individuals (particularly youth) that commit delinquent acts often do so according to "pushes" and "pulls" that act as motivations towards delinquency; the way to counteract the motivation and/or likelihood of delinquent acts is through the strength of "inner" and "outer" containments; and strong

4



EXHIBIT 3 Page 4

"pushes" and "pulls," combined with weak "inner" and "outer" containments are the most likely scenario to produce delinquent behavior.

21. Theoretically, the "pushes" and "pulls" towards delinquency are generally negative and are correlated to delinquent behavior. For an example as it relates specifically to Teddrick, his family life "pushed" him to seek alternative forms of acceptance but he was "pulled" into gang affiliation and the larger lure of delinquency. The "pushes" and "pulls" are presumed to both take place and reinforce each other towards delinquent behavior. While these are not the sole aggregates of Teddrick's life circumstances that resulted in "pushes" and "pulls" towards delinquency, these are the most transparent.

22. Theoretically, the "inner" and "outer" containments that are structured to counteract delinquent behavior are generally positive are correlated to conformist behavior. "Inner" containments are suggested to be a strong sense of self-actualization, a strong moral compass and a fear of how other's in close relationship would view their potentially delinquent behavior. Additionally, "outer" containments are suggested to be implemented through strong parental and school supervision that structurally limits the ability for delinquency.

23. For an example as it relates specifically to Teddrick, while the school system and juvenile justice system attempted to create an outer containment (with clearly documented limitations), little containment came from those closest to him. Similar to the "pushes" and "pulls," the "inner" and "outer" containments (when present) are presumed to both take place and reinforce each other towards conforming behavior. While these are not the sole aggregate of Teddrick's life circumstances that resulted in "pushes" and "pulls" towards delinquency, his fundamental

5

EXHIBIT 3 Page 5

upbringing and his actions based upon weak "inner" and "outer" containments are the most transparent. These competing influences are exacerbated not only by the unstable environment Teddrick was born into, but the chaos that existed within his family, well before his birth.

### D. Teddrick's Birth

24. Teddrick Roshod Batiste was born on December 30, 1987, to a fifteen year old girl who hid the pregnancy from her family until she gave birth in the bathroom in the middle of the night.

25. Rowena LaShawn Batiste ("Rowena") knew she was pregnant because her menstrual cycle had stopped but she did not tell anyone about the pregnancy because she was afraid of how her mother Darlene Mitchell Beard ("Darlene") would react. Rowena was able to hide the physical manifestations of the pregnancy. She received no pre-natal care and did not see a doctor or other medical professional during the duration of the pregnancy. She just prayed for a healthy baby. (Affidavit of Rowena Scott.)

26. No one in the family knew or suspected that Rowena, a heavy-set girl, was pregnant. (Affidavits of Darlene Beard; Malcolm Mitchell; Beverly West; Truman Jackson; Melissa Beard-Carter; Monica Davis.) Rowena went into labor at home, just a few days after she turned fifteen years old.1 She labored for several hours. Darlene thought she was suffering from severe gas, but Rowena finally confided in her that she was having

---

1 There is some discrepancy as to whether Rowena had just turned fifteen or sixteen years old at the time Teddrick was born. Teddrick's birth certificate lists Rowena's age as sixteen. However, based on her birth year of 1972, she would have been just fifteen. Rowena's actual birth year may not be conclusively known as she herself was born at home and was not issued a birth certificate until she was approximately eight years old. (Affidavit of Monica Davis.)

6

a baby. Darlene caught Teddrick when he was born and cut the umbilical cord. (Affidavits of Rowena Scott; Darlene Beard.)

## E. Paternal Family History

27. Nothing is known about Teddrick's biological father. Rowena identified Teddrick's father as Clifton Johnson, a man with whom she had a single sexual encounter. According to Rowena, Clifton was twenty-two or twenty-three years old when she skipped school and met him at a friend's house. Clifton never knew Rowena was pregnant and has never met Teddrick or been involved in his life in any way. (Affidavit of Rowena Scott.)

28. Rowena never told members of her family the identity of Teddrick's father. There have been rumors over the years that Teddrick's father was actually a relative. Monica Davis (hereinafter "Monica"), Rowena's older sister, used to see an unknown man leaving money in the family's mailbox and she thought he might have been Teddrick's father. (Affidavits of Rowena Scott; Darlene Beard; Malcolm Mitchell; Beverly West; Truman Jackson; Melissa Beard-Carter; Monica Davis.)

## F. Maternal Family History: Darlene and Her Children

29. Darlene, Teddrick's grandmother, was born in 1948 and grew up in Coldspring, Texas, as one of nine children. She was raised by a single mother, Susan Clark Mitchell ("Susan"). Darlene met a boy named David Alexander when she was in high school and had a son by him named Malcolm Mitchell ("Malcolm") when she was sixteen years old. David did not stick around after Malcolm was born. Shortly thereafter, Darlene got pregnant again, this time by a man named Willie Fields. At seventeen years old Darlene delivered her second child, a daughter named Monica Mitchell ("Monica"). (Affidavit of Darlene Beard.)

7

EXHIBIT 3 Page 75

30. Darlene did not raise Malcolm and Monica. They were instead left in the care of Susan, who was also raising her other grandchildren Beverly, Etta, and Ray in Coldspring. (Affidavits of Darlene Beard; Monica Davis; Beverly West.)

31. Darlene moved to Houston in 1966 to try and make a better life for herself. She needed a job and there were no opportunities for her in Coldspring. Darlene met Truman Jackson in 1968 and they had a child together, a boy also named Truman Jackson ("Truman"). In a similar fashion to the previous two fathers, Truman Sr. did not stay and was never a significant part of Truman's life. (Affidavit of Darlene Beard.)

32. Darlene next met Clarence Batiste at a night club in Houston. He was married to another woman, but Darlene got pregnant by him and gave birth to a son named Christopher Batiste ("Christopher"). Clarence was not involved in raising or supporting Christopher. (Affidavit of Darlene Beard.)

33. Darlene next became involved with a man named Ulysee Bean. She lived with him briefly and he was good to her and the children. The relationship ended when Darlene moved back to Coldspring because her mother was ill. However, Darlene was pregnant again and Rowena was born soon thereafter. Ulysee is the father of Rowena, although Darlene led everyone to believe that Rowena's father was actually Clarence. Darlene gave Rowena the last name Batiste and it was not until Rowena was nine or ten years old that she was told who her actual biological father really was. (Affidavits of Darlene Beard; Rowena Scott.)

34. Darlene resumed her relationship with Clarence in Houston and gave birth to her sixth child, Willie Batiste ("Willie"). Clarence was still

8



EXHIBIT 3 Page 8

married at the time and again, took no part in raising or providing for his sons. (Affidavits of Darlene Beard; Monica Davis.)

35. By 1974, Darlene was a twenty-six year old single mother with six children fathered by five different men. All of her children were born at home and were not issued birth certificates. Two of the children, Rowena and Willie, were unable to start school at the appropriate age because they did not have the proper documentation. (Affidavit of Monica Davis.)

36. Darlene moved around frequently and was involved in brief relationships with many different men. She relied a great deal on family members to help care for her children. Malcolm and Monica were raised primarily by their grandmother Susan, and Truman frequently stayed with Susan as well. For reasons not known, Darlene concealed her pregnancies with Rowena and Willie. She was a heavy-set woman which made it physically possible for her to hide a pregnancy. (Affidavits of Monica Davis; Malcolm Mitchell; Truman Jackson.)

37. On Christmas Day of 1972, Monica was staying with Darlene. She was still living with Susan at the time, but was briefly staying at her mother's place. Darlene left to go to work and Monica heard what she thought was a doll crying. Monica believed that the doll was a Christmas gift left for her and ultimately determined that the crying was coming from inside a closet. With the help of an aunt, Monica got the "doll" down from the top shelf of the closet and discovered it was actually a newborn baby. Darlene had given birth in the house, put the baby on a pillow on the top shelf of the closet, and then left without telling anyone. That is how the family discovered that Rowena had been born. No one suspected that Darlene had been pregnant. (Affidavit of Monica Davis.)

9

EXHIBIT 3 Page 9

38. Similarly, Darlene did not tell anyone that she was pregnant with Willie, who was born approximately two years after Rowena. Monica and Susan were visiting a relative, SK Davis ("SK"), who at the time lived about a block away from Darlene. Darlene was there to visit as well. Susan mentioned that she really wanted some watermelon and Darlene said they should all go to her apartment because she had a surprise for everyone. They all went to Darlene's apartment expecting to find a watermelon, but instead they discovered a newborn baby Willie on the couch, alone in the apartment. (Affidavit of Monica Davis.) Malcolm did not realize that the baby was Darlene's and actually thought he belonged to a friend. (Affidavit of Malcolm Mitchell.)

39. Life for the family changed dramatically around 1979 when grandmother Susan became critically ill. She suffered from diabetes and severe gastrointestinal issues. Her doctor's wanted to amputate her leg because of the diabetes, but Susan refused. Susan's doctor was in Houston and she and the children still in her care at the time (Malcolm, Monica, and Beverly), moved to Houston permanently in order for her to be near the doctor. Susan was hospitalized and the children were forced to move into the Houston projects with Darlene. Susan spent several months in the hospital before she died. (Affidavit of Monica Davis.)

## G. Maternal Family History: Violence and Instability

40. For several years when her children were young, Darlene was involved with a physically and verbally abusive man named Peter Paul Zenon ("Zenon"). He was, by all accounts, a monster. (Affidavits of Darlene Beard; Monica Davis; Rowena Scott; Malcolm Mitchell; Truman Jackson; Necole Baldwin; Melissa Beard-Carter; Beverly West.) Darlene and her six children, as well as her niece Beverly, moved in with Zenon

EXHIBIT 3 Page 10



shortly before Susan died and lived with him off and on for the better part of four years. During that time, Zenon beat and terrorized Darlene on a constant basis, often in front of the children. Zenon broke Darlene's arm several times, beat her with a baseball bat, and hit her in the head so severely that she suffered permanent damage. When Susan died, Zenon beat Darlene so relentlessly that she was almost unable to attend the funeral. (Affidavits of Darlene Beard; Monica Davis.)

41. Rowena and the other children also bore the brunt of Zenon's wrath. Zenon chased Monica down the street with a gun, beat her with a bullwhip, and blinded her in one eye with a gun barrel. Rowena and the other children were beaten for minor infractions, like not cleaning up or eating food they were not supposed to have. Zenon "disciplined" Rowena and the other children by hitting them and making them kneel on coins. Zenon beat one of the boys until he bled for cutting up a couch, even though Zenon's own son was actually the one responsible. (Affidavits of Darlene Beard; Rowena Scott; Monica Davis; Malcolm Mitchell; Truman Jackson.)

42. The first time that the children saw Zenon attack their mother, they attempted to intervene to protect her. In response, Zenon lined them all up against a wall, shot a gun over their heads, and said if any of them ever interfered again he would kill Darlene. The children were terrified of Zenon. (Affidavits of Malcolm Mitchell; Truman Jackson; Monica Davis; Rowena Scott.)

43. Darlene frequently left Zenon and stayed with relatives. She would stay away a week or so, but then inevitably go back. It was a time of chaos and instability and the children were forced to move around a great deal. Sometimes Darlene stayed at Zenon's house with the children, sometimes

11

EXHIBIT 3 Page 11

she stayed at a relative's house with the children, and then sometimes she was not with the children at all. (Affidavits of Darlene Beard; Monica Davis.)

44. When Darlene left the children alone she told them she would be right back but then did not return for several days. The older children were forced by necessity to care for the younger children—making sure they were fed and got to school on time. Darlene sometimes left money for food and Monica or Malcolm went to the convenience store to buy it, but often times she did not leave money and the children were forced to live off of whatever they could find. Monica made pancakes by mixing flour and water and then made syrup from sugar and water. (Affidavits of Truman Jackson; Monica Davis.)

45. Darlene tried to leave Zenon for good, taking the children and fleeing to SK's house. Zenon followed them there and when SK denied they were in the house, Zenon shot up all of the windows with Darlene and the children inside. Zenon told Darlene that he would kill them all if she did not return to him and so she did. (Affidavit of Darlene Beard; Monica Davis.)

46. Monica was desperate to get away from Zenon. She ran away from home almost every weekend, either with Darlene or on her own. Eventually no one except SK would take any of them in because they too were afraid of Zenon. Monica left home for good when she was fifteen, choosing to move to Lubbock and marry a man eleven years her senior, rather than return to a life that included Zenon. Monica got pregnant shortly after moving to Lubbock, and at sixteen years old she got married and gave birth to her daughter, Necole. (Affidavit of Monica Davis.)

47. Malcolm also left home because he could not continue to see his mother get hurt and he himself did not want to get hurt. Malcolm started working for a moving company. (Affidavit of Malcolm Mitchell.) Beverly left the family as well. (Affidavit of Beverly West.) With the older children out of the house, the responsibility for taking care of the little ones fell to the next in line—Truman. He would take the younger children back and forth to school and they all became responsible for feeding themselves. (Affidavit of Truman Jackson.)

48. In November 1983, Darlene shot and killed Zenon in self-defense. The two got into an altercation in the street and Zenon pulled a gun on Darlene. There was a struggle, the gun went off, and then Darlene shot him several more times. The police responded to the scene but Darlene was never charged with any crime. (Affidavits of Darlene Beard; Monica Davis; Rowena Scott.)

49. After Zenon's death, Darlene and the children stayed with SK for a brief time before moving into government-run apartments. Darlene became involved with Eugene Beard ("Eugene") shortly after Zenon's death, eventually moving in with and then marrying him. Eugene was the only man Darlene ever married. They separated briefly but reconciled and were still married at the time of Eugene's death in 2007. (Affidavit of Darlene Beard; Rowena Scott.)

50. Darlene did not have financial or emotional support from the fathers of her children. She was steadily employed and did not rely on government assistance. However, her schedule also meant that she had to work long hours and either rely on other people to watch her children, or leave her children unattended. (Affidavit of Darlene Beard.) The older children took on a tremendous amount of responsibility for caring for the younger



children, feeding them, bathing them, and putting them to bed. Despite this Darlene was still hard on the children and would strike them with her hand, belt, or anything else that she had. (Affidavits of Darlene Beard; Monica Davis; Truman Jackson; Malcolm Mitchell; Rowena Scott; Beverly West.)

## H. Maternal Family History: Rowena's Childhood and Adolescence

51. Darlene moved in with Eugene and left the children behind with SK. A few months later she brought Rowena, Truman, Christopher, and Willie to Eugene's house. Eugene was a widower and lived with his children Melissa Beard ("Melissa") and Eugene Beard Jr. ("Gene"). Rowena shared a room with Melissa and Gene. She had her own bed and Melissa and Gene had bunk beds. (Affidavit of Rowena Scott.)

52. Eugene was an alcoholic, drinking every day throughout the day. He mostly drank beer, but would sometimes also have a shot of whiskey. When he was drunk he spoke harshly. (Affidavit of Melissa Beard-Carter.)

53. Darlene did not have a lot of rules, but when she said "no" she meant it. She regularly disciplined all of her children by hitting them with her hand, belt or whatever object she could find. She was particularly hard on Rowena, Melissa, and Gene. (Affidavits of Rowena Scott; Monica Davis; Malcolm Mitchell; Melissa Beard-Carter.)

54. Darlene was not affectionate to her children and did not tell them that she loved them. She was unsympathetic to the children's suffering and resulting trauma from the situation with Zenon. She did not acknowledge Zenon's abuse of the children, nor did she apologize or explain why she was unable to protect them. Instead, she refused to talk about it and acted

14



as though it never happened. (Affidavits of Rowena Scott; Monica Davis; Malcolm Mitchell, Truman Jackson.)

55. Because Darlene could not provide the affection that she craved, Rowena sought affection from other people, especially boys. She did not have dating relationships, but rather started engaging in sexual activity at the young age of fourteen. Darlene did not talk to Rowena about sex and she did not really understand what sex was all about, or anything at all about birth control, but engaged in activity with multiple partners. (Affidavit of Rowena Scott.) Rowena was insecure, very overweight, and suffered from low self-esteem. Rowena had the reputation in the neighborhood of being a girl willing to have sex with anyone. (Affidavit of Monica Davis.)

56. Rowena had sex with a much older man and became pregnant. She was aware of the pregnancy but did not tell anyone about it, did not see a doctor, and received no medical assistance or pre-natal care. Much like her mother before her, Rowena was able to physically hide the pregnancy, only revealing the existence of the baby when the reality of the situation became undeniable. (Affidavit of Rowena Scott.)

## I. Teddrick: Infancy and Early Childhood

57. As discussed in greater detail above, Teddrick's home birth was a surprise to the entire family. Once Teddrick was born he lived with Rowena at Darlene and Eugene's house. At first Darlene was angry because Rowena had concealed the pregnancy, but ultimately she adjusted to the idea. Darlene supported Rowena financially and took care of Rowena and Teddrick both. Rowena was just a baby who had a baby. (Affidavits of Darlene Beard; Rowena Scott.)

58. Rowena moved Teddrick into the bedroom she shared with Melissa and Gene. Teddrick slept with Rowena in her bed while Melissa and Gene continued to sleep in the bunk beds. Rowena stayed in high school and Beverly watched Teddrick during the day. (Affidavits of Rowena Scott; Beverly West.)

59. When Teddrick was about nine months old he got very sick. He was crying in his sleep and Darlene and Rowena took him to the emergency room. (Affidavits of Rowena Scott; Darlene Beard.) Teddrick arrived at the hospital lethargic and with a 105.8 degree fever. He was diagnosed with H. influenzae meningitis and spent nine days hospitalized.

## J. Teddrick: Unpredictability and Residential Instability

60. Rowena and Teddrick lived at Darlene's house for the first five years of Teddrick's life. In 1992, Rowena met a man named Kevin Noel ("Kevin Sr.") on her way to a car wash and became romantically involved with him, giving birth to Kevin Noel Jr. ("Kevin") that same year. When Kevin was about six months old, Rowena and her sons moved in with Kevin Sr. (Affidavit of Rowena Scott.)

61. The "family" only lived together for about six months before Rowena discovered Kevin Sr. was still seeing other women and she ended the relationship and moved out. Rowena later discovered that Kevin Sr. was using crack while they were living together. (Affidavit of Rowena Scott.)

62. Rowena, Teddrick, and Kevin moved in with Beverly for a few months and then moved in with Monica and her children for about a year. Teddrick and Kevin shared a room with Monica's son, Jermaine. (Affidavit of Necole Baldwin.) Rowena and Kevin Sr. were no longer in

16



a committed relationship, but continued to be sexually involved. (Affidavit of Rowena Scott.)

63. When she was living with Monica, Rowena got her first job—a temporary position on the assembly line at Compaq.  (Affidavit of Rowena Scott.)  Monica did not permit Rowena to have male company at the house because she believed it would be a bad influence on her own young daughter.  This angered Rowena and she moved out. (Affidavit of Monica Davis.)

64. Rowena went to a homeless shelter briefly and then moved with Teddrick and Kevin to their own place a few months later, a government subsidized apartment in a low-income housing community in Houston called Acres Homes.  It was not a good neighborhood.  Rowena paid twenty-five dollars a month in rent until she got laid off, and then she paid nothing.  Teddrick and Kevin Jr. went to a government subsidized day care in the apartment complex.  Eventually Rowena got a permanent job on the assembly line at Compaq.  (Affidavits of Monica Davis; Rowena Scott; Necole Baldwin.)

65. Rowena met Jerome Scott ("Jerome") shortly after moving into her own apartment, through his sister who lived in the same complex.  They met in 1996 and married in 1997.  Jerome had a serious drug problem, unbeknownst to Rowena when they first became involved.  As soon as they were married one of Jerome's nieces told Rowena that Jerome was a crack head.  (Affidavit of Rowena Scott.)

66. Jerome worked as a cook during the day and often watched Teddrick and Kevin Jr. while Rowena worked nights.  Jerome bought drugs on credit and then had to pay his dealers back once he got a check from work.  Jerome got paid on Tuesdays and then disappeared until Friday or

17

EXHIBIT 3 Page 17

Saturday. One night, Jerome was supposed to pick Rowena up from work but called and said he could not do it because he got robbed. Rowena got home and Jerome was high. He had not been robbed; rather he spent all of his money on drugs. (Affidavit of Rowena Scott.) Jerome and Rowena argued and fought, which was very upsetting to Teddrick. (Affidavit of Kevin Noel Jr.)

67. Teddrick did not get along with Jerome. Jerome got angry with Teddrick for minor things, yelled, and threatened to "whoop" him. (Affidavit of Rowena Scott.) Jerome was harder on Teddrick than he was on Kevin. Jerome showed a preference for Kevin and would say things like he was going to buy things for Kevin but not for Teddrick. (Affidavit of Kevin Noel Jr.)

68. Teddrick was aware that Jerome had a serious drug problem. Jerome took things from the house like the DVD player and microwave and pawned them for drug money. One year, Jerome said that he was going to get Kevin a remote controlled car for Christmas but he never did. Teddrick asked Jerome where the car was, even though he knew the entire time that Jerome had spent the money on drugs. (Affidavit of Kevin Noel Jr.)

69. Jerome was mentally and emotionally abusive to Rowena, with others suspecting that he was physically abusive as well. (Affidavits of Rowena Scott; Monica Davis.)

70. Rowena moved Teddrick and Kevin around a great deal over the years. Several times Rowena had financial problems that got her evicted and they would stay with Darlene until Rowena recovered financially. (Affidavit of Kevin Noel Jr.) Every time Rowena moved she would register Teddrick at the local school. (Affidavit of Rowena Scott.)

18

Teddrick attended seven different elementary schools and four different intermediate schools due to the moves.  (Batiste School Records.)

71. Rowena worked long hours throughout Teddrick's childhood and as a result he had to be very independent.   From a young age he was responsible for feeding himself, getting ready and catching the bus to school.   Teddrick and his brother rode the city bus to and from school. After school they would be alone for several hours in the apartment. Teddrick had very little supervision and was allowed to leave the apartment.  (Affidavit of Kevin Noel Jr.)

72. When Teddrick and Kevin were home alone they sometimes watched pornography that belonged to their uncle.  Teddrick was ten years old and Kevin was five.  They knew about things before they should have.  The uncle caught Teddrick viewing the pornographic movie and made him watch the entire thing, beginning to end. (Affidavit of Kevin Noel, Jr.)

73. Rowena was a "laid back" parent.   (Affidavit of Kevin Noel Jr.) Rowena acted like Teddrick's friend, not always his mother.   When Teddrick was in trouble, Rowena called him over and punched him in the chest rather than discipline him.  (Affidavit of Monica Davis.)

**K. Social Disorganization Theory**

74. A supplemental theory of criminal behavior that applies to Teddrick's upbringing is Shaw and McKay's (1929) "Social Disorganization Theory."

75. The primary contention of Social Disorganization Theory is that disorganized neighborhoods (or "transition zones") themselves, as opposed to the specific resident, produce increased rates of criminal behavior by individuals within particular neighborhoods.  More specifically, the theory suggests that persons that are raised in

19

EXHIBIT 3 Page 19

disorganized households within disorganized neighborhoods will "organize" their lives and living conditions in a non-traditional manner.

76. According to Shaw and McKay, there were three aspects of "disorganized" areas that were directly correlated to high-crime neighborhoods: the physical status of the neighborhood; the economic status of the neighborhood; and the population composition. More specifically, the "physical status" of the neighborhood refers to such things as condemned, run-down homes and buildings, and levels of multigenerational residence. The "economic status" refers to such things as the percentage of families on welfare, residential renting (as opposed to residential ownership) and limited employment possibilities, and the "neighborhood composition" refers to such things as the number of illegitimate births, low-levels of education, high-levels of crime, violence and drug and alcohol addiction.

77. Teddrick's maternal family history and his own upbringing is unmistakably consistent with the aspects of Social Disorganization Theory. For example, the night Rowena was born, Darlene left to go to work and Monica heard what she thought was a doll crying. Monica believed that the doll was a Christmas gift left for her and ultimately determined that the crying was coming from inside a closet. With the help of an aunt, Monica got the "doll" down from the top shelf of the closet and discovered it was actually a newborn baby. Darlene gave birth in the house, put the baby on a pillow on the top shelf of the closet, and then left the house without telling anyone. That is how the family discovered that Rowena had been born.

78. Another example is the fact that Darlene was a twenty-six year old single mother with six children fathered by five different men. All of her

20

EXHIBIT 3 Page 20

children were born at home and were not issued birth certificates. Yet another example is the fact that Rowena briefly lived at a homeless shelter and then moved Teddrick and Kevin into a government subsidized apartment in a low-income housing community in Houston called Acres Homes, which has historically been known as a rough neighborhood with high levels of crime. Rowena soon met Jerome, a drug addict, married him and moved her children in with him. Each of these examples is representative of the fact that Teddrick and his family were living a "socially disorganized" existence.

79. Teddrick experienced "lots of moves that were all on the north side" and that all of the locations were "ghetto" until he turned fifteen. When he relocated to the suburbs at age fifteen, he still was "going back to the old neighborhood every day" and that he was "living two lives at the same time." (Interview with Teddrick Batiste.)

80. Each of these examples is a clear demonstration that Teddrick's upbringing took place in a "socially disorganized" setting. The larger assumption is that this type of upbringing is not a direct predictor of crime. Instead, it is believed that this type of upbringing blurs what are believed to be clearly defined mores, values and laws within traditional, socially organized families and neighborhoods. Traditional families tend to have dual-parent families with children born of the same parents (in hospitals), minimal parental violence (both towards each other and towards their children), no drug and alcohol abuse (or at least well-concealed), residential stability, and a lack of a significant gang presence. Teddrick had none of these organizational structures and in my opinion it directly contributed to his path towards a level of delinquency that is unfortunately consistent within the neighborhoods of his upbringing.

21

EXHIBIT 3 Page 21

81. Equally important to the theory, while Teddrick's family believed that their efforts were not harmful and were more in line with an "appropriate" upbringing consistent with their multi-generational efforts, most any outside observer of Teddrick's upbringing would contend that his family interactions were both detrimental to his upbringing and indirectly contributive to his delinquency.  Again, it is important to note that (according to the theory) Tedderick's family was not knowledgeably and/or purposefully underproviding—they were merely acting in accordance with the structure of their multigenerational family and neighborhood.

## L. Teddrick: Adolescence and the Juvenile Justice System

82. Teddrick was popular as a young teenager.  He made decent grades, had perfect attendance, and played sports in school.  Teddrick started to hang out with kids who were older.  Teddrick saw things on the street and learned to do petty things like steal candy or kick holes in gates. (Affidavit of Kevin Noel Jr.)  Teddrick also started acting out at school, fighting and violating school policies.  In the eighth grade, Teddrick received twenty-two disciplinary actions and several suspensions. (School Records; Juvenile Probation Records.)  Rowena was unaware that Teddrick was in a time of crisis.  By the time Teddrick reached the eighth grade, his "outer" containment became structurally weaker (unaware of crisis), while the "pushes" and "pulls" of delinquency began to erode his "inner" containments.

83. When Teddrick was fourteen years old he met a man in his neighborhood named Daron who claimed to be a member of a gang, the Five Deuce Hoover Crips.  Daron was in his twenties, with a job and a family, but shared with Teddrick a tremendous amount of knowledge about the Crips

22



and the gang lifestyle. This was Teddrick's first real introduction to an alleged gang member, other than his exposure to people in the neighborhood who were affiliated. After meeting Daron, Teddrick began wearing blue and "dropping knowledge" about the Crips at school. This was despite the fact that Teddrick did not have any actual gang affiliation and did not belong to a clique within the Crips, or any other gang. (Affidavit of Charles Rotramel.)

