# CAUSE NO.: 1212366-A

## POST CONVICTION WRIT

## 174TH DISTRICT COURT

RECEIVED IN
COURT OF CRIMINAL APPEALS

JAN 29 2015

Abel Acosta, Clerk

## OF

This document contains some pages that are of poor quality at the time of imaging.

## HARRIS COUNTY, TEXAS

## TEDDRICK R. BATISTE
## APPLICANT

## VS.

## THE STATE OF TEXAS
## RESPONDENT

## VOLUME III of IV

# INDEX

|  | PAGE |
|---|---|
| LETTER TO APPLICANT | 557 |
| DISTRICT ATTORNEY ACKNOWLEDGMENT LETTER | 558 |
| UNOPPOSED MOTION FOR NINETY-DAY EXTENSION OF TIME TO FILE INITIAL STATE HABEAS APPLICATION | 559 |
| LETTER FROM OFFICE OF CAPITAL WRITS | 584 |
| AMENDED UNOPPOSED MOTION FOR NINETY-DAY EXTENSION OF TIME TO FILE INITIAL STATE HABEAS APPLICATION | 587 |
| 11.071 WRIT OF HABEAS CORPUS OATH OF INDIGRNCE/FINDINGS OF FACT/ ORDER APPOINTING COUNSEL/ STATEMENT OF FACTS | 625 |
| RESPONDENT'S MOTION FOR EXTENSION OF TIME | 627 |
| LETTER TO APPLICANT | 632 |
| RESPONDENT'S ORIGINAL ANSWER | 633 |
| LETTER TO APPLICANT | 791 |
| STATE'S MOTION DESIGNATING ISSUE AND FOR TRIAL COUNSEL TO FILE AN AFFIDAVIT/ STATE'S PROPOSED ORDER DESIGNATING ISSUE AND FOR TRIAL COUNSEL TO FILE AN AFFIDAVIT | 792 |
| LETTER TO APPLICANT | 809 |



# CHRIS DANIEL
### HARRIS COUNTY DISTRICT CLERK

May 7, 2013

JANET GILGER
ATTORNEY FOR  APPLICANT
OFFICE OF CAPITAL  WRITS
1700 N. CONGRESS  AVE, SUITE  460
AUSTIN, TEXAS  78711

RE: CAUSE # 1212366-A
174th District Court

Dear Applicant:

Your post conviction application for Writ of Habeas Corpus was received and filed on05/01/13.
 Article 11.071 of the Texas Code of Criminal Procedure affords the State 120 days in which to
answer the application after having been served with said application and also allows the State to
request a 60 day extension of time in which to file its answer.  After the State files its answer, the
Court has 20 days to determine the manner of resolving issues, if any.  After the Court has
resolved issues, if any, the application, pursuant to the Court's order, shall be forwarded to the
Court of Criminal Appeals, in accordance with either Article 11.071, Sec. 8 or Article 11.071,
Sec. 9.  In the event that the Court determines that your application is untimely or a subsequent
application, the application instead shall be forwarded to the Court of Criminal Appeals for its
consideration, pursuant to Article 11.071, Sec. 5.

The records of the office reflect the following:

| CAUSE NO. | PETITION FOR WRIT OF HABEAS CORPUS | DISPOSITION |
|-----------|-----------------------------------|-------------|
|           |                                   |             |

All future correspondence should indicate the above listed cause number.

Sincerely,

Adele Martinez, Deputy
Criminal Post Trial

CC:  District Attorney
       Judge, Presiding Court



Belinda Hill
Interim First Assistant

Criminal Justice Center
1201 Franklin, Suite 600
Houston, Texas 77002-1901

# HARRIS COUNTY DISTRICT ATTORNEY
## MIKE ANDERSON

May 7, 2013

Chris Daniel, District Clerk
Harris County, Texas
1201 Franklin
Houston, Texas 77002

Re: Ex parte BATISTE, TEDDERICK R.
No.1212366-A in the 174TH
District Court of Harris County, Texas
Filing date: 05/01/2013

Date copy of writ delivered to District Attorney's Basket: MAY 0 7 2013
By: Adele Martinez

Dear Sir:

I hereby acknowledge receipt of a copy of the above-captioned post conviction application for writ of habeas corpus, filed pursuant to Article 11.071 of the Texas Code of Criminal Procedure. Therefore, I waive service by certified mail as provided therein.

I understand that I have 120 days from the date received to answer.

Sincerely,

MAY 0 7 2013

Date Received

Assistant District Attorney
Harris County, Texas

27/998

: 00550

P25

# IN THE 174TH JUDICIAL DISTRICT COURT
# HARRIS COUNTY, TEXAS

| | |
|---|---|
| ) | Trial Cause No. |
| EX PARTE ) | 1212366 |
| Teddrick Batiste, ) | |
| APPLICANT ) | |
| ) | |
| ) | |

## UNOPPOSED MOTION FOR NINETY-DAY EXTENSION OF TIME TO FILE INITIAL STATE HABEAS APPLICATION

**F I L E D**
Chris Daniel
District Clerk

DEC 1 9 2012

Time: _____
Harris County, Texas

By _____
Deputy

BRAD D. LEVENSON (No. 24073411)
Director, Office of Capital Writs
(E-Mail: Brad.Levenson@ocw.texas.gov)
JANET GILGER (No. 24079978)
(E-Mail: Janet.Gilger@ocw.texas.gov)
Post-Conviction Attorneys
Office of Capital Writs
1700 N. Congress Ave, Suite 460
Austin, Texas 78711
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Applicant

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

: 00559

## IN THE 174TH JUDICIAL DISTRICT COURT
## HARRIS COUNTY, TEXAS

|  |  |
|---|---|
| EX PARTE ) | Trial Cause No. |
| Teddrick Batiste, ) | 1212366 |
| APPLICANT ) | |
|  ) | |
|  ) | |

## UNOPPOSED MOTION FOR NINETY-DAY EXTENSION OF TIME TO FILE INITIAL STATE HABEAS APPLICATION

Comes now Teddrick Batiste ("Applicant"), through his attorneys the Office of Capital Writs ("OCW"), and requests this Court grant an extension of time to file his initial state habeas application under article 11.071 of the Texas Code of Criminal Procedure. Article 11.071, section 4(b), authorizes this Court to grant one ninety-day extension for good cause shown. Tex. Code Crim. Proc. art. 11.071 § 4(b). For the reasons set out below, Applicant believes good cause exists to justify the granting of a ninety-day extension, to April 21, 2013, to allow Applicant the opportunity to file a thorough and complete initial state habeas application.[1]

---

[1] The OCW has corresponded with Roe Wilson, Chief, Post-Conviction Writ Division, Harris County District Attorney's Office, regarding this motion. Ms. Roe's office does not oppose this motion and the granting of this extension of time.

2

# I.

## PROCEDURAL HISTORY

Applicant is confined under a sentence of death pursuant to the judgment of this Court, case number 1212366, which was entered on June 23, 2011. On that same day, Patrick McCann was appointed as appellate counsel on Applicant's behalf. (7 CR at 1800.)[2] On June 25, 2012, Mr. McCann filed an opening brief on appeal, *Teddrick Batiste v. The State of Texas*, in the Court of Criminal Appeals ("CCA"), cause number AP-76,600. The State's brief in response was filed on December 7, 2012. The issues raised on direct appeal are now before the CCA for consideration.

This Court appointed the OCW on June 23, 2011, to represent Applicant in his state habeas corpus proceedings. Article 11.071 sets the deadline for filing an initial application as the 180th day after the date habeas counsel is appointed or the 45th day after the State files its original brief on direct appeal, which ever date falls later. Tex. Code Crim. Proc. art. 11.071 § 4(a). Therefore, Applicant's initial application for state habeas corpus relief is currently due in this Court on or before January 21, 2013.

---

[2] All citations to CR refer to the original clerk's record of this case, filed on August 15, 2011.

3

## II.

### STATEMENT OF FACTS

Following its appointment, the OCW has endeavored to expeditiously and thoroughly investigate Applicant's background and conviction for any factual and legal grounds for habeas corpus relief, as instructed under Article 11.071, section 3(a).

Applicant's case is unique in that the prosecution presented evidence of an unrelated and uncharged homicide during the punishment phase proceeding of Applicant's trial. As a result, there are two separate and distinct cases to be investigated on Applicant's behalf. The trial transcripts in Applicant's case are thirty-five volumes. Additionally, the OCW has collected and reviewed files created during Applicant's trial, including those held by Applicant's trial counsel, defense team investigators, and various experts hired for either consultation or testimony by the defense team.

To date, the OCW has independently identified and collected various records from Applicant's life history, including educational, medical, criminal, employment, and vital statistic records. The OCW has also completed a substantial independent investigation into Applicant's background and into the circumstances surrounding his conviction of capital murder. At this juncture, the OCW has identified a multitude of witnesses, including many family and friends of

4

: 00562

Applicant, that have knowledge potentially pertinent to claims Applicant intends to raise in his state habeas Application. While many of those witnesses have been interviewed by post-conviction counsel, some of these interviews are still outstanding. The OCW is in the process of collecting affidavits from these witnesses. Further, the OCW is in the process of identifying additional witnesses that will need to be interviewed.

The OCW has also hired multiple expert witnesses to assist in the presentation of Applicant's habeas corpus claims. Although initial interviews and consultations have occurred, the OCW is in the process of collecting affidavits and reports from these expert witnesses to be included in the state habeas application.

## III.

## ARGUMENT

Under Texas Code of Criminal Procedure article 11.071, this Court is authorized to grant a single ninety-day extension to a defendant seeking to file an initial state habeas application. Tex. Code Crim. Proc. art. 11.071 § 4(b). The Court may do so if it finds good cause exists, and the ninety days begin counting at the date of the original filing deadline. *Id.* Applicant believes good cause exists in this case to allow ninety days more time to investigate and develop his state habeas petition.

: 00563

**A. Many Steps Are Still Required in Order to Complete a Full Investigation of the Legal and Factual Grounds for Habeas Relief**

Although the OCW has performed significant work on Applicant's behalf since being appointed, much work still remains. Applicant's case is unique in that the prosecution presented a separate and unrelated alleged homicide during the punishment phase of Applicant's trial, with a different set of forensics, witnesses, and crime scene details. A multitude of witnesses have been identified as having relevant information concerning not only circumstances surrounding the alleged crimes, but also Applicant's family life, childhood, adult life, and other important areas of Applicant's background that will likely factor into claims for habeas relief.

In addition, the OCW is working with multiple experts, some of whom are likely to contribute affidavits supporting Applicant's claims. Development of those affidavits is ongoing. Arranging interviews of witnesses and experts, as well as drafting affidavits, will take much of (and likely more than) the next forty-five days. Applicant resided in several counties in Texas throughout his life, and while the majority of witnesses are located in the Houston area, travel from Austin (where the OCW is headquartered) for these interviews and subsequent trips to have affidavits signed and notarized takes considerable time and coordination.

The development of these witnesses and experts is particularly important for any claims that Applicant wishes to raise regarding ineffective assistance of trial counsel. The CCA has made clear that the ineffective assistance of counsel issue is

6

best raised on habeas corpus, not direct appeal, due to the outside-the-record nature of such claims. *Ex parte Torres*, 943 S.W.2d 469, 475 (Tex. Crim. App. 1997). Capital trial counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *Wiggins v. Smith*, 539 U.S. 510, 523 (2003); *Strickland v. Washington*, 466 U.S. 668, 690-91 (1984). The CCA holds capital trial counsel to a high standard: "It is not sufficient to inquire generally and leave it up to the defendant to raise topics or respond to open-ended questions. Like a doctor, [capital] defense counsel must be armed with a comprehensive check-list of possibilities, and forcefully inquire about each topic." *Ex parte Gonzales*, 204 S.W.3d 391, 400-01 (Tex. Crim. App. 2006). Therefore, in order to identify and fully prove claims of ineffective assistance, Applicant must himself fully investigate to determine whether important areas of evidence were left undiscovered.

## B. Any Legal or Factual Grounds That Are Not Raised in Applicant's Initial Application, But Could Have Been Raised, May Be Procedurally Barred From Future Review

Applicant must be particularly diligent in the investigation and presentation of his initial state habeas petition. Article 11.071 provides the single and best opportunity to challenge Applicant's conviction. Statements made in the Legislature during the passage of Article 11.071 illustrate this importance.

> And we tell individuals that everything you can possibly raise the first time, we expect you to raise it initially, one bite of the apple, one shot

7

: 00565

. . . .What we're attempting to do here is say 'raise everything at one time.' You get one bite of the apple. If you have to stick the kitchen sink in there, put it all in there, and we will go through those claims one at a time and make a decision. But none of this 'every week you file a new petition' which is currently basically what happens . . . . The idea is this: you're going to be able to fund counsel in these instances and we are going to give you one very well-represented run at a habeas corpus proceeding. And unless you meet a very fine-tuned exception, you're not going to be able to come back time after time after time.

*Ex Parte Kerr*, 64 S.W.3d 414, 418-19 (Tex. Crim. App. 2002) (quoting Representative Pete Gallego at the second reading of S.B. 440 on the floor of the House of Representatives, May 18, 1995).

The CCA has similarly noted that a habeas application under Article 11.071 is an applicant's one full and fair "bite at the apple." *Ex Parte Medina*, 361 S.W.3d 633, 642 (Tex. Crim. App. 2011). Part of the importance of this Application rests in the effect its filing takes on a defendant's future litigation over his conviction. Under Article 11.071, section 5, "[i]f a subsequent application for a writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application unless" one of three narrow circumstances exists. Tex. Code Crim. Proc. art 11.071 § 5. Therefore all grounds that are available to Applicant must be raised in this initial application or they will be procedurally barred from future review by this Court or the CCA. Similarly, any federal court wishing to review Applicant's conviction

8

: 00565

will be limited to only the claims raised in the state habeas proceeding. *See Coleman v. Thompson*, 501 U.S. 722 (1991).

In addition, the importance of developing a full record at the state habeas proceeding has recently been extolled by the United State Supreme Court. In *Cullen v. Pinholster*, the Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." 131 S. Ct. 1388, 1398 (2011). As such, Applicant is required to produce both all available claims and all available evidence at the filing of his initial application, lest he lose any opportunities to present them later.

## C. The OCW Has a Full Case Load That Also Requires Attention From Its Staff

As the state agency charged with representing capital defendants in their state habeas proceedings, the OCW is appointed in cases that have resulted in a capital sentence since September 1, 2010. These cases occur all across the state of Texas. With a legal staff of only five full-time attorneys and two investigators, the OCW staff works diligently to provide the highest caliber representation to each of its clients. Recently, the Supreme Court issued rulings implicating the performance of habeas counsel in *Maples v. Thomas*, 132 S. Ct. 912 (2012) and *Martinez v. Ryan*, 132 S. Ct. 1309 (2012). These opinions highlight the necessity, if not constitutional duty, of habeas counsel to perform well in its duty to develop habeas applications.

9

: 00567

While the OCW is focused on the development of Applicant's initial state habeas application, it must also devote attention to other cases that have equally pressing deadlines. Over the course of the next six months, the OCW anticipates filing five initial state habeas applications, including Applicant's. An additional ninety-day extension would allow the OCW to manage its case load appropriately and fully investigate and develop this application.

## IV.

## PRAYER FOR RELIEF

For the foregoing reasons, Applicant prays this Court would grant the ninety-day extension authorized under Article 11.071, section 4(b) and extend Applicant's deadline to file his initial state habeas application to April 21, 2013.

Respectfully submitted,

Brad D. Levenson
Director, Office of Capital Writs

DATED:     December 13, 2012          By _____
                                                Janet Gilger
                                                Post-Conviction Attorney

10

: 00568

# IN THE 174TH JUDICIAL DISTRICT COURT
# HARRIS COUNTY, TEXAS

| | |
|---|---|
| EX PARTE<br>Teddrick Batiste,<br>    APPLICANT | )<br>)<br>)<br>)<br>)<br>) |

Trial Cause No.
1212366

## ORDER

On this date, the Court considered Applicant's Unopposed Motion for Ninety-Day Extension of Time to File Initial State Habeas Application. After due consideration, Applicant's Motion is GRANTED. The initial state application is due on April 21, 2013.

ORDERED AND SIGNED on this /9 day of December, 2012

Ruben Guerrero
Judge, 174th Judicial District

11

: 00569

# CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Motion for Ninety-Day Extension of Time to:

Honorable Ruben Guerrero
Judge, 174th District Court
Harris County Criminal Justice Center
1201 Franklin, 19th Floor
Houston, Texas 77002
(One Copy – via email to diane_madrid@justex.net)

Harris County District Attorney
ATTN: Roe Wilson
1201 Franklin Street, Suite 600
Houston, TX 77002
(One Copy – via mail)

Court of Criminal Appeals
P.O. Box 112308
Austin, Texas 78711
(Courtesy Copy – via mail)

Teddrick Batiste
Polunsky Unit #999568
3872 FM 350 South
Livingston, Texas 77351
(One Copy – via mail)

This certification is executed on December 13, 2012, at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_____
Janet Gilger

12

# IN THE 174TH JUDICIAL DISTRICT COURT
# HARRIS COUNTY, TEXAS

|  |  |  |
|---|---|---|
| EX PARTE | ) | Trial Cause No. |
| Teddrick Batiste, | ) | 1212366 |
|      APPLICANT | ) |  |
|  | ) |  |
|  | ) |  |

## UNOPPOSED MOTION FOR NINETY-DAY EXTENSION OF TIME TO FILE INITIAL STATE HABEAS APPLICATION

**F I L E D**
Chris Daniel
District Clerk

DEC 1 9 2012

Time: _____ Harris County, Texas

By _____ Deputy

BRAD D. LEVENSON (No. 24073411)
Director, Office of Capital Writs
(E-Mail: Brad.Levenson@ocw.texas.gov)
JANET GILGER (No. 24079978)
(E-Mail: Janet.Gilger@ocw.texas.gov)
Post-Conviction Attorneys
Office of Capital Writs
1700 N. Congress Ave, Suite 460
Austin, Texas 78711
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Applicant

: 00571

# IN THE 174TH JUDICIAL DISTRICT COURT
## HARRIS COUNTY, TEXAS

| | |
|---|---|
| EX PARTE<br>Teddrick Batiste,<br>APPLICANT | ) Trial Cause No.<br>) 1212366<br>)<br>)<br>)<br>) |

Trial Cause No.
1212366

**FILED**
Chris Daniel
District Clerk
DEC 1 9 2012

Time: _____
Harris County, Texas

By _____

## UNOPPOSED MOTION FOR NINETY-DAY EXTENSION OF TIME TO FILE INITIAL STATE HABEAS APPLICATION

Comes now Teddrick Batiste ("Applicant"), through his attorneys the Office of Capital Writs ("OCW"), and requests this Court grant an extension of time to file his initial state habeas application under article 11.071 of the Texas Code of Criminal Procedure. Article 11.071, section 4(b), authorizes this Court to grant one ninety-day extension for good cause shown. Tex. Code Crim. Proc. art. 11.071 § 4(b). For the reasons set out below, Applicant believes good cause exists to justify the granting of a ninety-day extension, to April 21, 2013, to allow Applicant the opportunity to file a thorough and complete initial state habeas application.[1]

---

[1] The OCW has corresponded with Roe Wilson, Chief, Post-Conviction Writ Division, Harris County District Attorney's Office, regarding this motion. Ms. Roe's office does not oppose this motion and the granting of this extension of time.

2

# I.

## PROCEDURAL HISTORY

Applicant is confined under a sentence of death pursuant to the judgment of this Court, case number 1212366, which was entered on June 23, 2011. On that same day, Patrick McCann was appointed as appellate counsel on Applicant's behalf. (7 CR at 1800.)[2] On June 25, 2012, Mr. McCann filed an opening brief on appeal, *Teddrick Batiste v. The State of Texas*, in the Court of Criminal Appeals ("CCA"), cause number AP-76,600. The State's brief in response was filed on December 7, 2012. The issues raised on direct appeal are now before the CCA for consideration.

This Court appointed the OCW on June 23, 2011, to represent Applicant in his state habeas corpus proceedings. Article 11.071 sets the deadline for filing an initial application as the 180th day after the date habeas counsel is appointed or the 45th day after the State files its original brief on direct appeal, which ever date falls later. Tex. Code Crim. Proc. art. 11.071 § 4(a). Therefore, Applicant's initial application for state habeas corpus relief is currently due in this Court on or before January 21, 2013.

---

[2] All citations to CR refer to the original clerk's record of this case, filed on August 15, 2011.

3

: 00573

## II.

## STATEMENT OF FACTS

Following its appointment, the OCW has endeavored to expeditiously and thoroughly investigate Applicant's background and conviction for any factual and legal grounds for habeas corpus relief, as instructed under Article 11.071, section 3(a).

Applicant's case is unique in that the prosecution presented evidence of an unrelated and uncharged homicide during the punishment phase proceeding of Applicant's trial. As a result, there are two separate and distinct cases to be investigated on Applicant's behalf. The trial transcripts in Applicant's case are thirty-five volumes. Additionally, the OCW has collected and reviewed files created during Applicant's trial, including those held by Applicant's trial counsel, defense team investigators, and various experts hired for either consultation or testimony by the defense team.

To date, the OCW has independently identified and collected various records from Applicant's life history, including educational, medical, criminal, employment, and vital statistic records. The OCW has also completed a substantial independent investigation into Applicant's background and into the circumstances surrounding his conviction of capital murder. At this juncture, the OCW has identified a multitude of witnesses, including many family and friends of

4

: 00574

Applicant, that have knowledge potentially pertinent to claims Applicant intends to raise in his state habeas Application. While many of those witnesses have been interviewed by post-conviction counsel, some of these interviews are still outstanding. The OCW is in the process of collecting affidavits from these witnesses. Further, the OCW is in the process of identifying additional witnesses that will need to be interviewed.

The OCW has also hired multiple expert witnesses to assist in the presentation of Applicant's habeas corpus claims. Although initial interviews and consultations have occurred, the OCW is in the process of collecting affidavits and reports from these expert witnesses to be included in the state habeas application.

## III.

## ARGUMENT

Under Texas Code of Criminal Procedure article 11.071, this Court is authorized to grant a single ninety-day extension to a defendant seeking to file an initial state habeas application. Tex. Code Crim. Proc. art. 11.071 § 4(b). The Court may do so if it finds good cause exists, and the ninety days begin counting at the date of the original filing deadline. *Id.* Applicant believes good cause exists in this case to allow ninety days more time to investigate and develop his state habeas petition.

5

: 00575

### A. Many Steps Are Still Required in Order to Complete a Full Investigation of the Legal and Factual Grounds for Habeas Relief

Although the OCW has performed significant work on Applicant's behalf since being appointed, much work still remains. Applicant's case is unique in that the prosecution presented a separate and unrelated alleged homicide during the punishment phase of Applicant's trial, with a different set of forensics, witnesses, and crime scene details. A multitude of witnesses have been identified as having relevant information concerning not only circumstances surrounding the alleged crimes, but also Applicant's family life, childhood, adult life, and other important areas of Applicant's background that will likely factor into claims for habeas relief.

In addition, the OCW is working with multiple experts, some of whom are likely to contribute affidavits supporting Applicant's claims. Development of those affidavits is ongoing. Arranging interviews of witnesses and experts, as well as drafting affidavits, will take much of (and likely more than) the next forty-five days. Applicant resided in several counties in Texas throughout his life, and while the majority of witnesses are located in the Houston area, travel from Austin (where the OCW is headquartered) for these interviews and subsequent trips to have affidavits signed and notarized takes considerable time and coordination.

The development of these witnesses and experts is particularly important for any claims that Applicant wishes to raise regarding ineffective assistance of trial counsel. The CCA has made clear that the ineffective assistance of counsel issue is

6

best raised on habeas corpus, not direct appeal, due to the outside-the-record nature of such claims. *Ex parte Torres*, 943 S.W.2d 469, 475 (Tex. Crim. App. 1997). Capital trial counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *Wiggins v. Smith*, 539 U.S. 510, 523 (2003); *Strickland v. Washington*, 466 U.S. 668, 690-91 (1984). The CCA holds capital trial counsel to a high standard: "It is not sufficient to inquire generally and leave it up to the defendant to raise topics or respond to open-ended questions. Like a doctor, [capital] defense counsel must be armed with a comprehensive check-list of possibilities, and forcefully inquire about each topic." *Ex parte Gonzales*, 204 S.W.3d 391, 400-01 (Tex. Crim. App. 2006). Therefore, in order to identify and fully prove claims of ineffective assistance, Applicant must himself fully investigate to determine whether important areas of evidence were left undiscovered.

## B. Any Legal or Factual Grounds That Are Not Raised in Applicant's Initial Application, But Could Have Been Raised, May Be Procedurally Barred From Future Review

Applicant must be particularly diligent in the investigation and presentation of his initial state habeas petition. Article 11.071 provides the single and best opportunity to challenge Applicant's conviction. Statements made in the Legislature during the passage of Article 11.071 illustrate this importance.

> And we tell individuals that everything you can possibly raise the first time, we expect you to raise it initially, one bite of the apple, one shot

7

. . . .What we're attempting to do here is say 'raise everything at one time.' You get one bite of the apple. If you have to stick the kitchen sink in there, put it all in there, and we will go through those claims one at a time and make a decision. But none of this 'every week you file a new petition' which is currently basically what happens . . . . The idea is this: you're going to be able to fund counsel in these instances and we are going to give you one very well-represented run at a habeas corpus proceeding. And unless you meet a very fine-tuned exception, you're not going to be able to come back time after time after time.

*Ex Parte Kerr*, 64 S.W.3d 414, 418-19 (Tex. Crim. App. 2002) (quoting Representative Pete Gallego at the second reading of S.B. 440 on the floor of the House of Representatives, May 18, 1995).

The CCA has similarly noted that a habeas application under Article 11.071 is an applicant's one full and fair "bite at the apple." *Ex Parte Medina*, 361 S.W.3d 633, 642 (Tex. Crim. App. 2011). Part of the importance of this Application rests in the effect its filing takes on a defendant's future litigation over his conviction. Under Article 11.071, section 5, "[i]f a subsequent application for a writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application unless" one of three narrow circumstances exists. Tex. Code Crim. Proc. art 11.071 § 5. Therefore all grounds that are available to Applicant must be raised in this initial application or they will be procedurally barred from future review by this Court or the CCA. Similarly, any federal court wishing to review Applicant's conviction

8

: 00578

will be limited to only the claims raised in the state habeas proceeding. *See Coleman v. Thompson*, 501 U.S. 722 (1991).

In addition, the importance of developing a full record at the state habeas proceeding has recently been extolled by the United State Supreme Court. In *Cullen v. Pinholster*, the Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." 131 S. Ct. 1388, 1398 (2011). As such, Applicant is required to produce both all available claims and all available evidence at the filing of his initial application, lest he lose any opportunities to present them later.

## C. The OCW Has a Full Case Load That Also Requires Attention From Its Staff

As the state agency charged with representing capital defendants in their state habeas proceedings, the OCW is appointed in cases that have resulted in a capital sentence since September 1, 2010. These cases occur all across the state of Texas. With a legal staff of only five full-time attorneys and two investigators, the OCW staff works diligently to provide the highest caliber representation to each of its clients. Recently, the Supreme Court issued rulings implicating the performance of habeas counsel in *Maples v. Thomas*, 132 S. Ct. 912 (2012) and *Martinez v. Ryan*, 132 S. Ct. 1309 (2012). These opinions highlight the necessity, if not constitutional duty, of habeas counsel to perform well in its duty to develop habeas applications.

: 00579

While the OCW is focused on the development of Applicant's initial state habeas application, it must also devote attention to other cases that have equally pressing deadlines. Over the course of the next six months, the OCW anticipates filing five initial state habeas applications, including Applicant's. An additional ninety-day extension would allow the OCW to manage its case load appropriately and fully investigate and develop this application.

## IV.

## PRAYER FOR RELIEF

For the foregoing reasons, Applicant prays this Court would grant the ninety-day extension authorized under Article 11.071, section 4(b) and extend Applicant's deadline to file his initial state habeas application to April 21, 2013.

Respectfully submitted,

Brad D. Levenson
Director, Office of Capital Writs

DATED:     December 13, 2012         By _____
Janet Gilger
Post-Conviction Attorney

10

# IN THE 174TH JUDICIAL DISTRICT COURT
# HARRIS COUNTY, TEXAS

|  |  |
|---|---|
| | ) Trial Cause No. |
| EX PARTE | ) 1212366 |
| Teddrick Batiste, | ) |
| APPLICANT | ) |
| | ) |
| | ) |

## ORDER

On this date, the Court considered Applicant's Unopposed Motion for Ninety-Day Extension of Time to File Initial State Habeas Application. After due consideration, Applicant's Motion is GRANTED. The initial state application is due on April 21, 2013.

DEC 1 9 2012

ORDERED AND SIGNED on this ___ day of December, 2012

Ruben Guerrero
Judge, 174th Judicial District

11

: 00581

# CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Motion for Ninety-Day Extension of Time to:

Honorable Ruben Guerrero
Judge, 174th District Court
Harris County Criminal Justice Center
1201 Franklin, 19th Floor
Houston, Texas 77002
(One Copy – via email to diane_madrid@justex.net)

Harris County District Attorney
ATTN: Roe Wilson
1201 Franklin Street, Suite 600
Houston, TX 77002
(One Copy – via mail)

Court of Criminal Appeals
P.O. Box 112308
Austin, Texas 78711
(Courtesy Copy – via mail)

Teddrick Batiste
Polunsky Unit #999568
3872 FM 350 South
Livingston, Texas 77351
(One Copy – via mail)

This certification is executed on December 13, 2012, at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_____
Janet Gilger

12

: 00582



OFFICIAL BUSINESS
STATE OF TEXAS
PENALTY FOR
PRIVATE USE

PRESORTED
FIRST CLASS

$ 01.25⁴
DEC 13 2012
MAILED FROM ZIP CODE 78701

Office of Capital Writs
1700 N. Congress Avenue, Suite 460
Austin, Texas 78711

Honorable Ruben Guerrero,
Judge, 174th District Court
Harris County Criminal Justice Center
1201 Franklin, 19th Floor
Houston, Texas 77002

: 00503

08/10/2011 WED 13:54 FAX                                                   ☒001/003



# OFFICE OF CAPITAL WRITS

1700 N. Congress Ave, Suite 460 • Austin, Texas 78752
Phone (512) 463-8600 • Fax (512) 463-8590

BRAD D. LEVENSON
Director

August 10, 2011

Harris County District Clerk
1201 Franklin, Suite 3180
P.O. Box 4651
Houston TX 77210
(713)-755-4579

**Re:   Teddrick Batiste**
**DOB:  12/30/1987**
**SS#:   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**

To Whom It May Concern:

Pursuant to Article 11.071, Section 2(b) of the Texas Code of Criminal Procedure and Chapter 78 of the Government Code, the Office of Capital Writs has been appointed to represent Mr. Teddrick Batiste in his post-conviction habeas proceedings. In our capacity as Mr. Batiste legal representative, and in accordance with the Public Information Act, Chapter 552 of the Texas Government Code, I am requesting a copy of all records and documents in the possession of Harris County Records Department relating to Teddrick Batiste

These records should include, but are not limited to, all records and documents pertaining to or arising from: (1) the investigation of all the crimes; (2) arrests; (3) trial of the underlying matters or plea negotiations; (4) the investigation or prosecution of any proceedings after trial, including motions for new trial and direct appeals; (5) judgments or sentences; and (6) any other information relating to judgments, sentences, information, indictments, and/or complaints related to criminal matters.

Please note that the Office of Capital Writs is a state agency and to the extent that you do not charge state agencies for copies, we respectfully request that the records be provided at no charge. If, however, you anticipate there will be a fee charged for copies of these records, please

: 00584
08/10/2011 WED 13:11 [TX/RX NO 6686]  ☒001

08/10/2011 WED 13:55 FAX                                    ☑002/003

contact me before proceeding with the request. In addition, if there are any documents that fall within this request that your office believes are not subject to disclosure, please provide a list with a general description of each document type and the reason it is being withheld. Such a list will satisfy the current request as it regards those documents. It is not my intent that your office be required to seek an Open Records ruling from the Office of the Attorney General.

For the purposes of this request, the terms "records" and "documents" are intended to include, without limitation, all written, typed, printed, recorded, graphic computer-generated, or other matter of any kind from which information can be derived, whether produced, reproduced, or stored on paper, cards, tapes, films, electronic facsimiles, computer storage devices, or any other medium. They include, without limitation, letters, memoranda (including internal memoranda), calendars, schedules, books, indices, notes, printed forms, publications, press releases, notices, minutes, summaries or abstracts, reports, files, transcripts, computer tapes, printouts, drawings, photographs, recordings (including both videotapes and audiotapes), telegrams, and telex messages, as well as any reproductions thereof that differ in any way from any other reproduction, such as copies containing marginal notations.

Please send the requested information to:

Office of Capital Writs
Attn: Brian P. Fayhee
1700 N. Congress Ave, Suite 460
Austin, Texas 78711

If you have any questions, please do not hesitate to contact me at (512) 463-8539 or via email at brian.fayhee@ocw.texas.gov. Thank you for your time and effort in gathering these records.

Sincerely,

Brian P. Fayhee
Post-Conviction Investigator

08/10/2011 WED 13:11 [TX/RX NO 6686] ☑002

08/10/2011 WED 13:55 FAX                                    ☒003/003

## Authorization for Release of Confidential Information and Records

My name is:                    Teddrick Batiste

My date of birth is:           12/30/1987

My social security number is:  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

By this release and photocopy thereof, I, Teddrick Batiste_____, authorize and request you release to the **Office of Capital Writs**, or any of their employees or their designated representatives, any and all information and/or records relating to me, including but not limited to, academic (including special education), adoption, correctional, employment, housing, jail, law enforcement, medical, mental health, military, prison, psychological, psychiatric, probation, rehabilitation (including alcohol and drug rehabilitation), and social services records, as well as any files prepared in connection with prior civil or criminal litigation, and any other correspondence or documents pertaining to me.

This document also authorizes any treating doctors, experts, lawyers, or other personnel to discuss otherwise confidential information with the above mentioned legal representatives.

This document does not authorize release of documents to state agents.

You are specifically authorized to photocopy these records and to release them to the above mentioned legal representatives.

_____          _____8. 9. 11_____
Signature                          Date

P13

# IN THE 174TH JUDICIAL DISTRICT COURT
# HARRIS COUNTY, TEXAS

| | |
|---|---|
| EX PARTE<br>Teddrick Batiste,<br>    APPLICANT | )<br>)<br>)<br>)<br>)<br>) |

Trial Cause No.
1212366

## AMENDED UNOPPOSED MOTION FOR NINETY-DAY EXTENSION OF
## TIME TO FILE INITIAL STATE HABEAS APPLICATION

BRAD D. LEVENSON (No. 24073411)
Director, Office of Capital Writs
(E-Mail: Brad.Levenson@ocw.texas.gov)
JANET GILGER (No. 24079978)
(E-Mail: Janet.Gilger@ocw.texas.gov)
Post-Conviction Attorneys
Office of Capital Writs
1700 N. Congress Ave, Suite 460
Austin, Texas 78711
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Applicant

IMAGED

**FILED**
Chris Daniel
District Clerk

JAN 22 2013

Time: 9:15 A
Harris County, Texas
By _____ Deputy

: 00587

IN THE 174TH JUDICIAL DISTRICT COURT
HARRIS COUNTY, TEXAS

|  |  |  |
|---|---|---|
| EX PARTE | ) | Trial Cause No. |
| Teddrick Batiste, | ) | 1212366 |
| APPLICANT | ) | |
|  | ) | |
|  | ) | |
|  | ) | |

**AMENDED UNOPPOSED MOTION FOR NINETY-DAY EXTENSION OF
TIME TO FILE INITIAL STATE HABEAS APPLICATION**

Comes now Teddrick Batiste ("Applicant"), through his attorneys the Office of Capital Writs ("OCW"), and requests this Court grant an extension of time to file his initial state habeas application under article 11.071 of the Texas Code of Criminal Procedure. Article 11.071, section 4(b), authorizes this Court to grant one ninety-day extension for good cause shown.[1] Tex. Code Crim. Proc. art. 11.071 § 4(b). For the reasons set out below, Applicant believes good cause exists to justify the granting of a ninety-day extension, to May 2, 2013, to allow

---

[1] Applicant initially filed his Unopposed Motion for Ninety-Day Extension of Time to File Initial State Habeas Application and requested an extension to April 21, 2013. This calculation was based on the understanding that the State filed its brief in response to Applicant's opening brief on appeal on December 7, 2012. However, the Court of Criminal Appeals did not actually consider the State's brief filed until December 18, 2012, due to the State's need to file a motion to allow an oversized brief. The date of May 2, 2013, that Applicant now requests is based on the December 18, 2012, filing by the State.

2

Applicant the opportunity to file a thorough and complete initial state habeas application.[2]

## I.

## PROCEDURAL HISTORY

Applicant is confined under a sentence of death pursuant to the judgment of this Court, case number 1212366, which was entered on June 23, 2011. On that same day, Patrick McCann was appointed as appellate counsel on Applicant's behalf. (7 CR at 1800.)[3] On June 25, 2012, Mr. McCann filed an opening brief on appeal, *Teddrick Batiste v. The State of Texas*, in the Court of Criminal Appeals ("CCA"), cause number AP-76,600. The State's brief in response was filed on December 18, 2012. The issues raised on direct appeal are now before the CCA for consideration.

This Court appointed the OCW on June 23, 2011, to represent Applicant in his state habeas corpus proceedings. Article 11.071 sets the deadline for filing an initial application as the 180th day after the date habeas counsel is appointed or the 45th day after the State files its original brief on direct appeal, which ever date falls later. Tex. Code Crim. Proc. art. 11.071 § 4(a). Therefore, Applicant's initial

---

[2] The OCW has corresponded with Roe Wilson, Chief, Post-Conviction Writ Division, Harris County District Attorney's Office, regarding this motion. Ms. Roe's office does not oppose this motion and the granting of this extension of time.

[3] All citations to CR refer to the original clerk's record of this case, filed on August 15, 2011.

3

: 00589

application for state habeas corpus relief is currently due in this Court on or before February 2, 2013.

## II.

## STATEMENT OF FACTS

Following its appointment, the OCW has endeavored to expeditiously and thoroughly investigate Applicant's background and conviction for any factual and legal grounds for habeas corpus relief, as instructed under Article 11.071, section 3(a).

Applicant's case is unique in that the prosecution presented evidence of an unrelated and uncharged homicide during the punishment phase proceeding of Applicant's trial. As a result, there are two separate and distinct cases to be investigated on Applicant's behalf. The trial transcripts in Applicant's case are thirty-five volumes. Additionally, the OCW has collected and reviewed files created during Applicant's trial, including those held by Applicant's trial counsel, defense team investigators, and various experts hired for either consultation or testimony by the defense team.

To date, the OCW has independently identified and collected various records from Applicant's life history, including educational, medical, criminal, employment, and vital statistic records. The OCW has also completed a substantial independent investigation into Applicant's background and into the

4

circumstances surrounding his conviction of capital murder. At this juncture, the OCW has identified a multitude of witnesses, including many family and friends of Applicant, that have knowledge potentially pertinent to claims Applicant intends to raise in his state habeas Application. While many of those witnesses have been interviewed by post-conviction counsel, some of these interviews are still outstanding. The OCW is in the process of collecting affidavits from these witnesses. Further, the OCW is in the process of identifying additional witnesses that will need to be interviewed.

The OCW has also hired multiple expert witnesses to assist in the presentation of Applicant's habeas corpus claims. Although initial interviews and consultations have occurred, the OCW is in the process of collecting affidavits and reports from these expert witnesses to be included in the state habeas application.

## III.

## ARGUMENT

Under Texas Code of Criminal Procedure article 11.071, this Court is authorized to grant a single ninety-day extension to a defendant seeking to file an initial state habeas application. Tex. Code Crim. Proc. art. 11.071 § 4(b). The Court may do so if it finds good cause exists, and the ninety days begin counting at the date of the original filing deadline. *Id.* Applicant believes good cause exists in

5

this case to allow ninety days more time to investigate and develop his state habeas petition.

## A. Many Steps Are Still Required in Order to Complete a Full Investigation of the Legal and Factual Grounds for Habeas Relief

Although the OCW has performed significant work on Applicant's behalf since being appointed, much work still remains. Applicant's case is unique in that the prosecution presented a separate and unrelated alleged homicide during the punishment phase of Applicant's trial, with a different set of forensics, witnesses, and crime scene details. A multitude of witnesses have been identified as having relevant information concerning not only circumstances surrounding the alleged crimes, but also Applicant's family life, childhood, adult life, and other important areas of Applicant's background that will likely factor into claims for habeas relief.

In addition, the OCW is working with multiple experts, some of whom are likely to contribute affidavits supporting Applicant's claims. Development of those affidavits is ongoing. Arranging interviews of witnesses and experts, as well as drafting affidavits, will take much of (and likely more than) the next forty-five days. Applicant resided in several counties in Texas throughout his life, and while the majority of witnesses are located in the Houston area, travel from Austin (where the OCW is headquartered) for these interviews and subsequent trips to have affidavits signed and notarized takes considerable time and coordination.

6

: 00592

The development of these witnesses and experts is particularly important for any claims that Applicant wishes to raise regarding ineffective assistance of trial counsel. The CCA has made clear that the ineffective assistance of counsel issue is best raised on habeas corpus, not direct appeal, due to the outside-the-record nature of such claims. *Ex parte Torres*, 943 S.W.2d 469, 475 (Tex. Crim. App. 1997). Capital trial counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *Wiggins v. Smith*, 539 U.S. 510, 523 (2003); *Strickland v. Washington*, 466 U.S. 668, 690-91 (1984). The CCA holds capital trial counsel to a high standard: "It is not sufficient to inquire generally and leave it up to the defendant to raise topics or respond to open-ended questions. Like a doctor, [capital] defense counsel must be armed with a comprehensive check-list of possibilities, and forcefully inquire about each topic." *Ex parte Gonzales*, 204 S.W.3d 391, 400-01 (Tex. Crim. App. 2006). Therefore, in order to identify and fully prove claims of ineffective assistance, Applicant must himself fully investigate to determine whether important areas of evidence were left undiscovered.

**B. Any Legal or Factual Grounds That Are Not Raised in Applicant's Initial Application, But Could Have Been Raised, May Be Procedurally Barred From Future Review**

Applicant must be particularly diligent in the investigation and presentation of his initial state habeas petition. Article 11.071 provides the single and best

7

opportunity to challenge Applicant's conviction. Statements made in the Legislature during the passage of Article 11.071 illustrate this importance.

> And we tell individuals that everything you can possibly raise the first time, we expect you to raise it initially, one bite of the apple, one shot . . . . What we're attempting to do here is say 'raise everything at one time.' You get one bite of the apple. If you have to stick the kitchen sink in there, put it all in there, and we will go through those claims one at a time and make a decision. But none of this 'every week you file a new petition' which is currently basically what happens . . . . The idea is this: you're going to be able to fund counsel in these instances and we are going to give you one very well-represented run at a habeas corpus proceeding. And unless you meet a very fine-tuned exception, you're not going to be able to come back time after time after time.

*Ex Parte Kerr*, 64 S.W.3d 414, 418-19 (Tex. Crim. App. 2002) (quoting Representative Pete Gallego at the second reading of S.B. 440 on the floor of the House of Representatives, May 18, 1995).

The CCA has similarly noted that a habeas application under Article 11.071 is an applicant's one full and fair "bite at the apple." *Ex Parte Medina*, 361 S.W.3d 633, 642 (Tex. Crim. App. 2011). Part of the importance of this Application rests in the effect its filing takes on a defendant's future litigation over his conviction. Under Article 11.071, section 5, "[i]f a subsequent application for a writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application unless" one of three narrow circumstances exists. Tex. Code Crim. Proc. art 11.071 § 5. Therefore all grounds that are available to Applicant must be raised in this initial

8

application or they will be procedurally barred from future review by this Court or the CCA. Similarly, any federal court wishing to review Applicant's conviction will be limited to only the claims raised in the state habeas proceeding. *See Coleman v. Thompson*, 501 U.S. 722 (1991).

In addition, the importance of developing a full record at the state habeas proceeding has recently been extolled by the United State Supreme Court. In *Cullen v. Pinholster*, the Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." 131 S. Ct. 1388, 1398 (2011). As such, Applicant is required to produce both all available claims and all available evidence at the filing of his initial application, lest he lose any opportunities to present them later.

## C. The OCW Has a Full Case Load That Also Requires Attention From Its Staff

As the state agency charged with representing capital defendants in their state habeas proceedings, the OCW is appointed in cases that have resulted in a capital sentence since September 1, 2010. These cases occur all across the state of Texas. With a legal staff of only five full-time attorneys and two investigators, the OCW staff works diligently to provide the highest caliber representation to each of its clients. Recently, the Supreme Court issued rulings implicating the performance of habeas counsel in *Maples v. Thomas*, 132 S. Ct. 912 (2012) and *Martinez v. Ryan*, 132 S. Ct. 1309 (2012). These opinions highlight the necessity,

9

if not constitutional duty, of habeas counsel to perform well in its duty to develop habeas applications.

While the OCW is focused on the development of Applicant's initial state habeas application, it must also devote attention to other cases that have equally pressing deadlines. Over the course of the next six months, the OCW anticipates filing five initial state habeas applications, including Applicant's. An additional ninety-day extension would allow the OCW to manage its case load appropriately and fully investigate and develop this application.

## IV.

## PRAYER FOR RELIEF

For the foregoing reasons, Applicant prays this Court would grant the ninety-day extension authorized under Article 11.071, section 4(b) and extend Applicant's deadline to file his initial state habeas application to May 2, 2013.

Respectfully submitted,

Brad D. Levenson
Director, Office of Capital Writs

DATED:     January 17, 2013

By _____
Janet Gilger
Post-Conviction Attorney

10

: 00599

# IN THE 174TH JUDICIAL DISTRICT COURT
# HARRIS COUNTY, TEXAS

|  |  |
|---|---|
| ———————————— ) | Trial Cause No. |
| EX PARTE ) | 1212366 |
| Teddrick Batiste, ) | |
| APPLICANT ) | |
| ) | |
| ———————————— ) | |

## ORDER

On this date, the Court considered Applicant's Amended Unopposed Motion for Ninety-Day Extension of Time to File Initial State Habeas Application. After due consideration, Applicant's Motion is GRANTED. The initial state application is due on May 2, 2013.

ORDERED AND SIGNED on this 24th day of January, 2013.

Ruben Guerrero
Judge, 174th Judicial District



131 a5

11

: 00597

# CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Amended Unopposed Motion for Ninety-Day Extension of Time to:

Paula Gibson
Criminal Post-Trial
Harris County District Clerk
1201 Franklin Street, 3rd Floor (Suite 3180)
Houston, Texas 77002
(Original and one copy via mail)
(One copy via email to paula_gibson@justex.net)

Honorable Ruben Guerrero
Judge, 174th District Court
Harris County Criminal Justice Center
1201 Franklin, 19th Floor
Houston, Texas 77002
(One copy via mail)
(One Copy – via email to diane_madrid@justex.net)

Harris County District Attorney
ATTN: Lynn Hardaway
1201 Franklin Street, Suite 600
Houston, TX 77002
(One copy via mail)
(One Copy – via email to Hardaway_Lynn@dao.hctx.net)

Court of Criminal Appeals
P.O. Box 112308
Austin, Texas 78711
(Courtesy Copy – via mail)

Teddrick Batiste
Polunsky Unit #999568
3872 FM 350 South
Livingston, Texas 77351
(One Copy – via mail)

: 00598

This certification is executed on January 17, 2013, at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_____
Janet Gilger

13

P25



# IN THE 174TH JUDICIAL DISTRICT COURT
# HARRIS COUNTY, TEXAS

| | | |
|---|---|---|
| | ) | Trial Cause No. |
| EX PARTE | ) | 1212366 |
| Teddrick Batiste, | ) | |
| APPLICANT | ) | |
| | ) | |
| | ) | |

## UNOPPOSED MOTION FOR NINETY-DAY EXTENSION OF TIME TO FILE INITIAL STATE HABEAS APPLICATION

BRAD D. LEVENSON (No. 24073411)
Director, Office of Capital Writs
(E-Mail: Brad.Levenson@ocw.texas.gov)
JANET GILGER (No. 24079978)
(E-Mail: Janet.Gilger@ocw.texas.gov)
Post-Conviction Attorneys
Office of Capital Writs
1700 N. Congress Ave, Suite 460
Austin, Texas 78711
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Applicant

**F I L E D**
Chris Daniel
District Clerk

DEC 1 9 2012

Time: _____
Harris County, Texas
By _____
Deputy

IMAGED

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

## IN THE 174TH JUDICIAL DISTRICT COURT
## HARRIS COUNTY, TEXAS

|                          |   |                        |
|--------------------------|---|------------------------|
| EX PARTE                 | ) | Trial Cause No.        |
| Teddrick Batiste,        | ) | 1212366                |
|    APPLICANT | ) |                     |
|                          | ) |                        |
|                          | ) |                        |

## UNOPPOSED MOTION FOR NINETY-DAY EXTENSION OF TIME TO FILE INITIAL STATE HABEAS APPLICATION

Comes now Teddrick Batiste ("Applicant"), through his attorneys the Office of Capital Writs ("OCW"), and requests this Court grant an extension of time to file his initial state habeas application under article 11.071 of the Texas Code of Criminal Procedure. Article 11.071, section 4(b), authorizes this Court to grant one ninety-day extension for good cause shown. Tex. Code Crim. Proc. art. 11.071 § 4(b). For the reasons set out below, Applicant believes good cause exists to justify the granting of a ninety-day extension, to April 21, 2013, to allow Applicant the opportunity to file a thorough and complete initial state habeas application.[1]

---

[1] The OCW has corresponded with Roe Wilson, Chief, Post-Conviction Writ Division, Harris County District Attorney's Office, regarding this motion. Ms. Roe's office does not oppose this motion and the granting of this extension of time.

2

: 000001

# I.

## PROCEDURAL HISTORY

Applicant is confined under a sentence of death pursuant to the judgment of this Court, case number 1212366, which was entered on June 23, 2011. On that same day, Patrick McCann was appointed as appellate counsel on Applicant's behalf. (7 CR at 1800.)[2] On June 25, 2012, Mr. McCann filed an opening brief on appeal, *Teddrick Batiste v. The State of Texas*, in the Court of Criminal Appeals ("CCA"), cause number AP-76,600. The State's brief in response was filed on December 7, 2012. The issues raised on direct appeal are now before the CCA for consideration.

This Court appointed the OCW on June 23, 2011, to represent Applicant in his state habeas corpus proceedings. Article 11.071 sets the deadline for filing an initial application as the 180th day after the date habeas counsel is appointed or the 45th day after the State files its original brief on direct appeal, which ever date falls later. Tex. Code Crim. Proc. art. 11.071 § 4(a). Therefore, Applicant's initial application for state habeas corpus relief is currently due in this Court on or before January 21, 2013.

---

[2] All citations to CR refer to the original clerk's record of this case, filed on August 15, 2011.

3

## II.

## STATEMENT OF FACTS

Following its appointment, the OCW has endeavored to expeditiously and thoroughly investigate Applicant's background and conviction for any factual and legal grounds for habeas corpus relief, as instructed under Article 11.071, section 3(a).

Applicant's case is unique in that the prosecution presented evidence of an unrelated and uncharged homicide during the punishment phase proceeding of Applicant's trial. As a result, there are two separate and distinct cases to be investigated on Applicant's behalf. The trial transcripts in Applicant's case are thirty-five volumes. Additionally, the OCW has collected and reviewed files created during Applicant's trial, including those held by Applicant's trial counsel, defense team investigators, and various experts hired for either consultation or testimony by the defense team.

To date, the OCW has independently identified and collected various records from Applicant's life history, including educational, medical, criminal, employment, and vital statistic records. The OCW has also completed a substantial independent investigation into Applicant's background and into the circumstances surrounding his conviction of capital murder. At this juncture, the OCW has identified a multitude of witnesses, including many family and friends of

4

Applicant, that have knowledge potentially pertinent to claims Applicant intends to raise in his state habeas Application. While many of those witnesses have been interviewed by post-conviction counsel, some of these interviews are still outstanding. The OCW is in the process of collecting affidavits from these witnesses. Further, the OCW is in the process of identifying additional witnesses that will need to be interviewed.

The OCW has also hired multiple expert witnesses to assist in the presentation of Applicant's habeas corpus claims. Although initial interviews and consultations have occurred, the OCW is in the process of collecting affidavits and reports from these expert witnesses to be included in the state habeas application.

## III.

## ARGUMENT

Under Texas Code of Criminal Procedure article 11.071, this Court is authorized to grant a single ninety-day extension to a defendant seeking to file an initial state habeas application. Tex. Code Crim. Proc. art. 11.071 § 4(b). The Court may do so if it finds good cause exists, and the ninety days begin counting at the date of the original filing deadline. *Id.* Applicant believes good cause exists in this case to allow ninety days more time to investigate and develop his state habeas petition.

5

## A. Many Steps Are Still Required in Order to Complete a Full Investigation of the Legal and Factual Grounds for Habeas Relief

Although the OCW has performed significant work on Applicant's behalf since being appointed, much work still remains. Applicant's case is unique in that the prosecution presented a separate and unrelated alleged homicide during the punishment phase of Applicant's trial, with a different set of forensics, witnesses, and crime scene details. A multitude of witnesses have been identified as having relevant information concerning not only circumstances surrounding the alleged crimes, but also Applicant's family life, childhood, adult life, and other important areas of Applicant's background that will likely factor into claims for habeas relief.

In addition, the OCW is working with multiple experts, some of whom are likely to contribute affidavits supporting Applicant's claims. Development of those affidavits is ongoing. Arranging interviews of witnesses and experts, as well as drafting affidavits, will take much of (and likely more than) the next forty-five days. Applicant resided in several counties in Texas throughout his life, and while the majority of witnesses are located in the Houston area, travel from Austin (where the OCW is headquartered) for these interviews and subsequent trips to have affidavits signed and notarized takes considerable time and coordination.

The development of these witnesses and experts is particularly important for any claims that Applicant wishes to raise regarding ineffective assistance of trial counsel. The CCA has made clear that the ineffective assistance of counsel issue is

6

best raised on habeas corpus, not direct appeal, due to the outside-the-record nature of such claims. *Ex parte Torres*, 943 S.W.2d 469, 475 (Tex. Crim. App. 1997). Capital trial counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *Wiggins v. Smith*, 539 U.S. 510, 523 (2003); *Strickland v. Washington*, 466 U.S. 668, 690-91 (1984). The CCA holds capital trial counsel to a high standard: "It is not sufficient to inquire generally and leave it up to the defendant to raise topics or respond to open-ended questions. Like a doctor, [capital] defense counsel must be armed with a comprehensive check-list of possibilities, and forcefully inquire about each topic." *Ex parte Gonzales*, 204 S.W.3d 391, 400-01 (Tex. Crim. App. 2006). Therefore, in order to identify and fully prove claims of ineffective assistance, Applicant must himself fully investigate to determine whether important areas of evidence were left undiscovered.

### B. Any Legal or Factual Grounds That Are Not Raised in Applicant's Initial Application, But Could Have Been Raised, May Be Procedurally Barred From Future Review

Applicant must be particularly diligent in the investigation and presentation of his initial state habeas petition. Article 11.071 provides the single and best opportunity to challenge Applicant's conviction. Statements made in the Legislature during the passage of Article 11.071 illustrate this importance.

> And we tell individuals that everything you can possibly raise the first time, we expect you to raise it initially, one bite of the apple, one shot

7

. . . .What we're attempting to do here is say 'raise everything at one
time.' You get one bite of the apple. If you have to stick the kitchen
sink in there, put it all in there, and we will go through those claims
one at a time and make a decision. But none of this 'every week you
file a new petition' which is currently basically what happens . . . .
The idea is this: you're going to be able to fund counsel in these
instances and we are going to give you one very well-represented run
at a habeas corpus proceeding. And unless you meet a very fine-tuned
exception, you're not going to be able to come back time after time
after time.

*Ex Parte Kerr*, 64 S.W.3d 414, 418-19 (Tex. Crim. App. 2002) (quoting

Representative Pete Gallego at the second reading of S.B. 440 on the floor of the

House of Representatives, May 18, 1995).

The CCA has similarly noted that a habeas application under Article 11.071

is an applicant's one full and fair "bite at the apple." *Ex Parte Medina*, 361

S.W.3d 633, 642 (Tex. Crim. App. 2011). Part of the importance of this

Application rests in the effect its filing takes on a defendant's future litigation over

his conviction. Under Article 11.071, section 5, "[i]f a subsequent application for a

writ of habeas corpus is filed after filing an initial application, a court may not

consider the merits of or grant relief based on the subsequent application unless"

one of three narrow circumstances exists. Tex. Code Crim. Proc. art 11.071 § 5.

Therefore all grounds that are available to Applicant must be raised in this initial

application or they will be procedurally barred from future review by this Court or

the CCA. Similarly, any federal court wishing to review Applicant's conviction

8

will be limited to only the claims raised in the state habeas proceeding. *See Coleman v. Thompson*, 501 U.S. 722 (1991).

In addition, the importance of developing a full record at the state habeas proceeding has recently been extolled by the United State Supreme Court. In *Cullen v. Pinholster*, the Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." 131 S. Ct. 1388, 1398 (2011). As such, Applicant is required to produce both all available claims and all available evidence at the filing of his initial application, lest he lose any opportunities to present them later.

## C. The OCW Has a Full Case Load That Also Requires Attention From Its Staff

As the state agency charged with representing capital defendants in their state habeas proceedings, the OCW is appointed in cases that have resulted in a capital sentence since September 1, 2010. These cases occur all across the state of Texas. With a legal staff of only five full-time attorneys and two investigators, the OCW staff works diligently to provide the highest caliber representation to each of its clients. Recently, the Supreme Court issued rulings implicating the performance of habeas counsel in *Maples v. Thomas*, 132 S. Ct. 912 (2012) and *Martinez v. Ryan*, 132 S. Ct. 1309 (2012). These opinions highlight the necessity, if not constitutional duty, of habeas counsel to perform well in its duty to develop habeas applications.

9

: 00008

While the OCW is focused on the development of Applicant's initial state habeas application, it must also devote attention to other cases that have equally pressing deadlines. Over the course of the next six months, the OCW anticipates filing five initial state habeas applications, including Applicant's. An additional ninety-day extension would allow the OCW to manage its case load appropriately and fully investigate and develop this application.

## IV.

## PRAYER FOR RELIEF

For the foregoing reasons, Applicant prays this Court would grant the ninety-day extension authorized under Article 11.071, section 4(b) and extend Applicant's deadline to file his initial state habeas application to April 21, 2013.

Respectfully submitted,

Brad D. Levenson
Director, Office of Capital Writs

DATED:     December 13, 2012

By _____
Janet Gilger
Post-Conviction Attorney

10

## IN THE 174TH JUDICIAL DISTRICT COURT
## HARRIS COUNTY, TEXAS

|  |  |  |
|---|---|---|
| _____ | ) | Trial Cause No. |
| EX PARTE | ) | 1212366 |
| Teddrick Batiste, | ) | |
| APPLICANT | ) | |
| _____ | ) | |

## ORDER

On this date, the Court considered Applicant's Unopposed Motion for Ninety-Day Extension of Time to File Initial State Habeas Application. After due consideration, Applicant's Motion is GRANTED. The initial state application is due on April 21, 2013.

ORDERED AND SIGNED on this 19 day of December, 2012

Ruben Guerrero
Judge, 174th Judicial District

11

# CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Motion for Ninety-Day Extension of Time to:

Honorable Ruben Guerrero
Judge, 174th District Court
Harris County Criminal Justice Center
1201 Franklin, 19th Floor
Houston, Texas 77002
(One Copy – via email to diane_madrid@justex.net)

Harris County District Attorney
ATTN: Roe Wilson
1201 Franklin Street, Suite 600
Houston, TX 77002
(One Copy – via mail)

Court of Criminal Appeals
P.O. Box 112308
Austin, Texas 78711
(Courtesy Copy – via mail)

Teddrick Batiste
Polunsky Unit #999568
3872 FM 350 South
Livingston, Texas 77351
(One Copy – via mail)

This certification is executed on December 13, 2012, at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Janet Gilger

: 00011

## IN THE 174TH JUDICIAL DISTRICT COURT
## HARRIS COUNTY, TEXAS

|  |  |
|---|---|
| ) | Trial Cause No. |
| EX PARTE ) | 1212366 |
| Teddrick Batiste, ) | |
| APPLICANT ) | |
| ) | |
| ) | |

## UNOPPOSED MOTION FOR NINETY-DAY EXTENSION OF TIME TO FILE INITIAL STATE HABEAS APPLICATION

**F I L E D**
Chris Daniel
District Clerk

DEC 1 9 2012

Time: _____
Harris County, Texas

By _____
Deputy

BRAD D. LEVENSON (No. 24073411)
Director, Office of Capital Writs
(E-Mail: Brad.Levenson@ocw.texas.gov)
JANET GILGER (No. 24079978)
(E-Mail: Janet.Gilger@ocw.texas.gov)
Post-Conviction Attorneys
Office of Capital Writs
1700 N. Congress Ave, Suite 460
Austin, Texas 78711
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Applicant

: 000612

## IN THE 174TH JUDICIAL DISTRICT COURT
## HARRIS COUNTY, TEXAS

|  |  |  |
|---|---|---|
| EX PARTE<br>Teddrick Batiste,<br>APPLICANT | ) <br> ) <br> ) <br> ) <br> ) <br> ) | Trial Cause No.<br>1212366<br><br>**FILED**<br>Chris Daniel<br>District Clerk<br>DEC **1 9** 2012<br><br>Time: _____<br>Harris County, Texas<br>By_____ |

## UNOPPOSED MOTION FOR NINETY-DAY EXTENSION OF TIME TO FILE INITIAL STATE HABEAS APPLICATION

Comes now Teddrick Batiste ("Applicant"), through his attorneys the Office of Capital Writs ("OCW"), and requests this Court grant an extension of time to file his initial state habeas application under article 11.071 of the Texas Code of Criminal Procedure.  Article 11.071, section 4(b), authorizes this Court to grant one ninety-day extension for good cause shown.  Tex. Code Crim. Proc. art. 11.071 § 4(b).  For the reasons set out below, Applicant believes good cause exists to justify the granting of a ninety-day extension, to April 21, 2013, to allow Applicant the opportunity to file a thorough and complete initial state habeas application.[1]

---

[1] The OCW has corresponded with Roe Wilson, Chief, Post-Conviction Writ Division, Harris County District Attorney's Office, regarding this motion.  Ms. Roe's office does not oppose this motion and the granting of this extension of time.

2

# I.

## PROCEDURAL HISTORY

Applicant is confined under a sentence of death pursuant to the judgment of this Court, case number 1212366, which was entered on June 23, 2011. On that same day, Patrick McCann was appointed as appellate counsel on Applicant's behalf. (7 CR at 1800.)[2] On June 25, 2012, Mr. McCann filed an opening brief on appeal, *Teddrick Batiste v. The State of Texas*, in the Court of Criminal Appeals ("CCA"), cause number AP-76,600. The State's brief in response was filed on December 7, 2012. The issues raised on direct appeal are now before the CCA for consideration.

This Court appointed the OCW on June 23, 2011, to represent Applicant in his state habeas corpus proceedings. Article 11.071 sets the deadline for filing an initial application as the 180th day after the date habeas counsel is appointed or the 45th day after the State files its original brief on direct appeal, which ever date falls later. Tex. Code Crim. Proc. art. 11.071 § 4(a). Therefore, Applicant's initial application for state habeas corpus relief is currently due in this Court on or before January 21, 2013.

---

[2] All citations to CR refer to the original clerk's record of this case, filed on August 15, 2011.

3

## II.

## STATEMENT OF FACTS

Following its appointment, the OCW has endeavored to expeditiously and thoroughly investigate Applicant's background and conviction for any factual and legal grounds for habeas corpus relief, as instructed under Article 11.071, section 3(a).

Applicant's case is unique in that the prosecution presented evidence of an unrelated and uncharged homicide during the punishment phase proceeding of Applicant's trial. As a result, there are two separate and distinct cases to be investigated on Applicant's behalf. The trial transcripts in Applicant's case are thirty-five volumes. Additionally, the OCW has collected and reviewed files created during Applicant's trial, including those held by Applicant's trial counsel, defense team investigators, and various experts hired for either consultation or testimony by the defense team.

To date, the OCW has independently identified and collected various records from Applicant's life history, including educational, medical, criminal, employment, and vital statistic records. The OCW has also completed a substantial independent investigation into Applicant's background and into the circumstances surrounding his conviction of capital murder. At this juncture, the OCW has identified a multitude of witnesses, including many family and friends of

4

Applicant, that have knowledge potentially pertinent to claims Applicant intends to raise in his state habeas Application. While many of those witnesses have been interviewed by post-conviction counsel, some of these interviews are still outstanding. The OCW is in the process of collecting affidavits from these witnesses. Further, the OCW is in the process of identifying additional witnesses that will need to be interviewed.

The OCW has also hired multiple expert witnesses to assist in the presentation of Applicant's habeas corpus claims. Although initial interviews and consultations have occurred, the OCW is in the process of collecting affidavits and reports from these expert witnesses to be included in the state habeas application.

## III.

## ARGUMENT

Under Texas Code of Criminal Procedure article 11.071, this Court is authorized to grant a single ninety-day extension to a defendant seeking to file an initial state habeas application. Tex. Code Crim. Proc. art. 11.071 § 4(b). The Court may do so if it finds good cause exists, and the ninety days begin counting at the date of the original filing deadline. *Id.* Applicant believes good cause exists in this case to allow ninety days more time to investigate and develop his state habeas petition.

5

### A. Many Steps Are Still Required in Order to Complete a Full Investigation of the Legal and Factual Grounds for Habeas Relief

Although the OCW has performed significant work on Applicant's behalf since being appointed, much work still remains. Applicant's case is unique in that the prosecution presented a separate and unrelated alleged homicide during the punishment phase of Applicant's trial, with a different set of forensics, witnesses, and crime scene details. A multitude of witnesses have been identified as having relevant information concerning not only circumstances surrounding the alleged crimes, but also Applicant's family life, childhood, adult life, and other important areas of Applicant's background that will likely factor into claims for habeas relief.

In addition, the OCW is working with multiple experts, some of whom are likely to contribute affidavits supporting Applicant's claims. Development of those affidavits is ongoing. Arranging interviews of witnesses and experts, as well as drafting affidavits, will take much of (and likely more than) the next forty-five days. Applicant resided in several counties in Texas throughout his life, and while the majority of witnesses are located in the Houston area, travel from Austin (where the OCW is headquartered) for these interviews and subsequent trips to have affidavits signed and notarized takes considerable time and coordination.

The development of these witnesses and experts is particularly important for any claims that Applicant wishes to raise regarding ineffective assistance of trial counsel. The CCA has made clear that the ineffective assistance of counsel issue is

6

best raised on habeas corpus, not direct appeal, due to the outside-the-record nature of such claims. *Ex parte Torres*, 943 S.W.2d 469, 475 (Tex. Crim. App. 1997). Capital trial counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *Wiggins v. Smith*, 539 U.S. 510, 523 (2003); *Strickland v. Washington*, 466 U.S. 668, 690-91 (1984). The CCA holds capital trial counsel to a high standard: "It is not sufficient to inquire generally and leave it up to the defendant to raise topics or respond to open-ended questions. Like a doctor, [capital] defense counsel must be armed with a comprehensive check-list of possibilities, and forcefully inquire about each topic." *Ex parte Gonzales*, 204 S.W.3d 391, 400-01 (Tex. Crim. App. 2006). Therefore, in order to identify and fully prove claims of ineffective assistance, Applicant must himself fully investigate to determine whether important areas of evidence were left undiscovered.

## B. Any Legal or Factual Grounds That Are Not Raised in Applicant's Initial Application, But Could Have Been Raised, May Be Procedurally Barred From Future Review

Applicant must be particularly diligent in the investigation and presentation of his initial state habeas petition. Article 11.071 provides the single and best opportunity to challenge Applicant's conviction. Statements made in the Legislature during the passage of Article 11.071 illustrate this importance.

> And we tell individuals that everything you can possibly raise the first time, we expect you to raise it initially, one bite of the apple, one shot

7

> . . . .What we're attempting to do here is say 'raise everything at one
> time.' You get one bite of the apple. If you have to stick the kitchen
> sink in there, put it all in there, and we will go through those claims
> one at a time and make a decision. But none of this 'every week you
> file a new petition' which is currently basically what happens . . . .
> The idea is this: you're going to be able to fund counsel in these
> instances and we are going to give you one very well-represented run
> at a habeas corpus proceeding. And unless you meet a very fine-tuned
> exception, you're not going to be able to come back time after time
> after time.

*Ex Parte Kerr*, 64 S.W.3d 414, 418-19 (Tex. Crim. App. 2002) (quoting

Representative Pete Gallego at the second reading of S.B. 440 on the floor of the

House of Representatives, May 18, 1995).

The CCA has similarly noted that a habeas application under Article 11.071

is an applicant's one full and fair "bite at the apple." *Ex Parte Medina*, 361

S.W.3d 633, 642 (Tex. Crim. App. 2011). Part of the importance of this

Application rests in the effect its filing takes on a defendant's future litigation over

his conviction. Under Article 11.071, section 5, "[i]f a subsequent application for a

writ of habeas corpus is filed after filing an initial application, a court may not

consider the merits of or grant relief based on the subsequent application unless"

one of three narrow circumstances exists. Tex. Code Crim. Proc. art 11.071 § 5.

Therefore all grounds that are available to Applicant must be raised in this initial

application or they will be procedurally barred from future review by this Court or

the CCA. Similarly, any federal court wishing to review Applicant's conviction

8

will be limited to only the claims raised in the state habeas proceeding. *See Coleman v. Thompson*, 501 U.S. 722 (1991).

In addition, the importance of developing a full record at the state habeas proceeding has recently been extolled by the United State Supreme Court. In *Cullen v. Pinholster*, the Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." 131 S. Ct. 1388, 1398 (2011). As such, Applicant is required to produce both all available claims and all available evidence at the filing of his initial application, lest he lose any opportunities to present them later.

**C. The OCW Has a Full Case Load That Also Requires Attention From Its Staff**

As the state agency charged with representing capital defendants in their state habeas proceedings, the OCW is appointed in cases that have resulted in a capital sentence since September 1, 2010. These cases occur all across the state of Texas. With a legal staff of only five full-time attorneys and two investigators, the OCW staff works diligently to provide the highest caliber representation to each of its clients. Recently, the Supreme Court issued rulings implicating the performance of habeas counsel in *Maples v. Thomas*, 132 S. Ct. 912 (2012) and *Martinez v. Ryan*, 132 S. Ct. 1309 (2012). These opinions highlight the necessity, if not constitutional duty, of habeas counsel to perform well in its duty to develop habeas applications.

9

: 00628

While the OCW is focused on the development of Applicant's initial state habeas application, it must also devote attention to other cases that have equally pressing deadlines. Over the course of the next six months, the OCW anticipates filing five initial state habeas applications, including Applicant's. An additional ninety-day extension would allow the OCW to manage its case load appropriately and fully investigate and develop this application.

## IV.

## PRAYER FOR RELIEF

For the foregoing reasons, Applicant prays this Court would grant the ninety-day extension authorized under Article 11.071, section 4(b) and extend Applicant's deadline to file his initial state habeas application to April 21, 2013.

Respectfully submitted,

Brad D. Levenson
Director, Office of Capital Writs

DATED:    December 13, 2012    By _____

Janet Gilger
Post-Conviction Attorney

10

**IN THE 174TH JUDICIAL DISTRICT COURT**
**HARRIS COUNTY, TEXAS**

9581/4/43

|                                  |   |                        |
|----------------------------------|---|------------------------|
| _____        | ) | Trial Cause No.        |
| EX PARTE                         | ) | 1212366                |
| Teddrick Batiste,                | ) |                        |
|            APPLICANT             | ) |                        |
|                                  | ) |                        |
| _____        | ) |                        |

**ORDER**

On this date, the Court considered Applicant's Unopposed Motion for Ninety-Day Extension of Time to File Initial State Habeas Application. After due consideration, Applicant's Motion is GRANTED. The initial state application is due on April 21, 2013.

DEC 19 2012

ORDERED AND SIGNED on this ___ day of December, 2012

Ruben Guerrero
Judge, 174th Judicial District

11

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Motion for Ninety-Day Extension of Time to:

Honorable Ruben Guerrero
Judge, 174th District Court
Harris County Criminal Justice Center
1201 Franklin, 19th Floor
Houston, Texas 77002
(One Copy – via email to diane_madrid@justex.net)

Harris County District Attorney
ATTN: Roe Wilson
1201 Franklin Street, Suite 600
Houston, TX 77002
(One Copy – via mail)

Court of Criminal Appeals
P.O. Box 112308
Austin, Texas 78711
(Courtesy Copy – via mail)

Teddrick Batiste
Polunsky Unit #999568
3872 FM 350 South
Livingston, Texas 77351
(One Copy – via mail)

This certification is executed on December 13, 2012, at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Janet Gilger

12

: 00623



USITED STATES POSTAL SERVICE

$ 01.25⁴
DEC 13 2012
MAILED FROM ZIP CODE 78701

02 1M
0004286372

PRESORTED
FIRST CLASS

OFFICIAL BUSINESS
STATE OF TEXAS
PENALTY FOR
PRIVATE USE

Office of Capital Writs
1700 N. Congress Avenue, Suite 460
Austin, Texas 78711

Honorable Ruben Guerrero,
Judge, 174th District Court
Harris County Criminal Justice Center
1201 Franklin, 19th Floor
Houston. Texas 77002

: 00624

CAUSE NO. **121236601010**

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE **174**TH DISTRICT COURT |
| | § | |
| VS. | § | |
| | § | |
| **BATISTE, TEDDERICK R.** | § | OF HARRIS COUNTY, TEXAS |
| DEFENDANT | § | |

---

### 11.071 WRIT OF HABEAS CORPUS
### OATH OF INDIGENCE/ FINDINGS OF FACT/
### ORDER APPOINTING COUNSEL / STATEMENT OF FACTS

---

#### OATH OF INDIGENCE

TO THE HONORABLE JUDGE OF SAID COURT:

    The defendant has been convicted of capital murder and sentenced to death. Accordingly, defendant notifies the Court that he/she is indigent and asks the court to appoint counsel to represent him/her to pursue a post-conviction writ of habeas corpus. TEX. CODE CRIM. PROC. art. 11.071. The defendant also asks the court to make findings of fact that he/she is indigent and desires counsel appointed to represent him/her on writ of habeas corpus. The defendant further asks the Court to order the Court Reporter to prepare a statement of facts without charge.

Defendant's signature

Sworn and subscribed before me on this date: **JUN 2 3 2011**

Deputy District Clerk

#### ORDER APPOINTING COUNSEL

    The defendant filed an oath of indigence in the above captioned case. After considering the defendant's oath and other evidence presented, the Court FINDS the defendant is indigent and has asked the court to appoint counsel to represent him/her on a writ of habeas corpus. TEX. CODE CRIM. PROC. art. 11.071 (2)(b).

    The Court further FINDS that the Court of Criminal Appeals has approved the attorney listed below to represent indigent defendants on post-conviction death penalty writs.

    Accordingly, the Court ORDERS the **attorney** listed below to represent the defendant on a writ of habeas corpus.

    The Court ORDERS the **Court Reporter** to prepare a statement of facts of the testimony in this case in question and answer form. The Court ORDERS the **District Clerk** to send a copy of this document and the judgment in this case to the attorney appointed to represent defendant on writ of habeas corpus, to Roe Wilson in the Harris County District Attorney's Office, and to the Court Reporter who took the testimony in said cause.

    The Court further ORDERS the **District Clerk** to send a copy of this document and the judgment in this case to the Court of Criminal Appeals immediately.

| | |
|---|---|
| Attorney | Address |
| State Bar Number | City, State, Zip Code |
| Telephone Number | Fax Number |

| |
|---|
| Court Reporter(s) |

**JUN 2 3 2011**

Date Signed

Judge Presiding

101204

CAUSE NO. 1212366

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| vs. | § | HARRIS COUNTY, TEXAS |
| | § | |
| TEDDERICK R. BATISTE | § | 174TH_ JUDICIAL DISTRICT |
| DEFENDANT | § | |

## OATH OF INDIGENCE

TO THE HONORABLE JUDGE OF SAID COURT:

The defendant, **Tedderick Batiste** swears under oath that he is without funds, property or income. The defendant respectfully asks the Court to appoint counsel to represent him in filing an application for a writ of habeas corpus seeking relief from final conviction under TEX. CODE CRIM. PROC. Chapter 11. The defendant also asks the Court to order that a free record be provided to him.

X _Tedderick Batiste_
DEFENDANT

SUBSCRIBED AND SWORN to before me, this **23** day of **June** 2011.

**F I L E D**
Chris Daniel
District Clerk

AUG 25 2011

Time: _____
Harris County, Texas
By_____ Deputy

_____
DEPUTY DISTRICT CLERK
174TH DISTRICT COURT
HARRIS COUNTY, TEXAS

## ORDER APPOINTING COUNSEL

On **June 23, 2011**, the Court conducted a hearing and found that the defendant is indigent.

☑ The Court **ORDERS** that the Office of Capital Writs is appointed to represent the defendant/applicant under TEX. CODE CRIM. PROC. Chapter 11.

☑ The Court **ORDERS** the court reporter to prepare and file the reporter's record without charge to the defendant/applicant.

The Court further **ORDERS** that the clerk of this court send a copy of this order and the judgment in this case to:

(1) the court reporter: **B.J. Orsack**;
(2) Brad Levenson, Director of the Office of Capital Writs, Stephen F. Austin Building, 1700 N. Congress Ave., Suite 460, Austin, Texas 78752.  Phone # 512-463-8502, Fax # 512-463-8590, SPN # 24073411;
(3) the post conviction writs division of the Harris County District Attorney's Office; and
(4) the Court of Criminal Appeals, P.O. Box 12308, Austin, Texas 78711.

The court further **ORDERS** that the Office of Capital Writs send written notification of its acceptance or non-acceptance of this appointment to this Court within thirty (30) days after receiving this Court's appointment.

The court further **ORDERS** that above-named counsel and counsel for the State appear for a status conference on

at 9:00 a.m.   JUN 23 2011

_____
JUDGE PRESIDING, 174TH DISTRICT COURT
HARRIS COUNTY, TEXAS

**RECORDER'S MEMORANDUM**
This instrument is of poor quality
at the time of imaging

IMAGED

: 00626



No. 1212366-A

EX PARTE § IN THE 174TH DISTRICT COURT

§ OF

TEDDRICK BATISTE § HARRIS COUNTY, TEXAS
Applicant

## RESPONDENT'S MOTION FOR EXTENSION OF TIME

COMES NOW the State of Texas, by and through the undersigned Assistant District Attorney, and respectfully requests an extension of time to files its Original Answer in the above-captioned case and for good cause shows the following:

### I.

On May 7, 2013, the applicant filed a writ of habeas corpus, cause no. 1212366-A, with the Harris County District Clerk's Office, pursuant to TEX. CODE CRIM. PROC. ANN. art. 11.071. Pursuant to art. 11.071 §7(A), the Respondent has 120 days after receiving notice of the issuance of the applicant's writ in which to file an answer, and the Respondent may request one 60 day extension of time. TEX. CODE CRIM. PROC. art. 11.071, § 7(a).

### II.

The Respondent is currently engaged in capital habeas litigation in approximately forty (40) Harris County capital murder cases. The Respondent has a two-day evidentiary hearing in September involving one of these cases that requires significant attention. In addition, Respondent has been ordered by the Court of Criminal Appeals to prepare a brief regarding an art. 11.07 writ of habeas corpus and anticipates that oral argument will take place during August or September.

On July 15, 2013, the Respondent spoke with habeas counsel Ryan O'Dell regarding this request for an extension and habeas counsel indicated that he is unopposed.

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging



: 00627

**III.**

Therefore, the Respondent respectfully requests that the Court grant Respondent's motion for a one-time extension of 60 days in which to file its answer in the above-captioned cause, making the answer due on or before November 4, 2013.

SIGNED July 22, 2013.

Respectfully submitted,

_____

JOSHUA REISS
Assistant District Attorney
1201 Franklin
Houston, Texas 77002-1901
TBC No. 14500600
(713) 755-6657
(713) 755-5809 fax

2



No. 1212366-A

| EX PARTE | § | IN THE 174TH DISTRICT COURT |
| | § | OF |
| TEDDRICK BATISTE | § | HARRIS COUNTY, TEXAS |
| Applicant | | |

**Certificate of Service**

A copy of this instrument was delivered by e-mail on July 22, 2013 to habeas

counsel:

> Janet Gilger
> Office of Capital Writs
> 1700 N. Congress Ave.
> Suite 460
> Austin TX, 77002
> (512) 463-8600
> Janet.gilger@ocw.texas.gov

JOSHUA REISS
Assistant District Attorney

3

: 00629

FILED
Chris Daniel
District Clerk

JUL 23 2013

Time: _____
Harris County, Texas
By _____
Deputy

No. 1212366-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 174TH DISTRICT COURT |
| | § | OF |
| TEDDRICK BATISTE , | § | HARRIS COUNTY, TEXAS |
| Applicant | | |

## ORDER

Having considered the Respondent's Motion for Extension of Time, the Court

**GRANTS** the Respondent's Motion and **ORDERS** that the Respondent's Original

Answer be filed on or before November 5, 2013.

SIGNED this 3/ day of July, 2013.

RUBEN GUERRERO
Presiding Judge
174TH District Court

FILED
Chris Daniel
District Clerk

JUL 23 2013

Time: _____
Harris County, Texas
By _____
Deputy

4

:00636



# CHRIS DANIEL
## HARRIS COUNTY DISTRICT CLERK

August 1, 2013

MIKE ANDERSON
DISTRICT ATTORNEY
HARRIS COUNTY, TEXAS

To Whom It May Concern:

Pursuant to Article 11.07 of the Texas Code of Criminal Procedure, please find enclosed copies of the documents indicated below concerning the Post Conviction Writ filed in cause number 1212366-A in the 174th District Court.

☐ State's Original Answer Filed

☐ Affidavit

☒ Court Order Dated July 31, 2013

☐ Respondent's Proposed Order Designating Issues and Order For Filing Affidavit.

☐ Respondent's Proposed Findings of Fact and Order

☒ Other

Sincerely,

Leslie Hernandez, Deputy
Criminal Post Trial

lah

Enclosure(s) – STATE'S MOTION / ORDER FOR EXTENSION OF TIME



# CHRIS DANIEL
### HARRIS COUNTY DISTRICT CLERK

August 1, 2013

JANET GILGER
OFFICE OF CAPITAL WRITS
1700 N. CONGRESS AVE., SUITE 460
AUSTIN, TEXAS 78711

To Whom It May Concern:

Pursuant to Article 11.07 of the Texas Code of Criminal Procedure, please find enclosed copies of the documents indicated below concerning the Post Conviction Writ filed in cause number 1212366-A in the 174th District Court.

☐ State's Original Answer Filed                    ,

☐ Affidavit          ,

☒ Court Order Dated July 31, 2013

☐ Respondent's Proposed Order Designating Issues and Order For Filing Affidavit.

☐ Respondent's Proposed Findings of Fact and Order                    ,

☒ Other

Sincerely,

Leslie Hernandez, Deputy
Criminal Post Trial

lah

Enclosure(s) – STATE'S MOTION / ORDER FOR EXTENSION OF TIME

1201 FRANKLIN  •  P.O. BOX 4651  •  HOUSTON, TEXAS 77210-4651  •  (888) 545-5577

PAGE 1 OF 1                                                    REV: 01-02-04

**Original**

# EX PARTE TEDDRICK R. BATISTE

## CAUSE NO. 1212366-A
## 174TH DISTRICT COURT
## HARRIS COUNTY, TEXAS

FILED
Chris Daniel
District Clerk

NOV 0 5 2013

Time:
By:

# <u>STATE'S ORIGINAL ANSWER</u>

Joshua A. Reiss
Assistant District Attorney
Harris County District Attorney
1201 Franklin St.
Houston TX 77002
713 755 6657
713 755 5240 (fax)
TBC No. 24053738
reiss_josh@dao.hctx.net

: 00633

No. 1212366-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 174th DISTRICT COURT |
| | § | OF |
| TEDDRICK R. BATISTE,<br>Applicant | § | HARRIS COUNTY, TEXAS |

## STATE'S ORIGINAL ANSWER

RESPONDENT, the State of Texas, by and through its Assistant District Attorney for Harris County, files this, its original answer, in the above-captioned cause, having been served with the applicant's writ of habeas corpus, cause no. 1212366-A. The State denies the factual allegations made in the instant application, except those supported by official court documents, and offers the following additional reply.

### I.

### PROCEDURAL POSTURE

The applicant is confined pursuant to a judgment and sentence of the 174th District Court wherein a jury convicted the applicant of capital murder for the robbery and murder of Horace Lee Holiday ("Holiday"). TEX. PENAL CODE § 19.03(a)(2). Based on the jury's answers to the special issues set forth in TEX. CODE CRIM. PROC. art. 37.071 §§ 2(b), 2(e)(1), the trial judge sentenced the applicant to death. TEX. CODE CRIM. PROC. art. 37.071 § 2(g).

1

The Court of Criminal Appeals affirmed the applicant's conviction in an unpublished opinion issued on June 5, 2013. *Batiste v. State*, No. AP-76600, 2013 WL 2424134 (Tex. Crim. App. June 5, 2013)(not designated for publication).

## II.

## SUMMARY OF TRIAL

### State's Evidence at Guilt-Innocence

**CAPITAL MURDER OF HORACE HOLIDAY**

In the early morning hours of April 19, 2009, the applicant "was at home, and . . . just decided to go into the streets" to try to make some money, possibly by stealing a car with "rims" on it or by committing some other crime (XXIV R.R. at 211; XXXV R.R. at 18). The applicant hid his nine-millimeter Glock handgun under the floor mat beneath the brake pedal in his Buick and set out with "Loc," another member of the Crip criminal street gang to which the applicant belonged, riding in the front passenger seat (XXIV R.R. at 215-16; XXVII R.R. at 17; Defense Exhibit R-1 at 2-4, 7, 22; State's Exhibit 133). After cruising around for a while, appellant drove into a parking lot shared by a grocery store and an after-hours nightclub, where people were gathered around their cars (XXVII R.R. at 17; State's Exhibit 133; Defense Exhibit R-1 at 5). There, around 2:30 a.m., the applicant spotted Holiday, the complainant, and Holiday's white Cadillac, that had a set of "rims"

2

: 000635

the applicant thought he could "get [Holiday] for[,]" and sell on the streets for about $3,000 (XXIV R.R. at 215-16; Defense Exhibit R-1 at 5-6).

The applicant stalked Holiday over several miles until, while they were on a highway, the applicant "just made the decision . . . [to] pull up on [Holiday]" (XXIV R.R. at 212-13; Defense Exhibit R-1 at 6-7). Possibly in an attempt to block the applicant from drawing alongside him, Holiday started to move his Cadillac from lane to lane (XXIV R.R. at 212-13). Holiday's efforts were to no avail; the applicant pulled up to Holiday's left, such that the passenger side of the Buick was even with the driver's side of the Cadillac, and four or more shots were fired at Holiday from the Buick (XXIV R.R. at 213, 216; Defense Exhibit R-1 at 8-10). At least three bullets passed through the driver's area of the Cadillac, striking Holiday repeatedly and shattering both windows on the left side of that car (XVI R.R. at 36-45, 49-54, 56-57; XXVII R.R. at 87; State's Exhibit 203 at 13). Though he was severely wounded, Holiday was able to maintain control of the Cadillac and exit the highway, with the applicant still in pursuit (XXIV R.R. at 216-17; Defense Exhibit R-1 at 10). Disappointed that "[Holiday] didn't die or…wreck the [Cadillac]," the applicant considered driving off when he "saw [Holiday] pull into [an Exxon] station" and slowly drift into one of the gas pumps just after 2:55 a.m. (XXIV R.R. at 216-17; Defense Exhibit R-1 at 10). Holiday cried out, honked his

: 00636

horn for help, opened his driver's side door, and then crawled or fell face-down on the ground between the Cadillac and the gas pump; the applicant drove his Buick in two laps around the Exxon station (XIII R.R. at 114-15, 131, 138-43; XXIV R.R. at 216-17, 219-20; Defense Exhibit R-1 at 10-11).

Remembering the rims on the Cadillac, the applicant thought to himself, "[T]his is my chance.  I got to get these wheels" (XXIV R.R. at 216-17, 219-20; Defense Exhibit R-1 at 10).  The applicant pulled over by the Exxon station, told "Loc" to take the Buick to the applicant's wife, grabbed the applicant's nine-millimeter pistol and a black ski mask, and got out of the car (XXIV R.R. at 215; Defense Exhibit R-1 at 11-12).  At approximately 2:58 a.m., the applicant strode across the Exxon parking lot towards the Cadillac, pulling the ski mask over his head and racking the slide on his gun to load a round into the chamber along the way (XIV R.R. at 41, 44, 46-47; XXIV R.R. at 216-17; Defense Exhibit R-1 at 10-12).  As he approached Holiday, who was still lying on his stomach, the applicant fired about four shots at Holiday (XIII R.R. at 25, 119, 131, 143-44; XIV R.R. at 41-52; XV R.R. at 6-7, 133-36; XXIV R.R. at 217-21; Defense Exhibit R-1 at 13-15).  One of the bullets struck Holiday in the head—killing him almost immediately, if he had not yet died from his numerous other gunshot wounds (XVI R.R. at 26-30).

: 000637

Harris County Sheriff's Office Deputies Bryce Curtis ("Curtis") and Mark Gustafson ("Gustafson"), who had been talking in the parking lot of a nearby police substation, heard the gunshots ring out "around the Exxon" (XIII R.R. at 24-25; XV R.R. at 6-7). The officers jumped into their separate vehicles and drove in direction of the gunfire to investigate (XIII R.R. at 25-26; XV R.R. at 7-8).

At the Exxon station, the applicant immediately got into the driver's seat of the Cadillac and put the car in gear, observing that Holiday's blood was all over the interior of the car, thickly covering the steering wheel, and that there was "glass everywhere" from the shattered driver's side windows (XXIV R.R. at 220-22; Defense Exhibit R-1 at 15). Curtis neared the Exxon station just as the applicant was quickly driving the Cadillac out of the Exxon parking lot, headed back to the highway (XIII R.R. at 26; XV R.R. at 9-11). Curtis described the white Cadillac and its flight path to Gustafson over the radio, but remained at the Exxon to call EMS and secure the crime scene (XIII R.R. at 26; XV R.R. at 10-16). Gustafson pursued the applicant onto the highway and "accelerated as rapidly as [he] could[,] trying to catch up with the vehicle" (XIII R.R. at 26-28). As Gustafson chased the applicant at a high rate of speed over several miles, he observed the applicant throw his nine-millimeter handgun and the ski mask out of the driver's window of the Cadillac (XIII R.R. at 30-34, 63-64). Other officers joined the pursuit and, only

5

after a spike strip thrown across the applicant's path destroyed both passenger-side tires on the Cadillac, did the applicant finally stop (XIII R.R. at 30-38, 59-60, 64, 72-77).

The applicant was taken into custody, and was later transported to a police station by Sergeant Sidney Miller with the Homicide Division of the Harris County Sheriff's Office (XIV R.R. at 128-30, 150-51, 159-60). At the station, the applicant voluntarily confessed to the capital murder of Holiday (XIV R.R. at 128-39, 161-66).

### Applicant's Evidence at Guilt-Innocence

The applicant did not present any evidence during the guilt-innocence proceedings (XVI R.R. at 84).

### State's Evidence at Punishment

The majority of the State's punishment evidence centered on an additional capital murder and aggravated robbery in which the applicant participated and organized. The State also presented significant evidence of bad acts committed by the applicant including testimony documenting his juvenile criminal history, extensive involvement with the Crips gang, and an assault on an inmate committed while in the Harris County jail awaiting trial in the instant proceedings.

6

: 00639

**Phat Kats Tattoo Parlor Aggravated Robbery**

In the evening of March 23, 2009, Walter Jones ("Walter"); Kari Jones ("Kari"), Walter's wife; the Joneses' five-year-old son; and David McInnis ("McInnis"), one of Walter's employees, were at Phat Kat Tats tattoo shop, which Walter owned and operated with Kari (XIX R.R. at 165-70, 173-74; XX R.R. at 3-7). Shortly before 11:00 p.m., the applicant parked his Buick in the parking lot that Phat Kat Tats shared with other businesses in the same strip center (XIX R.R. at 177, 195; XX R.R. at 27-30). As Walter was talking on the telephone inside the tattoo parlor, he looked through the glass of his storefront and saw three men walking up to his shop, pulling blue bandanas over their faces as they approached (XIX R.R. at 174-75, 177-78, 200; XX R.R. at 12). The applicant walked into the shop, cocked the semiautomatic pistol in his hand to load a round into the chamber; and screamed, "This is a fucking robbery[!]"(XIX R.R. at 178-81).

In an organized manner, the applicant — the "ringleader" of the three robbers — walked up to Walter and pointed his gun at Walter's face while a second robber held Kari at gunpoint, and the third robber covered McInnis (XIX R.R. at 181-82, 189, 200-02; XX R.R. at 8-9, 12-15; XXIV R.R. at 192-94, 201-02). The three men yelled and cursed at Walter, Kari, and McInnis, took away their cell

7

: 00648

phones, and demanded money from them (XIX R.R. at 182-86, 189; XX R.R. at 8-9). Afraid that her young child would emerge from an adjacent room in the shop, Kari pleaded with the robbers not to panic and shoot the boy if he came out (XIX R.R. at 183-84; XX R.R. at 11-12). Seeing that Kari's appeals were only escalating the robbers' aggression, especially that of the robber who was covering Kari, and fearing that the gunmen would "kill somebody[,]" Walter quickly turned the robbers' attention to the computers and other valuable items in the shop (XIX R.R. at 183-89; XX R.R. at 15-17). The gunmen then "started grabbing a bunch of stuff[,]" including two laptop computers, a Nikon digital camera, three tattoo machines, "wallets, cell phones," and "at least $50 worth of [one-dollar bills]" (XIX R.R. at 182-83, 186-88, 190; XX R.R. at 15-16).

The applicant and his cohorts carried the property to his Buick, and fled the scene as Walter ran after them and attempted to follow them in his own vehicle (XIX R.R. at 188, 192-95). Unable to keep up with the Buick, Walter returned to his shop to await the arrival of the police (XIX R.R. 194-96). Though "[t]he whole robbery probably took maybe four or five minutes, tops[,]" Walter was able to get a good look at the applicant's face and the face of the robber who held Kari at gunpoint because their bandanas "kept sliding down a little bit" (XIX R.R. at 190-91). Walter provided the police with a description of the applicant and the

8

gunman that guarded Kari — and positively identified both men in a photo array shown to him later — but the police were unable to develop leads for any of the three robbers at that time (XX R.R. at 44-46; XIX R.R. at 190-91, 198, 205-07, 209-10; XX R.R. at 25).

## Black Widow Tattoo Parlor Capital Murder of Steve Robbins

On the evening of April 7, 2009, Anthony ("Anthony") and Christie ("Christie") Moore accompanied Anthony's best friend, Joshua Norsworthy ("Norsworthy"), to the Black Widow Tattoo parlor so that Norsworthy could get some tattoo work done (XXI R.R. at 85-87, 123-24; XXII R.R. at 15-16). As Steve Robbins ("Robbins"), the owner and operator of Black Widow Tattoo, got to work tattooing Joshua's arm, Anthony and Christie settled on a small couch at the front of the shop, intending to nap during the four or five hours that it would take Robbins to complete the job (XXI R.R. at 87-88, 124-25; XXII R.R. at 16-18).

At approximately 12:45 a.m. on April 8, 2009, the applicant drove his Buick in a circle through the parking lot of the strip center where Black Widow Tattoo was located, casing the shop (XXI R.R. at 32-33, 37-39, 42-43). Seeing that people were inside, the applicant pulled over behind a nearby restaurant and covered his license plates with duct tape, then drove his Buick back to the strip center, and backed the vehicle in to a parking space in front of the shop (XXI R.R. at 33). The

9

applicant and two other men got out of the Buick and walked into Black Widow

Tattoo (XXI R.R. at 43-44).

Anthony, who had fallen asleep on the couch, "felt like a whiff of wind,"

and "woke up to a gun in [his] face[,]" held by a man who told Anthony, "Don't

fucking move" (XXI R.R. 90-91).  As Anthony nudged Christie awake and tried to

pull her behind him on the couch, he noticed the two other men that had also

come into the shop, holding handguns of their own (XXI R.R. 91-94).  As two of the

gunmen held-up Anthony and Christie near the shop entrance, the third gunman

moved further into the parlor where Robbins was tattooing Norsworthy (XXI R.R.

92-95).  Unable to hear the intruders come into the store over the din of the

tattoo machine, Norsworthy was startled when Robbins abruptly stopped

tattooing; Norsworthy turned his head, saw "a semiautomatic pistol in [his]

face[,]" and followed the gunman's order to move to the middle of the shop and

lay on the floor (XXI R.R. 126-28).  The three gunmen were yelling and "cussing" at

everyone in the store, demanding their wallets and money (XXI R.R. at 133).  The

applicant — who was holding Christie at gunpoint — was in charge of the other

gunmen and appeared to be "[e]xtremely assertive, empowered[,]" and confident

as he issued orders (XXI R.R. at 94-97; XXII R.R. at 19-20; XXIV R.R. at 192-94, 201-

02).

: 00643

The robbers grabbed Norsworthy's wallet and Christie's purse and seemed to be leaving when Robbins stood up, slowly approached the robbers with his hands up and empty, and calmly told the applicant, "[T]his doesn't have to happen"; and that there were surveillance cameras in the shop (XXI R.R. at 98-101, 133-34; XXII R.R. at 22-24). Upon hearing that the robbery had been captured on camera, the applicant turned back to Robbins, said: "What, mother-fucker?", and began shooting (XXI R.R. at 100-02, 114-16, 133-34; XXII R.R. at 23-24).

The applicant shot Robbins several times, fatally wounding him, and then, with one of the other gunmen, began firing at Norsworthy as he sprinted towards the back of the shop (XXI R.R. at 103-04, 134-37; XXII R.R. at 24-25). Anthony pushed Christie onto the floor and covered her with his body while the applicant and another robber fired approximately sixteen shots in the shop before they left (XXI R.R. at 103-04, 134-37; XXII R.R. at 24-25). As Robbins died on the floor, Anthony and Christie ran to where Norsworthy was hiding in a small back room of the shop; the applicant and his two colleagues fled in the applicant's Buick (XXI R.R. at 39-40, 43, 105-10, 137-38; XXII R.R. XXII at 25-27).

Upon being taken into custody for the capital murder of Holiday, the applicant also confessed to participating in the Black Widow capital murder and

11

the Phat Kats aggravated robbery (XIV R.R. at 128-39, 161-66; XX R.R.at 32-42; XXI R.R. at 54-66). In addition, Anthony, Christie, and Norsworthy all positively identified the applicant upon viewing him in live or videotaped live-lineups shown to them after the applicant's confession (XXI R.R. at 113-14, 144-46; XXII R.R. at 29-31).

**Crips Gang Participation and Prison Classification**

Officer Clint Ponder ("Ponder") of the Houston Police Department Divisional Gang Unit testified regarding the significance of multiple Crips street gang tattoos on the applicant's body (XVIII R.R. at 157-200; State's Exhibits 242-72). Ponder testified that the applicant was a member of the Five Deuce Hoover Crips street gang which was involved in a myriad of crime related activities, in particular drug dealing (XVIII R.R. at 166, 170).

Irma Fernandez ("Fernandez") of the Texas Department of Criminal Justice – Correctional Institutions Division ("TDCJ-CID") testified regarding the prison classification system (XIX R.R. at 30-104). Fernandez explained that the Crips gang is considered a security threat group and that Crips members tend to continue their gang related activities, including acts of extortion and assaultive behavior, while incarcerated (XIX R.R. at 36, 39-40, 64). Fernandez testified that gang recruitment continues in prison and that an individual who is a member of a

: 00645

security threat group serving a sentence of life without parole will tend to have

"more influence" over other inmates and be more assaultive (XIX R.R. at 57, 67).

Fernandez said that the applicant was a self-admitted member of the Crips, and

that members of a security threat group like the Crips are not necessarily

incarcerated in an extra security area or unit (XIX R.R. at 46, 52).  On cross-

examination Fernandez testified that she had seen Crips and their rival gang the

Bloods get along in prison, "many" prisoners sentenced to life without parole in

the general prison population conduct themselves in an appropriate manner, and

all units have administrative segregation available for an "obstinate" inmate (XIX

R.R. at 95, 98).

**Bad Acts in the Harris County Jail While Awaiting Trial**

While awaiting trial for the instant capital murder, the applicant was

investigated and/or disciplined for multiple infractions of Harris County Jail rules

including assault on an inmate, unauthorized contact with staff, failure to obey an

order, possession or manufacture of an intoxicant, and possession/manufacture

of a weapon (XVIII R.R. at 129-48; State's Exhibit 229-41).

Robert Dean ("Dean") testified about the applicant's activities and behavior

while they were incarcerated in the same area of the Harris County jail.  Dean said

that the atmosphere in the pod went from "peaceable to unpredictable" once the

: 000645

applicant arrived, that the applicant and two friends tried to assault him, and his

prior incarceration in the TDCJ-CID was "more peaceful" than his stay in the Harris

County jail with the applicant and his Crip friends (XIX R.R. at 112, 129, 133, 135).

Specifically he testified that the applicant was the leader of a group of inmates

that would pick fights with other (particularly older) inmates, steal other inmate's

property, and trade the stolen goods for contraband cigarettes (XIX R.R. at 114,

117, 121). Dean told the jury that the applicant acknowledged being a member of

the Crips, "bragged" about being incarcerated for a capital murder, and indicated

that he had "nothing to live for" (XIX R.R. at 125-26).

**TYC Psychological Intake Assessment**

Scott Kreiger, a licensed psychological associate and counselor testified

regarding the March 29, 2004 psychological intake assessment he conducted of

the applicant when he was incarcerated at TYC for unauthorized use of a motor

vehicle (XVIII R.R. at 36-98). The applicant was not mentally retarded and had an

MMPI score was 89, one point short of normal, but was functioning at a higher

level than his scores would indicate (XVIII R.R. at 46-47, 62). In his MMPI the only

scale that was elevated was the scale that measured his energy level; individuals

who score higher on this scale are "impulsive," and "prefer action over thought

and reflection" (XVIII R.R. at 59). The applicant was diagnosed with disruptive

: 00647

behavior disorder unspecified and cannabis dependence (XVIII R.R. at 48). The applicant provided no indication that he had been sexually abused or had a family history of emotional disorder (XVIII R.R. at 50-51). The applicant indicated that he was associated with a gang (XVIII R.R. at 58). The applicant said that it made him irritable to think about his crime victims (XVIII R.R. at 51-52).

On cross-examination Kreiger indicated that the applicant never met his biological father, had relatives involved in crime and drugs, and that these could be "risk factors" for his poor conduct and judgment (XVIII R.R. 77, 81). Additionally, Kreiger testified that the applicant's elevated personality traits of "impulsivity" and a preference for "action over thought and reflection" could become a "risk factor" of future conduct if raised "in a community of violence" (XVIII R.R. at 71-72). Kreiger also told the jury that in the structured environment of TYC the applicant's Global Assessment Functioning score rose indicating that he was "benefitting" from TYC's structure (XVIII R.R. at 75-76).

**Victim Impact Testimony**

Lisa Harmon ("Harmon"), Holiday's mother, and Mayola Holiday, Holiday's grandmother, testified about the impact of his death on their respective lives (XXII R.R. at 49-75). Harmon testified that Horace had two children, graduated from high school, saved money to buy the Cadillac and "rims", and that a piece of her

: 00648

heart has been broken by his capital murder (XXII R.R. at 52-54, 64).

## Applicant's Evidence at Punishment

The applicant presented a comprehensive case at punishment involving the testimony of twelve (12) witnesses.

## Classification

The majority of the applicant's classification evidence was presented by expert Dr. Mary Elizabeth Pelz, Ph.D. ("Dr.Pelz"), Dean of the College of Public Service at the University of Houston-Downtown (XXIII R.R. 26-113).   Dr. Pelz interviewed the applicant and reviewed his criminal history (including all of the cases presented by the State during punishment), documents from any prior incarceration (including TYC), and employment records (XXIII R.R. at 28).  Pelz indicated that she had a working knowledge of how classification works within the TDCJ-CID as it was part of her job function when she worked as a correctional counselor at Ramsey Unit from 1983-1986 and she has "kept up" with the issue (XXIII R.R. at 28).

Dr. Pelz testified that: studies indicate that prisoners sentenced to life without parole are "very manageable" and "do not illustrate" an increase in acts of violence while incarcerated; inmates sentenced to life without parole are more likely to obey prison rules because they will need to keep as many privileges as

: 00649

possible in order to survive; an inmate's previous behavior in prison is more important than the actual crime committed to determine how someone in prison will behave in the future; she was not aware of the applicant having any disciplinary issues while previously incarcerated in state jail; and, the applicant's physical altercations in the Harris County jail while awaiting trial would not be "seriously considered" for his inmate classification (XXIII R.R. at 27-30, 43, 50-52, 59, 110).

On cross-examination Dr. Pelz acknowledged that: as a G-3 the applicant would be free to move around other inmates, chaplains and volunteers; an inmate with a history of extorting other inmates "could" give the jury some guidance as to how they would behave in the TDCJ-CID; and, while an assault of another inmate is not considered a serious infraction among inmates it is a criminal act of violence (XXIII R.R. at 93-97). Nevertheless, Dr. Pelz maintained that the applicant's future behavior in prison would become "tempered" as he gets older and institutionalized (XXIII R.R. at 97-98).

Sgt. David Davis of the Harris County Sheriff's Office Classification Unit testified that the applicant's Harris County jail disciplinary records contain no record that he ever had any physical contact with the jail staff (XVIII R.R. at 6).

: 000658

## School and Work History

Gary Thiebaud, the head football coach at Cypress Ridge High School testified that the applicant was a gifted athlete and knew that the applicant had been in trouble with the law which is why he matriculated into ninth grade during the spring (XXIII R.R. at 115-16). The applicant did well in athletics, presented no disciplinary problems, and benefitted from the program's highly structured nature (XXIII R.R. at 121). Thiebaud testified that he considered the applicant to be a "follower" influenced by those around him and encouraged the applicant to look beyond his neighborhood and consider using his athletic talents towards a college degree. Thiebaud told the jury that he "lost" the applicant after spring football when he left the structure of the sports program and became involved in car thefts (XXIII R.R. at 118-19, 122).

Kristopher McSherry, the plant manager for Forge USA, testified regarding the applicant's work history. McSherry told the jury that: the applicant was a helper of a forging crew; the work was physically demanding and often required working more than eight hours per day; he never had any issues with the applicant's job performance; and, he was shocked when the applicant was charged with capital murder (XXIII R.R. at 130-36, 147). On cross-examination McSherry testified that the applicant lied about the circumstances of his 2007

18

unauthorized use of a motor vehicle conviction on his job application; McSherry still hired the applicant because the applicant indicated that he was "desperate to find a job to feed his family" (XXIII R.R. at 145-46).

**Family Members and Friends**

Stephanie Soliz ("Soliz"), the applicant's girlfriend, testified that the applicant was the "best" father to their biological son Alex and Kash, her son from a different relationship (XXIII R.R. at 155). The applicant took care of her, Alex, and Kash financially, he regularly bathed and clothed the boys, and was trying to be a positive influence of the children while in the Harris County jail (XXIII R.R. at 155-58). On cross-examination, Soliz acknowledged that she and the applicant smoked marihuana at their home on a regular basis and that people from the neighborhood would routinely bring stolen goods into their home for the applicant to sell (XXIII R.R. at 168-70). Soliz also testified that members of the Crips gang would come into their home (XXIII R.R. at 167).

Terry Soliz, Soliz's mother, testified that the applicant was a loving influence on Kash and cared for the infant more than anybody else after he was born (XXIII R.R. at 6-7). She also told the jury that the applicant was always "very respectful" to her, took care of her when she was sick, and that she was "shocked" by the capital murder (XXIII R.R. at 11-12).

19

: 000652

Kevin Noel ("Noel"), the applicant's brother, testified that the applicant was a loving brother, and a "good father" who "takes care of his family" (XXIV R.R. at 26, 30). Noel told the jury that he did not know the applicant was a member of the Crips, and that tattoos are a common practice in their neighborhood (XXIV R.R. at 26). On cross-examination, Noel acknowledged that the applicant wrote him a letter in which he directed Noel to contact a mutual friend "OG Rome" and tell him to visit the applicant in jail so that the applicant could tell him something; Noel said that "OG" stands for "original gangster" (XXIV R.R. at 40, 43). Noel also testified that he was a member of the Bloods criminal street gang and that the applicant wrote him a letter from the Harris County jail in which he gave Noel advice on the type of gang tattoo he should receive (XXIV R.R. 44-45, 51).

Micala Lara ("Lara"), the applicant's friend, testified that the applicant and Soliz lived with her and her husband, Ricardo, in Denton, Texas during 2007 when Ricardo helped the applicant get a job in the area (XXIV R.R. 56-60, 65). Lara told the jury that the applicant got along with everyone, treated his own children well, was respectful to Soliz and loved her (XXIV R.R. at 62). On cross-examination Lara acknowledged that the applicant wrote her and her husband a letter from the Harris County jail in which he discussed assaulting another inmate and making contraband liquor; the letter also contained Crips gang imagery (XXIV R.R. at 67-

: 00653

71).

Beverly West, the applicant's cousin, testified that she: has known the applicant all of his life; his mother was fifteen years-old when she gave birth to the applicant; the applicant always treated her with respect; and, she never saw the applicant disrespect any family members (XXIV R.R. at 74-80).

Darlene Beard ("Beard"), the applicant's grandmother, testified about various aspects of the applicant's childhood (XXIV R.R. at 80-92). The applicant is her "favorite" grandchild (XXIV R.R. at 85). According to Beard, the applicant: was born in her home because no one knew that his mother was pregnant; was respectful to other family members; attended church as a child; and never had a father figure in his life (XXIV R.R. at 86-90).

Rowena Scott ("Scott"), the applicant's mother, testified that she and the applicant moved around quite a bit when he was young and that her relationship with his step-father had a "bad effect" on him (XXIV R.R. at 97, 107). Scott told the jury that the applicant had meningitis as a child but otherwise was healthy, and presented no "mental problems" or learning disabilities (XXIV R.R. at 98). Scott said that the applicant can follow rules and that it would be possible for him to be a positive influence on his children while in prison (XXIV R.R. at 110-11).

: 000654

**Testimony of Teddrick Batiste**

On direct examination the applicant described his upbringing, relationship with Soliz and their children, gang membership, criminal acts, and remorse.

- *Childhood and School*: The applicant testified that his grandfather was a positive influence on him but that he died while the applicant was in state jail (XXIV R.R. at 113-14). He attended a series of schools in Houston as his mom kept moving and sold Ritalin in middle school to make money (XXIV R.R. at 118). The applicant would listen to his coach Gary Thiebaud, but after he left TYC, the "goal" of school disappeared (XXIV R.R. at 119-20). He acknowledged that it was his fault that he did not listen to Thiebaud (XXIV R.R. at 120).

- *Family*: The applicant testified that his relationship with Soliz developed while he was in TYC and that he decided to play a fatherly role in Kash's life because he knew that Kash's biological father had no interest in raising the child (XXIV R.R. at 123-25). He acknowledged that he had let his family down and understood that he needed to teach Kash and Alex right from wrong (XXIV R.R. at 126-27).

- *Forge Industries*: The applicant testified that he paid the rent and other bills with the money he earned from Forge Industries, but that his hours

22

: 00655

were cut as the economy soured and he started selling stolen goods to make up the difference (XXIV R.R. at 133-35).

- *Gang Membership*:  The applicant acknowledged being a member of the Crips but planned to "distance" himself from the gang in prison and "do what I have to do to renounce them" (XXIV R.R. at 138).  He testified that he intended to follow all the rules in prison (XXIV R.R. at 142).

- *Criminal Acts and Remorse*:  The applicant acknowledged killing Horace Holiday, Robbins, and participating in the Phat Kats aggravated robbery (XXIV R.R. at 136).  He expressed remorse for his actions:

> Q. (By Mr. Cornelius) Why are you sorry?
>
> A. Because I know ain't no right to take nobody's life, didn't even have a right to take anything from anybody because of the problems I was going through.  Could have been other ways to get around it. I let material things, you know, get ahold of me. Can't blame nobody but myself. And just I was wrong for what I did. No other explanation, you know.
>
> Q. Mr. Ramirez just said that whatever happened is your fault.
>
> A. Yes, sir.
>
> Q. You admit that?
>
> A. Yes, sir.

23

: 00656

(XXIV R.R. at 226-27).

On cross-examination the applicant acknowledged his role in the two capital murders and aggravated robbery and provided an explanation for the rap lyrics contained in various letters he composed while in the Harris County jail (XXIV R.R. at 190-224).

- *Holiday Capital Murder*: The applicant testified that even though he knew that Holiday had been shot and heard him crying for help he felt Holiday could still protect himself at the gas station; he also acknowledged putting on a on a ski mask and throwing his firearm out of the car in order to facilitate the crime (XXIV R.R. at 218, 221-23). The applicant denied that he put window tint on his Buick to facilitate his crimes and insisted that it was to protect his children from the sun (XXIV R.R. at 160-61).

- *Phat Kats Aggravated Robbery*: The applicant told the jury that he was in charge of the Phat Kats aggravated robbery and recruited fellow Crips gang members to participate (XXIV R.R. at 192-93).

- *Black Widow Capital Murder*: The applicant testified that: he led and planned the capital murder; he shot Robbins first as Robbins was coming toward him to protect his customers; and he shot at Norsworthy as he

24

ran away toward the back of the shop (XXIV R.R. at 201, 204-05, 207-08).

- *Rap Lyrics*: The State questioned the applicant about rap lyrics contained in several letters he composed while in the Harris County jail (XXIV R.R. at 182-89, 192-93). The lyrics describe his feelings regarding Stephanie Soliz's new love interest, his murder of Holiday, and his active participation in the Phat Kat aggravated robbery (XXIV R.R. at 184, 186, 192-93). The applicant explained that the lyrics did not necessarily reflect his actual feelings and that eighty-five percent of his lyrics are "hype music" (XXIV R.R. at 184-86, 227-28).

**Exhibits**

Prior to resting its case trial counsel introduced twenty-one documents into evidence including: (1) the applicant's juvenile and TYC files; (2) the applicant's juvenile psychological evaluations; (3) the applicant's letters composed while in the Harris County jail; (4) the applicant's employment and educational records (XXIV R.R. at 6-14; Defendant's Exhibit 1-20, 31). These documents contained attached "flags" placed on the documents by both the State and defense to highlight certain information (XXIV R.R. at 7).

: 00658

III.

## REPLY TO THE APPLICANT'S CLAIMS OF
## INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

The applicant makes twelve (12) claims of ineffective assistance of trial counsel: (1) failure to discover and present evidence regarding the applicant's frontal lobe damage; (2) failure to present a gang expert to rebut evidence of the applicant's gang involvement; (3) failure to present an expert to explain the relevance of the applicant's life history; (4) failure to properly investigate and prepare lay witnesses for testimony; (5) failure to investigate and present additional witnesses to strengthen the applicant's mitigation case; (6) failure to present evidence that the applicant would not be a future danger; (7) failure to adequately prepare the applicant to testify; (8) failure to challenge the prosecution's use of the applicant's jail letters during the punishment phase of trial; (9) failure to sufficiently preserve error; (10) failure to follow American Bar Association guideliens by requesting and accepting a flat fee as compensation; (11) failure to sufficiently preserve error by making a proper, timely First Amendment objection to the introduction of religious scapular evidence; and (12) failure to generally preserve the record for appeal. *Applicant's Writ at 15-30, 30-52, 53-93, 94-116, 117-31, 132-48, 149-60, 161-77, 179-83, 191-97, 203-11, 228-32.*

: 00659

**Overview of Representation**

The applicant was represented by trial counsel R.P. "Skip" Cornelius and

Gerald Bourque.  Trial counsel filed forty-four (44) motions or legal memoranda

with the trial court (I C.R. 5-7, 8-10, 11-16, 17-18, 19-25, 26-28, 30, 63-65, 69-95,

96-106, 107-09, 110-13, 132-44, 145-58, 159-62, 163-71; III C.R. at 860-75; V C.R.

at 1431-1456, 1457-59, 1460-69, 1470-72, 1473-77, 1478-81, 1482-84, 1485-90,

1491-94, 1495-1499; VI C.R. at 1500-102, 1503-06, 1507-15, 1516-23, 1524-1595,

1596-1606, 1607-1635, 1635-1640, 1641-1643, 1644-1663, 1664-72, 1673-1680,

1722-28, 1729-30, 1734-1737, 1738-41, 1742-52).  Trial counsel conducted a pre-

trial motion to suppress hearing regarding the applicant's statement during the

guilt-innocence phase of trial (XI R.R. at 8-75).   Trial counsel conducted a

comprehensive voir dire from April 26, 2011 until May 5, 2011.  As part of their

pre-trial investigation, trial counsel retained the services of experts on

psychology, addiction, mitigation, investigation, and criminal justice (I C.R. at 69-

95, 96-106, 107-09, 132-44, 145-58, 159-62; III C.R. at 860-75).  In addition to the

twelve (12) witnesses presented during the punishment phase of trial, trial

counsel cross-examined twenty-four of the State's witnesses (XIII R.R. at 63-68,

128-33, 154-59; XIV R.R. at 3-23, 93-100, 149-67, 187-89; XV R.R. at 46-53, 90-97,

157-60; XVI R.R. at 73-77, 80-83; XVIII R.R. at 33-35, 63-91, 97; XIX R.R. at 73-99,

: 00660

136-49, 150-58, 160-65; XX R.R. at 21, 46-56, 57, 123-44, 169-78; XXI R.R. at 18-27, 74-80, 116-121, 152-161, 163; XXII R.R. at 3-11, 31-44, 46-49).

**Pertinent Law**

The United States Supreme Court held in *Strickland v. Washington,* 466 U.S. 668, 686; 104 S.Ct. 2052, 2064 (1984), that the benchmark for judging any claim of ineffective assistance of counsel is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. The Court in *Strickland* set forth a two-part standard, which has been adopted by Texas. *Hernandez v. State*, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986).

First, the defendant must prove by a preponderance of the evidence that counsel's representation fell below an objective standard of reasonableness. *Narvaiz v. State*, 840 S.W.2d 415, 434 (Tex. Crim. App. 1992) (citing *Strickland*, 466 U.S. at 688). Reasonably effective assistance of counsel does not require error-free counsel. *Hernandez*, 726 S.W.2d at 58. Second, to obtain habeas corpus relief under *Strickland*, an applicant must show that his counsel's performance was deficient and that there is a "reasonable probability," one sufficient to undermine confidence in the result, that the outcome would have been different but for his counsel's deficient performance. *Ex parte Chandler*, 182 S.W.2d 350,

: 000661

354 (Tex. Crim. App. 2005).

Whether a defendant has received effective assistance is to be judged by "the totality of the representation," rather than isolated acts or omissions of trial counsel. *Ex parte Raborn*, 658 S.W.2d 602, 605 (Tex. Crim. App. 1983). In evaluating a *Strickland* claim, it is presumed that trial counsel made all significant decisions in the exercise of professional judgment. *Delrio v. State*, 840 S.W.2d 443, 447 (Tex. Crim. App. 1992). The Court will not use hindsight to second-guess a tactical decision made by trial counsel. *Ex parte Chandler,* 182 S.W. 2d at 359. Moreover, trial counsel is not ineffective simply because another attorney might have employed a different strategy. *Strickland,* 466 U.S. at 689.

## Filing Affidavits by Trial Counsel

A complete and comprehensive original answer to the applicant's claims of ineffective assistance of trial counsel necessitates trial counsel's respective insights into their investigation and strategy that may not necessarily be apparent from a review of the record. Ordinarily an attorney is not permitted to reveal privileged information relating to the representation of a client. *See Pope v. State*, 207 S.W.3d 352, 357-59 (Tex. Crim. App. 2006) (discussing scope of attorney work product doctrine); *see also* Tex. R. Evid. 503(b); ABA Rules of Professional Conduct 1.6(a). However, an attorney may disclose such

29

: 00662

information to the extent reasonably necessary to respond to allegations concerning the lawyer's representation or to comply with a court order such as an order for affidavit. ABA RULES OF PROFESSIONAL CONDUCT 1.6(b)(5), 1.6 (b)(6). Indeed, Texas and Fifth Circuit jurisprudence recognize that a defendant who lodges an ineffective assistance claim waives attorney-client privilege with respect to the specific facts in the ground for relief. *See Ex parte Mowbray*, 943 S.W.2d 461, 467 n. 3 (Tex. Crim. App. 1996 ) (Keller, J. dissenting); *United States v. Wines*, 691 F.3d 599, 612 n. 21 (5th Cir. 2012); *see also Formal Op. 10-456*, at p. 2 (citing RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 80(1)(b) & cmt. c (2000) ("A client who contends that a lawyer's assistance was defective waives the privilege with respect to communication relevant to that contention. Waiver affords to interested parties fair opportunity to establish the facts underlying the claim.").

The Code of Criminal Procedure provides the trial court with authority to order that affidavits be filed responsive to factual issues material to the legality of the applicant's confinement. TEX. CODE CRIM. PROC. art. 11.071 §9(a). In fact, affidavits are often used to resolve such factual claims. *Ex parte Broadway*, 301 S.W.3d 694, 696 (Tex. Crim. App. 2009) (trial court considered affidavit from attorney accused of ineffective assistance of counsel to enter findings of fact and conclusions of law). Therefore, the State respectfully requests that the trial court

order trial counsel R.P. "Skip: Cornelius and Gerald Bourque to file affidavits responsive to the applicant's allegations of ineffective assistance of counsel. (The applicant's claims of ineffective assistance of appellate counsel do not necessitate a filing affidavit from direct appeal counsel Patrick McCann).

Nevertheless, and without waiving any additional argumentation that may result from trial counsels' affidavits, the State offers the following answer to the applicant's multiple claims of ineffective assistance of counsel. Simply put, none of the applicant's claims withstand scrutiny and all should be denied.

## REPLY TO APPLICANT'S FIRST GROUND FOR RELIEF

The applicant contends that he suffers from frontal lobe damage. *Applicant's Writ at 15-30.* In support of this contention he has attached to his writ the affidavit of neuropsychologist Dr. James Underhill, Psy.D. ("Dr. Underhill"). *Applicant's Writ Exhibit 1, affidavit of Dr. James Underhill.* Based on his post-conviction examination of the applicant, Dr. Underhill advances that the applicant's frontal lobe damage affects that part of his prefrontal cortex that controls risk taking. *Id.* at ¶ 23. As a result the applicant is unlikely to stop risky behavior once it has begun. *Id.* at ¶ 28. Dr. Underhill believes that Ritalin, a dopamine reuptake inhibator available to prisoners in the TDCJ-CID, can treat the disorder. *Id.* at ¶ 34.

31

: 000664

As a result of Dr. Underhill's analysis, the applicant avers that trial counsel was ineffective for failure to engage a neuropsychologist, discover his frontal lobe condition, and advance a mitigation defense involving his general cognitive functioning. *Applicant's Writ at 29-30*. However, a review of the record reflects that trial counsel conducted a thorough pre-trial investigation of the applicant's psychological health. Moreover, his argument that Ritalin can treat his disorder is undercut by evidence the applicant points to in his writ involving his behavior while in state jail.

Trial counsel sought funding for and retained three experts pertinent to the applicant's claim for relief: psychologist Dr. Jolie Brams, psychologist Dr. Matthew Mendel, and Dr. Terry Rustin, M.D., an expert in substance abuse (I C.R. at 69-95, 132-44, 145-58). None of these experts testified at trial.

While the applicant acknowledges that these experts were retained, he omits that they each reviewed records pertinent to the case and consulted with trial counsel regarding their observations and findings. Indeed, underscoring the apparent thoroughness of the pre-trial investigation, Dr. Brams conducted a four (4) hour forensic interview with the applicant, and Dr. Rustin interviewed him for three (3) hours. *State's Writ Exhibit A, invoice of Dr. Jolie Brams*; *State Writ Exhibit B, invoice of Dr. Terry Rustin*. Apparently, this investigation failed to detect

: 000005

any indicia of Frontal Lobe dysfunction.[1]  Under these circumstances, trial counsel cannot be shown to have conducted a deficient pre-trial investigation of the applicant's mental health.  *See Ex parte McFarland*, 163 S.W.3d 743, 754 (Tex. Crim. App. 2005) (trial counsel conducted an adequate pre-trial investigation when he read a leading treatise, reviewed the state's files, filed multiple pre-trial motions, hired an investigator, and consulted with other attorneys).

The applicant's claim is also undercut by Dr. Kreiger's trial testimony that the applicant's MMPI-A score evidenced that he was impulsive, and preferred action over thought and reflection (XVIII R.R. at 59-60).  As a result, Dr. Underhill's findings are cumulative of similar punishment evidence and fail to overcome the egregious nature of the applicant's two capital murders and an aggravated robbery committed in the space of a month.  *See Scott v. Ryan*, 686 F.3d 1130, 1134-35 (9th Cir. 2012) (holding that post-conviction evidence of the defendant's head injuries and seizures would not have made a difference in the outcome of trial).

---

[1]  The magnitude of the applicant's alleged frontal lobe disorder is vague.  According to Dr. Underhill evidence of the applicant's dysfunction is demonstrated, in part, by his score on the Iowa Gambling Test in which a "majority" of a representative sample of the United States population scored better than the applicant.  *Applicant's Writ Exhibit 1* at ¶ 27.  Under his vague explanation "majority" could mean that the applicant simply was in the bottom fifty percent of a representative sample.  Moreover, Dr. Underhill does not explain whether this test was adjusted for age, race, gender, or education.

Further weakening the applicant's claim is the disciplinary record of his state jail incarceration that is attached as an exhibit to his writ. *Applicant's Writ Exhibit 25, state jail disciplinary records.* No disciplinaries were found on the applicant's record while incarcerated in the Lynchner unit. *Id.* This is consistent with the information the applicant provided Dr. Pelz (XXIII R.R. at 59). Importantly, the applicant presents no evidence that Ritalin was involved with his ability to conform to prison rules. As a result, Dr. Underhill's conclusion that medication can address the applicant's alleged dysfunction is empirically incorrect. Accordingly, the applicant's claim for relief should be denied. *Strickland,* 466 U.S. at 700; *Ex parte Miller*, 330 S.W.3d 610, 617-22 (Tex. Crim. App. 2009) (ineffective assistance of counsel claim denied for failure to demonstrate constitutionally unreasonable performance or prejudice).

## REPLY TO APPLICANT'S SECOND GROUND FOR RELIEF

The applicant claims that trial counsel was ineffective for failure to present an expert to assist the jury in understanding the nature of his gang involvement. *Applicant's Writ at 30-53.* In essence he advances that the expert would have helped the jury understand that his involvement with the Crips was "limited" and that he was not a "hard core" gang member. *Id.* at 30, 48.

Simply put, the applicant's contention is contrary to the significant

34

evidence of his gang involvement contained in the record including multiple photographs of his gang tattoos and acknowledgement to jail classification officers that he was a member of the Crips. *State's Original Answer at 12-13, supra.* Indeed, on direct examination, the applicant did not characterize his gang affiliation as "limited"; rather he told the jury that he intended to "distance" himself from the gang in prison and "do what I have to do to *renounce* them," an indication that he was indeed a "hard core" member (XXIV R.R. at 138) (emphasis added).

Moreover, excluding his gang involvement, the remaining evidence against the applicant -- two capital murders, an aggravated robbery, and multiple convictions for unauthorized use of a motor vehicle, and an assault on an inmate -- is of such strength that the applicant cannot demonstrate prejudice. *See Ex parte Martinez*, 330 S.W.3d 891, 902-04 (trial counsel not ineffective for failure to object to gang related evidence when the remaining evidence against the defendant was "strong"); *Henderson v. Cockrell*, 333 F.3d 592, 601 (5th Cir. 2003) (trial counsel not ineffective for failure to object to evidence of the defendant's gang affiliation given the "brutal and senseless nature of the crime, the evidence of Henderson's utter lack of remorse, and the extremely strong evidence of guilt").

: 000068

## REPLY TO APPLICANT'S THIRD GROUND FOR RELIEF

The applicant contends that trial counsel should have retained and presented a social historian to "create a social history" of his life for the jury's consideration. *Applicant's Writ at 53-94.* Importantly, the applicant presents no case law to support the thrust of his claim regarding prevailing professional norms: in addition to hiring a mitigation specialist to gather evidence regarding a defendant's social history,[2] trial counsel "must" retain an expert in social history to "synthesize that information into a coherent psycho-social narrative for presentation to the jury." *Id.* at 53.

According to the applicant, the social historian would have been able to weave the various aspects of his life into a single narrative to explain that he "simply could not manage the pushes and pulls of a delinquent life – particularly living in a socially disorganized neighborhood where gang affiliation and delinquent behavior are at best accepted and at worst glorified." *Id.* at 92. This narrative would include his birth to a teenage mother, the lack of a father-figure in his life, the instability of his years living with his grandmother and his mother's frequent changes in residence, the impact of the juvenile justice system and TYC on his development, how he tried to provide for his family, and the role of gangs

---

[2]  Trial counsel retained Gina Vitale as a mitigation expert (I C.R. at 96-106).

: 00069

in his community. *Id.* at 56-93.

A review of the record reflects that this is the very testimony presented by defense counsel during punishment. *State's Original Answer at 19-24, supra.* However, it was presented by the parties who actually comprise the social fabric of the applicant's family, rather than a third-party social historian.[3]  Moreover, as to the theme that the socially disorganized nature of his community contributed to his actions, both trial counsel emotionally made this very argument in closing argument.  Mr. Cornelius told the jury "You know, the saddest thing about this case for me is I know without a doubt that if he were my son, he wouldn't be here. We would -- I would be watching him play football on Sunday"  (XXV R.R. at 44).  Mr. Bourque argued:

> What I've talked to you about is just this.  Even when he thinks he's leading, he's still following.  When he was working 80 hours and 100 hours a week and he was bringing home that paycheck, the vultures were hanging outside the apartment and watching and waiting. Because if he had had a dad, his dad would have said to him: Son, times are going to get tough.  Okay?  You're not going to get to work 90 hours every week, every day forever. Times are going to get tough. Put money aside for that rainy day.  And he didn't have anybody that cared enough to teach him any of those lessons.

(XXV R.R. at 25).

---

[3]  In addition, the State notes that the overwhelming majority of the social historian's testimony would have been hearsay. TEX. R. EVID. 802.

37

Accordingly, the applicant fails to demonstrate deficient performance or prejudice and his claim for relief should be denied. *Strickland*, 466 U.S. at 700; *Coble v. Quarterman*, 496 F.3d 430, 441 (5th Cir. 2007) (trial counsel not ineffective for presenting family history in outline form as part of mitigation case).

## REPLY TO APPLICANT'S FOURTH GROUND FOR RELIEF

The applicant contends that none of his lay witnesses were properly prepared to testify by trial counsel. *Applicant's Writ at 94-117.* As a result, he contends that: social history testimony of Rowena Scott, Darlene Beard, and Beverly West was not fully developed; Stephanie Soliz, Kevin Noel, and Micaela Lara were vulnerable to cross-examination, and Gary Thiebaud and Kristopher McSherry ultimately provided harmful testimony. *Id.* at 97-102, 102-11, 111-16.

While all witnesses subject to cross-examination may provide testimony that weakens their direct examination, the record reflects a different picture of the pre-trial preparation and resulting mitigation case presented by trial counsel through these lay witnesses. Cumulatively, through direct examination, the witnesses set forth a clear and detailed picture of the applicant. The child of a teenage mother who frequently moved her residence during his formative years, the applicant lacked a father-figure in his life, worked in a difficult and physically demanding job to support the family he loved, assumed a fatherly role to a non-

: 000671

biological child, and was a gifted athlete in an inner-city high school who ultimately did not overcome the challenges of his neighborhood. *State's Original Answer at 19-24, supra.* In addition, the applicant testified at length to explain his life story in context for the jury to consider including his family, work, and educational history. *State's Original Answer at 22-24, supra.*

In sum, the record reflects that trial counsel's preparation for trial, and preparation of the lay witnesses, was constitutionally reasonable and did not prejudice the applicant. Accordingly, the applicant's claim is without merit and should be denied. *Cf. Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (trial counsel ineffective for failing to investigate mitigating evidence and only present testimony from three witnesses that the defendant was a "nice" boy and the tape recorded statement of a psychiatrist); *see Coble*, 496 F.3d at 441 (trial counsel effective for presenting a mitigation case including a "significant number of witnesses who testified regarding his background" including his time in a state home and "positive factors relating to his wife and children").

: 00672

## REPLY TO APPLICANT'S FIFTH GROUND FOR RELIEF

The applicant avers that trial counsel was ineffective for failure to present the testimony of ten (10) family members and friends. *Applicant's Writ at 117-31.* Four of these witnesses were interviewed by the applicant's mitigation expert. *Id.* at 118. According to the applicant, these witnesses would have testified that "he was the product of three generations of poverty, teenage pregnancy, residential instability, and a lack of positive male role models. He was also searching desperately for a way out of the path he was on, a person who helped other people and provided for his family when he could." *Id.* at 131. In essence they would have provided the <u>same</u> evidence the applicant presented through the lay witnesses who testified. *State's Original Answer at 18-22, supra.*

In sum, the applicant's claim is a *Strickland* "double failure" that fails to demonstrate deficient performance or prejudice and should be denied. *Strickland,* 466 U.S. 700; *Coble,* 496 F.3d at 441; *see Ruiz v. Stephens,* 728 F.3d 416, 424-27 (5th Cir. 2013) (defendant did not suffer prejudice by trial counsel's failure to develop evidence of his "bleak" childhood given the violent nature of capital murder coupled with his multiple attacks on guards and inmates while awaiting trial).

: 00673

## REPLY TO APPLICANT'S SIXTH GROUND FOR RELIEF

The applicant contends that trial counsel rendered constitutionally deficient representation for failure to present "any" evidence that he "was not likely to commit criminal acts of violence in the future." *Applicant's Writ at 132*. The core of his claim is that Dr. Pelz "was not utilized . . . in an appropriate manner" because she was not asked her expert opinion regarding whether or not Batiste would be a future danger. *Id.* at 136. Outside the presence of the jury, trial counsel placed on the record that he made a strategic decision not to ask Dr. Pelz her opinion as to the applicant's future dangerousness (XXIII R.R. at 73). According to the applicant, if Dr. Pelz had been utilized properly the jury would have heard that he was not likely to be a future danger because his age, education, employment history, desire to maintain privileges, and most importantly, his prior state jail incarceration all indicated that he would adapt to a secure prison environment in a positive, non-violent way.[4] *Applicant's Writ at 148*.

Dr. Pelz was retained by the defense to be an expert in criminal justice. She communicated with trial counsel prior to her testimony and was aware of the

---

[4] Since his conviction and sentence, the applicant has apparently lost privileges for use of force against a prison guard. The applicant related the following in a July 8, 2013 letter to Miss Jade Evans: "June 13, I got a use of force on me cause I assaulted a officer who tried to play them games and some stuff you don't do. I tried to stab him but I missed and only nicked him. He got the point. I didn't wonna seriously hurt him, just let him know not me." *State's Writ Exhibit C at 7, applicant's letter.*

: 000674

topics she would be asked on direct examination.  *Applicant's Writ Exhibit 4 at ¶ 11.*

Contrary to the applicant's contention that defense counsel did not present "any" evidence regarding future dangerousness, the record reflects that trial counsel used Dr. Pelz in a comprehensive manner.  On the matter of an inmate's previous behavior in prison (the factor the applicant considers to be the most important) Dr. Pelz testified that: prior incarceration behavior is more important than the actual crime committed to determine how someone will behave in prison in the future; she was not aware of the applicant having any disciplinary issues while previously incarcerated in state jail; and, the applicant's physical altercations with other inmates in the Harris County jail would not be "seriously considered" for his inmate classification.  Regarding the general behavior of prisoners sentenced to life without parole, Dr. Pelz testified that studies indicate that these prisoners are "very manageable" and "do not illustrate" increased acts of violence while incarcerated.  On the topic of privileges, Dr. Pelz told the jury that inmates sentenced to life without parole are more likely to obey prison rules because they will need to keep as many privileges as possible in order to survive.  Regarding age, Pelz maintained that the applicant's future behavior in prison would become "tempered" as he got older and institutionalized (XXIII R.R. at 27-

: 00675

30, 43, 50-52, 59, 97-98, 110).

In sum, far from failing to present "any" evidence regarding future dangerousness, through Dr. Pelz trial counsel set forth the majority of the factors regarding an assessment of future dangerousness that the applicant considers to be relevant, including the absence of any disciplinary actions against the applicant while he was incarcerated in state jail. Failing to demonstrate constitutionally deficient performance or prejudice, the applicant's claim should be denied. *Strickland*, 466 U.S. at 700; *Ex parte Miller*, 330 S.W.3d at 617-22.

## REPLY TO APPLICANT'S SEVENTH GROUND FOR RELIEF

Notwithstanding his on the record acknowledgement he talked with trial counsel "at length" about his decision to testify (XXIV R.R. at 226), the applicant now advances that he was not adequately prepared by trial counsel. *Applicant's Writ at 149.* The applicant's claim suffers in two significant respects and should be denied.

First, the applicant claims that there was not "proper preparation" of his testimony. *Applicant's Writ at 155.* However, an alleged lack of "proper" presentation indicates that there was preparation. The applicant's claim is noticeably absent any discussion or evidence regarding the amount of time he spent with trial counsel regarding his testimony and anticipated areas of cross-

43

: 000676

examination.  As a result, the applicant's claim is conclusory, vague, and he does not plead sufficient facts to justify relief.  *Ex parte Medina*, 361 S.W.3d at 637.

Second, the record does not support the applicant's allegation that his testimony suffered from a lack of preparation.   While the applicant's cross-examination was rigorous (as would be expected given that he had to acknowledge his participation and leadership role in two capital murders and an aggravated robbery), a complete review of the record reflects a detailed, methodical, and well prepared direct examination testimony that elicited important evidence pertaining to his upbringing, love of family, desire to leave the Crips, and remorse. *See State's Original Answer at 22-25, supra.*  Accordingly, the applicant fails to demonstrate constitutionally deficient representation or prejudice and his claim for relief should be denied. *Strickland*, 466 U.S. at 700; *Ex parte Miller*, 330 S.W.3d at 617-22.

## REPLY TO APPLICANT'S EIGHTH GROUND FOR RELIEF

The applicant avers that trial counsel was ineffective for the manner in which they dealt with hundreds of pages of letters he wrote to family and friends while in the Harris County jail. *Applicant's Writ at 161-78*.  In advance of trial, the State filed and served a "Supplemental Notice of the State's Intent to Use Extraneous Offenses and Prior Convictions for Impeachment and/or Punishment"

: 00677

(VI C.R. at 1426-30). This supplemental notice provided trial counsel with notice of the State's intent to introduce the contents of the applicant's jail letters into evidence. The letters could easily be authenticated by multiple defense witnesses including the applicant, Kevin Noel, Micaela Lara, and Rowena Scott. TEX. R. EVID. 901(b)(2). A number of the letters contain sexually suggestive and/or violent lyrics, including one in which his lyrics describe Holiday's murder (XXIV R.R. at 186).

The applicant contends that trial counsel should have presented an expert witness to place the rap lyrics in the context of the typical "hyperbolic and grandiose language" of hip hop music and culture. *Applicant's Writ at 163-64*. He also advances that trial counsel was deficient in not adequately preparing witnesses (including him) to answer questions on cross-examination about the letters. *Applicant's Writ at 174-75*. For four reasons, these claims do not withstand scrutiny and both should be denied.

At a threshold level, the notion that music lyrics, regardless of genre, are often expressive, grandiose, and a vehicle for the lyricist to express their inner emotions is not a concept alien to the typical lay person on a jury. Indeed, "hip hop" music and culture is not an emerging phenomenon, it is a well established art form. For example, a jury would not have required an expert to assist them to

45

: 00678

understand that the following lyric expresses introspection about his predicament: "[I] built my own bridge, but I sliped [sic] and now I free fall" (XXVIII R.R. at 77). As a result an expert's specialized knowledge would not have been necessary to "assist" the jury to understand the applicant's lyrics and their "hip hop" context. SEE TEX. R. EVID. 702; *cf. Fielder v. State*, 756 S.W.2d 309, 321 (Tex. Crim. App. 1988) (defense expert allowed to testify about why a woman who was physically and sexually abused would stay in a relationship with her abuser because the average lay juror "has no basis for understanding the conduct of a woman who endures an abusive relationship").

Second, an expert's testimony that the applicant's "boasts and braggadocio" constituted "hypemusic" (*Applicant's Writ at 168-69*) would have been the same as the applicant's trial testimony (XXIV R.R. at 184, 227-28). As a result, the expert's testimony would have been cumulative. TEX. R. EVID. 403.

Third, trial counsel appears to have made a strategic decision to deal with the content of the letters by introducing them into evidence themselves in order to highlight some of their positive elements while not exploring them in particular detail so as to call attention to some of their negative qualities (XXV R.R. at 10-11). Portions of the letters were "flagged" to highlight pertinent sections (XXV R.R. at 7). Trial counsel explained the strategic decision to the jury in closing

: 00679

argument:

> The things I want to talk about in the record, we got the flags. And I will tell you -- as the 12 of you sit here, I will tell you there are reasons that there are flags there. If you want to read some more about the foul language he uses and disgusting street stuff that he does with his hypemusic, you can read all about it. It's flagged. If you want to read about him as he talks to his uncles and brothers and his family about what he's done to himself, those are flagged in there as well. If you, as a human being, are motivated by anger, vengeance, and vitriol, then there's plenty of it flagged by the State in there for you to kill him. If, on the other hand, you're motivated by love, compassion, and understanding, there's information in here that will help you.

(XXV R.R. at 21). Jurisprudence is clear that scrutiny of this strategic decision must be highly deferential, and the possibility that another attorney would have employed a different strategy did not render trial counsel ineffective in the instant case. As the Supreme Court emphasized in *Strickland*, "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689.

Fourth, the applicant has not demonstrated that he was prejudiced by the introduction of his letters and lyrics into evidence. Indeed, the rap lyrics constituted only a small portion of the trial testimony and argument (XXIV R.R. at

144, 182-89, 192-93, 227-28; XXV R.R. at 21, 58, 76). Reviewing the entirety of the record, including evidence that the applicant, as an active member of the Crips gang, organized and carried out two capital murders and an aggravated robbery and proceeded to assault and extort inmates in the Harris County jail while awaiting trial, the applicant fails to satisfy *Strickland*'s second prong and his claim for relief should be denied. *Strickland*, 466 U.S. at 700; *Ex parte Miller*, 330 S.W.3d at 617-22.

### REPLY TO APPLICANT'S ELEVENTH GROUND FOR RELIEF

The applicant complains that trial counsel was ineffective for failure to make fifty-five (55) various objections involving hearsay, improper impeachment, and/or relevance. *Applicant's Writ at 192 n. 62-64*. However, the applicant chooses to discuss only eight (8) specific objections he believes trial counsel should have made, deeming these the most "egregious"; he leaves the State and the Court to guess about the specifics of the remainder from the record cites in his footnotes. *Id. at 192 n. 62-64, 193*. As a result the applicant "does not allege specific facts so that anyone reading the writ application would understand precisely the factual basis for his legal claim." *Ex parte Medina*, 361 S.W.3d at 637-38. Accordingly, his claim for relief involving these forty-seven objections should be denied.

48

With regard to the eight (8) allegedly "egregious" examples, the applicant contends that Soliz and Noel were impeached with improper character evidence that harmed their credibility and "crippled" his mitigation case. *Applicant's Writ at 197.* Specifically, he contends that Noel was harmed by evidence of his membership in the Bloods gang, Soliz was harmed by a suggestion that she stole cars with the applicant, and both were harmed by cross-examination testimony that they smoked marihuana with the applicant. *Applicant's Writ at 193-96.* The applicant's claim does not withstand scrutiny.

At a threshold level, examining the totality of Soliz's and Noel's testimony, it is clear that they did not "cripple" his mitigation case. Indeed, they provided evidence favorable to the applicant regarding his love for Kash and Alex and desire to provide for them. *State's Original Answer at 19-21, supra.* Soliz, testified that the applicant was the "best" father (XXIII R.R. at 155). Noel testified that the applicant was a loving brother, and a "good father" who "takes care of his family" (XXIV R.R. at 26, 30).

Regarding Noel's involvement with the Bloods gang, questions in this area were relevant evidence for the jury to consider given that the applicant wrote him a letter from the Harris County jail in which he gave Noel advice on the type of gang tattoo he should receive (XXIV R.R. 44-45, 51). TEX. R. EVID. 401; TEX. CODE

00682

CRIM. PROC. art. 37.071 §2(a)(1). Noel's gang involvement was also relevant in light of a letter the applicant wrote him in which he directed Noel to contact a mutual friend "OG Rome" and instruct him to visit the applicant in jail so that the applicant could tell him something; Noel said that "OG" stands for "original gangster" (XXIV R.R. at 40, 43).

The applicant's complaints about cross-examination questions of Soliz and Noel regarding their marihuana use also suffers from the reality of the record. Indeed, the applicant acknowledged on cross-examination that he would regularly spend $150 per week on marihuana for his home (XXIV R.R. at 159). Coupled with the enormity of the other punishment evidence presented by the State the applicant cannot demonstrate prejudice. Accordingly, the applicant's claim is meritless and should be denied. *Strickland*, 466 U.S. at 700; *Ex parte Miller*, 330 S.W.3d at 617-22.

## REPLY TO APPLICANT'S THIRTEENTH GROUND FOR RELIEF

The applicant's claim stems from the State's introduction of Exhibit 141, a blue Santa Muerte scapular he wore at the time of his arrest (XIV R.R. at 184; XVIII R.R. at 172-74). Trial counsel lodged the following objection: "Our objection is going to be relevance, lack of foundation on the part of the witness. Not that they didn't try to get it in. And a 403 objection." (XVIII R.R. at 177). Upon

: 000683

the trial court overruling this objection and its introduction into evidence, Ponder testified that Crips normally associate themselves with the color blue and that "Santa Muerte is a saint that a lot of guys will worship to ward off the police" (XVIII R.R. at 175). Ponder acknowledged that non-gang members and non-criminals also wear the Santa Muerte scapular, and he did not advance that the applicant wore the scapular in furtherance of his faith (XVIII R.R. at 176).

The applicant contends that trial counsel was ineffective for failing to lodge a First Amendment objection. *Applicant's Writ at 203-12*. To prevail on his claim, the applicant must demonstrate that the trial judge would have committed error in overruling the objection had it been made. *Ex parte White*, 160 S.W.3d 46, 53 (Tex. Crim. App. 2004).

The Court of Criminal Appeals has determined that even if trial counsel had lodged a First Amendment objection the trial judge would not have abused his discretion in overruling that objection. *Batiste*, 2013 WL 2424134 at *4 n. 6 (discussing cases from other jurisdictions regarding the Santa Muerte scapular). The Court explained that at "no time did the prosecutor or the gang expert suggest that the necklace had any significance to the exercise of a bone fide religion":

51

: 000084

> In this case, Officer Ponder never referred to appellant's religious beliefs or affiliations; he simply stated that the Crips gang uses the color blue as was used in the necklace and that the "grim reaper" pendant is used by criminal gangs. The logical connection to be made is between "Santa Muerte" necklace and gang membership and criminal activities, not between wearing a "Santa Muerte" necklace and being religious or being Catholic.

*Id.* at *4. The Court also concluded that the applicant was not prejudiced by the introduction of the scapular, noting that "the time spent discussing the necklace was one-twentieth the time spent on appellant's tattoos, which were a much more graphic display of appellant's criminal-gang affiliation." *Id.*

In light of the Court of Criminal Appeals' opinion, it is clear that trial counsel did not render ineffective assistance for failure to lodge a meritless First Amendment objection and that the applicant was not prejudiced by the introduction of the Santa Muerte scapular given the other compelling evidence of his gang activity. *See Kinnamon v. State*, 791 S.W.2d 84, 97 (Tex. Crim. App. 1990) (holding counsel not ineffective for failing to request jury charge on lesser-included of murder when the evidence did not support such charge). The Court's opinion also indicates that appellate counsel made an objectively reasonable decision to not raise a point of error on direct appeal regarding trial counsel's alleged ineffectiveness. *Cf. Ex parte Miller*, 33 S.W.3d 610, 624-25 (Tex. Crim.

: 00685

App. 2009) (appellate counsel ineffective for failure to raise a "lead pipe cinch" claim). Accordingly, the applicant's claim for relief should be denied.

## REPLY TO APPLICANT'S SIXTEENTH GROUND FOR RELIEF

The applicant complains that trial counsel was ineffective for consenting to twenty-seven (27) off-the-record conferences. *Applicant's Writ at 228-33*. As a result he contends that a "substantial and crucial portion" of the record is missing and he was denied meaningful appellate review. *Applicant's Writ at 232*. He also insists that there are "few contextual clues" for these off-the-record conferences. *Id.* The applicant's claim reveals that it should be denied for three distinct reasons.

First, under normal circumstances the trial record is insufficient to raise a claim of ineffective assistance of trial counsel. *Ex parte Nailor*, 149 S.W.3d 125, 130 (Tex. Crim. App. 2004). However, the applicant's claim clearly stems from a matter apparent from the trial record. As a result it should have been raised on direct appeal and cannot now be reviewed on habeas. *Ex parte Banks*, 769 S.W.2d at 540.

Second, the off-the-record conferences do not constitute a "substantial and crucial portion" of the trial transcript that the applicant asks this Court to adopt as the standard of prejudice. The applicant points to *United States v. Selva*, 559 F.2d

: 00685

1303, 1305-06 (5th Cir. 1977), as persuasive authority for the proposition that he was prejudiced by the off-the record conferences.  In *Selva* the reporter's record of the entire closing argument was missing because the court reporter became ill, his tape recorder malfunctioned, and it was impossible to reconstruct a verbatim account.  *Id.* at 1304-05.  While expressly rejecting a "mechanistic approach," the Fifth Circuit concluded that because a "substantial and significant portion[5] of the record is missing, and the appellant is represented on appeal by counsel not involved in trial" he was entitled to a new trial.  *Id.* at 1306.

The instant application is easily distinguishable from *Selva*.  At its core, *Selva* concerned what standard of prejudice should apply when an administrative error has occurred during trial; it did not involve whether or not the trial attorney "made the adversarial testing process work in the particular case."  *Strickland*, 466 U.S. at 690.  Indeed, the record of the applicant's trial comprises thousands of pages of voir dire, testimony, and argument contained within twenty-four (24) volumes.  There are no missing sections of an entire phase of the trial, nor does the applicant advance such a claim.  As a result, the applicant fails to satisfy the very "substantial and significant" prejudice standard he advances.

---

[5]  The applicant has accidentally misstated the test as "substantial and crucial."

: 00687

Third, the applicant's claim that there are "few contextual clues for determining the subject matter" of the off-the-record conferences is not supported by an examination of the record. For example, it is apparent that least two of the conferences pertain to administrative matters involving the scheduling of testimony (XX R.R. at 57; XXI R.R. at 120), one relates to whether the jury should be given a break (XVIII R.R. at 90), and one concerns identification of an individual whose cell phone continued to ring during the proceeding (XVIII R.R. at 25-26). Through the lens of a voluminous trial record, the failure to record such matters does not constitute deficient performance, nor can the applicant demonstrate any prejudice and his claim for relief should be denied. *See Jackson v. Johnson*, 150 F.3d 520, 524-26 (5th Cir. 1998) (appellate counsel was not ineffective for failure to submit for appellate review a videotape that had been the subject of the defendant's motion to suppress).

## IV.

## REPLY TO THE REMAINDER OF THE APPLICANT'S CLAIMS FOR RELIEF

In addition to his multiple claims of ineffective assistance of counsel, the applicant lodges six (6) claims of due process violations. None of these claims withstand scrutiny and all should be denied.

## REPLY TO APPLICANT'S NINTH GROUND FOR RELIEF

The applicant complains that the State violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny for failure to disclose that witness Anthony D. Moore ("Moore"), one of the three witnesses to the Black Widow capital murder, was convicted in Michigan in 2003 of uttering & publishing and larceny and was an absconder from supervision at the time of trial. *Applicant's Writ at 179-83*; *Applicant's Writ Exhibit 24 at 2*.  The applicant's claim fails for two reasons and should be denied.

A prosecutor has an affirmative duty to disclose material, exculpatory evidence in her possession. *Brady*, 373 U.S. at 87.  When, as in the instant matter, an applicant asserts a *Brady* claim in a post-conviction writ of habeas corpus, the applicant bears the burden of proving, by a preponderance of the evidence, the facts that would entitle him to relief. *Ex parte Richardson*, 70 S.W.3d 865, 870 (Tex. Crim. App. 2002).  The applicant must satisfy a three-part test: (1) the State failed to disclose evidence, regardless of the prosecution's good or bad faith; (2) the withheld evidence is favorable to the applicant; and, (3) the evidence is material, that is, there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different. *Id.*; *Hampton v. State*, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002); *Webb v. State*, 232 S.W.3d 109,

114 (Tex. Crim. App 2007). However, *Brady's* scope has very real limits. Jurisprudence is clear that an applicant must satisfy all parts of the three-part test. *Strickler v. Greene*, 527 U.S. at 263, 282 (1999) (relief denied for failure to satisfy materiality requirement); *Webb*, 232 S.W.3d at 114 (same).

The standard of materiality of undisclosed evidence is whether the omitted evidence creates a reasonable doubt of guilt that did not otherwise exist. *United States v. Agurs,* 427 U.S. 97 (1976); *United States v. Bagley,* 473 U.S. 667 (1985) (holding evidence is material where there is reasonable probability that, if disclosed, result of proceeding would have been different). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Ex parte Adams,* 768 S.W.2d 281 (Tex. Crim. App. 1989) (adopting materiality standard set forth by Supreme Court in *Bagley*). The mere possibility that undisclosed information might have helped the defense or might have affected the outcome of the trial does not establish materiality. *Agurs,* 427 U.S. at 110; *Stone v. State,* 583 S.W.2d 410 (Tex. Crim. App. 1979).

Moreover, *Brady* jurisprudence also recognizes the realities and scope of modern day government. Although the Supreme Court recognizes the obligation of imputed knowledge, i.e., the prosecution team being imputed with the knowledge of the police in a particular case, the Supreme Court has also

distinguished that a prosecutor "has a duty to learn of any favorable evidence known to the others *acting on the government's behalf in the case*, including the police." *Kyles v. Whitley*, 514 U.S. 419, 427 (1995) (emphasis added); *Harm v. State*, 183 S.W.3d 403, 406 (Tex. Crim. App. 2006). If a government agency, acting in the scope of its normal activities, possessed possible impeachment information about a State's witness, it does not necessarily follow that a prosecutor breached due process for failing to disclose its contents to the defense. That government agency must be involved in the prosecution of the case in question. *See Kyles*, 514 U.S. at 427; *Harm*, 183 S.W.3d at 403; *Avila v. Quarterman*, 560 F.3d 299, 307-08 (5th Cir. 2009).

At a threshold level, the applicant's claim fails because knowledge of Moore's Michigan criminal history cannot be imputed to the prosecutors during the applicant's trial. The State has attached the credible affidavits of Harris County Assistant District Attorney Traci Moore Bennett ("Bennett") and Investigator Donald Cohn ("Cohn"). Bennett explains that when she ran Moore's criminal history on June 1, 2011 his Michigan offenses were not reflected. *State's Writ Exhibit D, affidavit of Traci Moore Bennett.* Cohn investigated the discrepancy and explains that this administrative error was the result of Moore's FBI number not being electronically linked to his Texas State Identification

58

: 00691

number in the NCIC/TCIC system. *State's Writ Exhibit E, affidavit of Donald Cohn*.

As a result the State did not possess knowledge of Moore's out-of-state criminal

history so the applicant cannot satisfy *Brady*'s first-prong. *Kyles*, 514 U.S. at 427;

*Harm*, 183 S.W.3d at 406-08 (impeachment evidence in the possession of Child

Protective Services cannot be imputed to the prosecution when the records were

in the possession of a state agency uninvolved in the prosecution of the

defendant).

Additionally, the applicant fails to satisfy the *Brady* materiality prong.

Indeed, the applicant confessed that he led and planned the Black Widow capital

murder, shot Steve Robbins first as Robbins was coming toward him to protect his

customers, and shot at Norsworthy as he ran away (XXIV R.R. at 201, 204-05, 207-

08). Such facts do not demonstrate a reasonable probability that the result of the

punishment proceeding would have been different had he been able to impeach

Moore with his Michigan criminal history. *Strickler*, 527 U.S. at 263; *Webb*, 232

S.W.3d at 114. Accordingly, the applicant's claim for relief should be denied.

## REPLY TO APPLICANT'S TENTH GROUND FOR RELIEF

The applicant contends that he was denied due process as a result of juror

misconduct and that appellate counsel was ineffective for failure to raise juror

misconduct as a claim on direct appeal. *Applicant's Writ at 181-91*. The

: 00692

applicant's claim fails for two reasons.  First, it is a record claim that could, and should, have been raised on direct appeal.  Second, the trial court's inquiry into the event, coupled with its multiple admonishments to the jurors, resolved any potential prejudice.

On June 14, 2011, during the second day of the applicant's punishment hearing, juror Upshaw became emotionally upset while riding in the elevator on her way up to court when a man wearing a turquoise color shirt and tattoos of guns and initials behind both ears talked to and stood close to her in an elevator that was not crowded (XIX R.R. at 3-4).  Juror Coleman was in the elevator and they discussed the incident (XIX R.R. at 3-4).  When Upshaw and Coleman reached the jury room they talked with the other jurors about what transpired and there was discussion among the jurors about their safety (XIX R.R. at 4-5, 7-8).  In chambers, each of the jurors was then questioned individually by the trial court about the incident and each said that it would not affect their respective judgments and that they could consider all of the evidence; trial counsel did not request a mistrial (XIX R.R. at 4-7, 7, 15-27).  The trial court regularly admonished the jurors after this incident that they were not to discuss the case among themselves (XIX R.R. at 73, 215; XX R.R. at 181-82; XXI R.R. at 82, 165; XXII R.R. at 49, 76-77).

: 00693

The applicant's claim clearly stems from an incident that was apparent from the record.  As a result it should have been raised on direct appeal and cannot now be reviewed on habeas.  *Ex parte Banks*, 769 S.W.2d at 540.  Accordingly, the applicant's claim should be denied.

Additionally, pertinent jurisprudence does not support granting relief.  A juror must make decisions at the guilt and punishment phases using information obtained in the courtroom.  *Granados v. State,* 85 S.W.3d 217, 235 (Tex. Crim. App. 2002).  However, "it defies common sense and human nature to require that a juror have no impressions or opinions until the judge sends the jury to deliberate."  *Quinn v. State*, 958 S.W.2d 395, 403 (Tex. Crim. App. 1997).  When a juror "makes statements outside of deliberations that indicate bias or partiality, such bias can constitute jury misconduct that prohibits the accused from receiving a fair and impartial trial."  *Id.*  The Code of Criminal Procedure provides, "No person shall be permitted to converse with a juror about the case on trial except in the presence and by the permission of the court."  TEX. CODE CRIM PROC. art 36.22.  The primary goal of article 36.22 is to insulate jurors from outside influence.  *Chambliss v. State,* 647 S.W.2d 257, 266 (Tex. Crim. App. 1983).  "Therefore, if a violation is shown, the effectiveness of possible remedies will be determined in part by whether the conversation influenced the juror."  *Ocon v.*

: 00694

*State*, 284 S.W. 3d 880, 884 (Tex. Crim. App. 2009). A trial court's use of curative instructions is an effective remedy to resolve potential juror misconduct. *Id*. at 887.

The record reflects that the trial court spoke to each juror individually and they each assured the court that juror Upsahw's elevator incident would not affect their decision making. In addition the trial court routinely admonished the jurors after this incident that they should not discuss the case with anyone. Such circumstances do not support a due process violation. *See Ocon*, 284 S.W.3d at 887 (a trial court's repeated curative instructions to the jury were sufficient to cure juror misconduct after a juror was caught talking on the phone with a third-party about the trial); *Robinson v. State*, 851 S.W.2d 216, 230 (Tex. Crim. App. 1991) (trial court did not abuse discretion in denying a mistrial when a juror learned from a newspaper article printed during the trial about uncharged bad acts of the defendant and the juror assured the trial court that the article's content would not affect her decision making). Accordingly, appellate counsel's decision not to raise the issue on direct appeal was objectively reasonable. *See Ex parte Santana*, 227 S.W. 3d 700, 704-05 (Tex. Crim. App. 2007) (to qualify as ineffective assistance, counsel's decision not to raise a particular point of error must be objectively unreasonable and there is a reasonable probability that, but

: 000695

for counsel's failure to raise that particular issue, he would have prevailed on appeal).

## REPLY TO APPLICANT'S TWELTH GROUND FOR RELIEF

The applicant avers that the trial court committed error for granting a $70,000 flat fee each to defense counsel for their representation. *Applicant's Writ at 197-203*. Citing no legal authority, he insists that the flat fee arrangement created fundamental and structural error. *Id.* at 201. A review of the record, pertinent statutes, and controlling jurisprudence indicate that the applicant's claim is without merit and should be denied.

The Code of Criminal Procedure sets forth that counsel appointed to represent a defendant in a criminal proceeding "shall be paid a reasonable attorney's fee"; "reasonable" is undefined in the stature and flat rates are not expressly disallowed. TEX. CODE CRIM. PROC. art. 26.05(a). "All payments . . . shall be paid in accordance with a schedule of fees adopted by formal action of the judges of the . . . district courts trying criminal cases in each county." TEX. CODE CRIM. PROC. art. 26.05(b). "Each fee schedule adopted shall state reasonable fixed rates . . . taking into consideration reasonable and necessary overhead costs and the availability of qualified attorneys willing to accept the stated rates, and shall provide a form for the appointed counsel to itemize the types of services

63

: 00696

performed." TEX. CODE CRIM. PROC. art. 26.05(c). Counsel appointed for death penalty cases are to be compensated for their services in the same manner as those appointed to represent defendant charged with non-capital crimes. TEX. CODE CRIM. PROC. art. 26.052(l).

The Court of Criminal Appeals has determined that a violation of the attorney compensation statute does not affect a substantial right and is subject to a harmless error review. *Hughes v. State*, 24 S.W.3d 833, 837 n. 2 (Tex. Crim. App. 2000) ("Failure to adhere to statutory procedures serving to protect a constitutional provision is a violation of the statute, not a violation of the constitutional provision itself.").

At the time of trial, the Harris County District Courts fee schedule for a death capital murder was $35,000. *State's Writ Exhibit F, R.P. "Skip" Cornelius expense claim; State's Writ Exhibit G, Gerald Bourque expense claim.* However, the applicant's legal representation necessitated preparation of a defense for two capital murders and an aggravated robbery. Recognizing the unique and demanding nature of the representation, the trial court compensated both defense counsel at a flat rate of $70,000. *Id.; Id.*. The trial court explained its decision in a hand written note on Mr. Cornelius' voucher: "This was a complicated capital murder w/ [sic] multiple victims, DNA, ballistics, multiple

64

weapons, a second capital murder just as complicated as the first and then an aggravated robbery to add to all of the extraneous conduct stretching back to the age of 12 years." *Id.* at 2.[6]

The applicant's claim fails for three reasons. First, the basis of the claim was apparent from the record. As a result it should have been raised on direct appeal and cannot now be reviewed on habeas. *Ex parte Banks*, 769 S.W.2d at 540. Second, while noting ABA Guidelines and a purported "strong disapproval of flat fees" in the legal community, the applicant has not advanced specific facts to demonstrate an actual violation of the pertinent compensation statute. *See Ex parte Medina*, 361 S.W.3d at 637-38. Third, assuming *arguendo* that there has been a violation of the compensation statute, any violation would not have been structural and the applicant fails to demonstrate any harm given the overwhelming evidence of his guilt and the comprehensive mitigation case developed by defense counsel. *See Hughes*, 24 S.W.3d at 837-38 (capital murder defendant not harmed by violation of art. 26.052 when the record reflects that he was "represented by fully qualified and capable counsel"); *Wright v. State*, 28 S.W.3d 526, 530 n. 2 (Tex. Crim. App. 2000) (violation of art. 26.052 harmless when the record reflects that the defense attorney "filed numerous pre-trial

---

[6]     A similar handwritten note appears on the back of Mr. Bourque's voucher. *State's Writ Exhibit C at 2.*

motions, conducted voir dire, cross-examined the state's witnesses, made

objections, and made arguments at both phases of trial").

In addition to alleging trial court error, the applicant alleges that defense

counsel was ineffective for requesting and accepting a flat fee for their work.

*Applicant's Writ at 203-04.* However, as evidenced by their fee vouchers, a flat

fee is the prevailing professional (and statutory) norm for compensating defense

counsel appointed to represent a defendant in a death capital; defense counsel

cannot be held to be ineffective for acting in accord with prevailing professional

norms. *Strickland*, 466 U.S. at 688 ("The proper measure of attorney performance

remains simply reasonableness under prevailing professional norms.").

Accordingly, the applicant's claims are meritless and should be denied.

### REPLY TO APPLICANT'S FOURTEENTH GROUND FOR RELIEF

The applicant complains that his sentence was unconstitutional, under U.S.

CONST. amends. VI, VIII and XIV, based on Texas' alleged arbitrary system of

administering death penalties in various counties. *Applicant's Writ at 212-20.*

The applicant argues that a minority of Texas counties are responsible for a

majority of Texas death penalties and disparities of geography and race have

created an alleged arbitrary system. The applicant's claim is without merit and

should be denied.

The Court of Criminal Appeals has repeatedly held that the Texas death penalty scheme is constitutional both under U.S. CONST. amends. VIII and XIV and TEX. CONST. art. I, §§ 10, 13, and 19.  *See Saldano v. State,* 232 S.W.3d 77, 107-08, n.30 (Tex. Crim. App. 2007) (declining to revisit previous holdings of constitutionality of Texas death penalty scheme under United States and Texas Constitutions) (citing *Perry v. State,* 158 S.W.3d 438, 446-49 (Tex. Crim. App. 2004)); *Russell v. State,* 155 S.W.3d 176, 183 (Tex. Crim. App. 2005); *Escamilla v. State,* 143 S.W.3d 814, 827-29 (Tex. Crim. App. 2004); *Rayford v. State,* 125 S.W.3d 521, 532 (Tex. Crim. App. 2003); *Hughes v. State,* 24 S.W.3d 833, 844 (Tex. Crim. App. 2000); *Wyatt v. State,* 23 S.W.3d 18, 30 (Tex. Crim. App. 2000); *Chamberlain v. State,* 998 S.W.3d 230, 238 (Tex. Crim. App. 1999); *Pondexter v. State,* 942 S.W.2d 577, 587 (Tex. Crim. App. 1996)).   Moreover, the Court of Criminal Appeals has declined to interpret the Texas Constitution in a more expansive manner than the federal Constitution.  *See Cantu v. State,* 939 S.W.2d 627, 645 (Tex. Crim. App. 1997) (noting that Court has previously found no significance in difference between Eighth Amendment's phrase "cruel and unusual" and Texas Constitution's phrase "cruel or unusual").

Further, prosecutorial discretion does not render the death penalty unconstitutional; the "involvement of prosecutorial discretion to seek the death

penalty has been upheld." *See Matamoros v. State,* 901 S.W.2d 470, 478 (Tex. Crim. App. 1995) (citing *Cantu,* 842 S.W.2d 667, 691-92 (Tex. Crim. App. 1992), *cert. denied,* 509 U.S. 926 (1993)). Defendants who commit "the same offense on the same day are subject to the same statutory scheme, similarly situated defendants are similarly treated for purposes of the Fourteenth Amendment." *Lawton v. State,* 913 S.W.2d 542, 559-60 (Tex. Crim. App. 1995) (citing *Sonnier v. State,* 913 S.W.2d 511, 521 (Tex. Crim. App. 1995)); *see also Janecka v. State,* 937 S.W.2d 456, 474-75 (Tex. Crim. App. 1996) (rejecting argument that federal constitution requires comparative proportionality review on appeal of deathworthiness of each defendant sentenced to death to ensure that sentence is not disproportionate when compared to other cases where death imposed). An imposition of State-wide uniformity in counties seeking the death penalty would eliminate <u>any</u> discretion on the part of the State and prohibit the State from not seeking the death penalty in situations in which there are mitigating circumstances. *See and cf. Morris v. State,* 940 S.W.2d 610, 613-14 (Tex. Crim. App. 1996) (noting possibility of two defendants, who have committed identical murder, receiving different sentences based on differing degrees of mitigating character and background evidence).

: 00704

The applicant's claim that his death sentence was arbitrarily imposed, in violation of U.S. CONST. amends. VIII and XIV, because the death penalty is allegedly disparately applied in similar cases depending on the size and resources of the county in which the offense occurs has been previously raised in the Court of Criminal Appeals. In *Bell v. State,* 938 S.W.2d 35 (Tex. Crim. App. 1996), and *King v. State,* 953 S.W.2d 266 (Tex. Crim. App. 1997), the Court of Criminal Appeals "declined to reach the merits of the claim holding that because the appellant provides no 'empirical data, case law, or other factual basis' to support his claim, there was no foundation upon which we could have made a determination regarding the merits of the claim." *Allen v. State,* 108 S.W.3d 281, 286 (Tex. Crim. App. 2003) (quoting *Bell,* 938 S.W.2d at 55; *King,* 953 S.W.2d at 274).

In *Allen,* the capital defendant attempted to support his claim of disparate treatment based on different counties by providing (1) information from TDCJ-ID showing the number of offenses sentenced to death by county, with Harris County having the highest number; (2); a press release from the office of a state senator, citing the cost of a death penalty case and noting that rural counties cannot afford to try a death penalty case; and (3) two articles from the HOUSTON CHRONICLE concerning different treatment of similarly situated defendants

: 00702

depending on the county where the offense occurred. *Allen,* 108 S.W.3d at 286).

The Court of Criminal Appeals noted that the Capital Litigation section of the

Texas Attorney General's Office assists smaller counties in prosecuting capital

cases. *Id.* at 286, n.3. In rejecting the defendant's claim in *Allen,* the Court of

Criminal Appeals held:

> The fact that Harris County, a large county with a large
> budget, sentences more offenders to death than any
> other county in Texas, does not in and of itself establish
> disparate treatment among similarly situated
> defendants. In fact, one of the articles cited by
> appellant states that the "history of ample budgets" is
> only one of several factors that contribute to the higher
> number of death penalty convictions in Harris County.
> [fn and citation omitted] Appellant has made no
> threshold showing of disparate treatment between
> himself and other similarly situated defendants.

*Id.* at 286-87. Like the defendant in *Allen,* the applicant has made no showing of

disparate treatment between himself and other similarly situated defendants.

Although the applicant cites to statistics as to the number of Texas death

penalties from Harris County and the number from other counties that have

inmates on death row, the applicant fails to provide empirical data, case law, or

other factual basis that supports his claim.

Also, the Court of Criminal Appeals has consistently held that the Texas

death penalty scheme adequately narrows the class of death-eligible defendants.

*See Smith v. State,* 779 S.W.2d 417, 420 (Tex. Crim. App. 1989) (*quoting Jurek v. State,* 522 S.W.2d 934, 939)); *see also Fearance v. State,* 771 S.W.2d 486, 494 (Tex. Crim. App. 1988). Even with the addition of the mitigation special issue, enacted after the Supreme Court's decision in *Penry v. Lynaugh,* 494 U.S. 302 (1989)(*Penry I*), the "Texas' death penalty scheme continues to narrow the class of 'death-eligible' defendants while also providing a jury with more discretion than it had under Texas' prior statutory scheme to decline to impose the death penalty." *Cockrell v. State,* 933 S.W.2d 73, 92-93 (Tex. Crim. App. 1996); *Bell,* 938 S.W.2d at 53-54 (noting prior holdings that Texas death penalty scheme properly narrows eligibility decision during guilty phase while allowing jury at punishment ability to determine defendant's culpability); *Matchett v. State,* 941 S.W.2d 922, 933-34 (Tex. Crim. App. 1996) (rejecting argument that amendments to Texas death penalty scheme have created situations where similar defendants are treated arbitrarily and erratically exposed to death penalty, in violation of U.S. CONST. amends. VIII and XIX and TEX. CONST. art. I, §§ 13 and 19). The applicant fails to show that the Texas death penalty scheme is unconstitutional as applied to him. *See Cockrell,* 933 S.W.2d at 93 (holding defendant has to show scheme unconstitutional as applied to him to gain relief from death sentence).

71

Finally, the applicant's contention that the Texas death penalty is racially biased is based on arguments that prosecutors are allegedly more likely to seek the death penalty in cases with white victims and/or black defendants. The applicant then cites an Arizona law review concerning a study of the Missouri death penalty that supposedly showed that black defendants in Missouri were "about a third as likely to face a capital charge as white defendants." *Applicant's writ at 220.* However, the guilt-innocence complainant Holiday and the applicant are both African-American – a detail that undermines the allegation of racial bias so that the applicant's death sentence is unconstitutional. *See Cockrell,* 933 S.W.2d at 93 (holding defendant has to show scheme unconstitutional as applied to him to gain relief from death sentence). The alleged workings of the Missouri death penalty does not support the applicant's claim concerning the constitutionality of the Texas death penalty scheme.

Based on the foregoing, the applicant's ground for relief is without merit. The applicant fails to show that his constitutional rights, under the Texas and United States Constitution were violated and his claim for relief should be denied.

## REPLY TO APPLICANT'S FIFTEENTH GROUND FOR RELIEF

The applicant contends that his constitutional rights, under U.S. CONST. amends. VI, VIII, and XIV, were violated based on the trial court being prohibited

: 000785

from instructing the jury that one vote could result in a life sentence. The applicant argues that the 10-12 jury instruction violates the United States and Texas Constitutions and the "Supreme Court precedent" of *Mills v. Maryland,* 486 U.S. 367 (1988) and *McKoy v North Carolina,* 494 U.S. 433 (1990).

The Court of Criminal Appeals has repeatedly rejected a capital defendant's challenge to the constitutionality of art. 37.071, § (2)(a), based on the allegation that it misled the jury as to the effect of a single "no" vote. *See Williams v. State,* 301 S.W.3d 675, 694 (Tex. Crim. App. 2009); *Druery v. State,* 225 S.W.3d 491, 509 (Tex. Crim. App. 2007); *Prystash v. State,* 3 S.W.3d 522, 536 (Tex. Crim. App. 1999).

The Court of Criminal Appeals has also rejected the contention that the decisions in *Mills v. Maryland,* 486 U.S. 367 (1988), and *McKoy v. North Carolina,* 494 U.S. 433 (1990), support the applicant's argument:

> Moreover, *McKoy and Mills* are not controlling. Appellant asserts that the capital sentencing schemes at issue in *Mills* and *McKoy* were held unconstitutional because those schemes required a unanimous finding on the mitigating evidence. Appellant argues that the Texas scheme is unconstitutional under *McKoy* and *Mills* "because...there is no principled constitutional distinction to be drawn between a requirement of juror unanimity...and a requirement of 10 or more jurors." Appellant misconstrues *McKoy* and *Mills.* Under the capital sentencing scheme at issue in *Mills,* jurors were

73

: 00786

given the impression that they were precluded from considering any mitigating evidence unless they unanimously agreed on the existence of a particular circumstance. *Mills,* 486 U.S. at 384, 108 S. Ct. at 1870. The critical factor there was not the unanimity requirement in general, but the impression that all of the jurors must agree on the existence of the *same* mitigating circumstances before the mitigating evidence could be given effect. (footnote omitted). The scheme at issue in *McKoy* also prevented the jury from considering any mitigating factor it did not unanimously find. The Texas scheme does not require jurors to agree on the existence of the same mitigating evidence. Further, the Texas scheme allows a single juror to give effect to mitigating evidence by voting "no" on any special issue. The fact that they do not know the effect of their answers does not subject appellant to cruel and unusual punishment under the United States Constitution.

*Hughes v. State,* 897 S.W.2d 285, 300, 301 (Tex. Crim. App. 1994) (citing *Rousseau v. State,* 855 S.W.2d 666, 687 (Tex. Crim. App. 1993)). The Court also noted, in *Hughes,* that TEX. CODE CRIM. PROC. art. 37.071 was amended subsequent to the Supreme Court's decision in *Mills* to expressly provide that jurors need not agree on what particular evidence supports a "yes" or "no" answer to the special issues. *Hughes,* 897 S.W.2d at 300 n. 21. According to the Court, "the interpretive commentary stated that these revisions 'foreclose the potential for challenges' based upon *Mills.* We note however, that the article prior to the revisions did not violate *Mills." Id.* The applicant's fails to show that the Court of Criminal Appeals'

74

: 00707

interpretation of *Mills* is unconstitutional.

Based on the foregoing, the applicant's fourteenth ground for relief is without merit and should be denied; the applicant fails to show that his constitutional rights, under the Texas and United States Constitution, were violated.

## REPLY TO APPLICANT'S SEVENTEENTH GROUND FOR RELIEF

The applicant argues that his sentence should be vacated because the punishment instructions allegedly restricted the evidence that the jury could consider mitigating.  Specifically, the applicant contends that the instructions concerning "moral blameworthiness" and the lack of definitions unconstitutionally limit the categories of evidence the jury may find mitigating. *Applicant's Writ at 233-40.*  He also makes related claims that appellate counsel was ineffective for failure to present this claim on direct appeal and that trial counsel was ineffective for failure to request a jury instruction that clarified the meaning and application of mitigating evidence.  None of the applicant's claims withstand scrutiny and all should be denied.

In a pretrial motion, the applicant a motion regarding the proposed jury instruction that was denied in its entirety.  The motion did not request any clarifying instruction regarding what a "mitigating circumstance" may include (VII

C.R. at 1722-28).

The applicant's jury was given the following mitigation instruction:

> Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, Teddrick Batiste, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

(VII C.R. at 1714).

The applicant's jury was also instructed, in pertinent part:

> You shall consider all evidence submitted to you during the whole trial as to the defendant's background or character or the circumstances of the offense that militates for or against the imposition of the death penalty.

> You are instructed that when you deliberate on the questions posed in the special issues, you are to consider all relevant mitigating circumstances, if any, supported by the evidence presented in both phases of trial, whether presented by the State or the defendant. A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character, background, or the personal moral culpability of the defendant or circumstances of the crime which you believe could make a death sentence inappropriate in this crime. If you find that there is a mitigating circumstance or circumstances in this case, you must decide how much weight it/they deserve, if any, and thereafter, give effect and consideration to it/them in assessing the

defendant's personal moral culpability at the time you answer the special issue.

.You are instructed that mitigating evidence, if any, may be considered by you in answering any of the special issues under consideration.  If you determine, when giving effect to the mitigating evidence, if any, that a life sentence without parole rather than a death sentence is an appropriate response, let your answers to the special issues reflect that.

\* \* \*

In answering Special Issue No. 3 [mitigation issue] you shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's personal moral blameworthiness, including evidence of the defendant's background, character, the personal moral culpability of the defendant, or the circumstances of the offense that mitigates against the imposition of the death penalty.

(VII C.R. at 1705-06, 1709).

The Court of Criminal Appeals has previously rejected the argument that TEX. CODE CRIM. PROC. art. 37.071, § 2(f)(4) unconstitutionally narrows a jury's discretion to consider as mitigating only those factors concerning moral blameworthiness.  In *Shannon v. State,* 942 S.W.2d 591 (Tex. Crim. App. 1996), the Court of Criminal Appeals held,

Article 37.071 § 2(f)(4) "defines" "mitigating evidence" to be "evidence that a juror *might* regard as reducing the defendant's moral blameworthiness."  There is no evidence that must be viewed by a juror as being *per se* mitigating. Instead, jurors must individually determine

77

: 000710

what evidence, if any, mitigates against the imposition of the death penalty and what weight, if any, to give that evidence in its consideration.  Article 37.071 § 2(e) yields further support to this interpretation in that it requires the court to instruct the jury to take into consideration "*all* of the evidence, *including* the circumstances of the offense, the defendant's character and background, *and* the personal moral culpability of the defendant" (emphasis added) in determining whether sufficient mitigating circumstances exist to warrant a life sentence. *Because the consideration and weighing of mitigating evidence is an open-ended, subjective determination engaged in by each individual juror, we conclude that Article 37.071 § 2(f)(4) does not unconstitutionally narrow the jury's discretion to factors concerning only moral blameworthiness as appellant alleges.  See Colella v. State,* 915 S.W.2d 834 (Tex. Crim. App. 1995).

*Id.* at 597 (emphasis added).

The applicant's jury was instructed to consider all the evidence when answering the special issues, including the mitigation special issue.  The applicant fails to show that the Texas death penalty scheme unconstitutionally prevents a jury from considering as mitigating only evidence that reduces moral blameworthiness.  The applicant also fails to show that the Texas death penalty scheme is unconstitutional as applied to him.  *See Cockrell v. State,* 933 S.W.2d 73, 93 (Tex. Crim. App. 1996) (holding defendant has to show scheme unconstitutional as applied to him to gain relief from death sentence).

: 00711

Based on the foregoing, the applicant fails to show that his constitutional rights, under the Texas and United States Constitution, were violated. Correspondingly, given the well established jurisprudence regarding the applicant's claim, trial counsel was not ineffective for failure to lodge an objection to the jury charge and appellate counsel's decision not to raise the issue on direct appeal (particularly given the lack of a contemporaneous objection at trial) was objectively reasonable. *Kinnamon*, 791 S.W.2d at 97; *Ex parte Santana*, 227 S.W. 3d at 704-05. Failing to demonstrate a due process violation, the applicant's claim for relief should be denied.

: 00712

## V.

## CONCLUSION AND PRAYER

The applicant raises questions of law which can be resolved by the Court of Criminal Appeals upon review of official court records and without need for an evidentiary hearing.   However, and without waiving any of the arguments presented by in its original answer, the State respectfully requests that the trial court order trial counsel to file affidavits responding to the applicant's allegations of ineffective assistance.

Respectfully submitted,

_____

JOSHUA REISS
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas  77002
(713) 755-6657
(713) 755-55420 fax
Texas Bar ID #24053738
Reiss_Josh@dao.hctx.net

:00713

No. 1212366-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 174th DISTRICT COURT |
| | § | OF |
| TEDDRICK R. BATISTE,<br>  Applicant | § | HARRIS COUNTY, TEXAS |

## CERTIFICATE OF SERVICE

Service has been accomplished by sending a copy of this instrument via to

counsel for the applicant on this 5th day of November, 2013:

Janet Gilger-VanderZanden
Ryan O'Dell
Office of Capital Writs
1700 N. Congress Ave.
Suite 460
Austin TX 78711
Janet.gilger-vanderzaden@ocw.texas.gov
Ryan.odell@ocw.texas.gov

Respectfully submitted,

_____

JOSHUA REISS
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas  77002
(713) 755-6657
(713) 755-55420 fax
Texas Bar ID #24053738
Reiss_Josh@dao.hctx.net

81

# STATE'S WRIT EXHIBIT A
# Invoice of Dr. Jolie Brams

: 00715

**ATTORNEY FEES EXPENSE CLAIM**
**DISTRICT COURTS-CAPITAL CASE**
UNDER ARTICLE 26.05 CODE OF CRIMINAL PROCEDURE
AS AMENDED

*INSTRUCTIONS*

Specify one defendant per claim.

Before payment can be authorized, each form must be completed legibly in ink.

Forward completed claim to the presiding judge for approval

| Court No. 174th | Defendant Name Tedderick Batiste; No. 1212366 | | | | |
|---|---|---|---|---|---|
| **CAPITAL CASE** | | Number of Court Days/Hours | RATE: | TOTAL (presumptive maximum) | AMOUNT (Judge Completes) |
| **DEATH CAPITAL 1ST CHAIR** | Non-Trial Appearance | | $400/day | | |
| | Voir Dire | | $600/day | | |
| | Trial/Hearing with Testimony | | $800/day | | |
| | Out-of-Court Hours* | | $100/hour | $12,000 | |
| **DEATH CAPITAL 2ND CHAIR** | Non-Trial Appearance | | $400/day | | |
| | Voir Dire | | $500/day | | |
| | Trial/Hearing with Testimony | | $700/day | | |
| | Out-of-Court Hours* | | $80/hour | $9,600 | |
| **DEATH CAPITAL FLAT RATE** | Includes all fees except investigation costs, expert witness fees, and witness travel costs. Flat rate applies only if testimony begins in the guilt/innocence phase of trial. Otherwise, the daily and hourly rates apply. | | 1ST CHAIR | $35,000 | |
| | | | 2ND CHAIR | $30,000 | |
| **NON-DEATH CAPITAL** | Non-Trial Appearance | | $400/day | $3,200 | |
| | Trial/Hearing with Testimony | | $800/day | | |
| | Out-of-Court Hours* | | $100/hour | $5,000 | |
| **INVESTIGATION** | Bills submitted by investigators and experts must document the dates and hours spent on the case and must be sworn to or affirmed to be accurate. Expert expenses paid per County policy. (Dr. Brams) | | | 2268.75 | 2268 75 |
| **EXPERT TESTIMONY** | | | | | |
| **MENTAL HEALTH SUPPLEMENT*** | | | $50/day | $250 | |
| **BILINGUAL SUPPLEMENT** | | | $50/day | $250 | |
| **AFTER HOURS SUPP.** (Trial/Hearing after 6:00 pm) | | | $50/hour | | |
| **OTHER** See attached expenses | | | | 178.50 | 178 50 |
| | | | | TOTAL | $ 2447.25 |

*Must detail on Out-Of-Court Hours Log.

List date(s) of all Court Appearances. Attach Out-of-Court Hours Log.

**PERSONAL INFORMATION**

| Social Security Number (last 4 digits only) XXX - XX - 3065 | Telephone Number (713) 862-7766 | Bar Card Number 02716500 |
|---|---|---|

Mailing Address (Number, Street, Suite, City, State, Zip Code)
24 Waterway Ave, Ste 660, The Woodlands, TX 77380

**CERTIFICATION**

I, _Gerald E Bourque_ swear or affirm that the Harris County Auditor may rely upon the information contained above to make payment according to the fee schedule adopted by the Board of District Judges Trying Criminal Cases pursuant to Texas Code of Criminal Procedure Art. 26.05. I further swear or affirm that I have not received nor will I receive anything of value for representing the accused, except as otherwise disclosed to the Court in writing.

SWORN TO AND SUBSCRIBED BEFORE ME ON THIS THE _27th_ DAY OF _June_ A.D. 20 11

Approved _____

_____ Judge Presiding

_____ District Clerk Deputy (signature)

_Gerald E Bourque_ Attorney at Law (signature)

_Gerald E Bourque_ Attorney Name (print legibly)

STATE'S
EXHIBIT
A

Defendant's Name _Teddrick Batts_ Cause No. _1212366_ Date: _7-12-11_
Attorney Name: _Gerald Bourque_ Performed by: _Genesis Kimbrough_

## ATTORNEY FEES EXPENSE CLAIM CHECK LIST:
### CAPITALS, CAPITAL APPEALS, & 11.071 WRITS OF HABEAS CORPUS

| | | | Yes | No | Comments |
|---|---|---|---|---|---|
| 1) | Confirmed correct court number on claim? | | ☑ | ☐ | |
| 2) | Confirmed correct defendant's name on claim? | | ☑ | ☐ | |
| 3) | Confirmed correct cause number on claim? | | ☑ | ☐ | |
| 4) | Multiple cases on claim form? | | ☐ | ☑ | |
| 5) | Non-Death Capital Case? | | ☐ | ☑ | Please circle one: Disposed by Trial or Plea |
| 6) | Death Case? | | ☑ | ☐ | Please circle one: Disposed by (Trial) or Plea |
| 7) | Same offense throughout LQY9 history? | | ☑ | ☐ | |
| 8) | Capital – Appeal? | | ☐ | ☑ | |
| 9) | 11.071 Writ? | | ☐ | ☑ | |
| 10) | Service dates before January 1, 2002? | | ☐ | ☑ | |
| 11) | Correct claim form submitted for payment? | | ☑ | ☐ | |
| 12) | Attorney Appointment Order in case history on LQY9 screen in JIMS? | | ☑ | ☐ | |
| 13) | Attorney approved for capital appointment in FDAMS? | | ☑ | ☐ | |
| 14) | Dates of court appearances listed on claim? | | ☑ | ☐ | N/A |
| 15) | a.  Confirmed with history in the LQY8 screen? | | ☑ | ☐ | " |
| | If claiming out-of-court hours, is the out-of-court hours form completed and attached? | | ☐ | ☑ | N/A |
| | a.  Is it mathematically accurate? | | ☐ | ☐ | " |
| | b.  Does it match days/hours listed on the claim? | | ☐ | ☐ | " |
| 16) | On 11.071 Writs, is the Appointed Counsel Hourly Worksheet completed detailing services performed, dates, and times attached? | | ☐ | ☐ | N/A |
| | a.  Are the hours mathematically accurate? | | ☐ | ☐ | " |
| | b.  Does it match the amount requested on the claim? | | ☐ | ☐ | " |
| 17) | If an 11.071 Writ, is the claim eligible for reimbursement from the state? | | ☐ | ☐ | n/a |
| | If no, why not | | | | |
| 18) | Are expenses requested on claim? | | ☑ | ☐ | |
| 19) | Expense invoices attached? | | ☑ | ☐ | |
| 20) | Do the expense invoices detail services performed, dates and times? | | ☑ | ☐ | |
| | a.  Is it mathematically accurate? | | ☑ | ☐ | |
| | b.  Does it match the amount requested on the claim? | | ☑ | ☐ | |
| 21) | Is written court approval for expenses attached? | | ☑ | ☐ | |
| 22) | Is the expense amount on the claim equal to or less than the amount approved by the court? | | ☑ | ☐ | |
| 23) | Correct county mileage rate used? | | ☐ | ☐ | N/A |
| 24) | Correct claim line item used? | | ☑ | ☐ | |
| 25) | Claim amounts within limits? | | ☑ | ☐ | |
| 26) | If claim is totaled, is it mathematically accurate? | | ☑ | ☐ | |

Comments column (item 14-15):
```
1 · 100 · 00  +
  137 · 50  +
  178 · 50  +
  550 · 00  +
  275 · 00  +
  206 · 25  +
2 · 447 · 25
```

Attorney Expense: $ _____

Expert Expense: $ _2447.25_    _DR. Julie Brams_    TOTAL REQUESTED: $ _2447.25_

CAUSE NO. 1212366
CAUSE NO. 1212464

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| V. | § | HARRIS COUNTY, TEXAS |
| | § | |
| TEDDERICK BATISTE | § | 174th JUDICIAL DISTRICT |

EX PARTE
MOTION FOR FINAL PAYMENT
FOR EXPERT, DR. JOLIE BRAMS

COMES NOW, the Defendant, TEDDERICK BATISTE, in the above-entitled and numbered cause by and through Defendant's Attorneys of Record, and makes this his Motion for Final Payment for Expert, Dr. Jolie Brams, and in support thereof would show the Court as follows:

I.

The Defendant is indigent and unable to afford such services unless the cost hereof is defrayed by the State of Texas.

II.

Defendant's counsel, experts and investigators have been working on this case for many months through its conclusion with a jury verdict.

III.

The Court has previously authorized funding not to exceed $7,500.00 for Psychologist, Dr. Jolie Brams. (See attached Order – Exhibit A). A final invoice is attached hereto for services and expenses in the total amount of $2,447.25. (See attached Invoice - Exhibit B).

WHEREFORE, PREMISES CONSIDERED, counsel pray this Court will approve the

final payment to Jolie Brams, Psychologist.

Respectfully submitted,

GERALD E. BOURQUE
State Bar No. 02716500
24 Waterway Ave., Suite 660
The Woodlands, TX   77380
Telephone: (713) 862-7766
Telecopier: (832) 813-0321


R.P. CORNELIUS
State Bar No. 04831500
2028 Buffalo Terrace
Houston, TX   77019
Telephone:  (713) 237-8547
Fax:  (713) 528-0153


ATTORNEYS FOR DEFENDANT


<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above and foregoing instrument has not

been furnished to the District Attorney because this is an Ex Parte request for funds.


GERALD BOURQUE

CAUSE NO. 1212344
CAUSE NO. 1212464

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| V. | § | HARRIS COUNTY, TEXAS |
| | § | |
| | § | |
| TEDDERICK BATISTE | § | 174th JUDICIAL DISTRICT |

## ORDER

On this _____ day of ___ JAN 2 1 2010 ___, 2009, came on to be heard the

Defendant's Ex Parte Motion for the Appointment of an Expert – DR. JOLIE S. BRAMS

and after due consideration, the Court is of the opinion, and it is hereby ORDERED,

that said Request is:

_____ GRANTED, initial funding of $7,500.00 is approved.

_____ DENIED, to which ruling Defendant timely excepts.

SIGNED this the _____ day of ___ JAN 2 1 2010 ___, 2009.

JUDGE PRESIDING

EXHIBIT A

: 00728

# Brams & Associates, Inc.

### ▲ *Psychological Consulting* ▲

*Ohio License #3233*
*Texas License #33073*

February 3, 2011

Gerald Bourque
Attorney at Law
24 Waterway Avenue, Suite 660
The Woodlands, TX 77380

RE:   *Teddrick Batiste*
       *Cause No. 003/121246401010, 003/121236601010, Harris County, Texas*

**Payments**
None

|  |  |  |  | TOTAL | $ 00.00 |
|---|---|---|---|---|---|

**Charges**

| Date | Description | Hours | Amount |
|---|---|---|---|
| 03/17/10 | Forensic Interview | (4 hrs) | $1,100.00 |
| 03/18/10 | Consultation with Investigator | (0.5 hr) | 137.50 |
| 03/15-21/10 | Travel Expenses (prorated) | | 178.50 |

| | |
|---|---|
| *Airline* | *$ 58.23* |
| *Hotel* | *n/c* |
| *Rental Car* | *104.82* |
| *Meals* | *n/c* |
| *Airport Parking* | *15.45* |
| *Total* | *$178.50* |

| Date | Description | Hours | Amount |
|---|---|---|---|
| 03/15-21/10 | Travel Time (prorated) | (2 hrs) | 550.00 |
| 01/21/11 | Consultation and Review of Records | (1 hr) | 275.00 |
| 02/01/11 | Consultation with Expert | (0.75 hr) | 206.25 |
| | | **TOTAL** | **$2,447.25** |

## TOTAL AMOUNT DUE: $2,447.25
## THANK YOU!!!

985-B Bethel Road ▲ Columbus, Ohio  43214
614/457-0077 phone ▲ 614/457-2228 fax
Email:  bramsandassociates@rrohio.com
▲ *Forensics* ▲ *Business* ▲ *Education* ▲

EXHIBIT B



: 00721

eTicket Itinerary and Receipt



**Continental Airlines**  A STAR ALLIANCE MEMBER

Confirmation:
## CG1F4B
Check-in >

Issue Date: February 28, 2010

| Traveler | eTicket Number | Frequent Flyer | Seats |
|---|---|---|---|
| BRAMS/JOLIESMS | 0052155918702 | | 12A |

**FLIGHT INFORMATION**

| Day, Date | Flight | Class | Departure City and Time | Arrival City and Time | Aircraft | Meal |
|---|---|---|---|---|---|---|
| Mon, 15MAR10 | CO3095 | S | COLUMBUS OH 11:40AM | HOUSTON BUSH INTL 1:35PM | | |
| Sun, 21MAR10 | CO5866¹ | W | HOUSTON BUSH INTL (IAH) 5:05PM | COLUMBUS OH (CMH) 8:39PM | ERJ-145 | Snack |

¹Flight operated by CHAUTAUQUA AIRLINES INC doing business as CO EXPRESS

**FARE INFORMATION**

**Fare Breakdown**

| | | |
|---|---|---|
| Airfare: | 174.88 USD | |
| U.S. Federal Transportation Tax: | 13.12 | |
| U.S. Flight Segment Tax: | 7.40 | |
| U.S. Security Service Fee: | 5.00 | |
| U.S. Passenger Facility Charge: | 7.50 | |
| Per Person Total: | 207.90 USD | |
| **eTicket Total:** | **207.90 USD** | |

**Form of Payment:**
MASTERCARD
Last Four Digits 3354

*Handwritten:*
$207.90 airfare
25.00 charge fee
$232.90 Total
÷ 4 cases
$58.23

The airfare you paid on this itinerary totals: 174.88 USD

**The taxes you paid on this itinerary total: 33.02 USD**

Fare Rules:   Additional charges may apply for changes in addition to any fare rules listed.
NONREF/0VALUAFTDPT/CHGFEE
Cancel reservations before the scheduled departure time or TICKET HAS NO VALUE.

Additional Charges:   Sat., Mar. 20, 2010/MASTERCARD XXXXXXXXXXX3354 was charged 25.00 USD for the following: Change Fee - 25.00 USD/25.00 USD per ticket tax included/NON REF

### eTicket Reminders

- **Check-in Requirement** - Bags must be checked and boarding passes obtained at least 30 minutes prior to scheduled departure. Baggage will not be accepted and advance seat assignments may be cancelled if this condition is not met.
- **Boarding Requirement** - Passengers must be prepared to board at the departure gate with their boarding pass at least 15 minutes prior to scheduled departure.
- Failure to meet the **Boarding Requirements** may result in cancellation of reservations, denied boarding, removal of checked baggage from the aircraft and loss of eligibility for denied boarding compensation.
- Bring your boarding pass or this eTicket Receipt along with photo identification to the airport.
- The FAA now restricts carry-on baggage to one bag plus one personal item (purse, briefcase, laptop computer, etc.) per passenger.
- For up to the minute flight information, sign-up for your Flight Status E-mail at continental.com or call 1-800-784-4444; in Spanish 1-800-579-3938.
- If flight segments are not flown in order, your reservation will be cancelled. Rebooking will be subject to the fare rules governing your ticket.
- For the most current status of your reservation, flights and other important policies, go to continental.com.
- Your eTicket is non transferable and valid for 1 year from the issue date unless otherwise noted in the fare rules above.

Veh: Cls: IDAR
Lic.#: Color:
0
Rate: PXHWS Cls: IDAR Stall:
Fuel Level Out: FULL Mileage Out: 0

3/21/2010 6:00:00 PM    KB06910S-2

Date/Time Out    WAIT
3/15/2010 11:45:00 AM  MIN CHARGE 1DAY-24 hrs

| **Rental Rates** | | EST CHG |
|---|---|---|
| Hourly | | 7.07 |
| Daily | | 35.35 |
| Weekly | 1 @ 141.39 | 141.39 |
| Extra Day | | 22.99 |
| Total Time & Mileage | | 141.39 |

YOU ACCEPTED:

LOSS DAMAGE    7 @ 22.99/Day    160.93
WAIVER
Optional Coverages    160.93

YOU DECLINED:

UNINSURED
MOTORIST
PROTECTION
SUPPLEMENTAL
LIABILITY INS
PERSONAL
PASSENGER
PROTECTION

| FACLTYUSEFEE | 7 @ 3.75/Day | 26.25 |
| FLT LIC & TAX REC FEE | 7 @ 1.69/Day | 11.83 |
| BUS COST RECOVERY FEE | 1 @ 4.49/Itm | 4.49 |
| ENERGY RECOVERY FEE | 7 @ 0.45/Day | 3.15 |
| CONCFEERECOVERY | 11.11% | 16.56 |
| CNTYRNTLTAX | 5.00% | 18.23 |
| RENTAL TAX | 10.00% | 36.46 |
| Taxes/Fees/Options | | 116.97 |
| Optional Coverages | | 160.93 |

GEORGE BUSH IAH APO    KB0691062
ENTAL RECORD:    JOLIE
RANS    EPROCT
COMPLETED BY:  GEORGE BUSH IAH APO
ENTED:    03-15-10    1451
ENTAL:    03-15-10    1523
ETURN:    03-21-10    1523
ILES IN: 13616  OUT: 13188
ILES DRIVEN:    428
PLAN IN/OUT:    SPC /RXHW5
CLS: IDAR

YOU HAVE ACCEPTED OR DECLINED THE
ABOVE OPTIONAL ITEMS.

LOSS DAMAGE WAIVER ADDED ON 3/15/2010,
TERMINATED ON 03/21/2010 6:00 PM

1 EX WEEKS    141.39    141.39
SUBTOT    141.39
TAXABLE TOT    141.39
SALES TAX  INCLUDED
LDW1    22.99/DAY    160.93
FACUSEFEE    26.25
LTRPPT    11.83
BUSCOSTREC    4.49
ERF    3.15
CONCRECFEE    16.56
CNTYRNTL    18.23
RENTALTAX    36.46
NET DUE    419.29
PAYMENTS    -419.29
PAID BY: MC
CREDIT CARD #:  ************3354
FT# BC BS03G9

2010

You have declined the Prepaid Fuel
option. You have a choice of using our
Refueling Service option at $7.99 per
gallon or refuel the Vehicle within 10
miles of the return facility and
present the refueling receipt.

** Estimated Charges**    419.29

YOU ARE LIABLE FOR PAYMENT OF ALL TRAFFIC AND
MOVING VIOLATIONS. THESE INCLUDE, BUT ARE NOT
LIMITED TO: ALL TOLL FINES, PARKING VIOLATIONS,
TRAFFIC FINES, AND ANY VIOLATION CAPTURED BY
CAMERA. FAILURE TO PAY BY ORIGINAL DUE DATE
WILL RESULT IN EACH VIOLATION, AS WELL AS A $25
ADMINISTRATIVE FEE, BEING CHARGED TO YOUR
CREDIT CARD OR BILLING ACCOUNT.
ESTIMATED/ACTUAL CHARGES MAY VARY

8I
LSCRUT/42

$419.29
÷ 4 CASES
$104.82

## TEXAS - OPTIONAL LOSS DAMAGE WAIVER; NOTICE TO TEXAS RESIDENTS

NOTICE: Your rental agreement offers, for an additional charge, an optional Loss Damage Waiver ("LDW") to cover all or part of your responsibility for damage to or loss of the Vehicle. Before deciding whether to purchase LDW, you may wish to determine whether your own automobile insurance or credit card agreement provides you coverage for rental Vehicle damage or loss and determine the amount of the deductible under your own insurance coverage. The purchase of LDW is not mandatory. The damage waiver is not insurance.

NOTICE TO TEXAS RESIDENTS REGARDING DAMAGE WAIVERS: Your personal automobile insurance policy may or may not provide coverage for your liabilities in connection with the loss of or damage to a rented Vehicle. Before deciding whether to purchase a damage waiver, you may wish to determine whether your automobile insurance policy provides you coverage for rental Vehicle damage or loss. If you file a claim under your personal automobile insurance policy, your insurance company may choose to nonrenew your policy at your renewal date, but may do so only if you are at fault for the claim.

NOTICE REGARDING AUTO RENTAL LIABILITY INSURANCE: You may not need the auto insurance offered by the Company. The purchase of auto rental liability insurance is not required as a condition of renting a Vehicle. This insurance does not apply to any bodily injury or property damage arising out of the use or permitting the use of a rental Vehicle by any driver while under the influence of drugs or alcohol in violation of the law.

These terms supersede any conflicting terms stated elsewhere.

This Rental Agreement is between the undersigned and company identified above ("Rental Company"). By signature below, the undersigned acknowledge and represent that they are legally authorized to operate the rental vehicle, by valid Driver's License, and that they read and agree to the terms, conditions and notices, both printed and written, including damage waiver information, that appear on this Rental Agreement and on the separate rental jacket, which is incorporated herein. THE UNDERSIGNED AUTHORIZE RENTAL COMPANY TO PROCESS AND CHARGE THEIR CREDIT, DEBIT, OR CHARGE CARD IN THE AMOUNT SPECIFIED ABOVE FOR THIS RENTAL. SIGNATURE BELOW AND FOR ALL ADDITIONAL CHARGES DUE UPON RETURN OF THE VEHICLE. No additional drivers are permitted without Rental Company's approval.

| Primary Renter | Additional Renter(s) |
|---|---|
| | |

: 00723

Parking statement from 03/21/2010 to ●1/2010

**Thrifty** *Airport Parking*

840 Stelzer Road
Columbus, Ohio  43219-5717

For billing questions or account changes please call 614 237-5800 Ext. 224

DR JOLIE BRAMS
985 BETHEL RD
SUITE B
COLUMBUS, OH  43214

**Parking Perks # 9696**

| Ticket # | Date In | Date Out | Days | Hours | Parking | Wash | Oil | Gas | Detail | Misc | Apt Tax | Sls Tax | Total | Payments | Bal Due |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 236085 | 03/15/10 | 03/21/10 | 7 | | 56.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5.61 | 0.11 | 61.82 | 0.00 | 61.82 |
| | | | | | 56.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5.61 | 0.11 | 61.82 | 0.00 | 61.82 |

$ 61.82
÷ 4 cars
―――――
$15.45

: 00724

CAUSE NO. 1212366
CAUSE NO. 1212464

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| V. | § | HARRIS COUNTY, TEXAS |
| | § | |
| TEDDERICK BATISTE | § | 174th JUDICIAL DISTRICT |

## ORDER

On this 27th day of June , 2011, came to be heard the request for Final Payment of Dr. Jolie Brams, previously appointed to assist in the defense of the above-entitled and numbered cause.

The Court previously authorized funding for Dr. Brams in the amount of $7,500.00 (see attached Exhibit A).

IT IS, THEREFORE, ORDERED that Harris County, Texas, issue a check to the aforesaid Dr. Jolie Brams in the amount of $2,447.25 for services and expenses, ($2,268.75 and $178.50 respectively), (see attached Exhibit B), which the Court has determined to be the final payment for services rendered and expenses incurred, upon receipt of a certified copy of this Order.

SIGNED AND ENTERED this the 27th day of June , 2011.

JUDGE PRESIDING

: 00725

# STATE'S WRIT EXHIBIT B
# Invoice of Dr. Terry Rustin

ATTORNEY FEES EXPENSE CLAIM
DISTRICT COURTS-CAPITAL CASE
UNDER ARTICLE 26.05, CODE OF CRIMINAL PROCEDURE
AS AMENDED

INSTRUCTIONS

*show one defendant per claim*

*Before payment can be authorized, each form must be completed legibly in ink.*

*Forward completed claim to the presiding judge for approval.*

| Court No. 174th | Defendant Name Tedderick Batiste; No. 1212366 | | | | P8 |

| CAPITAL CASE | | Number of Court Days/Hours | RATE | TOTAL (presumptive maximum) | AMOUNT (Judge Completes) |
|---|---|---|---|---|---|
| **DEATH CAPITAL 1ST CHAIR** | Non-Trial Appearance | | $400/day | | |
| | Voir Dire | | $600/day | | |
| | Trial/Hearing with Testimony | | $800/day | | |
| | Out-of-Court Hours* | | $100/hour | $12,000 | |
| **DEATH CAPITAL 2ND CHAIR** | Non-Trial Appearance | | $400/day | | |
| | Voir Dire | | $500/day | | |
| | Trial/Hearing with Testimony | | $700/day | | |
| | Out-of-Court Hours* | | $80/hour | $9,600 | |
| **DEATH CAPITAL FLAT RATE** | Includes all fees except investigation costs, expert witness fees, and witness travel costs. Flat rate applies only if testimony begins in the guilt/innocence phase of trial. Otherwise, the daily and hourly rates apply. | 1ST CHAIR | | $35,000 | |
| | | 2ND CHAIR | | $30,000 | |
| **NON-DEATH CAPITAL** | Non-Trial Appearance | | $400/day | $3,200 | |
| | Trial/Hearing with Testimony | | $800/day | | |
| | Out-of-Court Hours* | | $100/hour | $5,000 | |
| **INVESTIGATION** | Bills submitted by investigators and experts must document the dates and hours spent on the case and must be sworn to or affirmed to as accurate. Expert expenses paid per County policy.   (Dr. Rustin) | | | 10,000 | 10,000 |
| **EXPERT TESTIMONY** | | | | | |
| MENTAL HEALTH SUPPLEMENT* | | | $50/hour | $250 | |
| BILINGUAL SUPPLEMENT | | | $50/day | $250 | |
| AFTER HOURS SUPP. (Trial/Hearing after 6:00 pm) | | | $50/hour | | |
| OTHER | | | — | | 10,000 |
| | | | TOTAL | $ | |

*Must detail on Out-Of-Court Hours Log.

List date(s) of all Court Appearances.  Attach Out-of-Court Hours Log.

PERSONAL INFORMATION

Social Security Number (last 4 digits only) XXX - XX - 3065

Telephone Number (713) 862-7766

Bar Card Number 02716500

Mailing Address (Number, Street, Suite, City, State, Zip Code) 24 Waterway Ave, Ste. 660, The Woodlands, TX 77380

CERTIFICATION

I, Gerald E. Bourque , swear or affirm that the Harris County Auditor may rely upon the information contained above to make payment according to the fee schedule, adopted by the Board of District Judges Trying Criminal Cases pursuant to Texas Code of Criminal Procedure Art. 26.05. I further swear or affirm that I have not received nor will I receive anything of value for representing the accused, except as otherwise disclosed to the Court in writing.

SWORN TO AND SUBSCRIBED BEFORE ME ON THIS THE 27th DAY OF June A.D. '11

Approved

Judge Presiding

Gerald E. Bourque

STATE'S
EXHIBIT
B
Habeas

Defendant's Name _Teddrick Batiste_ Cause No. _1212366_ Date: _7/6/11_
Attorney Name: _Gerald Bourque_ Performed by: _Geneva Kimbrough_

## ATTORNEY FEES EXPENSE CLAIM CHECK LIST
## CAPITALS, CAPITAL APPEALS, & 11.071 WRITS OF HABEAS CORPUS

| | | Yes | No | Comment |
|---|---|---|---|---|
| 1) | Confirmed correct court number on claim? | ☑ | ☐ | |
| 2) | Confirmed correct defendant's name on claim? | ☑ | ☐ | |
| 3) | Confirmed correct cause number on claim? | ☑ | ☐ | |
| 4) | Multiple cases on claim form? | ☐ | ☑ | |
| 5) | Non-Death Capital Case? | ☐ | ☑ Please circle one: Disposed by Trial or Plea |
| 6) | Death Case? | ☑ | ☐ Please circle one: Disposed by Trial or Plea |
| 7) | Same offense throughout LQY9 history? | ☑ | ☐ | |
| 8) | Capital – Appeal? | ☐ | ☐ | |
| 9) | 11.071 Writ? | ☐ | ☐ | |
| 10) | Service dates before January 1, 2002? | ☐ | ☑ | |
| 11) | Correct claim form submitted for payment? | ☑ | ☐ | |
| 12) | Attorney Appointment Order in case history on LQY9 screen in JIMS? | ☑ | ☐ | |
| 13) | Attorney approved for capital appointment in FDAMS? | ☑ | ☐ | |
| 14) | Dates of court appearances listed on claim? | ☐ | ☑ | |
| 15) | a. Confirmed with history in the LQY8 screen? | ☐ | ☐ N/A |
| | If claiming out-of-court hours, is the out-of-court hours form completed and attached? | ☐ | ☐ | |
| | a. Is it mathematically accurate? | ☐ | ☐ | |
| | b. Does it match days/hours listed on the claim? | ☐ | ☐ | |
| 16) | On 11.071 Writs, is the Appointed Counsel Hourly Worksheet completed detailing services performed, dates, and times attached? | | | |
| | a. Are the hours mathematically accurate? | ☐ | ☐ | |
| | b. Does it match the amount requested on the claim? | ☐ | ☐ | |
| 17) | If an 11.071 Writ, is the claim eligible for reimbursement from the state? | ☐ | ☐ | |
| | If no, why not | | | |
| 18) | Are expenses requested on claim? | ☑ | ☐ | |
| 19) | Expense invoices attached? | ☑ | ☐ | |
| 20) | Do the expense invoices detail services performed, dates and times? | ☑ | ☐ | |
| | a. Is it mathematically accurate? | ☑ | ☐ | |
| | b. Does it match the amount requested on the claim? | ☑ | ☐ | |
| 21) | Is written court approval for expenses attached? | ☑ | ☐ | |
| 22) | Is the expense amount on the claim equal to or less than the amount approved by the court? | ☑ | ☐ | |
| 23) | Correct county mileage rate used? | ☐ | ☐ N/A |
| 24) | Correct claim line item used? | ☑ | ☐ | |
| 25) | Claim amounts within limits? | ☑ | ☐ | |
| 26) | If claim is totaled, is it mathematically accurate? | ☑ | ☐ | |

Attorney Expense: $ _____

Expert Expense: $ _10,000.00_          TOTAL REQUESTED: $ _10,000.00_

: 00728



CAUSE NO. 1212366
CAUSE NO. 1212464

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| V. | § | HARRIS COUNTY, TEXAS |
| | § | |
| TEDDERICK BATISTE | § | 174th JUDICIAL DISTRICT |

EX PARTE
MOTION FOR FINAL PAYMENT
FOR EXPERT, DR. TERRY A. RUSTIN

COMES NOW, the Defendant, TEDDERICK BATISTE, in the above-entitled and numbered cause by and through Defendant's Attorneys of Record, and makes this his Motion for Final Payment for Expert, Dr. Terry A. Rustin, and in support thereof would show the Court as follows:

I.

The Defendant is indigent and unable to afford such services unless the cost hereof is defrayed by the State of Texas.

II.

Defendant's counsel, experts and investigators have been working on this case for many months through its conclusion with a jury verdict.

III.

The Court has previously authorized funding not to exceed $10,000.00 for Expert, Dr. Terry A. Rustin (See attached Order – Exhibit A). A final invoice is attached hereto for services in the total amount of $10,000.00 (See attached Invoice - Exhibit B).

WHEREFORE, PREMISES CONSIDERED, counsel pray this Court will approve the

final payment to Dr. Terry A. Rustin.

Respectfully submitted,

GERALD E. BOURQUE
State Bar No. 02716500
24 Waterway Ave., Suite 660
The Woodlands, TX 77380
Telephone: (713) 862-7766
Telecopier: (832) 813-0321


R.P. CORNELIUS
State Bar No. 04831500
2028 Buffalo Terrace
Houston, TX 77019
Telephone: (713) 237-8547
Fax: (713) 528-0153


ATTORNEYS FOR DEFENDANT


CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has not

been furnished to the District Attorney because this is an Ex Parte request for funds.

GERALD BOURQUE

CAUSE NO. 1212344
CAUSE NO. 1212464

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| V. | § | HARRIS COUNTY, TEXAS |
| | § | |
| TEDDERICK BATISTE | § | 174th JUDICIAL DISTRICT |

## ORDER

On this __7__ day of __April__, 2011, came on to be heard the

Defendant's Ex Parte Motion for the Appointment of an Expert – DR. TERRY A.

RUSTIN and after due consideration, the Court is of the opinion, and it is hereby

ORDERED, that said Request is:

_____✓_____ GRANTED, initial funding of $10,000.00 is approved.

_____ DENIED, to which ruling Defendant timely excepts.

SIGNED this the __7__ day of __April__, 2011.

_____
JUDGE PRESIDING

EXHIBIT A

: 00731

# Terry A. Rustin

9731 Greenwillow
Houston, Texas 77096
★

*Telephone 713.728.4473*
*Fax 888.792.7122*
*Email Terry.Rustin@gmail.com*

*See attached for alternate mailing addre →*

May 29 2011

Re: Tedderick Batiste

Mr. Gerald Bourque, Attorney at Law
24 Waterway Ave., Suite 660
The Woodlands, TX   77380

April 8 – 10, 2011
Review of records, 2 hr

April 11, 2011
Review of records 2 hr
Interview with client, 3 hr

May 25, - 26 2011
Review of records, research, preparation, 3 hr

May 26, 2011
Consultation with Mr. Bourque and Ms. Vitale, 5 hr

May 27, 2011
Review of records, research, preparation, 2 hr
Interview with client, 5 hr

May 28, 2011
Interview with client, 3 hr

Total 25 hr @ $400/ hr ........................................................... $10,000.00

EXHIBIT B

# Terry A. Rustin

9731 Greenwillow
Houston, Texas 77096

★

*Telephone 713.728.4473*
*Fax 888.792.7122*
*Email Terry.Rustin@gmail.com*

May 29 2011

Re: Tedderick Batiste

Mr. Gerald Bourque, Attorney at Law
24 Waterway Ave., Suite 660
The Woodlands, TX   77380

Dear Mr. Bourque,

Attached please find my statement of effort on behalf of your client. Mr. Tedderick Batiste. I understand that the Court has approved a maximum of $10,000 for my effort in this case, so I am not billing for travel time or out-of-pocket expenses.

I am leaving for Colorado on May 31, and can be reached on my cellphone at 713-775-7166. As of today, my mailing address is:

Terry A. Rustin, M.D.
555B Devon Drive
Estes Park, CO 80517

Sincerely,

Terry A. Rustin, M.D.

CAUSE NO. 1212366
CAUSE NO. 1212464

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| V. | § | HARRIS COUNTY, TEXAS |
| | § | |
| TEDDERICK BATISTE | § | 174th JUDICIAL DISTRICT |

## **ORDER**

On this **27** day of **June**, 2011, came to be heard the request for Final Payment of Expert, Dr. Terry A. Rustin, previously appointed to assist in the defense of the above-entitled and numbered cause.

The Court previously authorized funding for Expert, Terry A. Rustin, in the amount of $10,000.00 (see attached Exhibit A).

IT IS, THEREFORE, ORDERED that Harris County, Texas, issue a check to the aforesaid Dr. Terry A. Rustin in the amount of $10,000.00 for services (see attached Exhibit B), which the Court has determined to be the final payment for services rendered, upon receipt of a certified copy of this Order.

SIGNED AND ENTERED this the **27** day of **June**, 2011.

_____
JUDGE PRESIDING

: 00734

# STATE'S WRIT EXHIBIT C
# Applicant's Letter to Miss Jade Evans

Justice
FOREVER

Miss Jadi Evans
5305-50ᵗʰ St
P.O. Box 2054
Stony Plain, AB
T7Z 1X6 Canada

Eugene R. Baniers #999568
Polunsky Unit
3872 Fm 350 South
Livingston TX 77351

STATE'S
EXHIBIT
C
Habcas
: 00736

# TDCJ COMMISSARY PRICE LIST
## SUBJECT TO CHANGE W/OUT NOTICE

*(handwritten note:)* I checked the stuff I buy and it the time but sometime and not always is the same time

*(handwritten note:)* Prices have Changed a lot

### PACKAGED MEAT — RETAIL
| Item | Price |
|---|---|
| MACKEREL NA PEDRO-POUCH | $ 0.80 |
| TUNA IN WATER - POUCH | $ 1.20 |
| VIENNA-CHICKEN | $ 1.70 |
| BEEF POT ROAST-POUCH | $ 2.65 |
| CHUNK CHICKEN -POUCH | $ 1.30 |
| BEEF TIPS & GRAVY | $ 2.95 |

### CHILI — RETAIL
| Item | Price |
|---|---|
| CHILI W/BEANS-POUCH | $ 1.10 |
| REFRIED BEANS-POUCH | $ 1.10 |
| CHILI-NO BEANS POUCH | $ 1.10 |

### SEASONAL — RETAIL
| Item | Price |
|---|---|
| SAUSAGE-SLIM | $ 1.25 |
| SMOKED/SUGARED PEANUTS | $ 1.00 |
| REGAL GRAHAMS | $ 1.40 |
| CANDY CANE | $ 1.65 |
| HOLIDAY PACK | $ 13.00 |

### BAKED GOODS — RETAIL
| Item | Price |
|---|---|
| BREAD | $ 1.40 |
| WHEAT BREAD | $ 1.40 |
| TORTILLA-FLOUR | $ 0.70 |

### PERSONAL — RETAIL
| Item | Price |
|---|---|
| PHOTO ALBUM | $ 1.70 |
| READING GLASS 1.25,1.50,1.75,2.0,2.50 | $ 2.25 |
| LG HOLDER W/CLIP | $ 0.60 |

### JUICE — RETAIL
| Item | Price |
|---|---|
| JUICE-COCKTAIL STRAW(WM) | $ 0.60 |
| JUICE-CRANBERRY | $ 0.60 |
| JUICE-JALAPENO | $ 0.85 |
| JUICE-V8 | $ 0.85 |
| JUICE-ORANGE | $ 0.60 |

### INSTANT DRINK MIX — RETAIL
| Item | Price |
|---|---|
| CAPPUCHINOS | $ 0.27 |
| TEA BAGS * KINGS TRANS(M) | $ 2.60 |
| COFFEE-RP COLUMBIAN RESERVE | $ 2.70 |
| COFFEE-RP CAPPUCCINO INSTN | $ 1.30 |
| COFFEE-FOLGERS | $ 0.65 |
| CHOCOLATE-HOT 32 OZ.BAG | $ 2.40 |
| COOL DOWN-BAG | $ 0.65 |
| ELECTRO DRINK MIX | $ 0.18 |
| WHEY POWDER | $ 0.55 |
| CHOCOLATE SYRUP | $ 2.50 |

### DRINKS — RETAIL
| Item | Price |
|---|---|
| WATER-BOTTLE | $ 0.25 |
| DR.PEPPER / DIET DR. PEPPER | $ 0.45 |
| BIG RED | $ 0.45 |
| ORANGE FANTA | $ 0.45 |
| COKE / DIET COKE / COKE ZERO | $ 0.45 |
| LEMON LIME | $ 0.45 |
| ROOT BEER | $ 0.45 |
| VAULT | $ 0.45 |
| GRAPE / STRAWBERRY SODA | $ 0.30 |

### CONDIMENTS — RETAIL
| Item | Price |
|---|---|
| REGULAR HOT SAUCE | $ 0.65 |
| HABNERO HOT SAUCE | $ 0.65 |
| SALSA-MEDIUM CAMINO REAL | $ 2.65 |
| CHILI CON QUESO-BOTTLE | $ 2.65 |
| SALAD DRESSING JALAPENO | $ 1.45 |
| SANDWICH SPREAD | $ 1.55 |

### CANDY — RETAIL
| Item | Price |
|---|---|
| MUSTARD-BEST MAID | $ 1.10 |
| RANCH DRESSING | $ 1.70 |
| KETCHUP | $ 1.30 |
| BBQ SAUCE | $ 1.35 |
| SEASON ALL | $ 1.35 |
| PEPPER-EL CAMINO | $ 1.35 |
| PEANUT BUTTER | $ 1.30 |
| GRAPE JELLY | $ 1.55 |
| STRAWBERRY PRESERVES | $ 1.55 |
| CREAM CHEESE | $ 0.22 |
| SWEETNER/NO CALORIE | $ 1.00 |

### OTHER FOOD ITEMS — RETAIL
| Item | Price |
|---|---|
| PICKLES-DILL HOT | $ 0.90 |
| PEPPER-WHOLE JALAPENO | $ 0.23 |

### DRIED GOODS — RETAIL
| Item | Price |
|---|---|
| NOODLES-CHILI | $ 0.25 |
| NOODLES-CAJUN | $ 0.25 |
| NOODLES-BEEF | $ 0.25 |
| NOODLES-CHICKEN | $ 0.25 |
| RICE | $ 0.90 |
| BEEF FLVD BOUILLION CUBE | $ 1.05 |
| POTATO HERB BUTTERY 4 CH E | $ 1.05 |
| MILK INSTANT NONFAT | $ 2.90 |
| FRUIT TRAIL MIX | $ 2.50 |
| OATMEAL INSTANT VARIETY | $ 1.80 |

### CANDY — RETAIL
| Item | Price |
|---|---|
| CANDY BARS | $ 0.76 |
| ORANGE SLICES | $ 0.75 |
| JELLY BEANS | XXXXXX |
| BUTTERSCOTCH-BAG | $ 0.75 |
| CHICK O STICK | $ 0.30 |
| HARD FRUIT/LICIOUS-BAG | $ 1.05 |
| STICK CANDY | $ 0.09 |
| PEANUT PATTIES | $ 0.09 |
| PASCAL CANDY | $ 2.00 |
| JAW/BREAKER | $ 0.75 |
| SYRUP-CHOCOLATE | $ 2.50 |

### SNACK — RETAIL
| Item | Price |
|---|---|
| CHIP-SPICY NACHO CHEESE | $ 0.75 |
| CHIP-CRUNCHY CHEEZERS | $ 0.50 |
| HOT FRIES | $ 0.50 |
| CHIP-SALSA VERDE | $ 0.50 |
| CHIP-JALAPENO | $ 0.50 |
| CHIP-AMESQUITE BBQ | $ 0.50 |
| CHIP-TORTILLA  16 OZ | $ 2.00 |
| PORK SKINS | $ 0.75 |
| PORK SKIN 6 oz | $ 1.55 |
| PARTY MIX | $ 1.35 |
| COOKIES - ASSORTED | $ 1.10-1.20 |
| TOOTSIE-SALSA VERDE | $ 0.65 |
| BUGS COOKIES | $ 0.40 |
| GRANOLA BAR | $ 2.25 |
| MOON PIES - VAN, BAN. | $ 0.40 |
| CEREAL BARS - ASSORTED | $ 2.75 |
| FRUIT STICKS | $ 0.20 |
| CRACKER-CHEDDAR CHEESE | $ 0.20 |
| CRACKER-CHIPS | $ 0.20 |
| CRACKER-SALTINE | $ 0.27 |
| CRACKER SIZE CHEESE | $ 2.10 |
| CRACKER-HONEY GRAHAM | $ 1.75 |
| CRACKER-SNACK ROUND | $ 1.30 |
| FIDDLE FADDLE | $ 1.30 |
| CRACKER-SANDWICH | $ 0.65 |
| FRUIT & NUT SNACK MIX | $ 1.80 |
| FIG BAR | $ 0.40 |
| PEANUTS- HOT&SPICY | $ 0.30 |

### BLUE BELL / ICE CREAM — RETAIL
| Item | Price |
|---|---|
| NUT.CO .COOKIE DONE | $ 0.40 |
| SANDWICH-RAINBOW FREEZE | $ 0.45 |
| BOMBSTICK | $ 0.45 |
| SOLID RIM PINTS / SUGAR FREE | $ 1.75 |

### HYGIENE — LEVEL II & III
| Item | Price |
|---|---|
| TOOTHBRUSH 1 to 2 EACH ) | $ 0.80 |
| TOOTHPASTE 1 to 2 | $ 0.90 |
| HAWAIIAN ESS SHAMPOO 4 oz | $ 0.50 |

### HYGIENE — RETAIL
| Item | Price |
|---|---|
| CHAPSTICK | $ 0.40 |
| SOAP-DIAL | $ 0.10 |
| DISH-SOAP/PLASTIC | $ 0.35 |
| DEO-SP STXMEN/WOMEN ACTIVE FF | $ 1.85 |
| ANTI-PERIOD FRESH SCENT | $ 1.85 |
| COMB/BRUSH | $ 0.35 |
| SHOWER SCUFF | $ 1.30 |
| SHOWER SCUFF | $ 1.50 |
| TISSUE-TOILET(9PCS) | $ 1.55 |
| HAND SANITIZER | $ 0.70 |

### HEALTH — RETAIL
| Item | Price |
|---|---|
| VITA-EPADHA OMEGA 3 | $ 4.00 |
| VITA-AMINO ACID 1700 | $ 4.00 |
| VITA-GARLIC/OIL | $ 2.65 |
| VITA-KWAN MULTI&THISTLE | $ 4.25 |
| VITA-HB 6400 &SEEL | $ 1.50 |
| VITA-NB CAL-250/D-250 | $ 1.85 |
| VITA-MULTI/NO IRON | $ 3.50 |
| VITA-NB CAL 500 | $ 3.70 |
| VITA-NB C500 PLUS (C) | $ 1.80 |
| PAIN RELIEF PM | $ 1.80 |
| PAIN PM/TRIPLE ANTIBIOTIC | $ 2.15 |
| CORTISONE CREAM | $ 2.70 |
| OINTMENT-HEMORRHOID #1107 | $ 2.70 |
| EYE DROPS | $ 1.75 |
| NASAL SPRAY SALINE | $ 0.85 |
| LAXATIVE-BISACODYL | $ 1.35 |
| COUGH DROPS-BAG | $ 0.85 |
| COUGH MEDICATED NATURE CH | $ 0.85 |
| SWASS-COTTON | $ 1.80 |
| ALAMAG | $ 1.80 |
| IBUPROFEN PAK | $ 1.20 |

### ART
| Item | Price |
|---|---|
| BOARD-ILLUSTRATION 2-PK | $ 3.69 |
| PAD-DRAWING | $ 1.15 |
| RULER-PROTRACT#99542/3330 | $ 1.85 |
| WATERCOLORS-8#96/99.21 | $ 2.20 |
| PENCIL-COLORED | $ 1.05 |

### WRITING
| Item | Price |
|---|---|
| TYPING PAD PAPER | $ 0.85 |
| WRITING TABLET / NOTE BOOK | $ 1.50 |
| PEN-BLACK/RED PROPERTY | $ 0.28 |
| PENCIL-LEAD | $ 0.12 |
| SHARPENERS-PENCIL | $ 0.50 |

### PAPER
| Item | Price |
|---|---|
| PAPER-CARBON/OUT SHT | $ 0.30 |
| TOY, B,RAY, ASSORTED | $ 0.40 |
| ENVELOPE-JUMBO #800 | $ 0.02 |
| FOLDER-STOY/OXS | $ 1.00 |
| ENVELOPE-WRITG/UM/GED | $ 0.02 |
| DICTIONARY-SPANENG | $ 6.35 |

### OTHER LEGAL
| Item | Price |
|---|---|
| ENVELOPE PADD/VELO | $ 0.50 |
| ENVELOPE #10 BUSINESS | $ 0.02 |
| HANGER/CHIP | $ 0.45 |
| DICTIONARY | $ 6.35 |

### POSTAGE
| Item | Price |
|---|---|
| STAMPS-ASSORTED | $ .01-.65 |
| STAMPED ENVELOPES | $ 0.48 |

### MISCELLANEOUS
| Item | Price |
|---|---|
| MUG-PLASTIC | $ 0.95 |
| SPOONS-PLASTIC | $ 0.35 |
| PADLOCK-KEY/PLASTIC | $ 11.75 |
| DOMINO SET | $ 5.75 |
| CHESS SET-REGULAR | $ 9.15 |
| MIRROR-SHAVE/PLASTIC | $ 8.60 |
| EARBUD-BLACK/WHITE | $ 4.55 |
| LACES-BOOT 45IN | $ 0.80 |
| COMMISSARY MESH BAG | $ 2.60 |
| DETERGENT-CRYSTAL | $ 2.25 |
| CLIPPERS-NAIL | $ 0.25 |
| LIP KOTE-CHAPSTICK | $ 0.40 |
| LIP EX-MEDICATED TUBE | $ 0.60 |
| WASH CLOTH | $ 0.40 |
| SUDOKU BOOK | $ 3.00 |

### SHOES — RETAIL
| Item | Price |
|---|---|
| TENNIS SHOE | $ 35.00 |
| BOOT/WORK | $ 17.50 |

### NON-ASPIRIN/TYLENOL
| Item | Price |
|---|---|
| NON-ASPIRIN/TYLENOL | $ 1.20 |
| ASPRIN 5 GR. PAK | $ 1.20 |
| CHLORPHEN PAK | $ 0.85 |
| SPRAY-NASAL - SALINE | $ 1.40 |
| SUNSCREEN SPF30 | $ 1.40 |

*CHECK YOUR ORDER BEFORE LEAVING. THE WINDOW NO CORRECTIONS WILL BE MADE AFTER YOU LEAVE.*

5/18/2011



00738

excuse my mistakes and messy things                     Saturday. 1.P.

Jade.                    Damn, H3 WhaT3 A Mini Book                posted --- 7.8.13
time - Unknown - 1:40 am          "SHould kEEp Ya Busy            On a hot summer
Song: Jay Z "Song Cry"                                   night, in the middle of
movie: Belly                                             Swamps, lakes and trees!

Bonjour. comment ca va aujourdhui
Yeah, breake me off a foot-rub cause you lost the bet
on the play offs. lol... Look, put the rope down and chill, it will be
ok. The spurs are used for horses, not walkin in the Heat. Take that
you and mom, I wish the game was on 720 channels so you could
see them loose on any channel when one went to break. lol-Ha-Ha-Ha,
M·I· Yeahhh...

Whats good, I see you showed up again like baby teeth. Now
its time I do the driving. Imma do alot of ~~explaing~~ explaining of things
to you, this time around. Yeah, the enthusiam, well with me we gone call
it like, you've had a few shots and you listening to some loud ass
music thats wired up. lol. Time to jump in, plus I got alot to lace you
up on, digg these blues...

Starting from the top. When you come at someone in a real way,
it means alot and especially from a woman, "it dont happen alot". 9 times
out of 10, ya would get a reply from people who are real with themselves.
I feel ya on the "guard against disapointment", ~~bt~~ but why feel that way, if
they dont write back, O well. It's the same with people in jail, cause I
didnt think you would write me back. Why, it's just how it is, never mind now
you fished and I snatched your "bait, you and the fishing pole." Now your all
wet and wondery. well I got cha. its life a job now.

Girl, you cant get no playamader than you already are. You got
your head on point too. I dont judge people, but I do wonder why
is the men wearin tighter jean's than women, lol! Check it out, on the
gang shit, what they dont know is it's to get what they have, I mean

: 00739

safety, roil moodles, ect. I would put my last that no gang member joined a gang for the violence. When they say in trial, the jury is my peers, thats bullshit. Peers grow up together and most people half a small understanding, but are to scared to voice themselves. People point and say alot but follow someone who's job is to lable someone. All that talk about gangs, when they family member does something wrong, they "the judge" covers it up with a disorder, lol. They were left alone, bullied, beat ect..., we were to and by the judges. We could debate this all day, but some stuff you just dont entertain. I stand for something and fall for nouthing! I feel you on gang violence, but gangs are good cause it teaches unity and leadership. The ones that look up to me, I stay gettin on they ass when they fuck up and I never teach violence. They already new it and growing up they know what it is already. I have done some bad and some good but I snow my intentions, so if judgement day comes today I will die loyal in all I did.

When I talked about not getting envolved, I ment with certain people. I never idol myself, but I avoid the snitche's "ones who told", rappist, mollesters, racist people, childish and the ones that play the gay role. Nouthing aginst them, but at the most, I will speak and keep moving. I have a weakness for stuff like that so to avoid even thinking about expressing it, I slide back. A man is a male but, just cause he got a pair of nuts dont make you man. I involve myself with the huscle men, gangsters, just any man with morals and a positive way of thinking and real niggs period. I have two dudes here im like family with and im even at war to help one of them as we speak, I know they will do the same for me and we have unity. Even though im the yongest, we all learn from eachother. I trust them two and living with someone all day long, everyday, the real bond comes as the person's tru colors come out. We never change on no bull and we have grown to think with and not for each other. See, with me I

2

: 00740

dont let people read or lab rat me. Im silly as a kid but also serious and the way I carrie myself people know not to take my coolness as weak. I mean, I talk to alot of people cause I keep my hands in something so I will and deal alot but its business only. Not to be friendly. I get what's mine and keep it keep it moving. Money means alot here cause some of o us hussle to eat like me, but if you aint my two homies, its hello and no more or unless we in a group discussion that everyone joins in.

Or yeah, lil momma people have to prove themselves to you? That dont apply to me, im already in there right? lol. Sign me up to be a friend, wait if you cant cook then I dont know you. ☺... Na, but on the real all I can say is, I hold my end and I aint worried bout nothin, you already chose me, lol. You know you gone have to do better than that, what kind of painful things you been through dealing with people? we can exchange stories, talk to me lil momma cause you leavin me to wonder.

Dont kick me, I apologize Jade, lol. you u said champ, I like that. Hey, I had a visit almost a month ago and my mom and my ex girls mom brought my kids. She said my son gets grounded alot and that she wants to put them in martial arts to teach the something you told me abot about. I hope they really do end up in the classes, when I was their ages I could play all the sports really good. I once had a sword, I stole it and someone stole it from me, lol. Sounds like you could do some raw damage. Do you remember the kung fu skits on TV, when the master told the student to try and snach the sprit out his hand? When he held out the can, the student was focused on it then he snatched it and it was empty. Ha Ha!. That was some funny shit, he was like "Ha - I already drank it, then he burped", lol ☺! I bet I could side step your punch and kiss your elbow or side step your kick and tickle the back of your knee, lol. I would of loved to train. Back in 2007, my baby momma kicked me in the stomac, I almost cried. ☺ She raised her leg straight over her

if I would of been
21, I would of fell
in love lol

the french from playing the mario brothers game. lol... That's a classic game, maybe
in now :)

I traveld cause I had a side chick who was in the Army and lived
re. In New York, we "she" lived in the rich part of Brooklyn. I made her take
me all around the hood's. we only visited Brooklyn and the club's in time
Square. It was cool, but could be better alone, feel me. California was
he best and She was Houston and San Francisco 1/2 and 1/2. I wanted to go where
the gangs were, had to get knowledge of my gang history. Her family lived in
every district in California. New face, new place and I got alot of
attention and she didn't hand me. I wish I wasn't so young then, I felt obligated
lot and too eager. Her being older than me, we argued alot. I still say Cali was
rest. In las vegas it was All-star weekend and just like being in my own hood. It
vas dope-boys, prostitutes, undercover cop's, and all the sceans known to man. I was
so young to gamble legit, but they have alot of bootleg spots on the
ow you can go. If you live life restricted then you'll love it. I lived it to
nt, I let loose alot and have fun so it was like a really hype night out. The
cruise was with my mom and I was really young. cant recall much so I guess
some say it dont count. Mexico was grimmy, I went with my ex's family "baby
momma". I dont know how to spell the place we were in :), I've been to Cancun
on my own, yeah - that was some BOSS shit. Girls, girls, girls and more
girls and summer concerts. I remember in Vegas at a low-in gambling shack, I
got into it with the house man. I shoot dice all night and day at home so I
vas aware. Now when I hit the winning points, he said no good, "dice have
o hit the wall and when I hit the wall he said I didn't shake them". I
got mad and said "look bro, you got me fucked up tryin to play me". I stoped
shootin and my friend started to roll and I bet on every point. I
rave a friend who is hella lucky and he was hot and I won on side bet's.
the house man says bet $1,000 on every dot of a number, meaning

5

: 00742

head and swung it down full speed, it hurt so bad to I told her momma on her U. "our secret "lol. im glad she aint like you or I would be dead U. Ома have to check up on that and see bbe my kids are sharing. See there you go again making me wonder, what did the instructor do to you? when he gets really old, you can whoop his ass for pay back, lol, Jake! I know in school I use to fight alot and one dude took me to the gym and was teaching me and he tought me alot before I leearned how to throw a punch, he tough my mind and soul befor my body. Do you think youll ever use them skills. I cant believe you know how to kill someone with your hands. damn, do you wanna be on my team, not aginst me, lol..

Damn, your a baby and so young, lol. It's a good sign, you look young, means your doing something good. Do you eat healthy? In Houston, you dont even need ID. all you do is shake the bouncer's hand and slide him $5 and you'll be in that thang 18 and older, lol! I got your birthday logged in my head. I got cha youngsta. Damn, I cant believe I been in prison all my 20's, time flies by too quick. Yeah, I feel you on no boyfriend, in this generation every "alot" of people just want a nut then move on, lol. I mean no strings and move on, mostly how I was. I have matured alot and would understand the value of a woman now that I dont have one, lol. I see you aint met a man that can make your body move befor your mind yet, wait, then you do!

Ha, everybody knows what bonjour means from TV, lol. Say something else to me and I might be cool. Your momma had a good idea, you could get a good job some place. Have you saw the movie Next Friday and Baby Joker says im bilingual not bisexual, it's a difference, lol. That shit was funny! Bilingual Jade, how does that sound? Shows how dumb I am, I thought Filipino people spoke spanish. I wish I knew every language. One time when I was young and got arrested, the cop was talkin too damn much, he said "do you hear me, I said yeah but I dont speak bullshit, lol", he got hella mad, U! Man, I already forgot the phrase U. I know my name is french but Creole, not actually from france. I know some of

4

if my friend rolled a 8 then it's $18,000. I had peeped out the play as the house man switched the dice and most loaded dice are 2-1. meaning 2-losses and 1 win and they reset to 2-1. So "I" rolled 2 times and said sched "meaning" pre-roll. the house man was pissed I kept reseting the dice and after about 10 minutes I hit the 8 so the 6,1,1. I said bet the whole $12,000. I pick up out the dice "first roll" and he said bet not knowin "we" switched the dice. "dumbass !" I could hit 2 numbers 4 ways. I didnt care I just threw them and 5-6 "11", winner for me! The man grab'd me by my neck, slamed me and threw money my way. I was mad, but now was not the place, we were from the hoods of Houston and played a man's game and left $24,000 richer. Ha - crazy shit, huh? If ya do go to Hawaii are ya gonna wear a grass dress and coconut shells on your body and roll your stomac? If you say no, its a sign of disrespect, and we "ya" dont wanna do that. Man, now this place call Texas ya should visit, it will be awesome ☺. Are you gonna move out on your own soon or you going back to school first or what?

   We watch alot of the same shows. When I have my radio I listen to NCIS, Law & Order, The Unit, CSI ect.. I use to watch First 48 one stop when I was home and saw how people broke down. That show has alot of episodes in my neighborhood my mom says. You ever heard of Crime 360"? I listen to Steve Harvey, Jermy Cowl "spoiled it wrong", Greg Furgerson, all good shows. Here I only listen to Family Guy, American Dad, Bob's Burgess, Cleveland Show. I use to watch it all at home though my kids had me watching everyone of them. Do you know of "cartoon network"? They got some funny shit on Adult swim like, Boondeck's, Assy Mcgee, Squid Billies, all kind of stuff. My ex. would be like, Teddrick this is so stupid. Do you read grapic novels? I'm not really into all that but I read read the one called "100 Bullets", well I read 3 of how ever many there are.

   Slow down, little lady! I feel you on the consequences & nasty streak, its could E

Theres no such thing as mad at me, im too cool for all that. I was like, or yeah and laughing as I read that part of your letter. Ha, look at dude turn up. you can turn down now, I dont want no problems. lol. U u are a real solid person and will break the weak minded or average guy. Not me, I see past and deeper. I can have you so far out of your caracter in no time and you wont even know it. Yeah, like you said, we gone have some good debates and since you use to loosen. lol, we wont have a problem. Thank me, have a nice day' is that a something you say when you "feel like you won", ha, im just askin ☺.

The patience I ment was 'waiting for things' and to me, only you can teach the patience. I was joking but, I could teach you some patience. Think about his "all true". It was over 104° outside and almost the same inside. Me and one of my closest here are covered in tear gas that burns like hell, we cant see, chest feels like its caven in, nose running and about to pass out fighting a chemical gas and it's helpful heat. They are waiting on us to break and were wailing on them to break. It hurts my body, defeating me and my mind is saying dont pass out. My body already beat. My eyes closed and burning I still talk shit, "fucking cowards coming with a 6 man team in riot gear and gas aginst one person "2 cells side by side", a team for each of us. He say's Strip out or we will shoot more gas "fuck you, come get me"! PTSSSSSSSSSSS more gas to fight until you hear, stop no more. "the nurse"! Thank you lord, she saved me. Now that kind of patience made me grow. I just gonna tell you the story now, June 13, I got a use of force on me cause I assulted a officer who tried to play them games and some stuff you dont do. I tried to stab him but I missed and only nicked him. He got the point. I didn't wanna seriously hurt him, just let him know not me. That was after all the talking was done and the night befor my friend got the same kind of case. So we are both in "ad seg" for 90 days. The first 72 hours, no property, shower, fan, nothin. Just burning in heat and gas. On top of that, they shake you

7

down "cell 65each" every hour on the hour, which is against the law. They do it to play torture games like sleep deprivation. Now I accept my consequences, but they went too Far! Now I have writing supplies, book's and fan, mattress ect... No radio, hotpot, commissary, all the good shit for 90 days. It gives me alot of time to reflect and I've been in ad sey every year since I been here and one year twice in a year. The cells are built with some plexie glass cover over the screen on the door so it trap's all the air in, point blank it's fucked up in seg. I'm not crying, just letting you know i'm completely lost from the world now. When I said reliable and dependable, it means what it mean. If you say something, stay true to your word, if we agree agree on you doing something involving me, i'm depending on you and not meaning you just to say it like trust and believe. I'm not a fuck up but shit happens. Prime example of now! Some people put people down cause they got in trouble or they fall off and think, "your in jail and still fucking up". It's not like that, i'm still a man that lives here and i'm the one who does this time and everything else is a coping method. You know what, I don't even want you to answer or reply to that part, I'm blessed to recieve what you have to offer. I understand any limits there may be on all you have to offer, you can chill. I understand "that's far as it goes".

I won't shade it, I had fun as a kid and all the pain was normal. I mean the struggle was amung already and the pain at home was overcame. When it got hard I did something to help hide the pain and moved alot. I was the only baby in a house of about 8 adults. I played with kids alot, but when they were inside, I was outside learning, sleeping and just following my uncles and older kids. I even started to lead kids my age off what I learned and so on. I think it fascinates you cause you have always been intrested and we are some cool ass people, my verbal skills and your whoop ass skill's, we the best, lol... How diffrent did you think I would be? Yeah, you get delt these hands in life and cant play good then you meet someone like you

: 00746

who's the exact same "in ways" and yall find the solution to a streek of wins.

Alright the story between my sons mom and me. When we first got as one, I was already deep in the street and verry popular. Over time I found love in her and finally I commited with time. I went to ~~the~~ jail for 19 months when I was 14-15 ~~16-15~~ and she eventually moved on "no problem", it did hurt though. Right sefor I was about to come home, she wrote me with some kind of hello and plea for whatever she wanted. O-yeah, she broke up with me a few months befor with the lyrics of a song and I know it by heart too. When I come home im just turning 17 and she's 3 months pregnate and alone, her baby daddy got arrested. Now befor me she was all goodie-2-shoes until I changed her. I got back to the money and school and, in no time I was back to seeing thousands of dollars and living life. My name got round to her and I went to see her ~~the~~ the day after I got out first, then I did me. I kept her company and spent alot of time with her like I was the kids dad. I loved her and could not see her hurt or without. She got really ~~just~~ jealous, so I ended up back with her. I did it all for us as a family and faithfully. One day she used my note pad I left in my car "for writing raps", she wrote her kids father. I'm not trippen and would want him to be ~~there~~ apart of his kids life. I told her keep it too with me and respect my mind. One day I went to her bag to get my pad and found another letter she tried to hid and this one I read. She was talking to him about how they use to have sex and all that shit. I was like damn, but fuck it. I started to ~~ignore~~ ~~use~~ her, no sex, staying out all night, just my old ways and only taking care of the baby. I met a chick, and got to close, and I never fucked her, "no, no, I did" and all my "but i dont make it better. I grew so distance in my mind of her, she flipped and went crazy cause I didn't pay attention to ~~her~~ her. She fond about the other woman "Angie" and a big fight broke out so I said we ~~stsd~~ should split. By this time

9

: 00747

I was 18 and we had our own spot and she went back to her parents home. We found out she was pregnate with my son "Alex" at bad ~~timing~~ times! I didnt wanna create new life and not be able to provide even though the first kid was well taken care of. I was too deep in the street and in some risky shit. I ended up tryin to fix ~~things~~ things "we tried" and it was still fucked up. Her son's daddy had got out and "I" took him to see his daddy. His daddy was a bum dude and I proved to be right. Anyway one day ~~she~~ she was blowin my phone up and I got mad so I didnt call back. Later that night I was on my way to her and my step kid and when I got to the house, I banged on the door, she had my key. I called her lil sister to let me in and as she pulled up, and we were about to go in, my baby momma open the door with tears in her eyes. I was like baby whats wrong wares ~~his~~ kash "step kid"? I looked up and saw her baby daddie and knew what it was. There is something we say in my hood, "if you fuck once, you can fuck again", if your game is right. Well she was so call "depressed" over me and needed to feel loved is what she said. I dont care about none of that out, that night she had unpretected sex with him while she was pregnate with my son. I hated her for that and as a result I havent been faithful from April of 2007 until the time I came to prison. I did everything for my kids intrest and loved them the same, so I wanted to wait until they were in school ~~3~~ to split up and make sure she would be good. I never trip on women, yall can destroy us, but she had my son in her stomac. My heart broke that after we agreed to make it, she done that. Now I know I never had her and in the world if you dont ask you ~~sha~~ will never know your lover. That's the story of my broken heart.

The work hours are a mans job. Whatever to keep them from going without. I liked it and didnt, it wouldnt always 6 days a week. I had a real cool manager so I could flex my own hours and not miss much of

:00748

my kids life. As for family, its life! I did expect my baby momma to be by my side, but! Everyone tells me its her boyfriend keepin her from me and I know she aint happy in so many ways she cant let me go and I can have her crying if she hears my voice or look at me, She wrote me last November and I felt her love for me, by way's she said some of the things, said she would be writing alot more and apologized for alot, but! I aint trippen. I cant too playa for life, plus she let me down alot.

Pride, hell yeah its 2 sided. Its all I got Jade. I use to make #1,300-#1,900, a week and about #5,000 on drugs. I left alot behind and now I have to struggle to get #25 to buy soap, deoderant and some soup's, and a soda or pint of ice-cream. I did for all my people and never hurt or lied to them. now I'm suppose to let people who would buy drug's from me, people who got picked on in school, people who hate blacks, women who have been abused by men ect. I wont let them run my life, aint no ass kissing on my end. I make people help me cause we bond and understand, know me, trust me and see me. I made a mistake like alot of people in my shoes do.

Yeah, I hide my emotions cause thats what you do when your alone. I hide them from my visual image. I reveal when I write and it's like being in the rain with a face full of tears no one can tell when I write, people are like you have a talent, but im just spilling out my own pain. Nothing fake or creative, I have and still am living out what I write. Imma send you some poems, quotes, raps, ect.. when I get to stop being lazy and do so. I'm a champ and as solid as they come, if I told some people my flaws they would not believe me. Its like when your young around adults and older people, they think your more then you are and when they test you, you take it knowin your hurting, but never crack and always keep eye contact. I see my life like rain, alot of people dont like me but im affective and needed alot. if you grow to understand me. I'll bring the best out of you. Rain is great,

: 00749

Jade and when it's a rainy day, it gives you a diffrent feeling. Hand's down my favorite element. I use to ride through my city smoken and just listening and watching the rain and it can really bring you closer to someone. I promise if you were to see me and how I act, you would never know I was in prison. It's a must I stay fresh and keep my head up, never know when I might meet my chooser, so I do me until I do, feel me. Damn right, never underestimate women! I was raised by them and the little things y'all do can really defeat ~~me~~ a me. They can be just a grimmy ~~of~~ as men and worse. I had a hit on me over some money, pride, ego's and just beef all the way around. Instead she killed my best friend. Someone set her up to do it at a club. It was just me and "Rodney" in the car and we both saw her coming towards us, fine as hell and in all... the right spots "bad bitch", when she came to the car we both got on her with words, she got off track as I grabbed her hand, she had her gun in the other hand, we didn't see it and next thing you know, shots rung out "all 12". In club traffic I could not drive off and she pulled me to the gun but only my hit as bullets went right through to Rodney. It was even bullets in the little shoes I bought for my son that ~~dy~~ day. I was questioned by homicide for almost 3 day's, thinking I ~~knew~~ knew who she was. Really didn't wanna get into that but that's my main reason. She got my ~~soul~~ body first then my mind followed and I paid a harsh price. Not to mention how my baby momma done me "you could get a nigga back, but you don't do it like that"... The way my mom has done men and her strength to make it, 2 jobs my whole life, her grind mode, powerful mind, I have been with some powerful women and I have grown to know or understand parts of y'all. Of course i'm the first to tell you that cause i'm diffrent and understand the value of a woman. i'm not just a man Jade, i'm a grown man, feel me? But dont think I wont call some bluff on the sexist issue, some stuff y'all should stick to and for purposes y'all don't even understand means alot to men, yeah think ①. I do it section by

: 00750

section too. I have to pay attention and hit everything, plus you wouldn't be satisfied if I didn't hit everything. I made a mistake before, so it's my job to hit everything, piece by piece. It's like correspondent four play with words, never mind keep it moving. Subject trying to turn, lol.

"I've got pain over how she is and others, but I got too much love for her to hate her, I know if I was out shit would be different". It means a huge part of her is me and that part is my stubborn side. She's so cold in places she's lookin for me inside. Her new boyfriend is a ex friend of mine and is almost the same body structure as me and he treats her like shit. By her staying with him, it hurts me and by him knowing her, he keeps her restricted from me. She ignores family and friends over help they try to give her, so that's alot of pain in me. I use to be the same way, but I didn't need nouthin so I was making my actions ok with my money. She aint got shit and she's being fucked up. The other part, I have a part of her and I know if she was to be infront of me, I could break her down! So since she knows I cant now she acts diffrent. If I was out she would still be in her house "new" and would have it all. It's apart of me she needs and I thought she picked up, but she didnt. Every time I get a visit someone tells me "man, if you was out shit would be diffrent". I said that meaning - how I provided for my family and how she let me down with alot of shit she's done. A part of me truly understands, but most of me is how and why. Jade if I came home to you, laid between your legs, put a child in you, provided for you the whole 9 yards and more. Then also put you through a emotional wreck, no matter what or who! If you need me im there with my new lover or not! I dont want her to go beyond her limits for me, but damn "I should never have to go hungry"! She just is a diffrent person, but ima get to her one day, and no matter what your not suppose to do the one you love like that "so I thought", still I aint trippen.

I've been that way for along time, more female friends than men. Stop it, I seem like a ladies man, why you say that? Sounds like you talking with a different part of you. lol. In the world, I had friends I had sex with and we had a good bond and some who just had the good bond with me. I had to slide back from the sex, it brings feelings. My ex hatted it and it just happens that most of my friends looked better than her. Sometimes you need friends like that. I'm a real blunt and easly accepted accepted person and other males have this ego thing thats unseen. I would rather more girl than boy friends period, we vibe so good. As a kid I had mostly male friends until I saw that girls liked me. All my female friends are blunt, open and straight forward as can be. When I meet a woman who likes to play or just hold drama, I work on her and just keep it real and she will see and it always works cause they end up better in many way's. Both man and woman do the same shit. I remember along time ago I met this older chick #1 and I, wanted to do was have sex and she kept saying no, but played I mean came on game. So I just stop talkin to her. She told me, you gonna stop talkin to me cause I wont let you fuck me? lol. Then she said how cool I was and diffrent, ect... "And said dont try to sleep with every girl you meet, try and just be friends, sex will bring unwanted feelings"... That was some real shit to me, so I listen and it worked. I feel we are oppose to be closer to the opposite sex and not just cause the bible makes "some people" obligated, I just feel that way. If the world was about to end in 2 hours and you could be stuck with man or woman in a room alone naked with nouthing in the room, who would you pick?? 😊 I want a woman that I dont have to help understand, we should go out having sex and feeling good. Then the world dont end. 😊 Ha! well least you had sex, I know i'm crazy.

I'm about to tell you about some crazy mail, really blunt so mature

14

: 00752

up and dont be ssyin im tripped, lol, just playing. but listen. for almost a year, I have had over 4,000 people write me. Sometime you get a feeling about a person and dont feel a vibe. When I do that I just send a card and let them know what it really is. Sometimes you click with people and some you dont and as of now I have 27 penpals and 12 of them have accepted me like family, I write gay married women, single women, college women, married men and women, widows, whoever keeps it real. but no gay men at all. nothing against them just dont wanna get involved, hie and by. I bet you do wanna hear the weird/crazy stories from people "mostly women". Ok, I didnt know how much women love black men! They write me with these sex letters, how they want it, where they want, they wanna come visit. ect. I do have friends I write like that, but its mutual and I make her get a good deep nut end. she do the same to me with words. Some women send me first letters like that though. I never been touched by a black man, I love your ebony skin, ect! I know some are really sick and racist, but me in prison gives them some kind of slave powerful sex drive. Some women demand I write them, try to controll me, threaten me, I have 4 of them that stalks me and wont stop writing me. Yeah, I get crazy stalk mail everyday, I dont even read it. They say "you worthless piece of shit, show some respect and write me back, give me some of you black dick, send me some of your cum. They write me crying, tell me they love me, make promises. ect. I have never got mail such as hate mail only crazy women, I have got some pictures of them with nothing on "denied by the prison", but when they send pictures half naked, ass shots, it can be see through or like panties pulled up the vagina, real xx but not xxx. They send me money and say write me everyday, tell me how to eat, stalk my family, tell me I broke they heart after I stop writing, call me racist, judgemental, a slave, nigger ect. All from women. Im replyin to a letter tonight also also. this friend from England and her friend wants to see

15

: 00753

a measurement of my penis, lol and oma do it. See all this freaky shit, its cool with me, if thats how you wanna take it. It dont mean shit to me, and I dont only think about that shit, thats like my entertainment. I even had women try to send me their panties and the mail room is like "boy dont be tellin them to do that", I dont. A couple of friends, I did send them one of my shirts though and they send me pictures of them wearin it. I have tons of reporters who wanna interview me and talk about my gang life, me period, my crime and life in general. Some write cause they been hurt by men and need to talk, some want advice, want me try and help guid their son in the right direction, some just wanna know me. I've had men write me threatening me cause I wrote their wife, underage girls write me, all the way to normal minded people like you to everything under the sun. I've got alot of crazy mail and I actually like that shit. I will tell you more stories when I find old mail or get new mail. If I dont feel you mutually agree, I move on. I have some that help with legal work, send me books, help with what I have going on, everything from helping my kids back to me. Some people, I just wanna write back and get to know them more and grow, thats why im on page 16. I hope I satisfied your hunger and have alot more for you if you want.

    Oma just say send me your music play list and oma see if you get air play or no way, lol. Yeah we only get the wak "Half wak" radio music. All that i-pod business, no not in Texas. We dont need that, all they need to do is get satalite radio or some kind of Sirus radio and we would be good. We are only confined 23 hours a day in ad. seg. You get 2 hours out when your not in seg. Sometimes you get 4 hours out depending how busy they are and you can sneak and make deals for extra time, remind me to tell you how that works. Na-Na, now dance music or skiing jean music may be cute, but I dont make cute music, lol. The people I say im like now is a mix of Big KRIT, K.Lamar, Drake, in those

: 00754

time's now to speak.

I wont spend too much time on this but just so you will know, Lebron is not the greatest player the planet far-far-far from it! He cries alot cause he's big and most people have trouble holding him, so they foul and fuck up his drive, when they dont call it, its points he lost. Miami is nice and sorry! They should of swept SA and how can Crish Bosh be the best 3-point shooter on the starting 5 "sadly he is". I Arrogant is swag and you should expect it. You wrong about how they came together. The bulls did the same "Jordan, Pippen, Rodman", Rockets' Harkiem, Horry, Cacell", Buston - "Pierce, Allen, Rondo" SA "Duncan, Parker, Ginnoble "spilled wings". but they all patched up the team with greats to win. Danny Green is hot, but he is also a clover, remember where he came from? Parker is hard and reliable, Duncan is hard when he wants to be. That was one of the best Finals since Pheonix Vs. Chicago. I say Miami will go for 4 rings straight, watch every year will get harder and harder. The Rockets will be raw next year watch. Dont be bringing your mom into this, instead of a fur coat she got a fubu T-shirt, lol. Yeah we will "Hit" go down in flames, under strippers, money, Second ring, Crystal, music and happieness, C-ya U. I miss the last 3 games cause I was in Seg, but I kept the updates.

That's why I really didnt know if I should tell you. Please dont feel sad or sorry for me, im a champ. I just found out cause apart of my second appeal is family history and from my investigator doing her job, she got deep stuff. I didnt never ask, never wanted to or cared, but when I read what my family said it shocked me. Never use the word sorry, use apologize, but thanks for the care and concern, we can revisit if you want Jade, I dont burrie my skeletons and hide, they make me stronger everyday to even know they existed, sounds woird but it you dont understand, I know you'll ask.

Yeah, I know how you feel, but a tatted woman to me is sexy, lol. I would send you a picture of me with my shirt off but I dont think I could. It may not be good for your heath anyway U! I have a million pictures at home, I wish

17

: 00755

my baby momma would unhostge, "another reason I can read her"!

Yeah, you underestimated me huh? I put that 4% law of Power on your mind. I had the "Art of Seduction", but them books are not allowed her ☺, so they took it from me. Maybe you could print it out for me on paper and send it to me so I can finish it. My versatility is limitless girl, dont make me...... ☺ O- with me question you asked, I would change how I decide which situation I will pick. I have a way of saying fuck it and going for the more risky situations. I feel like I can beat the consequences or take them all on. I wish I wasn't so friendly so I wont have to get on people ass when they try me.

I gave you that green light to ask whatever and I dont have no unseen lines of limits. Just ask whatever and I understood wrong, but just see it as I answerd a diffrent question, lol! Yeah, this place is dirty. I told you how they did me this last time and they do even dirtier shit to people and the high rank people just ok it, then when you fuck one of them off, they all wanna talk. I tell them fuck you, get it how you live. It's only one thing you sent my way that I dont get and see alot or everyday and thats a comfort zone.

Yeah, I made commissary and its only been a handful when I didnt have money to go "sad-hurtful feeling too"! I threw away my list but ona get a new one, and send it to you. Wait I have a old one 3½ years old but most of the prices are higher now, some the same. I just rememberd if you go to "Houston cronical.com" and put in my name it should give you a video of me in trial to see. Fuck that typewriter right now, I need to send my son gift for his birthday plus me new ones are like $225-$250, I will get one, but until then you get my messy writing, lol.

Sending you a picture to keep now. I know I look mad, but I just felt like shit, next time ona smile. Dont be lookin at my chest, to me this is a sad picture, so dule and the copie machine gave me some more blackness ☺.

: 00756

Do you have other pen pals, meaning I have to compete? &#128578; Why cant you just get a credit card yourself? I dont care how you write, I just thought it would be better for you. Extra epic, huh? I hear you lil momma.

I guess I dont ask many questions, feeling you will come off and tell me. Trust me, its hard to thank when my mind goes blank, which it does alot. Since you want it, ima ~~get~~ give it to you. lol joke. ima give you questions &#9786;

① what was your first thought when you saw me?

② How did you expect me to be?

③ when you said what you had to offer, is that all you feel you can offer?

④ Do you think you'll be able to tell me some deep secrets?

⑤ what do your mom think about you writing me?

⑥ why did you write me with a P.O. Box and not a house address?

⑦ Do you understand the terms of having a pen pal?

⑧ what was your longest relationship? Reason why I ask.

⑨ Are you one to talk out the issue or will you just walk away?

⑩ If you had a boyfriend, what would he be like? Not indicating nothin, reason I ask

⑪ If I indirectly talked about you in my book, would you get mad?

Ok, no more for now. I have a legal visit in the morning. Oh yeah, my first appeal was denied so I ~~actually~~ only have 4 more. Time for me to put this in the wind and lay back like a dead fly. Thank you for the time, it's a blessin to kick it with the real. keep it tight and right until next time, kick it with the rain, relax release and relate. Peace 1-Hunned - Deuces

W. Byfor

1 2

Cash?

1h3 R3al D3al.

Kush 3nt3rtain3r.....

: 00757

# STATE'S WRIT EXHIBIT D
# Affidavit of Traci Moore Bennett

: 00758

No. 1212366-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 174th DISTRICT COURT |
| | § | OF |
| TEDDRICK R. BATISTE, | | |
| Applicant | § | HARRIS COUNTY, TEXAS |

## AFFIDAVIT OF TRACI MOORE BENNETT

My name is Traci Moore Bennett. I am an Assistant District Attorney with the Harris County District Attorney's office. My Bar Card Number is 75002489.

I prosecuted the State's case against Teddrick Batiste. In the course of my pre-trial investigation I ran the criminal history on witness Anthony Moore; this NCIC/TCIC report was generated on June 1, 2011. I have attached a copy of this report to my affidavit. It contains no mention of any State of Michigan criminal history. As a result I was not aware of Mr. Moore's Michigan criminal history at the time of trial. Had I known about his Michigan criminal history, and consistent with my obligations under *Brady v. Maryland*, I would have disclosed this to defense counsel.

I have personal knowledge of the facts contained in this affidavit, and they are true and correct.

Traci Bennett
Assistant District Attorney

SUBSCRIBED AND SWORN to before me on Nov. 4, 2013.

VIVIAN M. LOGAN
Notary Public
STATE OF TEXAS

Notary Public in and for the
STATE OF TEXAS

VIVIAN M. LOGAN
Notary Public
STATE OF TEXAS
Commission Exp. 02-09-2014



STATE'S
EXHIBIT
D
Habeas

1

of District Attorney, Harris County, Texas, Patricia R. Lykos

## MOORE, ANTHONY D.

| | | | |
|---|---|---|---|
| Date of Birth: | 4/9/1973 | Age: | 38 |
| Sex: | M | Race: | B |
| Height: | 604 | Weight: | 210 |
| Eye: | BRO | Hair: | BLK |
| Skin: | DBR | Build: | MED |
| SPN: | 01106897 | SO Number: | 0514348 |
| SSN: | 463491486 | State ID: | TX04608447 |
| FBI Number: | | DL Number: | 14633822, 16315091 |
| Tattoos: | SO 0514348, TAT L ARM, TTLF/ARM | | |
| Jail Status: | HAS BEEN IN JAIL | | |
| Warrant Status: | HAS NO OPEN WARRANTS. | | |

(1/2) 1/5/2009

Create Lineup / AFIS Summary / Save

CCH    Aliases    Related Cases    Person Master    Plea Games    Victims' Rights    Bond Forfeiture

| | |
|---|---|
| Charge: | FAILURE MAINTAIN FINANCIAL RES |
| Cause Number: | TR52X3005090 |
| Case Type: | JUSTICE OF THE PEACE CASES |
| Court Number: | 052 |
| File Date: | 9/10/1998 |
| Bond: | 000000 |

| | |
|---|---|
| Charge: | NO DRIVER LICENSE ON DEMAND |
| Cause Number: | TR52X3005091 |
| Case Type: | JUSTICE OF THE PEACE CASES |
| Court Number: | 052 |
| File Date: | 9/10/1998 |
| Bond: | 000000 |

| | |
|---|---|
| Charge: | CRIM MISCH >=$20 <$500 |
| Cause Number: | 9717277010I0 |
| Case Type: | MISDEMEANOR CASES |
| Court Number: | 013 |
| File Date: | 4/23/1997 |
| Bond: | 001000 |
| Agency: | HOUSTON POLICE DEPARTMENT (TXHPD0000) |
| DA Log Number: | 349484 |
| OR Number: | 371665970 |
| Offense Date: | 03/24/1997 |
| Officer Name: | BRASHER, VIRGINIA A |
| Transaction Number: | 349484 |
| Case Status: | DISPOSED |
| Disposition Category: | REFORMED |
| Disposition: | MOTION TO REVOKE PROBATION GRANTED |

of District Attorney, Harris County, Texas, Pane R. Lykos

Page 2 of

Sentence:              0001 YEARS PROBATION
Disposition Date:      1/23/1998

Summary of Facts    Case Summary    Persons Connected    Case Settings    DEEDS (2)

EF. DROVE THROUGH THE HURRICANE FENCE AT THE PUBLIC WORKS DEPARTMENTSTORAGE
YARD AT 6342 FAIRDALE. SECURITY GUARD, RICHARD COX, OBSERVED THEDEF. (IN A BMW)
DRIVING AROUND THE YARD, WHERE THE PUBLIC DOES NOT HAVEACCESS, TRYING TO FIND
AN EXIT. THE DEF. THEN DROVE BACK THROUGH THEHURRICANE FENCE IN ANOTHER
LOCATION, IN ORDER TO EXIT THE STORAGE YARD.A HOUSTON K-9 UNIT, OFFICER NIETO,
OBSERVED THE DEF. IN THE BMW JUST AFTERIT LEFT THE STORAGE YARD, WHILE ON
FAIRDALE, AND THEN SPOKE WITH MR. COX,WHO INDICATED TO HIM THAT THE DEF. HAD HIT
A LARGE SIGN POLE IN THE NEXTAREA, BUT DID NOT MENTION THE HURRICANE FENCE.
OFFICER NIETO STOPPED THEDEF., AND IDENTIFIED HIM, EVEN OBSERVING DAMAGE TO THE
DEF'S VEHICLE.OFFICER NIETO DID NOT KNOW OF THE FENCE DAMAGE, SO HE RELEASED THE
DEF.AFTER HE IDENTIFIED HIM. THE DAMAGE TO THE FENCE IS VALUED AT $255.00.

Complainant 1:         MCCLENDON, DERRICK Phone Number: 7132246231


Charge:               DRIVING WHILE LICENSE SUSP.
Cause Number:         944275201010
Case Type:            MISDEMEANOR CASES
Court Number:         013
File Date:            10/22/1994
Bond:                 000000
Agency:               HOUSTON POLICE DEPARTMENT (TXHPD0000)
DA Log Number:        149442
CR Number:            12002247194N
Offense Date:         10/22/1994
Officer Name:         LEYBA, BRIAN
Transaction Number:   149442
Case Status:          DISPOSED
Disposition Category: REFORMED
Disposition:          MOTION TO REVOKE PROBATION GRANTED
Sentence:             0180 DAYS PROBATION
Disposition Date:     2/12/1997

Summary of Facts    Case Summary    Persons Connected    Case Settings

OFFICER CS MURCHISON RIDING 18G49N DROVE BY SUSP. AND THE SUSP AND NOTICEDSUSP.
WAS NOT WEARING A SEAT BELT.OFFICER CS MURCHISON STOPPED SUSP. ANDFOUND HIM TO
BE DWLS . OFFICER BW LEYBA VERIFIED THE DWLS SGT. KLAUSNERFROM ACC DIV. AND SUSP.
SHOWED TO HAVE SUSPENDED LIC.SUSP. WAS TRAVILING EAST BOUND ON WETSHEIMER AND
WAS STOPPED AT 2700 STONEYBROOK


Charge:               ASSAULT-BODILY INJURY
Cause Number:         902002501010
Case Type:            MISDEMEANOR CASES
Court Number:         014
File Date:            5/22/1990
Bond:                 001000
Agency:               CONSTABLE PCT 5 (TX1015000)
Case Status:          DISPOSED
Disposition Category: OTHER
Disposition:          DEFERRED ADJUDICATION SUCCESSFULLY TERMINATED
Disposition Date:     8/7/1991

Summary of Facts    Case Summary    Persons Connected    Case Settings



No Summary of Facts

Charge:              PUBLIC INTOXICATION
  Cause Number:      JP0520304285
Case Type:           JUSTICE OF THE PEACE CASES
Court Number:        052
  Bond:              000200

```
  01106897                                          **NQY3(LNQY).** PG 1
NE `       NAME           USC PTY RAC SEX DOB   JAIL W/W CIN   SPN    CLS
    MOORE, ANTHONY D.      Y   D   B   M 040973  H   H   C   01106897989
   .MOORE, ANTHONY D.      Y   D   B   M 040973  H   H   C   01106897990
    MOORE, ANTHONY D.      Y   D   B   M 040973  H   H       01106897991
    MOORE, ANTHONY D.      Y   D   B   M 040973  H   H       01106897992
    MOORE, ANTHONY D       Y   D           H   H       01106897993
  SEE MORE ALIAS NAMES USE THE ALIAS NAME INQUIRY
ST ADDRESS: 20666        CASTLE BEND KATY        TX77450   PHONE: 281-646-9982
: 604 WT: 210 EYE: BRO HAI: BLK SKN: DBR BLD: MED SMT: TAT L ARM SON: 0514348

***                       CASE INFORMATION                        *****
 CDI CASE NUMBER   CRT CON FIL-DT OFFENSE    NXT-ST S CST INS DISPOSITION
 001 TR52X3005091 052 DEF 091098 TRAFFIC            N  A  WAR
2   001 TR52X3005090 052 DEF 091098 TRAFFIC         N  A  WAR
 002 971727701010 013 DEF 042397 OTHER MISD 012398 D  C  MRP DISP-012398
 001 JP0520304285 052 DEF        OTHER MISD         J  A  WAR
 002 944278201010 013 DEF 102294 OTHER MISD 021297 D  C  MRP DISP-021297
5   002 902002501010 014 DEF 052290 ASSAULT  050791 D  C  MAJ DISP-080791
 004 94427820101A 013 PRI 082796                    D  C  BFT BFPD-121996
 004 94427820101B 013 PRI 111396                    D  C  BFT BFPD-022597
ND OF DISPLAY- HIT CLEAR TO TERMINATE.                      PF5-97=WIQS
F6=LBKI PF9=LPER PF11=LAPI **LINE NO => ENTER=LQY6 PF1=BFS70 PF2=AP01 PF4=LDIS
5=LCDP PF7=LQY8 PF8=LQY9 PF10=LATT PF5-99=PTSM (LN + X PF5=CSR30 OR PF8=LDSP)
```

: 00763

```
RUN DATE - 06/01/2011      JUSTICE INFORMATION MANAGEMENT SYSTEM         001
TIME - 12.28.43              HARRIS COUNTY CRIMINAL RECORD               PTSP

SPN: 01106897


FILING DATE:042397    DEFENDANT NAME:MOORE, ANTHONY DWANE
OFFENSE:CRIM MISCH >=$20 <$500            CRT/CASE: 013/971727701010

            DISPOSITION              DAYS MONS YRS    IND    FINE    DISP DATE


PROBATION-PLEA OF GUILTY                     0001    HCJ 0000500      062597
REVOKED                           0060               HCJ              012398




FILING DATE:102294    DEFENDANT NAME:MOORE, ANTHONY D.
OFFENSE:DRIVING WHILE LICENSE SUSP.      CRT/CASE: 013/944278201010

            DISPOSITION              DAYS MONS YRS    IND    FINE    DISP DATE


PROBATION-PLEA OF GUILTY          0180               HCJ 0000100      011295
REVOKED                           0020               HCJ              021297




FILING DATE:052290    DEFENDANT NAME:MOORE, ANTHONY D.
OFFENSE:ASSAULT-BODILY INJURY            CRT/CASE: 014/902002501010

            DISPOSITION              DAYS MONS YRS    IND    FINE    DISP DATE


DEFERRED ADJUDICATION OF GU                  0001                     080890
PROBATION TERMINATION                                                080791




* * * * * * * * * * * * * * END OF DISPLAY * * * * * * *  * * * * * * * * * *
**********************************************************************************

++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++
12:28:45+++++ REPLY :
AUH3.2HN2   .TBR0859.


 63588
.TX101015A.AUH3.
T
I01AUH3 2HN2.QH.TX101015A
NAM/NORSWORTHY,JOSHUA.SEX/M.RAC/W.DOB/19800227.PUR/C.REQ/BENNETT, TRACI MOORE.OP
```

: 00764

```
********************************************************************************
+++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++
12:29:23+++++ REPLY :
  H3.2HN2  .TBR0859.
```

```
3764567
R.TX101015A.AUH3.
T
01AUH3 2HN2.QR.TX101015A
ID/TX04608447.PUR/C.ATN/BENNETT, TRACI MOORE.
XAS DEPARTMENT OF PUBLIC SAFETY COMPUTERIZED CRIMINAL HISTORY

E FOLLOWING RECORD PERTAINS TO DPS NUMBER/TX 04608447
```

ME(S)
ORE,ANTHONY DWANE
OORE,ANTHONY(AKA)
ORE,ANTHONY D(AKA)
BONE,NICKNAME(AKA)

| I NUMBER | DPS NUMBER |
|---|---|
| | TX 04608447 |

| OCIAL SECURITY | DRIVERS LICENSE | ID NUMBER |
|---|---|---|
| 3491486 | 14633822 TX | TX 16315091 |
| 3494486 | | |

| | RACE | SKIN TONE |
|---|---|---|
| | B | DBR |

| IGHT | WEIGHT | DATE OF BIRTH |
|---|---|---|
| 4 | 200 | 04-09-1973 |

| AIR COLOR | EYE COLOR | FINGERPRINT PATTERN |
|---|---|---|
| K | BRO | PO11POPO12CI13PIPICI |

| FIS FINGERPRINT | RIDGE COUNT | PRIMARY CLASS |
|---|---|---|

ENRY CLASS
  O 16 U    OOO 12  MWW
  I 26 U    OII     LWW

| LACE OF BIRTH | CITIZEN | III CODE |
|---|---|---|
| | US | |

| CARS, MARKS, AND TATTOOS | ALIAS DOB |
|---|---|
| AT L ARM | |
| AT R SHLD | |

NA

| E OF REPORT | ORIGINATION DATE | DATE OF LAST UPDATE |
|---|---|---|
| -01-2011 | 02-01-1992 | 04-14-2000 |

```
================================================================================
  EVENT CYCLE 1
    ARREST DATE          12-08-1991
```

:00765

```
· TYPE                     ADULT
  AGENCY                   TX1050000 - HAYS CO SO SAN MARCOS
  -------------------------------------------------------------------------
     TRACKING SUFFIX       *001
  -------------------------------------------------------------------------
     OFFENSE DATA
        OFFENSE              MOVING TRAFFIC VIOLATION
        OFFENSE DESC         DWLS
     -----------------------------------------------------------------------
  NO PROSECUTION DATA AVAILABLE
  -------------------------------------------------------------------------
     COURT DATA
        COURT OFFENSE        MOVING TRAFFIC VIOLATION
        OFFENSE DESC         DWLS
        DISPOSITION          CONVICTED
        DISPOSITION DATE     02-13-1992
        PROVISION            FINE & COST
================================================================================
EVENT CYCLE 2
  TRACKING NUMBER        9001379648
  ARREST DATE            10-22-1994
  TYPE                   ADULT
  AGENCY                 TXHPD0000 - HOUSTON POLICE DEPARTMENT
  NAME                   MOORE,ANTHONY D
  -------------------------------------------------------------------------
     TRACKING SUFFIX       A001
  -------------------------------------------------------------------------
     OFFENSE DATA
        AGENCY ID NUMBER     703683
        AGENCY CASE NUMBER   12002247194N
        OFFENSE DATE         10-22-1994
        OFFENSE              DRIVING WHILE LICENSE SUSPENDED
        CITATION             VCS 6687B-(34)(A)
        LEVEL & DEGREE       MISDEMEANOR - CLASS B
        DISPOSITION          TRANSFERRED TO COUNTY
        DISPOSITION DATE     10-22-1994
        REFERRED             TX101015A - DISTRICT ATTORNEYS OFFICE HOUSTON
     -----------------------------------------------------------------------
     PROSECUTION DATA
        PROSECUTION AGENCY   TX101015A - DISTRICT ATTORNEYS OFFICE HOUSTON
        ACTION               PROSECUTOR ACCEPTS THE CHARGE
        OFFENSE              DRIVING WHILE LICENSE SUSPENDED
        CITATION             VCS 6687B-(34)(A)
        LEVEL & DEGREE       MISDEMEANOR - CLASS B
     -----------------------------------------------------------------------
     COURT DATA
        COURT AGENCY         TX101683J - COUNTY CRIMINAL COURT 13 HOUSTON
        COURT OFFENSE        DRIVING WHILE LICENSE SUSPENDED
        CITATION             VCS 6687B-(34)(A)
        LEVEL & DEGREE       MISDEMEANOR - CLASS B
        DISPOSITION          PROBATION REVOCATION
        DISPOSITION DATE     02-12-1997
        SENTENCE DATE        02-12-1997
        CAUSE NUMBER         944278201010
        FINAL PLEADING       GUILTY
        CONFINEMENT          0020D
        RECEIVING CUSTODY    TX1010000 - HARRIS CO SO HOUSTON
        MULTIPLE SENTENCES   CONCURRENT
================================================================================
EVENT CYCLE 3
```

```
   TRACKING NUMBER       0008608385
   ARREST DATE           12-18-1994
   TYPE                  ADULT
   AGENCY                TX0930000 - GRIMES CO SO ANDERSON
   NAME                  MOORE,ANTHONY
-----------------------------------------------------------------------
     TRACKING SUFFIX     A001
-----------------------------------------------------------------------
     OFFENSE DATA
        AGENCY ID NUMBER     945021
        OFFENSE DATE         12-18-1994
        OFFENSE              DRIVING WHILE LICENSE SUSPENDED
        CITATION             VCS 6687B-(34)(A)
        LEVEL & DEGREE       MISDEMEANOR - CLASS UNKNOWN
        DISPOSITION          BAIL/RELEASED ON OWN RECOGNIZANCE
        DISPOSITION DATE     12-19-1994
        REFERRED             TX093013A - COUNTY ATTORNEY'S OFFICE ANDERSON
-----------------------------------------------------------------------
     PROSECUTION DATA
        PROSECUTION AGENCY   TX093013A - COUNTY ATTORNEY'S OFFICE ANDERSON
        ACTION               PROSECUTOR HAS REJECTED THE CHARGE WITHOUT A
                             PRE-TRIAL DIVERSION
        ACTION DATE          12-10-1996
        OFFENSE              DRIVING WHILE LICENSE SUSPENDED
        CITATION             VCS 6687B-(34)(A)
        LEVEL & DEGREE       MISDEMEANOR - CLASS UNKNOWN
-----------------------------------------------------------------------
     NO COURT DATA AVAILABLE
=======================================================================
EVENT CYCLE 4
   TRACKING NUMBER       9003415277
   ARREST DATE           05-16-1997
   TYPE                  ADULT
   AGENCY                TXHPD0000 - HOUSTON POLICE DEPARTMENT
   NAME                  MOORE,ANTHONY DWANE
-----------------------------------------------------------------------
     TRACKING SUFFIX     A001
-----------------------------------------------------------------------
     OFFENSE DATA
        AGENCY CASE NUMBER   371665970
        OFFENSE DATE         03-24-1997
        OFFENSE              CRIM MISCH>=$20<$500
        CITATION             PC 28.03(a)
        LEVEL & DEGREE       MISDEMEANOR - CLASS B
        DISPOSITION          HELD
        DISPOSITION DATE     05-16-1997
        REFERRED             TX101015A - DISTRICT ATTORNEYS OFFICE HOUSTON
-----------------------------------------------------------------------
     PROSECUTION DATA
        PROSECUTION AGENCY   TX101015A - DISTRICT ATTORNEYS OFFICE HOUSTON
        ACTION               PROSECUTOR ACCEPTS THE CHARGE
        OFFENSE              CRIM MISCH>=$20<$500
        CITATION             PC 28.03(a)
        LEVEL & DEGREE       MISDEMEANOR - CLASS B
-----------------------------------------------------------------------
     COURT DATA
        COURT AGENCY         TX101683J - COUNTY CRIMINAL COURT 13 HOUSTON
        COURT OFFENSE        CRIM MISCH>=$20<$500
        CITATION             PC 28.03(a)
        LEVEL & DEGREE       MISDEMEANOR - CLASS B
```

```
         DISPOSITION              CONVICTED
         DISPOSITION DATE         06-25-1997
         SENTENCE DATE            06-25-1997
         CAUSE NUMBER             971727701010
         FINAL PLEADING           GUILTY
         CONFINEMENT              0Y
         PROBATION                1Y
         FINE                     500
         RECEIVING CUSTODY        TX1010000 - HARRIS CO SO HOUSTON
         MULTIPLE SENTENCES       CONCURRENT
    -----------------------------------------------------------------
    COURT DATA
         COURT AGENCY             TX101683J - COUNTY CRIMINAL COURT 13 HOUSTON
         COURT OFFENSE            CRIM MISCH>=$20<$500
         CITATION                 PC 28.03(a)
         LEVEL & DEGREE           MISDEMEANOR - CLASS B
         DISPOSITION              PROBATION REVOCATION
         DISPOSITION DATE         01-23-1998
         SENTENCE DATE            01-23-1998
         CAUSE NUMBER             971727701010
         FINAL PLEADING           GUILTY
         CONFINEMENT              60D
         RECEIVING CUSTODY        TX1010000 - HARRIS CO SO HOUSTON
         MULTIPLE SENTENCES       CONCURRENT
================================================================================
 NO CUSTODY DATA AVAILABLE

AUTHORIZED USE OR DISCLOSURE OF THE INFORMATION CONTAINED IN THIS RECORD
***********************************************************************************

 ++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++
+12:29:23+++++ REPLY :
AUH3.2HN2  .TBR0859.


3764571
.TXNCIC000.AUH3.
T
L01AUH3
101015A
 IDENTIFIABLE RECORD IN THE NCIC INTERSTATE IDENTIFICATION INDEX
III) FOR SID/TX04608447.PUR/C.
TICE -- THIS DOES NOT PRECLUDE THE POSSIBLE EXISTENCE OF MATCHING
CORDS IN LOCAL, STATE, OR FBI CJIS DIVISION FILES THAT ARE
T INDEXED IN THE NCIC III. IF YOU DESIRE A SEARCH OF THE FBI
JIS DIVISION FILES, A FINGERPRINT CARD SHOULD BE SUBMITTED.
D

RI: 58764571 IN: NCIC 140177 AT 01JUN2011 12:28:29
JT: AUH3 8496 AT 01JUN2011 12:28:29

***********************************************************************************

AY RESULT IN SEVERE CRIMINAL PENALTIES.
EE TEXAS GOVERNMENT CODE SECTION 411.085.
    OF RECORD

CRIME RECORDS SERVICE DPS AUSTIN TX 06/01/2011
RI: 58764567 IN: CCH 21507 AT 01JUN2011 12:28:28
JT: AUH3 8496 AT 01JUN2011 12:28:28
```

# STATE'S WRIT EXHIBIT E
# Affidavit of Donald Cohn

No. 1212366-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 174th DISTRICT COURT |
| | § | OF |
| TEDDRICK R. BATISTE, | | |
| Applicant | § | HARRIS COUNTY, TEXAS |

## AFFIDAVIT OF DONALD COHN

My name is Donald Cohn. I am a certified peace officer and an Investigator with the Harris County District Attorney's office. The facts detailed below are true and correct.

Assistant District Attorney Joshua Reiss asked me if I could determine why the criminal history report generated by Assistant District Attorney Traci Bennett did not pull up information from the State of Michigan regarding witness Anthony D. Moore. I have determined that the reason is the result of an administrative error that failed to link up Mr. Moore's FBI number 437369AC4 with his Texas State Identification number TX04608447.

On October 15, 2013 at 1:47 PM I ran Mr. Moore's criminal history using his Texas State Identification number as an identifier. His FBI number did not appear nor did any State of Michigan criminal history. This is the same result as Assistant District Attorney Bennett's search conducted on June 1, 2011. On October 15, 2013 at 1:57 PM I ran Mr. Moore's criminal history using his State of Michigan Identification number 2235646A (obtained from an exhibit attached to Teddrick Batiste's habeas corpus writ) and it printed Moore's Michigan criminal history and his FBI number.

I alerted the Harris County Sheriff's Office to this discrepancy on 10/16/2013 and they have addressed the matter by forwarding unsent fingerprints of Mr. Moore to Texas

STATE'S EXHIBIT E

Department of Public Safety AFIS (Automatic Fingerprint Identification System) which linked the

Texas and Michigan criminal history by the FBI number as the same person.

Donald Cohn
Investigator
Harris County District Attorney

SUBSCRIBED AND SWORN to before me on Nov. 4, 2013.

VIVIAN M. LOGAN
Notary Public
STATE OF TEXAS
Commission Exp. 02-09-2014

Notary Public in and for the
STATE OF TEXAS

: 00771

# STATE'S WRIT EXHIBIT F
# R.P. "Skip" Cornelius Expense Claim

ATTORNEY FEES EXPENSE CLAIM
DISTRICT COURTS-CAPITAL CASE
UNDER ARTICLE 26.05, CODE OF CRIMINAL PROCEDURE
AS AMENDED

INSTRUCTIONS
Use only one defendant per claim.
Before payment can be authorized, each claim must be completed legibly in ink.
Turn in completed claim to the presiding judge for approval.

P7

| Court No. 174th | Defendant Name Teddrick R. Batiste | 1212366 |

| CAPITAL CASE | | Number of Court Days/Hours | RATE | TOTAL (presumptive maximum) | AMOUNT (Judge Completes) |
|---|---|---|---|---|---|
| **DEATH CAPITAL 1ST CHAIR** | Non-Trial Appearance | | $400/day | | |
| | Voir Dire | | $600/day | | |
| | Trial/Hearing with Testimony | | $800/day | | |
| | Out-of-Court Hours* | | $100/hour | $12,000 | |
| **DEATH CAPITAL 2ND CHAIR** | Non-Trial Appearance | | $400/day | | |
| | Voir Dire | | $500/day | | |
| | Trial/Hearing with Testimony | | $700/day | | |
| | Out-of-Court Hours* | | $80/hour | $9,600 | |
| **DEATH CAPITAL FLAT RATE** | Includes all fees except investigation costs, expert witness fees, and witness travel costs. Flat rate applies only if testimony begins in the guilt/innocence phase of trial. Otherwise, the daily and hourly rates apply. | 1ST CHAIR | $35,000 | $70,000.⁰⁰ | |
| | | 2ND CHAIR | $30,000 | | |
| **NON-DEATH CAPITAL** | Non-Trial Appearance | | $400/day | $3,200 | |
| | Trial/Hearing with Testimony | | $800/day | | |
| | Out-of-Court Hours* | | $100/hour | $5,000 | |
| **INVESTIGATION** | Bills submitted by investigators and experts must document the dates and hours spent on the case and must be sworn to or affirmed to as accurate. Expert expenses paid per County policy. | | | | |
| **EXPERT TESTIMONY** | | | | | |
| MENTAL HEALTH SUPPLEMENT* | | | $50/hour | $250 | |
| BILINGUAL SUPPLEMENT | | | $50/day | $250 | |
| AFTER HOURS SUPP. (Trial/Hearing after 6:00 pm) | | | $50/hour | | |
| OTHER | | | | | $70,000 |
| | | | | TOTAL $ | |

*Must detail on Out-Of-Court Hours Log.

List date(s) of all Court Appearances. Attach Out-of-Court Hours Log.

### PERSONAL INFORMATION

| Social Security Number (last 4 digits only) XXX - XX - 7339 | Telephone Number ( 713 ) 237- 8547 | Bar Card Number 04831500 |

Mailing Address (Number, Street, Suite, City, State, Zip Code)
2028 Buffalo Terrace, Hou, Tx. 77019

### CERTIFICATION

I, R.P. "Skip" Cornelius , swear or affirm that the Harris County Auditor may rely upon the information contained above to make payment according to the fee schedule adopted by the Board of District Judges Trying Criminal Cases pursuant to Texas Code of Criminal Procedure Art. 26.05. I further swear or affirm that I have not received nor will I receive anything of value for representing the accused, except as otherwise disclosed to the Court in writing.

SWORN TO AND SUBSCRIBED BEFORE ME ON THIS THE 27th DAY OF June A.D. 2011

Approved _____

_____ (Deputy signing)

_____ (District Clerk Deputy Signature)

R.P. "Skip" Cornelius (Attorney Name, Bar Card No., Signature)

STATE'S EXHIBIT F Habeas

This was a complicated victims -
Capital Murder of multiple victims -
DNA, ballistics, multiple weapons, a second
Capital murder just as complicated as the first and
Her an aggravated robbery to add to all the
extraneous conduct stretching back to the age
of 12 years.

Judge

Defendant's Name: _Teddrick Batts_  Cause No. _1212366_ Date: _7-1-11_
Attorney Name: _R. P. Cornelius_ performed by: _General Knowledge_

## ATTORNEY FEES EXPENSE CLAIM CHECK LIST
### CAPITALS, CAPITAL APPEALS, & 11.071 WRITS OF HABEAS CORPUS

|  |  | Yes | No | Comments |
|---|---|---|---|---|
| 1) | Confirmed correct court number on claim? | ☑ | ☐ | |
| 2) | Confirmed correct defendant's name on claim? | ☑ | ☐ | |
| 3) | Confirmed correct cause number on claim? | ☑ | ☐ | |
| 4) | Multiple cases on claim form? | ☐ | ☑ | |
| 5) | Non-Death Capital Case? | ☐ | ☐ | Please circle one:  Disposed by Trial  or  Plea |
| 6) | Death Case? | ☑ | ☐ | Please circle one:  Disposed by Trial  or  Plea |
| 7) | Same offense throughout LQY9 history? | ☑ | ☐ | |
| 8) | Capital - Appeal? | ☐ | ☑ | |
| 9) | 11.071 Writ? | ☐ | ☑ | |
| 10) | Service dates before January 1, 2002? | ☐ | ☑ | |
| 11) | Correct claim form submitted for payment? | ☑ | ☐ | |
| 12) | Attorney Appointment Order in case history on LQY9 screen in JIMS? | ☑ | ☐ | |
| 13) | Attorney approved for capital appointment in FDAMS? | ☑ | ☐ | |
| 14) | Dates of court appearances listed on claim? | ☐ | ☑ | _Flate Rate_ |
| 15) | a.  Confirmed with history in the LQY8 screen? | ☐ | ☐ | '' |
|  | If claiming out-of-court hours, is the out-of-court hours form completed and attached? | ☐ | ☐ | _N/A_ |
|  | a.  Is it mathematically accurate? | ☐ | ☐ | '' |
|  | b.  Does it match days/hours listed on the claim? | ☐ | ☐ | '' |
| 16) | On 11.071 Writs, is the Appointed Counsel Hourly Worksheet completed detailing services performed, dates, and times attached? | ☐ | ☐ | _N/A_ |
|  | a.  Are the hours mathematically accurate? | ☐ | ☐ | '' |
|  | b.  Does it match the amount requested on the claim? | ☐ | ☐ | '' |
| 17) | If an 11.071 Writ, is the claim eligible for reimbursement from the state? | ☐ | ☐ | _N/A_ |
|  | If no, why not | | | |
| 18) | Are expenses requested on claim? | ☐ | ☑ | |
| 19) | Expense invoices attached? | ☐ | ☐ | _N/A_ |
| 20) | Do the expense invoices detail services performed, dates and times? | ☐ | ☐ | _N/A_ |
|  | a.  Is it mathematically accurate? | ☐ | ☐ | '' |
|  | b.  Does it match the amount requested on the claim? | ☐ | ☐ | '' |
| 21) | Is written court approval for expenses attached? | ☐ | ☐ | _N/A_ |
| 22) | Is the expense amount on the claim equal to or less than the amount approved by the court? | ☐ | ☐ | '' |
| 23) | Correct county mileage rate used? | ☐ | ☐ | '' |
| 24) | Correct claim line item used? | ☑ | ☐ | |
| 25) | Claim amounts within limits? | ☐ | ☑ | |
| 26) | If claim is totaled, is it mathematically accurate? | ☑ | ☐ | |

Attorney Expense: $ _10,000._

Expert Expense: $ _____

TOTAL REQUESTED: $ _10,000_

CAUSE NO. 1212366
CAUSE NO. 1212464

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| V. | § | HARRIS COUNTY, TEXAS |
| | § | |
| TEDDERICK BATISTE | § | 174th JUDICIAL DISTRICT |

DEFENDANT'S EX PARTE
MOTION FOR COMPENSATION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, the Defendant, TEDDERICK BATISTE, in the above-entitled and numbered cause by and through Defendant's Attorney of Record, and would show the Court as follows:

I.

The Defendant stands indicted with two capital murders and at least one extraneous offense of aggravated robbery which will be offered by the prosecution at the guilt-innocence or pentlay phases of the trial.

ORIGINAL RECEIVED IN
DISTRICT CLERK'S OFFICE
JAN 2 1 2010

II.

The contract attorney fee for capital murder is $35,000.00.

III.

DEPUTY.

The Defendant is indigent and unable to afford such services unless the cost hereof is defrayed by the State of Texas.

: 00776

IV.

Defendant's counsel will be handling two capital murders and at least one extraneous aggravated robbery during the trial of this capital murder trial.

V.

Gerald E. Bourque is assigned by this Honorable Court as lead counsel and R.P. "Skip" Cornelius is assigned as co-counsel. Each lawyer has been litigating this State's most important criminal cases for over 30 years. Each lawyer is Board Certified in Criminal Law and certified to work on capital murder cases.

VI.

Gerald E. Bourque and R.P. "Skip" Cornelius will spend a minimum of a 800 hours each in the preparation for trial and trial of these three cases.

VII.

Counsel is requesting that the contract fee of $35,000 be paid the lawyers on each case for a total of $70,000. The death penalty trial will necessarily incorporate a trial on both capital murders at the same time and at least one other aggravated robbery. Therefore, the fee of $70,000 per lawyer is a reasonable and fair fee.

WHEREFORE, premises considered, Defendant, by and through his attorneys of record, requests and agree that this Honorable Court pay as their legal fee

$70,000 to each lawyer for the proceedings as cited above:  whether their work results in a plea, a dismissal or a trial.

Respectfully submitted,

GERALD E. BOURQUE
State Bar No. 02716500
24 Waterway Ave., Suite 660
The Woodlands, Texas 77379
(713) 713-862-7766
(832) 813-0321 (Fax)

R.P. "Skip" CORNELIUS
State Bar No. 04831500
2028 Buffalo Terrace
Houston, TX  77019
Telephone:  (713) 237-8547
Fax:  (713) 528-0153

ATTORNEYS FOR DEFENDANT,
TEDDERICK BATISTE

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above Ex Parte Motion has not been sent to the Harris County Assistant District Attorney.

GERALD E. BOURQUE

CAUSE NO. 1212344
CAUSE NO. 1212464

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| V. | § | HARRIS COUNTY, TEXAS |
| | § | |
| TEDDERICK BATISTE | § | 174th JUDICIAL DISTRICT |

## EX PARTE ORDER
## FOR ATTORNEY COMPENSATION

On this the 21 day of January, 2010, came to be heard and

considered the foregoing motion of the Defendant. After due consideration, the Court

finds that the Motion should in all things be

☑ GRANTED          ☐ DENIED

IT IS SO ORDERED, that Defendant's Motion is granted and Gerald E. Bourque

and R.P. "Skip" Cornelius shall be paid as their legal fee $70,000.00 to each lawyer,

whether their work results in a plea, a dismissal or a trial.

SIGNED this 21 day of January, 2010.

_____
JUDGE PRESIDING

: 00779

# STATE'S WRIT EXHIBIT G
# Gerald Bourque Expense Claim

: 00788

**INSTRUCTIONS**

ATTORNEY FEES EXPENSE CLAIM
DISTRICT COURTS-CAPITAL CASE
UNDER ARTICLE 26.05, CODE OF CRIMINAL PROCEDURE
AS AMENDED

Show only one defendant per claim.

Before payment can be authorized, each item must be completed legibly in ink

Forward completed claim to the presiding judge for approval.

Court No. **174th**   Defendant Name **Teddrick R. Batiste # 1212366**

| CAPITAL CASE | | Number of Court Days/Hours | RATE | TOTAL (presumptive maximum) | AMOUNT (Judge Completes) |
|---|---|---|---|---|---|
| DEATH CAPITAL 1ST CHAIR | Non-Trial Appearance | | $400/day | | |
| | Voir Dire | | $600/day | | |
| | Trial/Hearing with Testimony | | $800/day | | |
| | Out-of-Court Hours* | | $100/hour | $12,000 | |
| DEATH CAPITAL 2ND CHAIR | Non-Trial Appearance | | $400/day | | |
| | Voir Dire | | $500/day | | |
| | Trial/Hearing with Testimony | | $700/day | | |
| | Out-of-Court Hours* | | $80/hour | $9,600 | |
| DEATH CAPITAL FLAT RATE | Includes all fees except investigation costs, expert witness fees, and witness travel costs. Flat rate applies only if testimony begins in the guilt/innocence phase of trial. Otherwise, the daily and hourly rates apply. | 1ST CHAIR | $35,000 | | |
| | | 2ND CHAIR | $30,000 | | $70,000 |
| NON-DEATH CAPITAL | Non-Trial Appearance | | $400/day | $3,200 | |
| | Trial/Hearing with Testimony | | $800/day | | |
| | Out-of-Court Hours* | | $100/hour | $5,000 | |
| INVESTIGATION | Bills submitted by investigators and experts must document the dates and hours spent on the case and must be sworn to | | | | IMAGED |
| EXPERT TESTIMONY | or affirmed to as accurate. Expert expenses paid per County policy. | | | | |
| MENTAL HEALTH SUPPLEMENT* | | | $50/hour | $250 | PH |
| BILINGUAL SUPPLEMENT | | | $50/day | $250 | 7/5/11 |
| AFTER HOURS SUPP. (Trial/Hearing after 6:00 pm) | | | $50/hour | | |
| OTHER See attached expenses | | | | | 202.44 |
| | | | | TOTAL $ | 70,202.44 |

*Must detail on Out-Of-Court Hours Log.

List date(s) of all Court Appearances. Attach Out-of-Court Hours Log.

**PERSONAL INFORMATION**

Social Security Number (last 4 digits only) **XXX - XX - 3065**   Telephone Number **( 713 ) 862-7766**   Bar Card Number **02716500**

Mailing Address (Number, Street, Suite, City, State, Zip Code) **24 Waterway Av. #660, The Woodlands Tx 77380**

**CERTIFICATION**

I, **GERALD E. BOURQUE**, swear or affirm that the Harris County Auditor may rely upon the information contained above to make payment according to the fee schedule adopted by the Board of District Judges Trying Criminal Cases pursuant to Texas Code of Criminal Procedure Art. 26.05. I further swear or affirm that I have not received nor will I receive anything of value for representing the accused, except as otherwise disclosed to the Court in writing.

SWORN TO AND SUBSCRIBED BEFORE ME ON THIS THE **27th** DAY OF **June** A.D. 20 **11**

Approved _____

_____ Judge, Presiding

_____ Deputy Clerk Deputy (Signature)

**Gerald E. Bourque** Attorney at Law (Sign)

**GERALD E. BOURQUE** Attorney Name (pr)

STATE'S EXHIBIT 6
Habeas
PENGAD 800-631-6989

This was a very complicated capital murder with a second capital murder and an aggravated robbery. The lawyers had to defend 2 capitals with ballistics, DNA, lineups, + photo spreads on each case.

Judge

:00782

Kwik Kopy Printing
1010 Spring Cypress Road
Spring, TX 77373
(281) 353-7977 Fax: (281) 353-6741

ORDER 73042

Date: 11/23/2009

Customer Phone: (713) 862-7766
Fax: (281) 379-6916

Customer                    7519
ATTN: Monica
Gerald E.Bourque Attorney
At Law
24 Waterway Ct Ste. 660
The Woodlands, TX 77380

Order Taken By: WL
Salesperson: MY

**Order Description** 2 Copies of Batiste Hard Copy & 1 Ea. of Disk

| ORIG | QTY | SIDES | DESCRIPTION | PAPER | PRICE |
|------|-----|-------|-------------|-------|-------|
| 233 | 2 | 1 | 8 1/2 x 11 20# Bond White | | $69.90 |
| 1 | 2 | 1 | Audio CD Copy | | $10.00 |

*Pd Ck # 1531 11/30/09 GB*

**Ship-To**    **Ship Via:** Pickup

| | |
|---|---|
| SUBTOTAL | $79.90 |
| Typesetting | $18.00 |
| State Tax | $7.10 |
| **TOTAL** | $105.00 |
| Amount Paid | $0.00 |
| BALANCE DUE | $105.00 |
| Payment Due Date | 12/10/2009 |

Accepted by (signature): VBritz  Date: 11-24-09
Accepted by (please print): VBaltz  Date: 11-24-09

CAUSE NO. 1212366
CAUSE NO. 1212464

THE STATE OF TEXAS            §          IN THE DISTRICT COURT
                             §
V.                           §          HARRIS COUNTY, TEXAS
                             §
TEDDERICK BATISTE            §          174th JUDICIAL DISTRICT

## DEFENDANT'S EX PARTE
## MOTION FOR COMPENSATION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, the Defendant, TEDDERICK BATISTE, in the above-entitled and

numbered cause by and through Defendant's Attorney of Record, and would show the

Court as follows:

I.

The Defendant stands indicted with two capital murders and at least one

extraneous offense of aggravated robbery which will be offered by the prosecution at

the guilt-innocence or pentlaty phases of the trial.

ORIGINAL RECEIVED IN
DISTRICT CLERK'S OFFICE

JAN 21 2010

II.

The contract attorney fee for capital murder is $35,000.00.

DATE

III.

DEPUTY

The Defendant is indigent and unable to afford such services unless the cost

hereof is defrayed by the State of Texas.

: 00784

IV.

Defendant's counsel will be handling two capital murders and at least one extraneous aggravated robbery during the trial of this capital murder trial.

V.

Gerald E. Bourque is assigned by this Honorable Court as lead counsel and R.P. "Skip" Cornelius is assigned as co-counsel. Each lawyer has been litigating this State's most important criminal cases for over 30 years. Each lawyer is Board Certified in Criminal Law and certified to work on capital murder cases.

VI.

Gerald E. Bourque and R.P. "Skip" Cornelius will spend a minimum of 800 hours each in the preparation for trial and trial of these three cases.

VII.

Counsel is requesting that the contract fee of $35,000 be paid the lawyers on each case for a total of $70,000. The death penalty trial will necessarily incorporate a trial on both capital murders at the same time and at least one other aggravated robbery. Therefore, the fee of $70,000 per lawyer is a reasonable and fair fee.

WHEREFORE, premises considered, Defendant, by and through his attorneys of record, requests and agree that this Honorable Court pay as their legal fee

$70,000 to each lawyer for the proceedings as cited above: whether their work results in a plea, a dismissal or a trial.

Respectfully submitted,

GERALD E. BOURQUE
State Bar No. 02716500
24 Waterway Ave., Suite 660
The Woodlands, Texas 77379
(713) 713-862-7766
(832) 813-0321 (Fax)

R.P. "Skip" CORNELIUS
State Bar No. 04831500
2028 Buffalo Terrace
Houston, TX  77019
Telephone:  (713) 237-8547
Fax:  (713) 528-0153

ATTORNEYS FOR DEFENDANT,
TEDDERICK BATISTE

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above Ex Parte Motion has not been sent to the Harris County Assistant District Attorney.

GERALD E. BOURQUE

CAUSE NO. 1212344
CAUSE NO. 1212464

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| V. | § | HARRIS COUNTY, TEXAS |
| | § | |
| TEDDERICK BATISTE | § | 174th JUDICIAL DISTRICT |

## EX PARTE ORDER
## FOR ATTORNEY COMPENSATION

On this the 21 day of January, 2010, came to be heard and considered the foregoing motion of the Defendant. After due consideration, the Court finds that the Motion should in all things be

☑ GRANTED ☐ DENIED

IT IS SO ORDERED, that Defendant's Motion is granted and Gerald E. Bourque and R.P. "Skip" Cornelius shall be paid as their legal fee $70,000.00 to each lawyer, whether their work results in a plea, a dismissal or a trial.

SIGNED this 21 day of January, 2010.



JUDGE PRESIDING

**Kwik Kopy Printing**
1010 Spring Cypress Road
Spring, TX 77373
(281) 353-7977  Fax: (281) 353-6741

**ORDER 82333**

Date:   05/24/2011

Customer Phone: (713) 862-7766
Fax: (832) 813-0321

**Customer**                    7519

ATTN:  Monica
Gerald E.Bourque Attorney
At Law
24 Waterway Ct Ste. 660
The Woodlands, TX  77380

Order Taken By: my
Salesperson: MY

**Order Description**  1 Set Copies Cause for Batiste

| ORIG | QTY | SIDES | DESCRIPTION | PAPER | PRICE |
|------|-----|-------|-------------|-------|-------|
| 539 | 1 | 1 | 8 1/2 x 11 20# Bond White | | $80.85 |

*Pd*
*Ck #8472*
*5/24/11*

| | |
|---|---|
| SUBTOTAL | $80.85 |
| Finishing | $10.00 |
| State Tax | $6.59 |
| **TOTAL** | $97.44 |
| **Amount Paid** | $0.00 |
| **BALANCE DUE** | $97.44 |
| Payment Due Date | 6/3/2011 |

**Ship-To**     **Ship Via:**  Pickup

Accepted by (signature): _____ Date: _____

Accepted by (please print): _____ Date: _____

**This is Your Invoice**

: 88788

Defendant's Name: _Hedrick Eaton_  Cause No. _101356_ Date: _7/6/11_
Attorney Name: _Roberta Dohse_ Services Performed by: _Roberta Dohse_

## ATTORNEY FEES EXPENSE CLAIM CHECK LIST
## CAPITALS, CAPITAL APPEALS, & 11.071 WRITS OF HABEAS CORPUS

| | | Yes | No | Comments |
|---|---|---|---|---|
| 1) | Confirmed correct court number on claim? | ☑ | ☐ | |
| 2) | Confirmed correct defendant's name on claim? | ☑ | ☐ | |
| 3) | Confirmed correct cause number on claim? | ☑ | ☐ | |
| 4) | Multiple cases on claim form? | ☐ | ☑ | |
| 5) | Non-Death Capital Case? | ☐ | ☐ | (Please circle one: Disposed By Trial or Plea |
| 6) | Death Case? | ☐ | ☐ | |
| 7) | Same offense throughout LQ79 history? | ☑ | ☐ | Please circle one: Disposed by Trial or Plea |
| 8) | Capital – Appeal? | ☑ | ☐ | |
| 9) | 11.071 Writ? | ☐ | ☑ | |
| 10) | Service date before January 1, 2002? | ☐ | ☑ | |
| 11) | Correct claim form submitted for payment? | ☑ | ☐ | |
| 12) | Attorney Appointment Order in case history on LQ79 screen in IIMS? | ☑ | ☐ | |
| 13) | Attorney approved for capital appointment in FDAMS? | ☐ | ☐ | |
| 14) | Dates of court appearances listed on claim? | ☑ | ☐ | |
| 15) | a. Confirmed with history in the LQY8 screen? If claiming out-of-court hours, is the out-of-court hours form completed and attached? | ☑ | ☐ | N/A |
| | b. Is it mathematically accurate? | ☐ | ☐ | |
| 16) | a. Does it match dtp/phours listed on the claim? On 11.071 Writ, is the Appointed Counsel Hourly Worksheet completed detailing services performed, dates, and times attached? | ☐ | ☐ | Flat Rate |
| | b. Is it mathematically accurate? | ☐ | ☐ | |
| 17) | a. Are the hours mathematically accurate? | ☐ | ☐ | |
| | b. Does it match the amount requested on the claim? If an 11.071 Writ, is the claim eligible for reimbursement from the state? | ☐ | ☐ | |
| | If no, why not | | | |
| 18) | Are expenses requested on claim? | ☐ | ☑ | |
| 19) | Expense invoices attached? | ☐ | ☑ | |
| 20) | Do the expense invoices detail services performed, dates and times? | ☐ | ☐ | |
| 21) | a. Is it mathematically accurate? | ☐ | ☑ | |
| | b. Does it match the amount requested on the claim? | ☐ | ☑ | |
| 22) | Is written court approval for expenses attached? Is the expense amount on the claim equal to or less than | ☐ | ☐ | |

: 00790



# CHRIS DANIEL
## HARRIS COUNTY DISTRICT CLERK

November 6, 2013

JANET GILGER
ATTORNEY FOR APPLICANT
OFFICE OF CAPITAL WRITS
1700 N. CONGRESS AVENUE, SUITE 460
AUSTIN, TX 78711

To Whom It May Concern:

Pursuant to Article 11.07 of the Texas Code of Criminal Procedure, please find enclosed copies of the documents indicated below concerning the Post Conviction Writ filed in cause number 1212366-A in the 174th District Court.

☒ State's Original Answer Filed November 05, 2013

☐ Affidavit               ,

☐ Court Order Dated                ,

☐ Respondent's Proposed Order Designating Issues and Order For Filing Affidavit.

☐ Respondent's Proposed Findings of Fact and Order               ,

☐ Other

Sincerely,

Roxana Garcia, Deputy
Criminal Post Trial

rg

Enclosure(s) – STATE'S ORIGINAL ANSWER



No. 1212366-A

EX PARTE                                    §        IN THE 174th DISTRICT COURT

                                           §        OF

TEDDRICK R. BATISTE,                       §        HARRIS COUNTY, TEXAS
    Applicant                              §

## STATE'S MOTION DESIGNATING ISSUE AND
## FOR TRIAL COUNSEL TO FILE AN AFFIDAVIT

The State of Texas, by and through its Assistant District Attorney for Harris County,

requests that this Court, pursuant to TEX. CODE CRIM. PROC. ANN. art. 11.071, designate the issue

of ineffective assistance of trial counsel as an issue to be resolved and order trial counsel R.P.

"Skip" Cornelius and Gerald Bourque to file affidavits responding to the following allegations of

ineffective assistance of counsel in the application for writ of habeas corpus, cause no. 1212366-

A.

1.  Trial counsel failed conduct an adequate pre-trial investigation into the applicant's
    frontal lobe disorder and present evidence of this disorder;

2.  Trial counsel failed to present a gang expert to assist the jury to understand the limited
    scope of the applicant's gang involvement;

3.  Trial counsel failed to present evidence from a social historian;

4.  Trial counsel failed to properly prepare lay witnesses to testify;

5.  Trial counsel failed to present the testimony from ten of the applicant's family
    members and friends;

6.  Trial counsel failed to present any evidence that the applicant was not likely to commit
    criminal acts of violence in the future and failed to properly utilize expert Dr. Mary
    Elizabeth Pelz, Ph.D.;

1

: 00792

7.  Trial counsel failed to properly prepare the applicant to testify;

8.  Trial counsel failed to present an expert witness to assist the jury to understand the applicant's rap lyrics contained in the applicant's letters and generally failed to effectively present and explain the applicant's letters to the jury;

9.  Trial counsel failed to make fifty-five (55) objections during trial involving hearsay, improper impeachment, and/or relevance;

10.  Trial counsel failed to make a First Amendment object to the introduction of a blue Santa Muerte scapular worn by the applicant at the time of his arrest;

11.  Trial counsel failed to record a substantial and crucial portion of the record by consenting to twenty-seven (27) off-the-record conferences during the entirety of trial;

12.  Trial counsel failed to follow ABA guidelines by requesting and accepting a flat fee for representing the applicant;

13.  Trial counsel failed to lodge an objection to the punishment jury charge and request an instruction that clarified the meaning and application of mitigating evidence.

SIGNED this 6th day of November, 2013.

Respectfully submitted,

_____

Joshua Reiss
Assistant District Attorney
Harris County, Texas
1201 Franklin, 6th Floor
Houston, Texas  77002
(713) 755-6657
(713) 755-5809 (fax)
Texas Bar ID #24053738

2

: 00793

No. 1212366-A

| EX PARTE | § | IN THE 174th DISTRICT COURT |
| | § | OF |
| TEDDRICK R. BATISTE,<br>  Applicant | § | HARRIS COUNTY, TEXAS |

## CERTIFICATE OF SERVICE

Service has been accomplished by sending a copy of this instrument to counsel for the

applicant at the following address:

> Janet Gilger-VanderZanden
> Ryan O'Dell
> Office of Capital Writs
> 1700 N. Congress Ave.
> Suite 460
> Austin, TX 78711
> Janet.gilger-vanderzaden@ocw.texas.gov
> Ryan.odell@ocw.texas.gov

SIGNED this 6th day of November, 2013.

Respectfully submitted,



Joshua Reiss
Assistant District Attorney
Harris County, Texas
1201 Franklin, 6th Floor
Houston, Texas 77002
(713) 755-6657
(713) 755-5809 (fax)
Texas Bar ID #24053738

3





No. 1212366-A

EX PARTE § IN THE 174th DISTRICT COURT

§ OF

TEDDRICK R. BATISTE, § HARRIS COUNTY, TEXAS
Applicant

## STATE'S PROPOSED ORDER DESIGNATING ISSUE AND
## FOR TRIAL COUNSEL TO FILE AN AFFIDAVIT

Having considered the application for writ of habeas corpus in the above-captioned cause, the State's original answer, and the State's Motion Designating Issue and for Trial Counsel to File an Affidavit, the Court designates as an issue to be resolved whether the applicant was denied due process due to ineffective assistance of trial counsel. Therefore, pursuant to TEX. CODE CRIM. PROC. ANN. art. 11.071, §9(a), this Court will resolve the above-cited issue and then enter findings of fact.

To assist the Court in resolving this factual issue the applicant's punishment hearing counsel R.P. "Skip" Cornelius and Gerald Bourque are **ORDERED** to file an affidavit within ninety (90) days of the signing of this order concerning their representation in the above-styled case and specifically respond to the following allegations of ineffective assistance of counsel raised in the instant application for writ of habeas corpus, cause no. 1212366-A:

1. Trial counsel failed conduct an adequate pre-trial investigation into the applicant's frontal lobe disorder and present evidence of this disorder;

2. Trial counsel failed to present a gang expert to assist the jury to understand the limited scope of the applicant's gang involvement;

3. Trial counsel failed to present evidence from a social historian;

4. Trial counsel failed to properly prepare lay witnesses to testify;

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

1

: 00795

5. Trial counsel failed to present the testimony from ten of the applicant's family members and friends;

6. Trial counsel failed to present any evidence that the applicant was not likely to commit criminal acts of violence in the future and failed to properly utilize expert Dr. Mary Elizabeth Pelz, Ph.D.;

7. Trial counsel failed to properly prepare the applicant to testify;

8. Trial counsel failed to present an expert witness to assist the jury to understand the applicant's rap lyrics contained in the applicant's letters and generally failed to effectively present and explain the applicant's letters to the jury;

9. Trial counsel failed to make fifty-five (55) objections during trial involving hearsay, improper impeachment, and/or relevance;

10. Trial counsel failed to make a First Amendment object to the introduction of a blue Santa Muerte scapular worn by the applicant at the time of his arrest;

11. Trial counsel failed to record a substantial and crucial portion of the record by consenting to twenty-seven (27) off-the-record conferences during the entirety of trial;

12. Trial counsel failed to follow ABA guidelines by requesting and accepting a flat fee for representing the applicant;

13. Trial counsel failed to lodge an objection to the punishment jury charge and request an instruction that clarified the meaning and application of mitigating evidence.

: 00796

The Clerk of the Court is **ORDERED** to send a copy of this Order to counsel for the applicant and to the State, and to serve copies of this Order, the initial application for writ of habeas corpus, and the State's original answer to the initial application to: R.P. Cornelius, 2028 Buffalo Terrace, Houston TX 77019; and, Gerald Bourque, 24 Waterway, Suite 660, The Woodlands, TX 77380.

When the affidavits of R.P. Cornelius and Gerald Bourque are received, the Clerk is **ORDERED** to send a copy of said affidavit to counsel for the applicant: Janet Gilger Vander-Zanden and Ryan O'Dell, Office of Capital Writs, 1700 N. Congress Ave., Suite 460, Austin TX 78711; and to the State: Joshua Reiss, Harris County District Attorney, 1201 Franklin Street, Suite 600, Houston, Texas 77002.

The Clerk of the Court is **ORDERED** **NOT** to transmit at this time any documents in the above-styled case to the Court of Criminal Appeals until further ordered by this Court.

**BY THE FOLLOWING SIGNATURE THE COURT ADOPTS**

**THE STATE'S PROPOSED ORDER DESIGNATING ISSUE AND FOR TRIAL**

**COUNSEL TO FILE AN AFFIDAVIT IN CAUSE NUMBER 1212366-A.**

NOV 0 8 2013

Signed this _____ day of _____, 2013.

HON. RUBEN GUERRERO
PRESIDING JUDGE
174TH DISTRICT COURT

No. 1212366-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 174th DISTRICT COURT |
| | § | OF |
| TEDDRICK R. BATISTE, Applicant | § | HARRIS COUNTY, TEXAS |

## CERTIFICATE OF SERVICE

Service has been accomplished by sending a copy of this instrument to counsel for the applicant at the following address:

Janet Gilger-VanderZanden
Ryan O'Dell
Office of Capital Writs
1700 N. Congress Ave.
Suite 460
Austin, TX 78711
Janet.gilger-vanderzaden@ocw.texas.gov
Ryan.odell@ocw.texas.gov

SIGNED this 6th day of November, 2013.

Respectfully submitted,

Joshua Reiss
Assistant District Attorney
Harris County, Texas
1201 Franklin, 6th Floor
Houston, Texas  77002
(713) 755-6657
(713) 755-5809 (fax)
Texas Bar ID #24053738

4



# CHRIS DANIEL
### HARRIS COUNTY DISTRICT CLERK

November 11, 2013

DEVON ANDERSON
DISTRICT ATTORNEY
HARRIS COUNTY TEXAS

To Whom It May Concern:

Pursuant to Article 11.07 of the Texas Code of Criminal Procedure, please find enclosed copies of the documents indicated below concerning the Post Conviction Writ filed in cause number 1212366-A in the 174th District Court.

☐ State's Original Answer Filed               ,

☐ Affidavit               ,

☒ Court Order Dated November  8, 2013

☐ Respondent's Proposed Order Designating Issues and Order For Filing Affidavit.

☐ Respondent's Proposed Findings of Fact and Order               ,

☐ Other

Sincerely,

Roxana Garcia, Deputy
Criminal Post Trial

rg

Enclosure(s) – ORDER FOR MR. R.P CORNELIUS AND GERALD BOURQUE FOR FILING AFFIDAVIT

1201 FRANKLIN   •   P.O. BOX 4651   •   HOUSTON, TEXAS 77210-4651   •   (888) 545-5577



# CHRIS DANIEL
## HARRIS COUNTY DISTRICT CLERK

November 11, 2013

MR. R.P. CORNELIUS
2028 BUFFALO TERRACE
HOUSTON, TX 77019

RE:   TEDDRICK R. BATISTE # 999568
      CAUSE # 1212366-A
      174TH DISTRICT COURT

Dear Sir :

Enclosed herewith please find a copy of the Court's Order wherein the court orders that
MR.R.P. CORNELIUS, Attorney at Law, file an affidavit in response to allegations made
in the petition for post conviction writ of habeas corpus in the above numbered and styled
cause.

Sincerely,

Roxana Garcia, Deputy
Criminal Post Trial
Harris County District Clerk's Office

Enclosure:  Respondent's Proposed Order Designating Issues and Order for Filing
Affidavit, Respondent's Original Answer, Application for Writ of Habeas Corpus

CC:   Kelly Reyes



# CHRIS DANIEL
### HARRIS COUNTY DISTRICT CLERK

November 11, 2013

MR. GERALD BOURQUE
24 WATERWAY SUITE 660
THE WOODLANDS, TX 77380

RE:   TEDDRICK R. BATISTE # 999568
        CAUSE # 1212366-A
        174TH DISTRICT COURT

Dear Sir :

Enclosed herewith please find a copy of the Court's Order wherein the court orders that
MR.GERALD BOURQUE, Attorney at Law, file an affidavit in response to allegations
made in the petition for post conviction writ of habeas corpus in the above numbered and
styled cause.

Sincerely,

Roxana Garcia, Deputy
Criminal Post Trial
Harris County District Clerk's Office

Enclosure:  Respondent's Proposed Order Designating Issues and Order for Filing
Affidavit, Respondent's Original Answer, Application for Writ of Habeas Corpus

CC:   Kelly Reyes

1201 FRANKLIN   •   P.O. BOX 4651   •   HOUSTON, TEXAS 77210-4651   •   (888) 545-5577



# CHRIS DANIEL
## HARRIS COUNTY DISTRICT CLERK

November 11, 2013

JANET GILGER-VANDERZANDEN
RYAN O'DELL
OFFICE OF CAPITAL WRITS
1700 N. CONGRESS AVENUE SUITE 460
AUSTIN, TX 78711

To Whom It May Concern:

Pursuant to Article 11.07 of the Texas Code of Criminal Procedure, please find enclosed copies of the documents indicated below concerning the Post Conviction Writ filed in cause number 1212366-A in the 174th District Court.

☐ State's Original Answer Filed

☐ Affidavit

☒ Court Order Dated November  8, 2013

☐ Respondent's Proposed Order Designating Issues and Order For Filing Affidavit.

☐ Respondent's Proposed Findings of Fact and Order

☐ Other

Sincerely,

Roxana Garcia, Deputy
Criminal Post Trial

rg

Enclosure(s) – ORDER FOR MR. R.P CORNELIUS AND GERALD BOURQUE FOR FILING AFFIDAVIT

P9

# IN THE 174TH DISTRICT COURT

# HARRIS COUNTY, TEXAS

EX PARTE
Teddrick Batiste,
      APPLICANT

)
)
)
)
)
)

Trial Cause No.
1212366-A

## RESPONSE TO STATE'S MOTION DESIGNATING ISSUES AND FOR TRIAL COUNSEL AFFIDAVITS

BRAD D. LEVENSON (No. 24073411)
Director, Office of Capital Writs
(E-Mail: Brad.Levenson@ocw.texas.gov)
JANET GILGER-VANDERZANDEN (No. 24079978)
(E-Mail: Janet.Gilger-VanderZanden@ocw.texas.gov)
RYAN O'DELL (No. 24085505)
(E-Mail: Ryan O'Dell@ocw.texas.gov)
Post-Conviction Attorneys
Office of Capital Writs
1700 N. Congress Ave, Suite 460
Austin, Texas 78711
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Applicant

IMAGED

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

**FILED**
Chris Daniel
District Clerk

NOV 2 1 2013

Time: 0:15
By _____ Harris County, Texas
         Deputy



designate trial counsel's ineffectiveness as *an issue* or as *the only issue* to be resolved. To the extent that the State seeks to designate the issue of ineffective assistance of counsel as the only issue to be resolved, Batiste disagrees and objects. Instead, Batiste requests that the Court designate the following issues to be resolved in addition to the thirteen issues of ineffective assistance of trial counsel: juror misconduct (as raised in Claim Ten of Batiste's Application); and State misconduct (as raised in Claim Nine of Batiste's Application).

## I.

## ARGUMENT

Claims of ineffective assistance of counsel focus not only on the actions and omissions of counsel, but also on the reasons for counsel's action or inaction. The actions and omissions complained of may have resulted from sheer inadvertence; they may have resulted from lack of knowledge or experience, inadequate time and resources, or conflicting demands; and/or they may have been the result of a deliberate decision to pursue or not pursue a particular course of action. The process of identifying the underlying reasons for counsel's performance or lack thereof, and of distinguishing unreasonable decisions from reasonable judgments, requires the consideration and close examination of all factors and circumstances surrounding counsel's representation.

Affidavits submitted by trial counsel will almost invariably contain facts controverted by Batiste, the State, or both. Therefore, both sides must have an opportunity to probe all the possible factors that influenced counsel's performance for the adversarial process to function fully. Of course, if in their affidavits trial counsel concede deficient performance in each issue raised by Batiste, then it is imaginable that no facts would be disputed. More likely though, is that trial counsel's affidavits will be the beginning of the process of determining which facts are in dispute.

## II.

## PRAYER FOR RELIEF

For the foregoing reasons, Batiste requests that after trial counsel affidavits are submitted to the State and Batiste, the parties be allowed a period of time to determine which facts are in dispute. After the disputed facts are determined, the Court should order further fact-finding through either depositions or a live hearing, so that Batiste may be afforded a full and fair opportunity to litigate claims of ineffective assistance of trial counsel raised in his Application.

Respectfully submitted,

Brad D. Levenson
Director, Office of Capital Writs

DATED:     November 13, 2013

By: _____
Janet Gilger-VanderZanden

By: _____
Ryan O'Dell

5

: 00005

# IN THE 174TH DISTRICT COURT

# HARRIS COUNTY, TEXAS

|  |  |  |
|---|---|---|
| EX PARTE | ) | Trial Cause No. |
| Teddrick Batiste, | ) | 1212366-A |
| APPLICANT | ) |  |
|  | ) |  |
|  | ) |  |

## ORDER

On this date, the Court considered Batiste's Response to Request for Trial Counsel Affidavits. After due consideration, Batiste's Motion is GRANTED, and

1. Batiste's trial counsel shall file affidavits within ninety (90) days of the signing of this order concerning their representation of Batiste and respond to each allegation of ineffective assistance of counsel raised in Batiste's Initial Application.
2. Upon submission of affidavits to both the State and Batiste's post-conviction counsel, within sixty (60) days both parties shall determine which facts are in dispute and need to be resolved by either live hearing testimony or deposition.

ORDERED AND SIGNED on this ___ day of __**NOV 2 2 2013**__ 2013.

Ruben Guerrero
Judge, 174th District Court

6

# CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Motion as follows:

Paula Gibson
Criminal Post-Trial
Harris County District Clerk
1201 Franklin Street, 3rd Floor
Suite 3180
Houston, TX 77002
(Original and one copy, via mail)

Honorable Ruben Guerrero
Judge, 174th District Court
Harris County Criminal Justice Center
1201 Franklin, 19th Floor
Houston, Texas 77002
(One copy, via mail)

Harris County District Attorney
ATTN: Josh Reiss
1201 Franklin Street, Suite 600
Houston, TX 77002
(One copy, via mail)

Teddrick Batiste
Polunsky Unit #999568
3872 FM 350 South
Livingston, Texas 77351
(One copy, via mail)

This certification is executed on November 13, 2013, at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_____
Ryan O'Dell

7



# CHRIS DANIEL
## HARRIS COUNTY DISTRICT CLERK

December 2, 2013

DEVON ANDERSON
DISTRICT ATTORNEY
HARRIS COUNTY TEXAS

To Whom It May Concern:

Pursuant to Article 11.07 of the Texas Code of Criminal Procedure, please find enclosed copies of the documents indicated below concerning the Post Conviction Writ filed in cause number 1212366-A in the 174th District Court.

☐ State's Original Answer Filed

☐ Affidavit

☒ Court Order Dated November 22, 2013

☐ Respondent's Proposed Order Designating Issues and Order For Filing Affidavit.

☐ Respondent's Proposed Findings of Fact and Order

☐ Other

Sincerely,

Roxana Garcia, Deputy
Criminal Post Trial

rg

Enclosure(s) – ORDER FOR FILING AFFIDAVIT



# CHRIS DANIEL
### HARRIS COUNTY DISTRICT CLERK

December 2, 2013

BRAD D. LEVENSON
ATTORNEY FOR APPLICANT
POST CONVICTION ATTORNEYS
OFFICE OF CAPITAL WRITS
1700 N. CONGRESS AVE. SUITE 460
AUSTIN, TX 78711

To Whom It May Concern:

Pursuant to Article 11.07 of the Texas Code of Criminal Procedure, please find enclosed copies of the documents indicated below concerning the Post Conviction Writ filed in cause number 1212366-A in the 174th District Court.

☐ State's Original Answer Filed                    ,

☐ Affidavit            ,

☒ Court Order Dated November 22, 2013

☐ Respondent's Proposed Order Designating Issues and Order For Filing Affidavit.

☐ Respondent's Proposed Findings of Fact and Order                    ,

☐ Other

Sincerely,

Roxana Garcia, Deputy
Criminal Post Trial

rg

Enclosure(s) – COURT ORDER FOR FILING AFFIDAVIT

---