# AFFIDAVIT OF JAMES G. UNDERHILL, Psy.D.

I, James G. Underhill, state and declare as follows:

## A. Introduction

1. At the request of the Office of Capital Writs ("OCW"), previous counsel for Teddrick Batiste, I conducted a comprehensive neuropsychological evaluation of Mr. Batiste at the Polunsky Unit in Livingston, Texas on January 5 and January 6, 2012. The purpose of the neuropsychological testing was to determine whether measureable neuropsychological dysfunction or deficits were present and, if so, the nature, extent, and effects of those impairments on Mr. Batiste's behavioral, psychological, and cognitive functioning.

2. Based upon my review of the historical data, and the neuropsychological testing and clinical interview I conducted, I provided the courts with an affidavit indicating I was willing to testify regarding neuropsychological findings and the impact thereof if called.

3. It was my understanding at the time, that I would be called to testify at a later date.

4. I was contacted by Kenneth McGuire, counsel for Mr. Batiste. I was informed that the state appellate court had indicated that my affidavit was not persuasive. It is my understanding that the states findings of fact indicate that the basis of this determination was predicated upon the lack of stated scores in my affidavit, and jail records indicating controlled behavior in a correctional setting.

5. On August 4, 2017, Mr. McGuire provided the State's Proposed Finding of Fact, Conclusions of Law, and Order to me. Mr. McGuire requested I review the document, and submit my opinions about this document to the court.

## B. Opinions

### Circumstances of Affidavit Preparation

6. When the original affidavit was submitted to the court, it was my understanding that I would be called to testify at a later date.
7. I expected to be able to explain all of these scientific details during my testimony in open court.

### Key Errors in the State's Proposed Finding of Fact, Conclusions of Law, and Order Regarding Statistics

8. The State's Proposed Finding of Fact, Conclusions of Law, and Order, seems to rely upon incorrect assumptions regarding psychological testing, neuropsychology terms of art, and statistics.
9. Because psychological testing scores, neuropsychology terms of art, and the underlying statistics required to interpret those scores are difficult to understand without the requisite education, such professional organizations as the American Psychological Association, the American Educational Research Association, and the National Council on Measurement in Education have published guidelines indicating the minimal standards necessary to interpret psychological data.
10. Test publishers adhere to the same standards and will not sell these tests to unqualified people.
11. In neuropsychological testing, the word "impaired" is a term of art with specific connotations. The Heaton taxonomy of neuropsychological scores is arguably the most widely used manner of describing test scores in neuropsychology. I used this taxonomy in preparing my Affidavit submitted

to the state courts. In this taxonomy, the term impaired refers to any score under the 12th percentile. [1]

12. There is professional literature in neuropsychology which indicates that percentiles should not be used in forensic contexts because percentiles are easily misunderstood. [2] I prepared the document with the understanding that I would have the opportunity to explain the scores, and with the understanding that the courts did not have the necessary background to interpret psychological test scores. I specifically did not report percentiles because they are known to be misleading in the forensic context, which is exactly the error made by the State court in their criticism of my findings.

13. In the State's Proposed Finding of Fact, Conclusions of Law, and Order, the trier of fact attempts to interpret these finding without the assistance of someone trained in psychological testing and statistics.

14. The State's Proposed Finding of Fact, Conclusions of Law, and Order, relies upon what a term **could** mean, when it should have relied upon what the term in fact means and what my findings in fact were.

15. That Mr. Batiste scored within the impaired range means within the neuropsychology field that he did not score within the 49th percentile.

16. In actuality, Mr. Batiste's net score on the Iowa Gambling Test fell within the 7th percentile. Under the Heaton taxonomy, there are five degrees of impairment. This score would fall under the severely impaired range. Any standardized test has the potential for minor variation due to external factors if the test is repeated. Professionally, there are standardized methods for

---

[1] R.K. Heaton, S.W. Miller, M.J. Taylor, I. Grant (2004). Revised comprehensive norms for an expanded Halstead–Reitan battery (norms, manual and computer program) Psychological Assessment Resources, Odessa, FL
[2] Bowman, M. L. (2002). The perfidy of percentiles. Arch Clin Neuropsychol, 17(3), 295-303.

reporting these variations. Keeping this in mind, I chose to report the score in the most conservative term possible.

## C. Conclusions

It is my opinion, that the court relied upon suppositions which were not consistent with the professional standards required to interpret neuropsychological data. These misconceptions could have easily been addressed in open court.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on the 19 day of August, 2017 in Austin, Texas.

_____
DR. JAMES UNDERHILL