# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

TEDDRICK BATISTE,                          §
                                           §
    *Petitioner*,       §
                                           §
v.                                         §  CIVIL ACTION H-15-1258
                                           §
LORIE DAVIS,                               §
                                           §
    *Respondent*.       §

## MEMORANDUM OPINION & ORDER

Teddrick Batiste, an inmate on Texas' death row, has filed a federal petition for a writ of habeas corpus challenging his capital conviction and death sentence. Dkt. 9. Respondent Lorie Davis moves for summary judgment. Dkt. 22. After considering the record, the pleadings, and the applicable law, the Court finds that Batiste has not shown an entitlement to habeas relief. Accordingly, the Court will GRANT Respondent's motion for summary judgment and DENY Batiste's habeas petition. The Court will not certify any issue for appellate review.

## I. BACKGROUND

On direct appeal, the Texas Court of Criminal Appeals described the facts underlying the murder of Horace Holiday as follows:

> In the early morning hours of April 19, 2009, [Batiste], a member of the Five Deuce Hoover Crips, was at home getting some tattoos, when he looked in the mirror, thinking about all of his bills. He asked his friend, Loc, to "ride around" in his Buick with him looking for something to steal because "that's the way you get money." After fruitlessly cruising the streets for a while, they ended up at an after-hours club on Veteran's Memorial Drive on the north side of Houston. [Batiste] saw a white Cadillac coming out of the parking lot, and he decided that he wanted the Cadillac's fancy rims. "I just look at the rims, and I know what the rims are worth. . . . I could get $3,000 on the streets."

[Batiste] started following the Cadillac, and they drove for miles down the freeway. Eventually the driver must have noticed him, because the Cadillac began "swanging" from the right to the left lane and back again. [Batiste] was scared because the driver was acting "street smart," but he didn't want to show any fear because he and Loc were Crips, so he told Loc to lean back while [Batiste] pulled up even with the Cadillac and started shooting at the driver through Loc's passenger window. He shot the driver four or five times with his nine-millimeter, semi-automatic Glock pistol.

The Cadillac exited the freeway, pulled into an Exxon station, and ran into one of the gas pumps. [Batiste] drove into the station and saw the badly wounded driver slowly come out of the Cadillac, crying "Help, help, help." The man collapsed on the concrete. [Batiste] thought, "[M]an, this is my chance. I got to get those wheels. . . . And I got my gun, and I put my hat on, and I had a ski mask." He told Loc to drive the Buick to [Batiste's] wife's apartment, and then [Batiste] ran over to where Mr. Holiday, the driver, was lying on the ground. When he saw the man move, he shot him several more times in the back and head. Mr. Holiday died.[1]

[Batiste] jumped into the Cadillac and drove out of the Exxon station and back onto the Eastex freeway, heading north. He soon noticed a police car behind him and realized that he would be caught, but first he led the pursuing officers on a high-speed chase for about twelve miles.[2] It was not until officers placed a spike strip across the road and [Batiste] ran over it, destroying the Cadillac's passenger-side tires, that he was finally forced to stop.

[Batiste] was taken into custody and placed in a patrol car. One officer, who had noticed a great deal of blood on the Cadillac's steering wheel and driver's seat, came over to ask [Batiste] if he needed medical attention. [Batiste] told him that he was "fine"; it wasn't his blood, it "belongs to the guy I took the car from." After [Batiste] was taken to the homicide division, he gave officers a recorded statement confessing to the capital murder of Horace Holiday. He then gave two more confessions – one to a second capital murder and one to a separate aggravated robbery.

*Batiste v. State*, No. AP-76,600, 2013 WL 2424134, at *1 (Tex. Crim. App. June 5, 2013) (footnotes added) (hereinafter "Opinion on Direct Appeal at ___").

---

[1] The victim's body "had fifteen gunshot wounds, including fatal gunshot wounds to the brain, liver, gall bladder, and stomach." S.H.R. at 938.

[2] A police officer "observed a handgun and a ski mask being thrown out of the driver's side of the Cadillac" during the pursuit. S.H.R. at 937. "The bullets recovered from the [victim's] neck and back were consistent with being fired from [Batiste's] Glock recovered on the freeway." S.H.R. at 938.

In 2011, Batiste stood trial in the 174th District Court of Harris County, Texas.[3]  The defense did not call any witnesses or present evidence in the guilt/innocence phase.  One of Batiste's trial attorneys conceded in a habeas affidavit that "[t]he guilt phase was indefensible."  S.H.R. at 811.[4]  The jury found Batiste guilty of capital murder.

A Texas jury decides a capital defendant's fate by answering special issue questions at the conclusion of a separate punishment hearing.  Here, the instructions asked jurors to decide (1) whether Batiste would be a future societal danger and (2) whether sufficient circumstances militated against the imposition of a death sentence.  C.R. at 1712-13.  The Court of Criminal Appeals summarized the punishment portion of Batiste's trial as follows:

> During the punishment phase, the State offered evidence that, on March 23, 2009 (a little more than three weeks before killing Horace Holiday), [Batiste] robbed Walter Jones, his wife, Kari, and David McInnis, at the Phat Kat Tats tattoo shop.  A little before 11:00 p.m., [Batiste] parked his Buick in front of the Shipley's Donuts shop in the strip center where the tattoo shop was located.  Then he and two cohorts marched into the shop, wearing blue bandanas over their faces and carrying semi-automatic pistols. [Batiste] screamed, "This is a fucking robbery!"  Each of the robbers grabbed one of the three adults, and each put a gun to that person's head.  Walter Jones, the owner of Phat Kat Tats, noticed that these robbers were well organized and likely had done this before.  Kari, very afraid that their five-year-old son might come into the shop from the next room, pleaded with the robbers not to shoot him if he did so.  One of the robbers started yelling at her, "Shut up, bitch, I'll kill you, I'll kill you.  Shut up."  The robbers made them empty out their pockets.  Disappointed with the result, the robbers then scooped up two laptops, several cell phones, a digital camera, and three tattoo machines.  They ran out of the shop and fled in [Batiste's] Buick.  The surveillance camera at the nearby Shipley's Donuts caught [Batiste], his cohorts, and the Buick, on tape.

---

[3]     R. P. "Skip" Cornelius and Gerald Bourque represented Batiste at trial.  The Court will refer to the defense attorneys collectively as "trial counsel."

[4]     The state court proceedings in this case resulted in a voluminous record.  The Court will cite the Clerk's Record containing trial court motions and docket entries as C.R. at ___.  The reporter's record containing the trial court proceedings will be cited as Tr. Vol. ___ at ___.  The Court will refer to the record from Batiste's state habeas proceedings as S.H.R. at ___.

Two weeks later – shortly after midnight on April 8, 2009 – [Batiste] drove his Buick through the strip-mall center where the Black Widow tattoo parlor was located. He was "casing" it for a robbery. He backed his Buick into a parking slot in front of the shop, and then he and two other men walked into the tattoo parlor. Steve Robbins, the shop's owner, was tattooing Joshua's arm, while two of Joshua's friend–Anthony and Christie–were napping on the couch. Two of the robbers held Anthony and Christie at gunpoint, while the third robber went toward the back where Steve was tattooing Joshua. [Batiste] and the other two robbers were yelling and "cussing" at everyone, demanding money and wallets. When Steve told the robbers that they had gotten all the money and they should leave because the store had surveillance cameras, [Batiste] turned back to him and said, "What, motherfucker?" and began shooting Steve. [Batiste] and another robber shot a total of sixteen bullets before they finally fled in [Batiste's] Buick. Steve died.

The State also introduced evidence of [Batiste's] long criminal history, his gang-related activities, and his various acts of violence and intimidation while in jail.

Horace Holiday's mother, Lisa Holiday Harmon, gave the jurors a brief glimpse into her son's life and how he had saved up the money to buy the special rims for his Cadillac just two weeks before his death. She told the jury that, after the murder, Horace's grandmother moved into Horace's old room to be closer to his memory. Horace's grandmother testified that, after Horace's death, the "whole family fell apart."

During his punishment case, [Batiste] called a dean from the University of Houston to testify to the TDCJ inmate classification system and life in prison. He also called a high-school track and football coach who said that [Batiste] was a gifted athlete in middle school, but that he "disappeared" after he got into trouble for car thefts. [Batiste's] former boss testified that [Batiste] worked at Forge USA for over six months as a helper on the forging crew. He never had any problems with [Batiste]. [Batiste's] girlfriend, Stephanie Soliz, testified that she and [Batiste] lived together with her two children, one of whom was fathered by [Batiste]. [Batiste] was "the best" father. Stephanie admitted that they smoked a lot of marijuana at home and that [Batiste] had a second job as a "fence" for stolen property. She was "okay" with [Batiste] selling stolen property, as long as he wasn't doing the stealing himself.

[Batiste's] younger brother, Kevin Noel, testified that [Batiste] was "a very caring and loving brother." He did not try to get Kevin to commit crimes or join the Crips gang, but Kevin did join the Line Five Piru Bloods gang and has the gang's tattoos. Kevin would pick [Batiste] up from work and bring him back to his apartment where Kevin smoked dope with [Batiste] and Stephanie. [Batiste] would write him letters from jail suggesting various new gang tattoos and bragging about having sex with a nurse in the infirmary. [Batiste] also wrote a letter from the jail to a friend telling

him that he had broken his hand fighting with "a white guy from the military." When that man had interfered with [Batiste's] phone call, [Batiste] broke his jaw.

Darlene Beard testified that [Batiste] was her "favorite grandson." She took care of him until he was nine years old. After that, she saw him every Thanksgiving, and sometimes on her birthday or Mother's Day. She never saw [Batiste] do anything bad. "I can only tell you about the good things that I know concerning my grandchild." Mrs. Beard said that [Batiste] has a "huge" family and does not have any conflict with any member of that family. [Batiste's] mother testified that she was barely sixteen when [Batiste] was born, so her mother took care of him while she finished high school. He was a healthy, happy, church-going child without any mental-health or learning problems until he started getting into trouble in middle school. She knew that [Batiste] was sent to TYC for stealing cars, but he never told her about his other crimes, being in a gang, or having gang tattoos.

[Batiste] testified that he had a happy childhood, but when he was in middle school, he began selling Ritalin because he wanted to make money. After he was caught, he was sent to an alternative school for the rest of eighth grade and half of ninth grade. [Batiste] said that, after TYC, he committed crimes "just like to keep money in my pocket, keep everything I needed." [Batiste] stated that he spent some of his money on marijuana for Stephanie and himself, but he didn't commit crimes to get drug money. He said that he really loves his two boys, Kash and Alex, and would guide them and tell them "what's right, what's wrong."

[Batiste] testified that he could be a positive influence on people in prison, and he would distance himself from the Crips members "and just pick different goals." [Batiste] stated that he had followed the jail rules "[t]o the best of my ability. . . . Every time, it's always mutual combat. It's never been where I just hit somebody. I hit them back." But [Batiste] did admit that, when faced with the choice to show empathy and help Horace Holiday, who was bleeding to death on the concrete, [Batiste] made the choice to shoot him several more times and steal his car.

When [Batiste] was in jail, Stephanie tried to move on with a new boyfriend, Aaron. [Batiste] wrote rap lyrics about shooting him: "But Aaron ain't crazy, man. That nigga respect my game. He's a target up in my range. Extended clip to his brain." [Batiste] admitted that his jailhouse rap lyrics could be seen as glorifying capital murder ("I popped and he dropped"), the gangster lifestyle, and violence in general. [Batiste] agreed that he recruited the gang members for the Phat Kat Tats robbery and told them what to do. He admitted that he was the leader in the Black Widow capital murder as well. And he said that those were not his first robberies.

Opinion on Direct Appeal at 2-4. The jury answered Texas' special issue questions in a manner requiring the imposition of a death sentence.

Batiste challenged his conviction and sentence on appeal.[5] The Texas Court of Criminal Appeals issued an unpublished opinion affirming the judgment in 2013. *Batiste v. State*, No. AP-76,600, 2013 WL 2424134 (Tex. Crim. App. June 5, 2013).

Batiste filed a state habeas application during the pendency of his direct appeal.[6] In 2015, the trial-level state habeas court entered findings of fact and conclusions of law recommending that the Court of Criminal Appeals deny his habeas application.[7] On April 29, 2015, the Court of Criminal Appeals adopted the lower court's recommendation and denied habeas relief.

Federal review followed. Batiste filed a timely federal petition raising the following grounds for relief:

1.    Trial counsel provided ineffective representation by:

- not investigating, preparing, and presenting evidence of Batiste's brain dysfunction.
- not calling an expert witness to rebut the State's testimony concerning Batiste's gang involvement.

---

[5]    Patrick F. McCann represented Batiste on appeal.

[6]    The Texas Office of Capital Writs represented Batiste on habeas review.

[7]    The trial court signed the State's proposed findings and conclusions without alteration. Batiste unsuccessfully asked the Court of Criminal Appeals to remand his case to force the trial court to make independent findings. Batiste argues that this Court should not apply AEDPA's presumption of correctness to the state habeas court's factual findings because the trial judge signed the State's proposed findings and conclusions. Dkt. 38, pp. 29-32. In another context, the Supreme Court has criticized the "verbatim adoption of findings of fact prepared by prevailing parties, particularly when those findings have taken the form of conclusory statements unsupported by citation to the record." *Anderson v. City of Bessemer City*, 470 U.S. 564, 572 (1985); *see also Jefferson v. Upton*, 560 U.S. 284, 294-95 (2010) ("Although we have stated that a court's verbatim adoption of findings of fact prepared by prevailing parties should be treated as findings of the court, we have also criticized that practice.") (quotation omitted). The Fifth Circuit, however, has rejected the argument that habeas findings adopted verbatim from those submitted by the State are not entitled to deference. *See Basso v. Stephens,* 555 F. App'x 335, 342, 343 (5th Cir. 2014); *Green v. Thaler*, 699 F.3d 404, 416 n. 8 (5th Cir. 2012).

- not calling an expert witness to explain the relevance of Batiste's social history.
- not investigating, preparing, and presenting testimony from lay witnesses.
- not calling additional witnesses to strengthen his mitigating evidence.
- not presenting additional evidence that Batiste would not be a future societal danger.
- inadequately preparing Batiste to testify.
- failing to challenge the State's use of letters Batiste wrote while awaiting trial.

2.  The State violated Batiste's right to a fair trial by failing to disclose impeachment evidence.

3.  Juror misconduct violated Batiste's rights to due process and a fair trial.

4.  Trial counsel failed to preserve error regarding the State's presentation of allegedly inadmissible evidence.

5.  The trial court erred by compensating trial counsel with a flat fee and trial counsel provided ineffective representation by accepting that arrangement.

6.  Trial counsel provided ineffective representation by not making a sufficient objection to the introduction of evidence allegedly protected by the First Amendment.

7.  Texas unconstitutionally administers the death penalty in an arbitrary manner.

8.  The trial court violated the Constitution by not informing jurors that a single juror's vote could result in a life sentence.

9.  Trial counsel failed to preserve the record for appeal.

10. The punishment phase instructions constricted the jury's consideration of mitigating evidence.

11. Batiste's appellate and habeas attorneys provided ineffective representation in their selection of grounds for relief.

12. The trial court violated Batiste's First Amendment rights by allowing testimony and evidence about religious practices.

13. The trial court violated Texas evidentiary law by allowing victim-impact testimony.

14. Courtroom disruptions violated Batiste's right to due process.

15. The trial court improperly prevented the defense from presenting execution-impact testimony.

16. The trial court violated Batiste's constitutional rights by granting the State's challenge for cause to one prospective juror.

17. The trial court should have suppressed Batiste's statements to police officers.

Stating that his petition was "fact based" without "discuss[ing] all of the applicable law," Batiste indicated that he would file a supplement to his federal petition. Dkt. 9 at 2. The Court entered a scheduling order giving Batiste an opportunity to supplement the arguments in his petition. Dkt. 18. Batiste did not file any supplemental pleading.

Respondent has moved for summary judgment. Dkt. 22.[8] Batiste has filed a reply. Dkt. 38. This action is ripe for adjudication.

## II. STANDARD OF REVIEW

The writ of habeas corpus provides an important, but narrow, examination of an inmate's conviction and sentence. *See Harrington v. Richter*, 562 U.S. 86, 103 (2011); *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983). "Society's resources have been concentrated at [a criminal trial] in order to decide, within the limits of human fallibility, the question of guilt or innocence of one of its

---

[8] Summary judgment is proper when the record shows "that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases." *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000). A district court considering a motion for summary judgment usually construes disputed facts in a light most favorable to the nonmoving party, but must also view the evidence through "the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). The general summary judgment standards hold to the extent they do not conflict with AEDPA and other habeas law. *See Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir.2002) (Rule 56 "applies only to the extent that it does not conflict with the habeas rules"), *overruled on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004).

citizens." *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977); *see also McFarland v. Scott*, 512 U.S. 849, 859 (1994) (stating that a "criminal trial is the 'main event' at which a defendant's rights are to be determined"). The States, therefore, "possess primary authority for defining and enforcing the criminal law. In criminal trials they also hold the initial responsibility for vindicating constitutional rights." *Engle v. Isaac*, 456 U.S. 107, 128 (1982).

If the inmate has presented his federal constitutional claims to the state courts in a procedurally proper manner, and the state courts have adjudicated their merits, AEDPA provides for a deferential federal review. "[T]ime and again," the Supreme Court "has instructed that AEDPA, by setting forth necessary predicates before state-court judgments may be set aside, 'erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court.'" *White v. Wheeler*, ___ U.S. ___, 136 S. Ct. 456, 460 (2015) (quoting *Burt v. Titlow*, ___ U.S. ___, 134 S. Ct. 10, 16 (2013)). Under AEDPA's rigorous requirements, an inmate may only secure relief after showing that the state court's rejection of his claim was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1),(2).

Inmates arguing legal error in state court decisions must comply with § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses. *See Bell v. Cone*, 535 U.S. 685, 694 (2002). A petitioner does not merit relief by merely showing legal error in the state court's decision. *See White v. Woodall*, ___ U.S. ___, 134 S. Ct. 1697, 1702 (2014) (stating being "merely wrong" or in "clear error" will not suffice for federal relief under AEDPA). In contrast to "ordinary error correction through appeal," AEDPA review exist only to "guard against extreme malfunctions in the

state criminal justice systems . . . ." *Woods v. Donald*, ___ U.S. ___, 135 S. Ct. 1372, 1376 (2015) (quotation omitted). "[F]ocus[ing] on what a state court knew and did," *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011), AEDPA requires inmates to "'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woodall*, 134 S. Ct. at 1702 (quoting *Richter*, 562 U.S. at 103); *Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010); *Williams v. Taylor*, 529 U.S. 362, 413 (2000). "If this standard is difficult to meet, that is because it was meant to be." *Richter*, 562 U.S. at 102.

A petitioner challenging the factual basis for a state decision must show that it was an "unreasonable determination of the facts in light of the evidence . . . ." 28 U.S.C. § 2254(d)(2); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). A federal habeas court must also presume the underlying factual determinations of the state court to be correct, unless the inmate "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). As the same judge presided over the trial proceedings and the state habeas action in this case, the presumption of correctness for state habeas factual findings is especially strong. *See Mays v. Stephens*, 757 F.3d 211, 214 (5th Cir. 2014); *Woods v. Thaler*, 399 F. App'x. 884, 891 (5th Cir. 2010); *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000).[9]

---

[9] Section 2254(e)(2) authorizes evidentiary hearings under narrow conditions. No evidentiary hearing is necessary to adjudicate Batiste's petition.