84. Teddrick attended middle school at Campbell, which was within the Cy-Fair Independent School District in Houston. There he met Stephanie Soliz (hereinafter "Stephanie") and started hanging out with her and her friends. Teddrick met kids who turned him on to selling prescription pills. Teddrick came home with bikes and other new things. He stored his new possessions at friends' houses. Also in the eighth grade Teddrick got his first tattoo, "MOB" (Money Over Bitches). Several kids in the school had the same tattoo and Teddrick was following the crowd. (Affidavit of Kevin Noel Jr.)

85. Stephanie got into some trouble at Campbell for truancy and was sent to the Alternative Learning Center ("ALC"), which was an alternative school for kids who had disruptive behavior or violated school policies. (Affidavit of Stephanie Soliz.) At the same time, in May 2003, Teddrick got caught selling Ritalin to someone at school. Because the school had a "zero tolerance policy" for crimes committed on school grounds, Teddrick was immediately arrested and expelled. (Affidavit of Charles Rotramel; Harris County Juvenile Probation Records.)

86. Teddrick was adjudicated delinquent in the juvenile justice system, placed on probation, and released to the custody of Rowena and Jerome. However, because he had been expelled he could not return to Campbell

EXHIBIT 3 Page 23

and was instead sent to Excel Academy by the Juvenile Justice Alternative Education Program ("JJAEP"). Teddrick spent an entire summer and subsequent academic year at Excel Academy for the singular offense of selling Ritalin on school grounds. (Affidavit of Charles Rotramel; Harris County Juvenile Probation Records.)

87. To attend Excel Academy, Teddrick had to take a two-hour bus ride from home to school and then another two-hour bus ride home in the afternoon. Teddrick spent at least four hours a day on the bus with other teenagers mandated to Excel Academy. The bus ride was so long because youth from all over Houston were sent to Excel Academy and the same bus had to pick up all of the students. A lot of the juveniles Teddrick encountered on the bus were older than him, some as mature as eighteen or nineteen. Many of the juveniles were in the system for serious or even violent crimes. During these bus rides, Teddrick's older classmates would discuss how to steal cars and how to sell and cook crack. It was from these individuals Teddrick learned how to steal cars. (Affidavit of Charles Rotramel.)

88. Teddrick finished his time at Excel Academy in December 2002 and entered his freshman year at Cy-Ridge High School in January 2003. Teddrick had a strong desire to get involved in sports after his release from JJAEP. Coach Gary Thiebaud, the head football coach at Cy-Ridge, saw Teddrick play football in middle school and recruited him to play football at Cy-Ridge. Unfortunately, Teddrick missed the fall football season because he was in JJAEP and as a result could only participate in spring training, not the actual football season, once he arrived at Cy-Ridge. (Affidavit of Charles Rotramel.)

24

89. Stephanie returned from ALC and entered Cy-Ridge at the same time. They immediately started dating. Teddrick was a good boyfriend. Some kids at school gave them a hard time for being an inter-racial couple, but Teddrick consistently stood up for Stephanie. At age fifteen he tattooed her name across his chest. (Affidavit of Stephanie Soliz.)

90. Teddrick was interested in sports and involved with the track and football team, but also continued to associate with the teenagers he had met on the bus to Excel. Using the knowledge he learned from the juveniles at Excel, Teddrick started to steal cars, mainly so that he could go and visit Stephanie and they could ride around together. Teddrick was arrested twice, first in May and again in June 2003 for the unauthorized use of a motor vehicle. As a result of these two arrests, Teddrick was again adjudicated delinquent and placed in the custody of the Juvenile Probation Officer for Harris County. (Affidavits of Charles Rotramel; Stephanie Soliz; Harris County Juvenile Probation Records.)

91. This time, Juvenile Probation first placed Tedddrick at Burnett-Bayland Rehabilitation Center ("BBRC") and then at Delta Boot Camp, where he stayed until December 2003. Teddrick enjoyed the physical training, but did not see the point of the isolated boot camp experience unconnected to a military lifestyle. (Affidavit of Charles Rotramel; Harris County Juvenile Probation Records.)

92. Just as Teddrick left boot camp, his mother moved out of the Cy-Fair district and into an apartment near the Acres Homes neighborhood near Eisenhower High School—a notoriously high crime area where there was extensive drug dealing, prostitution, and other crimes. Teddrick was thrust into a rough, "socially disorganized" neighborhood where he knew no one and went to a school with considerable gang activity. He was far



EXHIBIT 3-Page 25

away from Stephanie and did not have access to a car. (Affidavits of Charles Rotramel; Stephanie Soliz.)

93. Two months later in February 2004, Teddrick was again arrested for unauthorized use of unauthorized use of a motor vehicle. When Teddrick was adjudicated delinquent for the third time he was sentenced to the Texas Youth Commission ("TYC"). After orientation, Teddrick was sent to the Sheffield campus, located in Pecos County, Texas. (Affidavit of Charles Rotramel; Harris County Juvenile Probation Records.)

94. Teddrick's experience at TYC's Sheffield Boot Camp proved transformative and he was thrust into an environment where he was forced to affiliate with a gang in order to survive the experience. This is consistent with the research of post-imprisonment gang membership (Fleisher & Decker, 2001; National Gang Crime Research Center, 2005). Sheffield was a facility deep in West Texas, with a reputation for being a harsh and isolating experience. The location was far from Teddrick's home, family, loved ones, and comfort zone. Teddrick's affiliation with the Crips at Sheffield was a matter of his own protection and survival in an unfamiliar and dangerous institution far removed from everything and everyone he knew. As one of the youngest youth in the facility, Teddrick would have been subject to abuse and exploitation by older youth if he lacked some protection. He was able to find this protection through affiliation with the Crips in Sheffield. (Affidavits of Charles Rotramel; Stephanie Soliz.)

95. Stephanie and Teddrick broke up when he was away, because Stephanie knew it would be impossible to maintain constant contact between them. She dated someone else while Teddrick was gone and became pregnant.

They stayed together about a year, but the father ended up going to jail and the relationship ended. (Affidavit of Stephanie Soliz.)

## M. Teddrick: Trying To Be An Adult

96. Teddrick was released from Sheffield and returned to Houston, but he was different. He was harder and tougher, more street-wise. He also had more tattoos, many of which were gang related. He came out of the TYC experience having better connections to drugs and with more sophisticated knowledge of how to steal cars. (Affidavits of Stephanie Soliz; Necole Baldwin; Danyell Soliz). The process of individuals that make unique and specific adjustments to being incarcerated is known as "prisonization" (Clemer, 1958; Pollock, 2006).

97. Donald Clemer (1958) describes prisonization as "taking on in greater or lesser degree of the folkways, customs, and general culture of the penitentiary," where "...a process of assimilation, in which prisoners adopt a subordinate status, learn prison argot (language), take on the habits of other prisoners, engage in various forms of deviant behavior . . . develop antagonistic attitudes toward guards, and become acquainted with inmate dogmas and mores." (p. 299-300).

98. Most conceptualizations of prisonization are associated with adults; however, there is abundant support for the increased effects of prisonization with juveniles (Thomas, 1983; Wheeler, 1978).

99. One presumed outcome of prisonization for juveniles that are released from juvenile state facilities is high recidivism rates. For a juvenile that experiences imprisonment and subsequent prisonization, it would be assumed that adjusting to a post-imprisonment life would prove challenging. Teddrick's experiences of prisonization had a direct effect on his views of gang activity, delinquency, and stronger connections to



other criminals. (Affidavits of Stephanie Soliz; Necole Baldwin; Danyell Soliz.) Moreover, the juvenile recidivism rates for 2004 (re-incarcerated within three years of release from a TYC facility) were slightly less than fifty percent, suggesting that one of every two juveniles released during the same year that Teddrick was released were re-incarcerated within three years.

100.   Despite the fact that Teddrick had made these associations, the gang culture and lifestyle still did not dominate his life. His family remained unaware that he was affiliated. (Affidavits of Rowena Scott; Kevin Noel; Monica Davis.) Teddrick dabbled in drugs during his early adolescence, but after being discharged from TYC, he smoked marijuana frequently, sometimes on a daily basis. He did not want his family, especially Kevin, to know that he smoked. (Affidavits of Kevin Noel Jr.; Ricardo Lara; Stephanie Soliz.)

101.   Teddrick and Stephanie resumed their relationship when he returned to Houston, even though she was pregnant with a child that was not his. Teddrick got a job at Sonic and then Babies R Us and committed to providing for Stephanie and the baby. He was seventeen years old. Teddrick moved in with Stephanie and her mom after they were in a car accident and took care of them. Teddrick got a job at Wal-mart because it was close to Stephanie's apartment. Teddrick was at the hospital with Stephanie when her son Kash Soliz was born on November 25, 2005. Stephanie tried to go back to school after Kash was born and Teddrick watched the baby during the day when Stephanie was gone and then worked at Wal-mart at night. (Affidavit of Stephanie Soliz.)

102.   Teddrick took a series of other low paying, back breaking jobs. He worked for Stephanie's father at the rodeo and also for his landscaping

28

business. Teddrick was a hard worker. (Affidavits of Stephanie Soliz; Raul Soliz.)

103.   What Teddrick really wanted was a "legitimate" life—one with a steady job, cars, and a house. Although he got his GED while at Sheffield, Teddrick regretted not finishing high school. He was not particularly interested in school, but lamented that he never got the opportunity to be competitive at sports. Teddrick's own failure became one of his greatest hopes for his own kids; that they would do well in school and excel in sports. (Affidavits of Raul Soliz; Danyell Soliz; Stephanie Soliz.)

104.   Teddrick was constantly looking for ways to make more money for Stephanie and would take various jobs like the overnight shift at the Office Depot distribution center and at an air conditioner factory. He earned enough money to buy a car and he and Stephanie moved into an apartment of their own with some friends from high school, Micaela and Ricardo Lara ("Mickey" and "Rico"). (Affidavits of Stephanie Soliz; Micaela Lara.)

105.   Things were difficult for the two young couples. Teddrick lost his job. Stephanie was not working and Teddrick felt as though he had to bear the burden of supporting them, because he was the man and that was his responsibility. (Affidavit of Micaela Lara.) The situation became even more complicated when Stephanie found out she was pregnant for the second time. Teddrick was unsure whether he wanted to be in a relationship with Stephanie or if he even wanted the baby. Stephanie left and moved back in with her mother and Teddrick moved back in with Rowena. (Affidavits of Stephanie Soliz; Michaela Lara.)

29

106.    Despite the fact that they had broken up, Teddrick continued to support Stephanie and Kash financially. In order to do so he began stealing cars in order to sell the rims. Once Stephanie decided to keep the baby, Teddrick went with her to her doctor appointments. (Affidavit of Stephanie Soliz.)

107.    One day, Teddrick called Stephanie out of the blue and said that he was sorry for all of the hurt he had caused her and he was glad that she decided to have the baby. Teddrick told her that he wanted them to be back in a relationship and was on his way to her house. He never showed up and two days later Stephanie got a call from the jail that he had been arrested for stealing a car. (Affidavit of Stephanie Soliz.)

108.    Teddrick was sentenced to 180 days in state jail. (TDCJ Records.) Stephanie and Teddrick agreed that they would live together once he got out and try to make their family work. Alex Batiste was born on September 7, 2007. Several weeks later, Teddrick was released from state jail. (Affidavit of Stephanie Soliz.)

109.    While Teddrick was in state jail, Mickey and Rico moved to Denton, Texas, because Mickey was pregnant and they wanted a fresh start. Teddrick was in touch with Mickey and Rico when he was locked up and they decided that as soon as he got out it would be a good idea for him to move to Denton as well. In the fall of 2007, Rico drove down to get Teddrick when he was released from state jail and brought him to Denton. Stephanie, Kash, and baby Alex followed a few weeks later. (Affidavits of Stephanie Soliz; Micaela Lara; Ricardo Lara.)

110.    Mickey's pregnancy ended in tragedy when her daughter was stillborn. Teddrick was a great source of emotional support to Mickey and Rico. They were devastated at the loss of their daughter and

30



Teddrick helped them through a terrible time in their lives, being there for them and listening. (Affidavit of Micaela Lara.)

111. Teddrick quickly got a job as a roofer's assistant and worked hard. Teddrick felt a lot of pressure to provide for Stephanie. When he was not working he would cook, clean, and take care of the kids. For a short time, Stephanie worked nights at a grocery store. She would sleep in and Mickey and Teddrick would take care of the kids. (Affidavits of Micaela Lara; Ricardo Lara.)

112. Stephanie suffered from personal issues that caused problems between her and Teddrick. Her hormonal birth control caused her to have heavy bleeding, mood swings, and extreme emotions. The young couple's relationship was strained because of it and they broke up. Stephanie and the children returned to Houston. (Affidavit of Stephanie Soliz.) Teddrick wanted to stay in Denton because he was doing well, but he also wanted to be there for his kids. (Affidavit of Micaela Lara.)

113. Mickey and Rico left for a weekend and while they were gone, Teddrick was arrested for breaking into a car. Teddrick spent several months in the Denton County Jail and as soon as he was released he took a bus back to Houston to be with Stephanie and their boys. (Affidavits of Micaela Lara; Rico Lara; Denton County Sheriff Records.)

114. Back in Houston, Teddrick moved in with Rowena and got a job first at a television repair place and then at Forge USA, a steel forging company. Teddrick spent as much time as possible with Kash and Alex, and tried to make things work with Stephanie. In December 2008, Teddrick moved Stephanie into an apartment of their own. Stephanie stayed home with the kids and Teddrick supported the family. (Affidavit of Stephanie Soliz.)

EXHIBIT 3 Page 31

115. Teddrick worked a great deal of overtime at Forge and brought in a significant amount of money. Soon after moving into the apartment, his hours were cut and he was no longer working overtime. Teddrick had serious money issues and a lot of expenses. Stephanie got into an accident in her sister's car and Teddrick had to pay for that car as well as the damage to the other car. Teddrick did not want Stephanie to work, because he knew first-hand how difficult life was for a single mother. Teddrick wanted to be the sole provider for his family, and the weight of the world was on his twenty-two year old shoulders. (Affidavit of Stephanie Soliz.) He had a great deal of pride and did not want to ask anyone for help. (Affidavit of Micaela Lara.)

116. Teddrick either made new connections with gang affiliated people or re-ignited old ones, in large part to find a way out of his mounting financial pressures. Either way, he started spending time on the streets. He made money shooting dice and showed young associates how to steal cars. Because they needed the money so badly, Teddrick also started to steal cars himself. (Affidavit of Stephanie Soliz.)

117. Teddrick was caught between two worlds—the "legitimate" world where he had a family, a job, and responsibilities; and the "criminal" world, where he could make significant amounts of money quickly and was a role model to young associates. (Affidavit of Charles Rotramel.) Again utilizing Reckless's theory, Teddrick was struggling to maintain and strengthen his "inner" containment, while the "pulls" of (easier) economic gains were strong.

118. Teddrick spent time with Melissa and her husband Dytaniel Rod Carter ("Rod") hanging out at their house. They would eat and relax and play games with Melissa and Rod's three kids. Sometimes Teddrick

32

would bring Kash and Alex over as well. (Affidavits of Melissa Beard-Carter; Dytaniel Carter.) Teddrick confided in Rod about the pressures he was feeling to provide for and take care of his family. Teddrick was beginning to feel desperate, like the walls were closing in on him and he was trapped. Teddrick was searching for love and honesty from someone and any kind of positive influence in his life. (Affidavit of Dytaniel Carter.)

119.   Everyone in Teddrick's life was shocked when he was arrested for homicide. Teddrick did not have a history of violence and no one could believe he was capable of the crime he was alleged to have committed. (Affidavits of Darlene Beard; Beverly West; Darlene Beard; Monica Davis; Necole Baldwin; Malcolm Mitchell; Truman Jackson; Rowena Scott; Kevin Noel Jr.; Raul Soliz; Danyell Soliz; Ricardo Lara; Michaela Lara; Melissa Beard-Carter; and Dytaniel Rod Carter.)

## N. Teddrick: The Gang Influence and Affiliation

120.   Throughout much of Teddrick's life, the presence of gang influences, gang members, and gang activities have been incontrovertibly present at his schools, in his neighborhoods, and the juvenile justice system. While it can be debated whether or not a juvenile can consistently and "rationally" choose to join a gang (e.g. issues of protection), the likelihood of a person associating with a gang in some way dramatically increases according to his location of residence in not only the United States, but also specifically the state of Texas.

121.   Within the United States, it has been estimated that there are nearly 30,000 different gangs and more than 750,000 gang members (www.nationalgangcenter.gov, 2010). In addition, these gang members are largely concentrated in larger cities (57.1%) and suburban counties

EXHIBIT 3 Page 33

(24.0%) (www.nationalgangcenter.gov, 2010). Consistent with the data on geographic location and gang membership, it is estimated that twelve percent of all homicides are gang-related and that sixty-three percent of all homicides take place in cities with populations of more than 100,000.

122. Within the state of Texas, it has been estimated that there are approximately 2,500 different gangs. Specifically within Harris County, the issue of gang membership is considerably intensified, as the Houston region/Harris County hosts the most gangs (approximately 225) and gang members (approximately 10,000) in the state of Texas. (National Gang Threat Assessment, 2010.) Unmistakably, the statistics that are provided for Harris County are not indicative of equivalent distribution of gangs and gang members throughout the entire county. There are concentrated pockets of gang activities within Harris County.

123. As previously presented, both gang presence and gang activities are most often correlated to socially disorganized neighborhoods. With the majority of gangs and gang members residing in areas that are large urban centers (indicative of Houston), the overall likelihood of exposure to gangs and gang activities was heightened for Teddrick.

124. Karl Hill, Christina Lui, and J. David Hawkins (2001) completed a research project that established categories and risk factors associated with likely gang membership. First, they established five categories that generally influence teens and the potential for gang activity: individual factors, family factors, peer group factors, school factors, and neighborhood factors. Risk factors were assigned within each category.

125. Within the "individual factors" category, the authors found associations with low religious-service attendance, early marijuana use, early violence, antisocial beliefs, early drinking, externalizing behaviors,

34



and poor refusal skills. Within the "family factors" category, the authors found associations with family structure, single parent households, households with one parent plus other adults, parental attitudes favoring violence, low-bonding with parents, low household income, sibling antisocial behavior, and poor family management.

126.   Within the "peer group factors" category, the authors found associations with friends who engage in problem behaviors. Within the "school factors" category, the authors found associations with being learning disabled, low academic achievement, low school attachment, low school commitment, and low academic aspirations. Within the "neighborhood factors" category, the authors found associations with availability of marijuana, neighborhood youth in trouble, and low neighborhood attachment.

127.   Finally they found that, as a predictor of joining a gang based on the aforementioned risk factors, those experiencing two to three risk factors were three times more likely to join a gang, those experiencing four to six risk factors were five times more likely to join a gang, and those who experience seven or more risk factors were thirteen times more likely to join a gang.

128.   Based on the various affidavits provided by family and my interview with Teddrick, I believe that he experienced twenty of the risk factors and I would further speculate that he potentially experienced an additional three risk factors. Therefore, despite placing a focus on the positive aspects of his life as a predicator for gang avoidance, the reality is that he was (at a minimum) thirteen times more likely to join a gang based on his mere existence and the risk factors associated with his existence.

129.   Mike Carlie (2002) suggested that gangs offer their members acceptance (based on social discrimination or rejection), a surrogate family (based on an absence of a family, positive adult role models, and proper discipline), power (based on a basic feeling of powerlessness), security (based on a fear or feeling of a lack of security), a means of earning money (based on economic deprivation), an alternative to school (based on school failure), opportunities to build high self-esteem (based on low self-esteem), and a setting to "act in an aggressive manner" (based on pathological needs).

130.   The distance between Teddrick and his mother (and other family members) and the complete absence of his father is well-documented. Teddrick was only fourteen years old when he first met Daron, who was a member of the Five Deuce Hoover Crips, and he was exposed to an inordinate number of gang affiliated youth during his time at the alternative school and TYC. The association with these gang friends superseded other associations, like friendships he had with sports friends, and Teddrick got his first tattoo along with other kids at school to strengthen his sense of belonging.   (Interview of Teddrick Batiste; Affidavit of Kevin Noel, Jr.).

131.   Teddrick was not born into a "gang family," nor was he initiated or "jumped in."   Instead, Teddrick associated himself with negative peers and adopted a "gangster" identity, perhaps as a way of seeking acceptance, security, and self-esteem. (Affidavit of Charles Rotramel.)

132.   With regard to Reckless's "Containment Theory" there are numerous instances where the "pushes" and "pulls" of this street life seemed to oppose the "internal" and "external" containments that Teddrick continued to try to establish.  For example, Teddrick was simultaneously

36

EXHIBIT 3 Page 36

associating with gang members while at the same time working normal, conforming jobs, and attempting to establish a commitment to his new family – including raising a child that he knew was not his. The constant struggle between Teddrick's "pushes and pulls" and his "internal and external" containments have been greatly underestimated in his larger social history.

## O. Teddrick: The Importance of A Father-Figure

133. From the time that Kash Soliz was born, a child that was not biologically his, Teddrick tried desperately hard to be a present, responsible, and loving father. A positive male role model was something that had always been missing from his life and he was determined that his children would not suffer the same fate.

134. Failed father figures were a common and constant disappointment in Teddrick's life. Teddrick never knew his biological father or any real details about him. The true identity of Teddrick's father has been a source of speculation within the family for years, leaving Teddrick with no real answers.

135. Unfortunately, the absence of fathers is a common experience for African American families in the United States. While twenty-five percent of all children in the United States are raised by a single parent, the statistic skyrockets to seventy-two percent of single mothers when specifically examining African-American families. This issue has been correlated to the increased incarceration rates of African American males (nearly 5,000 per 100,000), limited employment opportunities, and abject, multigenerational poverty (Walker, Spohn, and Delone, 2012; Wilson, 2012).



136.   As a very young child, Teddrick was close to Eugene Beard, his step-grandfather.   However, Teddrick no longer lived with Eugene after Rowena left the house and his interaction with both Darlene and Eugene was sporadic in later years.   Although Teddrick had great affection for his grandparents they were not involved with him on a daily basis and Eugene in particular could not fulfill the paternal role that Teddrick needed.   Eugene passed away in 2007 when Teddrick was in State Jail.

137.   The first real "father" Teddrick had was Kevin Noel Sr., the biological father of his half-brother.   Despite the fact that Rowena and Kevin Sr.'s relationship did not work out, Kevin Sr. treated Teddrick like a son and initially included him when he would take Kevin for visitation.   Teddrick may have even believed at some point in time that Kevin Sr. was his biological father as well.   (Affidavits of Kevin Noel Jr.; Rowena Scott.)

138.   Soon after Rowena married Jerome, Kevin Sr. and Jerome got into an altercation about the boys, and Kevin Sr. said he only cared about how Jerome treated Kevin and not Teddrick because Teddrick was not actually his son.   (Affidavit of Kevin Noel Sr.)   After the fight, Kevin Sr. came around less often and when he did come around, he often only took Kevin with him, leaving Teddrick behind.   (Affidavit of Kevin Noel Jr.)

139.   Teddrick never connected with Jerome, despite the fact that he was his step-father, but rather resented him for interfering in the family dynamic. Jerome's presence in Teddrick's life was not nurturing, it was stressful and antagonistic.   (Affidavit of Rowena Scott.)

140.   Other men came in and out of Rowena's life.   Some of the men Rowena dated were around long enough to become well known to Teddrick, while others were only present for a short time.   Almost all of



38

EXHIBIT 3-Page 38

them had criminal histories and problems with substance abuse. (Affidavits of Monica Davis; Kevin Noel Jr.)

141. When he became a father himself, Teddrick's desire for his own male role model became even more profound. Teddrick sought out a connection to Raul Soliz, Stephanie's father, and looked up to him as an example of the hard working family man he wanted to be. When Teddrick and Stephanie lived with Raul, Teddrick helped around the house, did yard work, and paid rent. Raul liked having him around. Teddrick started calling Raul, "Pops." (Affidavits of Raul Soliz; Danyell Soliz.)

142. Although he did not often talk about it, it bothered Teddrick that he did not know anything about his biological father. Something once showed up on a phone bill and Teddrick thought it might be his father trying to get in contact with him. Rowena told Teddrick the number had nothing to do with his dad, making him feel both stupid and hurt. Teddrick asked Rowena questions about his dad, but she became angry and told him that he already knew as much as she did. As a result, Teddrick never asked about his dad again. (Affidavit of Stephanie Soliz.)

143. In 1965, Senator Daniel Patrick Moynihan facilitated a report entitled "The Negro Family: The Case for National Action" (U.S. Department of Labor, 1965). This report is often referred to as the "Moynihan Report."

144. At the start of the chapter on "The Negro American Family," the Moynihan Report explains "at the heart of the deterioration of the fabric on Negro society is the deterioration of the Negro family" (p.5). The study goes on to detail many of the issues that African American families were facing in 1965. In comparing White and Black family structure during the time, the report indicated "by contrast, the family structure of

39

lower class Negroes is highly unstable, and in many urban centers is approaching complete breakdown" (p.5).

145.   Much like the contemporary presentation of Teddrick's upbringing, the Moynihan Report signified issues such as comparatively higher rates of unemployment, illegitimate births for African-Americans, and welfare dependency; the increasing presence of female, single head-of-household African-American families; and the clear absence of African-American males as financial and parental providers.  The greatest emphasis in the report was placed upon the absence of African-American fathers/husbands.

146.   In the section entitled "the Tangle of Pathology", the Moynihan Report points to a series of factors that are arguably the result of the breakdown of the African-American family. The aspect that is most relevant to Teddrick is the subsection entitled "delinquency and crime." The first sentence of the subsection reads, "the combined impact of poverty, failure, and isolation among Negro youth has had the predictable outcome in a disastrous delinquency and crime rate" (p. 38). Within the remainder  of the section, the report details statistical trends and African-American overrepresentations within the criminal justice system that are consistent with the contemporary, comparative data.

147.   While Moynihan indicates at the beginning of his report that "the statistics on the Negro family and most other subjects treated in this paper refer to only a specific point in time... they do not measure the experience of individuals over time", contemporary statistics do in fact indicate the African American families that are stuck in the types of abject poverty and importunate underclass that existed decades ago. Consequently, many of the statistics and trends discussed in regarding

40

Teddrick's life (e.g. absent fathers, unemployment rates, income/wealth gaps, rates of African-American juvenile delinquency) are categorically worse than fifty years ago.

148. Similar to the findings of the Moynihan Report, the mere absence of a positive, consistent, mentoring African-American father-figure in Teddrick's life was the beginnings of life-long challenges in finding and maintaining his own constructive, productive African-American manhood. Furthermore, the presence of inconsistent, violent, and absent father figures turned many of the aforementioned challenges into both modeled behaviors and opportunities for non-positive role models to capture Teddrick's need for acceptance, love and belonging. Sadly, this will presumably be the same challenges that his children will face, further perpetuating the cycle of absent African-American fathers and husbands.

**P. Teddrick: The Importance of Rap Music**

149. Rap music was, and continues to be, a profoundly significant part of Teddrick's life. This was evident through the multitudes of lyrics that Teddrick wrote during his incarceration at the county jail during the pendency of his capital trial, that were ultimately used against him at the punishment phase of trial.