An inmate's compliance with 28 U.S.C. § 2254(d) does not guarantee habeas relief. *See Horn v. Banks*, 536 U.S. 266, 272 (2002) (observing that no Supreme Court case "ha[s] suggested that a writ of habeas corpus should automatically issue if a prisoner satisfies the AEDPA standard[.]"); *Robertson v. Cain*, 324 F.3d 297, 306 (5th Cir. 2003) (finding that 28 U.S.C. § 2254(d) "does not require federal habeas courts to grant relief reflexively"). A habeas petitioner meeting his AEDPA burden must still comply with weighty jurisprudential tenets, such as the harmless-error doctrine and the non-retroactivity principle, that bridle federal habeas relief. *See Thacker v. Dretke*, 396 F.3d 607, 612 n.2 (5th Cir. 2005). Thus, any error cannot require habeas relief unless it "ha[d] a 'substantial and injurious effect or influence in determining the jury's verdict,'" *Robertson*, 324 F.3d at 304 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 629 (1993)), or would not require the creation of new constitutional law, *see Banks*, 536 U.S. at 272 (relying on *Teague v. Lane*, 489 U.S. 288 (1989)).

## III. ANALYSIS

### A.    Ineffective Assistance of Trial Counsel

Batiste raises several complaints about his trial representation. A court reviews an attorney's representation under the general conceptual framework established in *Strickland v. Washington*, 466 U.S. 668, 686 (1984). Under *Strickland*, a criminal defendant's Sixth Amendment rights are "denied when a defense attorney's *performance* falls below an objective standard of reasonableness and thereby *prejudices* the defense." *Yarborough v. Gentry*, 540 U.S. 1, 3 (2003) (emphasis added); *see also Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). To establish deficient performance, the petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*,

466 U.S. at 687. A petitioner must also show actual prejudice, meaning "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Id.* at 694; *see also Wiggins*, 539 U.S. at 534.

"Surmounting *Strickland*'s high bar is never an easy task . . . ." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). When the state courts have already adjudicated the merits of a *Strickland* claim, "[a] state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Richter*, 562 U.S. at 101. Federal courts employ a "doubly deferential judicial review" of already adjudicated Strickland claims that gives wide latitude to state decisions. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009); *see also Cullen v. Pinholster*, 563 U.S. 170, 201 (2011). "The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 104; *see also Premo v. Moore*, 562 U.S. 115, 123 (2011). With those standards in mind, the Court turns to Batiste's individual allegations of error by defense counsel.

1. *Investigation, Preparation, and Presentation of Evidence Relating to Brain Dysfunction*

Batiste claims that he was denied effective trial representation because counsel did not retain a neuropsychologist, investigate sufficiently whether he suffered from frontal lobe damage, and advance a mitigation defense based on his general cognitive functioning. Mental-health issues did not play a prominent role in Batiste's trial. The State presented testimony in the penalty phase from Dr. Scott Krieger, a clinical psychologist who had examined Batiste at age sixteen. Dr. Krieger had performed several psychological tests, including the Minnesota Multiphasic Inventory Adolescent Form (MMPI-A). As a result of his interview and testing, Dr. Krieger diagnosed Batiste with "disruptive behavior disorder non-specified," a condition characterized by disruptive or oppositional

behaviors. Dr. Kieger also testified that Batiste's results on the MMPI-A were common to people with hyperactive, impulsive behavior patterns. The State adduced testimony from Dr. Kieger showing that Batiste felt no empathy for his victims. Dr. Kieger, however, did not attribute any psychological condition to brain dysfunction or disorder. The defense did not call any mental-health experts at trial.

On state habeas review, Batiste argued that his trial attorneys did not perform an adequate investigation because they did not secure a neurological examination. Specifically, Batiste faulted trial counsel for not retaining a neuropsychologist who could diagnose him with brain dysfunction.[10] Batiste identified "neuropathology and cognitive dysfunction risk factors present in [his] social history," such as his "history of meningitis as a neonate" and other "risk factors present in [his] juvenile history," that should have prompted counsel to seek a neuropsychological evaluation. S.H.R. at 39. Batiste substantiated his claim through the results of a neuropsychological examination conducted by Dr. James Underhill on January 5 and 6, 2012. Dr. Underhill administered various testing instruments, the results of which led him to opine, "with a reasonable degree of scientific certainty, that Teddrick Batiste suffers from damage to the frontal lobe of his brain. As a result, he is unable to calculate risk and appropriately weigh the consequences of his actions." S.H.R. at 275.[11] Dr. Underhill could not identify the etiology of Batiste's brain dysfunction, but speculated that it may have been either his mother's lack of pre-natal care while pregnant with him or "the meningitis Mr.

---

[10]     In addition to training in clinical psychology, a neuropsychologist specializes in administrating psychological tests to evaluate human brain disorders or psychological impairment caused by, or related to, injury to brain tissue. *See United States v. Kasim*, No. 2:07 CR 56, 2008 WL 4822291, at *4 (N.D. Ind. Nov. 3, 2008) (describing a neuropsychologist as a "specialist of interdisciplinary branch of psychology and neuroscience that aims to understand how the structure and function of the brain relate to specific psychological processes and overt behaviors").

[11]     Dr. Underhill also concluded that "Mr. Batiste suffers from mild impairment of memory. However, it is his inability to conceptualize risk that significantly affects his functioning." S.H.R. at 272.

Batiste was reported to have suffered from as a neonate." S.H.R. at 273. Dr. Underhill specified that Batiste's "damage to his frontal lobe" was specifically located in "the part of the prefrontal cortex that controls risk taking." S.H.R. at 270. Persons with similar frontal lobe damage exhibit "[I]mpulsivity and/or risk taking" behaviors, causing them to "make a decision quickly, without considering the consequence, ultimately leading to behavior that exhibits a lack of control." S.H.R. at 271.[12] Dr. Underhill opined that "Mr. Batiste's inability to perceive risk can be compared to that of an impulsive gambler" because "the chance of winning is extraordinarily slim, and the likelihood of him losing his money is great," but "once the process of gambling has begun, he experiences difficulties in stopping himself" and "increases the risk by continuing to gamble, despite the fact that he can acknowledge he will almost certainly lose." Dr. Underhill opined that medication and the structures of prison life would help control Batiste's risk-taking behaviors. S.H.R. at 274-75.

The record indicates that trial counsel made some effort to investigate issues relating to Batiste's mental health. The state habeas court found that the defense's "pre-trial investigation included an investigation of [Batiste's] mental health; that trial counsel sought funding for and retained three mental health experts." S.H.R. at 950. Specifically, trial counsel retained two clinical psychologists and a medical doctor as a substance-abuse expert. The record indicates that these experts conducted forensic interviews, reviewed records, and consulted with the defense team. The

---

[12]     Dr. Underhill clarified:

Impulsivity and/or risk taking are often seen in individuals following frontal lobe damage; While these two concepts may seem to have the same meaning, they are indeed different; impulsivity is simply a response disinhibition, while risk taking is related to the reward-based aspects of decision-making. An impulsive person will make a decision quickly, without considering the consequences, leading ultimately to behavior that exhibits a lack of self-control. Contrarily, a person with an inability to evaluate risk will look at the consequences but not weigh them. Instead, they will jump at the opportunity of a reward even if the likelihood of receiving that reward is slim.

S.H.R. at 271.

record does not contain any psychological report obtained from those three experts. Nothing in the record, however, suggests that the three experts uncovered any information that would have indicated the need for neuropsychological testing.

Trial counsel provided an affidavit on state habeas review explaining the defense investigation into possible mental-health issues. Trial counsel expressed concern about the double-edged nature of using mental-health evidence in general:

> One of the realities of death penalty litigation that all experienced defense attorneys will admit is this: if you use mental health evidence, short of proving actual insanity, you run the risk of making the defendant look even more dangerous to the jury, and frankly it is generally true, because they are more dangerous. Let me illustrate briefly. If you prove that the defendant needs medicine to overcome his mental health challenges, and even if you prove the medicine is available, the State will argue that even if this were true the jury will never be assured the defendant will take his medicine and if he doesn't society is in danger.
>
> Conversely, if you don't use mental health evidence you will be writing affidavits like this one and/or testifying at hearings as to why you didn't use it.

S.H.R. at 817. With that context, trial counsel provided specific reasons for which the defense did not investigate the possibility of brain dysfunction:

> We had no information from any source, be it a family member, friend, our experts or investigators, or any record that would indicate a frontal lobe disorder, or any mental disorder. He was sharp and I personally saw him make decisions. I am very careful not to call witnesses, especially experts, who on cross examination can destroy our case.
>
> If the Texas Court of Criminal Appeals rules, or if the Texas Legislature passes a law that requires in every capital murder prosecution a defendant must be given neuropsychological testing to see if they have brain damage, even if there is absolutely no indication, and the county or State must bare the cost, then I certainly will follow that requirement but that is not my understanding of the law in Texas.

S.H.R. at 817.

With that background, the state habeas court entered findings of fact and conclusions of law denying this claim. Despite the use of three mental-health experts, as well as the other investigations into Batiste's background, the state habeas court found that trial counsel "had no information from any expert, investigator, record, family member, or friend indicating that [Batiste] had any indicia of frontal lobe disorder." S.H.R. at 951. The state habeas court also questioned Dr. Underhill's diagnosis of frontal lobe damage. The state habeas court found "unpersuasive Dr. Underhill's conclusions regarding [Batiste's] alleged frontal lobe damage and impaired perception/control of risky behavior." S.H.R. at 950. The state habeas court found that Dr. Underhill's conclusion about the source of Batiste's risk taking was "vague" because he "does not disclose [Batiste's] specific score" or provide specific facts which could be corroborated. S.H.R. at 951. Additionally, the state habeas court found "Dr. Underhill's conclusions unpersuasive" about his impulsivity because state jail records "reflect[ed] that [Batiste] had no disciplinaries while incarcerated at the Lynchner Unit [before trial] which indicated that [Batiste] could control his behavior, including risk taking behavior, when he so chose without medication." S.H.R. at 952. Also, Dr. Underhill's "conclusion regarding [Batiste's] alleged inability to calculate risk and weigh the consequences of his actions is cumulative of Scott Krieger's punishment testimony concerning the results of [his] MMPI-A score which indicated that [Batiste] was impulsive and preferred action over thought and reaction." S.H.R. at 952. In sum, the state habeas court found no deficient performance by counsel or actual prejudice.

    a.    Deficient Performance

    Batiste has not shown that trial counsel's performance was deficient. Batiste is correct that trial counsel "did not retain an expert to perform a neuropsychological evaluation and/or conduct any testing of Batiste." Dkt. 9 at 19. Applying applicable Supreme Court precedent, the Fifth Circuit has

explained that, "[I]n investigating potential mitigating evidence, counsel must either (1) undertake a reasonable investigation or (2) make an informed strategic decision that investigation is unnecessary." *Charles v. Stephens*, 736 F.3d 380, 389 (5th Cir. 2013). Trial counsel "must not ignore pertinent avenues of investigation, or even a single, particularly promising investigation lead." *Id*. at 390 (internal citations and quotation marks omitted); *see also Higgins v. Cain*, 720 F.3d 255, 265 (5th Cir. 2013) (explaining that counsel must "research relevant facts and law, or make an informed decision that certain avenues will not prove fruitful"). Batiste's claim depends on identifying some set of circumstances that would have led a reasonable attorney to engage in an investigation that included specific neuropsychological testing.

Trial counsel inquired into Batiste's background and retained the services of three mental-health experts. Batiste's attorneys explored facets of his mental health and background with the assistance of various psychologists.[13] Trial counsel did not receive "information from any source, be it a family member, friend, our experts or investigators, or any record that would indicate a frontal lobe disorder, or any mental disorder." S.H.R. at 817. Batiste has not pointed to any place in the record containing any indication that he experienced a head injury or other physical event causing brain damage.[14] Under the *Strickland* standard, counsel are required to conduct reasonable

---

[13]    In a state habeas hearing, the State summarized the concern with Batiste's argument: "Your Honor approved expert funding for two psychologists and an addiction specialist. Two psychologists met with Mr. Batiste. They interviewed family members. And what they told you was – is that was no indicia of any brain damage. And what habeas counsel and [Batiste] wants you to do is in essence create a new prevailing professional norm that in every case its not just enough that you have to see a psychologist you have to see a neuropsychologist. There's no case law to support that." Transcript of December 21, 2014 Writ Hearing, p.10.

[14]    Here, Dr. Underhill pointed to "several possible etiologies of the brain dysfunction." S.H.R. at 373. Dr. Underhill only specifically mentioned, however, that "[t]he impairment can result from head trauma or illness." S.H.R. at 373. Batiste argues that his "medical history of infantile meningitis" should have alerted trial counsel to engage in a neuropsychological investigation. Dkt. 38, p. 57. Dr. Underhill, however, opined that "the meningitis Mr. Batiste was reported to have suffered from as a neonate could have contributed to or been the direct cause of Mr. Batiste's
(continued...)

investigation under prevailing professional norms. *Strickland*, 466 U.S. at 688. Counsel are not expected to be experts in all fields, but can reasonably rely on experts in deciding the scope of pre-trial investigation. *See, e.g.*, *McClain v. Hall*, 552 F.3d 1245, 1253 (11th Cir. 2008) (finding no error in trial counsel's investigation notwithstanding a later, more favorable expert opinion). Recognizing that "[j]udicial scrutiny of counsel's performance must be highly deferential," *Strickland*, 466 U.S. at 698, Batiste's trial attorneys could reasonably forgo investigating neuropsychiatric problems when the defense's three mental health experts did not indicate that such investigation was necessary.

Yet even if trial counsel had uncovered evidence suggesting that Batiste possibly suffered from brain dysfunction, and secured results similar to those reached by Dr. Underhill, Batiste has not necessarily shown that a reasonable attorney would have presented that information to the jury. Trial counsel was apprehensive about presenting similar testimony because it would allow the State to characterize Batiste's mental state as unpredictably dangerous and intractable. Testimony about a brain injury may be a "'double-edged' sword," *Martinez v. Dretke*, 404 F.3d 878, 889 (5th Cir. 2005), because jurors could fear that the defendant would never be able to control his violent behavior. *See Nelson v. Quarterman*, 472 F.3d 287, 307-08 (5th Cir. 2006). "Presenting evidence of 'organic (i.e., permanent) brain damage,' which is associated with poor impulse control and a violent propensity, would have substantiated the state's evidence and increased the likelihood of a future dangerousness finding." *Martinez*, 404 F.3d at 890. And, as the Seventh Circuit has noted, sentencers "may not be impressed with the idea that to know the cause of viciousness is to excuse

---

[14]    (...continued)
impairment." S.H.R. at 273. Dr. Underhill posited that Batiste had developed brain dysfunction as a "neonate" based on his mother's claim that he had been born with meningitis. The record, however, does not indicate that Batiste suffered from any neonatal disease. Instead, Batiste experienced meningitis at nine months of age. S.H.R. at 385. Dr. Underhill's affidavit does not describe whether the same risk of frontal lobe damage occurs when the disease strikes one who is not a newborn.

it; they may conclude instead that when violent behavior appears to be outside the defendant's power of control, capital punishment is appropriate to incapacitate." *Foster v. Schomig*, 223 F.3d 626, 637 (7th Cir. 2000) (quotation omitted).

Dr. Underhill recognized the double-edged potential of brain trauma evidence but predicated the mitigating thrust of his conclusions on (1) the ability of medication to reduce Batiste's tendency toward risk taking and (2) the structures of prison preventing dangerous actions. Trial counsel, however, feared that those two factors would not withstand cross-examination. Trial counsel anticipated that the State would argue that Batiste would only be capable of improvement if he chose to take his medication. More important, the State had already presented evidence of Batiste's threats and violence while in jail awaiting trial. Testimony that incarceration would squelch Batiste's free-world violent impulsivity would ring hollow against his inability to control himself in a structured environment. Weighing the benefit of Dr. Underhill's testimony against the potential that the State would undercut it, and possibly turn it against the defense, a reasonable trial attorney could choose not to present such evidence.

b. Actual Prejudice

Batiste has also not shown that the state habeas court was unreasonable in deciding that he did not meet *Strickland*'s prejudice prong. The state habeas court concluded that (1) the jury already had before it evidence that Batiste "was 'impulsive' and 'preferred action over thought and reflection'" and (2) evidence of his "two capital murders, an aggravated robbery, and multiple bad acts" which was "particularly strong" would eclipse any brain-injury evidence. S.H.R. at 978. Without the veneer of neuropsychological testimony, the jury already heard a psychologist's opinion

that Batiste acted on impulse. Insofar as that information has only mitigating value, the jury could already consider the effects of evidence similar to that identified on state habeas review.

Importantly, strong evidence supported the jury's answers to the special issue questions. The question of *Strickland* prejudice does not exist in a vacuum; "[I]n making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695. On habeas review "the reviewing court must consider all the evidence – the good and the bad – when evaluating prejudice." *Wong v. Belmontes*, 558 U.S. 15, 26 (2009). The Fifth Circuit has indicated that a court looks to see if the petitioner's new evidence will "lessen the impact of the other evidence against him[,]" *Conner v. Quarterman*, 477 F.3d 287, 294 (5th Cir. 2007), because "overwhelming aggravating factors" can outweigh unpresented mitigating evidence. *Sonnier v. Quarterman*, 476 F.3d 349, 360 (5th Cir. 2007). For instance, the "horrific facts of the crime," *Martinez*, 481 F.3d at 259, the "brutal and senseless nature of the crime," *Smith v. Quarterman*, 471 F.3d 565, 576 (5th Cir. 2006), or the "cruel manner in which he killed," *Miniel v. Quarterman*, 339 F.3d 331, 347 (5th Cir. 2003), may weigh heavily against a finding of *Strickland* prejudice. *See also Strickland*, 466 U.S. at 700; *Knight v. Quarterman*, 186 F. App'x 518, 535 (5th Cir. 2006); *Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002); *Andrews v. Collins*, 21 F.3d 612, 624 n.23 (5th Cir. 1994); *Russell v. Lynaugh*, 892 F.2d 1205, 1213 (5th Cir. 1989). Additionally, if the "evidence of . . . future dangerousness was overwhelming . . . it is virtually impossible to establish prejudice." *Ladd*, 311 F.3d at 360 (citing *Strickland*, 466 U.S. at 698).

Batiste committed murders for personal gain. The killing in the instant case was particularly brutal and senseless. Batiste repeatedly shot into the victim's car on the freeway to steal the rims from his car. Once they both stopped, Batiste could have stolen the victim's car and left the injured

man lying on his stomach bleeding and pleading for his life. Instead, Batiste repeatedly shot him. Batiste's police statement indicates that he did not act on impulse. Batiste paused, mustering "all [his] empathy towards" the victim, but after "weighing" out what to do, decided that he had "to get these wheels." In addition, Batiste participated in, and led, aggravated robberies. He stole cars. He used drugs. He sold stolen property for others. Batiste did not reform his character after previous periods of incarceration and, in fact, he became more violent. Even knowing that the State would use his actions against him in an impending capital murder trial, pre-trial incarceration did not squelch Batiste's violence. Batiste engaged in fights, threatened inmates, disrespected jail personnel, and possessed weapons. Batiste exhibited little remorse in jailhouse correspondence, but continued glorifying the gang lifestyle and praising violence. Against that background, the state habeas court was not unreasonable in finding no reasonable probability of a different result from trial counsel's failure to present neuropsychological evidence.

> 2. *Efforts to Rebut Testimony Concerning Batiste's Gang Involvement*

Batiste argues that trial counsel failed to provide the jury with an accurate picture of his gang membership. While Batiste's gang membership was mentioned only briefly in the guilt/innocence phase,[15] it was a major and predominant theme throughout the punishment hearing.[16] References to Batiste's gang affiliation permeated both lay and expert testimony. The State called three expert witnesses who, in great detail, elaborated on the extent to which Batiste identified as a gang member:

---

[15]     Batiste's gang membership was only mentioned incidentally in the guilt/innocence phase. Tr. Vol. 14 at 127; Vol. 16 at 148.