150. At first glance it may have appeared as though Teddrick's rap lyrics were correlative to his violent actions and criminal behavior. However, Teddrick's writing was a form of expression, deeply embedded in his childhood. Teddrick listened to rap music consistently since the fourth grade and spent a significant amount of time "free-styling" (spontaneously making up rap lyrics) while on the school bus. (Interview of Teddrick Batiste.)



41

151.   Teddrick equated writing rap lyrics as synonymous with writing poetry.  Teddrick made up freestyle raps early in his childhood, but the growth and advancement in his contemporary lyrical writing was directly associated with the poetry program that he attended while detained at TYC.  The program assisted Teddrick in channeling his emotions and experiences into his poetry.  Teddrick wrote rap lyrics "all day, every day" while at TYC and even won first place in a TYC poetry contest. (Interview of Teddrick Batiste.)

152.   Correlations amongst the larger rap music, the larger hip-hop culture and lyrical poetry writings are well documented, including the establishment of "slam poetry", where poets present emotional, political, and cultural verses in an overarching hip-hop setting (Bruce & Davis, 2000; Smith, 2003).  In addition, despite the traditional narratives of rap music presenting negative, violence and drug glorifying, misogynistic lyrics, research suggests that the lyrics can prove empowering. (Travis & Bowman, 2011, Travis & Bowman, 2012; Tyson, 2006.)

153.   Teddrick was not bragging about his actions in his lyrical writing. Instead, for Teddrick, rap music and lyric-construction was "a way of coping" and an opportunity to "look at the mirror." These were not the writings of a cold, calculating person, but rather the writings of a thoughtful, yet emotionally challenged and misguided person.

## Q. Teddrick: A Family and Community That Failed Him

154.   No one could possibly have imagined that Teddrick would have ended up where he did.  Rowena did the best she could for Teddrick, however the tools she had were inadequate for the job.

155.   There are significant patterns throughout Teddrick's family history that have undoubtedly influenced his development and understanding of

42

family and sense of responsibility.  His grandmother Darlene had six children by five different men, beginning in her teenage years.  Few of her children ever had the opportunity to even know their biological fathers, and certainly did not receive emotional or financial support from them.  Darlene was no doubt a hard worker, but her children were frequently left in the care of others and responsible for far too much at too young an age.  Darlene hid her pregnancies from her children and gave birth at home each time.  There was no sense of joy or expectation at the arrival of a new baby, simply the realization of another mouth to feed.

156.  The family moved often, and never had the opportunity to put down roots in one place, or develop strong social support systems.  And until her marriage to Eugene, a number of men came in and out of Darlene's life, including violent, dangerous men like Peter Paul Zenon.  As a result, members of Teddrick's family have largely gone their separate ways as adults, seeing each other infrequently; communicating with one another out of obligation rather than affection.  They never really learned how to support for one another in times of turmoil and stress. (Affidavits of Darlene Beard; Monica Davis; Malcolm Mitchell; Truman Jackson; Rowena Scott; Necole Baldwin.)

157.  Like her mother, Rowena's boys also have different fathers.  At age fourteen she hid her first pregnancy and gave birth at home.  Like her mother, Rowena worked hard, but made very little money.  She also moved around frequently and had romantic relationships with multiple men, all of whom proved to be more of a drain on the family's emotional and financial resources than a benefit.  Rowena may have wanted to do things differently than Darlene, and she even succeeded in some respects,



43

but she was simply ill-equipped to fully break out of the maladaptive patterns established by her own mother, or provide a stable life for her sons. (Affidavits of Darlene Beard; Monica Davis; Rowena Scott; Kevin Noel Jr.).

158. Teddrick tried to do things differently. He worked hard to provide for Stephanie and his sons, refusing to allow her to suffer the same fate as his mother and grandmother. By all accounts, he was also a loving and present father who showered his boys with affection. But, he also started that family as a teenager, before he was ready emotionally or financially to take on the responsibility. In some ways, his struggle to escape his family's patterns of poverty and strife got him into deeper trouble due to his insistence of taking on more responsibility than he could handle, without ever asking for help. (Affidavits of Stephanie Soliz and Necole Baldwin).

159. As previously documented (and utilizing Reckless's Containment Theory as a theoretical foundation), Teddrick's life has been a constant "battle" between the "pushes" and "pulls" of the neighborhood and the it's numerous and multigenerational delinquent opportunities and the "inner" containment that he established for himself and limited "outer" containments of family, school, and community. Teddrick had an intrinsic desire ("inner containment") to be a better parent and mate than what he had experienced growing up and desperately wanted to escape the "pushes" and "pulls" that entangled him.

160. For Teddrick, he simply could not manage the "pushes" and "pulls" of a delinquent life—particularly living in a socially disorganized neighborhood where gang affiliation and delinquent behavior are at best accepted and at worst glorified. The strength of these "pushes" and



"pulls" seemed to consistently outweigh his "inner" and "outer" containments. Regardless of a fundamental need to maintain parental responsibility to his children, consistent physical and economic support to his girlfriend, opportunities for legitimate employment, the power of the "pushes" and "pulls" consistently and eventually took precedence in Teddrick's life. With more consistent "outer" containments (e.g. stable, consistent, disciplinary parents; teachers, coaches and administrators that were consistently a part of Teddrick's life; a community that unmistakably valued conforming behavior, higher education, gainful employment), Teddrick's life would have been different. He might have been a standout college athlete, a college graduate, or even a military officer.

## R. Expert Opinion

161. Teddrick Batiste was a product of his personal, social, and structural environment. Factors beyond Teddrick's control, including but not limited to the absence of a consistent father figure, residential and educational instability, the opportunity of gang affiliation and the emotional and financial benefits associated with participation, and the effects of prisonization upon release from his first detainment in the TYC inexorably shaped him during his formative years.

162. Because of his disorganized upbringing, as well as the constant "pushes" and "pulls" that he experienced throughout his young, tumultuous life, Teddrick was always motivated by a desire for stability—or in academic terms, social organization and collective efficacy—in his world. Unfortunately, Teddrick experienced more economic and emotional value and learned support in the "pushes" and "pulls" towards delinquency, compared to the limited, deficient, and



45

EXHIBIT 3 Page 45

often unlearned "inner" and "outer" containments that are designed to produce conforming behavior.

163. If I had been retained as an expert, I would have testified about Teddrick's life experiences as described above, which informed who he is and what he did. Jurors would have been able to consider both whether that information affected Teddrick's moral culpability for the crime and if it negated the State's claim that he was a future danger, thus sparing him from execution.

164. I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on the 24th day of April, 2013 in San Marcos, Texas.

SCOTT WM. BOWMAN, PH.D.

Subscribed and sworn to before me on April 24, 2013.

Notary Public, State of Texas

ARIANE EIGLER
Notary Public, State of Texas
My Commission Expires
JULY 11, 2016

Notary without Bond

46

EXHIBIT 3 Page 46

# ATTACHMENT A

PPS 8.10 Form 1A

# TEXAS STATE VITA

## I. Academic/Professional Background

A. Name: <u>Scott W. Bowman</u>                    Title: <u>Assistant Professor</u>

B. Educational Background

| Degree | Year | University | Major | Thesis/Dissertation |
|--------|------|------------|-------|---------------------|
| PhD | 2007 | Arizona State University | Justice Studies | Wealth and Asset Decision Making of Black Middle Class Families: The Rationalization of Economic Growth and Justice |
| M.S. | 2002 | Arizona State University | Justice Studies | Ritual Acts of the Collective: A Comparative Analysis of Southern Lynchings and Northern Sporting Events |
| B.S. | 1996 | Arizona State University | Justice Studies | N/A |
| B.A. | 1992 | Arizona State University | Psychology | N/A |

C. University Experience

| Position | University | Dates |
|----------|------------|-------|
| Assistant Professor | Texas State University | 8/07 – present |
| Lecturer | Texas State University | 08/06 – 08/07 |
| Lecturer | Arizona State University – West Campus | 08/05 – 08/06 |
| Adjunct Lecturer | Arizona State University | 08/03 – 08/05 |

D. Relevant Professional Experience
NA

## II. TEACHING

A. Teaching Honors and Awards:
Applied Arts Teaching Award

B. Courses Taught:

Texas State University
CJ 2355 (Corrections)
CJ 3300 (Juvenile Justice)
CJ 3346 (Research in Criminal Justice)
CJ 4340 (Crime Theory and Victimization)
CJ 4309 (Race, Ethnicity, and Criminal Justice)

Arizona State University – West Campus
CRJ 302 (Research Methods)
CRJ 303 (Statistics)
CRJ 304 (Criminology)
CRJ 306 (Race, Ethnicity and Crime)

EXHIBIT. 3 Page 47

PPS 8.10 Form 1A

C. Graduate Theses/Dissertations or Exit Committees (if supervisor, please indicate):

Graduate Thesis Chair – T. Lewis
Graduate Thesis Chair – B. Reyes
Graduate Thesis Chair – A. Origel

Graduate Thesis Committee Member – J. Thomison
Graduate Thesis Committee Member – A. Leal
Graduate Thesis Committee Member – A. Vega
Graduate Thesis Committee Member – A. Villarreal
Graduate Thesis Committee Member – R. Rojas

D. Courses Prepared and Curriculum Development:

CJ 4309 (Race, Ethnicity and Criminal Justice)

E. Funded External Teaching Grants and Contracts:

NA

F. Submitted, but not Funded, External Teaching Grants and Contracts:

NA

G. Funded Internal Teaching Grants and Contracts:

NA

H. Submitted, but not Funded, Internal Teaching Grants and Contracts:

NA

I. Other:

NA

## III. SCHOLARLY/CREATIVE

A. Works in Print

1. Books (if not refereed, please indicate)

a. Scholarly Monographs:

NA

b. Textbooks:

EXHIBIT: 3 Page 48

NA

c. Edited Books:

NA

d. Chapters in Books:

Bowman, S. (2008). George Foreman.  In M. Whitaker (Ed.), *African American Icons of Sport: Triumph, Courage, and Excellence.* (73-82). Westport, Ct.: Greenwood Press.

e. Creative Books:

NA

2. Articles

a. Refereed Journal Articles:

NA

b. Non-refereed Articles:

NA

3. Abstracts:

NA

4. Reports:

NA

5. Book Reviews:

NA

6. Other:

Travis, R. and Bowman, S. (2009). "Race, Place & Roots: A Systematic Model for Transforming Prisoner Reentry for African-Americans" (Journal Article Submitted to *Journal of African-American Studies – 4/30/09*)

Bowman, S. (2009). "Consumer Education for Collaborative Wealth: Social and Cultural Capital Considerations for Black Middle Class Families" (Journal Article submitted to *Journal of Consumer Education – 2/27/09*)

EXHIBIT 3 Page 49

PPS 8.10 Form 1A

Bowman, S. (2009). "The Effects of Multigenerationalism in Black Middle Class Wealth and Asset Decision Making" (Journal Article submitted to *Journal of Family and Economic Issues – 1/15/09*)

B. Works not in Print

"From Plantation to Penitentiary: A Foucaldian Perspective"
"Considerations of 'Sport' in Re-Examining the Ritual Punishment of Southern Lynchings"

1. Papers Presented at Professional Meetings:

Bowman, S. (2008). *Incorporating Marx in a 'Race/Ethnicity and Crime' Course – Crime, Historical Materialism, and the Social Construction of Race.* Paper Presentation at the annual meeting of the American Sociological Association.

Bowman, S. (2009). *Wealth and Asset Decision Making of Black Middle Class Families: The Rationalization of Economic Growth and Justice.* Paper Presentation at the annual meeting of the Association of Black Sociologists.

2. Invited Talks, Lectures, Presentations:

NA

3. Consultancies:

NA

4. Workshops:

NA

5. Other:

NA

C. Grants and Contracts

1. Funded External Grants and Contracts:

NA

2. Submitted, but not Funded, External Grants and Contracts:

NA

3. Funded Internal Grants and Contracts:

EXHIBIT 3 Page 50

PPS 8.10 Form 1A

*Co-Principle Investigator* – Research Enhancement Grant / Hip-hop Culture and Adolescent Development.

4. Submitted, but not Funded, Internal Grants and Contracts:

NA

D. Fellowships, Awards, Honors:

NA

## IV. SERVICE

A. University:

Member – University Council
Organizer – Black Faculty Brown Bag Lecture Series (Coalition of Black Faculty and Staff)

B. Departmental:

Advisor – LAE (Criminal Justice Fraternity)

C. Community:

NA

D. Professional:

NA

E. Organizations

1. Honorary:

NA

2. Professional:

Member – Academy of Criminal Justice Sciences
Member – American Sociological Association
Member – Association of Black Sociologists

F. Service Honors and Awards:

NA

: 00421

PPS 8.10 Form 1A

EXHIBIT 3 Page 52

# AFFIDAVIT OF MARY ELIZABETH PELZ

I, Mary Elizabeth Pelz, state and declare as follows:

## A. Introduction

1. I am the Dean of the College of Public Service at the University of Houston Downtown, which includes the Criminal Justice and Urban Teacher Education departments. I have worked at the University of Houston Downtown for twenty-five years.

2. I obtained my Ph.D. in Criminal Justice from Sam Houston State University in 1988. I received my Master's in Political Science from Stephen F. Austin State University in 1976, and my Bachelor of Arts degree in History, also from Stephen F. Austin State University in 1974.

3. I have served as the Dean of the College of Public Service since 2005. In addition to my current role at the University, in previous years I have served as Interim Dean of the College of Public Service; Chair of the Department of Criminal Justice; Associate Professor of Criminal Justice; Assistant Chair of the Department of Social Sciences and Coordinator of the Criminal Justice degree program; Assistant Professor of Criminal Justice; and Instructor at the Corrections Academy at the Downtown Criminal Justice Center.

4. Prior to my work at the University, from 1986 to 1988, I was a correctional counselor at the Ramsey One Unit at the Texas Department of Corrections. A complete copy of my curriculum vitae is attached hereto as Attachment A.

5. My area of expertise within the criminal justice system is inmate sub-cultures, specifically prison gangs. In addition to my academic work, I have authored and co-authored numerous journal articles on those topics as well as other subjects in the field of criminal justice. I am a frequent presenter on these same topics at conferences throughout the academic and criminal

EXHIBIT 4 Page 1

justice communities.  I have previously testified as an expert witness in capital trials on prison gangs, inmate sub-culture, and mitigation issues.

**B. Involvement at Trial**

6.  On or around April 28, 2011, I was appointed by the trial court to act as a defense expert in criminal justice in the capital case of Teddrick Batiste.  I was retained by Mr. Batiste's trial attorneys, specifically R.P. "Skip" Cornelius to provide an expert opinion regarding whether or not Mr. Batiste would be a future danger, should he be given a sentence of life without the possibility of parole instead of the death penalty.

7.  I was provided records related to Mr. Batiste by the mitigation specialist, Gina Vitale.  The records I reviewed included those from the Texas Youth Commission (TYC), Harris County Juvenile Probation, and Harris County jail disciplinary records.  I met with Mr. Batiste for approximately one hour at the Harris County jail and listened to the statement he made to law enforcement following his arrest.  In addition, I reviewed the June 14, 2011, testimony of the State's expert in security threat group classification, Irma Fernandez.

8.  I asked for, but did not receive, any disciplinary records from Mr. Batiste's time at state jail.  Additionally, I was not provided with any of the jail letters written by Mr. Batiste that were admitted at trial.

9.  In my experience testifying at capital trials, I typically meet with the trial attorneys for an extensive amount of time before my testimony in order to discuss my findings and opinions.  I became increasingly concerned in the days leading up to my scheduled testimony in this case because I had not heard from Mr. Batiste's attorneys.

10. I was scheduled to testify on Monday, June 20, 2011, and the first contact I had with trial counsel was a phone call I received from Mr. Cornelius on

EXHIBIT 4 Page 2

Saturday morning, June 18, 2011. During this conversation, Mr. Cornelius asked me if I was able to discuss issues related to the classification of inmates in prison. I told him that I could discuss the concept generally, but was not an expert in the field of classification.

11. Following this brief telephone conversation, I received an email from Mr. Cornelius with a list of topics he intended to address during my testimony. This list included specific classification topics, such as the different levels of custody, what grade Mr. Batiste would enter the system at, the training and competency of prison staff, and levels of security within the prison system itself.

12. I immediately responded to Mr. Cornelius and communicated that all of my knowledge of classification policies and procedures came from published policy manuals and staff training resources, rather than from any kind of inside working knowledge of the current prison system. I communicated to him that my personal knowledge of classification was from more than twenty years prior, even before the system of classifying inmates by G-1 to G-5 was instituted.

13. The first time I met with Mr. Cornelius in person was twenty minutes before I testified on Monday morning.

14. I was not asked during my testimony whether, in my expert opinion, Mr. Batiste would be a future danger if given a sentence of life without the possibility of parole, rather than the death penalty. Instead I testified to my experience in the late 1980's as a correctional counselor at the Ramsey Unit, and how incoming inmates were classified according to their history of past incarceration and other factors. I generally discussed how and why a prison setting is different than the free world and how prison sub-cultures enable inmates to peacefully live in proximity to others, as well as the fact that in

EXHIBIT 4 Page 3

my experience, people who do not function well in the free world can be successful in the structured environment of prison.

15. I extensively testified regarding the general movement of a G-3 classified inmate, including where he would be able to move within the prison grounds and what his ability to work would be. I testified that studies have generally shown that inmates sentenced to life in prison are manageable and do not demonstrate an increase in acts of violence. An inmate facing such a sentence has to decide soon after arriving if he will commit suicide, have a mental breakdown, or adapt to his new environment. I testified that the research indicates that young inmates given a sentence of life without parole adjust well to being in prison and realize how valuable privileges are and act accordingly. I testified that during the time I was a correctional counselor, inmates who identified as ex-gang members were put into administrative segregation for two reasons—to protect them from violence by other gang members, and to isolate them from the general population in case they were not completely out of the gang.

16. I testified generally about the structure of the prison and how safe it is. I testified generally that the most significant indicator of how a person will behave in prison is how they have behaved in prison before, not their behavior in the free world. I testified that although I requested Mr. Batiste's state jail records I never received any and was not aware whether Mr. Batiste had any disciplinary issues while at state jail.

17. Specific to Mr. Batiste, I discussed the fact that a fist fight is much less serious of an infraction than a fight with weapons, and that it was significant that Mr. Batiste never had a physical altercation with a staff member during any of his incarcerations. I testified that it might be inevitable that Mr.

EXHIBIT 4 Page 4

Batiste participates in a fight in prison at some point because he may need to protect himself from a physical or sexual assault.

18. I testified very generally regarding what a day in prison would be like for an inmate in general population, including what would happen if he were to misbehave. I also testified generally regarding what a day in prison would be like for an inmate on an administrative segregation unit. I testified generally regarding what kind of job or activity an inmate might be involved in during his time in prison.

19. On cross-examination I testified that I was not a uniformed correctional officer and did not walk the unit on a daily basis, and Ramsey was not a unit where a life without parole offender would be sent in the first place. I testified that someone convicted of capital murder would not automatically be assigned a higher security classification, rather it would be based on their institutional history. In that respect, violent and non-violent offenders could potentially be housed together. I also testified that someone convicted of a capital crime could potentially be given access to activities, contact visits, work programs, and enjoy some movement within the prison. I testified that death row was like administrative segregation with the most secure housing available from the Department of Corrections, and despite the intense security there have been escapes and attacks on staff.

20. I testified that the way an individual inmate will react to provocation in a prison setting will depend on their perception of what has been done to them and their ability to assess and adapt. I was specifically asked about the incident where Mr. Batiste assaulted another inmate for hanging up the phones, the incident where Mr. Batiste assaulted another inmate named Bobby Ortiz, the incident where Mr. Batiste was involved in a group demonstration and was cuffed, as well as fights Mr. Batiste had with other

EXHIBIT 4 Page 5

cadets at TYC, an incident where Mr. Batiste used aggressive language with a staff member, and incidents of misconduct at the Harris County jail. I was asked if I was aware of sex acts Mr. Batiste engaged in while at the county jail, but I had not been made aware of that act by anyone prior. I further testified on cross-examination that membership in the Crips is not enough for an inmate to automatically be housed in an administrative segregation capacity.

21. I was very uncomfortable with the outcome of my testimony. My understanding was that I was retained by defense counsel to provide an expert opinion on whether Mr. Batiste would be a future danger if sentenced to life in prison, not provide expert testimony with regard to prison classification policies and procedures, and communicated this to Mr. Cornelius accordingly.[1]

## C. Post-Conviction Involvement

22. I was contacted by Mr. Batiste's current post-conviction counsel, the Office of Capital Writs ("OCW") and asked to explain what I would have testified to at trial had I been asked by trial counsel my expert opinion on whether Mr. Batiste would be a future danger if sentenced to life in prison without the possibility of parole instead of death.

---

[1]   I had never previously testified regarding classification. When I was a correctional counselor at Ramsey I processed inmates as they came off the bus and presented them to the unit classification committee who determined where on the unit the inmate would live, what their job would be, and the immediate privilege or restrictions that would be given to them. I would coordinate jobs for inmates and would tweak housing assignments for inmates if they had disciplinary or other issues. At the time, inmates were classified as minimum, medium, or closed custody. Eventually this system was transitioned to what it is today, which is classification from G1 to G5.

EXHIBIT 4 Page 6

23. In addition to reviewing my prior testimony, I reviewed the expert affidavit from Dr. James Underhill regarding Mr. Batiste's frontal lobe damage and an affidavit from the custodian of records at Pam Lychner State Jail indicating Mr. Batiste had no disciplinary infractions during his time of incarceration.

24. Based on my education and experience, my expert opinion, which I hold to a reasonable degree of academic and professional certainty is as follows:

**D. Expert Opinion**

25. Analysis of a defendant's past behavior pattern (in a similar prison-like setting) is the most reliable approach in assessing the likelihood of future violent behavior in a prison context. The question of whether someone will commit violence in the future cannot be scientifically answered "yes or no" for the defendant or anyone in the courtroom. There is always some risk or probability that *anyone* may perpetrate violence in the future. To that end, probability must mean something more than mere possibility for the issue to hold any significance.

26. The probability of future violence by an inmate varies directly with the severity of the forecasted violence. For example, the likelihood that someone sentenced in their early twenties will shove another inmate at some point during the course of a life sentence is very high. Inmates often have to demonstrate a willingness to stand up for themselves in order to prevent more serious violence and victimization. On the other hand, the probability that an inmate will kill a correctional officer or other inmate is small.

27. The institutional history of Teddrick Batiste is unremarkable. It is extremely significant that Mr. Batiste received no disciplinaries during his

EXHIBIT 4 Page 7

incarceration in state jail.[2]  Mr. Batiste was incarcerated from May 17, 2007 to October 31, 2007.  This was the first time and only time he had been incarcerated at a facility other than a juvenile or county jail facility.  The environment at the state jail most closely resembles the environment he would experience at a state prison and the fact that he was infraction free was indicative of what he might experience during a permanent period of incarceration.

28. Mr. Batiste had a small number of incidents while he was incarcerated as a juvenile, but none that would significantly impact his ability to successfully acclimate to an adult prison environment.  Similarly, the disciplinary infractions he received while at the county jail during the pendency of his trial are of limited significance to the overall determination of the probability of future violence.

29. There is a tremendous difference in the free world as compared to the sub-culture of incarceration and these differences permeate all levels of human behavior and interaction.  There is symbolism in both spoken and body language that is unique to penal institutions, where a simple word or gesture can take on great meaning.  As a result, even the slightest infraction of language can be viewed as an act of disrespect and potentially lead to confrontation.  For example, the altercation between Mr. Batiste and the

---

[2]  There was no representation by the State that Mr. Batiste had disciplinary issues at state jail, but I was unable to definitively say during the course of my testimony that he was free of infractions during that time period because I was not provided with any documentation one way or the other.  It was not until I received the affidavit from the custodian of records at Pam Lychner State Jail that there were no disciplinary infractions that I could definitively rely on the fact that Mr. Batiste did not have disciplinary issues during that period of incarceration in asserting that he was likely to successfully adjust to life in prison following his capital conviction.

EXHIBIT 4 Page 8

inmate who hung up the phone was not an incident of a dominant inmate (Batiste) preying on a weaker inmate and acting aggressively towards him for a seemingly minor infraction, but rather something far more significant—that his contact, and other inmates contact, with the outside world was being threatened.

30. It is unreasonable to expect an inmate to be free of any disciplinary action whatsoever. Prison is by its very nature a punitive environment, where its inhabitants lose almost all of their personal autonomy. There is no mechanism by which an inmate can release frustration or experience a normal emotional response to a stressful situation. Any perceived acting out, even something as seemingly inconsequential as harsh words exchanged with another inmate or staff member, is characterized as an "offense" and subject to discipline. This is not an indication that they are presently a danger to others or that it is more probable they will be a danger to others in the future. Rather, it is indicative that they are human beings, with human flaws, and human reactions to situations of stress and dissatisfaction.

31. Furthermore, there is profound discord, anxiety, and apprehension that can occur when an inmate first arrives at an institution or is subjected to continuous change in environment and circumstances, all of which is common during an extended period of incarceration at a county jail. Once an inmate has the opportunity to acclimate to an environment they will remain in for an extended period of time, the stress level and potential for acting out is lessened.

32. There are currently approximately 41,000 inmates across the country serving life without parole sentences. This is a large population and extensive research studies have been done that isolate factors that have an impact on the probability of violent behavior after incarceration. In addition

EXHIBIT 4 Page 9

to Mr. Batiste's unremarkable disciplinary history, there are numerous other factors present that support the assertion that he had a high probability of successfully acclimating to life in a prison environment.

33. **Age**: Mr. Batiste would have been only twenty-three years old with no previous prison history at the time of sentencing.   With a potentially long life ahead of him Mr. Batiste would be forced to adapt to the prison environment in order for him to cultivate any sort of "normal" life.

34. **Education**: Mr. Batiste obtained his GED while at TYC.   The relationship between education and positive (i.e., non-violent) adjustment to prison has been demonstrated in large-scale investigations of prison misconduct and violence. Research has concluded that inmates with at least a high school diploma or GED are less likely to perpetrate assaults in prison. Level of education or literacy level has demonstrated an inverse relationship with assaultive prison misconduct.

35. **Employment History**: Additionally, a history of gainful employment in the community is indicative of an individual's ability to make a positive prison adjustment.   Research has found that inmates with histories of community employment tended to become "industrious" inmates in prison, occupying themselves in constructive ways and being less likely to be involved in prison misconduct and violence.   Despite moving around frequently, during periods of non-incarceration, Mr. Batiste was consistently employed in some capacity from the time he was released from TYC to the time he was arrested.

36. **Relationships**: A significant factor supporting the conclusion that Mr. Batiste would adjust to a capital life term in a Texas prison without serious violence was his continuing contact relationship with family, friends, and his two young children.   Inmates who have continuing relationships and contact

EXHIBIT 4 Page 10

with community members through visitation, telephone, and/or correspondence tend to have better prison adjustments. This is best explained by their remaining somewhat anchored to community values and the power of visitation and telephone privileges as incentives for compliance with institutional rules. Mr. Batiste acknowledged that he had a lot to live for, in particular his desire, despite the circumstances, to be a positive role model to his two young sons. This would be entirely incumbent on his ability to communicate with them and thus provide every reason in the world to maintain a status free of major disciplinary infractions in order to maintain the privileges that would afford him avenues of communication.