[16]     The state habeas court reviewed the State's evidence of "extensive involvement with the Crips gang" which included "(a) his gang tattoos; (b) [his] acknowledgment that he was a member of the Crips gang and organized fellow Crips gang members to participate in the Phat Kats aggravated robbery; (c) [his] letter regarding 'O[riginal] G[angster]' Rome; (d) [his] advice to his brother regarding the type of gang tattoo he should obtain; and (e) the testimony of Harris County Jail inmate Robert Dean." S.H.R. at 959.

- Prison classification expert David Davis testified for the prosecution about Batiste's tattoos related to his Crips membership.[17] In particular, Davis explained that the Five Deuce Hoover Crips were involved in various crime-related activities, including drug dealing.

- Clint Ponder, a Houston Police Department officer assigned to a gang unit, testified that Batiste was found in the gang membership database as a documented member of the Five Deuce Hoover Crips. Tr. Vol. 18 at 165-67. Ponder testified that Batiste had "quite a few tattoos that were gang-related." Tr. Vol. 18 at 171-72. Ponder testified extensively about Batiste's numerous gang-related tattoos. Those tattoos included the letters HCG under his left eye, which stand for "Hoover CRIP Gangster." Tr. Vol. 18 at 179. Other tattoos included LOC, a "common acronym . . . for love of CRIP"; a Roman numeral V below his right earlobe signifying the Five Deuce Hoover Crips; numbers 8-3-7, signifying the letters of the alphabet corresponding to HGC; and the word CRIP on his left hand. Some tattoos were intended to show disrespect to other gangs, including one meaning "Piru killer" and "Bloods killer." Tr. Vol. 18 at 171-198.

- Irma Fernandez, a prison security threat expert with TDCJ, testified that membership in a gang such as the Crips is a security threat in prison. Fernandez testified that Crips members tended to continue violent and unlawful activity when incarcerated. Tr. Vol. 19 at 36, 39-40, 64.

Lay testimony provided mixed information about Batiste's ties to the Crips. Robert Dean, a fellow jail inmate, testified that Batiste was the leader of a group of Crips inmates that would pick fights. Dean said that Batiste acknowledged his gang membership and bragged about being incarcerated for capital murder. Tr. Vol. 19 at 125-26. Some family members and friends did not know that Batiste belonged to the Crips. Tr. Vol. 24 at 25, 71. Batiste himself, however, took the stand and acknowledged being a member of the Crips. Batiste told the jury that he recruited fellow Crips gang members to participate in the Phat Kats aggravated robbery. Tr. Vol. 24 at 192-93.

---

[17] During a previous incarceration, TDCJ classified Batiste as a member of the Crips because he self-identified as such and had gang related tattoos, including with the gang's name itself. S.H.R. at 857.

Batiste, however, explained that he wanted to distance himself from the gang upon incarceration and "do what I have to do to renounce them." Tr. Vol. 24 at 138.

The State argued in closing that Batiste "wanted to portray himself as . . . a tatted-up street thug who deserves street cred." Tr. Vol. 25 at 63. The State told jurors: "He told you yesterday he wanted out of the gang, but you know as recent as May 15th, after all of you had been selected for this jury, he's still writing his gang symbols in his mail. . . . He wants to stay in. He's telling you that because he thinks you will feel sorry for him and say: Oh, he's going to change." Tr. Vol. 25 at 74.

Batiste claims that "he was not a hard-core gang member, and only ever marginally affiliated at best." Dkt. 9 at 5. Instead of being a leader in the Five Deuce Hoover Crips, Batiste was "a young man struggling with the 'gangster' label that had been thrust upon him." Dkt. 9 at 6. Batiste argues that trial counsel should have called an expert to place his gang affiliation into the proper context.

On state habeas review, Batiste presented an affidavit from Charles Rotramel, the executive director of an organization that works with at-risk and gang-influenced youth. Rotramel conducted a three-hour interview with Batiste while on death row in 2013. Rotramel also reviewed trial testimony, read affidavits from Batiste's family members, and examined various records. Rotramel opined that Batiste was "never a 'hard-core' gang member" because he was never "formally inducted into gang membership." S.H.R. at 238. According to Rotramel, Batiste "never broadcast his gang membership to the world around him" and, in fact, "never actively defined himself according to his gang affiliation." S.H.R. at 238-39. Rotramel explained that Batiste "did not have any actual involvement or membership" in the Crips before being in Texas Youth Commission custody. S.H.R. at 240. While in TYC, Batiste joined the Crips, but only "as a matter of his own protection and

survival in an unfamiliar and dangerous institution far removed from everything and everyone he knew." S.H.R. at 238. When released, Batiste "profess[ed] a Five Deuce Hoover Crip affiliation outwardly" but "actually never had a strong gang-affiliation because he lacked a set or a common group of gang members with whom he associated on a regular basis." S.H.R. at 231. Rotramel also said that Batiste's subsequent employment history and interaction with family members was not indicative of gang membership.

Rotramel reviewed Batiste's pre-trial letters and opined that they showed "an emotionally complex young man trying to come to terms with the consequences of his actions and preparing himself for a life of incarceration." S.H.R. at 235. "Using the common tropes and argot of hip hop music," Batiste "vacillat[ed] between typical empty rap braggadocio and genuine emotional expression" when creating rap lyrics that "commonly use hyperbolic and grandiose language" but do not truly "glorify[], much less encourage violence." S.H.R. at 935. Rotramel saw within Batiste's letters "emotional vulnerability behind the thin veneer of typical rap braggadocio and toughness." S.H.R. at 328. Also, Rotramel explained that "[r]emorse is a common theme in [Batiste's] letters." S.H.R. at 239. Rotramel contends that "[c]onspicuously absent from Teddrick's raps and letters are any explicit gang references, slang, or symbolism." S.H.R. at 330.

Trial counsel provided an affidavit responding to Rotramel's opinion that Batiste only had limited gang involvement:

> "Limited scope of [Batiste's] gang involvement?" Are you kidding? He was as ganged up as any person I have ever met and I have been doing this since way before there were gangs in Houston, Texas. A cursory reading of his writing will illustrate that his gang involvement included virtually every word he wrote. Every conceivable gang reference is contained in all of his writing, to the point of not using certain letters because they refer to a rival gang and using certain letters, or the formation of the letters, to emphasize his gang. He had on his body every conceivable tattoo and reference to his gang. Every decision he made was about the gang. He was the living

embodiment of his gang. We were not going to come out on top with testimony form any expert on gangs. The less said about gangs the more I liked our chances to save his life.

S.H.R. at 818.[18] Trial counsel, in fact, said that Batiste refused to consider a plea bargain because it would have required him to turn on another gang member. Trial counsel opined that Batiste was "so involved in his 'gang mentality' that he wouldn't even consider it. He wanted the life sentence but the gang code of honor was more important to him than his own life." S.H.R. at 959.

With that background, the state habeas court found that trial counsel "made a reasonable strategic decision to not present a gang expert at punishment because counsel believed that such tactic would harm the defense." S.H.R. at 954. The state habeas court expressed deep skepticism regarding Rotramel's opinion about Batiste's "limited involvement with the Crips," particularly in light of the trial record. S.H.R. at 878. With the extensive, detailed trial testimony about Batiste's gang membership, the state habeas court found that Rotramel's testimony was "unpersuasive." S.H.R. at 954. The state habeas court reasonably found that "the State's trial evidence and [Batiste's] testimony directly contradict [his] habeas characterization of his gang membership as 'limited.'" S.H.R. at 953.

Batiste has not shown that the state court was unreasonable in finding no deficiency because trial counsel did not present evidence similar to Rotramel's habeas affidavit. Trial counsel could reasonably decide that Batiste did not have only limited interaction with the Crips. Rotramel apparently drew a distinction between a "hard-core gang" member and someone only "affiliated" with a gang. S.H.R. at 317. Even accepting Rotramel's opinion that Batiste was not a hard-core gang member, a reasonable trial attorney could shy away from presenting that expert testimony when

---

[18] The state habeas court issued an explicit finding that trial court's affidavit was credible. S.H.R. at 935.

the violent conventions of gang life permeated Batiste's words, actions, and lifestyle. Batiste had not just adopted common customs of gang membership, he bore evidence of gang affiliation over his entire body. Jurors would have difficulty believing Rotramel's opinion that Batiste "never broadcast his gang membership to the world around him" when he had a gang tattoo on his face. The tattoos covering Batiste's body testified of his devotion to the Crips. More to the point, his actions bore indicia of gang membership as he recruited and directed other Crips in the commission of violent crimes. Batiste told police officers that, "because he was . . . [a member of the] CRIPS," he did not want to show fear as he shot into the victim's moving car. His self-identification as a gang member continued into the prison setting, where bad acts directly related to gang affiliation continued despite expert predictions that the rigors of prison would cause him to act otherwise. The state habeas court was not unreasonable in finding "unpersuasive" any attempt to minimize Batiste's gang membership.

A reasonable attorney could instead decide to avoid unnecessary reference to gang affiliation or identification. With the extensive evidence of Batiste's involvement in not only the Crips gang, but in the lawlessness associated with gang membership, the state habeas court was not unreasonable in finding no *Strickland* deficient performance or resultant prejudice. Batiste has not met his AEDPA burden with regard to his claim that counsel should have minimized his gang membership.

3.    *Mitigating Evidence*

Batiste's federal petition raises three specific challenges to trial counsel's efforts to investigate, prepare, and present mitigating evidence. With Batiste's extremely violent past, and aggressive behavior that extended into the prison setting, trial counsel knew that "[m]itigation was [the] best, and really only, opportunity to save his life at trial." S.H.R. at 916. The defense team

included an investigator, a specific mitigation investigator, three mental-health experts, and an expert on the criminal justice system. Trial counsel met with family members before trial. From the defense investigation, trial counsel called various witnesses to provide mitigating evidence. The state habeas court provided a comprehensive review of the defense's trial evidence, as recited below:

CLASSIFICATION AND FUTURE RISK

37.   Mary Elizabeth Pelz, Ph.D., Dean of the College of Public Service at the University of Houston-Downtown, testified as an expert regarding TDCJ-CID classification, stating that she had interviewed [Batiste] and reviewed his TYC, TDCJ-CID, and employment records; that studies indicated that prisoners sentenced to life without parole were "very manageable" and did not manifest an increase in acts of violence while incarcerated;-that inmates sentenced to life without parole were more likely to obey prison rules because they needed to keep as many privileges as possible in order to survive; that an inmate's previous behavior in prison was more important than the actual crime committed to determine future behavior; that Dr. Pelz was not aware of [Batiste] having any disciplinary issues while incarcerated in a state jail facility; that [Batiste's] physical altercations in the Harris County Jail while awaiting trial would not be "seriously considered" for his inmate classification; and, that [Batiste's] future behavior in prison would become "tempered" as he aged and became institutionalized (XXIII RR at 27-30, 43, 50-52, 59, 97-8, 110).

38.   Sgt. David Davis, Harris County Sheriff's Office Classification Unit, testified that [Batiste's] Harris County jail disciplinary records contained no record of [Batiste] having physical contact with the jail staff (XVIII RR at 6).

[BATISTE'S] SCHOOL AND WORK HISTORY

39.   Gary Thiebaud, head football coach at Cypress Ridge High School, testified that [Batiste] was a gifted athlete; that [Batiste] did well in athletics, presented no disciplinary problems, and benefitted from the program's highly structured nature; that Thiebaud considered [Batiste] to be a "follower" who was influenced by those around him; and, that Thiebaud "lost" [Batiste] after spring football when [Batiste] left the structure of the sports program and became involved in car thefts (XXIII R. R. at 115-6, 118-22).

40.   Kristopher McSherry, the plant manager for Forge USA, testified regarding [Batiste's] work history, stating that [Batiste] was a helper on a forging crew where the work was physically demanding and often required working more than eight hours per day; that McSherry never had issues with [Batiste's] job performance; that [Batiste] indicated that he was "desperate to find a job to feed his family"; and, that McSherry was shocked when [Batiste] was charged with capital murder (XXIII R.R. at 130-36, 145-7).

[BATISTE'S] SOCIAL/FAMILY HISTORY

41.    Stephanie Soliz, [Batiste's] girlfriend, testified that [Batiste] was the "best" father to their biological son Alex and her son Kash from a different relationship; that [Batiste] took care of her, Alex, and Kash financially; that [Batiste] regularly bathed and clothed the boys; and, that [Batiste] was trying to be a positive influence on the children while in the Harris County Jail (XXIII R.R. at 155-8).

42.    Terry Soliz, Stephanie Soliz's mother, testified that [Batiste] was a loving influence on Kash; that [Batiste] cared for Kash more than anyone else after Kash was born; that [Batiste] was always "very respectful" to her and took care of her when she was sick; and, that she was shocked by the primary offense (XXIII R.R. at 6-7, 11-2).

43.    Kevin Noel Jr., [Batiste's] brother, testified that [Batiste] was a loving brother and a good father who took care of his family; that Noel did not know that [Batiste] was a member of the Crips; and, that tattoos were common in their neighborhood (XXIV R.R. at 26, 30).

44.    Micala Lara, [Batiste's] friend, testified that [Batiste] and Stephanie Soliz lived with Lara and her husband, Ricardo, in Denton, Texas, in 2007; that Ricardo helped [Batiste] obtain a job in the Denton area; that [Batiste] got along with everyone and treated his own children well; and, that [Batiste] was respectful to Stephanie Soliz and loved her (XXIV R.R. at 56-60, 62, 65).

45.    Beverly West, [Batiste's] cousin, testified that [Batiste's] mother was fifteen years old when she gave birth to [Batiste]; that [Batiste] always treated her with respect; and, that she never saw [Batiste] act disrespectful to any family members (XXIV R.R. at 74-80).

46.    Darlene Beard, [Batiste's] grandmother, testified that [Batiste] was born in her home because no one knew that [Batiste's] mother was pregnant; that [Batiste] was respectful to other family members and attended church as a child; and, that [Batiste] never had a father figure (XXIV R.R. at 86-90).

47.    Rowena Scott, [Batiste's] mother, testified that she and [Batiste] frequently moved when he was young, and her relationship with [Batiste's] stepfather had a "bad effect" on [Batiste]; that [Batiste] could follow rules, and it was possible for [Batiste] to be a positive influence on his children while imprisoned; and, that, while [Batiste] had meningitis as a child, he was otherwise healthy with no mental problems or learning disabilities (XXIV R.R. at 97-8, 107-11).

[BATISTE'S] TESTIMONY AT PUNISHMENT

48.    [Batiste] testified on direct examination at punishment, providing a comprehensive account of his life and circumstances, including his transient upbringing, his relationship with Stephanie Soliz and their children, his gang membership, his criminal acts, and his remorse:

- Regarding his childhood and schooling, [Batiste] testified that his grandfather was a positive influence on him, but he died while [Batiste] was in state jail; that his mother kept moving which caused [Batiste] to attend a series of schools in Houston; that [Batiste] sold Ritalin in middle school to make money; that [Batiste] listened to his coach Gary Thiebaud, but the "goal" of school disappeared after [Batiste] left TYC; and, that it was [Batiste's] fault for not listening to Thiebaud (XXIV R.R. at 113-4, 118-20);

- Regarding his family, [Batiste] testified that his relationship with Stephanie Soliz developed while [Batiste] was in TYC, and [Batiste] decided to play a paternal role to Kash because he knew that Kash's biological father had no interest in raising the child.

- Regarding work, [Batiste] testified that he paid the rent and other bills with the money he earned from Forge Industries; that [Batiste's] work hours were cut as the economy soured; and, that [Batiste] started selling stolen goods to make up the difference in his earnings (XXIV R. R. at 133-5);

- Regarding his gang membership, [Batiste] acknowledged that he was a Crips member but testified that he planned to "distance" himself from the gang in prison, "do[ing] what I have to do to renounce them" (XXIV R.R. at 138);

- Regarding his criminal activities, [Batiste] admitted that he killed the complainant and Robbins and that he participated in the Phat Kats aggravated robbery (XXIV R.R. at 136);

- Regarding his feelings concerning the primary offense, [Batiste] testified that he had let his family down and understood that he needed to teach Kash and Alex right from wrong, and [Batiste] expressed remorse for his actions, stating: "I know ain't no right to take nobody's life . . . . I let material things, you know, get ahold of me. Can't blame nobody but myself. And just I was wrong for what I did" (XXIV R.R. at 126-70, 226-7); and

- Regarding future danger, [Batiste] testified that he intended to follow the rules in prison (XXIV R.R. at 142).

49. On the prosecution's cross-examination, [Batiste] testified about his leadership role in the capital murders and aggravated robbery, as well as certain rap lyrics he composed while awaiting trial in the Harris County Jail, testifying to the following:

- Regarding the primary offense, [Batiste] testified that, even though he knew that the complainant was shot and heard the

complainant crying for help, [Batiste] felt that the complainant could still protect himself at the gas station; that [Batiste] put on a ski mask and threw his firearm out of the car in order to facilitate the crime; and, that [Batiste] denied tinting the windows on his Buick to facilitate his crimes, insisting that the purpose of the tint was to protect his children from the sun (XXIV R.R. at 160-1, 218-23);

- Regarding the capital murder of Steve Robbins, [Batiste] testified that he led and planned the capital murder; that [Batiste] shot Robbins first as Robbins was coming towards him to protect his customers; and, that [Batiste] shot at Norsworthy as he ran away to the back of the shop (XXIV R.R. at 192-3);

- Regarding the Phat Kats aggravated robbery, [Batiste] testified that he was in charge, and he recruited fellow Crips gang members to participate in the offense (XXIV R.R. at 192-3);

- Regarding the rap lyrics in letters that [Batiste] composed while awaiting trial in the Harris County Jail, [Batiste] testified that the lyrics described [Batiste's] feelings regarding Stephanie Soliz's new love interest, [Batiste's] murder of the complainant, and [Batiste's] participation in the Phat Kats aggravated robbery; that the lyrics did not necessarily reflect [Batiste's] actual feelings; and, that eighty-five percent of [Batiste's] lyrics were "hype music" (XXIV R.R. at 182-9, 192-3, 227-8).

EXHIBITS

50. Prior to resting on punishment, the defense introduced twenty-one documents into evidence, including: (a) [Batiste's] juvenile and TYC files; (b) [Batiste's] juvenile psychological evaluations; (c) [Batiste's] letters composed while in the Harris County Jail; and (d) [Batiste's] employment and educational records (XXIV R.R. at 6-14); Defendant's Trial Exhibits 1-20, 31. The State and defense attached tabs on certain pages within the documents to highlight specific information (XXIV R.R. at 7).

S.H.R. at 943-48.

Despite the evidence presented at trial, Batiste contends that trial counsel: (1) should have called a social historian to put his mitigating evidence into a coherent narrative; (2) inadequately interviewed and prepared the lay witnesses who testified at trial; and (3) should have called

additional witnesses to provide mitigating evidence. On state habeas review, Batiste adduced numerous affidavits to support these arguments. The affidavits fall into three categories, each relating to Batiste's individual allegations of trial counsel errors.

First, Batiste presented affidavits from several witnesses from trial, to wit: Darlene Beard, Micaela Lara, Kristopher McSherry, Kevin Noel, Rowena Scott, Stephanie Scott, and Beverly West. Batiste relied on those affidavits to argue that trial counsel did not make sufficient efforts to prepare witnesses, leaving them vulnerable to cross-examination and prone to provide detrimental testimony. Batiste contends that with additional preparation those witnesses would have given jurors a more-fulsome view into his life.