37. **Privileges**: Inmates who demonstrate either good behavior or a lack of disciplinary infractions can become eligible for privileges beyond communication with the outside world. They can participate in work and educational programs, various recreational activities, and can enjoy a limited (yet controlled) amount of movement within the prison. These privileges are far more valuable to an inmate sentenced to life without parole than to one serving a shorter sentence because the inmate with a shorter sentence understands that he will enjoy the outside world at some point in the future. For a capitally convicted defendant, the outside world is no longer attainable and the life that can be constructed within the prison walls is the only life they will get. The only way to survive is to get and keep as many privileges as possible and this requires an abstention from violent or aggressive behavior.

38. Furthermore, I am aware of Dr. James Underhill's finding that Mr. Batiste suffers from frontal lobe damage that affects his ability to conceptualize and perceive risk and as a result will escalate his behavior in situations involving risk. I believe that Mr. Batiste's lack of disciplinary history at the state jail

EXHIBIT 4 Page 11

is indicative that a highly structured environment is conducive to controlling the negative effects of this type of dysfunction.

### E. Conclusion

39. Based on all of the factors I have outlined above it is my expert opinion, in both a professional and academic capacity, that there is nothing in Teddrick Batiste's history that leads me to believe that he would be a future danger if he had been sentenced to life in prison without the possibility of parole, rather than death. Instead, it is far more probable that Mr. Batiste would adjust to a prison environment—taking advantage of the privileges afforded him, while maintaining a meaningful relationship with his children, friends, and family members.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on the ___ day of April, 2013 in Houston, Texas.

DR. MARY ELIZABETH PELZ

Subscribed and sworn to before me on _April 23_, 2013.

Notary Public, State of Texas

LINDA F TRIMBLE DAVIDSON
MY COMMISSION EXPIRES
MARCH 14, 2017

EXHIBIT 4 Page 12

# ATTACHMENT A

: 00436

Pelz                                                                                               1

# VITAE

## Mary E. (Beth) Pelz

College of Public Service
One Main Street, C400
Houston, Texas 77002
Phone: (713) 221-8194 Fax : (713) 226-5274
e-mail: pelzb@uhd.edu

## Education

| Ph.D. | Criminal Justice | 1988 | Sam Houston State University Huntsville, Texas |
| M.A. | Political Science | 1976 | Stephen F. Austin State University, Nacogdoches, Texas |
| B.A. | History | 1974 | Stephen F. Austin State University, Nacogdoches, Texas |

## Professional/Academic Experience

| 2005-present | Dean, College of Public Service, UH-Downtown, Departments of Criminal Justice and Urban Teacher Education |
| 2003-2005 | Interim Dean, College of Public Service, UH-Downtown, Departments of Criminal Justice and Urban Teacher Education |
| 1999-2003 | Chair, Department of Criminal Justice, UH-Downtown, Houston, Texas, |
| 1994-present | Associate Professor of Criminal Justice, Department of Social Sciences, UH-Downtown, Houston, Texas |
| 1990-1998 | Assistant Chair, Department of Social Sciences and Coordinator of the Criminal Justice Degree Program, UH-Downtown, Houston, Texas |
| 1988-1994 | Assistant Professor of Criminal Justice, Department of Social Sciences, UH-Downtown, Houston, Texas |
| 1992-1993 | Instructor, Corrections Academy, UH-Downtown Criminal Justice Center, Inmate Gangs & Classification Segments |
| 1986-1988 | Correctional Counselor, Ramsey One Unit, Texas Department of Corrections, Rosharon, Texas |

EXHIBIT 4 Page 13

Pelz                                                                                            2

| 1981-1986 | Part-time Instructor, Government, Brazosport Junior College, Clute, Texas |
| 1980-1983 | High School Teacher, Government and History, Brazoswood High School, Brazosport Independent School District, Clute, Texas |
| 1979-1980 | High School Teacher, Government and History, Willis High School, Willis Independent School District, Willis, Texas |
| 1976-1979 | High School Teacher, Government, History and English, LaMarque High School, LaMarque Independent School District, LaMarque, Texas |

## Academic Assistantships

| Research Associate | Sam Houston State University College of Criminal Justice |
| Graduate Assistant | Stephen F. Austin State University Department of Political Science |

## External Research Grants

| 1993-1994 | Coordinated Houston site for Public Policy Research Institute, Texas A & M Drug Use Research Project, Harris County Jail Project, $37,500. |
| 1990-1993 | U.S. Department of Health and Human Services, Research Grant, *Examination of the Nature and Extent of Youth Gangs in Texas,* $300,000. |
| 1990 | Southwest Texas State University, Department of Education, Classroom Management and Discipline, Research Grant, *Assessment of Drug Usage/ Trafficking and Youth Gang Activity in an Urban High School,* $2,000. |

## Internal Grants

| 1992-1993 | University of Houston Downtown, Research Grant, *The Nature, Extent and Institutional Management Practices of Inmate Gangs in the United States,* $2,000. |
| 1990 | University of Houston-Downtown, Organized Research Grant, An Examination of Linkages Between Youth Gangs, Prison Gangs and Drug Distribution in Harris, Bexar and Dallas Counties, $2,500. |

Pelz                                                                                   3

## Techincal Assistance Grants

| | |
|---|---|
| 1996 | National Institute of Corrections, Technical Assistance Grant 2ND Annual NMGTF Training Conference, $10,000. |
| 1994 | National Institute of Corrections, Transitional Operational Funding for The National Major Gang Task Force, $25,000. |

## Successful Donor Solicitations

| | |
|---|---|
| 2011 | F.Y. Cheng, Chairman, Evergreen Group, *Scholarship Endowment,* $2 million.   Auxiliary to faculty member Hsiao-Ming Wang from 2004-2011 in cultivation of Dr. Cheng. |
| 2009 | Evergreen Shipping (America), *College of Public Service Graduate Scholarships,* $100,000. |
| 2008 | The Powell Foundation, *A Model of Faculty Development and Mentoring Program for Early Childhood Education at the House of Tiny Treasures,* $30,000 |
| 2008 | Union Pacific Foundation, *A Model of Faculty Development and Mentoring  Program for Early Childhood Education at the House of Tiny Treasures,* $10,000 |
| 2007 | Evergreen Shipping (America), *Master of Security Management Scholarships,* $50,000. |
| 2005 | Evergreen Shipping (America), *Master of Security Management Scholarships,* $50,000. |

## Publications

Williams, Frank P., Marilyn McShane & **Beth Pelz** (2011). Revision and reprint. "The Myth of the Prisons as Country Clubs," in Walker, Jeffery and Robert Bohm *Demystifying Crime and Criminal Justice.* Roxbury Publishing.

Kortz, W. J., Jenkins, K. L., Nath, J. L., **Pelz, B.,** Purdy, P.  (2009).   Partners for better practice: A teacher for homeless children. *International Journal of Case Method Research & Application, XXI*(1,)66-78.

EXHIBIT 4 Page 15

Pelz                                                                                                    4

Jenkins, K., Kortz, J., Nath, J. L., & **Pelz, B.**  (2007). A case of need: The House of Tiny Treasures. *Proceedings from the 24th International Conference on Case Method Research & Application,* 150-161.

Jenkins, K., Kortz, W., Nath, J. L., & **Pelz, B.**  (2007). A case of need: The House of Tiny Treasures. *The Journal of the World Association for Case Method Research & Application, XIX*(4), 370-382. **This is a different more robust publication from the proceedings above.

Kortz, W., Nath, J., **Pelz, B.** & Jenkins, K. (2007).  A Case of technical need:  The House of Tiny Treasures.  *Proceedings of E-Learn 2007 (World Conference on E-Learning in Corporate, Government, Healthcare & Higher Education, 6162-6168.*

Williams, Frank P., Marilyn McShane & **Beth Pelz** (2006). "The Myth of the Prisons as Country Clubs," in Walker, Jeffery and Robert Bohm *Demystifying Crime and Criminal Justice.* Roxbury Publishing.

McShane, Marilyn, Williams, Frank P., **Pelz, Beth** & Tranqina Quarles (2005). "The Role of Mental Disorder in Parolee Success," *Southwest Journal of Criminal Justice* Volume 2, Issue 1, Spring 2005:3-22.  www.cj.txstate.edu/swacjcontents.html .

**Pelz, Mary E**. (2003). "Juvenile Gangs: Theory, Practice and Programs," In McShane, Marilyn and Frank P. Williams *Encyclopedia of Juvenile Justice.* New York: Sage Publishing,

**Pelz, Mary E**., C. Terry Pelz. (2001). *Introduction to Criminal Justice: Texas Edition*, Belmont, CA: Wadsworth/Thomson Learning.

**Pelz, Mary E**. (1996). "Gangs in Prison." In McShane, Marilyn and Frank P. Williams *Encyclopedia of Prisons.* New York: Garland Publishing, Inc.

**Pelz, Mary E**., C. Terry Pelz and James W. Marquart (1991) "The Aryan Brotherhood of Texas: An Analysis of Right-Wing Extremism in the Texas Prisons." *The Prison Journal.* (71) (2)Fall-Winter 1991:23-37

**Pelz, Mary E**. 1986. Analysis of County Sentencing Averages for  Assault, Vehicle Theft, Forgery, Controlled Substances and DWI: The Data.  Report of the Commission on Sentencing Practices and Procedures to the Criminal Justice Policy Council, 70th Texas Legislature.

**Pelz, Mary E**. 1984. Attitude of the Texas Public as to Whether Punishment Should Be Decided by a Judge or Jury.  Report to the Commission on Sentencing Practices and Procedures to the  Criminal Justice Policy Council, 69th Texas Legislature.

EXHIBIT 4 Page 16

Pelz                                                                                                   5

## Professional Presentations

Pelz, Mary E. (Beth) Pelz (March 2013). *In the Beginning...and 35 Years Later: Interviews with a Prison Gang Member*. Paper presented at the annual conference of the Academy of Criminal Justices Sciences, Dallas, TX.

Nath, J. L., Cohen, M., **Pelz, B.**, Mahoney, S., & Garcia, V. (February, 2009). *Reflective "departmenting": Developing a Reflective, Evaluative Stance through CREATE.* Paper presented at the annual conference of the Association of Teacher Educators, Dallas, TX.

Nath, J. L., Kortz W., Van Horn, L., Jenkins, K., **Pelz, B.**, Cohen, M., Bartlett, M. & Hewitt, A. *A Culture Left Out: A University Partnership's Work with Children of the Homeless. Research presentation for the Association of Teacher Educators, Winter Conference, February 2009, Dallas, TX.*

Nath, J. L., **Pelz, B.,** Evans, L., Cohen, M., Fey, J., & Burditt, D. (2008, August). *Working together for teacher certification: An ISD/Community college/university partnership moving forward.* Paper presented at the annual summer conference of the Association of Teacher Educators, Washington, D.C.

Kortz, W. J., **Nath, J. L.,** Jenkins, K. K., Purdy, P., Pelz, B. (2008). *University-supported technology use at a school for children of the homeless.* Paper presented at the annual meeting of the World Conference on E-Learning in Corporate, Government, Healthcare, and Higher Education, Las Vegas, NV.

Kortz, W. J., Jenkins, K. L., Nath, J. L., **Pelz, B.**, Purdy, P. (2008, July). *Recognition of need: A teacher for homeless children.* Paper presented at the annual meeting of the World Association for Case Method Research & Application, Edinburgh, Scotland.

Burditt, Dell, Fey, Jo, **Pelz, Beth** & Louis Evans. *Partnering for Paras: Collaboration Enables Paraprofessionals to Achieve Teacher Certification.* National Association of Community College Teacher Education Programs, February 29-March 2, 2008, Denver, Colorado.

Kortz, J., Nath, J., Pelz, B., & Jenkins, K. (2007). *A case of technological need: The House of Tiny Treasures.* Paper presented at the annual meeting of the World Conference on E-Learning in Corporate, Government, Healthcare, & Higher Education, Quebec City, Canada.

Kortz, J., Jenkins, K., Nath, J. L. & **Pelz, B.** (2007, July). *A case of need: The House of Tiny Treasures.* A paper presented at the annual meeting of the ACT World Association for Case Method Research & Application, 24th International Conference, July 1-4, Guadalajara, MX.

*Inmate Gangs in the Texas Prisons: The More Things Change the More They Stay the Same,* Academy of Criminal Justices Sciences Meeting, March 2004, Las Vegas, Nevada.

EXHIBIT 4 Page 17

Pelz                                                                                                        6

*Which Came First Policy or Public Opinion? Revisiting the Myth of Prison as Country Club,* Academy of Criminal Justices Sciences Meeting, March 2004, Las Vegas, Nevada. With Marilyn McShane and Frank P. Williams III.

*Mental Illness and Parole Recidivism,* Academy of Criminal Justices Sciences Meeting, March 2003, Boston, MA. With Marilyn McShane, Frank P.Williams III and Traquina Quarles. This paper was nominated for the 2004 ACJS Anderson paper Award.

*Parenting a Special Needs Child,* Juvenile Delinquency: Special Needs Children Conference, UH-Downtown, Community Justice Institute, May 2003.

*Sensory Processing and Neurological Development in Adolescents,* Southwest Association of Criminal Justice, San Antonio, Texas, October 3-5, 2002.

*Technical Success v. the Reality of Failure in the Juvenile Justice System: A Case Study of a Young Capital Defendant,* Academy of Criminal Justices Sciences Meeting, April 2001, Washington, D.C.

*What We Can Learn from Jasper,* Academy of Criminal Justices Sciences Meeting, March 2000, New Orleans Louisiana.

*Managing Gangs in the Texas Prisons: A Case Study,* Academy of Criminal Justices Sciences Meeting, March 9-13, 1999, Orlando, Florida.

*Interagency Networking in the 90s,* Fourth Annual National Major Gang Task Force Training Conference, June 1-3, 1998, Daytona Beach, Florida.

*Research Update on Gang Activity and Management,* Third Annual National Major Gang Task Force Training Conference, March 17-19, 1997, Colorado Springs, Colorado.

*How Does the Social Organization of Gangs Impact Gang Activity?* Second Annual National Major Gang Task Force Training Conference, April 29-May 1, 1996, Houston, Texas.

*Linkages Between Youth Gangs and Street Gangs: An Update,* Mary E. (Beth) Pelz, Southwestern Association of Criminal Justice Educators, Houston, Texas , October 5-7, 1995.

*An Analysis of Texas Prison Gangs and Youth Gangs for Possible Linkages,* Mary E. (Beth) Pelz, Academy of Criminal Justice sciences, Chicago, Illinois, March 8-12, 1994.

*The Texas Youth Gang Project: Research Findings and Uses,* Third National Conference of the Youth Gang Drug Prevention Program, Family Youth Services Bureau, Administration on Children, Youth and Families, U.S. Department of Health and Human Services, October 19-20, 1993.

EXHIBIT 4 Page 18

Pelz                                                                                                    7

*Critique of Draft of Final Report of "Gangs and Drugs in New York State,"* New York State Bureau of Research and Program Evaluation, New York State Division of Youth, Third National Conference of the Youth Gang Drug Prevention Program, Family Youth Services Bureau, Administration on Children, Youth and Families, U.S. Department of Health and Human Services, October 19-20, 1993

*Analysis and Summary of the Texas Youth Gang Project's Justice Surveys 1990-1992,* Pelz, Mary E. (Beth) and Elizabeth McConnell, Academy of Criminal Justice Sciences, Kansas City, Missouri, March 16-20, 1993.

*The Texas Youth Gang Project: An Update",* Pelz, Mary E. & McConnell, Elizabeth, American Society of Criminology, New Orleans, Louisiana, November 4-7, 1992.

*The Texas Youth Gang Project-School Superintendent Data,* McConnell, Elizabeth and Mary E. (Beth) Pelz, presented to the Academy of Criminal Justice Sciences, Pittsburgh, Pennsylvania, March 10-13, 1992.

*Preliminary Assessment of Justice Agency Data Collected by the Texas Youth Gang Project,* Pelz, Mary E. & McConnell, Emma. American Society of Criminology, San Francisco, California, November 1991.

*Right-Wing Extremism in the Texas Prisons: The Rise and Fall of the Aryan Brotherhood of Texas,* Pelz, Mary E. & Pelz, Terry. American Society of Criminology, San Francisco, California, November 1991.

*The Texas Youth Gang Project: Progress and Problems in Gang Research,* Pelz, Mary E. & McConnell, Emma, Family and Youth Services Bureau of the U.S. Department of Health      and Human Services Research Forum on Youth Gangs, Washington, D.C., October 31-November 1, 1991.

*Juvenile Gang Activity in Texas: Research in Progress,* presented to the Academy of Criminal Justice Sciences, Denver, Colorado, March 1990.

*Assessing Youth Gangs In An Urban High School,* McConnell, E. & Pelz, Elizabeth. American Society of Criminology, Baltimore, Maryland, November 1990.

*Pre-Trial Release Risk Profile Assessment: A Viable Solution to Jail Overcrowding in Harris County, Texas?* Pelz, Mary E. & Engram, Peggy. Southwest Social Science Association, Fort Worth, Texas, March 1990.

*The Search for Constitutionally Adequate Medical Care in the Texas Department of Corrections: A Case Study,* Pelz, Mary E. Southwestern Criminal Justice Educator's Association. Corpus Christi, Texas, October 1989.

EXHIBIT 4 Page 19

Pelz                                                                                                    8

*Inmate Gangs: Impact on Institutional and Community Corrections in Texas*,  Pelz, Mary E. & Pelz, C. Terry.  Texas Corrections Association, Galveston, Texas, June 1987.

*When Brotherhood Leads to Violence: The Management of Inmate Gangs in the Texas Prisons.* Pelz, Mary E., Southwest Social Science Association.  San Antonio, Texas, March 1986.

## Poster Presentations

Berthelot, Emily R., **Pelz, Beth**, Nath, J.L., *Houston Independent School District Campus Police Relationships with Students: An Exploratory Study*, American Society of Criminology, Washington, D.C., November 16-20, 2011.

## Panels and Roundtables

Chair of Roundtable: *Tenure and Promotion Criteria in a Criminal Justice Department* Southwest Association of Criminal Justice, College Station, TX, September 29-October 1, 2011.

Chair of Panel on *Sensory Processing and Delinquency*, Juvenile Delinquency: Prevention and Intervention Conference, University of Houston Downtown, Community Justice Institute, July 23—24, 2002.

*Chairs Issues Panel*,  Chair and Moderator, Southwest Association of Criminal Justice, San Antonio, Texas, October 3-5, 2002.

*Chairs Issues Panel*,  Chair and Moderator, Southwest Association of Criminal Justice, San Antonio, Texas, October 2-4, 2001.

Town Meeting: *A LOST GENERATION*, Channel 8, Houston, Texas, May 11, 1994 One of seven focus panelists addressing social issues impacting youth.  I was asked to discuss the issue of youth gangs.

Town Meeting: *VIOLENCE PREVENTION*, Richmond, Texas, February 24, 1994. One of six panelists assessing and preventing violence.  I specifically addressed gang violence.

Organized and Chair Panel, *Ongoing Youth Gang Research Funded by the U.S. Dept. of Health & Human Services,* American Society of Criminology, New Orleans, Louisiana, November 1992.

Roundtable:   *RESEARCH ON GANG AND DRUG ISSUES*, Academy of Criminal Justices Sciences, Nashville, Tennessee, March 1991.

EXHIBIT 4 Page 20

Pelz                                                                          9

**Thesis Committees**

| | |
|---|---|
| August 1993 | Outside member, Master of Arts in Behavioral Sciences, UH-Clear Lake. *Media Youth Gangs and Hyperreality*, Theron Ray Shultz |
| December 2002 | Committee Member, Master of Arts in Criminal Justice, UH-Downtown. *An Examination of Selected Variables from the Marginalization, Victimization and Power-Control Theories of Female Criminality*, Deirdre M. Warren. |
| April 2005 | Committee Member, Master of Arts in Criminal Justice, UH-Downtown. *The Harris County Drug Courts: A Test of Symbolic Interactionism*, Paulette Purdy. |
| May 2005 | Committee Member, Master of Arts in Criminal Justice, UH-Downtown. *William E. Murphy, Deputy Chief of the Houston Police Department: Killed while Seated in a Restaurant*, James Dewey. |
| May 2005 | Committee Member, Master of Arts in Criminal Justice, UH-Downtown. *The Influence of Formal Education Upon Overall Police Officer Attitudes, Commitment, and Initiative in a Community –Oriented Police Setting*, Charles B. Assiff. |
| May 2005 | Committee Member, Master of Arts in Criminal Justice, UH-Downtown. *Juror "No Shows": Examining the Lack of Citizen Response to Jury Summons And It's Effect on Jury Representativeness*, Louis Dewey. |

**Expert Testimony and Consultation**

**State of Texas v. John Pham,** 208th District of Harris County, Texas, April 1999.
Murder case. Testified about street gang behavior.

***Capital Cases***
**State of Texas v. Efrain Perez,** 263rd District Court of Harris County, Texas, April 1995.
Testified about street gang and prison gang behavior.

**State of Texas v. Lawrence Russell Brewer,** Brazos County, Texas. September 1999.
Hired to testify about prion gang subculture. Did not testify due to deal made by attorneys.

**United States v. Kenneth Tatum** Eastern District of Texas, September 1999.
Testified about street gang, prison gang subculture and mitigation issues.

EXHIBIT 4 Page 24

Pelz                                                                                          10

**United States v. Shannon Agofsky,** Eastern District of Texas, Beaumont, Texas. July 2004.
             Testified about prison gang subculture.


**United States v. David Lee Jackson,** Eastern District of TX, Beaumont, TX. November 2006.
             Testified about prison gang subculture and mitigation issues.


**State of Texas v. Raymond DeLeon Martinez,** Harris County, Texas, March 2009.
             Testified about inmate subculture and mitigation issues.


**United States v. Issac Mark Snarr,** Eastern District of Texas, Beaumont, Texas May 2010.
             Testified about prison gang subculture and mitigation issues.


**State of Texas v. Teddrick Batiste,** Harris County, Texas, June 2011.
             Testified about classification and inmate routines.


***Consultation on Appellate Cases***
**United States v. Shannon Agofsky,** July-August, 2009.


## EDITORIAL BOARDS
*Journal of Applied Research on Children* (2010-present)
*The Gang Journal* which became the *Journal of Gang Research* (1991-1996)


## PROFESSIONAL REVIEWS
Have reviewed for:           *Crime & Delinquency*
Currently review for:        *Journal of Criminal Justice Education*
                             *Youth Violence and Juvenile Justice*


## BOOK REVIEWS
*Ethics in Crime and Justice, Instructor's Manual,* 4th edition.  Jennifer Langdon, Wadsworth /
        Thomson Learning, Belmont, California.  2005.

*America's Courts and the Criminal Justice System*, 4th edition. David W. Neubauer, Brooks/Cole,
        Pacific Grove , California.

Blind Reviews for Manuscripts, Sage Publications
        Untitled text on Girl Gangs and Gang members, 1993.
        <u>Gangs in America</u>, 1994.


EXHIBIT 4 Page 22

Pelz                                                                                    11

## Program Reviews
Criminal Justice Program, Department of Political Science, Northern Kentucky University. Submitted a report to the dean recommending major curriculum and organizational changes. All recommendations were adopted.

## Professional Organization Activity
Southwest Association of Criminal Justice, 2003-2004, President and Conference Program Chair.

Southwest Association of Criminal Justice, 2002-2003, 1st Vice President and Conference Program Chair.

Southwest Association of Criminal Justice, 2001-2002, 2nd Vice President and Conference Program Chair.

Academy of Criminal Justice Sciences 2002 Meeting, Program Committee, Professional Development

Coordinating Planning and Administration of the Fourth Annual National Major Gang Task Force Training Conference, June 1-3, 1998, Daytona Beach, Florida.

Coordinating Planning and Administration of the Third Annual National Major Gang Task Force Training Conference, March 17-19, 1997, Colorado Springs, Colorado.

Coordinated Planning and Administration of the Second Annual National Major Gang Task Force Training Conference, April 29-May 1, 1996.

Coordinated Planning and Administration of the First Annual National Major Gang Task Force

Training Conference, August 30-September 1, 1995, Hartford, Connecticut.

Coordinator of National Prison Gang/Security Threat Group Workshop, Hotel Soffitel, Houston, Texas. May 27-28, 1993. Sponsored by the University of Houston Downtown Criminal Justice Center and the American Correctional Association. Included prison gang coordinators from state and federal prisons as well as major urban jails.

Organized and Moderated the Second Quarterly Texas Interagency Gang Workshop, October 15, 1991. Hosted by the University of Houston Downtown Criminal Justice Center.

Organized and Moderated the First Quarterly Texas Interagency Gang Workshop, July 30, 1991. Hosted by the University of Houston Downtown Criminal Justice Center.

Pelz                                                                                           12

## CONSULTING
1992-1998   Co-founder and Administrative Coordinator of the **National Major Gang Task Force**. Working Task Force of local, state and federal corrections and law enforcement gang coordinators/intelligence personnel dedicated to the development and sharing of operational and strategic gang intelligence. My responsibilities included:

1. Maintain administrative office/supervise assistant coordinator;
2. Produce quarterly newsletter;
3. Coordinate annual training conference (averages 500 participants);
4. Coordinate communication between board of directors and executive director;
5. Maintain resource library.

2006-2008       Homicide Intervention Council, unpaid consultant to Houston Police Department Chief, Harold Hurt.

## TRAINING
"Youth Gangs: Intervention and Prevention", Sam Houston State University, May 3-5, 1992.

Southwest Regional Center for Drug-Free Schools and Communities, "Changing the Face of the 90s: A Conference on Gangs and Cults." September 5-7, 1990.

U.S. Department of Justice Certificate of Training, Youth Gangs Course, Houston, Texas, April 1990.

Texas Department of Corrections Officer Training Academy, Certified, December 1987.

## ACADEMIC SERVICE

| University | Department |
|---|---|
| Faculty Senate | Criminal Justice Student Association Sponsor |
| UHD Police Chief Search Committee | Organized Research Committee |
| Faculty Development Committee | Curriculum Committee 1999-2003 |
| Writing Proficiency Committee | Unit-based Budgeting Committee |
| Academic Affairs Committee 1999, 2003-present | Assessment Committee |
| Organized Research Committee | Faculty Development Committee |
| Unit Based Budgeting Overview Committee Chair | CJ Search Committees 91-92, 94-96 |
| Academic Honesty Committee | Member CJ Search Committee 1990 |
| Academic Policies Committee | History Fair Judge |
| Distance Learning Committee | Internship Program Coordinator 89-94 |
| University Policy Committee | Internship Fair Co-coordinator 94, 95 |
|  | Chair, 100 Club Scholarship Committee |
| Women's Month Committee 93, 94, 95 | Women in CJ Conference Committee |
| Chair, Criminal Justice Majors' Day, 1998 | Chair, Criminal Justice Master's Degree |
| Chair, CJ Unit Based Budgeting, 1998-2003 | Curriculum Development Committee, 97, 98 |
| University Curriculum Committee 1998-2003 |  |
| Chair, University Curriculum Committee, 2001 |  |

EXHIBIT 4 Page 24

Pelz                                                                                          13

Chair, Criminal Justice Community Advisory Board
Chair, Search Committee, Dean College of Business 2005
UHD Development Council 2007-present
Chair, Search Committee, Director of Public Affairs, 2008
Public Affairs Council 2008-present
Name Change Task Force 2008-2009
Chair, Search Committee, VP Advancement and External Relations, 2010
Search Committee, VPAA & Provost, 2013

**UH System**
Search Committee for UHD President 2009
UH Campus Safety Task Force 2009

## COMMUNITY SERVICE
Children-at-Risk Research Institute Board, 2009-present
Children-at-Risk Advisory Board, 2006-present

Keynote Speaker, Point/Counterpoint, Westwood Country Club Issues Committee, Topic: Armed
America, November 14, 1990.