Second, Batiste relies on affidavits from ten family members and friends that trial counsel did not put before the jury, four of whom had been interviewed by trial counsel. Batiste argues that these witnesses would have provided deeper insight into Batiste's personal background, and also have given jurors a longitudinal view into the intergenerational problems experienced by Batiste's family members.

Finally, Batiste criticizes counsel for not retaining a social historian to weave the details provided by the various witnesses into a coherent narrative. Through an affidavit provided by Dr. Scott Bowman, Batiste contends that trial counsel should have used expert testimony to fill in the outlines drawn by witness testimony, and rearrange the evidentiary picture into a more-powerful story. In sum, Batiste argues that the defense should have presented evidence that he "was the product of three generations of poverty, teenage pregnancy, residential instability, and a lack of positive role models. He was also searching desperately for a way out of the path he was on, [he was also] a person who helped other people and provided for his family when he could." S.H.R. at 149.

The state court based its resolution of these three arguments on an overarching theme: trial court presented a "clear and detailed mitigation case" differed from the habeas allegations in detail but not in mitigating thrust. S.H.R. at 955. The habeas affidavits from trial witnesses and those not called to testify did not travel a different mitigating path from the themes considered by jurors in answering the special issue questions.[19] Batiste's habeas arguments presupposed the development of a mitigating case that covered much of the same ground as the evidence from trial.

In reviewing the choices underlying a trial defense, the Court "must be particularly wary of arguments that essentially come down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing." *Dowthitt v. Johnson*, 230 F.3d 733, 743 (5th Cir. 2000) (internal quotation marks and citation omitted); *see also Kitchens v. Johnson*, 190 F.3d 698, 703 (5th Cir. 1999). This is a case where the additional mitigation evidence presented by Batiste "was largely cumulative and differed from the evidence presented at trial only in detail, not in mitigation thrust." *Villegas v. Quarterman*, 274 F. App'x 378, 384 (5th Cir. 2008). The new affidavits provide background information that "is essentially cumulative of [Batiste's] social history evidence presented at trial." S.H.R. at 959. In sum, trial counsel presented "a clear and detailed mitigation case" and Batiste was "unpersuasive in demonstrating that [his] mitigation case would have been strengthened by [the new affiant's] respective testimonies." S.H.R. at 957, 959.[20]

---

[19]     As summarized by the habeas court, the mitigating case at trial focused on showing that Batiste "was the child of a teenage mother who frequently moved her residence during his formative years, and [he] lacked a father-figure in his life, worked in a difficult and physically demanding job to support the family he loved, assumed a fatherly role to a non-biological child, and was a gifted athlete in an inner-city high school who ultimately did not overcome the challenges of his neighborhood." S.H.R. at 957.

[20]     The Court observes that Batiste's habeas affidavits contain information that pales in comparison to those cases in which the Supreme Court has found constitutional deficiencies in the investigation and presentation of
(continued...)

The only habeas evidence that arguably exceeded the contours of the trial evidence relates to the background of extended family members. The habeas affidavits discuss generations of poverty and difficult life circumstance which, in general, do not contain information substantially different from Batiste's own background. The new information only shows that other family members shared somewhat similar experiences. Batiste has not shown that the law requires reasonable attorneys to present that evidence or that it would have mattered had trial counsel presented it.[21]

Batiste's claim faults not only the content of counsel's chosen defense, but also how it was presented to jurors. Batiste's federal petition identifies ways in which an attorney may have brought mitigating evidence before jurors differently. Trial counsel relied on a mitigation specialist to develop evidence for the punishment phase. The mitigation specialist interviewed family members and obtained various medical, school, and criminal history records. Batiste wishes trial counsel had

<hr>

[20]        (...continued)
mitigating evidence. For example, in *Wiggins v. Smith*, 539 U.S. 510 (2003), "the only evidence that Wiggins's trial attorney presented to the sentencing jury was Wiggins's lack of prior criminal history. Comparatively, post-conviction counsel uncovered evidence of sexual abuse, rape, physical abuse, homelessness, as well as an 'alcoholic, absentee mother,' and evidence that Wiggins had 'diminished mental capacities.'" *Escamilla v. Stephens*, 602 F. App'x 939, 944 (5th Cir. 2015) (quoting *Wiggins*, 539 U.S. at 535). In *Rompilla v. Beard*, 45 U.S. 374, 392 (2005), trial counsel missed multiple "red flags" that would have led to previously undiscovered evidence of Rompilla's "organic brain damage[ ] an[d] extreme mental disturbance significantly impairing several of his cognitive functions [,] [which] relate back to his childhood, and were likely caused by fetal alcohol syndrome." In addition, Rompilla's trial attorney failed to recognize leads that would have uncovered severe childhood abuse and unimaginable neglect. In *Williams v. Taylor*, 529 U.S. 362 (2000), the inmate presented evidence that he was borderline mentally retarded, that he had experienced severe and repeated child abuse, that his parents had been imprisoned for criminal neglect, and that he shuffled through abusive foster homes while his parents were incarcerated. The evidence Batiste has developed after his trial differs fundamentally from the severe abuse, harsh neglect, and other deeply disturbing circumstance in those cases in which the Supreme Court found constitutional error. Batiste has not brought out powerful evidence that counsel ignored.

[21]        The Supreme Court's Eighth Amendment jurisprudence requires that the sentencing jury be able to consider, as a mitigating factor, the character and the record of the individual offender and his particular offense. Batiste has not pointed to any Supreme Court precedent requiring defense attorneys to build a mitigation case premised on life histories across several generations and following various branches of a defendant's family tree. *See, e.g, Wiggins*, 539 U.S. at 535 (addressing an attorney's obligation to investigate "powerful" evidence of abuse and neglect suffered specifically by the petitioner). Some of the evidence about the upbringing of Batiste's extended family members has only marginal relevance to Batiste or his own childhood, if it has any relevance at all. For instance, the fact that Batiste's grandmother was raised by a single mother would add little to the jury's consideration of the special issue questions. The focus of the mitigation special issue was on Batiste, as opposed to his ancestors or distant relatives. Any evidence of intergenerational mitigating evidence did not have strong relevance to the special issues.

not relied on other lay and expert witnesses to present the mitigating evidence, but instead had called a social historian[22] to tie together his mitigating evidence into a coherent life story.

Batiste's briefing suggests that not relying on a social historian is *per se* ineffective assistance. Dkt. 9 at 57-58. Constitutional law does not require that mitigating evidence come through one specific vehicle. Because "counsel has wide latitude in deciding how best to represent a client," an attorney may decide the best manner in which to put information before jurors. *Ward v. Stephens*, 777 F.3d 250, 264 (5th Cir. 2015). The state habeas court found the affidavit proffered by a social historian to be "similar" to the trial evidence. S.H.R. at 956.[23] Without the gloss of expert testimony, the basic tone and tenor of the social historian's habeas affidavit mirrors the mitigation case that the jurors considered. Without being summarized by an expert, trial counsel "presented a comprehensive social history of [Batiste] through the testimony of [Batiste himself], his family, and friends . . . ." S.H.R. at 955. Batiste has not shown that the Constitution demands that trial counsel call an expert to summarize and extrapolate conclusions from the same basic information jurors have already heard. In the end, "this is not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face . . . ." *Bobby v. Van Hook*, 558 U.S. 4, 11 (2009). The state habeas court was not unreasonable in finding

---

[22]    "[A] testifying social historian" is "a species of mitigation expert whose function in this habeas proceeding is to interpret the detailed social history summary of the [inmate] by developing a coherent theme of the case within a psychological framework to assist the court in understanding the mitigation evidence." *Allison v. Ayers*, 2008 WL 5274580, at *2 (C.D. Cal. 2008). A trial attorney may hesitate in presenting evidence through a social historian or mitigation specialist because much of the putative testimony may "qualif[y] as hearsay, however, since many of the facts recounted by the mitigation specialist reflected only what she had been told by others." *Clark v. Thaler*, 673 F.3d 410, 419 (5th Cir. 2012); *see also Watts v. Quarterman*, 448 F.Supp.2d 786, 796 (W.D.Tex. 2006) (recognizing that "the state trial court repeatedly sustained the prosecution's hearsay objections whenever defense counsel attempted to elicit testimony from [a mitigation specialist] concerning the contents of petitioner's school, medical, or jail records and concerning the contents of her discussions with petitioner's family and friends).

[23]    Even so, the state habeas court found the social historian's consolidation of evidence and conclusions derived therefrom to be "speculative, naive, and irrelevant." S.H.R. at 956.

that trial counsel did not perform deficiently in investigating, preparing, and presenting mitigating evidence.

Batiste has also not shown that the state habeas court unreasonably decided that he had not shown actual prejudice. Batiste has not adduced any mitigating evidence that would cause jurors to respond differently than they did at trial. "When compared to the strong aggravating evidence, any incremental increase in mitigation evidence would not create 'a reasonable probability that . . . the result of the proceeding would have been different.'" *Davila v. Davis*, 650 F. App'x 860, 870 (5th Cir. 2016) (quoting *Wiggins*, 539 U.S. at 534). The Court, therefore, finds that the state habeas court was not unreasonable in denying Batiste's claim that trial counsel should have better prepared mitigating witnesses, called more mitigating witnesses, or presented his cumulative evidence through a social historian.

### 4. Evidence of Future Dangerousness

Batiste complains that trial counsel "failed to present any evidence that Batiste was not likely to commit criminal acts of violence in the future." Dkt. 9 at 136. A brief review of the punishment phase contradicts Batiste's strident claim that trial counsel made no effort to secure a favorable answer to the future-dangerousness special issue. For instance, the defense called an officer from the Harris County Sheriff's Office Classification Unit, who explained that "there was no record of [Batiste] having physical contact with the jail staff in [his] Harris County jail disciplinary records." S.H.R. at 960. Also, the defense relied on records from Batiste's earlier incarcerations to argue that, once confined in the structured environment of prison, he would no longer pose a future danger. Setting his hyperbole aside, Batiste's federal habeas claim argues that trial counsel should have put on a better future-dangerousness defense, primarily through expert witness Dr. Mary Elizabeth Pelz.

Trial counsel called Dr. Pelz, Dean of the College of Public Service at the University of Houston-Downtown, as a punishment witness. The defense primarily posed general questions to Dr. Pelz about the strictures of prison life and the ability of life-sentenced inmates to conform their behavior to institutional norms. The defense only asked brief questions that elicited testimony that Batiste had not committed disciplinary infractions while in state jail or juvenile custody. Tr. Vol. 23 at 59.[24] Trial counsel carefully avoided asking Dr. Pelz to apply her general testimony about future dangerousness to Batiste's specific circumstances. In fact, trial counsel informed the trial court outside the jury's presence: "I want the record to reflect that I have not asked [Dr. Pelz] a question about her opinion as to future dangerousness of [Batiste] and I never intended to ask that. I haven't asked it and never intend to ask it. So, the record is clear on that." Tr. Vol. 23 at 73.[25]

The State's cross-examination challenged some of Dr. Pelz's general opinions about the threat posed by life-sentenced inmates housed in general population. Most problematic for the defense, however, the State challenged the insinuation that Batiste had not previously been violent

---

[24]     As summarized by the state habeas court, Dr. Pelz

testified for the defense at punishment on a range of topics related to future dangerousness in a comprehensive manner including: (a) prior incarceration behavior was more important than the actual crime committed to determine how someone will behave in prison in the future; (b) she was not aware of [Batiste] having any disciplinary issues while previously incarcerated in state jail; (c) [Batiste's] physical altercations with other inmates in the Harris County jail would not be "seriously considered" for his inmate classification; (d) studies of inmates sentenced to life without parole indicated that these prisoners were "very manageable" and "do not illustrate" increased acts of violence while incarcerated; (e) inmates sentenced to life without parole were more likely to obey prison rules because they need to keep as many privileges as possible in order to survive; and, (f) [Batiste's] future behavior in prison would become "tempered" as he got older and institutionalized.

S.H.R. at 960.

[25]     During voir dire examination by the State, Dr. Pelz explained that she had worked as the Coordinator of the Unit Classification in a Texas prison unit and had studied inmate populations for over thirty years. Tr. Vol. 23 at 30. Dr. Pelz said that she would testify that there was no "extraordinary violence" in Batiste's "institutional behavior" and it was her opinion that he would not be a future danger to society. Tr. Vol. 23 at 30, 32.

when in custody. The State questioned Dr. Pelz about Batiste engaging in various fights, assaults, aggressive actions, and belligerent behaviors while previously incarcerated, including in the time awaiting trial. Tr. Vol. 23 at 94-97. When the State asked why there is any "reason to believe that [Batiste is] going to change his behavior" when he entered the prison system, Dr. Pelz expressed a hope that his behavior "will be tempered because it is the first time he will be in prison. I don't know how else to reply to that." Tr. Vol. 23 at 98. Trial counsel's redirect tried to refocus Dr. Pelz's testimony on the general behavior of inmates, but also tried to minimize the specific violent actions Batiste had previously committed in jail.

Batiste claims that trial counsel should have done a better job of using Dr. Pelz's testimony to show that he would not be violent in prison. Dr. Pelz provided a habeas affidavit saying that, had her testimony been utilized more effectively, the jury would have heard that Batiste was not likely to be a future danger because of his age, education, employment history, desire to maintain prison privileges, and prior behavior while incarcerated. Dr. Pelz opined that trial counsel failed to show that Batiste would adapt to a secure prison environment in a positive non-violent way. To summarize, Dr. Pelz faulted counsel for not emphasizing that his past behavior, when considered in conjunction with future factors, would show a decrease in projected violence.

Trial counsel's state habeas affidavit explained why the defense limited the focus of Dr. Pelz's testimony:

> I decided to use Dr. Elizabeth Pelz the way I decided to use her because I felt it was our best shot at obtaining a life sentence. I did not feel the expert testimony she was prepared to offer about future dangerousness was going to be as helpful to our case as my ability to argue it from our witnesses and the records. We had good witnesses and good records and a lot to argue and my feeling was that a paid expert's opinion was not going to win the day and in fact might give the State more to argue and ultimately be more harmful than helpful.

Again this was my decision to emphasize this testimony and these records myself without a paid expert's opinion on future dangerousness. I believed we had so much to work with in this case that I felt a lay juror would understand it and I feared the repercussions of paid expert testimony. I felt we didn't need it and were better off without it. I could have offered it but chose not to.

It is easy to say today that we should have had this expert testimony or that expert testimony but in my opinion then and now experts in this case and on those issues would have had no impact on our jury.

S.H.R. at 918.

In light of the state habeas affidavits and the record, the state habeas court found that "Dr. Pelz's habeas affidavit is unpersuasive to demonstrate that trial counsel failed to present 'any' evidence that [Batiste] was not a future danger and that Dr. Pelz 'was not utilized in an appropriate manner.'" Specifically, the state habeas court found that trial counsel made "a strategic decision not to ask Dr. Pelz her opinion as to [Batiste's] future dangerousness." S.H.R. at 961. The state habeas court also found that "[t]rial counsel exercised a reasonable trial strategy decision regarding the presentation of future danger evidence, and [Batiste] does not establish trial counsels' deficient performance, much less harm." S.H.R. at 961.

The state habeas court's rejection of this claim was not unreasonable. Trial counsel made a strategic decision to focus Dr. Pelz's testimony on general prison procedures and classification without extensively particularizing the discussion to Batiste's own potential future conduct. In making that decision, trial counsel knew that testimony about Batiste's actions while incarcerated could harm the defense. The jury already knew that Batiste had not been subject to any prison disciplinary action while incarcerated in state jail in 2007 and during his time in juvenile facilities. But focusing on Batiste's threat of future violence while incarcerated would ultimately draw the jury's attention to his more recent violent actions while incarcerated before trial.

38

Specifically, a reasonable attorney could avoid presenting testimony similar to Dr. Pelz's opinion that "the disciplinary infractions [Batiste] received while at county jail during the pendency of his trial are of limited significance to the overall determination of the probability of future violence." S.H.R. at 481. During his pre-trial custody in Harris County, Batiste had led a group of inmates who assaulted, threatened, and stole from other inmates. Tr. Vol. 19 at 110-32. Batiste committed disciplinary infractions such as fighting, threatening inmates, possessing or manufacturing a weapon, and refusing to obey orders. Tr. Vol. 18 at 130-49. Batiste's actions caused the atmosphere of the jail to turn from "somewhat relaxed" to "unpredictable." Tr. Vol. 19 at 129. Batiste bragged in letters that he had broken another inmate's jaw. Tr. Vol. 24 at 69, 145-46. In closing argument the State chronicled his behavior while "awaiting trial, a trial where it will be determined whether or not he gets the death penalty. And he knows, he knows that [the State] gets records of what he does." Tr. Vol. 25 at 72. Even when in that structured setting, and with fateful incentives, Batiste could not "control himself." He engaged in a list of bad behavior: "disrespect of staff," "[p]ossessing intoxicants in the jail," "[d]amaging county property," "[r]iot, group demonstration," "[l]ots of fights," "[t]errorizing the other inmates, extorting, robbing, threatening." Tr. Vol. 25 at 72-73. Even when facing a capital murder charge, Batiste "was the big man there. And he was running things and he was hurting people. And he didn't care." Tr. Vol. 25 at 73.

In light of his violence while awaiting trial, Dr. Pelz's opinion that Batiste's institutional history was "unremarkable" would be unpersuasive and could be damaging to the defense. Thus, trial counsel made a reasonable strategic decision to focus Dr. Pelz's testimony on policies and procedures, rather than Batiste's own behavior. Because Dr. Pelz's unpersuasive habeas affidavit could allow the State to highlight further Batiste's pre-trial violent conduct, Batiste has not shown

that trial counsel's strategic decision prejudiced the defense. The state habeas court, therefore, was not unreasonable in finding no deficient performance or prejudice in counsel's use of Dr. Pelz's testimony.

5. *Preparing Batiste to Testify*

Batiste claims that "[w]ith little preparation, trial counsel thrust Batiste into the witness box to testify, ill-prepared for what questions to expect from his own defense team much less what the prosecution might bring up on cross-examination." Dkt. 9 at 153. While the defense was able to provide a mitigating view into Batiste's background through his testimony, a blistering cross-examination by the State examined in fine detail the violence replete throughout his life. In particular, Batiste's testimony allowed the State to introduce into evidence letters he wrote while awaiting trial showing his dedication to gang life, his lack of remorse, and his continued violence. Batiste now argues that "[h]ad trial counsel properly prepared [him] to testify and adequately advised him of the potential dangers and pitfalls inherent in testifying, the jury would have never heard such damaging and prejudicial testimony . . ., either because Batiste would have been more equipped to respond to the inevitable challenges of cross-examination, or because he would have chosen not to testify at all." Dkt. 9 at 159.

Trial counsel averred that they "did prepare [Batiste] to testify." S.H.R. at 819. Trial counsel's affidavit reconfirmed Batiste's trial testimony that trial counsel discussed "at length" whether he should testify. Tr. Vol. 24 at 226. The state habeas court found that Batiste then "provided a detailed account of his life and circumstances on direct examination, as well as an explanation for certain rap lyrics he composed while in the Harris County Jail, and [Batiste's] answers to trial counsel's comprehensive direct examination questions indicated prior preparation

by counsel." S.H.R. at 962. The trial testimony contradicted Batiste's "vague and conclusory" claim that counsel should have prepared him better. S.H.R. at 962.

Batiste has not shown that the state habeas court's rejection of this claim was unreasonable. Batiste provides nothing but conclusory allegations about how better preparation would have aided the defense. He does not explain how additional coaching would have changed what he said or how he said it, such that the results of the proceedings would have been different. Batiste chose to testify, and once he made his decision, he risked cross-examination that would hurt the defense. Even with additional coaching by trial counsel, cross-examination could still have covered Batiste's jailhouse correspondence, his former violent acts, and the dissonance between his mitigating evidence and his lawlessness. The Court finds that the state habeas court was not unreasonable for not finding deficient performance or actual prejudice.