Consultant to Mobile Learning Centers in developing a pilot program for parolees housed within the
New Directions Halfway House, Houston, Texas. The program provided literacy, basic skills and
computer literacy training for the residents, 1990-1991.

Consultant on Gang Issues, Gerald Garret, Member, Texas Department of Criminal Justice, Board of
Pardons and Parole, 1989-1991.

Town Meeting: VIOLENCE PREVENTION, Richmond, Texas, February 24, 1994.
One of six panelists assessing and preventing violence. I specifically addressed gang violence.

Town Meeting: A LOST GENERATION, Channel 8, Houston, Texas, May 11, 1994
One of seven focus panelists addressing social issues impacting youth. I was asked to discuss the
issue of youth gangs.

Gang Awareness Presentations to the following agencies 1996:
        Meadows, Texas  Police Department
        Humble, Texas Police Department
        Jester Unit Shift Meetings, Texas Department of Criminal Justice-Institutional Division

EXHIBIT 4 Page 25

Pelz                                                                                          14

## PROFESSIONAL ASSOCIATIONS
Academy of Criminal Justice Sciences
Council of Colleges of Arts and Sciences
Southwest Criminal Justice Educator's Association
American Society of Criminology
American Anthropology Association
Society of for the Study of Social Problems

## COURSES TAUGHT
### *Undergraduate Courses*

Law and Society   (Introduction to Criminal Justice)          Special Topics: Gangs
Corrections Systems                                            Special Topics: Youth Violence
Criminal Courts                                               Special Topics: Juvenile Issues
Institutional Corrections                                     Senior Seminar
Community Corrections                                         Criminal Justice Research
Correctional Counseling                                       Internship-Research and Agency
Court Administration                                          Crime & Delinquency
Criminal Law                                                  Research Methods
Ethics                                                        Juvenile Justice System
Research Topics                                               Criminology
Field Experience

### *Graduate Courses*

Issues in Criminal Justice                                    Issues in Juvenile Justice
Issues in Corrections                                         Administration in Criminal Justice
Special Topics: Inmate Social Organization                    Special Topics: Juvenile Justice
Current Issues for the Security Executive Independent Studies
Capstone Project for Master in Security Management for Executives
Demystifying Crime & Criminal Justice

EXHIBIT 4 Page 26

: 00451

## AFFIDAVIT OF NECOLE BALDWIN

I, Necole Baldwin, state and declare as follows:

1. My name is Necole Baldwin. I am the first cousin of Teddrick Batiste. My mother, Monica Davis, and Teddrick's mother, Rowena Scott, are sisters.

2. I live in Katy, Texas, and work at a pediatric hospital as a financial counselor. I live with my brother Jermaine Baldwin.

3. I was never contacted by anyone on Teddrick's trial team. I found out what was going on with the case from my mother and the Houston Chronicle. I was willing and able to testify on Teddrick's behalf. Had I been asked, I would have testified to the following:

4. I was born in 1982 in Lubbock, Texas. My parents separated when I was in the first grade and my mother moved me and my brother to Houston.

5. I am the oldest of the cousins on my mother's side of the family. I am about five years older than Teddrick. My extended family is not very close. Everyone gets together on Thanksgiving and maybe on Mother's Day or Easter, but otherwise the individual families go off and do their own thing. We are a family because we are blood, but we do not really do things for each other on a daily basis.

6. I believe that my mother is the most responsible one out of all of her siblings. Several of my mother's siblings stayed with us at different times when I was growing up for personal or financial reasons. It would annoy me. My mother functions as the "groove" of the family. She is not the oldest, but she is held to be that way by the others. She has lent her siblings money, helped them out, and let them stay at her house.

7. My mother left home and married early when she was very young. My grandmother, Darlene Beard, was involved with a very abusive man for

EXHIBIT 5 Page 4

several years and my mother has told me that their living situation was very difficult and took an emotional toll on her.

8.  The situation she grew up in influenced my mother a great deal. My grandmother was not loving or nurturing to my mother and the environment she grew up in was not stable or protective. I believe her experiences made my mother want to be a better mother than what she had herself. My mother protected and provided for me and my brother and we got better opportunities in terms of school and our living situation.

9.  My grandmother is not my favorite person because of the way she treated my mother. I did not see my grandmother very often growing up. She was not open or loving towards me. I would see her at holidays or family events but then have no more communication with her until the next event.

10. Of all my aunts and uncles, I was probably closest to Rowena. She lived with us for a while when I was in middle school. Teddrick and Kevin Jr. lived with us too. Teddrick would have been in elementary school at the time. Teddrick, Kevin and Jermaine all shared a room when they stayed with us. Rowena and the boys lived with us somewhere between six months and a year.

11. Teddrick was just a regular kid. Rowena would discipline Teddrick by whooping him real good. I once saw Rowena punch Teddrick in the chest. My mom was not any stricter than Rowena, but I think my brother and I respected her more than Rowena's boys respected Rowena.

12. Rowena struggled a lot. They lived in a lot of places and she moved Teddrick around a great deal. There was no stability. Rowena never had a great job and her socioeconomic status was lower. She would have to live in bad parts of town. Where she could afford to live was not the best area for teenage boys. Rowena did not make the best choices when it came to

EXHIBIT 5 Page 2

boyfriends. The men she was around were not the most positive influences. I think Kevin Sr. had a drug problem and he did not seem to do anything that improved Rowena's situation.

13. Rowena's husband Jerome had a criminal history and a serious drug problem. When Rowena met him they were already living in the "hood" and he did not help their situation. Instead, they continued to live in a bad neighborhood.

14. Teddrick got into trouble as a teenager and went to juvenile detention. You kind of have to adopt the lifestyle of where you are living and Teddrick lived in the hood. When he got out I just kind of knew that he was in a gang. No one else in our family is into gang stuff, but Teddrick had new tattoos that I recognized as being gang related. Teddrick also just seemed harder when he got out, like while he was there he learned the ways of the streets. He came out more street-wise, more informed, and a little tougher. I did not see him that often once he was out, maybe two or three times a year at family events.

15. I was not surprised when Teddrick took responsibility for the little boy that was not his. He was trying to be a better person and I thought it was commendable.

16. In February 2013, I was contacted by an investigator with the Office of Capital Writs.

17. I have read and reviewed this 4 -page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on 4/7 , 2013, in Houston , Texas.

EXHIBIT 5 Page 3

NECOLE BALDWIN

Subscribed and sworn to before me on _April 7_, 2013.

Notary Public, State of Texas



Notary without Bond



Notary without Bond

EXHIBIT 5 Page 4

## AFFIDAVIT OF DARLENE BEARD

I, Darlene Beard, state and declare as follows:

1. My name is Darlene Beard. I am Teddrick Batiste's maternal grandmother. My daughter Rowena Scott is Teddrick's mother.

2. I testified at Teddrick's trial. I didn't know what Teddrick's lawyers were going to ask me or what I was supposed to talk about before I testified.

3. At Teddrick's trial, I gave jurors background about Teddrick's family tree. I explained to them that Teddrick's birth was a surprise because I did not know that Rowena was pregnant. I explained to them that I took care of Teddrick until he was about nine years old while his mother finished school. I described Teddrick as a kind and respectful person and that he was good to his kids. I also told the jury that there was not a father figure in Teddrick's life when he was born and that I did not even know who his father even was.

4. If I had been asked, I would have elaborated and testified additionally to the following:

5. I grew up in Coldspring, Texas as one of nine children. I lived there until I moved to Houston 1966 to try to make a better life for myself.

6. My mother already had two children and my father already had five children when my parents met. Together they had three children. My older sister Doris was the first, I was the middle child and my brother Willie is the youngest.

7. My mother raised me by herself. She was as sweet as can be, but she would only tell you to do something once.

8. I remember when I was young my half-brother Sam from my father's side would drink a lot. He would get tore up every weekend. When he got drunk he would beat his wife. I would just have to sit there and watch it. I hated it but there was nothing that I could do.  *D.B.*

EXHIBIT 6 Page 1

9. I had my first child, Malcolm, when I was sixteen. I was not able to finish high school, but I eventually went to night school to get my degree. I met David Alexander, Malcolm's father in high school. I thought we would stay together, but he did not stick around after Malcolm was born. I was seventeen when I had my second child, Monica. Her father is Willie Fields. My mother helped me raise Malcolm and Monica while I finished school.

10. I moved to Houston because I wanted a better life. I needed to get a job and there were no opportunities in Coldspring. I got my first job through Job Corps at Jeff's Tailoring Shop. I must have been nineteen or twenty at the time.

11. I met Truman Jackson around 1968 in Houston and we had a son who we also named Truman. Truman Sr. did not do too much to help me. He did not stick around and was barely a part of our son Truman's life.

12. Next, I met Clarence Batiste at a night club. But he had a wife so there was not too much he could do to help me. I got pregnant and had a son named Christopher. Clarence was not around too often.

13. Then I met Ulysee Bean when I was going to nursing school in Woodville, Texas. He was the first man I lived with. He never fought with me and he was good to my kids and provided for us. Ulysee is the father of Rowena, although no one knew it at the time. Our relationship ended because I moved back to Coldspring when my mother got ill. Then I went back to Houston and got a job driving a school bus and then driving the Metro.

14. I went to Woodville between having Christopher and having Rowena. When I was back in Houston I stupidly went back to Clarence Batiste. That is when I had my youngest son Willie. Clarence still had a wife, but I was young and did not really know or care.

15. After Clarence, I got involved with a man named Peter Paul Zenon. I met him at a club. We lived together for four years or so. He was a monster. He

*D. B.*

EXHIBIT 6 Page 2

fought me with anything he could pick up. One time he broke my arm by hitting me with a baseball bat. I still have a scar running down the length of my forearm from that incident. I would leave him sometimes on the weekends but then I would turn around and go right back to him. I was really scared of him—it seemed that he would find me everywhere I went. I never called the police on him. Looking back, that was really stupid, but at the time, I was really scared. I kept asking, "Why are you doing this to me? Why? What have I done?" My kids saw all of this. They would cry and say, "Why are you still staying with him?" When Peter Paul was around, the kids were shaking like leaves on a tree just like me. The kids were scared of all of his screaming and hollering.

16. Finally, one night he was trying to fight me again and I shot him. I did not know how to shoot a gun. Afterwards, I called the police and told them what happened. They never arrested me because they knew it was self-defense. They looked at his criminal record and they said, "Oh my god, how were you living like this?" The police talked to one of my neighbors and he told them how abusive Peter Paul was to me.

17. Rowena was upset because of the way Peter Paul treated me. Rowena was happier after he died.

18. Afterwards, I took all of my kids and we stayed with my aunt, SK Davis. She babysat for me while I went to work. We lived with her for at least six months. Eventually I moved with the kids to some government apartments over by Cross Timbers. We lived there about two years.

19. Being a single mother was rough. I had to work long hours to have enough to take care of the kids. Because I was working a lot, other people had to watch the kids. I did not resent the children's fathers for not being around. I just did what I had to do. D. B.

EXHIBIT 6 Page 3

20. I did not know that Rowena was pregnant with Teddrick. She did not look or act differently. One morning I heard her screaming and hollering from the bathroom. She was in labor about two hours. I caught the baby and then took her to the hospital.

21. I still do not know who Teddrick's father is. I asked Rowena but she never told me who it was. Rowena was only sixteen and had to learn how to take care of a baby. She stayed in school and I was working, so Teddrick went to daycare or stayed with other family members.

22. Teddrick got really sick when he was a baby and had to go to the hospital. I thought it was a cold but it turned out to be much more serious. He had to stay in the hospital about a week.

23. Rowena moved out of the house with Teddrick when he was about three or four years old. After that I would see him from time to time and would take care of him when Rowena needed me to and I was available.

24. Teddrick grew up without a father in his life. He looked up to his uncles, especially Willie. Teddrick went to juvenile boot camp because he was messing with the wrong people. Once he got out, Teddrick considered himself grown and I did not see too much of him anymore.

25. I met Eugene Beard in 2003 at a club where we all used to hang out. I knew his brother. We got married. That was the only time I got married. He was a good guy and really cared about me. I felt like any man that would marry a woman with six kids had to really care or be crazy. Eugene had two kids, Melissa and Eugene Jr., who everyone called Gene. Eugene died in 2007.

26. I met with an investigator with the Office of Capital Writs in November 2012 and March 2013.

27. I have read and reviewed this five-page affidavit.

$\mathcal{D}. \mathcal{B}.$

EXHIBIT 6 Page 4

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on March 2 5 , 2013, in _Houston_ , Texas.



DARLENE BEARD

Subscribed and sworn to before me on March 25 , 2013.

Notary Public, State of Texas

ARIANE EIGLER
Notary Public, State of Texas
My Commission Expires
JULY 11, 2016
Notary without Bond

ARIANE EIGLER
Notary Public, State of Texas
My Commission Expires
JULY 11, 2016
Notary without Bond

EXHIBIT 6 Page 5

: 00462

## AFFIDAVIT OF MELISSA BEARD-CARTER

I, Melissa Beard-Carter, state and declare as follows:

1. My name is Melissa Beard-Carter. I am the daughter of Eugene Beard, who was married to Darlene Beard. Darlene is the maternal grandmother of Teddrick Batiste.

2. I am married and have three children. I work as an obstetrics nurse and am currently in school getting my Bachelor's degree in legal studies.

3. I was never contacted by anyone on Teddrick's defense team, nor was I asked to testify at trial. Had I been asked I would have testified to the following:

4. My mother died in 1984 when I was five years old and after that I lived with my father and Darlene, my brother Gene, and Darlene's six children. My father seemed closer to Darlene's children than to my brother and me, but I don't know why.

5. My father was an alcoholic. He drank every day for the majority of the day. He started off as a casual drinker but it got much worse when my mom got sick. She had cancer and was sick for about a year after she was diagnosed. My dad mostly drank beer but sometimes he would have a shot of whisky. When he was drunk he would speak the truth, and sometimes the truth was harsh. When he was drunk, he would tell you if he did not like you.

6. Darlene was a strict step-mother. She would beat all of us children with her hand or whatever else she could find. She hit everyone, but was especially hard on me, my brother Gene, and Rowena.

7. I was in middle school when Rowena had Teddrick. I did not even know that she was pregnant. I was still living at home but I not present when Teddrick was born.

8. I lived at the house with Rowena and Teddrick until I left when Teddrick was three or four years old. He was a typical child—naughty and mischievous. I did not see Teddrick again until about 2003, when my brother got me back into contact with him.

9. I do not know who took care of Teddrick when he was a small child while Rowena was in school. Darlene definitely did not take care of him, because she was at work. When Darlene came home from work, she would just go to her room and stay there. She hardly came out, which was best for us kids anyway. I do not have good memories of living with Darlene.

10. I left home and moved to California when I was fourteen or fifteen years old. I just did not want to live with my dad and Darlene anymore. I just had enough of all of the drinking and the abuse from Darlene and my father. The household was too abusive—verbally, physically, and mentally. Both Darlene and my father were abusive. My dad hit me with whatever he had in his hand. He never touched my brother though—my brother was like a saint. He was abusive to me because I reminded him of my mom.

11. I moved in with my aunt, my mom's sister, in California. I came back to Texas a few years later, but lived with my grandmother, not my dad and Darlene, when I got back. I felt estranged from both Darlene and my dad because of all that had happened before when I was still living at home.

12. I did live with my dad one time before he was on his deathbed, but we still did not get along. The good days were not often enough. The bad days outweighed the good.

13. I did not make peace with my father until he was on his deathbed. I think he was able to be more reflective once he was sick. He died of congestive heart failure.

14. I do not currently have a relationship with Darlene. When I moved to California and was away from her it was as though she ceased to exist to me. When I came back to Texas, Darlene and my dad were separated, although they did get back together at some point. I am angry with Darlene for how she treated me and the beatings that I received. She is not remorseful for the beatings and even denies that they happened.

15. Once I was out on my own, I started spending a lot more time with Teddrick. Teddrick would have been in his early 20s at the time, and he would come around a lot to see me and my husband, Dytaniel Carter. Teddrick would just come over and hang out at our house. Usually he would come alone, but sometimes he would bring his kids. There was no partying. We would talk and eat and play games with the kids. Teddrick could relax when he was with us.

16. The night he was arrested Teddrick was supposed to be at our house. He said he was coming over and we were going to order a pizza, but he never showed up. A couple of days later we saw him on the news. I was so surprised.

17. I never knew that Teddrick was in a gang. He never showed that part of his life to us. He never drank or smoked weed around me. His entire life was his kids.

18. In January 2013, I met with an investigator from the Office of Capital Writs.

EXHIBIT 7 Page 3

19. I have read and reviewed this __4__ -page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on _April 8_, 2013, in _Houston_, Texas.

MELISSA BEARD-CARTER

Subscribed and sworn to before me on _April 8_, 2013.

Notary Public, State of Texas

ARIANE EIGLER
Notary Public, State of Texas
My Commission Expires
JULY 11, 2016

Notary without Bond

EXHIBIT 7 Page 4

: 00467

## AFFIDAVIT OF DYTANIEL ROD CARTER

I, Dytaniel Rod Carter, state and declare as follows:

1. My name is Dytaniel Rod Carter.  I am married to Melissa Beard-Carter, who is the step-aunt of Teddrick Batiste.  Melissa and I have three children together.

2. I was never contacted by anyone on Teddrick's defense team, nor was I asked to testify at trial.  If I had been asked I would have testified to the following:

3. I knew Teddrick when he was in his early 20s.  He used to come over to our house just to relax and hang out.  I do not believe that Teddrick had anyone in his life that he could really talk to.  He would call me and ask if he could come over.  I think he was looking for someone to be a father figure to him.

4. Teddrick talked to me a lot about all of the pressure he was under.  He talked about his girlfriend Stephanie and the strong feelings he had for her.  He was really trying to do what was best for his family and his kids.  Teddrick said he felt as though his kids needed a lot of things and it was his responsibility to provide for them.  He felt desperate, like the walls were closing in on him.  He felt trapped.  I think Teddrick felt love and honesty from me and he desperately needed that from someone.  Teddrick had a lot of negative people in his life.

5. I feel like Teddrick was crying out for help and I hate that I was not able to be more of a positive influence on him.

6. In January 2013, I met with an investigator from the Office of Capital Writs.

7. I have read and reviewed this ___/___-page affidavit.

D.C.

EXHIBIT 8 Page 1

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on _April 8_ , 2013, in _Houston_, Texas.

DYTANIEL ROD CARTER

Subscribed and sworn to before me on _April 8_ , 2013.

Notary Public, State of Texas

ARIANE EIGLER
Notary Public, State of Texas
My Commission Expires
JULY 11, 2016

Notary without Bond

EXHIBIT 8 Page 2

: 00470

## AFFIDAVIT OF MONICA DAVIS

I, Monica Davis, state and declare as follows:

1. My name is Monica Davis. I am the maternal aunt of Teddrick Batiste. Teddrick's mother Rowena is my sister.

2. I was interviewed by an investigator from Teddrick's trial defense team. I think I spoke to the investigator over the phone. I went to court because I believed I was going to be a witness. I was not allowed to sit in on the trial because I was supposed to testify. At some point Teddrick's lawyer told me they did not plan on using me and I did not testify. I was ready and willing to testify on Teddrick's behalf.

3. If I had been asked I would have testified to the following:

4. I was born in Coldspring, Texas. I am the second oldest of six children born to my mother, Darlene Beard. My mother had my brother Malcolm when she was fifteen or sixteen years old and I was born eleven months later. Malcolm and I do not have the same father.

5. Malcolm and I did not consistently live with our mother as children. We were primarily raised in Coldspring by my grandmother, Susan Clark Mitchell. My grandmother was also raising my cousins Beverly, Etta, and Ray. My aunt, Jana Mae Travis, died in childbirth with Beverly. Beverly was a twin but the other baby also did not survive.

6. Even though we did not technically live with our mother, we went back and forth between Coldspring and Houston frequently. My mother stayed in a lot of different places and moved around a great deal. She often stayed with her aunt, S.K. Davis.

7. My mother ultimately had six children with five different men. Only two of my brothers have the same father. When I was four years old my brother

*MD*

EXHIBIT 9 Page 1

Truman was born. My mother had moved to Omaha, Nebraska for a while, supposedly to go to nursing school, and I believe that is where she met Truman's father. I do not know if she actually went to school there because she is not a nurse. She once worked at a nursing home but it was as an aide, not as a nurse.

8. Truman's father was also named Truman and he went by the name "Buggy." I have heard that he lived with my mother in Houston at some point, but I have no memory of that. I do not remember him ever being around.

9. Clarence Batiste is the father of my younger brothers Christopher and Willie. He was married to someone else at the time he was involved with my mother. My mother tried to say that he was also the father of Rowena and she gave Rowena the last name Batiste. Clarence was not around and was not involved with any of the kids.

10. Rowena was born in between Christopher and Willie. I think that is why my mother said that Clarence was her father. Rowena's actual father is a man named Ulysee Bean. I believe that my mother may have lived with Ulysee at some point, but I do not have any memory of him being around either.

11. I was six years old when Rowena was born. I did not know my mother was pregnant. She was heavy-set and you could not tell by looking at her that she was pregnant. Plus, I was just a kid and did not really have any knowledge of things like that. I was at my mother's house on Christmas Day and had gotten training wheels as a gift. I kept hearing a baby cry in the house and I thought it must be a doll that was intended to be another Christmas gift for me. The crying was coming from the closet and I asked my aunt to help me get the "doll" down. That is when we discovered that the "doll" was actually newborn baby Rowena. My mother had given birth

*MW*

EXHIBIT 9 Page 2

in the house and gone off to work. She put the baby on the top shelf of the closet on a pillow but did not tell anyone she was even there. That was how we discovered Rowena had been born. I do not believe that anyone even knew that my mother had been pregnant.

12. My youngest brother Willie was born two years later, again without me knowing that my mother was pregnant. I was with my grandmother at the time and we were visiting S.K. My mother was living in some government apartments about a block away from S.K.'s place. We were all together at S.K.'s home and my grandmother said she really wanted some watermelon. My mother said we should go to her place because she had something for us there. We went over to my mother's place expecting to find a watermelon. Instead we found a newborn baby Willie on the couch alone in apartment.

13. All of my mother's kids were born at home and so we did not have birth certificates at first. Rowena and Willie did not start school when they were supposed to because they did not have birth certificates. I do not think Rowena started school until she was eight years old.

14. When I was in the sixth grade my grandmother got sick. She had a hole in her intestines and she had diabetes. The doctors wanted to amputate her leg because of the diabetes but she refused.

15. When my grandmother got so sick we moved to Houston permanently in order to be near her doctor. My grandmother was in the hospital, so me, Malcolm, and Beverly had to move in with my mother in the projects in Houston. I did not want to live with my mother but we had no choice.

16. A few months after we moved to Houston for good, my grandmother died in the hospital. Her leg ended up killing her.

17. My mother had a lot of boyfriends over the years, but when I finally had to live with her for good she was involved with a man named Peter Paul Zenon.



EXHIBIT 9 Page 3

He was physically abusive to my mother.  We all moved in with him and as soon as we did, all of us kids saw him jump our mother for the first time. We ran in the room to try and help her and he lined us all up against a wall, pulled out a gun, and shot the wall over our heads.  He told us kids that if we ever tried to help our mother again he would shoot us, so we never did.

18. Peter Paul beat my mother often and badly.  She has permanent damage from being hit in the head.  He broke her arm several times.  He beat her so severely right before my grandmother's funeral that she almost didn't make it to the service.

19. Peter Paul beat me and the other kids, including Rowena.  He once chased me down the street with a gun.  I was beaten with a bullwhip and gun barrel. I am blind in one eye from being hit with a gun barrel.  My mother never stopped him when he was beating me.  I used to dream of feeding him rat poison.

20. My mother disappeared for days at a time to try and get away from Peter Paul.  She would leave the house on a Friday and say she would be back shortly but then she was gone for several days.  Most of the time there was no food in the house when she left.  Sometimes she left money for food and I went to the convenience store to get it.  But sometimes my mother left no money at all.  When that happened I would make myself and the rest of the kids pancakes with flour and water and then make syrup out of sugar and water.  That is all we had to eat until my mother returned.

21. My mother left us kids alone because of Peter Paul, but she also was gone a lot because she was at work.  Whenever she was gone, Malcolm and I were responsible for taking care of the younger kids.  If my mother still was not back by Monday morning I made sure that the rest of the kids got off to

*mD*

EXHIBIT 9 Page 4

school. I did everything a mom should do. Rowena and Willie were not in school yet, so sometimes they stayed with S.K.

22. The cops were never involved. People knew what was going on but everyone was terrified of Peter Paul and what he might do. Peter Paul often told me that he was going to kill my mother. One time my mother jumped out of the car at a red light because he beat her so badly. She ran into the woods and stayed there until he found her.

23. I ran away from home almost every weekend, either with my mother and the other kids or on my own. We stayed with various people but eventually no one took us in, because they were afraid of Peter Paul. Eventually the only one who took us in was S.K.

24. I never could understand why my mother stayed with Peter Paul because she did not need him for money. She worked and was never on food stamps. One time she did leave him for good and took us kids and went to S.K.'s house but he followed us there. He asked S.K. if we were there and S.K. said no, so he shot up the windows of the house with everyone inside. Peter Paul said that he would kill all of us if my mother did not go back to him, so she went back to him.

25. I left for good when I was fifteen and refused to go back. I was still terrified of Peter Paul, even after I left. I would hear a loud truck and think he was coming to get me. I went to stay with S.K. My mother said she was coming to get me and take me back so I decided to move to Lubbock with this older guy that I had met. He was twenty-six years old. I went to Lubbock with him and got pregnant. My mother said that if I did not marry him she would have him charged with statutory rape. We had a "shotgun wedding." My daughter Necole was born when I was sixteen.



EXHIBIT 9 Page 5
: 00475

26. In November 1983, about two years after I moved to Lubbock, my mother shot and killed Peter Paul in self-defense. My mother has never talked to me about what happened, so everything I know comes from newspaper articles, police reports, and the neighbors. The story I heard is that the night it happened my mother and Peter Paul were fighting because he did not like the cornbread dressing she had made. My mother was taking a shower and he ran her out of the house naked and shoved a gun down her throat. There was a tussle and the gun went off. She then shot him several more times. The police responded to the scene and she was never charged with any crime.

27. My mother never protected or defended me when Peter Paul was beating me and I still have not been able to forgive her for that. I have never once heard my mother tell me that she loves me. She thinks my children are spoiled because I tell them that I love them. I try to talk to her about Peter Paul and she tells me to get over it. All I want her to say is that she is sorry and she acts like it never happened. The violence that we saw between our mother and Peter Paul took a toll on me and I believe it has affected my brothers and sisters as well. For example, Willie is physically violent to his wife and Rowena has allowed her boyfriends to be violent towards her.

28. Right after Peter Paul's death, my mother met Eugene Beard at a nightclub. His wife had also recently died. My mother and Eugene were together from then on out and Eugene was the only man she married. Eugene was a good man who took my mother in with all of her kids.

29. They separated at some point, but got back together before Eugene died in 2007. Eugene was at home and started beating on the wall and my brother Truman went to see what was going on. Eugene was having a heart attack. He died at the hospital a few days later.