6.    *Batiste's Letters and Rap Lyrics*

The State filed a pre-trial a notice of its intent to introduce Batiste's extraneous offenses and jail correspondence at the punishment phase. C.R. at 1426-30. The notice said that the letters "reflect[] a lack of respect for authority and a high regard for street crime, gun use, theft and gang membership. In addition, [Batiste] has little regard or respect for women." C.R. at R 1427. The defense did not object to the admission of that evidence.

Batiste's letters proved his dedication to the Crips. Batiste's letters first came before the jurors during cross-examination of his brother Kevin Noel, Jr. Batiste wrote to Noel about someone called "OG Rome," resulting in testimony that the letters "OG" stand for "original gangster." Tr. Vol. 24 at 40, 43. The State also adduced testimony that Batiste had advised his brother on what kind of tattoos to get, including ones signifying gang membership. Tr. Vol. 24 at 46-47. In other

letters, Batiste was disrespectful to women when asking his brother to send contraband nude photographs and when describing sexual interaction with a jail nurse.  Tr. Vol. 24 at 47-49, 53-54.

Some letters confirmed Batiste's bad behavior during pretrial detention.  The State's cross-examination of Micaela Lara discussed correspondence in which Batiste claimed to have "beat[en] up a white guy from the military" because "[h]e hung up [his] phone call . . . ."  Tr. Vol. 24 at 69.  Batiste also wrote about making alcohol in prison.  Tr. Vol. 24 at 70.  In that same letter, he used spelling characteristic of a Crips gang member.  Tr. Vol. 70-71.

Batiste's own testimony allowed extensive discussion of his jailhouse letters.  The State repeatedly cross-examined Batiste about his own words, and particularly rap lyrics portraying himself as a remorseless, heartless, violent, sexist gang member.  The letters described Batiste's fights while incarcerated pending trial.  Batiste described wanting to shoot someone.  Tr. Vol. 24 at 184.  Batiste admitted that he glorified violence in some lyrics.  Tr. Vol. 24 at 185.  The State's questioning emphasized that Batiste's writings showed no remorse.  Tr. Vol. 24 at 187-89.

Batiste explained away his lyrics as "just hypermusic sometimes."  Tr. Vol. 24 at 186.  Batiste said that the rap lyrics were "just hype."  Tr. Vol. 24 at 182.

At the close of testimony, the prosecution moved without objection to place letters into evidence.  Tr. Vol. 23 at 174.  Trial counsel later submitted 225 pages of letters into evidence.  Tr. Vol. 25 at 10-11; Vol. 33 at 43-281.  The defense's closing arguments told jurors that, while they would find "foul language and disgusting street stuff" in the letters, Batiste also talked "about what he did to himself."  Trial counsel urged that the letters would help a person "motivated by love, compassion, and understanding."  Tr. Vol. 25 at 20-21.

On state habeas review, Batiste argued that trial counsel should have had expert witness Rotramel deaden the impact of his violent and lawless language by explaining that he only engaged in hyperbole. Also, Batiste argued that trial counsel should have prepared witnesses to discuss the letters better. Trial counsel's affidavit explained the defense's approach to the letters:

> Even though I told my client as I tell every one of my clients in person and in writing not to ever discuss the case with any person by phone or mail or in any manner unless I approve it he did not follow my advice. He was not even close to following my advice. He had it from me in writing and in person every single time I met with him but he did not follow it. But having said all of that he did as good a job of explaining the lyrics to the jury as any expert could have or any one else for that matter.

> Unfortunately there existed no explanation that would overcome the effect of those lyrics. No argument. No expert witness testimony. Nothing. As a matter of trial strategy in my opinion the best treatment of that part of the case was to leave it alone.

S.H.R. at 819.

The state habeas court found that "trial counsel made a strategic decision to enter over 200 pages of [Batiste's] letters into evidence at the close of punishment; that the letters contained 'flags' placed by the State and defense to highlight certain portions, including passages positive" to Batiste. S.H.R. at 964. The state habeas court found that the rap lyrics "constituted a small portion of the trial proceedings." S.H.R. at 965. Also, Rotramel's affidavit was "unpersuasive to demonstrate that an expert was necessary to assist the trier of fact to understand [Batiste's] rap lyrics when [Batiste] explained that the lyrics were largely 'hype.' Further, the fact that music lyrics are often expressive, grandiose, and a vehicle to express emotions is not a concept alien to the typical lay person on a jury." S.H.R. at 965. In sum, "counsel made reasonable trial strategy decisions in countering the State's presentation of [Batiste's] letters and rap lyrics, and [Batiste] does not establish trial counsels' deficient performance, much less harm, on the basis urged in the instant ground for relief." S.H.R. at 965.

Batiste has not shown that the state habeas court's decision was unreasonable. Batiste has not indicated how the defense could prevent his jailhouse correspondence from being admitted into evidence. Batiste did not heed counsel's directive not to discuss his case, and he created writings the prosecution would later use against him. Trial counsel chose to let Batiste explain his own words. The Court has already found that trial counsel did not otherwise provide ineffective representation in not calling Rotramel as a witness. Batiste has also not shown that trial counsel needed expert testimony to show effectively why Batiste wrote what he did. With the prejudicial language Batiste put to paper, trial counsel had to decide the least prejudicial manner in which it could come before jurors. Batiste has not shown that the concept that Batiste's writings exhibited hyperbole was beyond the jury's lay understanding.

Batiste has not shown that additional preparation of the recipients of his letters would have dampened the effect of his words. Perhaps other attorneys may have used a different approach to the letters, but Batiste has not overcome the state habeas court's finding that trial counsel made a reasonable strategic decision in how best to do so in this case. Further, Batiste has not shown that, had the defense acted as he argues on state habeas review, that there would have been a reasonable probability of a different result, particularly in light of the other aggravating evidence at trial. Batiste has not shown that the state habeas decision was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

7.    *Cumulative Prejudice*

Batiste argues that the Court should consider the cumulative effect of all trial counsel's alleged deficiencies. Batiste asserts that the jury would have responded to the special issues differently had trial counsel presented evidence of organic brain damage, refuted testimony about

his gang membership, amplified the mitigating evidence and cast it into a different form, asked his future-dangerousness expert different questions, prepared Batiste for what would assuredly be a blistering cross-examination, and otherwise performed differently. For the reasons discussed with regard to each allegation of *Strickland* error, it is not reasonably probable that the cumulative effect of different representation would have brought about a different result. Many of the differences between the case put on by counsel and that developed on habeas are differences in detail, not mitigating thrust. Some information may have refined and possibly broadened the mitigation evidence, but it would not have changed how jurors approached the special issues. Some habeas evidence, such as greater emphasis on gang affiliation and his pre-trial incarceration, was double edged and could have made jurors more disposed toward a death sentence. Even considering the full effect of Batiste's *Strickland* claim, the evidence of guilt was overwhelming. The State presented a solid case for a death sentence. Batiste lived a violent, lawless life. Despite his recent claims to minor gang affiliation, Batiste demonstrated his gang devotion though numerous Crips tattoos, including on his face. Even while holding down jobs, Batiste lived in a lawless world of stealing cars and selling stolen property. He used drugs. He committed aggravated robberies. Incarceration did not reform Batiste's character; he left each period of custody more violent than before. Batiste committed the instant murder in a brutal manner, possibly endangering the lives of many as he fired into the victim's car on the freeway, all for his own profit. Batiste did not need to shoot the victim as he pleaded for his life on the ground, but after weighing out his options, Batiste decided to kill anyway. The victim's body bore fifteen gunshot wounds. Crucially, the State presented the "the most powerful imaginable aggravating evidence": Batiste "had committed another murder." *Wong v. Belmontes*, 558 U.S. 15, 28 (2009). Whether considering each *Strickland* argument individually

or collectively, Batiste has not shown a reasonable probability that the jury would have responded to the special issues differently had counsel performed differently. The Court will deny Batiste's effective-assistance-of-counsel claims.

**B.     Disclosure of Impeachment Evidence**

In his second ground for relief, Batiste claims that the State failed to turn over important impeachment evidence relating to trial witness Anthony Moore. Moore was asleep inside the Black Widow tattoo parlor when Batiste and his friends entered to rob the shop. The State called Moore in the penalty phase to describe the subsequent crime, particularly emphasizing Batiste's role in directing the robbery and in shooting the shop owner. Batiste claims that the State violated his constitutional rights under *Brady v. Maryland*, 373 U.S. 83, 87 (1963) by failing to disclose that Moore had previous felony convictions and had absconded from a probated sentence in Michigan.

"There are three components to a *Brady* violation. First, the evidence must be favorable to the accused, a standard that includes impeachment evidence. Second, the State must have suppressed the evidence. Third, the defendant must have been prejudiced." *United States v. Hughes*, 230 F.3d 815, 819 (5th Cir. 2000). Cases often add a fourth requirement: "nondiscovery of the allegedly favorable evidence was not the result of a lack of due diligence." *United States v. Walters*, 351 F.3d 159, 169 (5th Cir. 2003); *see also Graves v. Cockrell*, 351 F.3d 143, 153–54 (5th Cir. 2003). "When evidence is equally available to both the defense and the prosecution, the defendant must bear the responsibility for failing to conduct a diligent investigation." *Kutzner v. Cockrell*, 303 F.3d 333, 336 (5th Cir. 2002).

Batiste has not shown that the State possessed undisclosed information that was unavailable to his attorneys. In rejecting this claim, the state habeas court found that the prosecutor did not know

46

about Moore's criminal history at the time of trial. The prosecutor provided an affidavit on state habeas review stating that "Moore's Michigan criminal history was not reflected on NCIC/TCIC when she generated his criminal history report on June 1, 2011. Had [the prosecutor] known of Moore's criminal history, she would have disclosed this information to trial counsel." S.H.R. at 966. According to an affidavit provided by an investigator for the State, the "the discrepancy in Moore's NCIC/TCIC criminal history report was the result of Moore's FBI number not being electronically linked to his State of Texas Identification number in the NCIC/TCIC system." S.H.R. at 966. On that basis, the state habeas court found that "the State did not possess knowledge of Moore's out-of-state criminal history at the time of [Batiste's] capital murder trial; therefore, knowledge of Moore's Michigan criminal history cannot be imputed to the prosecutors who tried [his] case." S.H.R. at 966.

Batiste has not refuted the state habeas findings that the State did not know about Moore's criminal history. Batiste has not shown that the government has a constitutional obligation to divulge information it does not possess. *See United States v. Cutno*, 431 F. App'x 275, 278-79 (5th Cir. 2011) (finding no *Brady* violation when a witness' criminal history did not appear in a NCIC report). Additionally, Batiste has not shown that a *Brady* violation occurs when allegedly suppressed evidence is equally available to the defense. Batiste concedes that "[m]odern technology has made access to information easy and inexpensive. Moore's criminal record was public and discoverable through a simple computer search." Dkt. 9 at 89 n. 56. "When information is fully available to a defendant at the time of trial and his only reason for not obtaining and presenting the evidence to the Court is his lack of reasonable diligence, the defendant has no *Brady* claim." *United States v. Brown*, 628 F.2d 471, 473 (5th Cir. 1980); *see also Woodford v. Cain*, 609 F.3d 774, 803 (5th Cir.

2010) ("[T]his court has previously recognized that there can be no viable *Brady* claim when allegedly suppressed evidence was available to the defendant through his own efforts.").[26]

Even if the State had withheld otherwise-unavailable evidence, Batiste has not shown that he has met *Brady*'s materiality prong. "The materiality of *Brady* material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state." *Edmond v. Collins*, 8 F.3d 290 (5th Cir. 1993). The state habeas court observed that "[I]n addition to Anthony Moore, two other witnesses, Christie Moore and Joshua Norsworthy, positively identified the [Batiste] as the shooter in the capital murder of Steve Robbins and provided in-court identifications of [him]." S.H.R. at 866. In fact, "[a]t punishment, [Batiste] acknowledged that he led and planned the Black Widow capital murder and admitted that he shot [the victim]." S.H.R. at 866. With that context, the state habeas court found that Batiste "does not establish materiality – by a reasonable probability that the result of the punishment proceeding would have been different had [he] been able to impeach Moore with his Michigan criminal history." S.H.R. at 867.

"[W]hen the testimony of a witness who might have been impeached by undisclosed evidence is strongly corroborated by additional evidence, the undisclosed evidence generally is not found to be material." *Wilson v. Whitley*, 28 F.3d 433, 439 (5th Cir. 1994). With the other evidence showing Batiste's leadership role in the Black Widow tattoo parlor robbery and murder, including

---

[26] Batiste summarily argues in a footnote that "[t]o the extent that trial counsel failed to conduct a comprehensive background and criminal history check of all witnesses testifying for the State, Batiste was denied the effective assistance of counsel." Dkt. 9 at 189 n.56. Respondent persuasively argues that any intended *Strickland* claim on that basis is "conclusory and subject to dismissal as such." Dkt. 22 at 152 n.37. Additionally, Batiste has not shown *Strickland* prejudice in light of the *Brady* materiality discussion that follows above. *See United States v. Bagley*, 473 U.S. 667, 682 (1985) ( adopting the "prejudice" prong of the *Strickland* as the appropriate standard for determining "materiality" under *Brady*).

Batiste's own confession to the crime, the state habeas court reasonably found that Batiste did not meet *Brady*'s materiality prong.

Batiste has not shown that the State withheld evidence of Moore's criminal history or that any *Brady* violation was material. Accordingly, the state habeas court's adjudication of this claim was not contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

## C.       Juror Misconduct

Batiste claims that external factors influenced jurors' deliberations. Batiste's juror-misconduct claim arises out of one juror's concern after an incident occurred in the courthouse contemporaneous to trial. During the second day of the penalty phase, jurors Cathy Upshaw and Robert Coleman both rode in an elevator on their way to the courtroom. As the crowded elevator emptied, a man remained uncomfortably close to juror Upshaw. Juror Upshaw described him as having "two big, fat braids," "a gun tattoo like behind both ears and some initials." The man turned around, "looked at [her] juror badge and said: You okay?" Tr. Vol. 19 at 3. When the jurors exited the elevator, juror Coleman asked juror Upshaw if she was alright, to which she responded: "Yeah. Now I can breathe. I couldn't breathe." Tr. Vol. 19 at 4. The two jurors told the others about the incident. The jurors discussed possible ways to maintain their safety, such as using a separate elevator and moving about in groups. Tr. Vol. 19 at 5. The jury foreman told the bailiff what had happened.

Even though the trial court "discovered that those people [on the elevator] are not a part of this case at all," Tr. Vol. 19 at 5, the trial court questioned jurors Upshaw and Coleman about the elevator episode. Juror Upshaw described how she "went into shock," but that she "was just being paranoid." Tr. Vol. 19 at 4. Even though she found the incident "a little bit intimidating," juror

Upshaw affirmed that the experience would not prejudice her against Batiste. Tr. Vol. 19 at 4. Juror Upshaw also avowed that she could decide the case based on the evidence alone. Tr. Vol. 19 at 4-5.

Juror Coleman explained that juror Upshaw "seemed uncomfortable" in the elevator. Tr. Vol. 19 at 7. Juror Coleman also said that "[t]here's some concern in the jury room over – especially among the women, but I think everyone felt pretty – I think the – I think the people are trying to calm each other down, not that they're overly excited or anything like that." Tr. Vol. 19 at 7. Juror Coleman stated that it would not change how he would rule in this case. Tr. Vol. 19 at 7.

The parties and the trial court discussed how to handle the situation. Trial counsel did not request a mistrial, but only requested that the trial court ask each juror if the incident would affect their verdict. Tr. Vol. 19 at 9-10. Rather than "leave it up to the writ lawyer" to find out if the incident made a difference, trial counsel asked the trial court to interview jurors one by one. Tr. Vol. 19 at 11, 13. Each juror affirmed that they could be impartial and that they would decide the case based on the evidence alone. Tr. Vol. 19 at 14-27

Batiste argues that "[j]urors in [his] trial committed misconduct when they impermissibly discussed issues fundamental to the case prior to the full presentation of evidence and the court's instructions." Dkt. 9 at 198. The defense's concern in the trial court, however, was not that jurors discussed the case, but that the incident "would affect their verdict." Tr. Vol. 19 at 10. Batiste contends that "juror Upshaw violated the court's orders" not to discuss the case with anyone "when she told the rest of the jury about the confrontation in the elevator." Dkt. 9 at 193.[27]

---

[27]    Batiste also argues that appellate counsel provided ineffective representation for not advancing this issue on direct appeal. The state habeas court found that "appellate counsel was not ineffective for not raising on direct appeal the meritless claim of juror misconduct." S.H.R. at 969. The state habeas court's decision was not unreasonable for the same reasons described above. *See Jones v. Barnes*, 463 U.S. 745, 103 (1983) (finding that appellate counsel not ineffective for choosing not to advance meritless appellate claim).

The state habeas court found that "Upshaw's elevator incident and subsequent discussion with fellow jurors does not establish the existence of an outside influence under Texas caselaw." S.H.R. at 968. The state habeas court's resolution of his issue was not unreasonable. The Sixth Amendment guarantees a "trial by an impartial jury." Exposure to outside influences during jury deliberations may violate a defendant's rights. *See Parker v. Gladden*, 385 U.S. 363, 364-65 (1966); *Oliver v. Quaterman*, 541 F.3d 329, 334-36 (5th Cir. 2008). A reviewing court, however, will only grant relief if the outside influence affected the jury's verdict. *See United States v. Olano*, 507 U.S. 725, 739 (1993). Here, the record does not suggest that the incident caused jurors to "impermissibl[y] discuss[] issues fundamental case prior to the full presentation of evidence . . . ." Dkt. 9 at 198. Respondent persuasively argues that "Batiste presents no evidence that the jury discussed his case at all prior to deliberations, much less that the jury discussed the incident involving the juror as it might have related to Batiste's case." Dkt. 22, p. 169.

The trial court reassured jurors that the elevator incident was unrelated to the trial. Jurors said that they discussed the incident but did not say that they specifically related it to the evidence in Batiste's case. Even if the incident made some jurors wary, subjective fears or concerns, rather than actual external influences, are not a basis for impeaching a jury's verdict. *See United States v. Ahee*, 5 F. App'x 342 (6th Cir. 2001), *Peterson v. Chrans*, 921 F.3d 278 (7th Cir. 1990); *United States v. Krall*, 835 F.2d 711, 715-16 (8th Cir. 1987).

Alternatively, the state habeas court found that "juror misconduct, if any, was resolved through the trial court's curative instructions." S.H.R. at 969. The trial court took steps to remedy any concerns raised by the incident. The state habeas court found that, "[u]pon learning of juror Upshaw's elevator incident, the trial court questioned each juror individually about what had

transpired, and each juror assured the Court that the situation would not affect their decision making in [Batiste's] trial. S.H.R. at 967; *see also Smith v. Phillips*, 455 U.S. 209, 215 (1982) ("This Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias."); *United States v. Martinez-Moncivais*, 14 F3d 1030, 1036 (5th Cir. 1994) ("[A] trial court must hold an evidentiary hearing when a defendant shows that external influence."). Each juror affirmed that they would impartially consider the evidence. After that, "the trial court regularly admonished the jurors that they were not to discuss the case among themselves." S.H.R. at 968. The trial court repeatedly instructed jurors only to consider only the evidence, which presumably cures any error. *See Zafiro v. United States*, 506 U.S. 534, 540 (1993).