*M Ø*

EXHIBIT 9 Page 6

30. My mother was tough on Rowena when she was growing up and used harsh words with her. Rowena was a heavy-set girl with low self-esteem and she wet the bed much longer than was normal. I once talked to some guys in the neighborhood who went to high school with Rowena and they told me she had the reputation of being willing to have sex with anyone. I do not know who Teddrick's father is; I did not even know that Rowena was pregnant.

31. Because Rowena has never said who the father is, I assumed it might have been a family member. There have been rumors that a relative of Eugene's is the father and a guy named Sammy has said he is the father too. Someone used to leave money in the mailbox for Rowena and I just assumed it was Teddrick's actual father.

32. I came back from Houston for a visit shortly after Peter Paul died. I had been gone for about two years and this was my family's first time meeting my daughter Necole. Several years later, in 1988, I was having problems with my husband so I left him temporarily and came to Houston. I stayed with my mother and Eugene. I felt like I was turning out to be just like my mom, going back and forth between different places. My mother and I had an argument because I felt like I was being treated like the "family bank." I loaned money to whoever needed it. I babysat Teddrick when I could, and then paid for the babysitter when I could not stay with him.

33. Teddrick had meningitis when he was about one year old. I was there when he got sick. He was just lying in bed and screaming. Rowena took him to the hospital and they said it was bacterial meningitis.

34. I was in Houston for about three months before I returned to Lubbock and my husband. Two years later we moved together with our two kids to the Houston area for good, although we did eventually divorce and I later remarried.

MO

35. Once I was in the Houston area permanently, Rowena and her kids (Teddrick and Kevin Jr.) stayed with me frequently. Rowena got angry at me and left because I did not allow her to have male company. I had a young daughter at the time and I did not think it was safe or appropriate to have strange men around. I was not exactly happy with Rowena's choice in men.

36. Rowena tends to date guys who are losers and treat her badly. Kevin Noel was a young guy. Rowena and Kevin dated for a long time but they did not live together for very long. Rowena only lived with him for a few weeks. He hit her once and when it happened and she had me come and get her.

37. One time Rowena was staying with me, got angry, and went to a homeless shelter. She went from the shelter to some trashy apartments and that is where she met Jerome. Rowena married Jerome and after that she never lived with me again.

38. Jerome was a terrible drug addict. He was never a father to Teddrick or Kevin Jr. I believe that Jerome was beating on Rowena. Rowena's later boyfriend Shun Armington was just as bad as the others. He did not work or do anything productive.

39. Teddrick got into a lot of trouble when he was a teenager. Rowena worked nights and Teddrick did not have much supervision. Rowena acted like Teddrick's friend, but not his mom. When Teddrick or his little brother Kevin got in trouble, Rowena would call them over and then just bust them in the chest. That is not discipline.

40. Rowena was a hard worker and provider, but could not afford to give Teddrick the kind of stuff he wanted. They lived in government apartments and did not have many luxuries.

*MD*

EXHIBIT 9 Page 8

41. I do not believe that Teddrick has ever had a positive male role model. Eugene was the only father figure that Teddrick ever had. Teddrick was in state jail when Eugene died and did not get to go to the funeral. Despite that, Teddrick tried to be a great dad himself. I think he stepped up with Kash because he knew what it was like not to have a father.

42. I did not know that Teddrick was in a gang. No one else in our family has had problems with the law. I was shocked when I found out what happened. I was not surprised to hear that Teddrick was involved with stealing something, but killing did not sound like him.

43. I have heard that Teddrick was not as involved with the tattoo shop case as he claimed to be. I talked to him once about why he confessed and he said that if he gave someone up he could get killed in prison.

44. In December 2012, I met with an investigator with the Office of Capital Writs.

45. I have read and reviewed this __9__ -page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on __April 7__, 2013, in __Houston__, Texas.

_Monica Davis_
MONICA DAVIS

Subscribed and sworn to before me on __April 7__, 2013.

_____
Notary Public, State of Texas

ARIANE EKGLER
Notary Public, State of Texas
My Commission Expires
JULY 11, 2016

Notary without Bond

EXHIBIT 9, Page 9

: 00486

## AFFIDAVIT OF TRUMAN JACKSON

I, Truman Jackson, state and declare as follows:

1. My name is Truman Jackson. I am the maternal uncle of Teddrick Batiste. Teddrick's mother, Rowena Scott, is my sister. Rowena and I have different fathers but the same mother, Darlene Beard.

2. I was subpoenaed to testify at Teddrick's trial. No one had ever talked to me before the trial. I just went to court and had to wait in a little room with the other family members. Someone told us what was going on with the trial, but no one ever told me what I would be asked if I testified. I was never put on the stand. I do not know why I was not called, and no one ever explained anything to me.

3. I was willing and able to testify on Teddrick's behalf. Had I been asked, I would have testified to the following:

4. I was born in Coldspring, Texas. I am not sure when I moved to Houston, but I do not have any memories of being in Coldspring. I lived with my mother but would stay with my grandmother at times. My sister Monica and my brother Malcolm lived with my grandmother.

5. My father was not around when I was growing up. We had no relationship. I do not remember the fathers of any of my siblings being around either.

6. The first man I remember living with was Peter Paul Zenon. He was an alcoholic and the way he treated us depended on how he felt at the time. I saw him hit my mother. I have tried to block out that memory. He hit all of us kids as well. We did not leave because we had nowhere else to go.

7. I was not there when Peter Paul was shot. I always thought he would kill my mother. I thought he would kill all of us. He was a violent person and unpredictable. I never knew what was going to happen.

EXHIBIT 40 Page 1

8. My brother Malcolm and sister Monica were able to do what the rest of us siblings could not do—they left. I basically lost my childhood taking care of my brothers and sisters. I was around twelve when Malcolm and Monica left home. Darlene was working during the day and would leave the house early around 6:00 a.m. I had to act like an adult and make sure everyone got to school. I would take the younger kids back and forth to school. All of us kids were responsible for finding something to eat on our own.

9. I was living at the house with my mother and siblings when Teddrick was born, but was not at the house on the day of his actual birth. I did not know Rowena was pregnant and was very surprised. I do not know who Teddrick's father is. Rowena has never said much about it. Rowena ended up being just like our mother—working all of the time.

10. I left home when I was nineteen. I had to live my own life and I did not want the burden of taking care of the other kids anymore. I lost touch with the family after I left.

11. I got in trouble with the law one time when I was eighteen or nineteen years old and spent one night in jail. That was enough to set me straight and I was done with all of that. I know the streets but I chose not to be on the streets.

12. I did not know Teddrick was in a gang. I asked him all of the time and he always said "No." I knew he went to TYC and as soon as he got out he went right back in. I did not get a chance to talk to him before he got in trouble again. When you are that age and your mother works at night, no one knows the kind of trouble you can get into.

13. I was very surprised when Teddrick was arrested for murder. I knew he had been back and forth to jail for stealing cars, but I never thought he could kill someone. A couple of weeks before Teddrick was arrested he came to my mother's house and told me that he had distanced himself from all of the

EXHIBIT 10 Page 2

people he had been associated with. Then just a few weeks later my mother told me Teddrick was arrested for murder. I just lost it.

14. In February 2013, I met with an investigator from the Office of Capital Writs.

15. I have read and reviewed this _3_-page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on _April 7_, 2013, in _Houston_, Texas.

TRUMAN JACKSON

Subscribed and sworn to before me on _April 7_, 2013.

Notary Public, State of Texas

ARIANE EIGLER
Notary Public, State of Texas
My Commission Expires
JULY 11, 2016
Notary without Bond

EXHIBIT 10 Page 3

: 00484

## AFFIDAVIT OF MICAELA LARA

I, Micaela Lara, state and declare as follows:

1. My name is Micaela "Mickey" Lara.  I am a close friend of Teddrick Batiste.

2. I am married to Ricardo "Rico" Lara and we have two children.  We currently live in Denton, Texas.

3. I testified on behalf of the defense at Teddrick's punishment trial.  I testified that I first met Teddrick in 2006 through my husband, and that we became good friends with Teddrick and his girlfriend, Stephanie Soliz.  I testified that we lived with Teddrick and Stephanie for a short time in Houston and then again in Denton.  I testified that Teddrick was a good boyfriend to Stephanie and a good father to their sons.

4. On cross-examination I was asked about my knowledge of Teddrick's criminal history.  I was also presented with and asked questions about several letters that Teddrick wrote to me and Rico from jail.

5. Prior to my testimony, I talked to Teddrick's trial investigator over the phone.  I never met with either of Teddrick's attorneys, even before I testified.  There was a woman who talked to the entire group of people waiting to testify and she would tell us who was next.  She told me the attorneys would just be asking me what Teddrick was like.

6. No one from Teddrick's defense team told me that the prosecution would be bringing up the letters that Teddrick wrote to me—I did not think they were allowed to do that.  I was very surprised by the letters.  The prosecution had highlighted the parts they wanted me to read out loud.  The very next line would say something like, "I am trying to do my best," but I was not allowed to read that part.  The letters were taken completely out of context.

EXHIBIT 41 Page 1

7. There was more I wanted to say about Teddrick. Had I been asked, I would have testified to the following:

8. I grew up in Houston, Texas. I have known my now husband Rico since middle school. I first met Teddrick in December 2006. Rico and Teddrick were already friends by the time I met Teddrick, and Teddrick was together with Stephanie Soliz. I thought Teddrick was goofy and nice.

9. I knew Stephanie from high school. Stephanie was really good friends with my cousin. I believe Teddrick and Stephanie started dating in middle school or early high school. Teddrick went away to boot camp and Stephanie got pregnant with her son Kash while Teddrick was away. Stephanie left school when she got pregnant. Even though the baby was not Teddrick's, he took care of Stephanie and Kash. He did not have to do it but he loved Stephanie and wanted Kash to have a dad.

10. When I met Teddrick he was living in an apartment with Stephanie and Kash. Shortly after that, in December 2006 or January 2007, Stephanie found out she was pregnant with Teddrick's biological son, Alex.

11. Teddrick and I had a good friendship. We would joke around with each other a lot. I felt very close to Teddrick, like I was his older sister. I would give him advice.

12. Rico and I stayed with Teddrick and Stephanie at their apartment in Houston for about a month. Rico worked out of state for the majority of that time. It was a tense situation because neither Stephanie nor Teddrick were working at the time and Teddrick felt as though he had to bear the burden of supporting them. Teddrick was upset and disappointed that he had recently lost his job and he and Stephanie were more distant with one another. He said he felt that way because he was the man and it was his responsibility to

EXHIBIT 41 Page 2

take care of Stephanie and Kash. They lost the apartment, I moved out, and Teddrick and Stephanie moved in with their respective moms.

13. Teddrick and Stephanie broke up when she was pregnant with Alex. I think it was the stress of being so young, having a one-year-old to take care of, and being pregnant again. Teddrick got in trouble for stealing cars, but as soon as he got out of jail he and Stephanie got back together again.

14. Rico and I moved to Denton in June of 2007. I was pregnant at the time and we knew we did not want to raise our baby in Houston and wanted to be someplace different. Rico had friends in Houston that he would get into trouble with. It was nothing serious or criminal, just dumb stuff like fighting and staying out late at night. I told him that if we were going to have a family it was not okay with me for him to be hanging out all night with his friends. Rico no longer wanted to be around that kind of lifestyle either. Rico's mother lived in Denton at the time and that is why we came here. After we moved to Denton I went into labor prematurely and our daughter was stillborn.

15. Teddrick went to state jail for stealing a car after Rico and I moved to Denton. When Teddrick was in state jail we talked about moving him up to Denton with us as soon as he got out. Teddrick did not want to get back into the same routine with the same people and we said we would help him get on his feet. Rico drove to Houston when Teddrick was released from jail and picked him up. Teddrick got here in October 2007 and Stephanie moved up with both Alex and Kash a week or two later.

16. Teddrick was emotionally supportive of me and my husband during the most devastating time in our lives. It was a terrible time for Rico and me because we had lost our daughter. Teddrick really supported us and was there for us. He could have just avoided us like a lot of other people did, but

EXHIBIT 151 Page 3

he did not. He talked to us and he helped us out. He listened and showed that he cared. He was there for us and was a good friend during the most difficult time in our lives.

17. Rico got Teddrick a job as a roofer's assistant. Teddrick did well with the job and had it until he left Denton. Stephanie worked nights at a grocery store. I helped with the kids because I was home. We all shared the bills.

18. Stephanie and Teddrick broke up and Stephanie left Denton in May 2008. Stephanie had a really hard time being away from her family. Later on she told me that she had gotten an IUD as birth control and it made her very hormonal and emotional and affected her relationship with Teddrick. Stephanie told me that she ended up getting the IUD surgically removed.

19. After Stephanie left, Teddrick would stay out late. One weekend, about a week after Stephanie left, Rico and I went to my cousin's graduation in Houston. As soon as we got back, we saw Teddrick briefly at the house and then he went out. Teddrick did not come home that night and the next day the police brought him home in handcuffs so that he could get his ID. I am not sure what he had done, but Teddrick told me he was sorry.

20. Teddrick was locked up for about two months. When he got out he stayed with us for just a couple of days, but then left to go back to Houston to be with Stephanie and the boys. Teddrick's mom bought him a bus ticket home.

21. Stephanie told me that Teddrick got in trouble when he was younger, for taking a car, because he was taking the blame for something Stephanie did. He wanted to take care of Stephanie, even if that meant taking the blame for her. I told Stephanie that she and Teddrick should move to Denton so that Teddrick would stay out of trouble. If Stephanie would have stayed in Denton, Teddrick would have as well.

EXHIBIT 44 Page 4

22. Every time Rico and I went to Houston after Stephanie and Teddrick moved back, we would make an effort to see them. At first, they were living with Stephanie's father but Teddrick was working and they were trying to get their own place. I saw them in March 2009 when I came to Houston for my baby shower, and by then they were in their own apartment.

23. I was not aware that they were having money problems. I was pregnant and the pregnancy was high risk and I could not have any stress. I think Teddrick did not say anything about the problems because they did not want to stress me out.

24. Teddrick has a younger brother and would try and get his brother to do the right thing. Teddrick would say, "do not do what I do, do not get in trouble, it is not cool." Teddrick was really good at sports and could have done something with it if he would not have gotten in trouble. Teddrick told me that he regretted not staying in school.

25. I did not know that Teddrick was in a gang. Where we went to middle and high school just about everyone acts like a gangster. Stephanie had friends who were supposedly gangsters, but I do not think they really were. They were just trying to be cool.

26. I was shocked when Teddrick was arrested. I could not believe it had happened. I have heard that Teddrick was covering for someone else in order to protect Stephanie and the kids. A few days after Teddrick was arrested, Stephanie's apartment was robbed. Teddrick believed that the people who did it wanted him to know that they knew were Stephanie and the kids lived. Teddrick was afraid that if he said what really happened something bad would happen to Stephanie or the kids. Teddrick had a lot of pride and would not ask for help from anyone.

EXHIBIT 11 Page 5

27. In January 2013, I met with an investigator from the Office of Capital Writs.

28. I have read and reviewed this 6̲ -page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on April 5th, 2013, in Denton, Texas.

_____

**MICAELA LARA**

Subscribed and sworn to before me on April 5th , 2013.

_____

Notary Public, State of Texas

EXHIBIT 11 Page 6

: 00491

## AFFIDAVIT OF RICARDO LARA

I, Ricardo Lara, state and declare as follows:

1. My name is Ricardo "Rico" Lara. I am a close friend of Teddrick Batiste.

2. I am married to Micaela "Mickey" Lara and we have two children.

3. I was briefly interviewed by someone on Teddrick's defense team by phone but was not asked to testify at trial. I wanted to testify at Teddrick's trial, and if I had been asked I would have testified to the following:

4. Teddrick and I went to the same high school. I knew of him in high school but we did not meet until we were introduced later by a friend. By the time I met Teddrick he was back from TYC and involved with Stephanie Soliz. They were living together and raising a baby. Teddrick was not the father of the baby, but he stepped up when Stephanie was pregnant and was raising the baby as if he was his own.

5. My wife Mickey and I lived with Teddrick, Stephanie, and baby Kash in Houston. It was the first time I was away from my family's house. I was really young, like seventeen or eighteen. We were a bunch of teenagers living together with a baby. Teddrick was working, and so was Mickey. I took a job in Atlanta or New Orleans for a while and Mickey stayed in Houston. When I came back, Teddrick and Stephanie were really stressed out about money and that Teddrick had gone to state jail for burglary of a vehicle. Stephanie was also pregnant again.

6. It was apparent to me that Teddrick really loved Stephanie. I think he felt a lot of pressure to provide for her. Teddrick worked outside the house but he also did most of the work around the house. He cooked, cleaned, and took care of the baby.

EXHIBIT 42 Page 1

7. Mickey and I came up to see my mom who was living in Denton and we decided we liked it here. I quickly got a job and we moved to Denton. The day after Teddrick got out of state jail I went to Houston to get him and brought him back with me to Denton.

8. In Denton, Teddrick worked as a laborer. He was a really hard worker. You would just have to give him something to do and he would do it. When he finished he did not have to wait to be told what to do next—he just did it.

9. Stephanie did not come to Denton at the same time as Teddrick because she wanted to make sure he actually got a job first. Once she came up with the two kids, we all lived together and split the bills. At first it was kind of crowded but then we moved to a townhouse and things got better. Stephanie had a job for a brief period of time. It was actually more stressful when she had a job because she felt as though she deserved more and should not have to take care of the kids as much. She would sleep in a lot and Mickey would have to take care of the kids. Teddrick would get home from work and then he would immediately take over and start taking care of the kids.

10. Teddrick and Stephanie had got into an argument one night and she left and went back to Houston with the kids. Stephanie wanted to go out and party and have fun. I think there was not enough of a good time for her in Denton. Teddrick wanted to stay because he was on a good path, but he also wanted to be with his kids. Mickey and I went to Houston for a weekend. When we got back we saw Teddrick briefly but then he went out. The next day we found out Teddrick was in jail for breaking into a car. Teddrick was doing fine until we left him alone for a weekend.

11. Teddrick smoked marijuana, mostly at night. He was funny about it. Sometimes he would smoke and then start vacuuming the house. It was like

he would get really motivated to do stuff. Teddrick does not like to sit down a lot.

12. I believe Teddrick was affiliated with the Crips. I think he may have gotten hooked up with them when he was at TYC. He just mentioned it, but I do not think it was a big deal to him. At the time it was a pretty common thing. By the time we were first living together in Houston it was already a part of his past.

13. When Teddrick went back to Houston from Denton I think he may have gotten involved in some stuff again. It had a lot to do with the area they moved to—there were just too many temptations. Teddrick and Stephanie were living on their own and not in a decent area.

14. I saw Teddrick just a few weeks before he was arrested. It seemed like things were not going his way. Teddrick's work had cut back his hours and he seemed to be really stressed about it. Stephanie called me to tell me he had been arrested. I was shocked.

15. Teddrick did not talk much about his family. I knew he had a younger brother that he wanted to be close to. It seemed like Teddrick was closer to Stephanie's family than he was to his own.

16. Teddrick was very out-going. He would give you the shirt off your back if you needed it.

17. In January 2013, I met with an investigator from the Office of Capital Writs.

18. I have read and reviewed this ⎿| -page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on April 5ᵗʰ, 2013, in Denton, Texas.

EXHIBIT 42 Page 3

RICARDO LARA

Subscribed and sworn to before me on April 5th , 2013.

Notary Public, State of Texas

EXHIBIT 42 Page 4

: 00496

## AFFIDAVIT OF KRISTOPHER MCSHERRY

I, Kristopher McSherry, state and declare as follows:

1. My name is Kristopher McSherry. I am the Plant Manager at Forge USA in Houston, Texas. I was Teddrick Batiste's supervisor for approximately ten months prior to his arrest for capital murder.

2. On direct examination, I testified that Teddrick was a good employee with no disciplinary issues.

3. On cross-examination, I testified that employees in Teddrick's position were guaranteed at least 40 hours a week, and that Teddrick had worked a full shift on April 8, 2009. I further testified that Teddrick first told me that he was late for work because he had walked into a tattoo parlor where people had been shot and immediately left, but he changed his story and said he had to stay and give a statement to the police. I testified that I was not aware Teddrick had been arrested for possession of marijuana and that Teddrick had notified the company that his vehicle was a 1997 Buick LaSabre. I testified that I had discovered Teddrick had lied on his employment application regarding his criminal history, but that I did not terminate Teddrick's employment. I further testified that I had conversations with Teddrick regarding his family and wife, and that Teddrick had shown me pictures of naked women on his cell phone, implying that Teddrick was running around with them.

4. I did not want to testify at Teddrick's trial and did so only because I was subpoenaed. I thought I was subpoenaed by the prosecution. I was not aware that I had actually been called by the defense until I was told that by the investigator from the Office of Capital Writs.

EXHIBIT 43 Page 1

5. I met with the lawyers for Teddrick's side briefly right before my testimony at trial. They just asked me about Teddrick's character, his family, and what kind of employee he had been.

6. I do not recall speaking with anyone from Teddrick's side before that day in court. I do remember being contacted by someone a few months after Teddrick was arrested, but I do not remember who it was. I think it was a man.

7. Prior to Teddrick's trial a police officer came out to interview me in person. Someone from the District Attorney's Office came out with the officer. They asked me about Teddrick's character and wanted to know if I could validate information they got from other employees regarding pictures Teddrick had of other women. They also wanted to know about timing since I believe one of the crimes happened right before Teddrick came to work.

8. The most difficult thing about testifying was looking at Teddrick. That was very strange because I felt I was not testifying in his favor.

9. In February 2013, I was contacted by an investigator from the Office of Capital Writs.

10. I have read and reviewed this two page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on *April 8*, 2013, in *Houston*, Texas.

KRISTOPHER MCSHERRY

Subscribed and sworn to before me on _____April 8_____, 2013.

Notary Public, State of Texas

ARIANE EIGLER
Notary Public, State of Texas
My Commission Expires
JULY 11, 2016

Notary without Bond

: 005QQ

## AFFIDAVIT OF MALCOLM MITCHELL

I, Malcolm Mitchell, state and declare as follows:

1. My name is Malcolm Mitchell. I am a maternal uncle of Teddrick Batiste. Rowena Scott, Teddrick's mother, is my sister.

2. I spoke on the phone with someone from Teddrick's trial team but was not asked to testify. I was willing and able to testify on Teddrick's behalf. Had I been asked, I would have testified to the following:

3. I am from Coldspring, Texas. I was raised by my grandmother, along with my siblings Monica and Truman, and my cousins Beverly and Etta. My mother, Darlene, lived with us off and on. At one point she went to nursing school in Omaha.

4. I am not sure exactly how old I was when we moved to Houston but I went to middle and high school in Houston. When I was in seventh grade I got in trouble and was sent to live with my father in Evergreen. It was not for anything serious, just mischievous stuff.

5. I never knew when my mother was pregnant. She was fat. Then all of a sudden we would have a new brother or sister. Rowena was born at Christmas-time, so we unexpectedly got a sister for Christmas. When Willie was born I thought he was a friend's baby.

6. My sister Monica and I took care of our younger siblings. We would make sure the babies ate, put them in the tub, and put them to bed. My mother did not have favorites. She was hard on all of us. She would whoop us with a belt or anything else she had. She used to tell us, "to find out who done it, I'll whoop all ya'll."

7. All of us kids lived with Peter Paul Zenon, my mother's boyfriend for a time. He treated my mother really badly, would jump on her and beat her. I

EXHIBIT 145 Page 1

remember my mother's arm being broken by Peter Paul. He beat her with a shot gun once. One time, Willie cut up the sofa with a razor blade and Peter Paul beat him really badly. I do not know why my mother stayed with Peter Paul. We were just kids; we could not do anything about it.

8. My mother would take us away from Peter Paul but we would end up going right back. We would leave and go to my aunt's house for a few days but then we would be back. I finally left home because I did not want to see my mother continue to get hurt and I did not want to get hurt myself. I went to stay with my cousin and started working for a moving company.

9. Peter Paul was killed when he and my mother were fighting over a gun. I had already left home when Peter Paul died and was not there when it happened. We did not really talk about it when it was over. I just told my mother I was glad she was okay.

10. Once I left home I went about my own business. I continued to live in the Houston area, but was not around the family much. I was concentrating on taking care of me. I worked a lot and would see the family occasionally.

11. When Rowena was a teenager, she looked a lot like our mother did—very big. I did not know Rowena was pregnant with Teddrick. One day I was just told that she had a baby. After Teddrick was born I heard she was pregnant again. I never knew who Teddrick's dad was.

12. I saw Teddrick periodically when he was growing up. Rowena worked hard to raise him and sometimes had to work nights. When Rowena was working it was just Teddrick and his brother. Teddrick was both a father and brother figure to Kevin.

13. I knew that Teddrick started getting in trouble for stealing cars. I did not know he was in a gang.

MGM

EXHIBIT 44 Page 2

14. In February 2013, I spoke with an investigator from the Office of Capital Writs.

15. I have read and reviewed this _3_-page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on _March 25_, 2013, in _Houston_, Texas.

_Malcolm Mitchell_

MALCOLM MITCHELL

Subscribed and sworn to before me on _March 25_, 2013.

_[signature]_

Notary Public, State of Texas

> ARIANE EIGLER
> Notary Public, State of Texas
> My Commission Expires
> JULY 11, 2016
>
> Notary without Bond

: 00504

## AFFIDAVIT OF KEVIN NOEL JR.

I, Kevin Noel Jr., state and declare as follows:

1. My name is Kevin Noel.  I was born and raised in Houston and now live in Beaumont, Texas.

2. I am the half-brother of Teddrick Batiste.  My parents are Rowena Scott and Kevin Noel, Sr.

3. My dad died on August 16, 2012.  He had AIDS.  He was healthy one day and the next he was in intensive care.  He did not tell anyone he was there, we had to find him.

4. I testified at Teddrick's trial during punishment.  I testified that Teddrick was a loving and caring brother who never tried to get me to commit any crimes or be involved in gang activity.  I testified that Teddrick was a good father to his kids.  I testified that there was friction between Teddrick and our step-father, Jerome Scott.  I testified that I did not know at the time that Teddrick or his friends were in a gang.

5. On cross-examination I testified that I knew Teddrick was getting into trouble as a juvenile and that I had smoked marijuana with Teddrick.  I was asked by the prosecutor about several letters that Teddrick and I exchanged when he was in jail; including letters about a person named Rome, various tattoos Teddrick suggested I get, Teddrick's desire to have sex with women, Teddrick's requests for pictures of women, and a sexual experience that Teddrick had in the hospital.  I also testified that I am a Line Five Piru Blood.

6. I talked to a defense investigator before trial.  I was surprised that the district attorney brought up the letters Teddrick wrote to me because no one on Teddrick's defense team told me they would be using them.

EXHIBIT 15 Page 1

7. If I had been asked I would have further testified to the following:

8. I was a baby when my parents separated and I do not remember them ever being together. My dad would come and get me every weekend. He would take Teddrick too. My dad treated Teddrick like he was his own son. My dad was a recovering alcoholic. He got clean in 1993, a year after I was born. Teddrick and I would go with him to AA meetings.

9. My mom married Jerome Scott when I was five years old. Soon after my mom married Jerome he and my dad got into it and my dad stopped coming around as often. My dad told me that Jerome would get jealous when he would take me and Teddrick. After my dad and Jerome got into it, my dad would sometimes come and get just me, leaving Teddrick behind.