Batiste has not shown that the state habeas court was unreasonable in finding that one juror's subjective concern, based on what likely was an innocuous incident, amounts to an outside influence on jury deliberations. Further, Batiste has not shown that the state court unreasonably found that the trial court's efforts and instructions were insufficient to cure any error. The Court, therefore, will deny Batiste's jury misconduct claim.

## D.    Objecting During the Cross-Examination of Defense Witnesses

Batiste faults trial counsel for not making numerous objections during the State's cross-examination of defense witnesses. Batiste argues: "During the cross-examination of the defense's eleven penalty phase witnesses, the State asked numerous impermissible questions that called for hearsay, improperly impeached witnesses, or related to irrelevant events. Despite this, trial counsel objected only twice, ignoring at least fifty other plausible objections." Dkt. 9 at 199 (footnotes omitted). As he did in his state habeas application, footnotes in Batiste's federal petition cite pages in the record which he argues trial counsel should have made "twenty-three different hearsay

objections," "twenty-two different character or impeachment objections," and ten different relevance based objections." Dkt. 9 at 199; S.H.R. at 192. Batiste, however, only provides significant discussion regarding a few of the unobjected-to questions.

The state habeas court found that Batiste had not adequately briefed most of his allegations of error. Batiste's habeas briefing cited record pages without identifying the particular statements to which trial counsel should have objected. The state habeas court found that, because Batiste did not identify "when an objection should have been made," much of this claim was "vague and inadequately briefed." S.H.R. at 969. Accordingly, the state habeas court found that Batiste had procedurally defaulted consideration of any inadequately briefed objections. The same default results in a procedural bar of federal review. *See Roberts v. Thaler*, 681 F.3d 597, 607-08 (5th Cir. 2012).[28] The Court, therefore, will only consider the eight objections which the state habeas court adjudicated. S.H.R. at 970.

The state habeas court considered only whether trial counsel should have objected during the State's cross-examination of witnesses Kevin Noel Jr. and Stephanie Soliz. Batiste complains that trial counsel should have objected when the State asked questions about those witnesses' bad acts, including Noel's gang membership, Soliz's participation in stealing cars with Batiste, and both of their drug use with Batiste. Tr. Vol. 23 at 168-69, 171; Tr. Vol. 24 at 3, 16, 23, 38, 44-45, 159. Batiste argued that his trial attorney's failure to object "tarnished the credibility of [the defense's] own witnesses, diminished the strength of the mitigating evidence these witnesses attempted to

---

[28]     Batiste's failure to provide any greater specificity regarding those allegations leaves the related portions of his federal claim subject to denial as conclusory and inadequately briefed. *See Dowthitt v. Johnson*, 230 F.3d 733, 752 (5th Cir. 2000) ("[Petitioner] does not provide further detail (beyond his assertion) as to why the failure to object rose to the level of a Sixth Amendment violation. Because this issue is inadequately briefed, we do not consider it on appeal."). Batiste's cursory federal briefing on these arguments also precludes finding that any of his prior attorneys provided deficient performance relating to these claims.

share, and crippled trial counsel's effort to make a compelling case for Batiste's life." S.H.R. at 215.[29]

Batiste based his state habeas claim on Rule 608 of the Texas Rules of Evidence which provides that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime . . ., may not be inquired into on cross-examination of the witness nor proved by extrinsic evidence." Under this rule, the parties may not attack a witness' character for truthfulness by offering extrinsic evidence concerning specific prior instances of untruthfulness. *See Hammer v. State*, 296 S.W.3d 555, 563 (Tex. Crim. App. 2009). Respondent argues that the State did not ask the indicated cross-examination questions in an effort to impeach the witness' credibility. Respondent argues that the witness' answers were relevant, offered in rebuttal to testimony on direct, or otherwise permissible under Texas law. For example, the state habeas court found that Noel's gang membership was relevant because it related to gang references in Batiste's correspondence with him. S.H.R. at 970. Also, Batiste's drug use with the two witnesses was relevant because Batiste had already "acknowledged on cross-examination that he would regularly spend $150 per week on marihuana for his home." S.H.R. at 970.

Even if trial counsel should have objected in those instances, however, the state habeas court found that "questions regarding Noel's and Soliz's bad acts in these eight specific areas of the record did not 'undermine' or 'cripple' [Batiste's] mitigation case" when "both witnesses provided evidence favorable to [Batiste] regarding his love for his children and the positive role he played in his

---

[29]     Trial counsel's state habeas affidavit responded to this claim: "I made the trial objections I felt were necessary and helpful to [Batiste]. If I failed to object to some piece of evidence or testimony it was because I either felt it was actually admissible or would come in another way, or I felt it was helpful to the defense." S.H.R. at 819.

children's lives." S.H.R. at 970. The state habeas court found that trial counsel's failure to object did not harm the defense.

Batiste has not shown that the state habeas decision was unreasonable, particularly because much of the unobjected-to testimony came before jurors in a different form or had negligible effect on the trial. Even if trial counsel did not ask Noel about his gang membership, Batiste's correspondence alluded to that fact. Batiste himself described marijuana use in his home, and the testimony of the indicated witnesses was not so harmful either to eviscerate the force of their testimony or influence the punishment phase as a whole. Batiste has not shown that the jury's verdict would have been different if trial counsel made the indicated objections. Batiste has not met his burden of showing that the state court judgment was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

## E.    Compensation of Trial Counsel

Batiste complains that the trial court violated federal and state law by compensating his trial attorneys through a flat fee arrangement. The trial court "grant[ed] a $70,000 flat fee to each trial counsel for their representation of [Batiste]." S.H.R. at 970. The state court observed that Texas law does not define what compensation for capital representation is "reasonable," nor does it expressly preclude compensation through a flat fee. S.H.R. at 971. In fact, at the time of trial "a flat fee for counsel appointed to represent a defendant in a Harris County death capital represented a prevailing professional norm." S.H.R. at 971. The state habeas court found that Batiste did not provide any "legal authority to support his claim that the [trial court] committed fundamental and structural error by granting trial counsel a flat fee for their representation in [his] capital murder trial." S.H.R. at 972.

Despite providing political and policy reasons for which a flat fee may not be the best way to ensure effective legal representation, Batiste has not identified any clearly established federal law requiring the States to adopt one method of compensating capital counsel. Accordingly, Batiste has not shown constitutional error in his conviction and sentence due to counsel's compensation, and finding otherwise would require the creation of new federal law in violation of the non-retroactivity doctrine announced in *Teague v. Lane*, 489 U.S. 288 (1989). The Court summarily denies Batiste's compensation-of-counsel claim.

## F.    Texas' Administration of the Death Penalty

Batiste complains that his death sentence is unconstitutional because he received it in Harris County, rather than in another location. According to Batiste, "geographic and racial disparities in Texas have created a system of capital punishment . . . that punishes, not based on the heinousness of a defendant's crime, but on the irrelevant factors of where he lives and what races were involved in the crime." Dkt. 9 at 220. Batiste argues that Texas arbitrarily and capriciously imposes death sentences because: (1) most capital convictions arise from only a few counties and (2) racial considerations taint capital prosecution and sentencing.

Batiste has not shown that a constitutional violation occurred because of where he received his death sentence. Constitutional law, particularly in the jurisprudence flowing from *Gregg v. Georgia*, 428 U.S. 153 (1976) and *Furman v. Georgia*, 408 U.S. 238 (1972), emphasizes "eliminating total arbitrariness and capriciousness in" imposing the death penalty. *Proffitt v. Florida*, 428 U.S. 242, 258 (1976). The Constitution, however, does not require complete uniformity throughout the entire death penalty process. Discretion permeates capital punishment at various stages: "the prosecutor's decision whether to charge a capital offense in the first place, his

56

decision whether to accept a plea to a lesser offense, the jury's consideration of lesser included offenses, and, after conviction and unsuccessful appeal, the Executive's decision whether to commute a death sentence." *Id.* at 254. The existence of discretion alone does not "render[] the capital sentences imposed arbitrary and capricious." *McCleskey v. Kemp*, 481 U.S. 279, 307 (1987) (quoting *Gregg*, 428 U.S. at 199); *see also Spinkellink v. Wainwright*, 578 F.2d 582, 608 (5th Cir. 1978); *Proffitt*, 428 U.S. at 254. The Constitution only limits prosecutorial discretion in charging capital crimes when "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification[.]" *Wayte v. United States*, 470 U.S. 598, 608 (1985) (quotations omitted); *see also United States v. Armstrong*, 517 U.S. 456, 465 (1996).

Batiste's briefing says that differences in death sentence throughout Texas occur because larger counties, such as Harris County, can allocate greater resources to capital prosecutions. The Supreme Court has not required uniformity in prosecutorial considerations made by state entities with different resources. Other courts have traditionally recognized "the amount of resources required to convict a defendant" and "the extent of prosecutorial resources" as "legitimate prosecutorial factors that would justify" the use of prosecutorial discretion. *United States v. Lightly*, 616 F.3d 321, 370 (4th Cir. 2010); *see also Jennings v. City of Stillwater*, 383 F.3d 1199, 1214 (10th Cir. 2004) (noting "the optimal deployment of prosecutorial resources" among the permissible "host of variables" in deciding to prosecute). Constitutionally prohibited arbitrariness does not occur merely because "[t]he capability of the responsible law enforcement agency can vary widely." *McCleskey*, 481 U.S. at 307 n.28. The Fifth Circuit has similarly observed in another context that the Constitution does not prohibit

> simply failing to prosecute all known lawbreakers, whether because of ineptitude or (more commonly) because of lack of adequate resources. The resulting pattern of

> nonenforcement may be random, or an effort may be made to get the most bang for the prosecutorial buck by concentrating on the most newsworthy lawbreakers, but in either case the result is that people who are equally guilty of crimes or other violations receive unequal treatment, with some being punished and others getting off scot-free. That form of selective prosecution, although it involves dramatically unequal legal treatment, has no standing in equal protection law.

*Parude v. City of Natchez*, 72 F. App'x 102, 105 (5th Cir. 2003) (quotation omitted). Batiste has not pointed to any case finding that different prosecutorial decisions in different counties violates the Equal Protection Clause.

In particular, Batiste has not shown that any unlawful considerations drive the State's choice to prosecute his as a capital crime. S*ee Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 489 (1999) (requiring "a criminal defendant to introduce 'clear evidence' displacing the presumption that a prosecutor has acted lawfully."). Batiste's crime facially fit the statutory requirements for capital murder. Nothing suggests that the prosecutor in this case considered anything other than the severity of Batiste's crime in asking for a severe punishment. Batiste can only speculate that Harris County's resources made his a capital prosecution when another county would have sought a lesser penalty. In short, federal habeas relief is not available because "no Supreme Court case has held that the Constitution prohibits geographically disparate application of the death penalty due to varying resources across jurisdictions." *Allen v. Stephens*, 805 F.3d 617, 629 (5th Cir. 2015).

Batiste has also not shown that racial discrimination played any part in his conviction or sentence. Batiste relies on studies which concluded that certain racial groups are more likely than others to be sentenced to death. "[T]o prevail under the Equal Protection Clause, [Batiste] must prove that the decisionmakers *in his case* acted with discriminatory purpose." *McCleskey v. Kemp*, 481 U.S. 279, 292-93 (1987) (emphasis added). Batiste "offers no evidence specific to his own case

that would support an inference that racial considerations played a part in his sentence." *McCleskey*, 481 U.S. at 292-93. Batiste has not shown that racism, rather than a permissible exercise of prosecutorial discretion, was the motivating factor in the State's decision to seek a sentence of death. The state court's rejection of this claim was not contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

## G.    Effect of a Single Juror's Vote

Consistent with article 37.071, § 2, of the Texas Code of Criminal Procedure, the trial court told jurors that their votes for a death sentence must be unanimous, but that ten or more jurors could return an answer resulting in a life sentence. C.R. at 1708. Courts generally label this instruction the "12-10 Rule." Batiste contends that, by not informing the jury of the effect of a single dissenting vote or of a single hold-out juror, the instructions predisposed the jurors to impose a death sentence, thus violating the Sixth, Eighth, and Fourteenth Amendments. Batiste specifically argues that the trial court's punishment-phase instructions violated *Mills v. Maryland*, 486 U.S. 367 (1988), by failing to adequately inform the jury on the effect of hold-out jurors.

In *Mills*, the Supreme Court "held invalid capital sentencing schemes that require juries to disregard mitigating factors not found unanimously." *Beard v. Banks*, 542 U.S. 406, 408 (2004) (emphasis added); *see also Smith v. Spisak*, 558 U.S. 139, 148 (2010); *McKoy v. North Carolina*, 494 U.S. 433, 439-40 (1990). Because the Constitution mandates that jurors be able to consider mitigating evidence, *see Lockett v. Ohio*, 438 U.S. 586, 604 (1978), *Mills* prohibits sentencing instructions that preclude jurors "from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." *Mills*, 486 U.S. at 384 (emphasis added). Batiste argues that the 12-10 Rule instruction gave jurors the mistaken impression that they did not

have an individual ability to prevent a death sentence, thus precluding them from considering mitigating evidence.

The Fifth Circuit has held that Texas's 12-10 Rule instruction "is wholly dissimilar to that involved in *Mills*," *Woods v. Johnson*, 75 F.3d 1017, 1036 (5th Cir. 1996), because "all jurors can take into account any mitigating circumstance." *Jacobs*, 31 F.3d at 1329. Unlike in *Mills*, "the instructions did not say that the jury must determine the existence of each individual mitigating factor unanimously." *Spisak*, 558 U.S. at 148. On that basis, the Fifth Circuit has repeatedly denied 12-10 Rule claims. *See Allen v. Stephens*, 805 F.3d 617, 632 (5th Cir. 2015); *Holiday v. Stephens*, 587 F. App'x 767, 789 (5th Cir. 2014); *Reed v. Stephens*, 739 F.3d 753, 779 (5th Cir. 2014); *Parr v. Thaler*, 481 F. App'x 872, 878 (5th Cir. 2012); *Druery v. Thaler*, 647 F.3d 535, 542–43 (5th Cir. 2011); *Greer v. Thaler*, 380 F. App'x 373, 389 (5th Cir. 2010). The Fifth Circuit also has held that any extension of *Mills* to Texas's penalty-phase instructions would violate *Teague v. Lane*'s prohibition on habeas courts from creating new constitutional law. *See Druery*, 647 F.3d at 542–43 (5th Cir. 2011). This Court concludes that Batiste has not shown entitlement to habeas relief based on the trial court's 12-10 Rule instruction to the jury.[30]

## H.    Preserving the Record

The trial court held twenty-seven off-the-record discussions throughout trial. Batiste complains that trial counsel should have asked for the court reporter to record all discussions.

On state habeas review, trial counsel averred that "[a]nything said by any one that could possibly adversely effect [Batiste's] right to a fair trial and due process was on the record." S.H.R. at 820. The state habeas court, presided over by the same judge who presided over trial, found

---

[30]    Batiste's challenge to the 12-10 Rule also fails in light of the AEDPA standards of review.

"[b]ased on the record and personal recollection," that the hearings involved "administrative matters" and other unimportant issues such as "whether the jury should be given a break." S.H.R. at 875. The state habeas court simply found that Batiste did not "demonstrate any alleged deficiency regarding the court reporter's record," S.H.R. at 876, because: "(1) the trial record is voluminous; (2) there are no missing sections of an entire phase of the trial; (3) counsel's efforts to build and protect the record allowed appellate counsel to raise twenty-two (22) points of error on direct appeal; and (4) the context of several of the conferences indicate that the topics being discussed were administrative." S.H.R. at 992.

Trial counsel averred that the off-the-record discussions did not involve Batiste's substantive rights. The state habeas court did not remember any issue missing from the record. Batiste has not countered those recollections with any verifiable showing that the court reporter omitted crucial matters from the trial record. *See Green v. Johnson*, 160 F.3d 1029, 1043-44 (5th Cir. 1998) (rejecting a similar claim when the petitioner offered "only the conclusory allegation that 'significant proceedings affecting substantial rights of the accused have been lost forever"). Batiste, therefore, has not shown that the state habeas court's judgment was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

## I.     Jury Instruction on Mitigating Evidence

Batiste's tenth claim complains that the trial court denied his Eighth Amendment rights by providing the jurors a definition of mitigating evidence that restricted their consideration of his punishment-phase evidence. The trial court gave the commonly used Texas instruction: "[Y]ou shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness, including evidence of the defendant's background, character, record,

emotional instability, intelligence, or the circumstances of the offense that mitigates against the imposition of the death penalty." C.R. at 1709; *see also* TEX. CODE CRIM. PRO. art. 37.071 § 2(g) (describing mitigating evidence as "evidence that a juror might regard as reducing the defendant's moral blameworthiness."). Even though the instruction given by the trial court informs jurors to consider broad factors such as a defendant's background and character, Batiste argues that the instructions confined the jury to considering only matters relating to his "personal culpability" because of the term "moral blameworthiness." C.R. at 435.

Batiste raised this claim on state habeas review. The state habeas court found that the Court of Criminal Appeals had "previously rejected the argument that TEX. CRIM. PRO. CODE art. 37.071 unconstitutionally narrows a jury's discretion to consider as mitigating only those factors concerning moral blameworthiness." S.H.R. at 977 (citing *Shannon v. State*, 942 S.W.2d 591 (Tex. Crim. App. 1996)). The state habeas court found that "the punishment instructions . . . allowed the jury to consider all submitted evidence in answering the special issues" and "did not restrict the jury to consider as mitigating only evidence that reduced [Batiste's] moral blameworthiness." S.H.R. at 977.

The law is clear that Texas' mitigation special issue provides a constitutionally acceptable vehicle to consider mitigating evidence. In fact, the Fifth Circuit has "rejected similar arguments multiple times." *Rockwell v. Davis*, 853 F.3d 758, 763 (5th Cir. 2017); *see also Blue v. Thaler*, 665 F.3d 647, 665-66 (5th Cir. 2011); *Robles v. Thaler*, 344 F. App'x 60, 63-64 (5th Cir. 2009); *Cantu v. Quarterman*, 341 F. App'x 55, 60-61 (5th Cir. 2009); *Roach v. Quarterman*, 220 F. App'x 270, 277 (5th Cir. 2007); *Jackson v. Dretke*, 181 F. App'x 400, 413-14 (5th Cir. 2006); *O'Brien v. Dretke*, 156 F. App'x 724, 735-36 (5th Cir. 2005); *Beazley*, 242 F.3d at 260. Accordingly, Batiste has not

shown that the state court's decision regarding his challenge to the trial court's mitigation instruction was contrary to or an unreasonable application of federal law. *See* 28 U.S.C. § 2254(d)(1).[31]

## J.      Selection of Grounds for Relief

Batiste claims for the first time on federal review that his appellate and habeas attorneys should have challenged Texas' capital punishment scheme under *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and its progeny. Batiste's failure to exhaust this claim makes it subject to dismissal, but it also lacks merit. Inmates have repeatedly challenged *Apprendi*'s application to Texas. Here, Batiste argues that his former attorneys should have argued that *Apprendi* requires that the indictment include findings on the future-dangerous special issue. The Court of Criminal Appeals, however, has rejected any application of *Apprendi* to a grand jury indictment. *See Velez v. State*, 2012 WL 2130890, at *34 (Tex. Crim. App. 2012); *Thompson v. State*, 2007 WL 3208755 (Tex. Crim. App. 2007); *Roberts v. State*, 220 S.W.3d 521, 535 (Tex. Crim. App. 2007); *Renteria v. State*, 206 S.W.3d 689, 709 (Tex. Crim. App. 2006); *Russeau v. State*, 171 S.W.3d 871, 886 (Tex. Crim. App. 2005); *see also Bigby v. Stephens*, 595 F. App'x 350, 354 (5th Cir. 2014).[32] An appellate or habeas attorney cannot provide ineffective assistance by, and no prejudice can result from, not raising a legal claim repeatedly rejected by the federal and state courts. This claim is without merit.