10. I went through periods of being close to my dad and then periods of not being close at all. There was a period of time that I did not see my dad for several years. My mom and I lived with my dad again when I was in the ninth grade because the lease was up on our apartment but the other one was not ready yet.

11. My step-father Jerome was a drug addict. I do not think I was fully aware of it when I was young, but it became obvious as I got older. Jerome would take stuff from the house and pawn it, like the DVD player and microwave. He would also go missing for days. Jerome and my mom would argue and fight and Teddrick would be so upset that he would burst out crying.

12. Jerome liked me but he was harder on Teddrick. Jerome would say he was going to get things for me but not for Teddrick. One time he said he was going to get me a remote controlled car for Christmas but he never did. Teddrick would ask where the car was, knowing the whole time that Jerome had spent the money on drugs. Teddrick and I talked about how bad

*Kevin Neal*

EXHIBIT 45, Page 2

Jerome's drug use had been later when I could finally put two and two together.

13. After Jerome left, my mom had a lot of boyfriends—they would come and go. There was one named Mr. Thomas who was around when I was in third grade and Teddrick was in the eighth grade. Mr. Thomas would do stuff with us and take us to his family's house. The relationship did not last long, less than a year, because my mom lost interest.

14. We moved around a lot when I was growing up. We lived with my grandmother Darlene off and on, and we also lived with my mom's cousin Beverly. My mom would have financial problems or get evicted and we would stay with my grandmother until my mom could get back on her feet. Sometimes my grandmother took me and Teddrick to work with her—she was a bus driver for Metro.

15. Teddrick and I shared a bedroom from the time I was born until he moved out. He was a good older brother, but he was not around a whole lot. We did not really hang out and he did not take me with him when he went off with his friends.

16. My mom was laid back but she would discipline us when necessary by spanking or grounding us. When my mom was at work me and Teddrick spent a lot of time with Jerome, but we were very independent and could take care of ourselves by a young age. My mom taught us how to catch the bus, iron our clothes, and feed ourselves. We would get up in the morning and go with my mom to her friend's house so she could get a ride to work. They would drop me and Teddrick off at the bus stop and we would take the bus to school. From the time I was in elementary school I rode the city bus to school. After school we would be alone for several hours at the house



EXHIBIT 45, Page 3

until my mom got home from work.  I was not supposed to leave the apartment during that time but Teddrick was older and had more freedom.

17. When we were home alone, Teddrick and I would sometimes watch pornography that belonged to our uncle.  I was five or six, so Teddrick must have been ten or eleven.  Teddrick would put a porn movie in and we would sit and watch it.  We knew about things way before we should have.  My uncle caught Teddrick with the porn once and made him watch the whole thing, beginning to end.

18. Teddrick had a lot of girlfriends.  He was very popular.  He played football and had perfect attendance.  Everyone knew him and girls really liked him.

19. Teddrick got into a lot of trouble as a teenager.  He would get into fights and then be suspended from school.  I think it was the crowd Teddrick was hanging around with.  He did not hang out with kids his own age, his friends were older.  I think Teddrick was looking for a male role model and we did not have one at home.  We needed a positive role model, not someone who was doing drugs.  Teddrick saw things on the street when he was younger and learned to do small stuff like how to steal candy or kick holes in gates.

20. There was a white kid that Teddrick knew that turned him on to selling pills.  Teddrick would come home with new stuff, like a bike.  Our mom was working a lot and Teddrick kept stuff from her.  He would show me the bike and then stash it at a friend's house.  Teddrick got his first tattoo when he was in eighth grade.  It said "MOB" which stands for "money over bitches." A lot of kids had the same tattoo.  Teddrick was just following the crowd.

21. Teddrick went to boot camp as a juvenile for stealing cars and when he got back he started putting up posters of gang stuff in our room.  When Teddrick got back I did not get to hang out with him and his friends but I eavesdropped on them talking about their girlfriends.  I also listened in on

EXHIBIT 15, Page 4

him smoking weed. I would pretend to be asleep and Teddrick would come in with his friends and I would hear them rolling and smoking.

22. After Hurricane Katrina, a lot of people from New Orleans moved to Texas. One of them was rolling a blunt and asked Teddrick for a lighter in front of me and Teddrick acted like he did not know what they guy was talking about. He did not want me to know that he smoked.

23. When Teddrick was locked up in state jail I got in with Five Line. I thought, "Dang, I'm alone. Ain't no one here to look after me. I can't go get my brother to watch my back." They were doing things for me that I felt I should have had my brother around to do. I think he should have been around to show me how shady the world can be and how people can pretend to be your friend and then stab you in the back. I had to learn that on my own, from people who were not my family.

24. When Teddrick really started acting like an adult—holding down a job and being a dad—I think he was doing something really positive and trying to better himself. He did not want to go to jail anymore. He really loved Stephanie and did not want to be away from her or me and our mom.

25. After Teddrick got back from Denton I saw him more because he and Stephanie moved in down the street from me and our mom. Teddrick would walk to the bus stop in the morning to go to work and then when he came home in the afternoons he would call me from the bus stop to pick him up and take him home.

26. I sometimes spent the night at Teddrick and Stephanie's apartment. Teddrick was the man of the house and took care of everyone and handled everything. He provided for the family financially and took care of the house as well.

*Kevin Noel*

EXHIBIT 15 Page 5

27. In November 2012, I met with an investigator from the Office of Capital Writs.

28. I have read and reviewed this _6_-page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on _4/19_, 2013, in _Beaumont_, Texas.


_Kevin Noel Jr_

KEVIN NOEL, JR.

Subscribed and sworn to before me on _April 19_, 2013.

_____

Notary Public, State of Texas

ARIANE EIGLER
Notary Public, State of Texas
My Commission Expires
JULY 11, 2016

Notary without Bond

: 00511

# AFFIDAVIT OF BRIAN FAYHEE

I, Brian Fayhee, state and declare as follows:

1. My name is Brian Fayhee. I was an investigator with the Office of Capital Writs ("OCW") in Austin, Texas, from October 2010 to June 2012. During my time at OCW I was the assigned investigator to Teddrick Batiste's capital post-conviction case.

2. On September 10, 2011, I interviewed Kevin Noel at his home in Houston, Texas. In October 2012, the OCW became aware that Mr. Noel died in August 2012. Mr. Noel relayed the following information to me during our interview:

3. Mr. Noel met Rowena Scott, Teddrick's mother, at a car wash in 1989. Mr. Noel was helping a friend wash his car and noticed Rowena. Mr. Noel went up to Rowena and started talking to her and they began dating shortly thereafter. Teddrick was about a year old when Mr. Noel and Rowena met.

4. Mr. Noel and Rowena lived together for about three years before their own son, Kevin Noel, Jr., was born. Mr. Noel lived with Rowena, Teddrick, and Kevin until Mr. Noel moved out when Teddrick was about eight years old and Kevin was about four. It was not a traumatic break-up, rather Mr. Noel and Rowena just went their separate ways.

5. Mr. Noel continued to see both Teddrick and Kevin on the weekends.

6. After Mr. Noel and Rowena's break-up, Rowena married a man named Jerome Scott.

7. When Teddrick was about twelve years old, there was tension between Mr. Noel and Mr. Scott due to the way that Mr. Scott had been talking to the boys. Mr. Noel and Mr. Scott got into an argument over the phone and Mr. Noel said, "I don't give a fuck how you talk to Teddrick, I care about what

EXHIBIT 16 Page 2

you say to Kevin Jr." Mr. Scott asked Mr. Noel why he did not care about the way Mr. Scott talked to Teddrick and Mr. Noel said it was because Teddrick was not his son.

8. Teddrick overheard this conversation and asked Rowena if what Mr. Noel had said was true—that Teddrick was not Mr. Noel's son.

9. Mr. Noel apologized to Teddrick and no one ever spoke about it again. Mr. Noel believed that Mr. Scott never forgot the conversation and spoke to Teddrick however he wanted.

10. After Teddrick got out of boot camp, Mr. Noel saw him on the weekends, but not as regularly as he had before. When Teddrick was eighteen years old he decided to "go his own way," moved out, and started raising his own family. Mr. Noel decided to give Teddrick his space because he believed if Teddrick had needed anything he would know to reach out to Mr. Noel.

11. Mr. Noel was not contacted by Teddrick's defense counsel. Mr. Noel would have gladly testified on Teddrick's behalf.

12. I have read and reviewed this two-page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on November 6th, 2012, in Austin, Texas.

Brian Fayhee

BRIAN FAYHEE

Subscribed and sworn to before me on November 6, 2012.

Notary Public, State of Texas



JENNIFER RENEE REIF
Notary Public, State of Texas
My Commission Expires
OCTOBER 3, 2016

Notary without Bond

EXHIBIT 16-Page 2

: 00514

## AFFIDAVIT OF ROWENA SCOTT

I, Rowena Scott, state and declare as follows:

1. My name is Rowena Scott. I am Teddrick Batiste's mother.

2. I testified during punishment at Teddrick's trial. I met with the defense investigator a few months before the trial. They just asked me what Teddrick was like as a child. Later, I met briefly with Teddrick's attorney Skip Cornelius at his office and he told me the kinds of things he would be asking me.

3. I testified that I did not tell anyone that I was pregnant with Teddrick because I was scared and my mother was really strict. I testified that my mother helped take care of Teddrick when he was young and had a big influence on him. I also testified that Teddrick had meningitis as an infant and was hospitalized. Teddrick's attorneys showed several photographs of Teddrick and other family members to the jury and I explained who was in each photograph and what they were doing. I testified that Teddrick got into some trouble as a juvenile and that Teddrick witnessed fighting between me and my husband, Jerome Scott. I testified about Teddrick's relationship with his girlfriend, Stephanie Solis, and how he was a good father to their boys. I testified that I did not know Teddrick was in a gang and I would not have allowed him to be in one if I had known about it. I was devastated by the news of Teddrick's arrest.

4. If I had been asked, I would have elaborated and testified additionally to the following:

5. I was born in Warren, Texas. My mother told me that my father was a man named Clarence Batiste, and she gave me his last name. Clarence was also the father of my older brother Christopher and my younger brother Willie. I did not know Clarence and he was not ever a part of my life. I was nine or

EXHIBIT 47 Page 1

ten years old before my mother told me that my actual father was Ulysee Bean. My father was not involved in my life until I was thirty-three and I "re-met" him through one of my boyfriends.

6. When I was young I moved around a lot. I sometimes stayed with my mother, but other times stayed with my mother's aunt SK Davis or her cousin Beverly. There were times that my mother was with me either at SK or Beverly's house, but other times that I was there without her. It was nice at SK's house and she took care of me and my siblings. SK was married but did not have any children of her own. She lived in a three bedroom house in the Cashmere Gardens neighborhood.

7. My mother had a boyfriend named Peter Paul Zenon and he was abusive. We lived with him off and on for several years. Peter Paul had kids of his own but for the most part they lived with their mom.

8. I saw Peter Paul beat my mother many times. One night he beat her so badly with the end of a shotgun barrel that he broke her arm. My older sister and brothers once jumped in and tried to help my mom fight Peter Paul off. My mother left Peter Paul several times. She would pack us all up and we would go to SK's house for a week or so, but they my mother would always go back. I do not understand why she continued to go back to him. My mother's relationship with Peter Paul has always affected me. My husband Jerome Scott was verbally abusive and when he yelled at me I had flashbacks of what it was like to be around Peter Paul.

9. Peter Paul hit me and my siblings as well. He said he was giving us whoopings because we had done something bad, but it was for really minor kid stuff, like not cleaning up or eating food we were not supposed to eat. He made us kneel on coins to punish us. Peter Paul had a leather couch and it got cut up once. Peter Paul beat my brother so badly for cutting the couch

EXHIBIT 17 Page 2

that he bled.  It was not actually my brother who had cut the couch; it was one of Peter Paul's kids.

10. One night when I was about ten years old, I was at SK's house and a neighbor came over and told us that Peter Paul was dead.  I was told that my mother and Peter Paul were arguing over cornbread and went to his truck and got a gun.  They were fighting, the gun went off on him, and he died.  The cops said it was self-defense.

11. My mother was not around very much during my childhood because she worked a lot.  I was mainly taken care of by my siblings, Beverly, or SK.  My mother was not very strict and did not have a lot of rules.  She did not say "no" a lot, but when she did she really meant it.

12. After Peter Paul died we lived at SK's house until my mother met Eugene Beard and she moved in with him.  After a few months she brought me and my brothers (Truman, Christopher, and Willie) to Eugene's house as well.  My mother and Eugene got married at some point.  At Eugene's house I shared a room with his kids, Melissa and Gene.  I slept in my own bed and Melissa and Gene had bunk beds.

13. My mother was not an affectionate person.  She never told me that she loved me.  I sought affection from other people, especially boys.  I did not really have boyfriends, but became sexually active at about fourteen years old.  My mother did not talk to me at all about sex and I did not really know what it was all about.  I cannot say that I was taken advantage of by boys because I was willing, but I was too young to really understand what I was doing.  I did not know anything about birth control or how to protect myself.

14. Teddrick's father is a man by the name of Clifton Johnson.  I met him when I skipped school and went to a friend's house.  It was a one night stand and I never saw him again.  I was fourteen at the time and he was twenty-two or twenty-three years old.  He never knew I was pregnant.

15. I knew I was pregnant because my menstrual cycle stopped but I did not tell anyone. I was scared and I hid the pregnancy. I wanted to tell my mother but I did not because I was afraid of how she might react. I felt like it was a really big deal and did not know what to do. I did not have any pre-natal care and I never saw a doctor. I just prayed for a healthy baby.

16. I went into labor at home in the bathroom, just a few days after I turned fifteen years old. I labored for a couple of hours. My mother thought I just had bad gas but I told her no, I was having a baby. My mother caught Teddrick when he was born and cut the cord. Teddrick was born at about 2:00 a.m. and then when it got light we went to the hospital.

17. At first my mother was angry because I did not tell her about the pregnancy. But then she got used to Teddrick and came around to the idea. My mother had to take care of both of us. I was just a baby who had a baby.

18. At the time Teddrick was born I still lived with my mother, Eugene, my brothers, Melissa and Gene. Teddrick slept with me in my bed and Eugene and Melissa were in the bunk beds in the same room. He was a good baby and slept through the night early on. My mother and Eugene supported me financially. I went to school and Beverly kept Teddrick during the day.

19. When Teddrick was about nine months old he got really sick. He was hollering in his sleep and we took him to the emergency room. They said he had meningitis of the brain and he had to stay in intensive care for almost two weeks. The doctors told me that if I had waited any longer to take Teddrick to the hospital he would have died.

20. I graduated from high school in 1991, when Teddrick was three years old. About a year later I was walking with a friend to the store and started talking to a guy named Kevin Noel. We started seeing each other and in 1992 I gave birth to our son, Kevin Noel, Jr. When Kevin Jr. was about six months

old, Teddrick and I moved out of my mother's house and into an apartment with Kevin.

21. Kevin supported us by working at Wendy's. He was good to me and the boys. I did not know it at the time, but Kevin was using crack. I was staying the night at his mom's house once and his sister said, "I don't know why you are messing with him, he's on drugs." We ended up breaking up about six months after we moved in because I found out Kevin was seeing other women. Kevin passed away recently. I heard from some people that he died of cancer, but I also heard that it was AIDS.

22. When we separated, the boys and I moved in with Beverly for a few months and then moved in with Monica and her kids for about a year. Even though we were technically not together, I was still messing around with Kevin during the time I was living with Monica.

23. When I was with Monica I got my first real job, a position on the assembly line at Compaq. I was able to move myself and the boys to our own apartment a few months after I got the job. I was twenty-three years old. It was a government subsidized apartment in a low-income housing community. I think I had to pay twenty-five dollars a month in rent. The job was only temporary and I got laid off. When I was out of work I did not have to pay anything for the apartment. I then got a permanent job on the assembly line at Compaq and worked there from 1994 to 2000.

24. Every time we moved someplace new I registered Teddrick at whatever local school was the closest. Teddrick was an out-going kid and seemed to adjust to the new schools okay.

25. Over the years I got some financial assistance from churches and also received food stamps. I did get child support from Kevin. At some point he started to receive social security and I automatically got a portion of that.

EXHIBIT 17 Page 5

26. Teddrick and Kevin Jr. went to the Head Start program in the apartment complex. It was government subsidized day care. The place we were living was the Acres Homes area. The neighborhood was pretty run down, with lots of government housing. There were all kinds of stuff that went down in those apartments.

27. I met Jerome Scott shortly after I moved out on my own. His sister lived in the apartments next to mine. We got together in 1996 and married in 1997. We have separated and gotten back together many times over the years because Jerome is a drug addict. I did not know about his drug problem before we married or I never would have married him. When we got married one of his nieces told me, "I wish you would have talked to me before marrying my uncle. He's the biggest crack head." Jerome used crack and also smoked weed. As far as I know, Jerome is still using drugs.

28. Jerome got drugs on credit and then when he got paid from work he had to pay people back. He was working as a cook at Luby's. Jerome got paid on Tuesdays and then we did not see him again until Friday or Saturday. He was just missing in action.

29. After his job at Luby's, Jerome was working as a cook at Kendricks Hospital. Like I did for the majority of my time at Compaq, I was working nights and Jerome stayed with the kids. One time he was supposed to pick me up from work but he called and said he had gotten robbed and could not pick me up. I got home and he was high. He did not get robbed, he smoked his money up.

30. Teddrick did not like Jerome at all. It was me and Teddrick and Kevin Jr. together for so long and I think that Teddrick felt like Jerome was interfering. Teddrick got in trouble by Jerome for every little thing. Jerome hollered at Teddrick and wanted to whoop and punish him. I told Jerome

EXHIBIT 47 Page 6

that was my job, so he would do things like put Teddrick in his room but let Kevin outside to play.

31. Kevin had visitation with both Teddrick and Kevin Jr.  Teddrick believed that Kevin was his biological father until one day Kevin and Jerome got into an argument.  Jerome then told Teddrick that Kevin was not his father. Teddrick was upset and just went in his room and closed the door.  That is how Teddrick dealt with being upset.  Another time, Kevin was supposed to pick up the boys for a visit and Kevin Jr. got sick and could not go.  Kevin wanted to go ahead and take Teddrick along, but Jerome did not let him go.

32. Jerome was not physically abusive to me but he was mentally and emotionally abusive.  Jerome was very argumentative and yelled and cursed at me.  In 2004, I found a baggie with crack cocaine in the back of the toilet when I was getting ready to get in the shower.  I asked Jerome to leave and he did.

33. I did not know that Teddrick was smoking weed as a teenager.  He hid it really well.  In middle school some kid stole his mom's pills and then he and Teddrick put the pills in Teddrick's locker.  Teddrick was caught, kicked out of school and sent to an alternative school.

34. Despite the trouble Teddrick got into, he was a good boy.  He was active and had a lot of energy.  Teddrick did well in school.  He liked it and had perfect attendance.  He was on the honor roll and did his homework.  He did football and track.  I never knew any of Teddrick's friends when he was in school.  I was always working.

35. Teddrick was sent to boot camp the first time when he was fifteen years old for stealing cars.  I did not even know he knew how to drive.  Teddrick got in trouble just a few months after he got back from boot camp and got sent to Sheffield, way out in West Texas.  He was there for a while and one weekend I went out to see him and took my mother and Kevin with me.

EXHIBIT 47 Page 7

Teddrick seemed to be doing okay, and just seemed like he was ready to get out of there.

36. While Teddrick was gone I started dating Shun Armington. Shun was a good guy and he got along with Teddrick and Kevin. Shun went with me to pick Teddrick up from the airport when he got back from Sheffield and that is where they met for the first time. Shun had been to jail before but did not use drugs. I was together with Shun until 2007. He wanted to move his father in with us and I was not okay with that so the relationship ended.

37. When Teddrick got back from Sheffield he stayed with me for about a month but then moved in with his girlfriend Stephanie, who was pregnant by another guy. When he got out, Teddrick seemed to be doing really well. I was surprised Teddrick wanted to take care of the baby. Teddrick said it made him be a man. I did not like it at first, but he was in love with Stephanie. I told him I was okay with it as long as he was working.

38. Teddrick was out having his own life, but I saw him as often as I could. I worked a lot and he was doing his own thing, but we talked regularly and saw each other when we could. When he and Stephanie moved into their apartment on Ella they were just down the street from me and so I saw them and the kids quite a bit.

39. In November 2012, I met with an investigator from the Office of Capital Writs.

40. I have read and reviewed this ___8___ -page affidavit.

*Rowena Scott*

ROWENA SCOTT

EXHIBIT 17 Page 8

Subscribed and sworn to before me on April __9__, 2013.

_____

Notary Public, State of Texas



ARIANE EIGLER
Notary Public, State of Texas
My Commission Expires
JULY 11, 2016

Notary without Bond

EXHIBIT 17 Page 9

: 00524

## AFFIDAVIT OF DANYELL SOLIZ

I, Danyell Soliz, state and declare as follows:

1. My name is Danyell Soliz. I am the sister of Stephanie Soliz. Stephanie is the mother of Kash and Alex, Teddrick Batiste's children.

2. I was never contacted by anyone on Teddrick's trial team. I was willing and able to testify on Teddrick's behalf. Had I been asked, I would have testified to the following:

3. I am two years younger than my sister, Stephanie. I first met Teddrick when I was in middle school. He and Stephanie were dating. Teddrick went away at some point and he would send Stephanie letters. I was nosey and would read the letters. The letters focused on their relationship.

4. I knew that Teddrick went to TYC for stealing cars. I am not sure how much Stephanie knew about what he was doing or how involved she was, but I remember them picking me up in a car once that they said belonged to Teddrick's mother. Years later Stephanie told me it was actually stolen.

5. I became aware that Teddrick had a gang affiliation once he got out of TYC. I knew some of the people Teddrick hung around after TYC and they were affiliated. I could also tell that Teddrick was affiliated because of some of his tattoos and some of the things he would say. I do not think he was in any kind of hard-core gang because I knew he had nothing to do with gangs before he went to TYC. After he came out of TYC, it seemed like something he had to do to fit in socially. Teddrick is funny and really goofy. No gangster acts like that. I never saw Teddrick angry or trying to fight anyone like you would expect hardcore gang members to act. Teddrick is very social and easy to get along with and made friends easily.

EXHIBIT 18 Page 1

6. Teddrick was the only one of Stephanie's boyfriends that my father ever liked. Teddrick was nice and goofy, played with the kids, and took care of Kash even though he was not biologically related. When Teddrick stayed at my father's house he would pay my dad rent and helped with the bills. Teddrick would also do chores and help with the yard work.

7. I lived with Teddrick and Stephanie when we were all staying at my father's house. This was when I was in high school and before Teddrick and Stephanie went to Denton. Teddrick always seemed to be at work. I would be holding Kash, and Teddrick would get off of work and come home and immediately take Kash.

8. Teddrick was the breadwinner. He took care of Stephanie and the kids financially. Even though Stephanie was happy when they lived in Denton, I think she was lonely without her family around. She told me that Teddrick worked a lot and she wanted something more. She came back to Houston, but Teddrick was not far behind.

9. When Teddrick and Stephanie came back to Houston from Denton they stayed with my father again and then got their own apartment in Greenspoint.

10. Teddrick said to me often that he really regretted messing up in high school. He was very good at sports. Teddrick would talk about the past and how different his future could have been. He wished he would have stayed in school because he did not think he would be able to get a good job. When he got that job at Forge USA, Teddrick worked so hard.

11. I was very surprised when I heard Teddrick had been arrested. My dad told me. My dad was crying—I have never seen my dad cry like that. I went straight over to be with my sister and she was so upset. We took her boys to

EXHIBIT 18 Page 2

get food and when we got back to her place there were cops everywhere and they had busted her door down and would not let us in.

12. I know Teddrick and I do not believe he is capable of such a thing.

13. In February 2013, I met with an investigator with the Office of Capital Writs.

14. I have read and reviewed this ___3___ -page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on _April 7_, 2013, in _Houston_, Texas.

_Danyell Soliz_

DANYELL SOLIZ

Subscribed and sworn to before me on _April 7_, 2013.

Notary Public, State of Texas

ARIANE EIGLER
Notary Public, State of Texas
My Commission Expires
JULY 11, 2016
Notary without Bond

EXHIBIT 18 Page 3

: 00528

## AFFIDAVIT OF RAUL SOLIZ

I, Raul Soliz, state and declare as follows:

1. My name is Raul Soliz. I am the father of Stephanie Soliz. Stephanie is the mother of Kash and Alex, Teddrick Batiste's children.

2. I was never contacted by anyone on Teddrick's trial team. I was willing and able to testify on Teddrick's behalf. Had I been asked, I would have testified to the following:

3. I met Teddrick after he started dating Stephanie. It must have been after Teddrick got out of TYC. Teddrick was a family guy. Other guys were out there doing stuff with their friends. Teddrick was more into the grown-up lifestyle of being home with the kids.

4. Teddrick worked for me doing landscaping when Kash was a baby. He was a good worker. The job was just temporary and then he went on to do other things.

5. Teddrick called me Pops and told me that I was like a father to him. I treated him just like I treated my own kids. I talked to Teddrick about life and work and priorities. I tried to give him advice. Teddrick told me that the most important thing to him was that he got to raise his kids. Teddrick wanted his kids to be good at sports.

6. I did not know Teddrick was in a gang. I knew Teddrick had been in trouble in the past but I did not know why. Teddrick told me that he wished his life was different—more like mine. I had a steady job, cars, and a house. I told Teddrick that he had to stay with his jobs and work hard. Teddrick was a really hard worker, but he sometimes had a hard time getting rides to work.

EXHIBIT 19 Page 4

7. Teddrick lived at my house for a while. Other boyfriends of Stephanie's had stayed there too, but Teddrick was different. He would help out and do housework.

8. Teddrick smoked pot and I believe that affected his priorities. I told him that when you smoke pot your mind floats off in different directions and your priorities get all twisted up. Teddrick understood but he liked smoking pot.

9. Teddrick told me about the way he was being treated at Forge. They were giving him the worst, most dangerous jobs. I am not sure why—maybe because he was new. Plus, they were cutting his hours. I told him to hang in there.

10. I spoke to an investigator with the Office of Capital Writs in April 2013.

11. I have read and reviewed this ___2___-page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on __4-12__, 2013, in __MANSFiEld OHiO__

_Raul Soliz_

RAUL SOLIZ

Subscribed and sworn to before me on __4-12__, 2013.

_Kathleen A Reindl_

Notary Public, State of __OHiO__

KATHLEEN A. REINDL
NOTARY PUBLIC,
STATE OF OHIO
My Commission
Expires
March 1, 2016

EXHIBIT 19 Page 2

: 00531

# AFFIDAVIT OF STEPHANIE SOLIZ

I, Stephanie Soliz, state and declare as follows:

1. My name is Stephanie Soliz. I was romantically involved with Teddrick Batiste from the time we were teenagers until after he was arrested for capital murder. Teddrick is the biological father of my second son, Alex Batiste.

2. I testified for the defense at the punishment phase of Teddrick's trial. I testified that I met Teddrick in middle school and started dating him in high school. I also testified that Teddrick was a good provider and father and assumed responsibility for my first son even though he was not biologically related. I testified about the places Teddrick worked and how he was the breadwinner for our family.

3. On cross-examination I was asked about the tint on Teddrick's car; his tattoos; the events surrounding Teddrick's arrest; Teddrick's involvement with marijuana; stolen property that was being kept in our apartment; and the amount of time Teddrick worked at his job versus the amount of time he spent on the street.