---

[31]      Batiste also claims that trial counsel provided ineffective assistance by not requesting a jury instruction that clarified with the term "mitigating evidence." The state habeas court found that "the punishment charge submitted to the jury comported with Tex. Code Crim. Proc. art. 37.071 therefore trial counsel was not ineffective for failing to object to the charge on the basis urged in the instant ground for relief." S.H.R. at 977. In light of the discussion above, Batiste has not shown that the state habeas court's decision was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

[32]      The Supreme Court has never held that the indictment provisions of the Fifth Amendment apply to the States through the Fourteenth Amendment. *See, e.g., Branzburg v. Haynes*, 408 U.S. 665, 686-88 n.25 (1972) (noting that "indictment by grand jury is not part of the due process of law guaranteed to state criminal defendants by the Fourteenth Amendment"); *see also Apprendi*, 530 U.S. at 477 n.3 (declining to discuss the implications of that decision on the sufficiency of an indictment).

## K.    First Amendment

Batiste was wearing a blue necklace when the police arrested him for murdering Horace Holiday.[33]  Clint Ponder, a Houston Police Department gang officer, provided the only testimony about the necklace.   When the State introduced the blue necklace into evidence, the parties approached the bench and trial counsel objected on relevance grounds.  Tr. Vol. 18 at 173.  The trial court identified the necklace as "a scapular," to which the prosecutor responded: "it's very similar to a scapular, but it's actually – instead of a Catholic saint, that it's what would be known in English as Saint Death. . . .  They're commonly worn, especially in Hispanic gangs more often in the drug cartels.  Before they go and commit crimes, they wear them as a form of protection from the police." Tr. Vol. 18 at 174.[34]  Trial counsel unsuccessfully renewed his objection to the necklace, and testimony about it, on grounds of "relevance, [and] lack of foundation on the part of the witness. Not that they didn't try to get it in. And a [Rule] 403 objection."  Tr. Vol. 18 at 174.

 Officer Ponder then provided the jury a brief description of the necklace as being blue, a color worn by Crips gang members, with a "grim reaper" figure attached.  Tr. Vol. 18 at 175, 177. Officer Ponder identified the necklace as a "Santa Muerte necklace" and explained its significance:

> Santa Muerte is a saint that a lot of guys will worship to ward off the police or . . . different people worship it for different things, but in a criminal world, you see a lot of guys wearing these, drug traffickers wear necklaces or detailed [on] the back of their car or shrines in their apartment.  And they pray to the saint for various reasons, but in the criminal world, it's to keep the cops away.  If you're making a big drug run

---

[33]       A police officer remarked earlier at trial that Batiste wore a "blue necklace that was around his neck" when arrested.  Tr. vol. 14 at 184.  The Court of Criminal Appeals observed that "[n]either the necklace, nor a photograph of it, is in the appellate record."  Opinion on Direct Appeal at 8.

[34]       The prosecution explained that Batiste wore the necklace because "he's married to a Hispanic person." Tr. Vol. 18 at 174.

across the state, a big package of marijuana from one state to the next, you wear this in hopes that you get to your destination without the cops stopping you, but it's – in the criminal world, it's worn for that, to keep the police away and hope your criminal endeavor goes okay.

Tr. Vol. 18 at 175. Officer Ponder affirmed that "non-gang members, non-criminals, also have items that might have Santa Muerte on them" and "[n]ot everybody wearing a Santa Muerte is a criminal." Tr. Vol. 18 at 176. Officer Ponder also agreed that "somebody who was going to commit a crime might wear" a Santa Muerte necklace. Tr. Vol. 18 at 176.[35]

Officer Ponder then gave extensive testimony about Batiste's various gang-related tattoos. Tr. Vol. 18 at 177-195. The prosecution also set the stage for later discussion of Batiste's prison letters by discussing with Officer Ponder idiosyncratic features in writing and clothing by Crips members. Tr. Vol. 195-200. Trial counsel did not ask Officer Ponder any questions.

Batiste raised several complaints about the necklace and related testimony on direct appeal, including that it "(1) violated his right to the free exercise of religion under the federal and Texas constitutions, (2) was irrelevant under Article 37.071, (3) should have been excluded under Rule 403, and (4) was not properly authenticated." On federal review, Batiste argues that the trial court violated his First Amendment rights by commenting on his religious background and practices.[36] Batiste also claims that trial counsel should have raised a First Amendment objection.

---

[35] Cases have linked the image of Santa Muerte to drug trafficking or criminal activity. *See United States v. Guerrero*, 768 F.3d 351, 356 (5th Cir. 2014); *United States v. Beltran-Aguilar*, 412 F. App'x 171 (10th Cir. 2011); *United States v. Pena Ponce*, 588 F.3d 579 (8th Cir. 2009).

[36] The First Amendment protects an individual's right to associate with others who hold similar beliefs. *Dawson v. Delaware*, 503 U.S. 159, 164 (1992). However, the Constitution does not prohibit the admission of evidence concerning an individual's beliefs and associations at sentencing "simply because those beliefs and associations are protected by the First Amendment." *Id.* at 165; *see also Fuller v. Johnson*, 114 F.3d 491, 498 (5th Cir. 1997) ("The fact that Fuller was within his rights in joining the gang does not bar the use of relevant evidence at trial."). Evidence concerning Batiste's gang membership was admissible because testimony showed he was a member of a gang that committed unlawful and violent acts.

Batiste, however, does not present his First Amendment arguments in a procedural actionable manner.  Trial counsel did not object based on the First Amendment.  Relying on TEX. R. APP. P. 33.1(a)(1)(A), the Court of Criminal Appeals held that Batiste "failed to preserve . . . any First Amendment or religious issue."  Opinion on Direct Appeal at 9.  In other words, the appellate court relied on Texas' contemporaneous-objection rule to preclude consideration of any First Amendment issue.  *See Evans v. Cockrell*, 285 F.3d 370, 373 (5th Cir. 2002) (linking TEX. R. APP. P. 33.1 and Texas' judicial contemporaneous-objection rule).  "The 'Texas contemporaneous objection rule constitutes an adequate and independent state ground that procedurally bars federal habeas review of a petitioner's claims.'"  *Styron v. Johnson*, 262 F.3d 436, 453 (5th Cir. 2001) (quoting *Jackson v. Johnson*, 194 F.3d 641, 652 (5th Cir. 1999).  The First Amendment portions of this claim are procedurally barred.

The Court of Criminal Appeals discussed the Santa Muerte necklace's religious implications in a footnote.  The Court of Criminal Appeals observed that "[a]t no time did the prosecutor or the gang expert suggest that Batiste's necklace had any significance to the exercise of a bona fide religion."  Opinion on Direct Appeal at 9, n.6.  After reviewing state and federal cases addressing the relationship between Santa Muerte worship and drug trafficking, the Court of Criminal Appeals observed that "Officer Ponder never referred to [Batiste's] religious beliefs or affiliations; he simply stated that the Crips gang uses the color blue as was used in the necklace and that the 'grim reaper' pendant is used by criminal gangs.  The logical connection to be made is between 'Santa Muerte' necklace and gang membership and criminal activities, not between wearing a 'Santa Muerte' necklace and being religious or being Catholic."  Opinion on Direct Appeal at 9, n.6.

The state habeas court's reasoning traveled a similar path in finding that trial counsel did not provide ineffective representation by not lodging an objection on First Amendment grounds. The state habeas court held that such an objection would have been meritless because "the State did not introduce into evidence that the scapular had any significance to the exercise of religion." S.H.R. at 990. Also, no prejudice resulted because "the evidence of [Batiste's] two capital murders, an aggravated robbery, and multiple bad acts was particularly strong." S.H.R. at 990. Appellate counsel also did not provide ineffective assistance by not raising trial counsel's effectiveness in that regard because Batiste did "not demonstrate that he would have prevailed on appeal" and because "appellate counsel chose to raise other claims on direct appeal regarding the Santa Muerte scapular." S.H.R. at 990.

The state court's rejection of any First Amendment claims was not unreasonable. This is not a case where, as Batiste alleges, "the State repeatedly injected the issue of religion." Dkt. 9 at 279. The State focused its references to the medallion on the gang and criminal, not religious, implications of wearing it. Interestingly, Batiste has never presented any evidence, through affidavit or otherwise, to establish what the Santa Muerte necklace meant to him. Batiste's briefing presumes that, because the medallion can have a religious meaning, it did to him. The record, however, does not provide any indication of whether Batiste wore the medallion for religious worship, as protection in the drug trade as suggested by the prosecution, or for some unrelated reason.[37] Batiste's claim presumes that he intended the medallion to be a manifestation of sincerely held religious conviction, though the record is entirely silent on that point.

---

[37] The defense, in fact, seemed to question whether Batiste even knew that the necklace represented Santa Muerte. Tr. Vol. 18 at 173.

Even so, Batiste has not identified any case law precluding a trial discussion of a Santa Muerte symbol on First Amendment grounds. Federal courts often cite testimony about the use of Santa Muerte by drug traffickers or other criminals without expressing any constitutional concern. *See United States v. Garcia-Coronado*, 657 F. App'x 648, 649 (9th Cir. 2016); *United State v. Zaragoza-Moreira*, 780 F.3d 971, 976 (9th Cir. 2015); *United States v. Guerrero*, 768 F.3d 351, 356 (5th Cir. 2014); *but see United States v. Medina-Copete*, 757 F.3d 1092, 1095 (10th Cir. 2014) (avoiding any constitutional question because trial discussion of Santa Muerte came through the testimony of a witnesses improperly qualified as an expert). Nevertheless, Officer Ponder's testimony did not necessarily link the Santa Muerte necklace to religious beliefs or practices, but instead observed its common use among some criminals. Officer Ponder also explained the distinctiveness of the necklace in this instance where it, contrary to other practices, contained colors associated with the Crips gang. Batiste has not shown any violation of his First Amendment rights at trial.

Batiste has not shown that the presentation and discussion of the Santa Muerte necklace prejudiced the defense. Whether Batiste casts his claim in a First Amendment, *Strickland*, or other framework, federal relief only becomes available after some showing of harm. Batiste has not shown that the necklace had any measurable effect on the jury's consideration of the special issue questions. The discussion of the necklace was brief. Officer Ponder explained why some people may wear such a necklace, but did not provide the jury with any definitive description of why Batiste chose to do so. Even then, the necklace's "probative value concerning [Batiste's] character and gang membership was not particularly compelling—not nearly as compelling as the myriad gang tattoos on his body . . . ." Opinion on Direct Appeal at 13. The discussion of the necklace was the prelude

to a lengthy and detailed discussion, comprising numerous pages of transcript, of how Batiste adorned himself with other signs of violence and lawlessness. The abundant and detailed testimony about Batiste's numerous gang-related tattoos would eclipse any short mention of the Santa Muerte necklace, particularly given the fact that the State did not return to discuss the necklace in closing arguments but amply addressed his gang tattoos. Nothing else in the record suggested that, as Batiste committed the repeated and extremely violent acts upon which the State premised its punishment case, he relied on divine or talismanic protection. When properly placed in the detailed landscape of the punishment phase, the necklace was of only incidental importance. Whether assessing the trial under a reasonable-probability, harmlessness, or other standard, Batiste has not shown that the admission of, and testimony about, the necklace prejudiced the defense. *See United States v. Esquivel-Rios*, 725 F.3d 1231, 1241 (10th Cir. 2013) (finding any error harmless when a government agent identified a Santa Muerte tattoo).

For the same reasons as discussed above, and in light of the fact that the state habeas court found that the "trial court would not have abused his discretion in overruling a First Amendment objection," Batiste has not shown that trial counsel should have objected to the necklace on First Amendment grounds. S.H.R. at 990. The Court denies Batiste's claims relating to his Santa Muerte necklace.

## L.    Spectator Outbursts and Victim-Impact Testimony

Batiste argues that the trial court violated Texas evidentiary law by allowing victim-impact testimony (claim eighteen) and that courtroom disruptions violated his due process rights (claim nineteen). Batiste's claims arise from three concerns: the trial court (1) did not prevent emotional outbursts by people observing the trial; (2) allowed family members to testify constructively through

emotional outbursts and (3) permitted one victim's mother to relate hearsay statements. Federal procedural and substantive law preclude habeas relief on these claims.

Batiste first argues that outbursts during trial violated his right to confront witnesses and to due process. The record indicates that some family members present in the courtroom reacted emotionally to trial testimony. The State requested that the trial court allow Horace Holiday's mother, grandmother, and uncle to be present in the courtroom during trial. Tr. Vol. 13 at 3. The trial court overruled the defense's objection that family members should be excluded from the courtroom for fear that they would become emotional.

As an assistant medical examiner testified about Mr. Holiday's death, the trial court requested a bench conference because Mr. Holiday's family was "all crying over there." Tr. Vol. 16 at 20-21. The prosecutor opined that she had heard some "sniffling," but had not heard any crying. Tr. Vol. 16 at 22. Trial counsel did not want to draw attention to the crying by asking for a jury instruction, but instead unsuccessfully requested a mistrial. Tr. Vol. 16 at 23.

In another incident, an unidentified spectator loudly said "Amen" when the prosecutor questioned Batiste "[i]f you were scared [during the Black Widow robbery] why did you do this robbery in the first place?" Tr. Vol. 24 at 208. Batiste attributes the outburst to the victim's uncle. Trial counsel did not object to the outburst. The trial court later made the following statement to courtroom spectators outside the jury's presence:

> I wanted to tell the rest of you, we had a little bit of an outburst out there. I'm asking you again if you feel like you can't be quiet while you're sitting there as a spectator in this trial, don't come in because it is – we still have a lot of testimony to go on and we don't want anything to jeopardize the jury. And I would remind you that I would have to use whatever contempt powers I have.
>
> So, please do not say anything while you're sitting out there.

Tr. Vol. 24 at 230. Batiste complains that these audible outbursts deprived him of a fair trial.

On direct appeal, the Court of Criminal Appeals observed that emotional outbursts by grieving family members is "one potential hazard in a society that cherishes the right to a public trial." Opinion on Direct Appeal at 21. The Court of Criminal Appeals continued: "The defendant in a criminal trial has the constitutional right to a trial that is open to the public; and the public – including both the defendant's and victim's family members – also has a right to attend criminal trials." Opinion on Direct Appeal at 21 (footnotes omitted). The Court of Criminal Appeals' review of the record led it to conclude:

> The mere fact that, at a couple of points during gruesome testimony, one or more of Mr. Holiday's family members were crying or sniffling does not show that the trial judge abused his discretion or that [Batiste] was denied a fair trial. Even a disruptive outburst by a witness or other bystander "which interferes with the normal proceedings of a trial will not result in reversible error unless the defendant shows a reasonable probability that the conduct interfered with the jury's verdict."

Opinion on Direct Appeal at 23-24 (quoting *Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009)). The Court of Criminal Appeals did not find any error because "[n]othing in this record suggests that the jury could not (1) ignore those occasions when Mr. Holiday's family members showed some emotion or (2) fairly examine the evidence in arriving at a verdict." Opinion on Direct Appeal at 24. Batiste's briefing does not show that the state court's assessment of those outbursts was unreasonable.

Batiste also complains that outbursts by Mr. Holiday's uncle (who was never called to the stand) was the equivalent of actual testimony, subject to confrontation and cross-examination under *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). The Court of Criminal Appeals, however, correctly observed that *Crawford* "applies only to those who offer testimony or testimonial statements." Opinion on Direct Appeal at 20, n.36. The Court of Criminal Appeals explained that

"Mr. Holiday's uncle cannot be said to have 'testified' against the defendant by sitting in the courtroom during public proceedings, even when he may have exhibited some emotion."  Opinion on Direct Appeal at 20, n. 36.[38]  Batiste has not shown any federal law extending *Crawford* to an outburst by someone who is not testifying.  *See Turner v. Johnson*, 2017 WL 2819039 (C.D. Cal. Mar. 29, 2017) ("Petitioner's right of confrontation was not implicated here because the spectator was not a witness against Petitioner and his comments were not offered as testimony at trial.").  Without clearly established federal law extending *Crawford* in the same manner as in Batiste's claim, and with *Teague*'s limitation on the creation of new law, habeas relief is not available on this argument.

Finally, Batiste complains because the trial court allowed Holiday's mother to relate hearsay statements.  During her trial testimony, Mr. Holiday's mother mentioned that he had saved his money to buy the wheel rims for his Cadillac.  Batiste complains that the contrast between the victim's hard work and his own robbery to obtain the rims was "a contrast that rises to the level of an impermissible use of victim impact evidence to compare the value of the complainant to other members of society."  Dkt. 9 at 287.  The Court of Criminal Appeals refused to consider this argument under TEX. R. APP. P. 33.1 because trial counsel did not make a hearsay objection, a holding that likewise bars federal habeas review.  The Court of Criminal Appeals also found that state law did not forbid that "type of comparison" and that any error was harmless.  Opinion on

---

[38]     Because Batiste "cite[d] no legal authority for his suggestion that 'the presence and actions' of Mr. Holiday's uncle in the courtroom 'were effectively testimonial'" and the Court of Criminal Appeals was "also unable to find any," this "aspect of [Batiste's] claim" was procedurally defaulted as "[in]adequately briefed and present[ing] nothing for review."  Opinion on Direct Appeal at 20, n.36 (citing TEX. R. APP. P. 38.1(I)).  Texas' briefing requirements "constitute[] an independent and adequate state ground for denial of relief that procedurally bars federal habeas review."  *Roberts v. Thaler*, 681 F.3d 597, 608 (5th Cir. 2012).  As Batiste has not shown cause or prejudice to overcome the procedural bar, this Court cannot grant relief on his aspect of his federal claim.

Direct Appeal at 21, n.36.  Because no clearly established federal law prohibits the testimony about Mr. Holiday's efforts to obtain the rims, and the testimony played only a minor role at trial, the state habeas court was not unreasonable in denying this aspect of Batiste's claim.

**M.    Execution-Impact Testimony**

Batiste claims that the trial court should have allowed testimony on how his execution would impact his family members.[39]  Batiste draws comparison to the Supreme Court's holding in *Payne v. Tennessee*, 501 U.S. 808 (1991), which held that the constitution permits the prosecution to present victim-impact evidence.  The Supreme Court, however, has not included execution-impact testimony within the category of mitigating evidence that must be allowed to come before jurors.  *See United States v. Snarr*, 704 F.3d 368, 401-02 (5th Cir. 2013); *United States v. Jackson*, 549 F.3d 963, 969 n.3 (5th Cir. 2008); *Jackson v. Dretke*, 450 F.3d 614, 618 (5th Cir. 2006).  The Fifth Circuit has observed that execution-impact claims

> ignore the reasoning behind the Court's holding in *Payne*.  Because victim impact evidence relates to the harm caused by the defendant, *Payne* held that it is relevant to the jury's assessment of 'the defendant's moral culpability and blameworthiness.'  In this respect, victim-impact evidence fundamentally differs from execution impact evidence, which in no way reflects on the defendant's culpability.

*Snarr*, 704 F.3d at 401-02 (quoting *Payne*, 501 U.S. at 825); *see also Jackson*, 450 F.3d at 618.  For those reasons, the Court of Criminal Appeals rejection of this claim was not contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).

---

[39]    Trial counsel filed a pre-trial Motion to Introduce the Testimony of Defendant's Family and Friends Regarding their Feelings on the Prospect of a Death Sentence.  C.R. at 1742.  The trial court summarily denied that motion.  Batiste argues that the trial court should have allowed the testimony from his family members.