4. I was contacted by Teddrick's defense team before trial and I believe I met with the lawyers. I was interviewed by the police immediately after Teddrick's arrest and then I was interviewed by the prosecutor very close to the time of trial. The prosecutor was very nice to me in person, and then as soon as I was on the stand she flipped everything I said. I expected to be cross-examined, but the extent of it surprised me.

5. I understand that the prosecutor was just doing her job, but the picture they painted of Teddrick was completely wrong. Teddrick was a great father, a great provider, and always was looking out for someone else. Teddrick is a



EXHIBIT 20 Page 1

good person.  If I had been asked by Teddrick's lawyers I would have additionally testified to the following:

6. I first met Teddrick in middle school.  I got in some trouble for not going to school and walking around the neighborhood during school hours.  I had to go to the Alternative Learning Center (ALC), which was an alternative school for kids who had disruptive behavior or violates school policies. Around the same time, Teddrick was stealing prescription pills and selling them to kids at school.  About a week after I got sent to ALC, Teddrick got caught selling pills and got expelled from middle school.  Teddrick was put on probation through the Juvenile Justice Alternative Education Program (JJAEP) and went to a different alternative school.  There were a lot of people at school selling pills.

7. After we finished our time at our respective alternative schools, we both began our freshman year at Cy-Ridge High School.  We started dating right away.  At that point, Teddrick was more mellow and really into sports.  He was not getting into trouble.

8.  Teddrick was a good boyfriend.  There were a lot of people who did not like the fact that the star black athlete was with the Hispanic white girl, but Teddrick would stand up for me and tell people that I was his girl.  Teddrick got his first tattoo before I knew him, but when he was fifteen he got his second one—my name across his chest.

9. We hung out a lot with other people, usually in a large group.  We would spend time with older kids and sometimes hang out with my sister and her friends.  We would play basketball or just spend time outside someone's apartment.   Teddrick got in trouble again our sophomore year for stealing cars and went to boot camp.  He would just take the cars so that we could ride around.  Teddrick had been riding bike to my house to see me, but once



EXHIBIT 20 Page 2

he learned how to get a car, he would come get me that way. Teddrick was not back from boot camp very long before he got caught with another car and this time he got sent to TYC.

10. We broke up when Teddrick was in TYC, because I knew it would be impossible to keep up and write to him every single day. I felt like it was not over between us and I think Teddrick knew I would be there for him when he got out. When Teddrick was away I started dating a guy named Corey. We were together for about a year but Corey went to jail for stealing cars. Corey is the father of my first son, Kash, but our relationship ended before the baby was born.

11. Even though we were technically broken up, I did keep in touch with Teddrick while he was at TYC. Teddrick came out of TYC knowing more and better ways to steal cars. Teddrick learned it from the people he met there. That is what I hate about TYC. They take the worst kids in the district and put them together in one place. Teddrick had more connections with drugs there as well.

12. When I first started dating Teddrick I was into the whole gang thing and he was into sports. Everything changed when he went to TYC. That is where Teddrick started affiliating with the Crips. Five Deuce is a TYC thing. I had been connected to a different clique from the neighborhood I grew up in, but was never really involved with the lifestyle. The gang lifestyle is something you are born into and grow up in. Teddrick did not have those kinds of associations before he went to TYC.

13. Teddrick never knew his dad. I could tell that it bothered him. Once in a while something would come up and I could tell that it was in the back of his mind. One time something showed up on a phone bill and Teddrick thought it might be his dad trying to get in contact with him. He really thought that.



EXHIBIT 20 Page 3

His mom told him that the number on the phone bill had nothing to do with his dad and Teddrick felt so stupid and hurt. Another time he asked his mom a couple of questions about his dad and she yelled at him, telling him that she had already told him as much as she knew. The conversation ended and to my knowledge, Teddrick never asked his mom about his dad again.

14. When Teddrick got out of TYC he got a job at Sonic and then at Babies R Us. He was working on being a grown-up. I was pregnant with my son Kash at the time and although Teddrick was not the biological father, he wanted to take care of me and the baby. Teddrick moved in with my family and me and my mom were in a car accident. Teddrick took really good care of us. Teddrick got a job at Wal-mart as a stocker in order to be closer to the apartment we were living in with my mom. Teddrick was at the hospital with me when Kash was born on November 25, 2005. After Kash was born I tried to go back to school. Teddrick would babysit Kash during the day when I was at school and then he would go to work at Wal-mart at night.

15. I ended up dropping out and getting my GED instead. Teddrick got his GED when he was at TYC. Teddrick was not a big school person so I do not think it bothered him that he got a GED instead of a high school diploma. He was just going to school to play football and he regretted not being able to play ball anymore.

16. Teddrick left his job at Wal-mart and worked for my father for a while at the Houston Livestock Show and Rodeo. The hours were long and he made minimum wage, but he worked enough to save up to buy a car. Teddrick also worked at my dad's other business, a landscaping company, and moved me and Kash out of my mom's place and into our own apartment.

EXHIBIT 20 Page 4

17. Teddrick was constantly looking for ways to make more money for us and would take various jobs like the overnight shift at the Office Depot distribution center and at an air conditioner factory.

18. Things between Teddrick and I got bad when I found out I was pregnant with Alex. Teddrick was using Ecstasy at the time and began to act differently. Teddrick told me he was not sure that he wanted to be in a relationship with me and that he did not want me to have the baby, so I moved back in with my mother. Even though we were broken up, Teddrick continued to provide financially for me and Kash. He told me he started stealing cars in order to sell the rims for money. We were not officially together, but once I decided to keep the baby, Teddrick came to all of my doctor's appointments.

19. One day, Teddrick called me out of the blue and said that he was sorry for all of the hurt he had caused me and he was so glad that I decided to have the baby. He said that he wanted us to be back in a relationship and was on his way over to my house. He never showed up and two days later I got a call from him from the jail and he said that he had been arrested for car theft.

20. Teddrick got a six month state jail sentence. My mom supported me when Teddrick was in jail. We were in touch the entire time he was gone and agreed that we would live together once he got out and we would try to make our family work. Our son Alex was born on September 7, 2007, several weeks before Teddrick was released from state jail.

21. Before he went to state jail, Teddrick had been hanging out with some people in my neighborhood. They were not gang affiliated, but guys that were into schemes and scams. I was worried that if Teddrick continued to hang out with them he would get into trouble again when he got out. We had really good friends, Rico and Mickey Lara, that had moved to Denton



EXHIBIT 20 Page 5

and we were hoping that if we could move up there with them it would get us away from some of the people in the neighborhood who were involved in some questionable things. When Teddrick got out of state jail he moved to Denton and got a job right away with a roofing company. I moved to Denton with the kids a couple of weeks later.

22. My family was supportive of us going to Denton and would visit us. I liked Denton, but I had some personal issues going on that caused problems between me and Teddrick. I had an IUD and it caused me to have heavy bleeding and a lot of mood swings. I had extreme emotions and was constantly in a bad mood and our relationship really suffered because of it. Teddrick and I broke up and I moved back to Houston.

23. Teddrick did not get into any trouble when I was in Denton with him. He worked and took care of the kids. We did not know anyone there except for Rico and Mickey. But Teddrick only lasted three days after I left before getting himself arrested. He ended up serving a few months in jail there. When Teddrick got out he moved back to Houston. He stayed with his mom in Greenspoint and I was at my dad's in Spring Branch.

24. We were not on the best of terms when Teddrick got back, but we were working on it. As soon as he got to Houston, Teddrick got a job with a television repair place and then later got the job at Forge. Teddrick would come over to see the boys and spend as much of his time as possible with us when he was not working. He was trying to make things right. I was having a hard time at my dad's house because it was too crowded. My brother and his daughter were there too and it got to be too much. Around December of 2008, Teddrick went and got us an apartment off of Ella Road. I was not working so I could take care of the kids.



EXHIBIT 20 Page 6

25. Once we had moved into the apartment, Teddrick's hours at Forge got cut and he started spending more time on the street. We had money issues and a lot of expenses. I got into an accident in my sister's car and had to pay for her car as well as the damage to the other car. I was not working and we started to owe a lot of money. Teddrick wanted to be "the man" and the weight got really heavy on his shoulders.

26. I started noticing that Teddrick was hanging out with people I had not seen before. I believe these new people were affiliated with the Crips. I could tell by the conversations they would have and the tattoos they would get together. The people he was hanging out with were willing to do whatever. At first, Teddrick was just showing them how to steal cars and other stuff, but because we needed the money, Teddrick started to do it himself. It was just a money issue. Right before he got arrested he was taking more and more risks.

27. Teddrick had always been a risky person. I am much more of a realist. You could count on him to be the person to take a bet. Teddrick would have his check from work direct deposited into our account. But then he would go out and come back with cash money. I knew he was not stealing or robbing to get that money, but he was shooting dice.

28. Teddrick's mind set was that he was responsible for providing. He did not want me to get a job. He saw how difficult life had been for his mom as a single mother and he did not want me to have to suffer the same way.

29. Teddrick took more of the blame than he deserved for the tattoo shop case. One of his co-defendants was only seventeen and the other was nineteen with a baby on the way. Teddrick felt responsible for them, like he had to take care of them.



EXHIBIT 20 Page 7

30. Teddrick took more of the blame than what he actually did in the Exxon case too. He was never willing to give the other guy up. That is the way he understood things—you do not tell on anybody.

31. In February 2013, I met with an investigator with the Office of Capital Writs.

32. I have read and reviewed this __8__ -page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on _April 7_ , 2013, in _Houston_ , Texas.


_Stephanie Soliz_
STEPHANIE SOLIZ

Subscribed and sworn to before me on _April 7_ , 2013.

_____
Notary Public, State of Texas

ARIANE EIGLER
Notary Public, State of Texas
My Commission Expires
JULY 11, 2016
Notary without Bond

EXHIBIT 20 Page 8

: 00540

## AFFIDAVIT OF BEVERLY WEST

I, Beverly West, state and declare as follows:

1. My name is Beverly West. I am the first cousin of Rowena Scott, who is the mother of Teddrick Batiste. My mother and Rowena's mother, Darlene Beard, were sisters.

2. I testified on Teddrick's behalf at the punishment phase of his trial. I testified that the family was surprised when a teenage Rowena gave birth to Teddrick because no one even knew she was pregnant. I testified that I saw Teddrick somewhat frequently when he was a baby, but as he got older I would go for long periods of time without seeing him at all. I testified that I did not really know Teddrick's girlfriend or his kids. I testified that I did not know about the trouble Teddrick got into as a juvenile and that he always treated me and other family members with respect.

3. I was initially contacted by someone on Teddrick's trial defense team by phone. I did not meet the lawyers until the day I appeared in court. I waited in a room with the other family members and someone came in and talked to us in a group and told us just to answer the questions we were asked.

4. If I had been asked, I would have further testified to the following:

5. I was born in Coldspring, Texas. My mother, Jana Mae Travis, died in childbirth with me and I was raised by my grandmother, Susan Mitchell. My grandmother also raised my sister and brother, as well as my cousins Monica and Malcolm. My Aunt Darlene, Rowena's mother, is also the mother of Monica and Malcolm. I am a few years older than my cousins.

6. I was about eighteen years old when my grandmother passed away. When she died, I went to live with my Aunt Darlene in Houston. Monica and Malcolm went to live with their mother as well. I had visited Darlene's



B.W

EXHIBIT 21 Page 1

house during previous summers, but did not actually live with her until my grandmother's death. Darlene was a single mother with six kids of her own.

7. Darlene worked a lot. I took care of the little kids with help from Monica and Malcolm. Darlene would be out late working night shifts and then would sleep during the day.

8. I was a little bit afraid of Darlene. Darlene whooped all of the kids, including myself. She would hit with anything she could find—a shoe or whatever was closest.

9. None of the fathers of Darlene's kids were around. I knew Darlene's boyfriend Peter Paul Zenon. He was crazy. He would yell at Darlene and her kids and they all seemed to be very afraid of him. I saw him shoot at Darlene, but he missed and shot out all of the glass in the window of her house instead. Darlene stayed with him for a long time.

10. I left school in the tenth grade and started working. After living with Darlene for about five years, I left her house and got married. After I left, Darlene met Eugene Beard. I would visit them occasionally. Eugene was a drinker.

11. I was out of the house by the time that Rowena had Teddrick. I did not even know she was pregnant. It was a huge shock. I do not know who Teddrick's father is. I took care of Teddrick all day when he was a baby so that Rowena could finish school. I was not working at the time but was taking care of my own kids. Someone would drop Teddrick off at my house in the morning and then pick him at the end of the day. Darlene and Rowena asked me to take care of Teddrick because no one else was available.

12. I did not know that Teddrick was in a gang. No one in our family that I know of is involved in gang stuff. I do not know when or why Teddrick started getting in trouble. Rowena was a good mother and did the best that

B. W. EXHIBIT 21 Page 2

she could. She worked two jobs. It hurt my heart to hear what happened to Teddrick. I did not ever think he would do something like this.

13. In January 2013, I met with an investigator from the Office of Capital Writs.

14. I have read and reviewed this _3_ -page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on _April 7_, 2013, in _Houston_, Texas.

_Beverly West_

BEVERLY WEST

Subscribed and sworn to before me on _April 7_, 2013.

_signature_

Notary Public, State of Texas



ARIANE EXLER
Notary Public, State of Texas
My Commission Expires
JULY 11, 2016
Notary without Bond

Notary without bond

EXHIBIT 21 Page 3

: 00544

## CERTIFICATION OF VITAL RECORD

# City of Houston, Texas

STATE OF TEXAS        CERTIFICATE OF BIRTH       BIRTH NO.

| CHILD | 1 NAME (Type or print) | [a] First | [b] Middle | | [c] Last | | 2 DATE OF BIRTH |
|---|---|---|---|---|---|---|---|
| | | TEDDRICK | ROSHON | | BATISTE | | DECEMBER 30, 1987 |

| 3 SEX | 4a. PLACE OF BIRTH — COUNTY | 4b. CITY OR TOWN [If outside city limits, give precinct no.] | 2 DATE OF BIRTH |
|---|---|---|---|
| MALE | HARRIS | HOUSTON | |

| 4c. NAME OF HOSPITAL [If not in hospital, give street address] | 4d. INSIDE CITY LIMITS? | 5a. THIS BIRTH-SINGLE, TWIN, TRIPLET, ETC. (Specify) | 5b. IF TWIN OR TRIPLET, WAS CHILD BORN 1st, 2nd, 3rd (Specify) |
|---|---|---|---|
| 5915 SHIRLEY MAE LANE | YES | SINGLE | |

| FATHER | 6 NAME | [a] First | [b] Middle | | [c] Last |
|---|---|---|---|---|---|
| | | | | | |

| 7 RACE | 6b. IS FATHER OF SPANISH ORIGIN? | 8b. IF YES, SPECIFY MEXICAN, CUBAN, PUERTO RICAN, ETC |
|---|---|---|
| | | |

| 9 AGE [At time of this birth] | 10 BIRTHPLACE [State or foreign country] | 11a. USUAL OCCUPATION | 11b. KIND OF BUSINESS OR INDUSTRY |
|---|---|---|---|
| | | | |

| MOTHER | 12 MAIDEN NAME | [a] First | [b] Middle | | [c] Last |
|---|---|---|---|---|---|
| | | ROWENA | LASHAWN | | BATISTE |

| 13 RACE | 14a. IS MOTHER OF SPANISH ORIGIN? | 14b. IF YES, SPECIFY MEXICAN, CUBAN, PUERTO RICAN, ETC. |
|---|---|---|
| BLACK | NO | |

| 15 AGE [At time of this birth] | 16 BIRTHPLACE [State or foreign country] | 17a. USUAL OCCUPATION | 17b. KIND OF BUSINESS OR INDUSTRY |
|---|---|---|---|
| 16 | TEXAS | STUDENT | HIGH SCHOOL |

| 18a. RESIDENCE — STATE | 18b. COUNTY | 18c. CITY OR TOWN [outside city limits: show rural] | 18d. ZIP CODE | 18e. STREET ADDRESS [If rural, give location] | 18e. INSIDE CITY LIMITS? |
|---|---|---|---|---|---|
| TEXAS | HARRIS | HOUSTON | 77091 | 5915 SHIRLEY MAE LN. | YES |

| 19 Children previously born to this mother [Do not include this birth] | a. How many other children are now living? | b. How many other children were born alive but are now dead? | c. How many children were born dead after 20 moths pregnancy? | 20. INFORMANT DARLENE BEARD |
|---|---|---|---|---|
| | 0 | 0 | 0 | *Darlene M. Beard* |

| 21 I hereby certify that this child was born alive on the date stated above. | 22a. ATTENDANT'S SIGNATURE DARLENE BEARD | 22b. ATTENDANT AT BIRTH M.D., D.O., C.N.M., MIDWIFE, OTHER) (Specify) |
|---|---|---|
| | *Darlene M. Beard* | GRANDMOTHER |

| a1 2:53 A.M | 22c. ATTENDANT'S ADDRESS | 22d. DATE SIGNED |
|---|---|---|
| | 5915 SHIRLEY MAE LANE | DECEMBER 30, 1987 |

| 23a. REGISTRAR'S FILE NO | 23b. DATE REC'D BY LOCAL REGISTRAR | 23c. SIGNATURE OF LOCAL REGISTRAR |
|---|---|---|
| 52679 | JAN. 13, 1988 | *R. W. Hanks* |

1468387

STATE OF TEXAS   ) ss
COUNTY OF HARRIS  )

CERTIFIED COPY OF VITAL RECORDS

DATE ISSUED    SEP 04 1992

This is a true and exact reproduction of the document officially registered and placed on file in the BUREAU OF VITAL STATISTICS, HOUSTON HEALTH AND HUMAN SERVICES DEPARTMENT.

*R. W. Hanks*
R. W. Hanks, Registrar
BUREAU OF VITAL STATISTICS

This copy not valid unless prepared on engraved border displaying seal and signature of Registrar
LAMINATION MAY VOID...



PAGE 02/02

WRKFRC SOL BMT

EXHIBIT 23 PAGE 547

: 00546

JIM LEITNER
FIRST ASSISTANT



CRIMINAL JUSTICE CENTER
1201 FRANKLIN, SUITE 600
HOUSTON, TEXAS 77002-1901

## PATRICIA R. LYKOS
### DISTRICT ATTORNEY
### HARRIS COUNTY, TEXAS

**State of Texas v. Teddrick Batiste**

Cause No. 1212464 & 1212366

Defense counsel representing the above captioned defendant received the following copies from the State's file in this case:

_____Offense Report

_____Copy of the defendant's statement

___✓___Miscellaneous items:

       **-Report of interview with Kris McSherry of Forged USA dated 4-27-11**

**Date:**       May 3, 2011

**Received by:**    GERALD E. BOURQUE
                           **Print name**

                           **Signature**

**Received From:**   Traci M. Bennett

EXHIBIT 23-Page-4

# HARRIS COUNTY DISTRICT ATTORNEY
## SPECIAL CRIMES BUREAU

**SUPPLEMENT REPORT  Cause# 1212464**            **DATE:** April 27, 2011
                                1212366
**SUBMITTED BY:** Tracy Peterson

On April 13, 2011  ADA Traci Bennett requested I serve Kris McSherry (Plant Manager of Forge USA) a Subpoena for all records pertaining to Teddrick Batiste. (Defendant in above two cause numbers).  I contacted Kris McSherry at Forge USA and he advised I could scan and email the subpoena to the HR department and I would be contacted when the records were complete.

On April 25, 2011 I was contacted and advised that the records were ready to be picked up. I made a appointment with Kris McSherry at that time so I could interview him in reference to Teddrick Batiste.

On April 26, 2011 I met with Kris McSherry at Forge USA. Mr. McSherry told me that he would consider his relationship with Teddrick as a casual professional relationship. They would have casual conversation almost everyday. How's your family doing, How's everything here at work? Nothing really more than that. He was not a disciplinary problem had only be counseled about not showing up on time and forgetting to punch in or out. He would not consider him a leader among the other employees. Teddrick didn't have any contact with customers. He acted hard but got along with all the employees. McSherry could not remember an incident between Teddrick and any other employee. McSherry did say that Teddrick showed him nude photographs of several different girls on his cell phone and talked about running around on his wife. Teddrick knew his job and preformed it well not excellent but well. McSherry knew Teddrick had several Tattoo's but didn't realize he was a gang member. McSherry said Teddrick told him the next morning after the Killings at the Tattoo Parlor on Magnum that he drove up to the Tattoo Parlor right after it happen and when inside and saw the dead guy on the floor. McSherry said he thought at the time that this was strange. McSherry also told me that another employee ( Anthony Joyce) had told one of the supervisors that he wasn't surprised that Teddrick was in jail for Murder because Teddrick had told him that he had killed people.

EXHIBIT 23 Page 2

 

**Corrections**

Michigan.gov Home | Contact MDOC | OTIS Help | MDOC's Most Wanted | Glossary | Disclaimer | MDOC Home

## BIOGRAPHICAL INFORMATION

| | |
|---|---|
| MDOC Number: | **455751** |
| SID Number: | **2235646A** |
| Name: | **ANTHONY DWANE MOORE** |
| Racial Identification: | **Black** |
| Gender: | **Male** |
| Hair: | **Black** |
| Eyes: | **Brown** |
| Height: | **6' 4"** |
| Weight: | **215 lbs.** |
| Date of Birth: | **04/09/1973  (40)** |
| Image Date: | |

Image Not Available

ANTHONY DWANE MOORE

## MDOC STATUS

| | | | |
|---|---|---|---|
| Current Status: | **Absconder from Probation** | Supervision Begin Date: | |
| Absconded from: | Oakland/Pontiac/Probation | Supervision Discharge Date: | |
| Security Level: | | Abscond Date: | **12/01/2006** |

| ALIASES | MARKS, SCARS & TATTOOS |
|---|---|
| ANTHONEY DWANE MOORE | Body Piercing- Lower Left Ear |
| | Body Piercing- Lower Right Ear |
| | Mark- Center Face - pot mark, skin discolorations |
| | Tattoo- Back - G.D.M. (father's initials) |
| | Tattoo- Back - cross |
| | Tattoo- Center Back - G.A.M. (mom's initials) |
| | Tattoo- Left Bicep - Michey Mouse |
| | Tattoo- Right Bicep - Sahara |
| | Tattoo- Right Chest - panther |

## PRISON SENTENCES

### ACTIVE

**None**

### INACTIVE

EXHIBIT 24 Page 1

| None | | | |
|---|---|---|---|

## PROBATION SENTENCES

### ACTIVE

#### Sentence 1

| Offense: | Uttering & Publishing | Minimum Sentence: | |
|---|---|---|---|
| MCL#: | 750.249 | Maximum Sentence: | 5 years 0 months |
| Court File#: | 03189648-FH | Date of Offense: | 08/30/2002 |
| County: | Oakland | Date of Sentence: | 05/20/2003 |
| Conviction Type: | Plea | | |

### INACTIVE

#### Sentence 1

| Offense: | Uttering & Publishing | Minimum Sentence: | |
|---|---|---|---|
| MCL#: | 750.249 | Maximum Sentence: | 2 years 0 months |
| Court File#: | 03189648-FH | Date of Offense: | 08/30/2002 |
| County: | Oakland | Date of Sentence: | 05/20/2003 |
| Conviction Type: | Plea | Discharge Date: | 11/22/2005 |
| | | Discharge Reason: | |

#### Sentence 2

| Offense: | Larceny in a Building | Minimum Sentence: | |
|---|---|---|---|
| MCL#: | 750.360 | Maximum Sentence: | 5 years 0 months |
| Court File#: | 03189790-FH | Date of Offense: | 12/11/2002 |
| County: | Oakland | Date of Sentence: | 05/20/2003 |
| Conviction Type: | Plea | Discharge Date: | 08/28/2006 |
| | | Discharge Reason: | Offender Discharge |

#### Sentence 3

| Offense: | Larceny in a Building | Minimum Sentence: | |
|---|---|---|---|
| MCL#: | 750.360 | Maximum Sentence: | 2 years 0 months |
| Court File#: | 03189790-FH | Date of Offense: | 12/11/2002 |
| County: | Oakland | Date of Sentence: | 05/20/2003 |
| Conviction Type: | Plea | Discharge Date: | 11/22/2005 |
| | | Discharge Reason: | Offender Discharge |

## SUPERVISION CONDITIONS

| Supervision Conditions are not published due to 'Absconder' status. |
|---|



EXHIBIT 24 Page 2

Michigan.gov Home  |  MDOC Home  |  Site Map  |  Escapee/Absconder Tips  |  State Web Sites
Accessibility Policy  |  Privacy Policy  |  Link Policy  |  Security Policy
Copyright © 2001-2013 State of Michigan

3/3

EXHIBIT 24 Page 3

**LYCHNER STATE JAIL FACILITY**
2350 ATASCOCITA ROAD
HUMBLE, TEXAS, 77396
PHONE (281) 454-5036
FAX (281) 459-7261

## FACSIMILE TRANSMISSION

SENDING TO:

NAME: *Ariane Eigler*

DEPARTMENT: *Office of Capital Writs*

FAX NO: *512-463-8590*

NUMBER OF PAGES (INCLUDING COVER PAGE) *2*

FROM:

NAME: *Hollins*

DEPARTMENT: *Inmate Records*

COMMENTS: *Teddrick Batiste*

EXHIBIT 25 Page 1

ATTACHMENT 16.08A



## TEXAS DEPARTMENT OF CRIMINAL JUSTICE

04-12-2013

RE: Batiste, Teddrick

TDCJ #: 1432290

To whom it may concern:

This will acknowledge receipt of your recent request with reference to the above subject. This is to advise the subject was received at TDCJ on __05-17-2007__ from __Harris__ County with a beginning date of sentence set for __05-07-2007__ to serve a term of day(s) __5__ month(s) _____ year(s) for _____

_____ UUMV _____

Subject was confined at the __Pam Lychner__ facility, and was released on __10-31-2007__ to __NA__ County. Subject is/is not under community supervision as a result of release.

Signature of TDCJ Official

__L. Davis-Casemanager__
Printed name and title

Per Texas Family Code, Section 85.025 (c), if a person, who is the subject of a protective order, is confined or imprisoned on the date the protective order would expire, the order is to be extended and will expire on the first anniversary of the date the person is released from confinement or imprisonment.

Per Texas Government Code, Section 493.030, the Social Security Administration has been notified of all offenders released who were confined in a facility for a period of less than twelve consecutive months and were previously receiving Supplemental Security Income or Social Security Disability Insurance benefits.

As 04-18-2013 have checked our files for the above offender released 10-31-2007 and there were no disciplinaries found.

cc:   file

EXHIBIT 25 Page 2

# CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Exhibits 1-25 to Application for a Writ of Habeas Corpus by hand to:

District Clerk of Harris County
Harris County Criminal Justice Center
1201 Franklin, Suite 3138
Houston, TX 77002
(One Copy – hand delivery)

Honorable Judge Ruben Guerrero
Harris County Criminal Justice Center
1201 Franklin, 19th Floor
Houston, TX 77002
(Courtesy Copy – hand delivery)

Harris County District Attorney
ATTN: Lynn Hardaway
Harris County Criminal Justice Center
1201 Franklin, Suite 600
Houston, TX 77002
(One Copy – hand delivery)

Teddrick Batiste
Polunsky Unit #999568
3872 FM 350 South
Livingston, Texas 77351
(One Copy – via mail)

This certification is executed on May 1, 2013 at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

JANET GILGER