**N. Dismissal for Cause**

Batiste claims that the trial court violated his constitutional rights by granting the State's motion to dismiss prospective juror Alexandria Dunwood for cause. As will be discussed below, the trial court excused Ms. Dunwood because she repeatedly said that she could not return a death sentence in this case. Exclusion of prospective jurors "hesitant in their ability to sentence a defendant to death" without any limitations violates the Fourth and Fourteenth amendments. *Morgan v. Illinois*, 504 U.S. 719, 732 (1992); *see also Adams v. Texas*, 448 U.S. 38, 45 (1980); *Witherspoon v. Illinois*, 391 U.S. 510, 521-22 (1968). The State must demonstrate through questioning that the potential juror it seeks to exclude lacks impartiality, and the judge must then determine whether the state's challenge is proper. *See Wainwright v. Witt*, 469 U.S. 412, 423 (1985). Thus, the key issue is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Id.* at 424 (quoting *Adams*, 448 U.S. at 45).

The exclusion of potential jurors is a question of fact. *See McCoy v. Lynaugh*, 874 F.2d 954, 960 (5th Cir. 1989); *Patton v. Yount*, 467 U.S. 1025, 1036 (1984). The factual determinations of the Texas Court of Criminal Appeals are presumed to be correct, and the petitioner has the burden of rebutting these determinations by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). This Court can grant federal habeas relief only if the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also Fuller v. Johnson*, 114 F.3d 491, 500-01 (5th Cir. 1997) (holding that a trial court's finding of juror bias is entitled to a presumption of correctness)

The prosecution questioned Alexandria Dunwood first. After a few preliminary inquires regarding her responses on the jury questionnaire about capital punishment, the prosecutor observed that Ms. Dunwood had not answered the question of whether she had any moral, religious, or personal beliefs that would prevent her from rendering a verdict that would result in execution. Tr. Vol. 8 at 103. Ms. Dunwood said that she did not answer the question because she "really [didn't] know what [her] answer would be to that question." Tr. Vol. 8 at 103. Throughout the remainder of the State's questioning, Ms. Dunwood consistently expressed that she could not return a verdict resulting in a death sentence. Tr. Vol. 8 at 104-05. After repeated questions resulting in similar answers, the State said that it "has a motion." Tr. Vol. 8 at 105. While the State did not elaborate that it intended to challenge Ms. Dunwood for cause, the defense's subsequent questioning shows that the parties understood that was the State's intention and that the for-cause challenge related to her inability to return a death sentence.

The defense asked several questions, and Ms. Dunwood repeatedly answered that she could not render a death sentence. Ms Dunwood affirmed that she could not do so "no matter what" and without regard to "how bad the case was." Tr. Vol. 8 at 107. Ms. Dunwood's answer to the final question put to her, however, gives rise to the instant claim:

> Q:     Let me see if I hear what you're saying. Are you saying that you might could find someone guilty of capital murder, but you would never be able to give him the death sentence?
> A:     Yes.
> Q:     No matter what the answers to the questions ought to be, you wouldn't be able to answer them because you could not ever participate in giving someone the death penalty?
> A:     True.
> Q:     No matter what they did?
> A:     Uh-huh.
> Q:     No matter how bad it was?

A:      *It depends on what actually happened during the case to me.*

Tr. Vol. 8 at 107 (emphasis added).  The State then objected to "any further questioning" because "She's already made herself clear.  And further battering by the defense counsel I don't think we should get her – make her change her answer to that question."  Tr. Vol. 8 at 107.  The trial court sustained that objection and granted the State's challenge for cause.  Trial counsel, however, had Ms. Dunwood clarify that the defense was not battering her.  Tr. Vol. at 8 at 108.

After the trial court excused Ms. Dunwood, the defense objected that her last answer indicated an ability to serve "depend[ing] on what the evidence was."  Tr. Vol. 8 at 108.  The State responded by asking the trial court to "make a finding on the record as to what her demeanor was and the way she answered the questions . . . ."  Tr. Vol. 8 at 109.  The trial court stated that "[s]he obviously, obviously said that she could not do it.  And I believe that any further questioning would be fruitless."  Tr. Vol. 8 at 109.

Batiste challenged the dismissal of Ms. Dunwood on direct appeal.  Under Texas law, appellate courts review the State's for-cause challenge with "considerable deference" because the trial court is in the best position to evaluate a prospective juror's demeanor and responses.  *Hernandez v. State*, 390 S.W.3d 310, 317 (Tex. Crim. App. 2012).  Texas appellate courts pay particular deference when a prospective juror's answers are vacillating, unclear, or contradictory.  *Id*.  A federal habeas court's respect for such a finding "certainly should be no less."  *Ortiz v. Quarterman*, 504 F.3d 492, 502 (5th Cir. 2007).

Here, the Court of Criminal Appeals found no error in the dismissal of Ms. Dunwood for cause:

> Ms. Dunwood's final statement was the only response indicating that she might be
> open to considering a death sentence.  Viewed in context, that one statement does not

convince us that she was an impartial juror. More importantly, it did not convince the trial judge, to whom we owe great deference. First, Ms. Dunwood had not answered any capital-punishment questions on the questionnaire. When asked why, she explained that initially she was unsure, but, after thinking about it, voting to impose a death sentence was "probably not something [she] could do." Second, Ms. Dunwood agreed that (1) she "could not sit on a jury where the [State] is seeking the death penalty," (2) "it would do violence to [her] conscience to have to answer questions in a way that could cause the defendant to be executed," and (3) she had "conscientious scruples in regard to the infliction of the punishment of death[.]" This is not the mind set of an impartial juror willing to consider both a life and a death sentence.

During defense questioning, Ms. Dunwood continued to answer in the same vein, noting that she "could find someone guilty of capital murder, but [she] would never be able to give him the death sentence." She agreed that "no matter what the answers to the questions ought to be, [she] wouldn't be able to answer them because [she] could not ever participate in giving somebody the death penalty." It was only after all of this questioning, that Ms. Dunwood said that her decision to impose capital punishment "depends on what actually happened during the case."

At best, Ms. Dunwood was a "vacillating juror," but even that is dubious. Only after unequivocally saying that she could not be impartial eight different times, did Ms. Dunwood say that her decision would "depend on the facts of the case." This single response does not establish her ability to follow the law; her answer may have been a concession to stop a seemingly endless barrage of questions. The significance of her answer, taking into account her accompanying tone and demeanor, was a factual determination for the trial judge.

Opinion on Direct Appeal at 34-35.

In all of the repeated questioning, Ms. Dunwood only possibly wavered in one instance. Notwithstanding that answer, the trial court did not hesitate to find that Ms. Dunwood's personal opinions would prevent her from following the law. The "predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from the appellate record." *Id.* at 429. Indeed,

[d]espite this lack of clarity [regarding a prospective juror's bias] in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law . . . [T]his is why deference must be paid the trial judge who sees and hears the juror.

*Witt*, 469 U.S. at 425-26. Despite her single statement during the defense examination, the trial court could reasonably conclude that Ms. Dunwod would "frustrate the State's legitimate interest in administering constitutional capital sentencing schemes by not following [her] oath[]." *Witt*, 469 U.S. at 423. As the trial court clearly could have been "left with the definite impression that [Ms. Dunwood] would be unable to faithfully and impartially apply the law," *Witt*, 469 U.S. at 426, the trial court had a reasonable basis for granting the State's challenge for cause. Batiste, therefore, has not met his AEDPA burden of overcoming the state court's factual determination regarding her answers and demeanor.

## O.     Statements to Police Officers

Batiste made several incriminating statements to police officers after the murder. Immediately after being pulled over, Batiste responded to questions about whether he had been shot. Batiste also confessed to the murder for which he was convicted, and other crimes, during a subsequent police interrogation. After hearing testimony in a suppression hearing, the trial court allowed Batiste's statements to come before the jury.[40] The trial court issued findings and conclusions determining that Batiste's statements were voluntary. C.R. at 1801-05. In claims twenty-five and twenty-six, Batiste complains that the trial court should have suppressed his first statement as it resulted from a custodial interrogation without the safeguards of *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). In claims twenty-seven through twenty-nine, Batiste contends that the trial court should have suppressed his statements during a later police interrogation because he had already made an inadmissible statement. Batiste must show that the state courts were unreasonable in finding that his statements were admissible.

---

[40]     The record contains Batiste's statement to Officer Miller at Tr. Vol. 35, Exhibit DX-1.

*1.      Initial Comments*

Batiste repeatedly shot the victim as he drove down the freeway.  Blood covered the inside of the victim's car when Batiste drove it away from the scene of the murder.  Police officers knew that Batiste had fired shots when the Cadillac had stopped at the gas station; they did not know the whole series of events that led to Batiste stealing the car.  Tr. Vol. 13 at 91. Batiste eluded police officers for some time until spike strips blew out the Cadillac's tires.  Police officers, including Harris County Sheriff Officer Christopher Gore, took Batiste into custody.  Officers handcuffed Batiste and put him in the back of a police car.

At that point, Officer Gore went to "clear[] the vehicle and ma[ke] sure it was safe."  Tr. Vol. 13 at 79.  Officer Gore then noticed "blood spatter throughout the interior of the vehicle and another small caliber handgun in the front seat."  Tr. Vol. 13 at 80.  "With the amount of blood that [he] saw," Officer Gore told another officer: "I wonder if this guy's been shot, there's blood everywhere."  Tr. Vol. 13 at 81.  The other officer said: "Go check on him, make sure he's not injured.  That way if he is we can get him medical attention."  Tr. Vol. 13 at 82.

Officer Gore then approached Batiste who was still sitting in a patrol car, under arrest.  Officer Gore saw blood on Batiste.  Officer Gore asked "if he had been shot."  Tr. Vol. 13 at 82.  The conversation that gives rise to the instant claim then took place:

Batiste:        No, I'm fine.
Officer Gore:  Well, you've got blood all over you.
Batiste:        That's not mine.  That's the driver's.
Officer Gore:  Well, you were driving.
Batiste:         No.  It belongs to the guy I took the car from.

Tr. Vol. 13 at 82-83.  Batiste argues that Officer Gore subjected him to a custodial interrogation and, because he did not receive his *Miranda* warnings, the trial court should not have allowed Officer Gore to tell jurors how Batiste had responded to his questions.

In *Miranda*, the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  384 U.S. at 444.  Custodial interrogation consists of questioning by law enforcement agents "after a person has been taken into custody."  *Id*.  The "term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect."  *Rhode Island v. Innis*, 446 U.S. 291, 300-301 (1980).  An incriminating response is "any statement – whether inculpatory or exculpatory – that the prosecution may seek to introduce at trial."  *Id*. at 301 n. 5.

The State conceded that Batiste was in custody when Officer Gore asked if he had been shot, but argued that Officer Gore did not interrogate him.  Tr. Vol. 13 at 87-88.  The Court of Criminal Appeals found that "[i]t is undisputed that [Batiste] was in custody," leaving only "the legal question [of] whether Sgt. Gore 'interrogated' [him] for the purposes of *Miranda*."  Opinion on Direct Appeal at 37.  Interrogation includes "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  *Innis*, 446 U.S. at 301.  Certain questions "normally attendant to arrest and custody" such as those concerning a suspect's "name, address, height, weight, eye color, date of birth, and current age" are not an interrogation.  *See Pennsylvania v. Muniz*, 496

U.S. 582 (1990). The State argued that Officer Gore's questions were not the functional equivalent of an interrogation because he "had a responsibility to make certain [Batiste] was not injured." Tr. Vol. 13 at 88.

Here, Officer Gore's question about whether Batiste was injured was not "reasonably likely to elicit an incriminating response." *Innis*, 446 U.S. at 301. On direct appeal, the Court of Criminal Appeals could not "say that Sgt. Gore was acting under the guise of inquiring about [Batiste's] medical condition, but actually hoping to elicit an incriminating response." Opinion on Direct Appeal at 39.[41] Officer Gore "repeatedly explained that his sole purpose in questioning was to 'check on his medical condition.'" Opinion on Direct Appeal at 39. The Court of Criminal Appeals observed that "police officers are under a general duty to ensure that, if a suspect is injured, he is provided proper medical attention. The question Sgt. Gore asked [Batiste] was in furtherance of this duty. Once Sgt. Gore was assured that [Batiste] did not need immediate medical attention, he ceased questioning." Opinion on Direct Appeal at 40. Even looking at the question "from a suspect's point of view," the question posed "was not one likely to elicit an incriminating response," because it only required a yes or no answer, neither of which "would have been incriminating." Opinion on Direct Appeal at 40. Officer Gore made "an inquiry that was appropriate under the circumstances and one that did not raise any concern of coerciveness or compulsion." Opinion on Direct Appeal at 41.

---

[41] The Court of Criminal Appeals "review[s] a trial judge's denial of a *Miranda*-violation claim under a bifurcated standard." When the trial judge has made factual findings, the Court of Criminal Appeals "afford[s] almost total deference . . . to fact rulings that turn on credibility and demeanor." Opinion on Direct Appeal at 39. "When there is no factual dispute as to whether *Miranda* warnings were given, what questions the officer asked, or what answers the defendant gave, the question of whether the defendant was subjected to 'interrogation' is a mixed question of fact and law reviewed *de novo* because there are no disputed issues of fact that depend upon credibility or demeanor." Opinion on Direct Appeal at 39.

Batiste has not shown that general on-the-scene questioning which enables an officer to determine if a suspect as been injured is an interrogation under *Miranda*.

Batiste provided a confusing answer to Officer Gore's initial question. He told Officer Gore that the driver had been shot, but without more-detailed information about the circumstances leading up to the chase, Officer Gore would not know that Batiste meant the victim. As the Court of Criminal Appeals observed, Batiste "responded with an answer to that question [which] was confusing and required some follow-up to ensure that (1) [he] was not actually suffering from a serious wound or trauma but was too confused or delusional to relay the correct information to the officer, or (2) there was not another person—perhaps the driver—who had been in the car with him, who may have left the scene, and was either a security threat or in need of immediate medical attention." Opinion on Direct Appeal at 41. "In sum, Sgt. Gore's questions neither presented [Batiste] with the 'psychological intimidation' associated with a police interrogation nor was it an underhanded way of bypassing *Miranda* and eliciting an incriminating response." Opinion on Direct Appeal at 41. Batiste's answer that the blood belonged to "the driver" confused the officers who had just seen him drive the car. Tr. Vol. 13 at 82-85, 92-93. Because Officer Gore's follow-up question was not reasonably likely to evoke an incriminating response, but only clarified who had been the driver that had left so much blood in the car, it does not constitute interrogation. *See Innis*, 446 U.S. 291 at 301. The state habeas court's rejection of Batiste's challenge to his initial statements was not contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

   2.   *Police Statements*

Batiste made several incriminating statements after the police transported him to the police station. Batiste first gave a recorded statement in which he confessed to the murder for which he was

eventually convicted. Tr. Vol. 14 at 138-48. About twelve hours later, a police officer interrogated Batiste about the murder he committed at the Black Widow tattoo parlor. The police officer taking that statement said that he delivered the *Miranda* warnings before speaking to Batiste. Tr. Vol. 11 at 59. Batiste gave an initial unrecorded confession to the crime, followed by a recorded statement reconfirming his guilt. A different officer later took a recorded statement in which Batiste confessed to robbing the Phat Kats tattoo parlor.

The trial court found that the police properly warned Batiste prior to each interview and statement. C.R. at 1800-04. Batiste presents no evidence to rebut the state court's findings. Batiste nonetheless claims that the trial court should have suppressed all these statements because they violated the rule set forth in *Missouri v. Seibert*, 542 U.S. 600 (2004).

In *Seibert*, the police diluted the effect of *Miranda* warnings through a two-step strategy: a detective exhaustively questioned the suspect until securing a confession and then, after a brief break, delivered the *Miranda* warnings and had the suspect repeat the earlier confession. *Seibert* addressed a specific concern: "the strategy of withholding *Miranda* warnings until after interrogating and drawing out a confession." 542 U.S. at 609; *see also United States v. Montalvo-Rangel*, 437 F. App'x 316, 319 (5th Cir. 2011) (stating that *Seibert* condemned a "question first" police tactic, "a strategy by which officials interrogate an individual without administering a *Miranda* warning, obtain an admission, administer a *Miranda* warning, and then obtain the same admission again"). Batiste claims that Officer Gore intentionally interrogated Batiste and, once he inculpated himself, only then warned him of his constitutional rights in the subsequent questioning.

On direct appeal, the Court of Criminal Appeals found that Batiste had procedurally defaulted consideration of this claim by not making an argument for their suppression under *Seibert*. Opinion

on Direct Appeal at 44. Because Batiste has not shown cause or prejudice to overcome that state-law ruling, a procedural bar precludes federal consideration of this claim.

In the alternative, the Court of Criminal Appeals found that Batiste's *Seibert* claim lacked merit:

> Even if [Batiste] had preserved this issue for appeal, his claim is without merit. As we have previously concluded, [Batiste's] roadside statement to Sgt. Gore was not the product of custodial interrogation, and therefore Sgt. Gore was not required to give [him] any *Miranda* warnings before [his] responses were admissible at trial. Because [Batiste's] first statement was not the product of custodial interrogation, *Seibert* is inapplicable as the "question first, warn later" situation arises only when both the unwarned and warned statements are the product of custodial interrogation. Furthermore, there is no suggestion that the three officers who obtained station house confessions ever mentioned any statement that [Batiste] had already made to Sgt. Gore, or that Sgt. Gore's inquiry had been part of a deliberate two-step interrogation.

Opinion on Direct Appeal at 44-45. Batiste's federal *Seibert* claim is also wholly dependant on the presence of constitutional error in his statement to Officer Gore. Because Batiste has not shown that Officer Gore violated his constitutional rights through the same "question first, warn later" procedure condemned in *Seibert*, he has also not demonstrated any constitutional violation. Batiste has not shown that the state court adjudication was unreasonable, and accordingly has not shown that he merits habeas relief.

## IV. CERTIFICATE OF APPEALABILITY

Under AEDPA, a prisoner cannot seek appellate review from a lower court's judgment without receiving a Certificate of Appealability ("COA"). *See* 28 U.S.C. § 2253(c). Batiste has not yet requested that this Court grant him a COA, though this Court can consider the issue *sua sponte*. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000). "The COA statute establishes procedural rules and requires a threshold inquiry into whether the circuit court may entertain an appeal." *Slack v. McDaniel*, 529 U.S. 473, 482 (2000). A court may only issue a COA when "the

applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C.

§ 2253(c)(2).

The Fifth Circuit holds that the severity of an inmate's punishment, even a sentence of death, "does not, in and of itself, require the issuance of a COA." *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000). The Fifth Circuit, however, anticipates that a court will resolve any questions about a COA in the death-row inmate's favor. *See Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000). The Supreme Court has explained the standard for evaluating the propriety of granting a COA on claims rejected on their merits as follows: "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack*, 529 U.S. at 484; *Miller-El*, 537 U.S. at 336-38. On the other hand, a district court that has denied habeas relief on procedural grounds should issue a COA "when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Slack*, 529 U.S. at 484; *Miller-El*, 537 U.S. at 336-38. Unless the prisoner meets the COA standard, "no appeal would be warranted." *Slack*, 529 U.S. at 484.

Batiste's petition raises issues worthy of judicial review. Nevertheless, having considered the merits of Batiste's petition, and in light of AEDPA's standards and controlling precedent, this Court determines that a COA should not issue on any claim.

## V. CONCLUSION

For the reasons described above, the Court GRANTS Respondent's motion for summary judgment, DENIES Batiste's petition, and DISMISSES this case WITH PREJUDICE. All other requests for relief are DENIED. The Court will not certify any issue for appellate review.

Signed at Houston, Texas on September 19, 2017.

_____
Gray H. Miller
United States District Judge